Michael J. Gearin, WSBA # 20982
David C. Neu, WSBA # 33143
Brian T. Peterson, WSBA # 42088
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580

Honorable Christopher M. Alston
Chapter 11
Location: Seattle, Courtroom 7206
Hearing Date: June 22, 2016

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

In re:

NORTHWEST TERRITORIAL MINT, LLC,

Case No. 16-11767-CMA

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY HEARING SCHEDULED FOR JUNE 22, 2016

## I.    INTRODUCTION

Mark Calvert, Chapter 11 Trustee (the "Trustee") for the Northwest Territorial Mint, LLC ("NWTM"), in the above-captioned proceeding, by and through his attorneys, K&L Gates, LLP, respectfully submits this prehearing brief related to the legal standard to be applied at the June 22, 2016 evidentiary hearing and the evidence that the Trustee will present. In summary, the evidence will show that the source of monies paid to Todd Tracy Law Group ("TTLG") as a retainer for legal representation (the "Retainer Funds") was precious metals and cash which Diane Erdmann and Ross Hansen stole from NWTM in the weeks prior to its bankruptcy filing. The evidence will show that Ms. Erdmann, who has lived with Ross Hansen, the owner of NWTM, as *de facto* husband and wife for the past sixteen years, had absolute and unfettered access to the vault (the "Vault") at NWTM's Federal Way, Washington, facility. Although she was not paid a wage by NWTM, Ms. Erdmann served as its "Vault Manager," a position in which she controlled the cash and bullion stored in the Vault, and was responsible for maintaining (or not maintaining) the records related thereto. The

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 1

K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 409    Filed 06/15/16    Ent. 06/15/16 16:39:12    Pg. 1 of 15

evidence will show that on the same day that a jury entered a verdict against NWTM in the United States District Court for the District of Nevada, Ms. Erdmann ceased maintaining the meager records, which she had previously maintained, related to the cash and precious metals held in the Vault, and that in the days leading up to NWTM's bankruptcy filing, she and Ross Hansen removed cash and other items from the Vault. The evidence will show that the cash and bullion removed from the Vault were the ultimate source of the Retainer Funds.

## II. STATEMENT OF FACTS

### A. Northwest Territorial Mint

At the time of its filing, NWTM billed itself as the largest private mint in the United States. As of April 1, 2016 it had approximately 240 employees located at facilities in six states. NWTM's business operations included custom minting of medals and commemorative coins as well as on-line and walk-in sales of precious metals and coins (the "Bullion Business"). Despite its size, and the breadth of its business, all facets of its operations were exclusively controlled by Ross Hansen, its 100% owner. Ross Hansen oversaw every aspect of NWTM's operations, and notwithstanding organization charts showing different levels of management, every employee effectively reported directly to Ross Hansen.

In 2010 NWTM leased a building in Federal Way, Washington (the "Federal Way Building"). As well as serving as NWTM's corporate headquarters, the Federal Way Building is the site at which the majority of the Bullion Business was conducted. The Federal Way Building contains a vault room (the "Vault"), with several safes containing bullion, coins, and cash. Walk-in sales of bullion to customers of NWTM were also offered at the Federal Way Building.

### B. Diane Erdmann's Background and Responsibilities at the NWTM

Other than her unpaid position at NWTM, Diane Erdmann has held one job since graduating from high school. From 1992 until 1993 she held a job checking-in specimens at a medical laboratory. In 1993 her husband was diagnosed with cancer, and Ms. Erdmann quit her job to care

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 2

K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 409    Filed 06/15/16    Ent. 06/15/16 16:39:12    Pg. 2 of 15

for him. He passed away in 1993, and on May 13, 1993, Ms. Erdmann received a check for $133,900 (the "Life Insurance Proceeds") from Servicemen's Group Life Insurance.

Diane Erdmann and Ross Hansen met in 1997, ostensibly when Ms. Erdmann purchased gold and silver coins from NWTM. Prior to meeting Ross Hansen, Ms. Erdmann lived with her mother, and had been unemployed since 1993. Ms. Erdmann began living with Ross Hansen in 2000, and started working at NWTM in the same year. They have lived together as *de facto* husband and wife since that time. Despite working for NWTM, Ms. Erdmann has never been an employee of NWTM, and she received no salary for the services she provided to NWTM. Mr. Hansen also received no salary from NWTM. Instead, when either Diane Erdmann or Ross Hansen needed money, they would take cash from the Vault as an "owner's draw." Other than these "owner draws" Ms. Erdmann has had no source of income since 1993.

