**EXHIBIT B**

1          UNITED STATES BANKRUPTCY COURT

2          WESTERN DISTRICT OF WASHINGTON

3                    AT SEATTLE

4    _____

5    In re:                    )
                               )
6    NORTHWEST TERRITORIAL MINT,   )
     LLC,                     )
7                             )
          Debtor.            ) No. 16-11767-CMA
8                             )

9    _____

10          DEPOSITION UPON ORAL EXAMINATION

11                         OF

12                 ANNETTE TRUNKETT

13   _____

14               1:25 P.M.

15               JULY 29, 2016

16         1000 SECOND AVENUE, SUITE 3500

17             SEATTLE, WASHINGTON

18

19

20

21

22

23

24   REPORTED BY: CHERYL O. SPRY, CCR No. 2226

25

1        A P P E A R A N C E S

2

3

4     FOR THE CHAPTER 11 TRUSTEE:

5          MICHAEL J. GEARIN

6          K&L Gates

7          925 Fourth Avenue, Suite 2900

8          Seattle, Washington 98104-1158

9          206.623.7580

10          michael.gearin@klgates.com

11

12

13     FOR ROSS HANSEN:

14          C. JAMES FRUSH

15          Cable Langenbach Kinerk & Bauer

16          1000 Second Avenue, Suite 3500

17          Seattle, Washington 98104-1063

18          206.292.8800

19          jfrush@cablelang.com

20

21

22     ALSO PRESENT:

23          ROSS HANSEN

24

3

1          I N D E X

2

3     EXAMINATION BY:                    PAGE

4          MR. FRUSH                 4

5

6     EXHIBITS FOR IDENTIFICATION          PAGE

7     Exhibit 1  6/8/2016 Declaration of Annette       7

8          Trunkett in Support of Trustee's Motion

9          for Order Holding Ross Hansen in

10          Contempt for Violation of the Automatic

11          Stay

12     Exhibit 2  4/11/2016 Cash Report          14

13     Exhibit 3  4/18/2016 Cash Report          20

14     Exhibit 4  4/16/2016 "Suppression Memo" to All       26

15          Current NWTM/MAC Employees from Mark

16          Calvert

17     Exhibit 5  Pages 40-43 of Ms. Trunkett's 6/8/2016      45

18          deposition

19

20

21

22

23

4

1          SEATTLE, WASHINGTON; JULY 29, 2016

2                    1:25 P.M.

3                    --oOo--

4              ANNETTE TRUNKETT,

5    sworn as a witness by the Certified Court Reporter,

6            testified as follows:

7              EXAMINATION

8    BY MR. FRUSH:

9      Q.  Have you ever been deposed before?

10     A.  Yes, I have.

11     Q.  Okay.  About how many times?

12     A.  Once.

13     Q.  Okay.  Was that in this case?  You were

14   deposed in this matter.

15     A.  Since I've been in employment with Northwest

16   Territorial Mint, yes.

17     Q.  Right.  You were deposed in connection with

18   the money that Diane obtained; is that right?

19     A.  Correct.

20     Q.  All right.  Well, my name is Jim Frush.  I

21   represent Ross Hansen.  I don't know what you learned in

22   the last deposition.  I do want you to be comfortable.

23   If you're not comfortable, you want to take a break, you

24   want to talk to Mr. Gearin, feel free to indicate that

25   at any time.

1        I would ask you if I've asked you a question,

2   it's not quite right that you'd want to confer with him

3   before you give an answer.  Just answer the question and

4   then say, "I'd like to talk to my attorney," or to

5   Mr. Gearin, and we'll take a break.  Okay?

6        A.  Okay.

7        Q.  I don't think we're going to be here long.

8   We've only got you scheduled for an hour or two, and so

9   this is not going to be an endurance contest.  But any

10   time you want a break, say so.

11        If you don't understand my questions or you're

12   confused, and I'm like a lot of attorneys, a lot of the

13   questions I ask aren't very artful, just say "I don't

14   understand" or "I'm confused," or whatever, and I'll

15   either rephrase the question or try to ask it in a more

16   direct fashion.

17        A.  Okay.

18        Q.  Yes.  Why don't you state your name and spell

19   your last name for the record.

20        A.  Annette Trunkett, T-R-U-N-K-E-T-T.

21        Q.  Do you have a mailing address, ma'am?

22    A.  22913 112th Place Southeast, Kent, 98031.

23    Q.  I'm going to talk about the Northwest

24  Territorial Mint.  I'm just going to call it the "Mint,"

25  so you'll know what I mean when I talk about the Mint.

1  Is that fair?

2    A.  Yes.

3    Q.  Okay.  We also have a company called Medallic

4  Art.  And I'm just going to call that probably

5  "Medallic."

6    A.  Okay.

7    Q.  I understand you might have some back

8  problems.  I do want to make sure, and this is a

9  deposition, it's under oath, we have a deposition

10  transcript, are you -- and I don't mean anything

11  negative about this, I'm just trying to find out, are

12  you under any influence of any kind of prescription

13  medication at all?

14    A.  No.

15    Q.  Okay, great.  That's super.

16       All right.  What's your current position at

17  the Mint?

18    A.  Accounting supervisor.

19    Q.  And how many people do you supervise?

20    A.  Two other people, at this time.

21      Q.   When the company was managed by Mr. Hansen,

22   how many people did you supervise?

23      A.   Three people.

24      Q.   Okay.  And who did you report to when

25   Mr. Hansen was there?

7

1      A.   In what time period?  Since I've been the

2   supervisor?

3      Q.   Yes.

4      A.   I reported to Greg Fullington.  Excuse me.

5   Once I became accounting supervisor, I reported to John

6   Young.

7      Q.   To who?

8      A.   Jay Young, Jay Young.

9         (Deposition Exhibit 1 was marked for

10            identification.)

11      Q.   (BY MR. FRUSH:)  And did you report to Sam

12   Furuness at one time?

13      A.   Yes, I did.

14      Q.   Okay.  I'm going to show you what's been

15   marked as Exhibit 1.  This is a declaration of yours, I

16   believe, Annette.

17      A.   Yes.

18      Q.   When was the last time you reviewed this

19   declaration?

