**EXHIBIT C**

1           UNITED STATES BANKRUPTCY COURT

2           WESTERN DISTRICT OF WASHINGTON

3                AT SEATTLE

4   _____

5   In re:          )
                    )
6   NORTHWEST TERRITORIAL MINT,  )
   LLC,             )
7                   )
       Debtor.     ) No. 16-11767-CMA
8                  )

9   _____

10       DEPOSITION UPON ORAL EXAMINATION

11                 OF

12            DAVID HUFFMAN

13   _____

14            11:05 A.M.

15           JULY 29, 2016

16       1000 SECOND AVENUE, SUITE 3500

17         SEATTLE, WASHINGTON

18

19

20

21

22

23

24   REPORTED BY: CHERYL O. SPRY, CCR No. 2226

25

1             A P P E A R A N C E S

2

3

4   FOR THE CHAPTER 11 TRUSTEE:

5      DAVID C. NEU

6      K&L Gates

7      925 Fourth Avenue, Suite 2900

8      Seattle, Washington 98104-1158

9      206.623.7580

10     david.neu@klgates.com

11

12

13  FOR ROSS HANSEN:

14     C. JAMES FRUSH

15     Cable Langenbach Kinerk & Bauer

16     1000 Second Avenue, Suite 3500

17     Seattle, Washington 98104-1063

18     206.292.8800

19     jfrush@cablelang.com

20

21

22  ALSO PRESENT:

23     ROSS HANSEN

24

3

1            I N D E X

2

3    EXAMINATION BY:                    PAGE

4        MR. FRUSH                  4

5

6    EXHIBITS FOR IDENTIFICATION              PAGE

7    Exhibit 1  4/16/2016 "Suppression Memo" to All      6

8            Current NWTM/MAC Employees from Mark

9            Calvert

10    Exhibit 2  6/28/2016 Declaration of Dave Huffman      9

11            in Support of Trustee's Motion for

12            Order Holding Ross Hansen in Contempt

13            for Violation of Automatic Stay

14

15

16

17

18

19

20

21

22

23

24

25

4

1          SEATTLE, WASHINGTON; JULY 29, 2016

2                    11:05 A.M.

3                    --oOo--

4                    DAVID HUFFMAN,

5     sworn as a witness by the Certified Court Reporter,

6               testified as follows:

7                    EXAMINATION

8     BY MR. FRUSH:

9        Q.   Would you please state your full name and

10    spell your last name for the record?

11       A.   David E. Huffman, H-U-F-F-M-A-N.

12       Q.   And would you give us a mailing address,

13    Mr. Huffman?

14       A.   P.O. Box 3661, Kent, Washington 98089.

15       Q.   Have you been deposed before?

16       A.   Yes.

17       Q.   About how many times?

18       A.   Probably 15 or 20.

19       Q.   So you're a veteran at this.  I'm not going to

20    go through a lot of ground rules.

21            It helps if we don't talk over each other, if

22    you say "Yes" or "No" instead of "Uh-huh" or "Huh-uh."

23    And you should feel free to take a break at any time.

24    This isn't an endurance contest.  Any time you want to

25    consult with your attorney is fine, although I would ask


5

1    do not try to consult with your attorney while I have a

2    question posed.  Go ahead and answer the question, and

3    then we'll take a break and then you can consult with

4    Mr. Neu.  Does that sound all right?

5        A.  Yes.

6        Q.  Okay.  What's your current title at Northwest

7    Territorial Mint?

8        A.  Director of Security.

9        Q.  And you were employed there when -- I'm going

10    to call it the "Mint" -- when the Mint went into

11    bankruptcy?

12        A.  Yes.

13        Q.  And who do you report to?

14        A.  Mark Calvert.

15        Q.  Is Mr. Wagner currently the president?

16        A.  I believe so.

17        Q.  But you don't report to the president of the

18    company?

19        A.  Well, I report to him as well.

20        Q.  So is it a dual report?

21        A.  It can be, depending on who is there.

22     Q.  All right.  So you report both to Mr. Calvert

23  and Mr. Wagner?

24     A.  That's correct.

25     Q.  Okay.  I'm going to ask you to look at what

6

1  we're going to mark as Exhibit 1.

2       (Deposition Exhibit 1 was marked for

3       identification.)

4     Q.  (BY MR. FRUSH:)  This, for the record, was

5  previously introduced as Exhibit 2 in the Wagner

6  deposition and Exhibit 4 in the Calvert deposition.

7  It's a Mint document entitled "Suppression Memo."

8       Have you seen this before?

9     A.  I think so.  I certainly have heard of it

10  verbally, whether I've actually read this page or not.

11     Q.  And you're aware that it was a policy of the

12  company from April 16th onward that employees were not

13  to communicate with Mr. Hansen or Ms. Erdmann; is that

14  right?

15     A.  Yeah, the request was not to communicate.

16     Q.  And if you did, you would -- you did that on

17  pain of being terminated; is that correct?

