# EXHIBIT D

1

1        UNITED STATES BANKRUPTCY COURT

2        WESTERN DISTRICT OF WASHINGTON

3              AT SEATTLE

4    _____

5    In re:                    )
                               )
6    NORTHWEST TERRITORIAL MINT,    )
     LLC,                      )
7                              )
           Debtor.             ) No. 16-11767-CMA
8                              )
9    _____

10       DEPOSITION UPON ORAL EXAMINATION

11                  OF

12             PAUL WAGNER

13   _____

14              9:30 A.M.

15           JULY 29, 2016

16      1000 SECOND AVENUE, SUITE 3500

17          SEATTLE, WASHINGTON

18

19

20

21

22

23

24   REPORTED BY: CHERYL O. SPRY, CCR No. 2226

25

                                        2

1                A P P E A R A N C E S

2

Wagner.txt

```
3
4      FOR THE CHAPTER 11 TRUSTEE:
5              DAVID C. NEU
6              K&L Gates
7              925 Fourth Avenue, Suite 2900
8              Seattle, Washington 98104-1158
9              206.623.7580
10             david.neu@klgates.com
11
12
13     FOR ROSS HANSEN:
14             C. JAMES FRUSH
15             Cable Langenbach Kinerk & Bauer
16             1000 Second Avenue, Suite 3500
17             Seattle, Washington 98104-1063
18             206.292.8800
19             jfrush@cablelang.com
20
21
22     ALSO PRESENT:
23             ROSS HANSEN
24
25
```

⚇

```
                                              3
1                       I N D E X
2
3      EXAMINATION BY:                      PAGE
4              MR. FRUSH                        4
5
```

Page 2

Wagner.txt

| 6 | EXHIBITS FOR IDENTIFICATION | PAGE |
|---|---|---|
| 7 | Exhibit 1  6/10/2016 Declaration of Paul Wagner in | 5 |
| 8 | Support of Trustee's Motion for Order | |
| 9 | Holding Ross Hansen in Contempt for | |
| 10 | Violation of the Automatic Stay | |
| 11 | Exhibit 2  4/16/2016 "Suppression Memo" to All | 17 |
| 12 | Current NWTM/MAC Employees from Mark | |
| 13 | Calvert | |
| 14 | Exhibit 3  Pages 63-65 of Mr. Wagner's 6/8/2016 | 34 |
| 15 | deposition | |
| 16 | Exhibit 4  Pages 66-69 of Mr. Wagner's 6/8/2016 | 39 |
| 17 | deposition | |

18

19

20

21

22

23

24

25

♀

4

1               SEATTLE, WASHINGTON; JULY 29, 2016

2                        9:30 A.M.

3                        --oOo--

4                     PAUL WAGNER,

5      sworn as a witness by the Certified Court Reporter,

6                   testified as follows:

7                      EXAMINATION

8    BY MR. FRUSH:

9         Q.   Would you state your full name and spell your

Page 3

Wagner.txt

10      last name for the record?

11          A.    Paul Wagner, W-A-G-N-E-R.

12          Q.    And would you give us a mailing address,

13      Mr. Wagner?

14          A.    It's 16414 Saybrook Drive in Woodinville,

15      Washington 98077.

16          Q.    Have you been deposed before, Mr. Wagner?

17          A.    I have.

18          Q.    About how many times?

19          A.    Once.

20          Q.    That was in connection with another matter

21      relating to the bankruptcy?

22          A.    That's correct.

23          Q.    Okay.  I suspected that they went through kind

24      of some of the ground rules or such with you.  They're

25      not terribly complex.

♀

                                                        5

1               I do want you to be comfortable.  If you want

2       to take a break at any time, this isn't an endurance

3       contest, and I don't think you're going to be here long

4       in any event.  If you want to talk to your lawyer at any

5       time, that's fine.  Kind of the only rule that I have

6       any particular interest in is if I have a question

7       that's posed, we don't want you to be conferring with

8       your lawyer before you respond.

9               Is that fair enough?

10          A.    Okay.

11          MR. FRUSH:  Let's mark this.

12          (Deposition Exhibit 1 was marked for

                        Page 4

13                    identification.)

14          Q.    (BY MR. FRUSH:)  Do you recognize what's been

15   marked as Exhibit 1?

16          A.    I do.

17          Q.    And would you tell us what that is?

18          A.    This is a declaration.

19          Q.    Is it your declaration?

20          A.    Yes, it is mine.

21          Q.    All right.  When is the last time you reviewed

22   this declaration?

23          A.    I looked at it yesterday.

24          Q.    Was it true and correct in all respects when

25   you signed it on June 10th?

                                                              6

1           A.    Yes.

2           Q.    Was it true and correct in all respects when

3    you reviewed it yesterday?

4           A.    Yes.

5           Q.    Are there any changes you'd like to make to

6    it?

7           A.    No.

8           Q.    Let's talk about your conversation on Friday,

9    June 3rd, at the federal courthouse in Seattle with

10   Mr. Hansen.  Where was -- I take it that, as you state

11   here, that Ross was outside the courtroom.  I've been

12   there a few times.  Was he out in the big open area --

13          A.    Yeah.

14          Q.    -- with the big windows, or was he sort of in

15   the vestibule that's contained --

16          A.    No, out in the big open.
                            Page 5

17      Q.      The elevators are in the center of those
18   floors.
19      A.      Yes.
20      Q.      And I take it -- did you see him when you came
21   off the elevator?
22      A.      He saw me when he came off the elevator.
23      Q.      When he came off the elevator.  So you were
24   standing there?
25      A.      Yes.

7

1       Q.      Where were you standing or sitting?
2       A.      Right outside as you turn left out of the
3    elevators going to the court, in front of the courtroom,
4    in that corner.
5       Q.      Would he naturally pass by you as he moved
6    into the courtroom or went into the courtroom?
7       A.      He would.  Yeah, he would have to pass by me
8    within 25 or 30 feet.
9       Q.      And did you acknowledge each other?
10      A.      Yeah.
11      Q.      How so?
12      A.      Ross walked over and engaged in a
13   conversation.
14      Q.      And did you indicate in any fashion that you
15   didn't want to talk to Mr. Hansen?
16      A.      No.
17      Q.      Tell me what the conversation was about.
18      A.      Well, he first asked -- or made a statement,
19   "I hope you're not angry with me."