When she started working at NWTM, Ms. Erdmann was given the responsibility and job title of "shipping manager." In the context of that position, Ms. Erdmann was responsible for packaging and filling bullion order received from customers. In 2005, while working at NWTM's facility located in Auburn, Washington, Ms. Erdmann was given the responsibility of "watching the vault [located at the Auburn facility] and tracking the metals throughout the company." In 2010, when NWTM moved into the Federal Way Building, Ms. Erdmann was put in charge of the Vault at that location. Ms. Erdmann was the only "employee" of NWTM, exclusive of Ross Hansen, with access to the gold stored in the Vault. In addition to precious metals, significant amounts of cash, as much as a million dollars at one point, were also kept in the Vault.

Astoundingly, despite being the Vault Manager, Ms. Erdmann maintained almost no records related to the precious metals and cash stored in the Vault. In her words, maintaining records, such as an inventory, "would have been far too time-consuming." NWTM "found it better to put one person [Diane Erdmann] in the [Vault] to be a kind of gatekeeper." The sole computer records kept related to the potentially millions of dollars worth of NWTM-owned bullion and cash stored in the

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 3
K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 409    Filed 06/15/16    Ent. 06/15/16 16:39:12    Pg. 3 of 15

Vault were two spreadsheets, both maintained by Diane Erdmann. The first, called a stock sheet ("Stock Sheet") was nothing more than a spreadsheet with a list of a few of the more common forms of bullion sold by NWTM (such as Gold Maple Leaf coins), on which Ms. Erdmann would notate the quantity of each held in the Vault. Not only was the Stock Sheet file not an inventory by any stretch of the imagination, it was overwritten daily so that it could not even be used as a running inventory of the few items that it tracked. At best, the Stock Sheet was a way for sale personnel to see if NWTM might have an item on hand that could be sold. The second record maintained by Ms. Erdmann was a running spreadsheet of cash kept in the vault (the "Vault Cash Log"). The Vault Cash Log was nothing more than a running tally of money deposited or removed from the vault, with a notation as to the source or use of the cash.

Ms. Erdmann was truly, as she stated, the "gatekeeper" of the bullion and cash. When a salesperson needed bullion to fill and order, or a sample to show a customer, they would have to get the bullion from Ms. Erdmann. She was the only person with authority to remove bullion (other than silver) from the Vault and the only person with the combination to the safes in which gold, platinum and palladium were kept. The fact that only she had access to the bullion was NWTM's sole theft-prevention measure with respect to gold, platinum, and palladium. Unfortunately, this theft prevention measure did nothing with respect to potential theft by Ms. Erdmann or Ross Hansen, and the lack of any inventory or useful records meant that theft by Ms. Erdmann or Mr. Hansen could not be detected.

C. The Cohen Judgment

In August, 2012, Bradley Stephen Cohen and Cohen Asset Management Inc. (collectively, the "Cohen Parties") commenced a lawsuit in the United States District Court for the District of Nevada, under case no. 12-01401 (the "Cohen Lawsuit"). The defendants in the Cohen Lawsuit included, amongst others, Ross Hansen and NWTM. The allegations in the Cohen Lawsuit were that Ross Hansen and others defamed the Cohen Parties by creating vindictive websites accusing Bradley

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 4

K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 409    Filed 06/15/16    Ent. 06/15/16 16:39:12    Pg. 4 of 15

Stephen Cohen, an investment manager, of running a Ponzi scheme. On February 17, 2016, the jury empaneled in the Cohen Lawsuit returned a verdict finding Ross Hansen, NWTM, and the other defendants liable for damages. On March 1, 2016, a judgment was entered in the Cohen Lawsuit. Judgment was entered in the amount of $12,500,000 as to NWTM, and judgment was entered against Ross Hansen in the amount of $25,500,000 (the "Judgment").