20    A.  Yesterday.

21    Q.  Is it accurate in all respects?

22    A.  Yes.

23    Q.  Do you want to make any changes in it?

24    A.  Not that I'm aware of.

25    Q.  Okay.  Now, you worked with Sam Furuness at

8

1    one time.  And he was the CFO of the company; is that

2    right?

3    A.  Yes.

4    Q.  And there came a time, was there not, that

5    Mr. Hansen became very frustrated over some invoices in

6    that sales tax was being paid, I think about $400,000,

7    in Texas that didn't need to be paid?  Do you remember

8    that?

9    A.  I do recall.

10    Q.  And Mr. Furuness was actually discharged over

11    that incident, wasn't he?

12    A.  I was not aware of why specifically he was let

13    go.

14    Q.  He was let go --

15    A.  A specific reason.

16    Q.  He was let go right after that incident.  Is

17    that your recollection?

18    A.  Yes, yes, he was.

19    Q.  And you and he had a meeting with Mr. Hansen

20    about that episode, I recollect.

21    A.  Yes.

22    Q.  And in fact, you were responsible for paying

23    the taxes; isn't that right?

24    A.  Yes, I was.

25    Q.  But you reported to Mr. Furuness.  And is the


9

1     number I have of about $400,000 that had been wrongfully

2     paid, is that about accurate, in your recollection?

3     A.  No, it is not.

4     Q.  How much money was involved?

5     A.  It was $40,000.

6     Q.  $40,000?

7     A.  That was my calculation of the overpayment.

8     Q.  Of the overpayment, all right.

9        And Mr. Hansen was very upset about that,

10    wasn't he?

11    A.  Uh-huh.

12    Q.  In your declaration in paragraph two you talk

13    about Mr. Hansen calling you and a former CFO in the

14    company in the office and yelling at you.  Do you

15    remember that?

16    A.  Yes, I do.

17    Q.  And you indicate in your declaration that he

18   yelled at you for four hours.

19       A.  Approximately.

20       Q.  Now, if you go to a Seahawk game, that's

21   about, oh, two hours or so, maybe a little more.  Is it

22   your recollection that Mr. Hansen yelled at you for the

23   equivalent time of a couple of Seahawks games, for four

24   hours?

25       A.  We went in before 4:00 and left after 7:00.


10

1        Q.  So it's closer to three hours?

2        A.  Could have been closer to three or four.  It

3    was approximately.

4        Q.  And he yelled that entire time?

5        A.  Maybe not consistently, no.

6        Q.  So to say that he yelled at you for

7    approximately four hours is really not accurate, is it?

8        A.  He was yelling at somebody in the room most of

9    the time.

10       Q.  Is it fairer to say that, say, for some period

11   of time closer to three hours that he would

12   intermittently yell at you or Sam?

13       A.  Repeat the question, please.

14       Q.  Sure.  It's one of those bad questions.

15           I'm trying to get a little more accurate

16   description.  It sounds like to me that it was probably

17  closer to three hours than four hours.  Isn't that fair

18  to say?

19      MR. GEARIN:  I think she's already answer that

20  question, asked and answered.

21    Q.  (BY MR. FRUSH:)  And it wasn't a constant

22  yelling, was it?

23      MR. GEARIN:  Again, asked and answered.

24    Q.  (BY MR. FRUSH:)  Go ahead and answer.

25    A.  To my recollection, it was pretty constant,


11

1  yes, it was.

2    Q.  Now, he was upset because that had cost the

3  company a lot of money; isn't that right?

4    A.  $40,000.

5    Q.  And you had actually been responsible for

6  paying those taxes; isn't that right?

7    A.  The CFO was responsible for the accounting

8  department.

9    Q.  Right.  And so Mr. Hansen didn't take that out

10  on you, did he?

11    A.  What?

12    Q.  That error.

13    A.  I was brought into the office and yelled at

14  just as -- right beside the CFO.

15    Q.  And you were not terminated or disciplined for

16    that mistake, were you?

17         A.  I was not terminated.

18         Q.  And Mr. Furuness was terminated at that point

19    in time; is that right?

20         A.  He left the company shortly after that

21    incident, yes.

22         Q.  And you in fact took over his job and became

23    the accounting manager, at that time; isn't that

24    correct?

25         A.  I did not.

1         Q.  When did that happen?

2         A.  I have not ever taken over Sam Furuness's job.

3         Q.  Oh, okay.  Were you given a promotion after

4    that event?

5         A.  No, I was not.

6         Q.  Your job stayed the same?

7         A.  Yes, it did.

8         Q.  Who supervised you at that point?

9         A.  Greg Fullington.

10         Q.  I thought Greg Fullington was the counsel for

11    the company.

12         A.  He is.

13         Q.  So he was both CFO and counsel?

14         A.  He was acting CFO for a time after Sam left.

15    Q.  Did he transition into being counsel for the

16  company from the CFO position?

17    A.  He was the counsel for the company and

18  additionally took on the responsibility.

19    Q.  Of CFO?

20    A.  Acting CFO.

21    Q.  After Sam left?

22    A.  Yes.

23    Q.  Let's put a date to that, if you can.  You may

24  not be able to.

25    A.  September of 2014.


13

1    Q.  Okay.  And had he been at the company -- had

2  Mr. Fullington been at the top prior to that time?

3    A.  Yes.

4    Q.  And prior to that time, had he had any

5  responsibilities for -- did he have any responsibility

6  for the finances of the company?

7    A.  Not to my knowledge.

8    Q.  So that was a new obligation or responsibility

9  that was given to Mr. Fullington after Sam left?

10    A.  It was not my knowledge whether he had any

11  previous intermixing with accounting or not.  I was not

12  in a position of knowing if he was interacting in

13  accounting.

14      Q.  Did you -- go ahead.

15      A.  I was not a manager.

16      Q.  Did you report to him after that point, to

17   Mr. Fullington?

18      A.  Greg Fullington?  Yes.

19      Q.  Was part of his responsibility ensuring that

20   orders were fulfilled in an appropriate time?

21      A.  I do not have knowledge of that.  I cannot

22   answer that question.

23      Q.  Okay.  I'm going to show you what's been

24   marked --

25          MR. FRUSH:  We're going to mark this new.


14

1          (Deposition Exhibit 2 was marked for

2              identification.)