18     A.  You might be terminated, you could be

19  terminated, yes.

20     Q.  Well, I think that it says, does it not, that

21    "Any... employee who is found communicating with news

22    agencies, Diane Erdmann or Ross Hansen - in any form -

23    about NWTM Company business will be terminated

24    immediately"?  Do you see that in the last paragraph?

25        A.  I haven't got down that far yet.

1        Q.  You take your time and get down there.

2        A.  Yes, it does say that.

3        Q.  It doesn't act like it's a discretionary -- it

4    doesn't sound like it's a discretionary matter.  Is that

5    fair to say?

6        A.  Well, not as it's written here.

7        Q.  All right.  And you were -- were all the

8    employees advised of this policy?

9        A.  I -- I cannot answer that.  I know many were.

10    Whether all or not, I have no knowledge.

11        Q.  It says up at the top that it's addressed to

12    all current Mint and Medallic employees.  And it lists a

13    large number of installations and also all freelance and

14    contract areas; is that correct?

15        A.  It appears to be, that is correct, yes.

16        Q.  And I assume that this would have been

17    distributed according to Mr. Calvert's directions?

18        A.  Yes, but I didn't distribute it, so...

19        Q.  You're the chief security officer?

20    A.  Yes, sir.

21    Q.  All right.  And were you responsible for

22  basically monitoring compliance with this Suppression

23  Memo?

24    A.  No.

25    Q.  Who was?

8

1    A.  Mark Calvert.

2    Q.  Would you, if you found any violation of this

3  memo, would you report that to Mr. Calvert?

4    A.  Yes.

5    Q.  On how many occasions did you report that to

6  Mr. Calvert?

7    A.  Personally, none.

8    Q.  Impersonally, perhaps?  I don't quite

9  understand your answer, sir.

10    A.  I have not had this conversation with

11  Mr. Calvert.

12    Q.  You never told Mr. Calvert that, hey, somebody

13  is violating the policy or somebody is communicating

14  with Ross?

15    A.  No.

16    Q.  All right.

17    A.  I try to deal in facts.  I believe people are

18  communicating with Ross.  I have no idea who they are.

19    Q.   All right.  So are you aware of any employees

20    being terminated as a result of violating this memo?

21    A.   No, I can't think of any.

22    Q.   Would you agree with me that this is a serious

23    memo, this seems to be authoritative in its direction?

24    A.   By nature, yes, it could be considered that.

25         MR. FRUSH:  All right.  Let's mark this.


                              9

1          (Deposition Exhibit 2 was marked for

2          identification.)

3     Q.   (BY MR. FRUSH:)  Mr. Wagner, that's your

4     declaration.

5     A.   I'm Huffman.

6     Q.   Excuse me.  We're having a list of people go

7     through here.

8     A.   I understand.

9     Q.   Go ahead and take a look at it.  It's your --

10    oh, I've given you your declaration.  Have I given you

11    your declaration, not Mr. Wagner's?

12    A.   Yes.

13    Q.   All right.  You executed this on June 10th.

14    Was it accurate when you executed it?

15    A.   I believe so.

16    Q.   And when was the last time you reviewed it?

17    A.   I looked at it yesterday.

18      Q.  Was it accurate in all respects when you

19   reviewed it yesterday?

20      A.  I believe so.

21      Q.  Are there any changes you'd like to make to it

22   before I question you about its contents, any

23   corrections?

24      A.  None that come to mind, but I may reserve

25   that.


                                10

1       Q.  All right.  How did this come about to be

2    prepared?

3       A.  At the direction of Mark Calvert.

4       Q.  And this revolves around communications with

5    Mr. Hansen on May 18th and thereafter.  How did

6    Mr. Calvert become aware of those communications?

7       A.  Would you ask that differently?

8       Q.  Sure.

9          Most of this declaration concerns an

10   interaction with you and Ross Hansen on May 18th.  And

11   then there is in paragraph seven some additional

12   communications between the two of you.  When did you

13   make Mr. Calvert aware of these communications?

14      A.  I don't specifically recall when I made him

15   aware.  I'm sure he was aware that day.  My recollection

16   was he was out of the office, and so I had no direct

17   communication with him.

18      Q.  When did -- who told you to -- I'm trying to

19   get into how this got prepared as a declaration.  Did

20   Mr. Calvert send you to K&L Gates lawyers to prepare

21   this?  How did it get prepared?

22      A.  I believe at the direction of Mr. Calvert, one

23   of our paralegal staff -- I drafted the initial outline

24   and then it was put in a legal format by somebody on

25   payroll.


11

1      Q.  Who told you to do the drafting?

2      A.  Mr. Calvert.

3      Q.  And he wanted you to document what occurred?

4      A.  That's correct.

5      Q.  All right.  And then did you -- what happened

6   with your outline?

7      A.  I don't have it.

8      Q.  Was it turned into this by the K&L Gates

9   lawyers?

10      A.  I think it eventually ended up with the K&L

11   Gates lawyers.  This is my statement of what happened on

12   that day.