Page 6

20          I said, "No, I'm not particularly angry with

21    you."

22          Q.    Why do you think he said that?

23          A.    He probably has a sense that most people are,

24    given what's transpired, most people are angry with him.

25          Q.    I'm sorry.  I was distracted.

⚥

1           A.    Given what has happened to the company, it's

2     natural to assume that people would be upset with him.

3           Q.    Because of the bankruptcy?

4           A.    Yeah.

5           Q.    What did you say?

6           A.    I said, "I'm not particularly upset."

7           Q.    Was this a cordial conversation?

8           A.    Yes, it was.

9           Q.    And did you at any time attempt to leave or

10    ask Mr. Hansen to stop talking to you?

11          A.    No.

12          Q.    Did you ever turn away and walk away from him?

13          A.    No.

14          Q.    Did you ever turn from him and walk into the

15    courtroom?

16          A.    No.

17          Q.    I take it at some point you went in the

18    courtroom and sat with people that were associated with

19    the trustee.  Is that fair to say?

20          A.    No, I didn't sit with anybody in particular.

21          Q.    Were you a witness at that proceeding?

22          A.    Yes.

23          Q.    Okay.  So you were segregated as a witness

24     outside?

25          A.    Uh-huh.


                                                  9

1               MR. NEU:   Make sure you answer with words.

2          A.    Yes.

3               MR. NEU:   She's good, but maybe not that good.

4          Q.    (BY MR. FRUSH:)  She's very good.   And we

5     should try not to talk over each other, because that

6     drives her crazy.

7          A.    Okay.

8          Q.    Was Mr. Hansen also a witness at that

9     proceeding?

10          A.    Yes.

11          Q.    So it made sense that the two of you would

12     have been outside the courtroom --

13          A.    Uh-huh.

14          Q.    -- is that right?

15          A.    That's correct.

16          Q.    So why don't you tell me the balance of the

17     conversation.

18          A.    Ross tried to convince me --

19          Q.    No, no, I don't want what Ross intended to do,

20     I want to know what you said and what Mr. Hansen said.

21          A.    Mr. Hansen produced a document that was his

22     turnaround plan.

23          Q.    Did you take this from him?

24          A.    He gave it to me.

25          Q.    And you took it?

                              Page 8

⚲

1      A.    Yes.

2      Q.    All right.  What was said?  I'm interested in

3  what exactly was said, not what people intended to do or

4  you thought they intended to do.

5      A.    That he had a turnaround plan that would --

6  his intent was to -- he communicated his intent to take

7  back the company.  He wanted to communicate a turnaround

8  plan.  He communicated to me that he knew that there

9  were a lot of employees that were about to leave the

10  company.  And that was the gist of the conversation.

11      Q.    What was said on your side?

12      A.    I told him I did not believe that a lot of

13  people were about to jump ship.  That was about it.

14      Q.    Did you bring up the subject of the closing of

15  the Tomball plant in Texas?

16      A.    Did I bring it up?  No.

17      Q.    Did he bring it up?

18      A.    I think so.

19      Q.    Did you indicate that there was a morale

20  problem because people had been fired and people in the

21  Washington state offices were expecting the same to

22  happen to them?

23      A.    No.

24      Q.    What exactly did you say?

25      A.    My response to him, his belief that that was a

⚲

1  mistake, I told him "No, it was not a mistake."

2      Q.    A mistake?  What was a mistake?

```
 3          A.    A mistake in selling the company.

 4          Q.    Selling that installation?

 5          A.    Yeah.

 6          Q.    Okay.  Go ahead.

 7          A.    And I told him, "No, it wasn't a mistake."

 8          Q.    Did you tell him why you felt that way?

 9          A.    Because the company lost money.  They bled us
10    dry.

11          Q.    Any other conversation on your part?

12          A.    No.

13          Q.    How long did this conversation take?

14          A.    I don't know.  Less than five minutes.

15          Q.    Did he make any threats to you?

16          A.    No.

17          Q.    Were you intimidated by Mr. Hansen, at that
18    time?

19          A.    No.

20          Q.    Did he solicit your employment?

21          A.    No.

22          Q.    Was it implicit in his discussion with you
23    that if he did take over the company that you would
24    still be associated with it?

25          A.    No.
```

                                                        12

```
 1          Q.    Was it implicit that you would not be
 2    associated with it?

 3          A.    No.

 4          Q.    So you didn't really discuss that aspect?

 5          A.    No, we didn't.
```

                          Page 10

6     Q.    So there was no discussion that if you took

7  over the company that you would be out of a job?

8     A.    No.

9     Q.    All right.

10    A.    We had no conversation in or around that topic

11 at all.

12    Q.    Is it fair to say that he was talking to you

13 about taking it over again and that it was in the

14 context of moving forward that he was pursuing the

15 conversation with you?  Is that fair to say?

16    A.    No, it's not.

17    Q.    Then why do you think he would bring this up?

18    A.    For the sole purpose of trying to convince

19 people that he would take control of this company again.

20    Q.    So that's what you felt his purpose was in

21 speaking to you?

22    A.    Absolutely.

23    Q.    Have I left anything out in my discussion with

24 you about your interaction with Mr. Hansen that morning?

25    A.    No, other than he wanted me to join him in the

♀

                                                      13

1  restroom during break and have a conversation.  I

2  wouldn't do it.

3     Q.    How did that -- what was said and done in that

4  regard?

5     A.    At the break he came by and said, "I've got to

6  go to the bathroom, Paul.  Don't you need to go to the

7  bathroom, too?"