### D. Diane Erdmann's and Ross Hansen's Actions Prior to NWTM's Bankruptcy

#### 1. Diane Erdmann ceases maintaining records

As set-forth above, Ms. Erdmann was in charge of maintaining the meager business records which NWTM maintained with respect to the cash and bullion stored in the Vault. Specifically, she maintained the Stock Sheet and Vault Cash Log. Although she maintained these Excel Spreadsheets, they were stored on a shared drive, where other NWTM employees could access them. Significantly, on February 17, 2016, the very day that the jury in the Cohen Lawsuit returned a verdict against NWTM and Ross Hansen, Ms. Erdmann ceased maintaining the Vault Cash Log. From that point forward, the only records of cash flowing into and out of the Vault were daily handwritten "vault logs" (the "Till Sheets"). A Till Sheet is a simple printed form with five columns - Amount, In, Out, Notes, and Initials. Every Day a fresh Till Sheet would be taped to the top of the cash till kept in the Vault, and over the course of the day cash additions and withdrawals would be logged onto the Till Sheet by hand. Although Ms. Erdmann ceased maintaining the Vault Cash Log, Annette Trunkett, an accounting employee, did her best to update the Vault Cash Log using the daily Till Sheets. Although the practice had been to start a fresh Till Sheet every day, on March 24, 2016, Ms. Erdmann forbade Ms. Trunkett from reviewing the Till Sheet or removing it from the till box so that the Vault Cash Log could be updated. During the period following March 24, 2016, until Ms. Erdmann ceased working at NWTM, April 12, 2016, cash deposits and withdrawals were noted on a single Till Sheet (the "Final Till Sheet"), maintained by Ms. Erdmann. The transactions recorded maintained on the Final Till Sheet contain no date on the Final Till Sheet, so it is impossible to tell

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 5

K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA   Doc 409   Filed 06/15/16   Ent. 06/15/16 16:39:12   Pg. 5 of 15

when Ms. Erdmann ceased maintaining it. The last entry on the Final Till Sheet, a disbursement of $500 would have left $189,367.76 in the Vault. On April 12, 2016, when Ms. Erdman ceased working at NWTM, the cash balance in the Vault was $1,672.34.

In addition to ceasing maintenance of the Vault Cash Log, in March, 2016, Ms. Erdmann appears to have stopped keeping the Stock Sheet on the shared drive. The last version on the shared drive was accessed last in March, 2016, and saved without information filled-in. Accordingly, there was no shared record of whether any of the items tracked on the Stock Sheet were in the Vault in later March, 2016, or any time thereafter.

### 2. Diane Erdmann opens new safety deposit boxes

Prior to late 2015, Ms. Erdmann maintained a single safety deposit box at Wells Fargo Bank. In October, 2015, she opened a new "small" safety deposit box, and on March 8, 2016, Diane Erdmann opened three new medium safety deposit boxes.

### 3. Increased coming and going

On a typical workday, Diane Erdmann would arrive at the Federal Way Building at approximately 9:30 a.m., and she would work until 6 or 7 p.m. It was uncommon for Ms. Erdman to leave the facility during the work day for lunch (other than to pick up lunch and bring it immediately back) or otherwise. Accordingly, Ms. Erdmann's frequent coming and goings from the facility, commencing in March, 2016, were noticed by other employees. Rather than sitting at her work station all day, as was her practice, other employees noticed that she starting leaving and returning at irregular times during the day, sometimes with Ross Hansen and sometimes alone.

### 4. Diane Erdmann and Ross Hansen remove items from the Vault

On Saturday, March 26, 2016, and again on Easter Sunday, March 27, 2016, the security cameras in the Vault and Federal Way Building recorded Diane Erdmann and Ross Hansen removing boxes from the Vault after business hours. On March 26, 2016, at approximately 8:10 p.m., Diane Erdman and Ross Hansen arrived at the Federal Way Building and shortly thereafter

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 6

K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA   Doc 409   Filed 06/15/16   Ent. 06/15/16 16:39:12   Pg. 6 of 15

were captured on video in the Vault. In the video, Ms. Erdmann can be seen opening the safe in which gold and other high value bullion was kept, and removing two medium-sized, and one large box from the safe while Ross Hansen watches. Security footage shows that Ross Hansen carried the boxes out of the Federal Way Building at approximately 8:18 p.m.