3      Q.  (BY MR. FRUSH:)  This is Exhibit 2.  Now,

4   you'll see that there is a mark on there that says

5   Exhibit 8, Calvert.  That's just an indication that this

6   document, same document was put forward in a deposition

7   yesterday of Mr. Calvert.  We're going to refer to it as

8   Exhibit 2 for your deposition.

9          Would you take a look at that, please?

10      A.  Yes.

11      Q.  Do you recognize this?

12      A.  Yes, I do.

13    Q.   What is this?

14    A.   This is a recap of finances that is presented

15   to the owner so he could make financial decisions.

16    Q.   And when was this Cash Report prepared?

17    A.   Daily.

18    Q.   And what's the date of this particular Cash

19   Report, Exhibit 2?

20    A.   This appears to be April the 11th.

21    Q.   Of this year?

22    A.   Of 2016.

23    Q.   And the time is 8:45 a.m.?

24    A.   Yes.

25    Q.   If you ran this report later in the day, would

15

1   there -- could it change?

2    A.   Yes.

3    Q.   Or would it change?

4    A.   Yes, perhaps it would.

5    Q.   Was it common that you would have a large

6   number of -- and I'm not an accountant, so if I misstate

7   the type of word, please forgive me, that there would be

8   more money that would typically come in on a Monday than

9   other days of the week?

10    A.   Yes.

11    Q.   Would it be a substantially -- would it be

12    fair to say that fairly consistently there would -- if

13    you ran this report at 5:00 in the afternoon on a

14    Monday, there would be more assets in the company than

15    if you ran it at 9:00 in the morning?

16        A.  Deposits would be brought in during the day

17    and it would be added to the report.

18        Q.  Okay.  So typically, it would be larger at the

19    end of the day as opposed --

20        A.  Not necessarily, not if checks had cleared

21    above that amount.  Checks clear and deposits go in, so

22    it's fluctuating constantly.

23        Q.  All right.  How often would you run this Cash

24    Report?

25        A.  I'd keep it calculated three times a day.


                                16

1         Q.  And were these Cash Reports saved or would

2     they be accessible in a retrospective examination?

3         A.  Yes, I have them saved.

4         Q.  So if I ask you to give me a Cash Report from

5     other times on April 11th, you could do that?

6         A.  Oh, I'm sorry.  I cannot do that.  I do not

7     have during the day.  I only have the last one of the

8     day saved.

9         Q.  Do you know who saved this one?

10        A.  Saved it?

11    Q.   Well, let me ask you, somebody punched in this

12   at 8:45 in the morning.  Do you recollect doing that?

13    A.   This would have been something that I would

14   do.  Do I actually remember doing this on this date?

15   No.

16    Q.   Would you email these reports to Mr. Hansen on

17   a regular basis?

18    A.   At a point in time, I started emailing these

19   to him every night, at the end of the day.

20    Q.   So how much money were in the corporation's

21   accounts at 8:45 on April 11th, 2016?

22        MR. GEARIN:  Object to foundation.  There is

23   no --

24        MR. FRUSH:  Let me rephrase the question.

25    Q.   (BY MR. FRUSH:)  What does the report reflect


17

1   as -- I'm trying to figure out how to read this.  What

2   does the report reflect as to how much money -- does the

3   report reflect how much money is in the bank that

4   belongs to the corporation?

5        MR. GEARIN:  Again; object as to foundation.

6    Q.   (BY MR. FRUSH:)  Go ahead and answer it, if

7   you can.  He's going to put objections in the record.

8   The way this works is he makes his objection, I can

9   decide to rephrase the question or not.  It's something

10    you shouldn't worry about.  If you can answer the

11    question, you should go ahead and answer the question.

12    All right?

13         A.  Could you repeat it?

14         Q.  Sure.

15         MR. FRUSH:  Would you read it back for us,

16    please, Cheryl?

17         THE COURT REPORTER:  "Question:  I'm trying to

18    figure out how to read this.  What does the report

19    reflect as to how much money -- does the report reflect

20    how much money is in the bank that belongs to the

21    corporation?"

22         A.  I don't understand the question, "belongs to

23    the corporation."

24         Q.  (BY MR. FRUSH:)  Well, let's say how much

25    money is in the bank accounts that are the corporation's


                              18

1     bank accounts.  Does the --

2          A.  These are the corporation's -- the LLC, the

3     Mint's, this is the Mint's bank accounts, yes, it is.

4          Q.  All right.  So at that time, the Mint had

5     three accounts?

6          A.  Yes.

7          Q.  And how much money was in the bank, at

8     HomeStreet Bank at that time?

9       MR. GEARIN: Object as to foundation. She's

10    already said she doesn't have any personal knowledge.

11    She can talk about the report. I think your prior

12    questions have been what does the report reflect.

13       MR. FRUSH: That's fair enough.

14    Q.  (BY MR. FRUSH:) What does the report reflect

15    as to how much money is in HomeStreet Bank?

16    A.  It reflects that -- it reflects the amount

17    that's in there right now, it reflects what the account

18    would be at if all the checks had been written that were

19    in the mail, what the account would be.

20    Q.  Now, where is that reflected?

21    A.  Directly under the name "HomeStreet Bank" it

22    says "True Balance." Those are checks that had been

23    written. And if all of them had cleared, that would be

24    the bank status.

25    Q.  What's the "On Hold" mean?


19

1    A.  That means those are checks that had been

2    written that had not been approved to be sent out yet.

3    Q.  As I understand it, the report reflects that

4    there was $67,000 in the bank, but there was $113,000 in

5    checks outstanding on that bank account; is that right?

6    A.  Yes.

7    Q.  And then on the Bank of America, the report

8    reflects $151,000 in the bank?

9        A.  Yes.

10       Q.  Now, that's a positive number underneath.  The

11   $113,000, what does that reflect?

12       A.  That reflects a $37,000 check out in the mail.

13   And if it cleared, the account would be at $113,000.

14       Q.  Okay.  And then the KeyBank has nothing that's

15   out in the mail?

16       A.  That is correct.

17       Q.  So the report reflects how much as far as the

18   net amount of monies are in the corporation's bank

19   accounts?

20       A.  Available.

21       Q.  Right.  And that number is $218,000?

22       A.  That's what this report suggests.

23       Q.  Is there something else that would somehow

24   make this report inaccurate?  I mean, you say it

25   suggests --

1        A.  It changes during the day.

2        Q.  But at that point in time, at 8:45 in the

3    morning, there is a net $218,000 in the corporation's

4    bank accounts.  Is that fair to say?