13      Q.  Did your draft it or did they draft it from

14   your outline?

15      A.  Most of it is my wording, but there may be

16    some words that I didn't initially draft. But I can't

17    specifically tell you which ones are which.

18        Q.  Was it a back-and-forth editing process, or

19    did you end up signing what they gave you?

20        A.  I ended up reviewing it after it was typed up

21    in a legal format and signed it. So I reviewed it and

22    agreed to its content.

23        Q.  You didn't have any changes to it when it was

24    presented to you in the legal format?

25        A.  Not that I recall.


12

1     Q.  Who is Patrick Ward?

2     A.  He's one of the security officers.

3     Q.  And was he working for you on May 17th?

4     A.  I believe so.

5     Q.  Are you aware that he had a conversation with

6    Ross Hansen that day?

7     A.  I know he has had conversations with Ross in

8    the past. Specifically that day? I don't recall.

9     Q.  This is the day before Ross appeared at the

10   facility on May 18th. Are you aware that Ross had had a

11   conversation with Patrick about visiting the facility

12   the day before he arrived?

13       A.  Not off the top of my head, no.

14       Q.  Did Patrick Ward tell you that Ross had called

15  and that he was going to visit to pick up some documents

16  before Ross arrived?

17      A.  I have a recollection that Patrick did say

18  something to that effect.  I don't know if it was the

19  day before or the day of this incident, but he did at

20  some point tell me that he had had a conversation with

21  Ross.

22      Q.  And that was a conversation with Ross, with

23  Ross letting him know that he intended to come by to

24  pick up some documents; is that correct?

25      A.  That could be correct, but Patrick doesn't


13


1  have the authority to authorize Ross to come by and pick

2  up anything.

3      Q.  The point I'm trying to make is that

4  Mr. Hansen advised security personnel at the Mint that

5  he intended to visit to pick up documents, isn't that

6  correct, prior to his arrival?

7      A.  Well, I wasn't privy to that conversation, so

8  I don't know what was discussed.

9      Q.  Did Patrick Ward talk to you, Mr. Huffman,

10  about the fact that Ross called?

11      A.  He did say at some point, as I just stated,

12  that he did have a conversation with Ross.  I don't

13  remember if it was the day before or the day of.

14    Q.  Didn't you say Mr. Hansen, when you were

15    escorting him out on the 18th, that when Mr. Hansen told

16    you that he had talked to Patrick the day before you

17    said words to the effect that, "I know, but he doesn't

18    have the authority, he's not the proper person to tell?"

19    Didn't you tell them that as you escorted him out on the

20    18th?

21    A.  I probably did, uh-huh.

22    Q.  And Mr. Hansen tried to give prior notice,

23    perhaps to the wrong person, but he gave prior notice

24    that he was coming down, didn't he?

25    A.  Not to me he didn't.


14

1    Q.  I'm not asking about to you.  You're aware

2    that he told your personnel that he was coming, aren't

3    you?

4    A.  As I said, I vaguely remember something to

5    that effect.  I don't know what day or when that

6    conversation took place.

7    Q.  Well, you certainly couldn't have had that

8    conversation with Mr. Hansen as you were escorting him

9    out if you hadn't had it before the time you were

10    escorting him out, could you, Mr. Huffman?

11    A.  Well, you're assuming that's when that

12    conversation took place.

13    Q.  Did you have a conversation at the offices of

14  the Mint after that time with Mr. Hansen?

15    A.  Yes, he called me at night --

16    Q.  No, no, in person, in person.

17    A.  No, he called me that night and he called me a

18  couple weeks later.

19    Q.  All right, Mr. Huffman.  We'll move on.

20      Let's go to your declaration.  You weren't

21  there when Mr. Hansen arrived with Ms. Erdmann, were

22  you?

23    A.  No.  I was probably one or two minutes behind

24  them.

25    Q.  You didn't see Annette Trunkett hug


15

1  Ms. Erdmann, did you?

2    A.  No, I did not.

3    Q.  You didn't see how she greeted Ross at all,

4  did you?

5    A.  No, sir.

6    Q.  And when you arrived, Ross was across the desk

7  from Ms. Trunkett; is that right?

8    A.  He was leaning over her desk in her face.  He

9  was not across the room on the other side of her desk.

10    Q.  Well, your declaration, let's look at page

11  four -- or rather paragraph four, it says he was leaning

12  over the front of her desk and speaking very quietly to

13  her.

14      A.  That's correct.

15      Q.  And that's what you said happened; right?

16      A.  Yes, sir.

17      Q.  And he wasn't speaking in a loud voice, was

18  he?

19      A.  You don't have to intimidate somebody in a

20  loud voice or in a quiet voice.

21      Q.  Mr. Huffman, answer my question.

22      A.  I did answer your question.

23      Q.  No, no, no.

24      A.  You're inferring something.

25      Q.  You're giving me a speech about what people do

16

1  when they want to intimidate people.  I'm asking you

2  whether he spoke in a loud voice or a soft voice.