8     Q.    And you said, "No"?

9     A.    No, no.
                         Page 11

10          Q.    Did he ask you that he hoped you were on the
11    same side?
12          A.    He hoped that I was on the same side?  No,
13    that's not what he said.
14          Q.    Look at your declaration, Exhibit 1, paragraph
15    two.  There you say, quote, "He told me that he hopes I
16    know that 'we are on the same side...'"
17          A.    He said, "We're on the same side."
18          Q.    Oh, I thought you just said that he didn't say
19    that.
20          A.    I don't think he said "hope."  Maybe I
21    interpreted "hope," but his declaration was, "I know you
22    and I are on the same side."
23          Q.    Well, did he say that or didn't he say that,
24    words to the effect that --
25          A.    Yeah, to the effect, yeah.

♀

                                                        14
1           Q.    All right.  How did you come to draft this
2     declaration?
3           A.    I drafted it with the help of an attorney at
4     K&L Gates.
5           Q.    And what was the name of the attorney?
6           A.    I don't remember his name.
7           Q.    It wasn't Mr. Neu?
8           A.    No.
9           Q.    Did you do a draft that you gave the
10    attorneys, or did the attorneys do a draft and give it
11    to you?  And I don't want to talk about what you said
12    with the attorneys, I'm just looking at the process.

Page 12

13    A.    The attorneys provided a draft to me, yeah.

14    Q.    Who did you tell about this conversation?

15    A.    Mark specifically, yeah, and Mike Gearin.

16    Q.    And when did you tell them?

17    A.    Right after the hearing on June 10th.

18    Q.    And what did Mark tell you?

19    A.    Or June 3rd, rather.

20    Q.    I'm sorry?

21    A.    Whenever that court date was.  Was it

22  June 3rd?

23    Q.    June 3rd.

24    A.    Yeah.

25    Q.    And what did Mark tell you in regards to this

⚲

15

1   conversation?

2    A.    "Get it documented."

3    Q.    And did he tell you how to go about that?

4    A.    No.

5    Q.    What did you do in response to that direction?

6    A.    The next time I was at K&L Gates, we went

7   through it.  I dictated to the attorney what the gist of

8   that conversation was.

9    Q.    How long after that conversation occurred did

10  that process occur?

11    A.    I don't recall.  A few days later.

12    Q.    Did you ask Mr. Hansen to call you over the

13  weekend?

14    A.    No, I did not ask him.

15    Q.    Did he indicate he would call you over the

16  weekend?

Page 13

Wagner.txt

```
17        A.    Yes.

18        Q.    Did he call you?

19        A.    Yes.

20        Q.    And did you touch base with him over the

21   weekend?

22        A.    No, I did not.

23        Q.    Did you call him back?

24        A.    No, I did not.

25        Q.    Were you aware of a document called a
```

⚲

16

```
1    "Suppression Memo"?

2         A.    A Suppression Memo?  No.

3         Q.    I think it was entitled, "Suppression Memo."

4         A.    Huh-uh.

5               MR. NEU:   Sorry.  We just need a verbal

6    answer.

7         A.    No.

8         Q.    (BY MR. FRUSH:)  Do you recall a memorandum

9    that Mr. Calvert sent out that forbid employees to talk

10   to Mr. Hansen on pain of termination?

11        A.    No.

12              MR. FRUSH:   Let me grab an exhibit that we

13   used yesterday.  I'll be right back, Mr. Wagner.   Pardon

14   me for the delay.

15              (Discussion off the record.)

16        Q.    (BY MR. FRUSH:)  You say in paragraph four of

17   your declaration that you're aware that Mr. Hansen has

18   attempted to contact numerous other employees.

19              Who are the numerous other employees that
```

                                Page 14

20    Mr. Hansen has attempted to contact?

21        A.    Tom Boyle, Dennis Timm.

22        Q.    I'm sorry, Dennis?

23        A.    Dennis Timm.

24        Q.    Let's do some spellings for the court

25    reporter.

♀

                                                        17

1         A.    T-I-M-M.  Don Ruth, Steve Barnard, Dave

2    Huffman, Destiny Krum.  That's all I have.

3         Q.    Do you whether Mr. Hansen contacted them or

4    they contacted him?

5         A.    He contacted them.

6         Q.    How do you know that?

7         A.    Because they told me.

8         Q.    That's what they told you?

9         A.    Uh-huh.

10        Q.    You just have to say "Yes" or "No."

11        A.    Yes, yes.

12        Q.    All right.  You weren't present when any of

13    these contacts occurred; is that right?

14        A.    That's correct.

15        Q.    I'll show you what's been -- what we're going

16    to mark as Exhibit 2 in your dep.

17              THE COURT REPORTER:  Jim, can we go off the

18    record for a second?

19              MR. FRUSH:  Yes.

20              (Discussion off the record.)

21              (Deposition Exhibit 2 was marked for

22              identification.)

23        Q.    (BY MR. FRUSH:)  I'll show you what's been
                        Page 15

24      marked as Exhibit 2 in your deposition.  You'll see on

25      the top of it there is a marking that says "Exhibit 4."

♀

                                                                    18

1       This was also introduced as Exhibit No. 4 in

2       Mr. Calvert's deposition yesterday.  And that's the

3       explanation for that.  So I didn't want you to get

4       confused by that.

5                Would you take a look at Exhibit 2?  And I'm

6       going to refer to it by the exhibit number in your

7       deposition.

8           A.   Okay.

9           Q.   Have you seen this before?

10          A.   I don't recall it.

11          Q.   Were you aware that this had been issued by

12      Mr. Calvert?

13          A.   I don't recall it being issued by Mr. Calvert,

14      no.

15          Q.   Do you recall receiving a copy of this memo?

16          A.   No, I don't.

17          Q.   On April 16th, 2016, were you the president of

18      Northwest Territorial Mint?

19          A.   No.

20          Q.   What was your job title on that day?

21          A.   Chief information officer.

22          Q.   So you were the chief information officer on

23      April 16th when this memo was dated and I assume

24      distributed, but you have no knowledge of this memo; is

25      that right?

♀

1      A.    I don't recall it.

2      Q.    Did you have any discussions with any of the

3  employees, including the six employees you listed, about

4  the prohibition of having contact with Mr. Hansen?