The following night, Easter Sunday, Ms. Erdmann and Ross Hansen were captured on security video arriving at the Federal Way Building at approximately 8:16 p.m. Ms. Erdmann and Mr. Hansen were filmed entering the Vault at 8:22 p.m., and filling a box with items taken from a safe and other locations in the Vault. They left the Vault with the box at approximately 8:27 p.m. and were filmed leaving the Federal Way Building, with the box.

### E. Funding of the Retainer and Events of March 31, 2016

#### 1. The $50,000 wire

On March 31, 2016, the Retainer Funds were paid to TTLG. $50,000 of the Retainer Funds were paid via a wire transfer from Ms. Erdmann's bank account at Wells Fargo Bank (the "Retainer Wire Portion"). In a declaration filed on May 2, 2016 Ms. Erdman describes the transaction as follows: "I transferred $50,000 from my individual checking account by wire transfer." What Ms. Erdmann failed to state in her declaration is that on the same day, March 31, 2016, she deposited $50,000 in cash into her checking account and immediately wired it out. Just two weeks earlier, on March 17, 2016, Ms. Erdmann paid another retainer, to a law firm in North Carolina, by depositing $25,000 in cash into her back account and wiring it out the same day.

#### 2. The coin sale

On the morning of March 31, 2016, Ms. Erdmann arrived for work at approximately 8:40 a.m. carrying a medium-sized black zip-up bag (the "Black Bag"). Ms. Erdmann placed the Black Bag under her work station. Later in the day, on March 31, 2016, David Huffman, NWTM's head of security was called into Ross Hansen's office. Ross Hansen instructed Mr. Huffman to go the Vault and pick up the Black Bag from M. Erdmann, which he indicated was full of gold bullion, and to

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 7
K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 409    Filed 06/15/16    Ent. 06/15/16 16:39:12    Pg. 7 of 15

take it to a refinery in Mount Vernon. Once there, he was to allow the manager of the refinery to "pick through" the bag, and take whatever he wanted. Ross Hansen informed Mr. Huffman that the manager was to then create a check in Diane Erdmann's name. As instructed, Mr. Huffman went to the Vault, where Ms. Erdmann handed the Black Bag to him. Mr. Huffman left the Federal Way Building and began driving to Mount Vernon. About half-way to Mount Vernon, Mr. Huffman received a phone call from Ross Hansen, instructing him to turn around, and to take the Black Bag to the Seattle Coin Shop in Wedgewood. There, John Drummey, the owner, would pick through the bag for items he wanted to purchase, and would issue a check to Diane Erdmann.

Per Ms. Erdmann, the Black Bag contained approximately 200 ounces of gold bullion in the form of coins and small bars. At the Seattle Coin Shop, Mr. Drummey "picked through" the bag and took eighty (80) 1 oz. gold coins. Mr. Drummey and Mr. Hansen, who was carrying the Black Bag with the remaining 120 ounces of bullion, walked to a nearby branch of Key Bank, where a cashier's check in the amount of $99,460 (the "Check") was issued, made out to Diane Erdman. Mr. Huffman drove back to the Federal Way Building with the check and Black Bag. Once there, he returned the Black Bag to Ross Hansen in his office, who instructed him to drive to TTLG's office and deliver the Check. Ms. Erdmann, who was also in Ross Hansen's office, endorsed the Check to TTLG and handed it to Mr. Huffman. As instructed, Mr. Huffman drove the Check to Seattle and delivered it to Todd Tracy.

### III. STATEMENT OF TRIAL ISSUES

1) Does the NWTM bankruptcy estate have an interest in the Retainer Funds?

2) What is the nature of the estate's interest in the (Funds) Retainer?

3) Whether any of Ms. Erdmann's actions constitute violations of the automatic stay of 11 U.S.C. 362?

4) Whether Ms. Erdmann should be sanctioned for violating 11 U.S.C. §362, and if so, in what amount?

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 8

K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 409    Filed 06/15/16    Ent. 06/15/16 16:39:12    Pg. 8 of 15

## IV. LEGAL STANDARD

NWTM's bankruptcy estate is comprised of all "legal or equitable interests of [NWMT] in property as of the commencement of the case." 11 U.S.C. §541(a)(1). The statutory definition of estate property is broadly construed. *United States v. Whiting Pools, Inc*., 462 U.S. 198, 203, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). The burden of proof as to what is property of the estate rests with the non-debtor. *In re Altman*, 230 B.R. 6, 11 (Bankr. D. Conn. 1999).[1] The nature and extent of the debtor's interest in property is determined by state law. *In re Cogar*, 210 B.R. 803, 809 9th Cir BAP 1997).