5            MR. GEARIN:  Object.

6        Q.  (BY MR. FRUSH:)  Reflected in the report.

7    A.  That is what this report reflects, yes.

8        MR. FRUSH:  Okay.  I'm going to ask that this

9    be marked as Exhibit 3.

10       (Deposition Exhibit 3 was marked for

11          identification.)

12   Q.  (BY MR. FRUSH:)  Again, there is a No. 9 on

13   it.  There you go, Annette.  Take a look at that, if you

14   would, please.

15       This would be Exhibit 3 for you.  Is this a

16   Cash Report for April 18th?

17   A.  The piece of paper says that this is a Cash

18   Report from 4/18, "AM."  Unless I check my records, I

19   cannot vouch that yes, this is.  It appears to be.

20   Q.  Take a look through it.  It's about 10,

21   15-pages long.

22   A.  No.  This is not my -- the report.

23   Q.  It is not your report?

24   A.  This is not the Cash Report for 4/18, all of

25   these papers.


21

1    Q.  So what are the other papers?  I'm trying to

2    understand this.  The Cash Report is reflected on the

3    first page; is that correct?

4    A.  This is a recap of -- yes, this is a recap.

5    Q.  And so as of the morning, or rather it just

6    says "AM" here, in the morning of 4/18 was there

7    $511,000?  Does this report reflect that there is an

8    available $511,000 in the corporation's accounts?

9        A.  Yes, it does.

10       Q.  Is there something in the balance of these

11   documents in the report, the pages in the report that

12   help us better understand the financial situation of the

13   company as far as how much money is reflected as being

14   in the accounts of the corporation?

15       A.  I apologize.  I don't understand your

16   question.

17       Q.  Why don't we just go through it.  What's the

18   second page reflect?

19       A.  So this is the Bank of America spreadsheet.

20       Q.  On page two?

21       A.  And this would be for April the 18th.  And so

22   this is the Bank of America backup information.

23       Q.  And then the third page?

24       A.  So this is --

25       Q.  It's the KeyBank?


                                22

1        A.  This is KeyBank.

2        Q.  All right.

3        A.  Yeah.  And then this one is HomeStreet Bank.

4        Q.  That's the --

5   A.  This is HomeStreet, right.

6   Q.  Well, you're going to have to give me a page

7   number so we have a clear record.

8   A.  Do you count this as one?

9   Q.  I take the top page as one.

10  A.  It's page five.

11  Q.  What's on page four?

12  A.  Page four is the second page of KeyBank.

13  Q.  Oh, I see.  And then you get over to --

14  A.  There is HomeStreet Bank, one, two, three,

15  four pages of HomeStreet Bank.  That is the Cash Report.

16  Q.  And so you've got all three accounts?

17  A.  Yes.

18  Q.  What do the balance of these pages reflect?

19  A.  I am not -- I do not know why they're here.

20  Q.  Would they normally --

21  A.  These are not part of this report.

22  Q.  Generally?

23  A.  Generally.

24  Q.  When you were preparing it, it would not be

25  part of the report?


23

1   A.  Correct.

2   Q.  Okay.  I'm just trying to understand.

3   A.  Yes, yes.

4    Q.  It's not a test.  Okay?

5    A.  Yes.

6    Q.  All right.  Thank you.

7        Do you know Stacy Butler?

8    A.  Yes.

9    Q.  And do you know Patty --

10   A.  I'm sorry.  Go ahead.

11   Q.  Do you know Patty Hoffman?

12   A.  Yes.

13   Q.  Who is Stacy Butler?

14   A.  She was a receptionist at the company.

15   Q.  Did she leave the company at some point?

16   A.  Yes, she did.

17   Q.  Why did she leave the company?

18   A.  She left the company because she was caught

19   stealing.

20   Q.  And was she prosecuted?

21   A.  I don't really know what happened to the

22   outcome.  I thought it was still pending.

23   Q.  And do you know Patty Hoffman?

24   A.  Yes.

25   Q.  What was Patty Hoffman's position with the

24

1   company?

2    A.  Receptionist as well.

3    Q.  Did she work closely with Stacy Butler?

4    A.  Yes.

5    Q.  And is it fair to say that they were close

6 friends?

7    A.  I have no knowledge.

8    Q.  Now, the receptionists sit in an area that has

9 surveillance cameras; is that correct?

10   A.  Yes.

11   Q.  And it has multiple surveillance cameras,

12 doesn't it?

13   A.  I'm -- I do not know the answer to that

14 question.

15   Q.  Would it surprise you if there were as many as

16 three surveillance cameras in the reception area?

17   A.  It would surprise me if they were looking at

18 all of the same place.

19   Q.  Right.

20   A.  That would surprise me, yes.

21   Q.  No, no, I just meant there were three

22 different cameras mounted -- surveillance cameras that

23 surveilled the different aspects of the reception area.

24   A.  I'm sorry.  I did not ever notice there was

25 three.


25

1    Q.  All right.  Now, there was an EEOC complaint

2    filed against the company, wasn't there?

3        A.  Yes.

4        Q.  And it was filed by Patty Hoffman, wasn't it?

5        A.  Hearsay, yes.

6            MR. GEARIN:  Well, so if you don't know the

7    answer, don't answer.

8        A.  I do not know who filed it.

9        Q.  (BY MR. FRUSH:)  Is it your understanding that

10   Patty Hoffman filed it?

11       A.  I do not know who filed it.

12       Q.  What is your understanding?

13       A.  I don't -- nobody has ever said that she filed

14   it, so I do not know.

15       Q.  Do you know that she's -- is it your

16   understanding that she's the person that complained that

17   Mr. Hansen acted inappropriately towards her?

18       A.  Yes.

19       Q.  And that included allegedly groping her in the

20   reception area?

21       A.  I wasn't aware of the details.

22       Q.  And you're not aware that these actions

23   allegedly occurred in an area that was surveilled?

24       A.  I am aware that -- what is your question?

25   Please repeat.

1    Q.   Never mind.

2         Was Patty Hoffman upset that Stacy Butler was

3    terminated?

4    A.   I was not aware of that.

5    Q.   Patty Hoffman quit very shortly after that

6    period of time that Stacy was terminated, didn't she?

7    A.   I don't recollect the time frame.  It was

8    after she had left, but I don't recollect the time

9    frame.