3      A.  He spoke in a soft voice.

4      Q.  All right.  And he was not on the same side of

5  the desk with her, he was across the desk, wasn't he?

6      A.  Yes, sir.

7      Q.  Now, you couldn't tell what he was saying,

8  could you?

9      A.  I did not hear what he said, but I could see

10  her face.

11    Q.   Well, it's your opinion he was attempting to,

12    quote, intimidate her; is that right?

13    A.   That's right, based upon my many years of law

14    enforcement and domestic violence.

15    Q.   What makes you -- well, I'm not -- so you're

16    capable of walking into a room and in seconds

17    determining whether somebody who is standing across the

18    desk from somebody speaking in a soft voice is

19    intimidating that person?  That's your testimony?

20    A.   In this instance, yes.

21    Q.   Did you ever talk to Annette of whether she

22    felt intimidated?

23    A.   Yes, I did.

24    Q.   What did she tell you?

25    A.   She did feel intimidated in that incident.


17

1    Q.   Did she tell you that Mr. Hansen had

2    threatened her?

3    A.   She told me she was intimidated.  And later

4    that day when she had to go to Building B over in

5    Auburn, she asked for an escort.  So I escorted her over

6    there.  And the fear factor was based upon that incident

7    earlier that day with Mr. Hansen.

8    MR. FRUSH:  Would you read my question back,

9    please?

10      THE COURT REPORTER: "Question: Did she tell

11  you that Mr. Hansen had threatened her?"

12      Q. (BY MR. FRUSH:) Do you understand my

13  question?

14      A. Yes, and I gave you my answer.

15      Q. No. The answer is did she tell you Mr. Hansen

16  threatened her?

17      A. Define "threat."

18      Q. Well, I guess "threat" means that you're going

19  to either do or say something that causes some type of

20  harm. Do you not -- you've been in law enforcement for

21  a long time. What do you think a threat is? You define

22  "threat" for me, Mr. Huffman.

23      A. Well, you're asking me the question, so I'm

24  trying to get your definition of how to answer it.

25      Q. What's a threat, Mr. Huffman, in your mind?


18

1      A. A threat can be verbal, nonverbal, it can be

2  with weapons, it can be without weapons. There is all

3  types of threats.

4      Q. Did she indicate in any fashion that

5  Mr. Hansen had threatened her?

6      A. She felt threatened.

7      Q. No, no. Did she tell you?

8      A. Yes, she told me she felt threatened. I've

9    answered that question several times the same way.

10       Q.  She told you she felt threatened.  Did she

11    tell you that he threatened her?  I'm not asking how she

12    felt.

13       A.  Yes, you did.

14       Q.  No, I'm asking you did he make a threat to

15    her?

16       A.  I don't know.  I could not hear his

17    conversation.

18       Q.  My question is did she tell you that he made a

19    threat to her?

20       A.  She felt threatened.

21       Q.  I'm not asking --

22       A.  That's what she told me.

23       Q.  She told you she felt threatened?

24       A.  Yes.

25       Q.  Did she tell you anything else?


19

1       A.  That she felt threatened and later that day

2    asked for an escort over to Building B.

3       Q.  It is the case that she did not tell you that,

4    "He threatened me"?  Isn't that right?

5       A.  That's not the case.  She told me she felt

6    threatened.

7       Q.  Mr. Huffman, look, you know, we can make this

8    hard or we can make it easy.

9        A.   Okay.

10       Q.   All right?  Answer the question.

11       A.   I did answer your question.

12       Q.   No.  I'm asking did Mr. Hansen -- excuse me,

13   did Annette tell you that, "He threatened me," or words

14   to that effect?

15       A.   Words to that effect.  Yes, she felt

16   threatened by Mr. Hansen.

17       Q.   I'm not asking how she felt, I'm asking did he

18   make a threat.

19       A.   What's the difference?

20       Q.   The difference is one is how she feels and --

21       A.   I didn't hear what he said to her, but she

22   later told me she felt threatened by his presence and

23   what he did tell her.

24       Q.   Was there some threat that he made that she

25   related to you?

20

1        A.   Not specifically.

2        Q.   Generally?

3        A.   Yes, generally she felt threatened by the

4    conversation.

5        Q.   All right, all right.

6            MR. FRUSH:  David, I'm going to take a break.

7    All right?  I need you to talk to this fellow.  All

8    right?  Because we're going to go to the judge on this.

9    I'm not going to put up with this stuff.

10          (Recess.)

11     Q.   (BY MR. FRUSH:)  Mr. Huffman, let's try again.

12   During that day, did Mr. Hansen threaten you?

13     A.   No.

14     Q.   Were you intimidated by Mr. Hansen?

15     A.   No.

16     Q.   Did you feel threatened by Mr. Hansen?

17     A.   No.

18     Q.   Did you hear him utter any threat against

19   anyone else present?