5      A.    I did not.

6      Q.    Did you ever have any discussion with any

7  employees about any prohibition to have a conversation

8  with Mr. Hansen?

9      A.    I had not.

10     Q.    All the items in paragraph four are things

11 that other people have told you; is that correct?

12     A.    That's correct.

13     Q.    So you have no personal knowledge of any of

14 the items in paragraph four, do you?

15     A.    Are you asking me was I there in Green Bay

16 when Ross called Dennis Timm and did I see his number

17 pop up on his phone?  Is that --

18     Q.    Well, if you have personal knowledge of any

19 these alleged contacts, then say you either do or you

20 don't.  Do you know what I mean by "personal knowledge"?

21     A.    If I were there personally witnessing the

22 phone call from Mr. Hansen, that's what you're referring

23 to?

24     Q.    Correct, as opposed to hearsay, somebody tells

25 you --

♀

1      A.    No, I'm not --

2      Q.    It's just a terrible record if you try to

3      answer my question before I finish it.

4              All of the information in paragraph four is

5      hearsay, isn't it, things that people told you; is that

6      right?

7          A.    That is correct.

8          Q.    And you have no personal knowledge of anything

9      that's contained in paragraph four, do you?

10         A.    Again, my question is are you asking was I

11     there when the recipient received the call from Ross?

12         Q.    Correct.

13         A.    The answer is no.

14         Q.    Do you have a program where you monitor phone

15     calls at the -- I'm going to call it the "Mint," or

16     Northwest Territorial Mint.  Do you have a program you

17     use to monitor phone calls at the Mint?

18         A.    We have a -- we have logs of calls coming into

19     the Mint.

20         Q.    All right.  Are those calls recorded?

21         A.    Calls are not recorded, no.

22         Q.    Do you have a program where you monitor emails

23     that come in and out of the Mint?

24         A.    We have logging systems that log it in and

25     out.

⚲

1          Q.    How does it log it?

2          A.    It logs any inbound email and any outbound

3      email.  We have no monitoring systems either in voice or

4      email.

5          Q.    When you say it logs it, what does it show,

6    the recipients and the sender, or what's expressed in

7    the log, Mr. Wagner?

8         A.    Content and the recipient and the sender,

9    yeah.

10        Q.    So it's basically a record of the email?

11        A.    Yes.

12        Q.    And there is nothing left out?

13        A.    Essentially, yes.

14        Q.    Was it the situation or the circumstance that

15   there was a directive put out by Mr. Calvert or anyone

16   that all communications, email communications between

17   any employees and Mr. Hansen would be either noted or

18   brought to the attention of someone at the company?  And

19   that's not a very artful question, but what I'm trying

20   to get at is was there something in place that was

21   trying to monitor communications with Mr. Hansen?

22        A.    Yeah, I think Mr. Calvert did communicate

23   anybody that hears anything from Diane or Ross, let them

24   know, and if there is anybody operating as an informant

25   on behalf of Ross or Diane, they would be fired.

♀

                                                      22

1         Q.    Was there a directive by Mr. Calvert or anyone

2    on his behalf that all communications between Mint

3    employees and Ross or Diane would be brought to

4    Mr. Calvert's attention?

5         A.    I think early on, he tried to put his

6    ex-administrative assistant in place as the sole person

7    to communicate with Ross, should Ross need to

8    communicate with someone inside the Mint.

9         Q.    And that was Maura?

10      A.      Yeah.

11      Q.      Maura Richardson?

12      A.      Yeah.

13      Q.      And was it the situation that Maura would

14  share any emails that she received or sent to Ross with

15  Mr. Calvert?

16      A.      I have no direct information on that.  I

17  wouldn't know.

18      Q.      What's your belief?

19      A.      I think she probably would.

20      Q.      It would make sense in the context --

21      A.      Yeah.

22      Q.      -- of the directives that were going out?

23      A.      Yeah.

24      Q.      Yes?

25      A.      Yes.

♀

                                                        23

1       Q.      All right.  Were you aware that some people at

2   the Mint were using Ross's cell phone to track his

3   movements?

4       A.      The company-owned cell phone?

5       Q.      Yes.

6       A.      Yes.

7       Q.      Did you participate in any fashion?

8       A.      No.

9       Q.      Were you aware of it while it was going on

10  contemporaneously?

11      A.      Yes.

12      Q.      Did you raise any concerns about that?

                            Page 20

13        A.    No.

14              MR. NEU:   What's the relevance of this with

15        respect to the issues at hand?

16              MR. FRUSH:   Well, I think that much of the

17        trustee's motion revolves around communications between

18        Ross and the employees.   Mr. Calvert testified yesterday

19        that he was unaware of an email I showed him that was

20        between Ross and Maura within about the first week of

21        leaving.   So Mr. Wagner's contradicted the testimony

22        of --

23              MR. NEU:   Right, but what I'm talking about

24        specifically is whether Mr. Hansen's cell phone was

25        being tracked, what's the -- I mean, his location.


                                                            24

1               MR. FRUSH:   It goes to the communications and

2         the monitoring of communications and activities of

3         Mr. Hansen.

4               MR. NEU:   Go ahead.

5               MR. FRUSH:   I'm not going to dwell on it.

6         I'll move on, David.

7               MR. NEU:   Thank you.

8         Q.    (BY MR. FRUSH:)   Were you knowledgeable of a

9         trespass into a hangar of Mr. Hansen during a period of

10        time by Mint personnel?

11        A.    Yes.

12        Q.    Were you aware of it contemporaneously with it

13        occurring?

14        A.    No.

15        Q.    You found out about it after the fact?

16        A.    That's correct.
                         Page 21

17      Q.    Did you raise any concerns about that

18   trespass?

19      A.    No.

20      Q.    Were you given any photographs that were taken

21   during that trespass?

22      A.    No.

23            MR. NEU:   You used the word "trespass."  I

24   think that's a legal conclusion as to -- it's a -- a

25   trespass is a criminal activity.

⚲

1             MR. FRUSH:   That's correct.

2             MR. NEU:   And so I don't think there is any

3    foundation for calling it --

4             MR. FRUSH:   You can say that you object on the

5    basis it calls for a legal conclusion.