### A. The Debtor Owns the Retainer Funds

It is axiomatic that a thief does not take title to assets stolen from another. *State v. Hermann*, 138 Wn. App. 596, 604 (2007) ("it is well established that a thief does not take title to stolen property"). Accordingly, to the extent the Retainer Funds can be traced to property stolen from NWTM pre-petition, NWTM retains ownership of such Retainer Funds.

The Retainer Funds consist of two components - cash which Ms. Erdmann took directly from the Debtor, and the proceeds of the sale of gold bullion stolen from the Debtor. It is expected that Ms. Erdmann will contend that the source of the Retainer Funds was the approximately $130,000 in Life Insurance Proceeds, paid to her twenty-three years ago. Ms. Erdmann claims that in 1997, using some of the Life Insurance Proceeds, she purchased gold and silver bullion from NWTM in approximately three transactions of $10,000 each, and that by executing a few swaps of silver for gold, and vice versa, in 2008 and 2009, she was able to parlay her initial investment into the sizeable amounts of cash and bullion she held immediately prior to March 31, 2016. Ms. Erdmann's

---

[1] At the hearing on May 6, 2016, this Court stated, "[Ms. Erdmann] has put into issue the source of these funds by claim that money she got 23 years ago was put into property and it was that particular property [that paid the retainer] . . . She needs to prove her claims. She needs to provide the evidence to prove that."

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 9

K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 409    Filed 06/15/16    Ent. 06/15/16 16:39:12    Pg. 9 of 15

explanation is simply not credible. The Trustee will establish, at trial, that Ms. Erdmann purchased no more than $10,000 to $15,000 of bullion from NWTM, net, in 1997. It is undisputed that she had no source of income between 1993 and 2000, and has received no salary since that date. Somehow, this $130,000 payout in 1993 has not only covered twenty-three years of living expenses (even if one assumes such expenses were only $4,000 a year, such expenses would total $92,000), but she was able to transform it into $175,000 in cash and gold used to pay attorney retainers in March, 2016, approximately $150,000 in gold and silver which she claims to own, currently held by the King County Sherriff, and an undisclosed amount of bullion held on her behalf by friends. Notwithstanding Ms. Erdmann's contention that she owned hundreds of thousands of dollars of precious metals and large amounts of cash, she has absolutely no records that would substantiate her claim. She has no records related to bullion purchases or the alleged trades which somehow multiplied her bullion from tens of ounces to hundreds. There are no insurance policies, photographs, inventories, or even first-hand accounts from uninterested parties as to Ms. Erdmann's cash and bullion collection. Simply put, other than the word of Ross Hansen and Diane Erdmann, there is not a scintilla of evidence to support her story.

The far more rational explanation as to the source of the Retainer Funds is that Ms. Erdmann and Mr. Hansen helped themselves to NWTM's assets on the eve of bankruptcy. NWTM was a sinking ship in the weeks prior to its bankruptcy filing, and Ross Hansen was clearly a desperate man. Not only was Ross Hansen personally subject to an insurmountable debt of $25 million as a result of Cohen Lawsuit, but his and Ms. Erdmann's sole source of money, NWTM, was also subject to a judgment that was sure to drive it out of business. The fact that he and Ms. Erdmann had exclusive access to NWTM's cash and bullion assets, which were largely untraceable due to NWTM's poor records, was certainly a temptation that could not be ignored. Ms. Erdmann had sole control over the Vault, and any records of what might be stored in the Vault. Following the jury verdict in the Cohen Lawsuit, she ceased keeping even the meager records she had previously

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 10

K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 409    Filed 06/15/16    Ent. 06/15/16 16:39:12    Pg. 10 of 15

maintained, creating a situation where no records would exist of missing assets. In the month of March, 2016, she opened several safety deposit boxes and deposited tens of thousands of dollars in cash in her bank account. She and Ross Hansen were caught on security footage taking boxes of NWTM's property from the vault less than a week before the Retainer Funds were paid. There is only one explanation for the source of the Retainer Funds.