10   Q.   Do you know whether Patty Hoffman made any

11   statements that reflected she was going to get even or

12   some kind of retribution, or words to that effect, for

13   the firing and prosecution -- firing of Stacy Butler?

14   A.   I did not hear anything like that.

15   Q.   Okay.  I'm going to show you what's become our

16   favorite exhibit.

17        (Deposition Exhibit 4 was marked for

18         identification.)

19   Q.   (BY MR. FRUSH:)  I'll show you what's been

20   marked as Exhibit 4.  And again, these other markings on

21   it are simply a reflection that this has been used at

22   other depositions.

23   A.   I understand.

24   Q.   Have you seen this document before?

25   A.   Yes, I have.

1    Q.  And this is a document that forbids you and

2  other Mint employees from speaking to Ross and Diane

3  Erdmann or the press; isn't that right?

4    A.  That's correct.

5    Q.  And it indicates that if you do that, you may

6  be terminated; is that correct?

7    A.  I would have to read the entire thing over

8  again to answer your question.

9    Q.  You go right ahead and do that.

10    A.  Okay.

11    Q.  Do you remember getting this memo?

12    A.  I remember reading it, yes.

13    Q.  And was that around the time that it's dated,

14  April 16th, 2016?

15    A.  I believe so, yes.

16    Q.  And did you take this memorandum seriously?

17    A.  Yes.

18    Q.  You note in your declaration that between

19  April 26 and May 18th, Diane Erdmann tried to contact

20  you by text and voicemail and that you did not return

21  her call or text.  Do you see that in paragraph three

22  of --

23    A.  Yes, I'm familiar with it.

24    Q.  Did this memorandum influence your decision

25  not to return her calls or texts?

1    A.   In part.

2    Q.   They appeared at the Federal Way facility you

3    indicate unannounced on May 18th; is that correct?

4    A.   That's correct.

5    Q.   Are you aware whether Mr. Hansen had spoken

6    the day before with Paul Ward about --

7         MR. HANSEN:  Patrick.

8    Q.   (BY MR. FRUSH:)  I'm sorry, Patrick Ward about

9    coming by to pick up some documents?

10   A.   I'm sorry.  What is the question?

11   Q.   Sure.  Are you aware whether Ross had spoken

12   with Patrick Ward, Security personnel, at the Mint on

13   the day before, May 17th, about his intention to come by

14   and pick up documents?

15   A.   I did not know that it had happened until

16   Mr. Hansen told me that he had, or he was telling Dave

17   Huffman.

18        MR. GEARIN:  Object; foundation as to whether

19   she has any basis for knowing any conversation that

20   Mr. Hansen had with somebody else.

21        MR. FRUSH:  You can just object.  If I have

22   trouble figuring out the nature of the form of your

23   objection, I'll rephrase.  And if I don't, I'll ask you.

24   I just don't like you suggesting to the witness

25   anything.  That's kind of the way I practice.  I think

1    that's a fair way.

2         MR. GEARIN:  Well, I think the way I practice

3    is I want you to be clear about what the nature of the

4    objection is.

5         MR. FRUSH:  Well, the problem with that, Mike,

6    is it suggests to the witness that, jeez, I object,

7    calls for speculation.  And then the witness says, oh, I

8    don't want to speculate.  And when you make a speech

9    about, well, I don't want you to talk about it unless

10   it's something Mr. Hansen said to you, I'll try and make

11   sure we get it clear.  She didn't really have an answer

12   to that question.

13        MR. GEARIN:  I think my role, Jim, is to

14   object when appropriate, and your role is to ask the

15   questions.

16        MR. FRUSH:  All right.  We'll see where we go.

17        MR. GEARIN:  Sure.

18   Q.   (BY MR. FRUSH:)  Did there come a time when

19   you learned that Mr. Hansen had contacted Patrick Ward

20   the day before about coming by to pick up the documents?

21   A.   I believe I did hear that.

22   Q.   Who did you hear it from?

23   A.   Mr. Hansen, I believe.

24   Q.   At what time did you hear it from Mr. Hansen?

25    A.  When he was standing in my office.

1    Q.  So he indicated to you that he had

2    contacted -- this is on May 18th, he indicated he had

3    contacted Mr. Ward; is that right?

4    A.  I believe that he was speaking to Mr. Huffman

5    when he said that.  I was not part of the conversation,

6    only overheard it.

7    Q.  So you overheard him tell that to Mr. Huffman?

8    A.  To the best of my recollection, I do believe

9    that is what happened.

10    Q.  Was Maura Richardson there that day, on the

11    18th?

12    A.  I don't recall.

13    Q.  Was that about the time that she quit working

14    for the company, at least temporarily?

15    A.  I don't remember what dates she went.  She

16    went on vacation and didn't come back.  I don't know

17    what date that was.  She was gone for two weeks.

18    Q.  Was that a preplanned vacation or was that in

19    response to events that were occurring, or do you know?

20    A.  I do not know, honestly.

21    Q.  Do you have an opinion as to why she left?

22    A.  I don't know why she left.  But in regards to

23    her vacation request, is what the question was, did I

24    know about it ahead of time, I believe I did know a

25    couple days ahead of time, maybe even a week.

1         So it could have been preapproved and

2    preplanned.  I'm not aware.

3    Q.   Now, the documents we're talking about, the

4    documents -- is it your understanding that the documents

5    were copies of documents that related to Medallic Art?

6         MR. GEARIN:  Object; vague.  What documents?

7    Q.   (BY MR. FRUSH:)  The documents that Mr. Hansen

8    was supposed to pick up --

9    A.   Yes.

10   Q.   -- or that he said he was supposed to pick up.

11   A.   Right.

12   Q.   What was your understanding as to what

13   comprised those documents?  What was in those documents?

14   What were they documents about?

15   A.   I assumed he was looking for the agreement

16   between Mr. Bressler and himself.

17   Q.   You prepared financial statements for Medallic

18   Art, didn't you?

19   A.   I replicated the CFO's reports that he pulled

20   out of the system that were already pre-prompted with

21   specific numbers.

22   Q.   And those reports accounted for the finances

23   of Medallic separate from the Mint.  Is that accurate to

24   say?

25        MR. GEARIN:  Object as to foundation.  She

1   just testified all she did was replicate the reports.