20     A.   No.

21     Q.   Did you see him take any action that would

22   constitute a threatening behavior towards any person in

23   your presence?

24     A.   Yes.

25     Q.   Who?

21

1    A.   Annette.

2    Q.   What threatening behavior was he exhibiting?

3    A.   It was his posture, both his hands on her

4   desk, leaning over her desk in her face.  There was less

5   than two feet between their faces.  And he could have

6     certainly been seated on the other side of the desk, he

7     could have stood in the doorway.  But it was very

8     intentional that he got very close, leaned over her desk

9     in a very authoritative posture.

10        Q.  So that's how you perceived that posture?

11        A.  Yes.

12        Q.  Anything other than his posture that you took

13    as a threatening behavior on his part?

14        A.  Just his body stance.

15        Q.  That's posture.  Anything else?

16        A.  No, sir.

17        Q.  His tone of voice was low?

18        A.  Yes.

19        Q.  Did he ever raise his voice to anyone present?

20        A.  Not that day.

21        Q.  Now, you came in when Mr. Hansen was engaged

22    in a conversation with Annette; is that right?

23        A.  That's correct.

24        Q.  And he told you that he had -- he was there to

25    pick up documents that related to Medallic Art; is that

22

1     correct?

2         A.  I believe that's correct, yes.

3         Q.  And he gave you some documents which were an

4     email from his lawyer and a cover envelope of some type

5    that were attached as exhibits to your declaration; is

6    that correct?

7        A.  That's correct.

8        Q.  And did you read those at the time?

9        A.  Yes.

10       Q.  And you told him that he was to leave; is that

11   right?

12       A.  That's correct.

13       Q.  And you told him that you would call the

14   police; is that correct?

15       A.  That's correct.

16       Q.  And you told him that he had about three

17   minutes to leave; is that right?

18       A.  I don't know that I stated a time frame, but I

19   said the police had been called, yes.

20       Q.  And he said or exhibited behavior to the

21   effect of I'm leaving; is that right?

22       A.  No, he stood there and debated that for quite

23   a while before he left, but he did eventually leave.

24       Q.  Did he debate it in a loud fashion?

25       A.  No.  I've heard Ross get loud before, and he

23

1    was not loud with me.

2        Q.  Was he relying upon the letter from his

3    attorney or the email from his attorney?

4     A.   Well, he was relying on the paperwork he had

5     brought with him.  So I don't know where -- where it

6     came from.

7     Q.   And you were on the phone with someone at that

8     time, or right before that time?

9     A.   During my discussion with Ross, I got a call

10    from Paul Wagner, who was down in Dayton, Nevada.

11    Q.   And what did Mr. Wagner tell you?

12    A.   That Mr. Hansen had to leave immediately and

13    take nothing from the office.

14    Q.   And you made that clear to Mr. Hansen?

15    A.   Yes, I did.

16    Q.   And other than a discussion of him trying to

17    rely on the paperwork he brought, that was the end of

18    it.  Is that fair to say?

19    A.   Well, as I said a moment ago, it took him a

20    little time to vacate the office, but he did leave.

21    Q.   Between the time you arrived and the time you

22    walked out with him, how long did it take?

23    A.   Oh, probably approximately eight to ten

24    minutes.

25    Q.   When you're leaving with Mr. Hansen, you had

24

1     additional conversation; is that correct?

2     A.   With whom?

3      Q.  With Ross Hansen.  As you're walking out with

4   Ross, you're continuing to talk.  Is that fair to say?

5      A.  I talked to him while he was in the office.  I

6   did not go out into the parking lot with him, so I'm not

7   sure what you're referring to.

8      Q.  You escorted him to the door; is that right?

9      A.  Yes, sir.

10     Q.  And before you get to the door, did you have a

11  conversation with Ross where he complained or rather he

12  said that he told you that he had talked to Patrick Ward

13  the day before?

14     A.  We may have had that conversation.  I don't

15  specifically recall.

16     Q.  And did he complain to you that Maura --

17  excuse me.  Strike that.

18        At that point, Maura Richardson was no longer

19  with the company, was she?

20     A.  I think that's correct.

21     Q.  Did Ross indicate to you that his point of

22  contact had been Maura Richardson up until that time?

23     A.  In the office conversation?

24     Q.  Right.

25     A.  No.

1      Q.  Were you aware that Maura Richardson was

2  designated by Mr. Calvert as a point of contact for

3  Ross?

4      A.  Ross told me that.

5      Q.  All right.  Did you understand that from

6  Mr. Calvert?

7      A.  Not at that time.  Later I asked him, and he

8  said yes.

9      Q.  So Mr. Calvert confirmed for you that Maura

10  was a point of contact for Ross; is that right?

11      A.  At some point, yeah.

12      Q.  And Ross told you that day that Maura had been

13  a point of contact, she's no longer there, and he asked

14  you who could be a proper point of contact; isn't that

15  right?

16      A.  I think that was a couple weeks later when he

17  called me on my cell phone.