6             MR. NEU:   I certainly object that it calls for

7    a legal conclusion.

8             MR. FRUSH:   That's fine, that's fine.

9       Q.    (BY MR. FRUSH:)  Let's go to paragraph five.

10   You talk about Mr. Hansen's appearance at the debtor's

11   facility.

12            Are you talking about an appearance that he

13   made after they left the business and then came back to

14   pick up some documents?  Is that the one we're talking

15   about?  I think that it was on or about May 18th.

16      A.    Yes.

17      Q.    Were you there when he was --

18      A.    No, I was not.

19      Q.    So you have no personal knowledge of what

                        Page 22

20    occurred at that appearance?

21        A.    No.

22        Q.    You mentioned employee morale.  What has

23    employee morale been like since Mr. Calvert took over?

24        A.    In what context?

25        Q.    General.


♀

                                                            26
1         A.    General?  Generally, vastly improved.

2         Q.    Improved?

3         A.    Yes.

4         Q.    And how many employees has Mr. Calvert

5     terminated since he took over?

6         A.    Roughly 90.

7         Q.    Out of?

8         A.    Out of 250.

9         Q.    So he's gotten rid of about a third of the

10    employees and morale has improved?  Is that your

11    testimony?

12        A.    That is correct.

13        Q.    Has he closed facilities of the company?

14        A.    Yes.

15        Q.    And that's helped improve morale as well,

16    Mr. Wagner?

17        A.    Absolutely.

18        Q.    What are some of the other steps he's taken

19    that have improved morale?

20        A.    We've introduced some leadership training.

21    We've put in place managers that foster working

22    together, teamwork.  We overcommunicate the financial

23    health of the company today being vastly and materially
                        Page 23

24      better than it was prior to bankruptcy.

25           Q.    And what's the morale of the employees, the 90

                                                          27

1       employees who were let go?

2            A.    I don't know.

3            Q.    Do you keep in touch with any of them?

4            A.    I do not.

5            Q.    Why do you think Mr. Hansen would appear

6       unannounced at Mint facilities?

7            A.    Just to create chaos.

8            Q.    No, no.  Why do you think he would appear?

9       Not the result, but why do you think he would make an

10      appearance?

11           A.    To create chaos.

12           Q.    How does his appearance create chaos?

13           A.    Nobody wants to see him there.

14           Q.    And their reaction is chaotic?

15           A.    His reaction is chaotic.  Their reaction is

16      fearful.

17           Q.    Did he make any chaotic activities, present

18      any chaotic presence when he was there on May 18th?

19           A.    I wasn't there.

20           Q.    Has he been to any of the facilities since

21      May 18th?

22           A.    Not to my knowledge.

23           Q.    Are you aware that he's been banned from

24      appearing at any of the facilities?

25           A.    My understanding is there is a stay that

                              Page 24

Wagner.txt

```
 1    should prohibit him from visiting facilities.
 2         Q.    And are you aware that he was appearing at the
 3    Mint on May 18th in response to a direction from his
 4    attorney to pick up Medallic documents?
 5         A.    I believe the memo from his attorney was if
 6    you can get documents, try and do so, something to that
 7    effect.
 8         Q.    Were you aware whether there were Medallic
 9    documents at the Mint when Mr. Hansen left it?
10         A.    I would make an assumption that there are
11    Medallic documents.
12         Q.    Do you believe he has a right to access to
13    those documents?
14         A.    Possibly.
15         Q.    Do you think it's unusual for someone to
16    attempt to obtain access to documents to which they have
17    a right?
18         A.    Doing it the right way, yes.
19         Q.    I'm going to call your attention to Monday
20    morning, April 11th.  That's the first day Mr. Calvert
21    was there.
22         A.    Right.
23         Q.    Was it the case that Mr. Calvert was there
24    before Ross had arrived?  Is that right?
25         A.    That's correct.
```

```
 1         Q.    And you had had a phone conversation the day
 2    before with Mr. Calvert, hadn't you?
```

3          A.      That's correct.

4          Q.      And that morning when Ross arrived, did you

5    have a meeting with him and Mr. Calvert at the Mint?

6          A.      I did.

7          Q.      And what happened when Ross sat down for that

8    meeting?

9          A.      I think we got into the business of the Mint.

10          Q.      Was there discussion of an FBI investigation?

11          A.      There was.

12          Q.      Wasn't that the first day it was discussed?

13          A.      Possibly.

14          Q.      And isn't it the case that when Ross sat down,

15    Mark Calvert told him that he had -- that Ross had been

16    under FBI investigation for six months?

17          A.      He did.

18          Q.      Were you aware of that fact, prior to

19    Mr. Calvert stating it?

20          A.      For six months?  No.

21          Q.      How long did you think the investigation had

22    been going -- well, strike that.

23                  Were you aware whether there was an FBI

24    investigation?

25          A.      I was under the assumption that there was,

₽

                                                                30

1    yes.

2          Q.      Why is that?

3          A.      Because I was told there was.

4          Q.      By whom?

5          A.      Greg Fullington.

Page 26

```
 6        Q.    When did Mr. Fullington tell you that?

 7        A.    I don't know.  Somewhere around December when

 8    the FBI was questioning him.

 9        Q.    So the FBI questioned Mr. Fullington in

10    December?

11        A.    I believe so.

12        Q.    Did the FBI question you, prior to Mr. Calvert

13    arriving at the Mint?

14        A.    No.

15        Q.    Have they questioned you since?

16        A.    Yes.

17        Q.    How many times?

18        A.    Once.

19        Q.    Were they in the presence of an Assistant U.S.

20    Attorney?

21        A.    No.

22        Q.    How long was your interview with the FBI?

23        A.    An hour, hour and a half maybe.

24        Q.    How long ago was that?

25        A.    I think it was sometime in May.
```

♀

                                                                    31

```
 1        Q.    What was the general focus of the questioning

 2    by the Bureau?

 3        A.    Just general questions; how did the company

 4    get in this state.

 5        Q.    I'm sorry?

 6        A.    How did the company end up in this state, how

 7    did it get here.

 8        Q.    How long had you been with the company?

 9        A.    A little more than three years.
```
                            Page 27

    10          Q.     Did they tell you whether you had any

    11    exposure?