B. <u>Even if the Life Insurance Proceeds were the Source of Retainer Funds, the Estate Maintains an Interest</u>

The parties are in agreement regarding the nature of the retainer paid to TTLG - it was an advance fee retainer. Accordingly, upon the filing of NWTM's bankruptcy proceeding, the Retainer Funds became property of the bankruptcy estate. *In re Radulovic*, 2006 WL 6810999 at *3 (9th Cir. BAP 2006) ("we conclude that the retainer fee was an advance fee deposit that became property of the estate within the meaning of §541"). There can be no dispute that the Retainer Funds were paid to TTLG to satisfy NWTM's obligation under its agreement to TTLG. On March 31, 2016, NWTM signed an engagement agreement (the "Engagement Agreement") with TTLG. Under the terms of the Engagement Agreement, TTLG required a security retainer of $150,000 as a condition to filing NWTM's bankruptcy proceeding. The <u>only</u> agreement regarding the retainer is between TTLG and NWTM. There is no agreement between TTLG and Diane Erdmann. In fact, Todd Tracy and Ms. Erdmann have never spoken at all.

Assuming, for the sake of argument, that the Retainer Funds really were paid from the Insurance Proceeds, they were clearly paid for NWTM's benefit and to satisfy its obligations under the Engagement Letter. Property of the estate includes property in which the debtor holds a beneficial interest. *In re Brown*, 2006 WL 6810938 at *9 (9th Cir. BAP 2006) (quoting legislative history at 124 Cong. Rec. H11096 (daily ed. Sept. 28, 1978). In a case with similar fact patterns, a girlfriend writing a check to pay a retainer to her boyfriend's divorce attorney, the United States Bankruptcy Court for the District of Pennsylvania, in addressing whether such funds were property

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 11

K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 409    Filed 06/15/16    Ent. 06/15/16 16:39:12    Pg. 11 of 15

of the boyfriend's bankruptcy estate asked "[t]he question is whether the form the transfer took should determine the outcome here." *In re Datesman*, 1999 WL 608856 at *3 (Bankr. E.D. Pa. 1999). It found that the "source of the payment . . . does not preclude Debtor's interest in it from being property of his estate." *Id.* at *4. As in *Datesman*, the fact that Diane Erdmann paid the Retainer Funds (a fact which the Trustee disputed) does not preclude the estate from holding an interest.

C. Ms. Erdmann's and Mr. Hansen's Actions Violate 11 U.S.C. §362

The automatic stay protects the estate from any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. 11 U.S.C. §362. Because the Retainer Funds are estate property, Ms. Erdmann and Mr. Hansen's actions to obtain the Retainer Funds from TTLG violate the stay. Almost immediately after appointment of the Chapter 11 Trustee, Ross Hansen contacted Mr. Tracy and demanded that he release the Retainer Funds to Diane Erdmann. When Mr. Tracy indicated that he could not return the Retainer Funds given that the Trustee was investigating the source of the Retainer Funds, Mr. Hansen informed Todd Tracy that he (Ross) had spoken with the Trustee, and the Trustee authorized the release of the Retainer Funds. Mr. Tracy called the Trustee's attorney who refuted Mr. Hansen's story. Following this exchange, Mr. Tracy informed Ross Hansen that he would not release the Retainer Funds without written authorization from the Trustee. Later that day, Todd Tracy returned to the office to find Ross Hansen personally waiting for him. Mr. Hansen again attempted to convince Todd Tracy to release the Retainer Funds. When Mr. Tracy refused, Mr. Hansen verbally threatened him, stating that that he would "make [Mr. Tracy's] life a living hell."

On the same day that the exchanges detailed above occurred, April 14, 2016, Ms. Erdmann filed a complaint against Todd Tracy with the Washington State Bar Association (the "Bar Complaint), raising the possibility that TTLG had misappropriated the Retainer Funds. On the following day, April 15, 2016, Ms. Erdmann filed a complaint against TTLG with the Office of the

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 12

K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 409    Filed 06/15/16    Ent. 06/15/16 16:39:12    Pg. 12 of 15

Washington Attorney General (the "AG Complaint"). The AG Complaint was clearly retaliatory and designed to exert pressure on TTLG to release the Retainer Funds. Despite this Court's ruling on May 9, 2016, that TTLG continue to hold the Retainer Funds, Ms. Erdmann has not withdrawn the AG Complaint or the Bar Complaint. In fact, she has doubled-down, filling a supplement to the Bar Complaint, dated June 1, 2016, further accusing Mr. Tracy of ethical violations and committing malpractice.