2     Q.  (BY MR. FRUSH:)  If you understand my

3   question, you can go ahead and answer.

4     A.  Could you repeat the question?

5        THE COURT REPORTER:  "Question:  And those

6   reports accounted for the finances of Medallic separate

7   from the Mint.  Is that accurate to say?"

8     A.  That is accurate.

9     Q.  (BY MR. FRUSH:)  And did you provide those

10   financial statements to Mr. Bressler on occasion?

11     A.  After Mr. Furuness left the company.

12     Q.  You did provide those reports to Dick

13   Bressler?

14     A.  Yes, I did.

15     Q.  Okay.  Was it your understanding that the

16   documents that Mr. Hansen was there to collect were

17   documents that related -- that were copies of documents

18   that related to Medallic Art?

19     A.  What is the question?

20     Q.  I'll rephrase it.  I'm trying to be careful so

21   Mr. Gearin won't jump on me.

22      MR. GEARIN:  The poor defenseless guy that you

23   are.

24      MR. FRUSH:  That's true.

25   Q.  (BY MR. FRUSH:)  Was it your understanding

1   that these documents that Ross was coming by to collect

2   were copies of documents that related to Medallic Art?

3      A.  No, I don't recall thinking about that either

4   way.

5      Q.  Did you have some documents that you were

6   aware Mr. Hansen wanted to pick up?

7      A.  No.  I did not know he was wanting to come in

8   and pick them up.  I wasn't aware of it before he showed

9   up.

10      Q.  Had Maura given you some documents that were

11   the subject of that visit prior to Mr. Hansen arriving

12   there?

13      A.  The documents that he was requesting were

14   always held in the accounting department.

15      Q.  Had anybody made any effort to segregate those

16   documents, prior to him arriving there?

17      A.  No.

18      Q.  Did Maura tell you to compile certain

19   documents relating to Medallic Art?

20      A.  No.

21     Q.  Did anybody direct you to compile certain

22   documents relating to Medallic Art?

23     A.  Who do you mean?

24     Q.  I'm just asking anyone.

25     A.  Anyone?

1     Q.  Yes.

2     A.  At the time of the Tracy submitting the

3   bankruptcy, yes, I had to submit certain -- I had to

4   find the documents.

5     Q.  Let me come at it this way, Annette.  Ross

6   shows up and wants some copies of documents.

7     A.  Okay.

8     Q.  Does he tell you they're related to Medallic

9   Art?

10     A.  He did say they were Medallic Art, yes.

11     Q.  Did it appear to you that he expected you to

12   have a stack of documents ready for him?  I don't know.

13   I'm just asking what you believed.

14     A.  No, no.

15     Q.  So did this catch you by surprise?

16     A.  Yes.

17     Q.  All right.  Let's get to that.  Ross and Diane

18   show up on May 18th; is that right?

19     A.  Yes.

20    Q.  Do you recall what time of day it was?

21    A.  No, I do not.

22    Q.  All right.  And they came through the

23  reception area, I take it; is that correct?

24    A.  I was in my office.  I don't know how they

25  came in.

<br>

35

1    Q.  And your office is near reception?

2    A.  It's around the corner.

3    Q.  Did you hear them come in?

4    A.  I did not.

5    Q.  When do you first see them?

6    A.  I was coming out of the office and he was

7  coming around the corner.

8    Q.  Was Diane with him?

9    A.  I didn't see her at first.  She was still back

10  in the second part of the hall coming down.

11    Q.  Did she join you at some point?

12    A.  I believe she stayed out of the office.  I

13  don't recall her being inside my office with Ross.

14    Q.  Do you recall giving her a hug?

15    A.  Yes.  She was outside the office.

16    Q.  And you -- did you go out to the -- to her and

17  hug --

18    A.  I was already outside the office.

19    Q.  And you gave her a hug when you saw her?

20    A.  I actually leaned in and told her I was taking

21  care of her plants.

22    Q.  Good.  Did you give her a hug?

23    A.  Yes.

24    Q.  All right.  And how did you greet Mr. Hansen?

25    A.  With a handshake.


36

1    Q.  Were you frightened?

2    A.  I was startled.

3    Q.  But that's by the sudden interaction, or were

4  you frightened of Mr. Hansen?

5    A.  From the abrupt interaction and from the court

6  order of him not being in the building, it startled me.

7    Q.  When you say "court order," did somebody

8  represent to you that exhibit -- what's this exhibit

9  number on the suppression, the yellow tag?

10    MR. GEARIN:  Four.

11    Q.  (BY MR. FRUSH:)  Exhibit 4, was that your

12  impression, that this was a court order?

13    A.  I was under the impression that there was some

14  sort of document that was stated that he was not allowed

15  to come into the business, into the company building,

16  yes.

17    Q.  Who gave you that understanding?

18    A.  Oh, I'm sorry.  I couldn't even tell you who

19  told me.  I was --

20        MR. HANSEN:  One moment.  I apologize.

21        MR. GEARIN:  Do you want to take a break?

22        MR. FRUSH:  Let's take a break.  We're on the

23  home stretch, Annette.

24        MR. HANSEN:  My apologies for the

25  interruption.

37

1        (Recess.)

2        MR. FRUSH:  Where were we?

3        THE COURT REPORTER:  "Question:  Exhibit 4,

4  was that your impression, that this was a court order?

5        "Answer:  I was under the impression that

6  there was some sort of document that was stated that he

7  was not allowed to come into the business, into the

8  company building, yes.

9        "Question:  Who gave you that understanding?

10        "Answer:  Oh, I'm sorry.  I couldn't even tell

11  you who told me."

12    Q.  (BY MR. FRUSH:)  But was it your understanding

13  that Mr. Hansen was barred from the premises?

14    A.  It was my understanding that he was to stay

15  away and not come into the office.

16    Q.  And you don't recollect how you got that

17   understanding?

18   A.   I don't.

19   Q.   So did it surprise you to see him there?

20   A.   Yes.

21   Q.   Did you feel intimidated by Mr. Hansen?

22   A.   I felt he took an intimidating posture over my

23   desk.

24   Q.   How so?

25   A.   In leaning into my space and trying to talk to

38

1   me very quietly.

2   Q.   He was speaking to you in a soft voice?

3   A.   Yes.

4   Q.   And he was on the opposite side of the desk

5   from you; is that right?