18      Q.  Didn't you tell him that Patrick Ward was not

19  a proper point of contact?

20      A.  Probably.

21      Q.  And that was the person that he told you he

22  had talked to the day before he showed up at the Federal

23  Way facility; isn't that right?

24      A.  If fact in we had that conversation while he

25  was in the office, my reply was his point of contact is

26

1    Mark Calvert.

2        Q.  Well, at some point, he did tell you that

3    Patrick Ward had been contacted by him the day before?

4        A.  That's correct.

5        Q.  All right.  And at some point, did you become

6    the point of contact for Ross?

7        A.  No.

8        Q.  You didn't tell him that day that he could use

9    you as a point of contact?

10        A.  Absolutely not.

11        Q.  Did you have three or four telephone

12    conversations with him over the next couple weeks?

13        A.  No.  I had one later that day and one in a

14    couple weeks, and I haven't spoken to him since.

15        Q.  So you had at least two conversations with him

16    after the visit; is that right?

17        A.  Yes, that's correct.

18        Q.  Could there have been a third or fourth

19    conversation that you don't recall, or are you certain

20    there were only two?

21        A.  I'm pretty sure there were two.

22        Q.  And not more?

23        A.  As far as I can recall right now.

24        Q.  Was he talking to you about trying to get the

25    documents when you had these subsequent phone

1   conversations?

2       A.  I don't remember.

3       Q.  You're not certain whether or not he discussed

4   with you during those conversations that he wanted to

5   get those Medallic Art documents?

6       A.  Well, later that day he requested that I be

7   his point of contact, and I said I was not his point of

8   contact.  We ended up terminating that conversation.

9           And then at some of point after that,

10  approximately a week or so, we had another conversation

11  by phone.  And Ross was being his charming self.  And I

12  say that in all honesty.  I like Ross, I think Ross

13  likes me, but he also uses that to gain intelligence and

14  inside information.  So I told him I wasn't going to

15  play that game.

16      Q.  Did you notify Mr. Calvert that you were

17  having these communications with Ross?

18      A.  Yes, I told him Ross called me.

19      Q.  Now, when he called you on both those

20  occasions, you could have told him that, "I'm not going

21  to talk to you and I'm hanging up."  Is that right?

22      A.  I could have.

23      Q.  Did he threaten you in any of those phone

24  calls?

25      A.  No.  I don't think Ross has ever threatened

1    me.

2        Q.   Did you feel intimidated by those phone calls?

3        A.   No.  I think we've covered that.  I don't feel

4    intimidated by Ross.

5        Q.   And you could have terminated those phone

6    calls at any time?

7        A.   Which did happen, yes.

8        Q.   Well, actually, the second phone call he hung

9    up; isn't that right?

10        A.   I believe so, yeah.

11        Q.   And in fact, you asked him repeatedly to, in

12    some fashion, to try to find out who at the Mint was

13    providing him information; isn't that correct?

14        A.   That's correct, yes.

15        Q.   And that was something you were trying to get

16    out of Mr. Hansen; isn't that correct?

17        A.   Yes.

18        Q.   And he said that he wasn't going to rat people

19    out, didn't he?

20        A.   That's correct.

21        Q.   And at that point you said, well, there is

22    nothing further for us to discuss -- or rather he said,

23    "There is nothing further for us to discuss," and he

24    hung up on you; is that right?

25        A.   I believe that's what happened, yes.

1    Q.  So while you feel that Mr. Hansen was trying

2    to get information from you, certainly you were also

3    trying to get information from him in these phone calls.

4    Is that fair to say?

5    A.  That's what we both do, is collect

6    information.

7    Q.  All right.  And I've asked you this question

8    before and I apologize, I'm just trying to make sure.

9    You're not certain whether in these subsequent

10   conversations he talked to you about trying to get the

11   documents, the Medallic Art documents from the Mint?

12   A.  Well, the day he was physically present, yes,

13   he had paperwork.

14   Q.  I'm talking about the phone calls.

15   A.  Oh, I don't specifically recall the phone

16   calls having to deal with documents.

17   Q.  They might have, you just don't recall

18   specifically?

19   A.  I don't recall the conversations dealing with

20   documents.

21       MR. FRUSH:  Let's take just a one-minute

22   break.  I think we're almost through.  I may have one

23   more question.  Excuse me.

24       (Recess.)

1    questions.

2        Q.  (BY MR. FRUSH:)  You were seeking information

3    from Mr. Hansen as to who was providing him information

4    in these subsequent calls; is that correct?

5        A.  Yes, we had that discussion.  I think it was

6    the second call.

7        Q.  Okay.  What were you going to do with that

8    information?

9        A.  I was going to try and connect dots.

10       Q.  So did you want to report to Mr. Calvert who

11   was communicating with Ross?

12       A.  If I could verify it.

13       Q.  And was that with the purpose of having them

14   either disciplined or terminated?