    12          A.     No.

    13          Q.     Were you represented by counsel?

    14          A.     No.

    15          Q.     What was your general response to how the

    16    company got there?

    17          A.     My comment was I believe the company got here

    18    long before I ever arrived, and the company was probably

    19    in this state for a lot of years.

    20          Q.     Had you made -- had you expressed those

    21    concerns to Mr. Hansen when he was in charge of the

    22    company?

    23          A.     No.

    24          Q.     No?

    25          A.     No.


⚇

                                                                32

    1           Q.     Why not?

    2           A.     It wasn't my job to.

    3           Q.     What was your job at that point?

    4           A.     Chief information officer.

    5           Q.     Going back to the email retrieval system, you

    6     would routinely get requests to retrieve people's

    7     emails, wouldn't you?

    8           A.     Yes.

    9           Q.     And you've done that in connection with

    10    Mr. Ross, isn't that -- in connection with Mr. Hansen,

    11    haven't you?

    12          A.     Mr. Hansen pre-bankruptcy would ask me a lot

                              Page 28

to go retrieve emails, yeah.
Q. And has anybody asked you post-bankruptcy to retrieve emails?
A. Oh, my goodness, yes.
Q. I'm sorry?
A. Oh, my goodness, yes.
Q. Who all has asked you?
A. K&L Gates.
Q. I'm sorry?
A. K&L Gates and Mark Calvert.
Q. Have they particularly asked for emails of Mr. Hansen?
A. Yes.

♀

Q. Have any of those emails been emails that may have been accessible after the date of -- or that were created after the date of the bankruptcy?
A. I wouldn't think so, but we turned over everything. It was not date bound.
Q. K&L Gates was scorching the earth to get all of those emails?
MR. FRUSH: I say that with an affectionate nod, Counsel.
MR. NEU: Yeah, I get it, I get it.
MR. FRUSH: This transcript never shows the humor.
Q. (BY MR. FRUSH:) Did you have any participation in the providing of videos to either K&L Gates or the trustee or the FBI?
A. Yeah. About the only thing I did was move the

Wagner.txt

17    stuff to a medium off of Dave Huffman's machine.
18        Q.    Why don't you explain that to me, because I
19    can't follow that at all.
20        A.    We had one of the IT guys compile video and
21    put it on Dave Huffman's desktop computer.   The only
22    role I had was moving it off his desktop computer onto a
23    flash drive.
24        Q.    Are the email accounts of Diane and Ross at
25    the Mint, are those still active?



                                                          34
1        A.    I don't believe so.
2        Q.    When were they turned off?
3        A.    I would assume on the day that they left.
4              MR. FRUSH:   Let's mark this.
5              (Deposition Exhibit 3 was marked for
6              identification.)
7        Q.    (BY MR. FRUSH:)   I'll show you what's been
8    marked as Exhibit 3.   It's a portion of your transcript
9    from a June 8th, 2016 deposition.   I want you to look at
10   page 64.
11             It appears that you testified that as of
12   June 8th, the old email accounts were being monitored --
13   were active and being monitored by Melissa Gafford.   Do
14   you see your testimony there?
15       A.    Uh-huh, yeah.
16       Q.    Is that accurate?
17       A.    That is accurate.
18       Q.    So you just testified that you thought the
19   email accounts were turned off on the day of the

                          Page 30









Case 16-11767-CMA   Doc 570-4   Filed 08/02/16   Ent. 08/02/16 16:56:32   Pg. 31 of 44

20    bankruptcy or shortly thereafter, if I recollect

21    correctly.  Why the discrepancy between your testimony

22    today and --

23        A.    There is no discrepancy.

24        Q.    So explain how they could have been active and

25    monitored in June when you say they were turned off in

♀

35

1     basically the first half of April.

2         A.    You make an assumption that "turned off" means

3     that you can't receive email.

4         Q.    Yes.

5         A.    Being deactivated, meaning that you can't send

6     or receive using that account, is different than being

7     able to see inbound emails that would come in to

8     Mr. Hansen that could be monitored by Melissa.

9         Q.    Well, I assume "active" means that you could

10    receive the email.

11        A.    You could have a deactivated account and still

12    be able to receive inbound emails to that account.

13        Q.    And can you send emails from that account?

14        A.    No, no.

15        Q.    So only the sending part would be deactivated?

16    Is that your testimony?

17        A.    That is correct.

18        Q.    And the fact that it was received and being

19    monitored doesn't make it active at all?

20        A.    That is correct.

21        Q.    Well, then why do you say on June 8th that,

22    the question is, "The email accounts that Diane and Ross

23    had at the Mint, are they still active?"  And you say,

Page 31

24    "I would assume that" -- excuse me.  And the question
25    goes on, "Can they still receive mail, do you know?"

⚲

36

1              And you say, "I would assume that they can,
2    yes."
3              That means that you're implying, as I read
4    your testimony, I wasn't there, that you're saying they
5    were active because they were receiving email?
6         A.    Well, technical definition of "active" would
7    mean that they can send and receive email.  When we
8    deactivate an account, it doesn't mean that we don't get
9    emails coming into that mailbox.  We certainly can and
10   we can monitor it, we just can't send.
11        Q.    And on June 8th --
12        A.    And we can't move from mailbox to mailbox and
13   organize documents that come into that.
14        Q.    And on June 8th, you felt that was, quote,
15   "active," close quote; is that right?
16              MR. NEU:  Object to the form of the question.
17   That's not what he said on June 8th.
18        Q.    (BY MR. FRUSH:)  Do you have any knowledge of
19   personal mail coming to the Mint for Ross since he's
20   left?
21        A.    I would assume that mail has come into the
22   Mint.  Email or mail?
23        Q.    I'm talking about U.S. Mail.
24        A.    I would assume that some mail has come in,
25   yes.