Ms. Erdmann and Mr. Hansen have clearly violated the automatic stay. Despite personal knowledge of the source of the Retainer Funds, Ms. Erdman and Mr. Hansen have gone to extraordinary lengths to strong-arm Mr. Tracy into releasing the Retainer Funds to them. They have lied. They have threatened. Finally they have filed professional complaints against Mr. Tracy with clearly punitive and vindictive motivations and with the intention of pressuring him to release estate property.

### D. Amount of Sanctions

The Court has inherent authority under its Section 105(a) contempt powers to award sanctions to the Trustee for Ms. Erdmann's and Mr. Hansen's violations of the automatic stay. *In re Dyer*, 322 F.3d 1178, 1190 (9th Cir. 2003); *In re Del Mission Ltd.*, 98 F.3d 1147, 1150 (9th Cir. 1996). The standard for imposition of sanctions under 11 U.S.C. §105(a) is that the violation be willful. *Dyer*, 322 F.3d 1191. "Willful" does not require intent to violate the stay, rather the Court need only find that Ms. Erdmann and Mr. Hansen knew of the automatic stay and that the actions which violated the stay were intentional. *Id*. Ms. Erdmann and Mr. Hansen's actions are both willful and ongoing. On May 6, 2016, this Court warned Ms. Erdmann and Mr. Hansen of the fact that their actions may have violated the automatic stay. Instead of taking the Court's warning, and remedying such violations,[2] Ms. Erdmann filed a supplement to her bar complaint against Todd

---

[2] A party that has violated the stay has an affirmative obligation to remedy such violation. *In re Abrams*, 127 B.R. 239, 244 (9th Cir BAP 1991).

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 13
K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 409    Filed 06/15/16    Ent. 06/15/16 16:39:12    Pg. 13 of 15

Tracy. Given the willful and egregious conduct of Ms. Erdmann and Mr. Hansen, the Court should award the estate sanctions in the amount of fees and costs it has expended in an effort to recover the Retainer Funds.

## V. CONCLUSION

The only evidence that Ms. Erdmann will be able to present regarding the source of the Retainer Funds is her self-serving testimony. There are no records or credible witness accounts that Ms. Erdmann had independent resources sufficient in March, 2016 to pay TTLG's retainer as well as the retainer to the firm in North Carolina. The idea that the proceeds of a life insurance policy, received in 1993, has somehow funded Ms. Erdmann's needs for twenty-three years, with hundreds of thousands of dollars of cash and bullion to spare, defies credibility. What is credible, and what the evidence will show, is that Diane Erdmann and Ross Hansen looted assets from NWTM prior to the bankruptcy, and that such assets were the ultimate source of the Retainer Funds.

DATED this 15th day of June, 2016.

K&L GATES LLP


By */s/ David C. Neu*
   Michael J. Gearin, WSBA #20982
   David C. Neu, WSBA #33143
   Brian T. Peterson, WSBA #42088
Attorneys for Mark Calvert, Chapter 11 Trustee

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 14

K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 409    Filed 06/15/16    Ent. 06/15/16 16:39:12    Pg. 14 of 15

## CERTIFICATE OF SERVICE

The undersigned declares as follows:

That she is a paralegal in the law firm of K&L Gates LLP, and on June 15, 2016, she caused the foregoing document to be filed electronically through the CM/ECF system which caused Registered Participants to be served by electronic means, as fully reflected on the Notice of Electronic Filing.

I declare under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

Executed on the 15th day of June, 2016 at Seattle, Washington.

*/s/ Denise A. Evans*
Denise A. Evans

TRUSTEE'S TRIAL BRIEF FOR EVIDENTIARY
HEARING SCHEDULED JUNE 22, 2016 - 15

K:\2070561\00001\20347_DCN\20347A28K3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 409    Filed 06/15/16    Ent. 06/15/16 16:39:12    Pg. 15 of 15