6   A.   Yes.

7   Q.   He didn't come around the other side of the

8   desk right next to you, did he?

9   A.   No, he did not.

10   Q.   Did he make any threats against you?

11   A.   No, he did not.

12   Q.   He was asking for the Medallic Art documents;

13   is that right?

14   A.   Yes, he did.

15   Q.   And he was asking for copies; is that correct?

16     A.  He asked for the files.

17     Q.  And what did you tell him?

18     A.  I told him that I could not give him any

19  document unless instructed by Mark Calvert.

20     Q.  And what did he say?

21     A.  He said that he made prior arrangements to

22  come and pick them up.  I told him I was not aware of

23  it, and I called Mark Calvert.

24     Q.  And did you get Mark?

25     A.  I did not.

1     Q.  At some point, Mr. Huffman comes on the scene;

2  is that correct?

3     A.  That's correct.

4     Q.  And he's on the other side of your desk

5  leaning over and asking you in a soft voice for the

6  documents.  And you say, "I can't give them," whatever

7  you testified to.  At what point in the process does

8  Mr. Huffman appear?

9     A.  While Mr. Hansen is leaning over the desk

10  talking to me.

11     Q.  So how long all together do you think

12  Mr. Hansen was in your office before he left with

13  Mr. Huffman?

14     A.  Maybe ten minutes.

15    Q.  That long?

16    A.  I don't recall.

17    Q.  It wasn't a very long period of time?

18    A.  It could be shorter, it could be longer.

19  Approximately.

20    Q.  And did you have other conversation with

21  Mr. Hansen other than about the documents?

22    A.  Yes.

23    Q.  What was the nature of that conversation?

24    A.  He asked me where my loyalties lie.

25    Q.  And what did you say?


40

1    A.  I told him that I did not have loyalty to Ross

2  Hansen and I did not have loyalty to Mark Calvert, and

3  that as soon as the company became stable or sold, or

4  whatever was going to happen, I was going to go on to

5  disability, because I've been having some problems with

6  my back.

7    Q.  Did that upset Mr. Hansen?

8    A.  I do not have any knowledge of that.

9    Q.  He didn't appear upset when you told him that?

10    A.  No.

11    Q.  And he didn't do anything in a negative

12  reaction to your statement that you were -- that you

13  just recited to me?

14      A.  I believe that he was insinuating that I would

15  be without a job.  Other than that --

16      Q.  But that was an insinuation.  I'm asking for

17  some concrete reaction.

18      A.  I do not recall.

19      Q.  All right.  And what other conversation did

20  you have with Mr. Hansen?

21      A.  I do not recall that we spoke of anything

22  else.

23      Q.  All right.  And when you told him that you

24  weren't giving him -- it's true that you told him you

25  weren't giving him documents without Mr. Calvert's

41

1   permission, and you attempted to reach Mr. Calvert on

2   the phone?

3       A.  That is true, yes.

4       Q.  And what happens when you try to reach

5   Mr. Calvert?

6       A.  I did not reach him.  So I called one of his

7   employees.

8       Q.  So while you're on the phone, what's

9   Mr. Hansen doing?

10      A.  I would not know.  I was -- I don't recall.

11      Q.  I mean, was he standing?

12      A.  Yes, in front of my desk where he was, yes.

13      Q.   Did he have his hands on the desk the entire

14   time?

15      A.   I believe that he did not have his hands on my

16   desk at that time.

17      Q.   So he stood back from your desk while you were

18   making phone calls?

19      A.   Yes.

20      Q.   And he was waiting patiently?

21      A.   Yes.

22      Q.   And then what happens was you tried to get

23   somebody besides Mr. Calvert?

24      A.   Correct.

25      Q.   Was that Mr. Wagner?

1      A.   No.  Jody Cannady.

2      Q.   Who is that?

3      A.   She's one of his employees, Mark Hansen --

4   Mark Calvert's.

5      Q.   Did you have any better luck?

6      A.   Yes, I did get in touch with her.

7      Q.   And what did she say?

8      A.   She told me not to give him any files.

9      Q.   And did you communicate that to Mr. Hansen?

10      A.   Yes, I did.

11      Q.   What was his reaction?

12    A.  I believe that's when Mr. Huffman came in and

13  took over the conversation.  Mr. Huffman said that we

14  would not be able to give him the files.

15    Q.  Did Mr. Hansen provide you any paperwork

16  relating to his authorization to pick up the files?

17    A.  I believe there was a piece of paper.  I don't

18  recall what it said anymore.  But yes, he did hand me a

19  piece of paper.  I don't recall what it was.

20    Q.  Did he also give the paper to Mr. Huffman?

21    A.  I don't recall.

22    Q.  Did you hear the entire conversation between

23  Mr. Huffman and Mr. Hansen?

24    A.  I believe so.

25    Q.  Now, you didn't follow them out to the front

43

1  door?

2    A.  No, I did not, just in my office.

3    Q.  All right.  And you overheard Mr. Hansen

4  telling Mr. Huffman that he had talked to Patrick Ward

5  the day before?

6    A.  That's when I heard that, yes.

7    Q.  What else did you hear between Mr. Hansen and

8  Mr. Huffman?

9    A.  Mr. Huffman asking Mr. Hansen to leave.

10    Q.  Did Mr. Huffman tell Mr. Hansen he'd call the

11   police?

12      A.  Yes, he did.

13      Q.  And did he tell Mr. Hansen that he had three

14   minutes to leave?

15      A.  I believe he did.

16      Q.  And what was Mr. Hansen's reaction?

17      A.  He says, "I don't want to have any trouble.

18   I'll leave."

19      Q.  And did he do just that?

20      A.  Yes, I believe he did.

21      Q.  Were you aware at the time that Mr. Hansen

22   came in to get the documents whether there was an FBI

23   investigation of either the Mint or Mr. Hansen?

24      A.  I was not given the knowledge that there was

25   an FBI investigation going on.


44

1      Q.  Did you --

2      A.  I'm sorry.  Could you repeat the question?

3      Q.  Sure, sure, you bet.  And let's go back to

4   when Mr. Hansen came into the office.

5      A.  Okay, okay.

6      Q.  At that time, he had been gone for about --

7   well, let me back up.  I will strike all that and start

8   over.