15       A.  That's not up to me.  That would be up to

16   Mr. Calvert.

17       Q.  Right.  But you felt it was your role to try

18   to provide Mr. Calvert with the information as to who

19   was communicating with Ross?

20       A.  Well, as director of Security, yes.

21       Q.  And you felt that was in your --

22       A.  Scope of employment.

23       Q.  Let me finish.  That was in your area of

24  responsibility?

25      A.  Yes.

1       Q.  And you were actively seeking to find out who

2   it might be so you could tell Mr. Calvert?

3       A.  It would probably end up in Mr. Calvert's

4   hands, yes.

5       Q.  Well, probably, I assume that's -- never mind.

6   That's why you were asking the questions, wasn't it?

7       A.  Well, I think you've been in this business

8   long enough to understand there is intelligence and

9   there is evidence.  There is a difference between the

10  two.

11      Q.  Well, if Mr. Hansen had told you that

12  so-and-so was communicating with him, you would have

13  probably gone and confronted that person, wouldn't you?

14      A.  Probably.

15      Q.  And you would have done an investigation as

16  head of Security of that?

17      A.  Probably.

18      Q.  And you were doing that because there was a

19  Suppression Memo that prohibited that kind of

20  communication, wasn't there?

21      A.  Yes, there was a memo to that effect.

22      Q.  And you would have reported your results of

23   your investigation to Mr. Calvert; correct?

24      A.  Probably.

25      Q.  Would there have been a situation where you

1   would have conducted an investigation about somebody

2   communicating with Ross and not reported it to

3   Mr. Calvert?

4      A.  I'd have to verify the fact that actually was

5   happening.  There was a potential that Ross could have

6   said it was John Doe, who had nothing to do with it, to

7   throw somebody under the bus.

8      Q.  Fair enough.

9      A.  It could be a vindictive thing to get me on

10   the wrong track.  So I'm a skilled investigator; I know

11   the difference.

12      Q.  Fair enough.  So I take it if you thought that

13   the report from Ross was well founded that that person

14   was communicating with him, you would have finished an

15   investigation of that and reported it to Mr. Calvert?

16      A.  Probably.

17      Q.  Did that process happen with any of the

18   employees at the Mint, that you reported or someone

19   reported to Mr. Calvert that they were communicating

20   with Ross?

21      A.  Not to my knowledge.  I have not done so.  I

22  can't speak for anybody else.

23      Q.  Did you have any knowledge about Ross's

24  communications with Destiny Krum, K-R-U-M?

25      A.  Yes.

33

1       Q.  How did you become aware of those

2   communications?

3       A.  I had heard through the office grapevine that

4   he had made a call to her, and I went over and talked to

5   her.  And she explained to me what the call was about

6   and when it happened.

7       Q.  Who at the office told you about --

8       A.  I don't recall.

9       Q.  Was it a female manager in the Auburn office?

10      A.  I don't recall who told me.  And no,

11  specifically it was not a female manager from the Auburn

12  office.  I do not get to the Auburn office very often.

13      Q.  So you don't have any recollection of who told

14  you that Destiny had had a conversation with Ross?

15      A.  That's what I stated.

16      Q.  Did you learn from any other source of anyone

17  else having a conversation with Ross?

18      A.  Did I what?

19      Q.  Did you -- you heard from the office grapevine

20  that Destiny had had a conversation with Ross, and you

21    went and you talked to her about it.  Is that fair?

22         A.  Yes.

23         Q.  All right.

24         A.  That's what I said.

25         Q.  Is there anyone else besides Destiny that that

1    process occurred with?

2         A.  Not that I can think of at the moment.

3         Q.  Where did you talk to Destiny?

4         A.  At Building B.

5         Q.  Who else was present besides you and Destiny?

6         A.  Nobody.

7         Q.  How long did that conversation occur?

8         A.  I don't know.  Ten minutes?

9         Q.  What did Destiny tell you?

10        A.  That Ross had called her, if I recall the day,

11   it was on a Friday evening after work, and that --

12   apparently, Diane called her and then handed the phone

13   to Ross, or -- I'm sorry.  Diane called Destiny and said

14   to the effect, "Someone wants to talk to you," and

15   handed the phone to Ross.  So therefore, Ross had the

16   conversation with Destiny.

17        And I didn't hear that conversation.  As it

18   was relayed to me, he asked her if she would go to work

19   for him, if she would copy the information off the

20    engraving machine and then delete everything out of the

21    engraving machine so it would become, in effect,

22    worthless.

23        Q.  And Destiny told you that?

24        A.  Yes.

25        Q.  And did you take notes of that meeting?

1         A.  No.

2         Q.  You didn't take notes?

3         A.  No.

4         Q.  Did you threaten her with termination?

5         A.  No.

6         Q.  Did you have any discussion of the prohibition

7     against her communicating with Ross?

8         A.  No.  As I said, that's a Calvert decision.

9     I'm not going to fire somebody for talking to Ross.

10        Q.  So you reported all that to Mr. Calvert?

11        A.  I'm sure I did.

12        Q.  Did you prepare a writing or a memo to report

13    it?