Page 32

1          Q.    Is there some directive in place by you or

2     Mr. Calvert as to how that personal mail is handled?

3          A.    It would go through Melissa and she would sort

4     through it.   And if there was anything relevant, then

5     she would route it to the right person.

6          Q.    Would anybody consider giving it to

7     Mr. Hansen?

8          A.    I don't think so.

9          Q.    It's his personal mail; right?

10         A.    Not necessarily.

11         Q.    Well, you just testified, Mr. Wagner, that

12    some of the mail that was coming in was personal; isn't

13    that right?

14              MR. NEU:   I don't think that was what he

15    testified.

16              MR. FRUSH:   Well, I think that's what he did

17    testify to.

18         Q.   (BY MR. FRUSH:)  Let's get to this.   Has

19    Mr. Hansen been getting personal mail?

20         A.    I do not know.   I would not know that.

21         Q.    Who would?

22         A.    Melissa.

23         Q.    All right.  Is all of Mr. Hansen's mail,

24    personal and otherwise, being opened?

25         A.    I would assume so, yes.

1          Q.    Is there any safeguard in place to keep people

2     from opening up what is obviously personal mail to

                                Page 33

```
 3    Mr. Hansen?
 4         A.    No.
 5         Q.    Why not?
 6         A.    Why would there be?
 7         Q.    Because it's his personal mail.  Maybe some
 8    things relate to medical issues.
 9         A.    How would we know what's personal and what's
10    business without opening it up?
11         Q.    I guess sometimes you can tell and sometimes
12    you can't.  You're telling me you can't tell?
13         A.    Exactly how would you do that?
14         Q.    All right, Mr. Wagner.  And you're still
15    monitoring his email that's coming in; right?
16         A.    I'm not monitoring his email, no.
17         Q.    And his email accounts are still active in a
18    fashion that they can receive email?
19         A.    They are inactive but in such a way that they
20    can receive email, yes.
21         Q.    Very artful.
22               You don't forward emails to Mr. Hansen, do
23    you?
24         A.    I do not.
25         Q.    Do you make any effort to determine what are
```

⚲

```
                                                          39
 1    personal emails and what are business emails?
 2         A.    I do not.
 3         Q.    Now, Mr. Fullington threatened Ross, didn't
 4    he?
 5         A.    I don't know if "threatened" would be the
```

6    right word.

7                (Deposition Exhibit 4 was marked for

8                identification.)

9        Q.   (BY MR. FRUSH:)  Exhibit 4 is a portion of

10   your transcript on June 8th, 2016.  I'd like you to look

11   at page 67, line ten.  You say in response to a

12   question, "Greg," and I assume you mean Fullington,

13   "threatened Ross and he later, you know, backed off of

14   it, told him he had no business doing it, but he

15   threatened to roll on Ross with the FBI."

16               Do you see where you said that?

17       A.   Yeah, yeah, I do.

18       Q.   You used the word "threatened" back in June,

19   didn't you?

20       A.   Okay.

21       Q.   Now, to your knowledge, did Mr. Fullington

22   follow through with his threat to, quote, "roll on Ross

23   with the FBI," close quote?

24       A.   To my knowledge, he did not.

25       Q.   Do you know how the FBI came to interview

♀

                                                        40

1    Mr. Fullington?

2        A.   I do not.

3        Q.   Was Mr. Fullington having an affair with

4    Amelia Swan?

5        A.   I don't believe so.

6        Q.   Was Amelia Swan let go, prior to

7    Mr. Fullington's leaving?

8        A.   She found another job.

9        Q.   They were the legal department, weren't they?

                            Page 35

10          A.     That's correct.

11          Q.     And what were their responsibilities as the

12    legal department?

13          A.     Protect and defend the company.

14          Q.     What about relating to bailments?  Do you know

15    what a bailment is?

16          A.     No.

17          Q.     Let's say that you have customers who have

18    some type of product, bullion or otherwise, that's

19    stored with the company.

20          A.     Uh-huh.

21          Q.     You have to answer "Yes" or "No."

22          A.     Yes, yes, yes.  I'm sorry.

23          Q.     What responsibility does legal have in

24    relationship to that?

25          A.     Their job was to maintain lease and storage

♀

                                                          41

1     agreements.

2           Q.     Amelia's was?

3           A.     Yes.

4           Q.     And it was her job to monitor the bailment or

5     the maintaining of those items?

6           A.     That's correct.

7           Q.     And who did she report to?

8           A.     Mr. Fullington.

9           Q.     What about compliance with the consent decree?

10    Do you know what I'm talking about in that regard?

11          A.     No.

12          Q.     Are you aware that the Mint entered into a

                          Page 36

13    consent decree with the Attorney General of the State of

14    Washington?

15         A.    Is that back eons ago, in terms of a way of

16    doing business?

17         Q.    About five or six years ago.

18         A.    Yes, yes, I'm aware of that.

19         Q.    And it relates to the fulfillment of orders?

20         A.    Yes, that's right.

21         Q.    Who was responsible for monitoring compliance

22    with that agreement?

23         A.    I would say Diane Erdmann.

24         Q.    Not the legal department?

25         A.    No.

♀

                                                          42

1          Q.    I thought Diane was in charge of the vault?

2          A.    She was in charge of the vault and bullion

3     fulfillment.

4          Q.    And is it your testimony that she was in

5     charge of compliance with the consent decree?

6          A.    I would make that assumption, yes.

7          Q.    Is it simply an assumption on your part?

8          A.    It is.

9          Q.    When Mr. Fullington parted -- strike that.

10               This threat that Mr. Fullington made, when was

11    that made?

12         A.    It was made on the last day he was employed

13    back last fall, whenever that was.

14         Q.    And was it a resignation or a mutual parting

15    of the ways, or was he fired?

16         A.    No, he quit.

                         Page 37

17          Q.    Did you witness the interchange between Ross
18    and Mr. Fullington?
19          A.    I did.
20          Q.    Was Maura there?
21          A.    She was -- I don't know.  I don't know.
22          Q.    Did you give Maura instructions to document
23    what happened?
24          A.    Ross did, yes.
25          Q.    Did you give Maura notes on what you observed?