9         Mr. Hansen left the company at about

10   April 12th.  Does that sound about right?

11       A.  I think that I have been told the 11th.

12       Q.  All right.  Close enough.

13       A.  Yes.

14       Q.  At the time he came in to get the documents

15   some five or six weeks later, were you aware that there

16   was an investigation, FBI investigation of the company

17   or Mr. Hansen?

18       A.  I don't know how to answer the question.

19   There were FBI people there occasionally asking

20   questions, but as far as them telling me that there is

21   an investigation, no.  And I did not know that there was

22   one on -- for him personally, no.

23       Q.  And so you have two or three accounting staff

24   working for you; is that right?

25       A.  Yes.


45

1        Q.  And I take it that any potential FBI

2    investigation of Mr. Hansen was not something that had

3    been discussed with you and your staff or among your

4    staff during that approximate month between when he left

5    and he came to pick up the documents.  Is that accurate?

6        A.  I would not have any knowledge if somebody

7    went to talk to one of my employees.  It wasn't brought

8    to my attention.  Yeah, it wasn't brought to my

9    attention.

10       Q.  I guess I'm not being very artful.  You didn't

11    have any conversation with your staff about an FBI

12    investigation of Mr. Hansen?

13       A.  No, I did not.

14       Q.  And you didn't really learn there was an

15    investigation of Mr. Hansen until you were deposed back

16    in June, did you?

17       A.  I didn't even know then.

18          MR. FRUSH:  Well, let's mark this.

19          (Deposition Exhibit 5 was marked for

20              identification.)

21       Q.  (BY MR. FRUSH:)  I'm going to show you what's

22    been marked as Exhibit 5.  It's a transcript of your

23    testimony from the June 8th deposition.  And again --

24       A.  The deposition?

25       Q.  Yes, the deposition.


46

1        A.  All right.

2        Q.  And again, this is not a test and we're not

3     trying to trick you, I'm just trying to refresh your

4     recollection.

5        A.  Yes.

6        Q.  Why don't you just take a minute and read

7     through it, and then we'll talk about -- and actually, I

8    think I copied more pages than I needed.  You might want

9    to start on page 41.

10       A.   Where it's highlighted?

11       Q.   Did you get -- oh, see, that's my copy.

12   That's not fair.  I can't take advantage of you if you

13   know where the highlighting is.

14           I'll get this right eventually.  There you go.

15       A.   All right.

16       Q.   I forgot where I was supposed to start; I

17   couldn't find my highlighting.

18           All right.  Start about mid 41 and go through

19   42.  I'm particularly interested in page 42, lines

20   eleven through 24.

21       A.   Okay.

22       Q.   So you testified back in June, if I'm reading

23   your transcript correctly, that at least before that

24   day, June 8th, 2016, you were unaware of any criminal

25   investigations; is that right?

47

1        A.   Of Ross Hansen or Diane Erdmann.

2        Q.   Right.  And you felt the investigation was

3    being conducted by Mr. Calvert's team; is that right?

4        A.   That's what I said here, yes, that the

5    criminal investigation -- the company was being

6    investigated, yes.

7      Q.  By Mr. Calvert's team?

8      A.  Yes, yes.

9      Q.  And that you indicated you weren't aware of an

10    investigation by anyone else?

11      A.  Yes, I see that I said that.

12      Q.  And was this accurate when you said it?

13      A.  It's hard to remember when things were said.

14    So to the best of my knowledge, at this time I was

15    speaking the truth.  At this time, I'm speaking the

16    truth.  I don't remember time frames.  I'm sorry.

17      Q.  It's fair to say that June 8th, almost seven

18    weeks ago --

19      A.  June 8th, okay.

20      Q.  -- these events were more recent to you, more

21    recent occurrence to you at that point.  Is that fair to

22    say?

23      A.  Than --

24      Q.  Than they are today.

25      A.  Oh, they're further away now than they were,

1    yes.

2      Q.  And you were closer in time --

3      A.  Then, yes, okay.

4      Q.  It's more likely you'd have a better memory

5    two months ago than today.  Is that fair to say?

6    A.  Yes, I see where you're going with that.

7    Q.  Would you agree with me?

8    A.  I would agree.

9        MR. FRUSH:  Why don't we take a quick

10   two-minute break.  I may have one more question but not

11   much.  We're almost through.

12       MR. GEARIN:  Sounds good.

13       (Recess.)

14       MR. FRUSH:  I have no further questions,

15   Annette.

16       (Deposition recessed at 2:30 p.m.)

17       (Signature was requested.)

18

19

20

21

22

23

24

25

49

1        CORRECTION & SIGNATURE PAGE

2    RE:  NORTHWEST TERRITORIAL MINT, LLC

3        UNITED STATES BANKRUPTCY COURT; No. 16-11767-CMA

4        ANNETTE TRUNKETT; TAKEN JULY 29, 2016

5        Reported by: CHERYL O. SPRY, CCR No. 2226

6        I, ANNETTE TRUNKETT, have read the within

7  transcript taken JULY 29, 2016, and the same is true and

8  accurate except for any changes and/or corrections, if

9  any, as follows:

10  PAGE/LINE       CORRECTION       REASON

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22    Signed at _____, Washington,

23  on this date: _____

24

25          _____
              ANNETTE TRUNKETT

50

1       REPORTER'S CERTIFICATE

2      I, CHERYL O. SPRY, the undersigned Certified Court

3  Reporter, pursuant to RCW 5.28.010, authorized to

4    administer oaths and affirmations in and for the State

5    of Washington, do hereby certify:

6        That the sworn testimony and/or proceedings, a

7    transcript of which is attached, was given before me at

8    the time and place stated therein; that any and/or all

9    witness(es) were by me duly sworn to testify to the

10   truth; that the sworn testimony and/or proceedings were

11   by me stenographically recorded and transcribed under my

12   supervision, to the best of my ability; that the

13   foregoing transcript contains a full, true, and accurate

14   record of all the sworn testimony and/or proceedings

15   given and occurring at the time and place stated in the

16   transcript; that a review of which was requested; that I

17   am in no way related to any party to the matter, nor to

18   any counsel, nor do I have any financial interest in the

19   event of the cause.

20       WITNESS MY HAND AND DIGITAL SIGNATURE THIS 3OTH day

21   of JULY, 2016.

22

23   _____

24   CHERYL O. SPRY
     Washington State Certified Court Reporter No. 2226
25   cspry@yomreporting.com