14        A.  No.  I -- if I recall, Calvert requested she

15    prepare a statement because the conversation happened

16    between her and Ross.

17        Q.  So you have no notes of your conversation with

18    her?

19    A.  No.

20    Q.  One last area.  Were you in charge of the

21  video surveillance at the Mint?

22    A.  Define "in charge."

23    Q.  Well, I guess it's a fair question.  Were you

24  responsible for ensuring that the video surveillance was

25  active and maintained?

36

1    A.  No.

2    Q.  Who was?

3    A.  The IT department.

4    Q.  The IT department?

5    A.  Uh-huh.

6    Q.  How would it happen that a video surveillance

7  tape would be -- where was it generally deposited or

8  maintained?

9    A.  Well, on a limited basis, it was stored in the

10  servers, I believe, at the Northwest Territorial Mint.

11  But the IT department, I believe, and I'm not an IT

12  expert, I think that they also had storage of whatever

13  was recorded on any of the systems.  And my vague

14  understanding is a lot of it was deposited off-site as

15  well.  But again, I'm not an IT guy.

16    Q.  It generally wasn't maintained on your

17  computers at Security, was it?

18    A.  No, it was not.

19    Q.  We've heard from Mr. Wagner that, if I

20  recollect right --

21      MR. FRUSH:  And correct me if I'm wrong,

22  David.

23    Q.  (BY MR. FRUSH:)  -- that at one point he

24  obtained from your computers video surveillance tape.

25  Does that sound accurate?

1    A.  It wasn't from my computer, so I don't know

2  what computers they gained access to.  I personally did

3  not download any video to whatever.

4    Q.  When the videotape was taken that was the

5  dispute that was related to visits to the vault --

6  you're aware of that, you were deposed in connection to

7  that.  Did you play any role in the handling of that

8  video surveillance tape?  Do you understand my question?

9    A.  I didn't download it.  You know, that's above

10   my skill level.

11    Q.  Do you know who did?

12    A.  I don't.

13    Q.  It would have been IT people?

14    A.  Yes.

15    Q.  All right.

16    A.  I didn't have any ability to download it.

17    Q.   You're aware of the video that was taken in

18    the vault of Diane and Ross before the bankruptcy.  Is

19    that -- let me ask, are you aware of the video that was

20    taken?

21    A.   Yes.

22    Q.   And have you reviewed it?

23    A.   I've seen it, yes.

24    Q.   All right.  And that was the subject of

25    questioning of you at another deposition I recollect.

38

1    Is that fair?

2    A.   I believe so, yeah.

3         MR. FRUSH:  All right.  I don't think I have

4    anything further.  Thank you very much, Mr. Huffman.

5         THE WITNESS:  Thank you.

6         (Deposition recessed at 11:55 a.m.)

7         (Signature was requested.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        CORRECTION & SIGNATURE PAGE

2   RE:  NORTHWEST TERRITORIAL MINT, LLC

3     UNITED STATES BANKRUPTCY COURT; No. 16-11767-CMA

4     DAVID HUFFMAN; TAKEN JULY 29, 2016

5      Reported by: CHERYL O. SPRY, CCR No. 2226

6      I, DAVID HUFFMAN, have read the within

7   transcript taken JULY 29, 2016, and the same is true and

8   accurate except for any changes and/or corrections, if

9   any, as follows:

10   PAGE/LINE       CORRECTION       REASON

11   _____

12   _____

13   _____

14   _____

| | |
|---|---|
| 15 | _____ |
| 16 | _____ |
| 17 | _____ |
| 18 | _____ |
| 19 | _____ |
| 20 | _____ |
| 21 | _____ |

22     Signed at _____, Washington,

23  on this date: _____

24

25             _____
                    DAVID HUFFMAN

40

1         REPORTER'S CERTIFICATE

2     I, CHERYL O. SPRY, the undersigned Certified Court

3  Reporter, pursuant to RCW 5.28.010, authorized to

4  administer oaths and affirmations in and for the State

5  of Washington, do hereby certify:

6     That the sworn testimony and/or proceedings, a

7  transcript of which is attached, was given before me at

8  the time and place stated therein; that any and/or all

9  witness(es) were by me duly sworn to testify to the

10  truth; that the sworn testimony and/or proceedings were

11  by me stenographically recorded and transcribed under my

12  supervision, to the best of my ability; that the

13  foregoing transcript contains a full, true, and accurate

14    record of all the sworn testimony and/or proceedings

15    given and occurring at the time and place stated in the

16    transcript; that a review of which was requested; that I

17    am in no way related to any party to the matter, nor to

18    any counsel, nor do I have any financial interest in the

19    event of the cause.

20        WITNESS MY HAND AND DIGITAL SIGNATURE THIS 30TH day

21    of JULY, 2016.

22

23    _____

24    CHERYL O. SPRY
      Washington State Certified Court Reporter No. 2226
25    cspry@yomreporting.com