1           A.    Yes.
2           Q.    Did Mr. Hansen in any fashion attempt to
3     influence the accuracy of that documentation?
4           A.    No.
5           Q.    Do you know what the purpose of that
6     documentation was for?
7           A.    Just to document how Greg left.
8                 MR. NEU:  Counsel, what's the relevance of
9     this line of questioning to the evidentiary issue of
10    whether the stay has been violated?
11                MR. FRUSH:  More to bias and interest.  And I
12    don't have much more, Dave.  And I appreciate your
13    patience.  I mean, you know, it's just easy to try to
14    clean up some of these things.
15                Also, his veracity as a witness, I'm getting
16    what I think are some --
17                MR. NEU:  I'm not generally in the habit of
18    raising objections in deposition, but what I don't want
19    is just a fishing expedition.

Page 38

20          MR. FRUSH:  No, no, I'm not fishing.  No hand

21    grenade is being thrown in the water here.

22          We're going to take a five-minute break,

23    because I think we're through.  I want to talk to Ross.

24          (Recess.)

25          MR. FRUSH:  I just have one question, I think.

♀

                                                    44
1           Q.   (BY MR. FRUSH:)  Chief information officer, is

2     that your current title?

3           A.   That is not, no.

4           Q.   What is your current title now?

5           A.   President.

6           Q.   President, okay.  That's not the question I

7     had.

8                As chief information officer, before the

9     bankruptcy there were surveillance tapes taken of not

10    just the vault but various places in the company; is

11    that right?

12          A.   That's correct.

13          Q.   Were there any tapes made prior to the

14    bankruptcy of the inventory of the company?

15          A.   I don't believe so.

16          Q.   Do you know what -- well, since the

17    bankruptcy, there have been photographs taken?

18          A.   Yes, that's correct.

19          Q.   Lots?

20          A.   Lots.

21          Q.   But you're not aware of a similar type of

22    effort before the bankruptcy; is that right?

23          A.   We tried before the bankruptcy to get in and
                              Page 39

24    take videotape and take pictures of the inventory in the
25    vault, yes.

⚲

                                                              45
1          Q.    And what happened?
2          A.    But we were denied by Diane.
3          Q.    Who tried to get in?
4          A.    We tried to have John, Ricky and Matt Fisk in
5     Dayton take video of the inventory in that vault.
6          Q.    When you say "we" tried, who are you talking
7     about?
8          A.    Well, Maura tried to have inventory videotaped
9     in the Dayton vault.
10         Q.    In the Dayton vault in Nevada?
11         A.    That's correct.
12         Q.    And do you know why Maura wanted that made?
13         A.    Just to have the inventory documented.
14         Q.    Okay.  Was there a particular concern that
15    you're aware of?
16         A.    That inventory could find legs and walk out,
17    yes.
18         Q.    All right.  Are you aware of any other efforts
19    to try to videotape or --
20         A.    No, I know Mr. Fullington --
21         Q.    Let me finish, please, Mr. Wagner.  It's just
22    tough for her.
23               -- memorialize the existence of video before
24    the bankruptcy?
25         A.    I know Mr. Fullington proposed doing an audit

                           Page 40

♀

1    of the inventory and the assets.

2         Q.    Okay, but that never came to fruition?

3         A.    It did not.  He was denied.

4         Q.    All right.  Well, a video was never taken of

5    the vault in Dayton; right?

6         A.    Not to my knowledge.

7         Q.    And this was initiated by Maura; is that

8    correct?

9         A.    That's correct.

10        Q.    And you really don't know why she initiated

11   it.  Is that fair to say?

12        A.    That's fair, yeah.

13             MR. FRUSH:  All right, all right.  We have

14   nothing further.

15             Do you have anything, Dave?

16             MR. NEU:  No, I do not.

17             (Deposition recessed at 10:30 a.m.)

18             (Signature was requested.)

19

20

21

22

23

24

25

♀

1                   CORRECTION & SIGNATURE PAGE

2    RE:   NORTHWEST TERRITORIAL MINT, LLC
                         Page 41

Wagner.txt

3         UNITED STATES BANKRUPTCY COURT; No. 16-11767-CMA

4         PAUL WAGNER; TAKEN JULY 29, 2016

5            Reported by: CHERYL O. SPRY, CCR No. 2226

6            I, PAUL WAGNER, have read the within

7         transcript taken JULY 29, 2016, and the same is true and

8         accurate except for any changes and/or corrections, if

9         any, as follows:

10        PAGE/LINE          CORRECTION         REASON

11        _____

12        _____

13        _____

14        _____

15        _____

16        _____

17        _____

18        _____

19        _____

20        _____

21        _____

22            Signed at _____, Washington,

23        on this date: _____

24

25                   _____
                                     PAUL WAGNER

♀

                                           48

1               REPORTER'S CERTIFICATE

2           I, CHERYL O. SPRY, the undersigned Certified Court

3         Reporter, pursuant to RCW 5.28.010, authorized to

4         administer oaths and affirmations in and for the State

5         of Washington, do hereby certify:

Page 42

```
 6          That the sworn testimony and/or proceedings, a
 7     transcript of which is attached, was given before me at
 8     the time and place stated therein; that any and/or all
 9     witness(es) were by me duly sworn to testify to the
10     truth; that the sworn testimony and/or proceedings were
11     by me stenographically recorded and transcribed under my
12     supervision, to the best of my ability; that the
13     foregoing transcript contains a full, true, and accurate
14     record of all the sworn testimony and/or proceedings
15     given and occurring at the time and place stated in the
16     transcript; that a review of which was requested; that I
17     am in no way related to any party to the matter, nor to
18     any counsel, nor do I have any financial interest in the
19     event of the cause.
20          WITNESS MY HAND AND DIGITAL SIGNATURE THIS 30TH day
21     of JULY, 2016.
22
23     _____
24     CHERYL O. SPRY
       Washington State Certified Court Reporter No. 2226
25     cspry@yomreporting.com
```

♀

Page 43