Page 1

1           UNITED STATES BANKRUPTCY COURT

2        WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3

4   _____

5   IN RE:                            )

6   NORTHWEST TERRITORIAL MINT, LLC,  )

7          Debtor.                    )    16-11767-CMA

8   _____

9           DEPOSITION UPON ORAL EXAMINATION OF

10                    ROSS B. HANSEN

11  _____

12

13

14

15                      9:35 A.M.

16                   AUGUST 1, 2016

17           925 FOURTH AVENUE, SUITE 2900

18                 SEATTLE, WASHINGTON

19

20

21

22

23

24

25  REPORTED BY:  SHARI L. WHEELER, CCR NO. 2396



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Page 66

1  A. It set a -- it left a bad taste in my mouth.
2  Q. So you were upset about it?
3  A. I wasn't really upset. I thought, you know,
4  this is silly. But, you know, that's -- the thing is,
5  I don't get a vote in this. You know, at that point,
6  he's the boss.
7  Q. And Mr. Calvert -- you said he asked the
8  security people to keep an eye on you to make sure that
9  you weren't taking something; is that right?
10  A. That was my understanding. Yes.
11  Q. And did you object to that?
12  A. I had no basis to object.
13  Q. Mr. Calvert also took control over the vault in
14  Federal Way, did he not?
15  A. No.
16  Q. He didn't take control over the vault?
17  A. No, he did not.
18  Q. Did he start to give instructions to the
19  security people?
20  A. I don't know what instructions he gave the
21  security people. But Diane was in the vault until --
22  you know, basically doing her usual thing until she
23  left on Tuesday afternoon. So she had full access.
24  Q. Did Mr. Calvert take control over the business
25  operations of the company as of April 11th?

Page 67

1  A. He did.
2  Q. And did you object to that?
3  A. No.
4  Q. Were you upset about that?
5  A. No. I was expecting it.
6  Q. Did he tell you that you were not in the chain
7  of command any longer?
8  A. He did.
9  Q. Did he tell you that you were reporting
10  directly to him?
11  A. No.
12  Q. Did Mr. Calvert -- within the first few days of
13  his appointment, did he change the locks on any of the
14  Mint facilities?
15  A. Yes.
16  Q. Which ones?
17  A. As I understand it, all the locks on all the
18  facilities.
19  Q. Did you object to that?
20  A. The only objection I had was the Dayton
21  facility, which I am the leaseholder on. And Medallic
22  Art has its items there. And I memorialized that in a
23  letter to him on April 12th.
24  Q. So you didn't object to him changing the locks
25  at Federal Way or Auburn?

Page 68

1  A. Not at all.
2  Q. Were you upset about him changing the locks?
3  A. No. He told me he was going to. And that's
4  something a trustee would almost be required to do.
5  Q. You don't like Mr. Calvert, do you?
6  A. No, I really don't.
7  Q. And you are angry with him, aren't you?
8  A. Yes.
9  Q. And you've told others that you don't like
10  Mr. Calvert, haven't you?
11  A. That's correct.
12  Q. You've been very critical of him, haven't you?
13  A. Yes, I have.
14  Q. You think you know how to run this business
15  better than Mr. Calvert, don't you?
16  A. I think I have more knowledge about the
17  business than he does. Yes.
18  Q. You think you should still be in control of the
19  business, don't you?
20  A. I believe I should have a part in the business.
21  But the bottom line is, is that the Court felt
22  differently. The Court appointed a trustee, and that's
23  the reality of life. But I think it would be to the
24  benefit of the creditors if I played a larger part in
25  the company. But that's not for me to decide.

Page 69

1  Q. Do you have any idea, Mr. Hansen, of how many
2  creditors, unpaid customers, there are -- prebankruptcy
3  customers that have not been paid in this case?
4  A. I believe about 2,500.
5  Q. And do you have any idea what the dollar amount
6  is that those customers are owed?
7  A. It's about $25 million.
8  Q. And that's all based on your prior management
9  of the company, isn't it?
10  A. That is correct.
11  Q. You're angry with Mr. Calvert about him
12  discussing the FBI investigation, aren't you?
13  A. The way he did it, I think was detrimental to
14  the morale and the retention of employees within the
15  company.
16  Q. And you're angry about that, aren't you?
17  A. I didn't like how he did it.
18  Q. You're angry about it, aren't you?
19  A. Yes. I think it served his ego. And I didn't
20  think it benefited the company, nor the creditors.
21  Q. It was a fact, right, that there was an FBI
22  investigation going on, wasn't it?
23  A. That was a fact.
24      (Deposition Exhibit 3 was marked for
25       identification.)

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 2 of 20

Page 70

1  Q. (BY MR. GEARIN) Okay. Mr. Hansen, you've been
2  handed Deposition Exhibit Number 3. Have you seen that
3  email before?
4  A. Boy, not since it was sent, months ago.
5  Q. But you have seen it before, correct?
6  A. I believe I've seen it.
7  Q. This is an email from me to Mr. Wenokur,
8  correct?
9  A. Correct.
10 Q. And the date is April 14, 2016, at 10 a.m.,
11 correct?
12 A. Correct.
13 Q. Did you see this email on or about April 14,
14 2016?
15    MR. FRUSH: I'm sorry. What was the
16 question?
17 Q. (BY MR. GEARIN) Did you see the email on or
18 about April 14, 2016?
19 A. I think there was some issue about it getting
20 to me. It might have been a day or two late.
21 Q. So within a day or two of April 14th, you saw
22 the email, correct?
23 A. I did. Yes.
24 Q. In this email, I talked to Mr. Wenokur, and I
25 opened a conversation with Mr. Wenokur about a number

Page 71

1  of issues. And one of the things that the email says
2  is: The trustee has been informed that Mr. Hansen has
3  contacted employees, seeking to have them terminate
4  their employment with the company and join a competing
5  business to be conducted by Mr. Hansen.
6     So as of April 14, 2016, was that true? Were
7  you contacting employees and asking them to terminate
8  their employment with the company?
9  A. No.
10 Q. Were you contacting customers of the company as
11 of April 14, 2016?
12 A. A couple, yes.
13 Q. Which customers?
14 A. Customers that were calling me, asking me what
15 was going on with the company.
16 Q. Tell me, in particular, which ones did you talk
17 to?
18 A. Oh, I think I spoke to a handful of bullion
19 customers.
20 Q. But you can't remember any specific names?
21 A. I don't recall.
22 Q. So these would be people who had placed orders
23 for bullion, and their orders had not been fulfilled
24 yet?
25 A. Not necessarily. They're longtime customers,

Page 72

1  you know, who had read something in the paper and
2  called me and asked me what was going on. And some of
3  them were expressing concern, some of them expressing
4  support. There was just, you know, people wanting
5  to -- you know, people who you've developed friendships
6  over time with were calling and asking me what was
7  happening.
8  Q. Did you speak with any customers other than the
9  bullion customers?
10 A. I don't think so.
11 Q. Have you spoken with any customers, other than
12 bullion customers, since the bankruptcy case was filed?
13 Actually, strike that.
14    Have you spoken with any customers, other than
15 the bullion customers, since Mr. Calvert was appointed?
16 A. I don't believe so.
17 Q. And you haven't reached out to any customers,
18 other than bullion customers? You haven't tried to
19 contact any customers of the Mint since Mr. Calvert was
20 appointed?
21    MR. FRUSH: Objection. You're assuming
22 facts not in evidence. He testified that they called
23 him.
24    MR. GEARIN: I'm asking a separate
25 question, Jim.

Page 73

1     MR. FRUSH: All right. You're asking
2  whether he's reached out?
3     MR. GEARIN: I'm asking whether he reached
4  out, correct.
5  A. I have not.
6  Q. (BY MR. GEARIN) How about the vendors of
7  Northwest Territorial Mint? Have you contacted any
8  vendors of the Mint since Mr. Calvert was appointed?
9  A. Yes.
10 Q. Which ones?
11 A. A couple of coin dealers.
12 Q. Which coin dealers?
13 A. I believe I've spoken to Bill Wolverton. I
14 think I've spoken to Renton Coin Shop. I believe I've
15 spoken to John Drummey.
16    MR. FRUSH: When you say, "vendors," Mike,
17 can we get a handle on what you're talking about?
18 Because vendors strike me as people who would provide
19 goods or services to Mint. That would be a vendor.
20 And I just don't want us to go astray here.
21    MR. GEARIN: I think that's a fair
22 clarification, Jim. I think we are talking about
23 people who have provided goods and services to the
24 Mint. So I would include manufacturers, people who
25 were providing services, people who were providing

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Page 78

1  concept that you had expressed an ownership in personal
2  assets and assets that belonged to Medallic Art
3  Company. And you had said that there were certain
4  personal assets and Medallic assets that were still on
5  the business premises of the Mint, correct?
6      A. That's correct.
7      Q. And I asked you in this email, through
8  Mr. Wenokur -- I asked you to provide a list of those
9  materials, did I not?
10     A. You did.
11     Q. And did you ever provide that list?
12     A. I did not.
13     Q. You never responded to this communication, did
14 you?
15     A. No, I did not.
16     Q. I asked you to provide copies of documents to
17 me relating to the Medallic relationship, did I not?
18         MR. FRUSH: Objection. The email is not to
19 Mr. Hansen. It's to an attorney. I think you're
20 mischaracterizing the thrust of the email.
21         MR. GEARIN: Well, I think he's already
22 testified --
23         MR. FRUSH: He said he read it.
24         MR. GEARIN: He testified that he read it
25 and he understood what the request was.

Page 79

1          MR. FRUSH: Well, I'm not even sure that
2  this attorney, at that point, was even representing
3  him. But, anyway, I'll ask that question later.
4      Q. (BY MR. GEARIN) Was Mr. Wenokur representing
5  you as of April 14, Mr. Hansen?
6      A. No. I think I had fired him by that point.
7      Q. You think you had fired him. But you already
8  did testify that he did pass the communication along to
9  you, right?
10     A. Yes, he did.
11     Q. And you read it, right?
12     A. Yes, I did.
13     Q. Now, at the end of this letter, I asked for a
14 commitment from you that you would not interfere with
15 the company's relationships, with the company's
16 employees, customers, vendors, of business associates.
17 Do you see that?
18     A. Yes.
19     Q. Do you remember that request?
20     A. I see it here.
21     Q. Did you ever make that commitment? Did you
22 ever commit to Mr. Calvert that you would not interfere
23 with the company's relationships between the company
24 and the employees, customers, vendors, or business
25 associates?

Page 80

1      A. I did not.
2      Q. I also asked you to confirm that you would
3  refrain from contacting employees, customers, vendors,
4  and business associates for the purpose of soliciting
5  them to another business. Do you remember that?
6      A. You asked, yes.
7      Q. Did you refrain from contacting employees?
8      A. I did not.
9      Q. Did you contact the coin dealers -- the three
10 coin dealers that we just spoke about, did you contact
11 them after April 14th?
12     A. I don't recall when I've had these
13 conversations. But most likely, yes.
14     Q. And you contacted employees after April 14th
15 for the purpose of soliciting them to go to work for
16 Medallic, did you not?
17     A. Yes.
18     Q. Have you told employees of the Mint that the
19 Mint is going to be liquidated and they will not have a
20 job any longer?
21     A. No.
22     Q. Have you told the employees that Mr. Calvert is
23 a liquidator?
24     A. Yes.
25     Q. Have you told them that the company will be

Page 81

1  liquidated? Have you told employees that the company
2  will be liquidated?
3      A. I've told employees that most likely the
4  company would be liquidated.
5      Q. But you haven't suggested to them that their
6  jobs would be gone?
7      A. I have suggested that most likely their jobs
8  would be gone, as a significant amount of employees
9  have already found out.
10     Q. Let's talk about your contacts with the
11 employees. Who have you contacted? Which employees
12 have you contacted?
13     A. Most of the time, it's been employees
14 contacting me. So the employees that I've contacted --
15 well, initially, I was given Maura Richardson to speak
16 to. But I've talked with Paul Wagner a number of
17 times. I've spoken to the die shop in Green Bay and
18 most of its employees.
19     Q. Give me the specific names of the employees.
20     A. I've spoken to --
21         MR. FRUSH: Is this you contacting? Or are
22 they contacting? I'd like you to be precise,
23 Mr. Hansen. It sounds to me like you started your
24 answer and it was people that you had reached out to.
25     A. (Continuing) Actually, you know what I'm going

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 4 of 20

Page 90

1  Q. And what was your purpose in reaching out to
2  Mr. Timm?
3  A. I wanted to assure him that if he got laid off,
4  I would find a home for him at Medallic Art.
5  Q. So did you offer him employment through
6  Medallic Art?
7  A. No. I just told him that he was essential to
8  the company. And I wanted to assure him that from what
9  I knew, the trustee was talking about making some cuts.
10 And if he was on the list, I would like to know about
11 it, and I would find alternative employment for him
12 through my other company.
13 Q. Did you tell him that Mr. Calvert was going to
14 liquidate and that his job would be terminated?
15 A. I told him that that was a possibility. I told
16 him -- I said that if that happened, if he was laid off
17 or the company was terminated, I would like him to come
18 work for Medallic Art Company.
19 Q. Did you ask him to walk out?
20 A. No.
21 Q. You didn't ask him to leave the Mint or leave
22 the employment of the Mint?
23 A. Nope.
24 Q. Did you offer him present employment with
25 Medallic or with somebody else?

Page 91

1  A. No. I told him that in the future, if he
2  should lose his job or if they liquidate the Mint, we
3  would create a new position for him at Medallic Art
4  Company.
5  Q. When's the last time you spoke with Mr. Timm?
6  A. I think that was the first and only
7  conversation I had with him.
8  Q. So you just talked to him one time?
9  A. Yes.
10 Q. The other employee in Green Bay, we'll come
11 back and find his name. Did you have more than one
12 conversation with him?
13 A. No. I just had one.
14 Q. Was it the same basic conversation you had with
15 Mr. Timm?
16 A. Yep. It was mainly to settle them down so that
17 they would remain employed with Northwest Territorial
18 Mint. A lot of people were expressing concerns and had
19 their resumes out. Mr. Calvert is not a well-liked
20 person. So I was assuring them that -- you know,
21 please stick with your current position. But if you
22 should get laid off, or if you get fired by
23 Mr. Calvert, we'll find you -- you know, don't fret
24 about it. Don't start looking for a job now. Just
25 call me, and we'll find you a place at Medallic Art.

Page 92

1  Q. Do you think you're a well-liked person at the
2  Mint, Mr. Hansen?
3  A. Would I win a popularity contest? I think --
4  I'm not qualified to answer that.
5  Q. You don't have an opinion as to whether you're
6  well-liked or not at the Mint?
7  A. I don't think it matters.
8  Q. You don't know whether the employees like you
9  or they don't like you?
10 A. I don't think it matters.
11 Q. Well, I want you to answer the question. Do
12 you know whether the employees like you or do not like
13 you?
14 A. I think most of them do like me.
15 Q. So you think you are popular at the Mint?
16 A. I wouldn't say I'm popular. I think they like
17 what I do, that I'm a competent person, when it comes
18 to creating products.
19 ==Q. Do you have a past history of intimidating==
20 ==employees at the Mint?==
21 ==A. Define "intimidating."==
22 ==Q. Have you ever yelled at employees at the Mint?==
23 ==A. Of course.==
24 Q. Have you ever taken employees into your office
25 for hours-long meetings and yelled at them?

Page 93

1  A. No.
2  Q. Did you ever choke a member of your staff?
3  A. No.
4  Q. You've never choked a member of your staff and
5  had the police come to your business premises?
6  A. Choked a member of my staff? No.
7  Q. That's never happened?
8  A. Never happened.
9  Q. Have you told your staff that you killed
10 somebody in prison?
11 A. It's possible.
12 Q. So you did tell them that?
13 A. I don't recall. Which employee?
14 Q. I'm asking you: Have you told any employees
15 that you killed someone in prison?
16 A. What does this have to do with the contempt
17 motion?
18 ==Q. You just started to talk about how Mr. Calvert==
19 ==is not popular. And the line of questioning is: Do==
20 ==you think you are somebody who is intimidating?==
21 ==A. Am I intimidating?==
22 ==Q. Are the employees intimidated by you?==
23 ==A. I would hope so.==
24 ==Q. You hope that they are intimidated by you?==
25 ==A. Absolutely.==

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 5 of 20

**Page 126**

1  more concerned about legal issues that you had
2  threatened him with. And I said, Well, okay.
3      And he made it very clear that until he got the
4  green light from you, he wasn't going to release the
5  funds. And there was really no -- he was pretty firm
6  on that. So at that point, I left.
7      Q. Did you direct Ms. Erdmann to file a bar
8  complaint against Mr. Tracy regarding the release of
9  the funds?
10     A. No. Actually, she did that all on her own. I
11 didn't even know she was doing it until it was done. I
12 actually would have advised her against that.
13     Q. Okay. I want to talk about the sale of the
14 Graco assets, the Tomball sale. We'll call it the
15 Tomball sale.
16     A. Yes.
17     Q. Do you remember that there was a hearing in the
18 last week of May in front of the Court regarding the
19 sale of the Tomball assets?
20     A. Correct.
21     Q. And you appeared in court in connection with
22 those sale matters, didn't you?
23     A. Correct.
24     Q. And you appeared on behalf of Medallic Art
25 Company, LLC, did you not?

**Page 127**

1      A. Yes.
2      Q. And you objected to the sale of the Tomball
3  assets on behalf of Medallic, didn't you?
4          MR. FRUSH: I wasn't there. Was he
5  represented by counsel? I just want to make sure where
6  this question is going.
7          MR. GEARIN: Yeah. He was represented by
8  Mr. Stehlik at the hearing.
9          MR. FRUSH: Well, when you're asking him,
10 did he do something, does that encompass Mr. Stehlik
11 representing him?
12         MR. GEARIN: Mr. Hansen was there himself.
13         MR. FRUSH: I'm just wondering who was
14 speaking. Was it Hansen or Stehlik?
15         THE WITNESS: Mr. Stehlik.
16         MR. GEARIN: Mr. Stehlik did most of the
17 speaking.
18     Q. (BY MR. GEARIN) But you spoke, right,
19 Mr. Hansen?
20     A. I don't think I did.
21     Q. You testified, right? You don't remember
22 testifying? You don't remember getting up on the stand
23 and testifying?
24     A. I believe I did. Yes.
25     Q. Right. And you were a representative of

**Page 128**

1  Medallic in connection with those objections that were
2  being interposed to the sale, weren't you?
3      A. Well, I was objecting for a number of reasons.
4  I was objecting on behalf of the estate. I was
5  objecting on behalf of what was in the best interest of
6  the company and objecting to the process. I had a
7  number of objections.
8      Q. Well, my question is: You were the
9  representative on behalf of Medallic that interposed
10 the objection to the sale, correct?
11         MR. FRUSH: Objection, to the extent that
12 you're trying to get a legal opinion out of him.
13         Mike, I have no idea what Mr. Stehlik said
14 or didn't say or what Mr. Hansen said or didn't say.
15 But to the extent -- you know, you said, You were
16 objecting on behalf of Medallic.
17         I suspect that the record speaks for itself
18 there. But to the extent you're asking him for a legal
19 conclusion, I'd just enter a continuing objection.
20         MR. GEARIN: Okay. The objection is noted.
21     Q. (BY MR. GEARIN) Mr. Hansen, you can answer the
22 question.
23     A. Well, I was objecting to the whole process. I,
24 you know, one, thought it was a bonehead move. And,
25 two --

**Page 129**

1      Q. I'm not asking you --
2      A. And I wanted to make it clear that --
3      Q. You're not answering my question, sir. You're
4  not answering my question. My question was: Were you
5  the representative that interposed the objection on
6  behalf of Medallic?
7      A. Again, I'm not certain on the technicality of
8  that. But, yes, as an interested party, Medallic Art
9  did object. Because Medallic Art had some assets
10 involved in that sale.
11     Q. And you signed a declaration on behalf of
12 Medallic in connection with that objection, right?
13     A. I did.
14     Q. And you testified on behalf of Medallic in
15 connection with that objection, correct?
16     A. Correct.
17     Q. And you sat in court on behalf of Medallic
18 through those sale proceedings, did you not?
19     A. Correct.
20     Q. You also sought to purchase the Tomball assets
21 on behalf of Medallic in connection with those sale
22 proceedings, did you not?
23     A. Correct.
24     Q. And you told the Court that you wanted to
25 tender a bid to buy the assets, right?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 6 of 20

Page 130

1　　A. I did.
2　　Q. Now, I've heard you testify before as to the
3　ownership of Medallic. And my understanding is that
4　Medallic -- that is, Medallic Art Company, LLC, a
5　Nevada LLC -- is owned 50 percent by you and 50 percent
6　by Mr. Richard Bressler; is that true?
7　　A. That's true.
8　　Q. Did you inform Mr. Bressler that you were
9　filing objections to the Tomball sale on behalf of
10　Medallic?
11　　A. I did not.
12　　Q. Did you talk to Mr. Bressler at all about the
13　Tomball sale matters?
14　　A. I did not. I didn't need to.
15　　Q. And you didn't need to because you have
16　management authority over Medallic?
17　　A. Yes, I do.
18　　Q. And you didn't think it was necessary to talk
19　to Mr. Bressler about purchasing hundreds of thousands
20　of dollars -- or a million dollars or more of assets?
21　　A. Well, I'm sure I would've informed him at one
22　time or another. But as managing member of Medallic
23　Art, I have the authority to bind the company.
24　　Q. Okay. So you can tell Mr. Bressler about it
25　after the fact? After you've bound the company, you

Page 131

1　can go and inform him; is that your understanding?
2　　A. Had I, yes.
3　　Q. Did you inform Mr. Bressler that you were
4　bidding on the Tomball assets on behalf of Medallic?
5　　A. My conversations with my partner are not
6　germane to this.
7　　MR. FRUSH: Just answer the questions.
8　　THE WITNESS: I'm not going to answer the
9　questions about what I may or may not have said with my
10　partner. It's not important.
11　　MR. FRUSH: Ross, we don't need to --
12　　THE WITNESS: I'm not going to let him get
13　into what us partners talk about.
14　　MR. GEARIN: Well, we are going to talk
15　about it, Mr. Hansen.
16　　MR. FRUSH: Ross, you can't -- the judge is
17　going to make you testify about this. And if there
18　weren't these conversations, then just tell him that
19　there weren't conversations.
20　　A. I had no conversations with him on that.
21　　Q. (BY MR. GEARIN) When's the last time that you
22　spoke with Mr. Bressler?
23　　A. A couple of weeks ago.
24　　Q. About two weeks ago?
25　　A. Yeah.

Page 132

1　　Q. What did you talk about?
2　　MR. FRUSH: I'm going to pose an objection,
3　to the extent that there was any discussion between
4　Mr. Hansen and Mr. Bressler that was at the
5　direction -- or communicated legal advice or legal
6　opinion.
7　　So to the extent your conversation didn't
8　touch on anything that was privileged, you can talk
9　about it. To the extent it dealt with litigation
10　strategy, anything you discussed with the attorneys and
11　the like, then it's privileged and we'll enter an
12　objection to that.
13　　A. My conversations then would be privileged.
14　　Q. (BY MR. GEARIN) So you spoke with Mr. Bressler
15　about two weeks ago. And before that conversation,
16　when was the last time you spoke to him?
17　　A. A few weeks before that.
18　　Q. How many times have you spoken with
19　Mr. Bressler since the bankruptcy case was filed?
20　　A. I don't know.
21　　Q. Did you ask Mr. Bressler to provide the
22　funding -- additional funding for Medallic?
23　　A. No.
24　　Q. You didn't ask Mr. Bressler to provide funding
25　to support the acquisition of the Tomball assets?

Page 133

1　　MR. FRUSH: If this was involved in a
2　litigation strategy that you discussed with the
3　attorneys, I think it's privileged.
4　　A. It is privileged. Because this involves Tom
5　and everybody else.
6　　Q. (BY MR. GEARIN) Well, I'm not asking you about
7　your conversations with your lawyers.
8　　MR. FRUSH: I think, Mike, if the lawyers
9　are saying, All right, Ross, here's what we're going to
10　do. See what Dick thinks and report back to us -- then
11　I think it's privileged. I think that's work product.
12　　MR. GEARIN: Well, I don't understand how
13　the --
14　　MR. FRUSH: It's work product, if that's
15　what happened. And certainly there's a commonality of
16　interest between Mr. Hansen and Mr. Bressler that is
17　protected. I mean, even to the extent that there's an
18　informal joint litigation agreement. I just don't
19　think it's -- I happen to know that these are
20　discussions that should be considered, at the very
21　least, work product.
22　　MR. GEARIN: I'm having a difficult time,
23　Jim, understanding how conversations -- commitments and
24　discussions that he's having with Mr. Bressler about
25　funding a bid on the Tomball assets -- how those could

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 7 of 20

Page 134

1  be connected to any litigation strategy.  I'm having a
2  difficult time with that.
3       MR. FRUSH:  Well, part of the litigation
4  strategy, as I understand it -- and you know that there
5  are three attorneys, at least, that are advising Ross
6  on this.  Two of them are bankruptcy attorneys,
7  Mr. Powers and Mr. Bucknell, with Mr. Stehlik
8  representing Medallic.  And I'm involved with those
9  discussions.  And, believe me, the lawyers talk a lot
10 with the clients and with Mr. Hansen about the business
11 side of this situation.  I mean, I think we expressed
12 to you last week, after the depositions, some of the
13 sort of discussions that are on everybody's mind.
14      MR. GEARIN:  You don't represent
15 Mr. Bressler, do you, Jim?
16      MR. FRUSH:  I don't represent Mr. Bressler,
17 but Mr. Bressler has counsel as well.  And I just think
18 you're getting into work product and litigation
19 strategy by asking about how certain things that, in
20 the context of this litigation and on the advice of
21 counsel -- that are covered by the attorney-client
22 privilege or work product.
23      MR. GEARIN:  I disagree with you.  But
24 let's reframe the question and make it a little
25 clearer, then.

Page 135

1       MR. FRUSH:  All right.
2       Q. (BY MR. GEARIN)  Did Mr. Bressler commit to
3  provide any funding to Medallic for the purpose of
4  acquiring the Tomball, Texas assets?
5       A. No.
6       Q. No?  No was your answer; is that right?
7       A. That's correct.
8       Q. Has Mr. Bressler committed to provide any
9  funding to Medallic, for any purpose, since the
10 bankruptcy case was filed -- since the Mint bankruptcy
11 case was filed?
12      A. I'm not going to answer that.
13      MR. FRUSH:  I'm sorry.  What?
14      THE WITNESS:  He's asking me again about
15 strategies and --
16      MR. FRUSH:  But I think you --
17      THE WITNESS:  While you guys hammer this
18 out, I'm going to go use the restroom.  You guys can
19 talk about it.  But that really goes into the --
20      MR. FRUSH:  All right.  All right.
21      THE WITNESS:  Because there's stuff that
22 even you don't know about.
23      MR. FRUSH:  That's what I'm --
24      MR. GEARIN:  Let the record reflect that
25 Mr. Hansen has left the room.

Page 136

1       MR. FRUSH:  To go to the bathroom.
2       MR. GEARIN:  In the middle of a question,
3  he's excused himself.
4       MR. FRUSH:  I'm not following him out
5  there, Mike.  He said he had to go to the bathroom.
6  And he said that you and I could resolve this stuff.
7       MR. GEARIN:  Yeah.
8       MR. FRUSH:  You're trying to get into work
9  product with the lawyers and how to strategize asset
10 acquiring in this bankruptcy.  As you well know -- and
11 he has testified to it -- he's interested in taking
12 back some or all of the Mint through Medallic.  And
13 he's interested in making sure that Medallic stays
14 independent from the Mint.  And this has been the
15 subject of an enormous amount of conversation by the
16 lawyers and Mr. Hansen.  And I just think it's -- if
17 the lawyers say, Talk to your partner about this and
18 explain to him what we're thinking --
19      Mr. GEARIN:  I haven't asked him that
20 question, Jim.  I haven't asked him that.  You know, up
21 to this point, we've actually done pretty good.  Both
22 sides on this.
23      MR. FRUSH:  Right.
24      MR. GEARIN:  But I'm telling you, this is
25 hogwash.  Right?  You are putting a specious discussion

Page 137

1  of privilege and work product in here to seek to
2  disrupt my ability to ask him about legitimate matters.
3       These are issues.  He's taken the position
4  that Medallic is a viable company, and he has the
5  ability to go hire people.  He's telling the employees
6  that he's going to hire them all, he's going to take
7  care of them all, he's going to conduct a business
8  through Medallic, he's going to bid on assets and
9  acquire assets through Medallic.  And he hasn't shown
10 that there's any capability for Medallic to do that at
11 all.  It is a legitimate line of questioning for me to
12 ask him what funding Medallic has, who is backing
13 Medallic, does Mr. Bressler really know what he's
14 involved in here.
15      Those are all legitimate lines of inquiry.
16 And I'm not impinging on anybody's work product
17 or attorney-client privilege in any way.  I haven't
18 asked him about any of the conversations that either he
19 or Mr. Bressler have had with any of his lawyers.  So
20 for you to interpose that objection right now is clear
21 obstruction.  And if we need to, then we'll go get the
22 Court.  And we'll get to the bottom of the line of
23 inquiry about Mr. Bressler's involvement and what he's
24 committed to do and what he hasn't committed to do.
25      MR. FRUSH:  Well, you know, I don't see how

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 8 of 20

**Page 150**

1   said.
2       A. That's not what I said.
3       Q. (BY MR. GEARIN) Are you aware of any specific
4   asset, in Texas, that belongs to Medallic?
5       A. Yes.
6       Q. What asset?
7       A. There are trim tools. There are coining dies.
8   There is a tumbler. There is ribbon. There are
9   findings. And there is -- did I already say dies?
10      Q. You said coining dies.
11      A. Yeah. And trim dies, coining dies, and designs
12  that belong to Medallic Art Company.
13      Q. I observed the testimony you had at the hearing
14  to that effect.
15      A. But wanting to be thorough, I want to be able
16  to make sure I can identify all these. And I need
17  access to my records and my inventories and shipping
18  records.
19      Q. Let's talk about your visit to the Federal Way
20  facility on May 18, 2016.
21      A. Yes.
22      Q. Now, you did come to the premises in Federal
23  Way -- the Mint premises in Federal Way on May 18th,
24  correct?
25      A. Yes.

**Page 151**

1       Q. And you came unannounced, didn't you?
2       A. No.
3       Q. Did you call Mr. Calvert and tell him you were
4   coming?
5       A. I called Patrick Ward.
6       Q. Who is Mr. Ward?
7       A. Mr. Ward is the security guard. It was my
8   belief that my visit had been approved through
9   Mr. Stehlik. But making sure that the word had
10  filtered down, I called Mr. Ward and informed him that
11  I would be coming midday the next day. And I asked him
12  to make sure that that was cleared through Mr. Huffman
13  and that everybody was aware of it. Because I didn't
14  want any surprises. I did not want exactly what has
15  happened -- you guys making something out of nothing.
16          So I called, and I explained to him that I
17  would be there the next day. And I told him that if
18  there was any problem, to give me a call back.
19      Q. So you explained to Mr. Ward that you were
20  coming. But you didn't ask his permission to come, did
21  you?
22      A. Well, I thought that had already been worked
23  out. And I told him to talk to Mr. Huffman. I asked
24  for Mr. Huffman when I first called, and he wasn't
25  there. So Mr. Ward is the security officer there, so I

**Page 152**

1   spoke to the security officer. Because I would like to
2   have talked to Maura, but she had left the company. So
3   Mr. Ward seemed like the logical contact because he was
4   the chief -- or he was the security officer. And I
5   explained to him that I would be there the next day,
6   pursuant to what I thought was an agreement between
7   Mr. Stehlik and Mr. Calvert, and that I wanted to make
8   sure that there were no issues or problems and that
9   everybody was aware of it and that it wouldn't come as
10  a surprise.
11      Q. You didn't talk to Mr. Calvert about getting
12  permission, did you?
13      A. No. But I thought Mr. Stehlik had.
14      Q. You assumed that?
15      A. Through the conversations I had with
16  Mr. Stehlik, I thought that had all been arranged.
17      Q. I see. Did you know Mr. Calvert was out of
18  town on May 18, 2016?
19      A. I did not.
20      Q. So you showed up at the premises on May 18th.
21  What did you do? Did you announce yourself at
22  reception and stay in the reception area? Or what did
23  you do?
24      A. I walked in. I brought an ex-employee with me,
25  and --

**Page 153**

1       Q. What do you mean, "ex-employee"? Who did you
2   bring with you?
3       A. I brought with me -- for whatever reason, my
4   mind is blank right now. I brought Diane's vault guy.
5   Anyway, I'll think of his name in just a minute. Don
6   Schwenk.
7       Q. Mr. Schwenk was with you at the time?
8       A. Yes. And I brought him along just to be a
9   witness, in case there was a problem. And we walked in
10  and were greeted warmly at the front reception desk.
11  And I was under the impression that there was no big
12  deal. Everything was fine. A number of employees came
13  out and greeted us. The receptionist said, Go ahead.
14          I asked if it was okay if we go in the back.
15  And she said, Yeah, go ahead. Go see Annette.
16          Diane and I walked around the counter, and
17  Annette was just coming out of her office. She saw us.
18  She gave Diane a hug. She shook my hand. I told her
19  why I was there. She was surprised, which surprised
20  me. And I said, Do you know why I'm here?
21          And she said, Gosh, no.
22          And I was befuddled because I thought that
23  everything had been prearranged. So we stepped back
24  into her office. And she said that she had not been
25  instructed to give me the file for Medallic Art and

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 9 of 20

Page 154

1   that she needed to call Mr. Calvert.  And I told her
2   that would be fine.  She asked for me to wait while she
3   made a phone call to Mr. Calvert.
4           She called Mr. Calvert, and apparently she was
5   not able to get ahold of Mr. Calvert.  So she asked for
6   me to wait another moment.  And she called, I believe,
7   one of Mr. Calvert's employees, who said, I don't know
8   anything about it.  Don't give him anything -- or
9   that's what she relayed to me.
10          And just as she was telling me that,
11  Mr. Huffman walked in.  And he was on the phone with
12  somebody -- I think he told me it was Paul -- and told
13  me that I wasn't authorized to be there and --
14      Q. Let me stop you there, Mr. Hansen.
15      A. Okay.
16      Q. So your testimony is that the receptionist told
17  you to go ahead and go back to Ms. Trunkett's office;
18  is that right?
19      A. Yes.
20      Q. You didn't just walk past the receptionist and
21  go back to Ms. Trunkett's office?
22      A. No.  We stopped, and we were talking to
23  everybody.  People were coming out and shaking my hand
24  and saying hi and asking us how we were doing.  You
25  know, it was kind of like old home week.

Page 155

1       Q. Did you ask for permission to go back to
2   Ms. Trunkett's office?
3       A. I think she just said -- I said, We just need
4   to go back and pick up some stuff.  And she was, like,
5   Go ahead.
6           I asked her if it was okay.
7       Q. Did you tell Ms. Trunkett that you had the
8   authority to pick up records from the Mint offices?
9       A. Yes, I did.
10      Q. All right.  Did you tell her that you had the
11  trustee's authority to pick up the records?
12      A. I told her that it had been arranged between
13  Mr. Stehlik and Mr. Calvert for me to pick up the
14  records of Medallic Art Company.  That's what I
15  believed at the time.
16      Q. Do you still believe that to be true?
17      A. Mr. Calvert said that he never made such an
18  agreement with Mr. Stehlik, and I'm confused.  To me,
19  it was -- I showed up there.  It was kind of a waste of
20  my time.
21      Q. Did you ever see anything in writing between
22  Mr. Stehlik and me about an agreement to allow you to
23  have access to the Mint premises to pick records up?
24      A. I don't recall what I saw.  I just know that
25  Mr. Stehlik sent me an email saying that it was good to

Page 156

1   go.  And he asked if I wanted him to go with me.  And I
2   said, No.  Because every time you go me with, it costs
3   me a lot of money.
4           And he said, Well, take somebody who can be a
5   witness, in case there's a problem.
6           And I said, Okay.  I'll do that.
7       Q. So you didn't see anything in writing from me
8   to Mr. Stehlik that granted you permission to come into
9   the premises, did you?
10      A. No.  That was told to me by Mr. Stehlik.
11      Q. When you talked to Ms. Trunkett, did you tell
12  her that you had Mr. Calvert's permission to pick the
13  records up?
14      A. I told her that my attorney had told me that he
15  had worked out a deal with -- I believe it was with
16  you -- to pick up the records -- pick up a copy of the
17  records of Medallic Art Company.
18      Q. That's what you told Ms. Trunkett?  You
19  specifically told her that your attorney had worked out
20  an agreement with me?
21      A. I believe that's what I told her.
22      Q. You didn't tell her that you had the authority
23  to pick the records up?
24          MR. FRUSH:  Objection.
25      A. Well, I don't know what the difference is.

Page 157

1       Q. (BY MR. GEARIN)  Well, I want to talk about
2   precise language.  I want to talk about what words you
3   used.  Did you use the words -- when you spoke to
4   Ms. Trunkett, did you tell her:  I have the authority
5   to pick the records up?
6       A. I told her that I had permission to pick the
7   records up.
8       Q. But you didn't use the word "authority"?
9       A. Well, authority?  What's the authority?  Define
10  "authority."
11      Q. Well, do you remember what words you used?
12      A. No, I really don't.  I didn't think it was a
13  big deal.  I mean, come on.  You know, get your tail
14  out of a twist and quit trying to make a mountain out
15  of a molehill.
16          MR. FRUSH:  Ross, no speeches, please.
17  Just keep the record clean.
18          THE WITNESS:  Jesus Christ.
19      Q. (BY MR. GEARIN)  You have a difficult time,
20  sir, answering a direct question.  I was asking --
21          MR. FRUSH:  Well, he was answering.
22      Q. (BY MR. GEARIN)  I asked you a direct question
23  about what words you used when you spoke with
24  Ms. Trunkett.  And now you want to try to twist that
25  around and not give me a direct answer to that

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 10 of 20

Page 158

1  question.  So I have to continue to ask you the same
2  question on multiple occasions.  That's why we've been
3  here as long as we have.
4      MR. FRUSH:  Objection.  Asked and answered.
5  He's answered that question three times now.  And now
6  he's elaborated on it.  He's told you that he doesn't
7  remember whether it was "permission" or "authority."
8  Let's move on.
9      MR. GEARIN:  It took him multiple occasions
10 to answer the specific question.
11     Q. (BY MR. GEARIN)  Mr. Hansen, did you produce --
12 you produced a letter, right?
13     A. Yes.
14     Q. You waved a letter around when you walked into
15 the premises, right?
16     MR. FRUSH:  Objection.  This is
17 argumentative.  You waved.  You demanded.  You showed
18 up.
19     You know, did you present a letter?  I
20 mean, you're being very argumentative.  I've tried to
21 keep my objections to a minimum.
22     MR. GEARIN:  I don't think it is
23 argumentative at all.
24     Q. (BY MR. GEARIN)  Mr. Hansen, did you bring a
25 letter into the premises of the Mint on May 18th?

Page 159

1      A. Yes, I did.
2      Q. Did you show that letter to the employees of
3  the Mint and purport that that letter granted you
4  authority to pick the records up?
5      A. Yes.  Not authority, but it gave me permission.
6      Q. "Permission" was the word you used?
7      A. I used the word "permission."
8      Q. Mr. Hansen, I'm just going to show you -- I'm
9  not going to mark it as an exhibit.  I know this is
10 really not legible.  But I want you to look at that
11 page there and then the back side of that document.
12 And I want to ask you if you recognize the language
13 that's on that back side there?
14     A. Yes.  What about it?
15     Q. Is that the language that was on the
16 letter that --
17     A. I don't recall.
18     Q. You don't recall.
19     Mr. Stehlik's letter -- the letter you had with
20 you on May 18th -- didn't say that Mr. Stehlik had
21 reached an agreement with the trustee to provide access
22 to the records, did it?
23     MR. FRUSH:  Objection.  The letter speaks
24 for itself.
25     Q. (BY MR. GEARIN)  You can answer the question,

Page 160

1  Mr. Hansen.
2      A. I don't have the letter in front of me, but I
3  don't recall.  I remember it was a continuation of a
4  discussion that I had had with Maura, who told me that
5  there were records waiting for me.  And it was just --
6  to me, it was a big nonissue.  There was a box of
7  records down there that belonged to me.  Mr. Stehlik
8  had spoken to you about it.  And it didn't seem like it
9  was a big issue.
10     Q. You don't remember that the letter that you
11 brought on May 18th said:  I asked Mr. Calvert's
12 attorney some time ago to provide these records, but he
13 has not responded?
14     You don't remember that?
15     A. I don't recall.
16     Q. You don't remember if that was the letter?
17     A. I don't recall.
18     Q. But your testimony is that you believed, when
19 you went to the premises on May 18th -- you thought
20 that your attorney had reached an agreement with
21 Mr. Calvert's attorney, correct?
22     A. I wasn't sure if he had spoken to Mr. Calvert
23 at the hearing that we had just attended.  But there
24 was some understanding, I believed, between yourself or
25 Mr. Calvert -- and Maura had confirmed it -- that there

Page 161

1  was a box of records that was in the accounting
2  department that we could pick up.
3      Q. So the letter that Mr. Stehlik provided to you,
4  that you brought to the Mint on May 18th, did he
5  prepare that the day before, May 17th?
6      A. I don't recall.
7      Q. Do you recall Mr. Stehlik saying to you in the
8  letter, I'm aware that you're going to try to gain
9  access to the Mint's offices in Federal Way, and I hope
10 that Mr. Calvert will cooperate with you and allow you
11 access?
12     Do you recall him telling you that?
13     A. Well, Mr. Calvert had told me previously that
14 if I needed access --
15     Q. Mr. Hansen, you're not answering my question
16 again.  I need to interrupt you.  You're not answering
17 my question.
18     A. I don't recall what the letter from Mr. Stehlik
19 to me said.  Based upon prior representations by both
20 Mr. Calvert and also by Maura Richardson, and by what
21 my conversation with Mr. Stehlik was, I believed that I
22 had permission to come to the office and pick up a box
23 of records.  And that's why I called the day before and
24 spoke with security, just to confirm all of that.  And
25 I said, If there's any problem, please call me back.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 11 of 20

Page 162

1  And nobody called me back.
2  Q. So you believe that you obtained permission to
3  visit the Mint's premises by calling one of the
4  security officers at the Mint? Is that what you're
5  saying?
6  A. No. I believe that by prior agreement with
7  Mr. Calvert, subsequent conversations with
8  Ms. Richardson, and conversations that Mr. Stehlik had
9  with either yourself or Mr. Calvert, that permission to
10 pick up the box of records that did not belong to you,
11 that belonged to me -- that that was okay. And out of
12 an abundance of caution, I called the day before and
13 wanted to make sure. Because I knew that attorneys
14 such as yourself -- and you're doing exactly what I was
15 worried about -- would make a mountain out of a
16 molehill. So I said, Please, if there's a problem,
17 call me back, and I won't come down.
18     Because I did not want to end up in the very
19 position that I'm in today, being accused of doing
20 something wrong.
21 Q. Tell me again, who did you have this
22 conversation with? The security officer?
23 A. Patrick Ward. And when I was there,
24 Mr. Huffman acknowledged that I had spoken with Patrick
25 Ward but chided me that Patrick Ward was the wrong

Page 163

1  person to call, that I should have called him.
2  Q. But you didn't call Mr. Huffman, did you?
3  A. Well, I asked for Mr. Huffman. But Mr. Huffman
4  was out of the office when I called. And I explained
5  to Mr. Ward -- I said, I'm coming down tomorrow to pick
6  up some records. I believe it's all been worked out.
7  I just want to make sure that my visit isn't going to
8  cause any problems. And if it is going to cause a
9  problem, please call me back, and I won't come down.
10 Q. Did you demand that Ms. Trunkett give you
11 original records from your office?
12     MR. FRUSH: Objection.
13 A. I made no demand to her. All I asked for
14 was -- I had been told by Maura Richardson that there
15 was a box of records that Mr. Calvert would not release
16 until they were copied. They had been copied, and they
17 were now available to pick up. And so I believed that
18 I was picking up a box of copies of the records.
19 Q. (BY MR. GEARIN) Did you record the
20 conversation with Ms. Trunkett while you were at the
21 Mint on May 18th?
22 A. Yes, I did.
23 Q. Do you have a copy of the recording?
24 A. I do.
25 Q. I'm going to ask your counsel to produce that

Page 164

1  recording to me.
2  A. Okay.
3      MR. GEARIN: I would like a copy.
4  Q. (BY MR. GEARIN) When Mr. Huffman came and
5  interceded and told you that you needed to leave, did
6  you try to push past him to get to the office?
7  A. No.
8  Q. What did you say to Ms. Trunkett when you were
9  leaning over her desk at that meeting? What did you
10 say to her?
11     MR. FRUSH: Objection. Assumes facts not
12 in evidence. You haven't asked him where he was in
13 relation to --
14     MR. GEARIN: Okay. Well, let's go back to
15 that.
16 Q. (BY MR. GEARIN) Mr. Hansen, when you walked
17 in, I think you said you engaged with Ms. Trunkett and
18 you went into her office.
19 A. I did.
20 Q. Did she sit down?
21 A. I believe she went on the other side of her
22 desk so she could make the phone call to Mr. Calvert.
23 Q. Then did she sit down at her desk?
24 A. I believe she did.
25 Q. And did you stand over the top of her desk?

Page 165

1  A. I was on the other side of her desk.
2  Q. Okay. Did you put your hands on her desk?
3  A. I don't recall.
4  Q. Did you lean over the desk?
5  A. I don't think so. I was -- it was a friendly,
6  cordial conversation.
7  Q. All right. What did you say to her?
8  A. I asked her what her plans were with the
9  company. And I asked her if I was -- if I -- that I
10 hoped to take back the company and that I -- that if I
11 do take back the company, I asked her if she would
12 consider coming to work for me. And she said that her
13 back was causing her such grief, that what she really
14 wanted to do was -- she was waiting to hear a decision
15 on her application for a disability. And she really
16 wanted not to be working anymore. She wanted to go on
17 disability because she was in a lot of pain.
18 Q. Did you tell Ms. Trunkett that you were
19 recording her conversation?
20 A. I did not.
21 Q. Did you tell Mr. Huffman that you were
22 recording the conversation?
23 A. I did not.
24 Q. Did you record the conversation with
25 Mr. Huffman as well?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 12 of 20

Page 166

1  A. I had a recorder in my pocket. I don't think I
2  had the opportunity to tell him anything. He came in,
3  and he was very forceful. He ordered me to leave, and
4  I left immediately.
5  Q. But you did offer Ms. Trunkett a job; is that
6  right?
7       MR. FRUSH: Objection. Asked and answered.
8  He's testified as to the conversation.
9  A. I said that if I took back over the company, I
10 wish she would stay employed with us. Yes.
11 Q. (BY MR. GEARIN) Did you try to get
12 Ms. Trunkett to leave her employment with the Mint?
13 A. No, I did not.
14      (Deposition Exhibit 5 was marked for
15       identification.)
16 Q. (BY MR. GEARIN) Let's look at the face page of
17 this, Mr. Hansen. This is now what has been marked as
18 Deposition Exhibit Number 5. Do you recognize this?
19 A. Yes, I do.
20 Q. Is this your declaration that you just filed on
21 Friday with the court?
22 A. It is.
23 Q. Let's go to Exhibit C of this declaration,
24 which is the email that we earlier discussed, the email
25 that you sent to Ms. Richardson.

Page 167

1  A. Okay.
2  Q. Well, strike that question. I think we've
3  already covered that ground. I think we've already
4  talked about this.
5      Let's talk about your issues in paragraph 10,
6  where you talk about your personal mail.
7  A. I'm sorry. Which --
8  Q. Paragraph 10.
9  A. Oh, in the declaration. Okay.
10 Q. You say: I have requested that the Mint
11 forward to me personal mail, including mail related to
12 healthcare.
13     Who did you make a request to to have your
14 personal mail forwarded to you?
15 A. I have spoken to Mr. Calvert. I have spoken to
16 Ms. Richardson. I have spoken to Ms. Trunkett. And I
17 have spoken to -- I believe it was a lady named Jodi.
18 I apologize. Is that one of Mr. Calvert's helpers down
19 there?
20 Q. Yeah. So when did you talk to Mr. Calvert
21 about your personal mail?
22 A. When I left. And then I spoke to him at one of
23 the hearings. And I asked him if there was a reason I
24 wasn't getting it. And he said, No, but I'll look into
25 it.

Page 168

1  Q. When did you speak to Ms. Richardson about your
2  mail?
3  A. During the couple of weeks she was there,
4  before she left. And she had told me that -- she was
5  squirrelly about it. She said that Mr. Calvert had
6  wanted to go through my mail and look at my mail and
7  that it wasn't her decision to give it to me.
8  Q. So that would have been in April of 2016,
9  correct?
10 A. Correct.
11 Q. And when did you talk to Ms. Trunkett about
12 your mail?
13 A. I believe in one of my phone calls down there
14 about my financial records, I asked her about it. I
15 also saw her in court here a while back, and I asked
16 her about it. She said that she wasn't handling the
17 mail, that that was going through Jodi.
18 Q. Did you call Jodi?
19 A. I did.
20 Q. You called her at the Mint and spoke with her?
21 A. Yes.
22 Q. When did you do that?
23 A. Sometime in April, I believe.
24 Q. Okay. Let's focus on paragraph 11 to your
25 declaration, the issues with Ms. Krum.

Page 169

1  A. Yes.
2  Q. You say, in your declaration, that when
3  Ms. Krum was on maternity leave, the custom software in
4  her machine had been corrupted. And Ms. Krum was
5  concerned that it would be corrupted again.
6      Is that your recollection? When Ms. Krum was
7  on maternity leave, the software in her engraving
8  machine was corrupted?
9  A. Yes. It was actually the parameters of where
10 the engraving pads are, which are hard to set up, as I
11 understand it. I've never run that machine. But she
12 was pretty upset, when she came back, that the
13 parameters for the different engraving pads in the
14 engraving areas on the different types of coins had
15 been, quote, screwed up. And she was furious about it.
16 She said, I almost quit over it.
17 Q. So if the software on the engraving machine was
18 corrupted, would that cause problems for the company?
19 A. Well, as I understand it, the software itself
20 is off-the-shelf software. It's the parameters of the
21 engraving pad that are the problem. So I think there's
22 some difference between the software and the engraving
23 pads.
24 Q. So you're saying that there's actually some
25 input that someone at the Mint has put into the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 13 of 20

Page 170

1  software that runs the engraving machine; is that
2  correct?
3      A. As I understand it, yes.  She has actually put
4  in some parameters so that -- it just makes it easier
5  to operate.
6      Q. And those engraving pads, are those templates?
7      A. Yes.
8      Q. Those are templates for additional product that
9  she would make?
10     A. Well, no.  What happens -- if I can explain --
11 is, each of the different products that we have has a
12 different area on it that is engravable, and those are
13 templates that are put into the machine.  And it
14 downloads from the website so that you can pull up that
15 program.  It will show you where, on that coin, it will
16 engrave.  And she was very concerned about -- she told
17 me she was on the verge of walking out.  I did
18 everything I could to tell her not to.  And she said,
19 Well, if I come back and the machine is screwed up, I'm
20 not going to redo this machine again.
21         And I said, Well, if you do walk out, copy your
22 parameters so you can put them back in.  I mean, that's
23 the solution.  I said, You know, come on.  You're a big
24 girl.  You don't need to walk out.
25     Q. But the point is that if that software was

Page 171

1  corrupted or destroyed, it actually would cause delay,
2  time, expense --
3      A. A little bit.  I think it's just more of a
4  hassle than --
5      Q. Mr. Hansen, let me finish the question.  It
6  would cause delay, expense, trouble for the company; is
7  that true?
8      A. I think so.  Yeah.
9      Q. And your testimony is that you told Ms. Krum to
10 copy the software, the engraving pads, when she came
11 back from maternity leave?
12     A. Yeah.  What I told her is -- I said, Make two
13 copies.  Take one copy and put it in the safe down
14 there, and take the other copy with you.
15         And I said, That way -- you know, I asked her
16 if there was a copy of the -- I asked her, How did you
17 allow it to get screwed up in the first place?  I said,
18 Isn't anybody backing that machine up?
19         And she said, No.
20         And I said, Well, immediately go make some
21 copies of it and go put one of the copies in the safe
22 down there so that if, for whatever reason, it gets
23 corrupted again, by accident or on purpose, somebody
24 can reload it into the machine.
25     Q. Do you recall when Ms. Krum went on maternity

Page 172

1  leave?
2      A. No, I don't.
3      Q. Do you recall how old her child is?
4      A. About a year old.
5      Q. So is it your recollection that this
6  conversation with Ms. Krum about copying the files was
7  a year or so ago?
8         MR. FRUSH:  Objection.
9      A. No, not at all.  It was -- the first
10 conversation about this was at my house, and it was a
11 couple days after we quit.  Sometime in April.
12     Q. (BY MR. GEARIN)  So it was not contemporaneous
13 with her coming back from maternity leave.  It was
14 actually much later than that, that you talked to her
15 about copying the files?
16     A. Correct.  She --
17        MR. FRUSH:  Objection.  I think you're
18 mischaracterizing his testimony.  His testimony was
19 that she had a problem when she came back from
20 maternity leave, and that's what they talked about --
21 the same type of problem.
22        MR. GEARIN:  I'm not mischaracterizing.
23 I'm trying to get to the bottom of the timing of when
24 he had this conversation with Ms. Krum.  I could be
25 mistaken.  I could be assuming that it was a year or

Page 173

1  two ago.
2      Q. (BY MR. GEARIN)  You're telling me it wasn't.
3  You're telling me the conversation was in April or May
4  of 2016?
5      A. Correct.  And what happened was, after we left
6  the company, Ms. Krum was at our home.  And she was
7  expressing her great unhappiness with the situation,
8  with Mr. Calvert, and especially with Mr. Wagner, and
9  how much she disliked Mr. Wagner.  And she was telling
10 me that she had put her resume out and that her and a
11 couple of other employees were prepared to walk out the
12 door.  And she was just waiting to get a new job.
13     Q. You know Ms. Krum pretty well, don't you?
14     A. She more Diane's friend.
15     Q. Do you think Ms. Krum is a truthful person?
16     A. No, not really.
17     Q. So you're saying that it was Ms. Krum that
18 talked to you about walking out, not the other way
19 around?
20     A. That's correct.
21     Q. You've heard Ms. Krum's testimony to the effect
22 that you asked her to delete files from the Mint
23 computer.  Is that true?
24     A. That's not true.  That would not serve my
25 interest.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 14 of 20

Page 174

1  Q. Back in paragraph 11 of your declaration, you
2  talk about "in the event the trustee lays off Ms. Krum
3  or she is employed elsewhere." Did you have some
4  indication that the trustee was going to lay Ms. Krum
5  off?
6  A. No. Ms. Krum had talked about quitting. And
7  this actually was over a three- or four-conversation
8  period. It wasn't in one conversation. And she had
9  expressed her unhappiness. She was afraid that the
10 company was going to implode and that she could be laid
11 off. And she just had the concerns that all the
12 employees have. And I assured her that she had a very
13 valuable position and that she needed to remain there.
14 Q. All right.
15 A. But she was concerned that Mr. Wagner didn't
16 like her and that he would lay her off because he
17 didn't like her.
18 Q. Okay. So she was concerned about getting laid
19 off. You had not necessarily heard from someone else
20 that she might be laid off?
21 A. That's correct.
22 Q. Did you tell her that she might be laid off?
23 A. I told her -- I said -- she asked me what I
24 knew about the company. And she -- the wildfire
25 through the company about, you know, Tomball, Texas and

Page 175

1  everybody losing their jobs and everything else, was --
2  you know, I think there was some contemplation, at that
3  time, about it being shut down and just a lot of
4  nervousness. And I told her that she held a very
5  valuable position and that I think she would be one of
6  the last people that they would lay off.
7  And she talked about how her and Paul didn't
8  get along and that she hated Paul. And Paul, she
9  thought, had it in for her and that if Paul had the
10 opportunity, Paul would lay her off and get somebody
11 else to do her job.
12 Q. Did you tell Ms. Krum that you wanted to hire
13 her?
14 A. Yes. I told her that I thought she was an
15 excellent employee and that if she couldn't stand it
16 there any longer or if she got laid off, to give me a
17 call. And I would find work for her until I could get
18 her a position at Medallic Art Company.
19 Q. Is that still the case? Would you still want
20 to hire Ms. Krum?
21 A. No.
22 MR. GEARIN: All right. The rest of my
23 questions, I think, relate back to the issues that we
24 need to address with the judge.
25 MR. FRUSH: You've got nothing else, other

Page 176

1  than those issues?
2  MR. GEARIN: No. I think that's probably
3  where I am. It's about 3:25 right now.
4  MR. FRUSH: Right. What time is our call?
5  MR. GEARIN: 3:55.
6  MR. FRUSH: All right. What are the
7  questions that you want to raise with the Court? Let's
8  use this time to make sure we're all talking about the
9  same thing.
10 MR. GEARIN: Yeah. I want to talk about
11 the funding -- actually, let's take this discussion off
12 the record.
13 (Discussion off the record.)
14 MR. GEARIN: Let's go back on the record.
15 MR. FRUSH: Okay. We're on the record.
16 EXAMINATION
17 BY MR. FRUSH:
18 Q. Do you want the Mint to fail?
19 A. No.
20 Q. Why?
21 A. I believe it's in the best interest of the
22 employees and the creditors of the Mint for the Mint to
23 succeed. And it's vital, for the Mint to succeed,
24 that -- the Mint is made up -- the greatest asset the
25 Mint has is not its equipment. It's its employees and

Page 177

1  its relationships with its customers. And it's very
2  important that we maintain all of those assets.
3  Q. Have you ever asked an employee to quit the
4  Mint?
5  A. No, I have not.
6  Q. Has it always been your intention, since this
7  matter went into bankruptcy, to hopefully regain
8  control of the Mint?
9  A. I would like to reorganize the Mint. Yes.
10 Q. Would it be contrary to your desires and
11 interests to sabotage equipment at the Mint?
12 A. It would be against my best interest and the
13 Mint's best interest. It would be in no one's
14 interest. It would serve no purpose to sabotage any
15 portion of the Mint.
16 Q. Did you ask Ms. Krum to sabotage any machines?
17 A. I did not.
18 Q. Was it the case that you were concerned that if
19 you took over the Mint again and she had quit, that she
20 needed to have a copy of the software -- whatever you
21 call it -- the parameters, so she could come back to
22 get back to work in a productive fashion?
23 A. Not only did I do that, but I asked her to make
24 two copies and put one in the safe at the Mint. So if
25 it did get corrupted, if I did not take over the Mint,

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 15 of 20

Page 178

1  or if there was somebody else in place, that there
2  would be a copy, you know, on the premises. I was
3  appalled that there was no backup of her machine and
4  was instructing her to immediately make a backup and
5  give one copy to the powers that be who are there
6  currently.
7      Q. When you visited the Federal Way facility on
8  May 18th, did you announce to anyone there that you
9  were recording the exchange?
10     A. I walked in, and I had a pen microphone. And I
11 announced, I believe, to the front desk that I was
12 going to be recording this conversation.
13     Q. You talked this morning about intimidation.
14 Have you ever assaulted any employee at the Mint?
15     A. Not to my knowledge.
16     Q. When you were speaking about intimidation, what
17 did you include -- well, let me ask you this question:
18 When you were talking about intimidation with
19 Mr. Gearin, were you talking about physical
20 intimidation?
21     A. No. What you want with an employee, is you
22 want them to respect you and, you know, bend to your
23 wishes. You want them to work for you very hard, and
24 you want to be -- you want to kind of intimidate them
25 with your knowledge and your wherewithal. And you want

Page 179

1  them to, you know, be in awe so they join the team.
2      Q. Have you yelled at employees?
3      A. Yes.
4      Q. Have employees yelled at you?
5      A. Yes.
6      Q. Was there a culture at the Mint -- well, I
7  don't want to say culture. Were there occasions at the
8  Mint when people would raise their voices and yell at
9  each other in relation to work issues?
10     A. We have a saying at the Mint: You can yell,
11 scream, kick, do everything you can for your position.
12 What we want is, we want passionate people. We don't
13 want a bunch of drones. And I'll argue all day long
14 with an employee. And I might, at the end, look at
15 them and say, You know what? Are you willing to be
16 fired over your position?
17        And they'll say, Yes.
18        And I'll say, Well, then, I guess we better go
19 with your position because you're right.
20        I want passionate employees. I want people
21 that are willing to argue strenuously for their
22 position. Because if they're not willing to do that,
23 then they're not worth having.
24     Q. Have you ever tried to physically intimidate
25 the employees?

Page 180

1      A. No. I've gotten old and fat. And, you know,
2  that doesn't work anymore.
3      Q. Did it ever work?
4      A. You know, in the old days, you think you're
5  tougher than you are. But I'll tell you what. I
6  learned a long time ago that there's always somebody
7  tougher. I've got a lot of big guys down there.
8      Q. The reason you took the pen recorder to the
9  Federal Way facility on May 18th, was it because you
10 were afraid that what would happen is exactly what has
11 happened?
12     A. Exactly. And that's the reason I called
13 before. Because I'll tell you what. I knew Mr. Gearin
14 and Mr. Calvert have a reputation in this town of
15 being --
16     Q. I don't want you to talk about anybody's
17 reputation in this town. Just answer the question.
18     A. Well, my personal experience is that -- let's
19 just say that they're not always truthful. And I
20 wanted to do my best to avoid a problem.
21        MR. FRUSH: I've got nothing further, Mike.
22 Do you have any redirect on that stuff?
23        MR. GEARIN: Yeah. I'll just ask a couple
24 of follow-up questions.
25 ///

Page 181

1                      EXAMINATION
2  BY MR. GEARIN:
3      Q. Mr. Hansen, you just said that you instructed
4  Ms. Krum to put the software in the safe at the Mint,
5  right? You instructed her; that's the term you used.
6  Do you recall that?
7      A. Yeah. I told her that she should make two
8  copies and she should -- I instructed her to give a
9  copy to the managers to put in the safe down there.
10     Q. But you didn't have any authority to give
11 instructions to Ms. Krum at that point, did you?
12     A. No. But it was good advice.
13     Q. But you didn't have any authority to give her
14 any instructions, correct?
15     A. No. But I thought that would be a good thing
16 for the Mint. I was still looking after the Mint's
17 best interest.
18     Q. Have you given other instructions to employees
19 since Mr. Calvert was appointed?
20     A. I have.
21     Q. Why do you think you have authority to give
22 instructions to employees?
23     A. Because people call me up and ask me how to do
24 certain things. There's many things that I used to do
25 down there that nobody else knows how to do. And

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 16 of 20

**Page 182**

1  people have called me in confidence and asked me, Hey,
2  Ross, I have to do your job now. How do I do this?
3      And I have given them instructions on how to do
4  it. I'm looking after the best interest of the Mint.
5  I want the Mint to succeed.
6      Q. So you are interfering with the trustee's
7  ability to run the company, aren't you, sir?
8      A. No. Exactly the opposite. I'm assisting the
9  trustee. The trustee asked for help. Then the trustee
10 didn't want any of the employees to talk to me. So
11 through the back door, they are calling me to say, How
12 do I do this?
13     And I'm telling them how to do it.
14     Q. Do you think there's a difference between
15 respect and intimidation, Mr. Hansen?
16     A. Yes.
17     Q. But you've used the term "intimidation." You
18 said you've intimidated employees, haven't you?
19     A. Yes, I have intimidated employees.
20     Q. And intentionally so, correct?
21     A. Not necessarily. But my mannerisms sometimes
22 can be described as intimidating. I try not to. But
23 I'm always amazed at what people think is intimidation.
24     Q. You told employees that you killed a man in
25 prison, right?

**Page 183**

1      MR. FRUSH: Objection.
2      A. I don't want to talk about anything that may or
3  may not have happened in prison.
4      Q. (BY MR. GEARIN) But you told employees that.
5  And that's a form of intimidation, isn't it?
6      MR. FRUSH: Objection.
7      A. I don't think that's germane to this
8  conversation.
9      Q. (BY MR. GEARIN) Well, I think you need to
10 answer the question, sir. Did you tell employees --
11 you already told me that. You told me earlier in the
12 deposition that you have told employees that you killed
13 a man in prison, right?
14     A. Yes.
15     Q. Do you think that's a form of intimidation?
16     A. No.
17     Q. You don't think that's a form of intimidation?
18     A. No. And I don't think we're in prison anymore.
19     Q. Is it true that you killed a man in prison?
20     A. I don't want to talk about what may or may not
21 have happened in prison.
22     Q. Was it truthful when you told the employees
23 that you killed a man in prison?
24     MR. FRUSH: Objection. You're arguing with
25 him. He's already answered you.

**Page 184**

1      MR. GEARIN: That's a straightforward
2  question.
3      A. I'm not going to answer that.
4      Q. (BY MR. GEARIN) Was it truthful?
5      A. I'm not going to answer that. I take the fifth
6  amendment.
7      Q. You said you told the receptionist that you
8  were recording the conversation with Ms. Trunkett and
9  Mr. Huffman. Was --
10     MR. FRUSH: Objection. You're
11 mischaracterizing his testimony. He said he told the
12 receptionist that he was going to be recording the
13 visit, or words to that effect. He didn't mention
14 Ms. Trunkett or Mr. Huffman.
15     MR. GEARIN: Okay. That's fair.
16     Q. (BY MR. GEARIN) You told the receptionist that
17 you were going to be recording the visit, correct?
18     A. Correct.
19     Q. Was Mr. Huffman in the presence of the
20 receptionist when you said you were going to record the
21 visit?
22     A. He was not.
23     Q. Was Ms. Trunkett in the presence of the
24 receptionist?
25     A. I believe she was just coming around the corner

**Page 185**

1  at the time.
2      Q. Did she hear you tell the --
3      A. I don't know if she did or not.
4      Q. But you already told me, before, that you
5  didn't tell Ms. Trunkett that you were recording the
6  conversation, right?
7      A. I did not specifically tell her that I was
8  recording the conversation.
9      Q. And you didn't tell Mr. Huffman that you were
10 recording the conversation?
11     A. No. Mr. Huffman came upon me just as I was
12 getting ready to leave.
13     Q. Where did you have the pen recorder?
14     A. I believe it was in my front pocket.
15     Q. Was that designed to -- a pen recorder is
16 designed to be innocuous, so that nobody knows it's
17 there?
18     A. It was just a small recording device that I
19 just thought was handy to have, that if I had to -- you
20 know, it was just a cheap, inexpensive way of being
21 able to record a conversation.
22     Q. Is it true, Mr. Hansen, that you have stopped
23 reaching out to employees of the Mint since the
24 beginning of June of 2016?
25     A. Yes.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 17 of 20

Page 194

1  violate the work product -- the scope of work product.
2  And some of these questions are related to his
3  co-shareholder in Medallic, Richard Bressler.  And we
4  don't think that, at this stage, that's appropriate,
5  with the lawyers being participants in that
6  transaction.
7         On the Tomball transaction itself, we think
8  there's a lack of relevance.  And we certainly think
9  that the facts you have before you, Your Honor -- the
10 fact that he came in with a $100,000 check, the fact
11 that he tried to make it a nonrefundable deposit, and
12 the fact that he brought in an email from Mr. Parish,
13 who was deposed last week by Mr. Gearin's law firm, and
14 who has received what we consider to be correspondence
15 trying to interfere with his relationship with
16 Mr. Hansen -- it's a real strong indicator to us that
17 they would do the same thing if additional sources of
18 financing were exposed.
19        THE COURT:  All right.  Thank you,
20 Mr. Frush.
21        With regards to questions about the
22 availability or sources of financing that might have
23 been available or that Mr. Hansen was relying on to
24 purchase the Tomball facility, those questions will be
25 answered.  They are relevant to the motion.  I have

Page 195

1  read the motion; and I've actually read the response
2  already, in anticipation of there being a contested
3  hearing this Friday.  So I am familiar with the
4  trustee's position.
5         As I understand the trustee's position --
6  and I'm not weighing in on the merits of it -- but the
7  trustee's position is that among the things that the
8  trustee has alleged, is that Mr. Hansen falsely
9  asserted an ability to purchase the Tomball assets and
10 was doing so for improper purposes.  Whether or not he
11 had the ability to pursue an actual sale -- or an
12 actual purchase and sale of its assets is relevant or
13 can lead to the discovery of admissible evidence.  So
14 I'm going to overrule the relevance objection.
15        As to the work product objection, I do not
16 see how that comes into play at all.  The attorneys
17 were not running the deal.  I'm assuming the attorneys
18 were just advising people.  The attorney work product,
19 the last time I looked at the doctrine, involved the
20 attorneys' impressions and thoughts.  That's not what
21 is going on here.  Who Mr. Hansen talked to is not -- I
22 don't see how that could possibly be privileged or
23 protected.  And whether or not he had the ability to
24 close certainly would not be protected.  And if he was,
25 in fact, the successful bidder, he would have to

Page 196

1  disclose the sources of his financing.  So I'm going to
2  overrule the objection with regard to what happened on
3  the Tomball -- the attempts to acquire the Tomball
4  assets.
5         As for going forward, I'll sustain the
6  objection to questions about the source of funding that
7  Medallic may turn to to acquire assets.  At this point,
8  there's nothing on the table, and I don't see that
9  Mr. Hansen should need to disclose what he might do in
10 the future.  I don't see how that's relevant to this
11 motion at this time.
12        MR. GEARIN:  Well, Your Honor, to be clear,
13 I'll let you know that we conceded that point for
14 purposes of today's deposition.  We don't think it's
15 relevant.  The trustee does not think those issues are
16 now relevant as to future financing.  We are really
17 talking about the Tomball sale financing.
18        THE COURT:  All right.  It sounded like, at
19 the beginning, you were both on two ships passing in
20 the night.  But at least for this motion, it appears
21 that questions about Medallic's potential ability to
22 fund a purchase of any assets is not relevant to this
23 motion.  So that's the Court's ruling.
24        Is there anything further that the parties
25 need?

Page 197

1         MR. FRUSH:  Not from Mr. Hansen, Your
2  Honor.  We appreciate your courtesy and your time.
3         MR. GEARIN:  Not from the trustee either.
4         THE COURT:  All right.  I'd like to try to
5  handle these matters like this going forward so the
6  parties get a quick response and can move on.  So I'm
7  happy to do that.
8         MR. GEARIN:  Thank you, Your Honor.
9         MR. FRUSH:  Appreciate it, Your Honor.
10 Thank you.
11        THE COURT:  You're welcome.  See you on
12 Friday.  Goodbye.
13        (The conference call was disconnected.)
14        (Discussion off the record.)
15        MR. GEARIN:  Okay.  We're on the record.
16 Let's go back and see where we were.
17 Q.  (BY MR. GEARIN)  All right.  Mr. Hansen,
18 refreshing the context of what we were discussing, we
19 were talking about your participation in the hearings
20 on the sale of the Tomball assets.  Do you recall that?
21 A.  Yes.
22 Q.  Who had agreed to provide the funding for
23 Medallic's acquisition of the Tomball assets?
24 A.  Mr. Parish said that he would put up, up to a
25 million dollars of his money.  But he did not want to

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 18 of 20

Page 198

1  put it up on a long-term basis. No more than a year.
2  So that gave me a year to come up with other financing.
3  And my other financing was probably going to be worked
4  out with Vanguard.
5      Q. So your testimony is that Mr. Parish agreed to
6  put up at least a million dollars in supporting your
7  ability to acquire the Tomball assets?
8      A. Yes.
9      Q. Did anybody else agree to provide financing in
10 connection with Medallic's acquisition of the Tomball
11 assets?
12         MR. FRUSH: I believe he had conversations
13 with Vanguard before the actual --
14         MR. GEARIN: He told me, in his deposition,
15 that Vanguard did not -- in this deposition, he told me
16 that Vanguard did not make a commitment to provide
17 financing.
18         MR. FRUSH: Well, that's not my
19 recollection of the testimony.
20         MR. GEARIN: Well, then let's go back
21 through it again.
22      Q. (BY MR. GEARIN) Did anybody, other than
23 Mr. Parish, agree to provide financing to fund the
24 Tomball acquisition at the end of May 2016?
25      A. Only Mr. Parish made a firm commitment.

Page 199

1  Vanguard said that they needed to look at it. And if
2  they had more time, they would probably go ahead and do
3  the deal. But we did not have time to negotiate out a
4  deal. So I had no firm commitment from Vanguard, but I
5  felt like I could get one if I had the time.
6      Q. Did anybody else make a commitment to provide
7  funding, other than what we've talked about here,
8  Mr. Parish/Olympic Trading, and Vanguard?
9      A. No.
10         (Deposition Exhibit 6 was marked for
11         identification.)
12      Q. (BY MR. GEARIN) Handing you now what has been
13 marked as Deposition Exhibit 6, Mr. Hansen. Do you
14 recognize that email?
15     A. Yes.
16     Q. Is that an email from Mr. Parish to you on --
17 it looks like it's dated May 27, 2016, at 1:32 a.m.; is
18 that correct?
19     A. No. It says it was sent on 5/27 at 12:40 p.m.
20     Q. Oh, I see what you're looking at. Thank you.
21     But it is an email from Mr. Parish to you,
22 correct?
23     A. Yes.
24     Q. And is this the email that you've referred to
25 before as the evidence that Mr. Parish provided of his

Page 200

1  willingness to provide financing for the Tomball sale?
2      A. Yes.
3      Q. And this is the email that you handed to me
4  here in my offices at the auction of the Tomball
5  assets, correct?
6      A. Correct.
7      Q. In this email, Mr. Parish says: I am Mike
8  Parish. I'm executive vice president of Olympic
9  Trading Corp. And I have the financial wherewithal to
10 complete this transaction in question. Mike Parish.
11 Correct?
12     A. Correct.
13     Q. It doesn't say, in this email: I've agreed to
14 provide a million dollars' worth of financing, does it?
15     A. No, it does not.
16     Q. Is there any other document that Mr. Parish
17 gave you, where he gave you a written commitment to
18 provide a million dollars' worth of financing?
19     A. No. I think that was the reason that you
20 successfully argued that I was not allowed to bid.
21     Q. Do you know that Mr. Parish has a million
22 dollars in available funds -- in readily available
23 funds to provide a loan of a million dollars to you?
24     A. He told me he did.
25     Q. Do you know that independently?

Page 201

1      A. No, I do not.
2      Q. Do you have any idea of what Mr. Parish's net
3  worth is?
4      A. Well, I attended his deposition the other day,
5  and I heard his deposition.
6      Q. So --
7         MR. FRUSH: Answer the question.
8      Q. (BY MR. GEARIN) So do you know what his net
9  worth is?
10     A. I think he said between a million and a half
11 and 2 million.
12     Q. That's his net worth?
13     A. Yes.
14     Q. Did it surprise you to hear that his net worth
15 was a million and a half to $2 million?
16     A. I didn't know what his net worth was. I think
17 there's some other issues regarding his insurance
18 settlement at this time.
19     Q. All right. Let's talk about Medallic's assets
20 as we sit here today. Does Medallic have a million
21 dollars' worth of cash?
22     A. No, we do not.
23     Q. How much cash does Medallic have?
24     A. Medallic has accounts receivable of almost
25 $2 million it's owed by the trustee --

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 19 of 20

Page 202

1  Q. Mr. Hansen, you're not answering my question.
2  A. You just asked me about its assets.
3  Q. I asked you about cash. How much cash --
4       MR. FRUSH: How does this bear on the
5  contempt motion?
6       MR. GEARIN: We've already talked about
7  this. You already told me these were fair questions
8  for me to ask about.
9       MR. FRUSH: Well, I didn't object to the
10 questions. I guess -- you know, you're going to do a
11 30(b)(6) on Medallic, I think, at some point.
12      MR. GEARIN: These have to do with the
13 allegations that the trustee has that Mr. Hansen has
14 told employees that the Mint is going away and that
15 Medallic is prepared to hire them all.
16      MR. FRUSH: Okay. I see your point. A
17 certain amount of it is fine.
18      MR. GEARIN: The point of it is, Jim --
19      MR. FRUSH: I got you.
20 Q. (BY MR. GEARIN) So, Mr. Hansen, how much cash
21 does Medallic have?
22 A. Medallic, right now, only has just a few
23 hundred in the bank.
24 Q. A few hundred dollars?
25 A. Yes. It should be receiving about $60,000 a

Page 203

1  month from the trustee, once the trustee gets off
2  the --
3  Q. I'm not asking you what it should have. I'm
4  asking you what the cash assets are in the company.
5  A. Yes.
6  Q. Between April 1st and today, has there ever
7  been more than a few hundred dollars in Medallic's bank
8  account?
9  A. No.
10 Q. Does Medallic have a banking relationship with
11 any bank?
12 A. Yes, we do.
13 Q. Does it have a line of credit with any bank?
14 A. Not with a bank.
15 Q. Does it have a line of credit with any other
16 party?
17 A. Yes.
18 Q. Who?
19 A. Again, I don't think that's --
20      MR. FRUSH: I don't think we're going to
21 get into Medallic's funding. I think he said the
22 funding for Medallic going forward is not appropriate
23 at this point. He sustained my objection on that.
24      MR. GEARIN: Well, on the issue as to
25 whether or not somebody made a commitment to financing,

Page 204

1  but -- well, that may be fair.
2       MR. FRUSH: I heard the word "sustained."
3       MR. GEARIN: Well, I think he sustained an
4  objection to a point that we had already agreed to
5  withdraw, but yeah.
6       MR. FRUSH: You're just sneakily getting
7  behind -- going around the building and coming in the
8  back door. It was a good effort, but I don't think
9  it's appropriate.
10      MR. GEARIN: I'm not doing anything that's
11 sneaky. Everything I've done thus far has been
12 straight to the point. I've asked direct questions,
13 and I --
14      MR. FRUSH: Well, sneaky is -- I said it
15 with a smile. I'm just saying that you're taking a
16 different approach to it, and I understand that. I
17 don't think it's an appropriate line of questioning.
18 Q. (BY MR. GEARIN) At any time, Mr. Hansen, from
19 the time the Mint bankruptcy case was filed to today,
20 has Medallic been capable of hiring a number of
21 employees of the Mint?
22 A. Yes.
23 Q. How would Medallic pay those employees?
24 A. With a check.
25 Q. A check on the bank account that holds a few

Page 205

1  hundred dollars?
2  A. Currently.
3       MR. GEARIN: Okay. Thank you. I have
4  nothing further.
5       MR. FRUSH: Let me follow up on Medallic.
6            EXAMINATION
7  BY MR. FRUSH:
8  Q. How much does Medallic have in accounts
9  receivable, if you know?
10 A. Almost $2 million.
11 Q. Who owes them all that money?
12 A. The trustee owes approximately $200,000
13 postpetition and about 1.7 million prepetition.
14 Q. Is Medallic a general unsecured creditor, or
15 are they secured?
16 A. I think that's for the Court to determine.
17 Q. Does Medallic have counsel?
18 A. They do.
19 Q. Is that the Bucknell Stehlik firm?
20 A. It is. Mr. Bucknell has told me that the
21 issues of accounts receivable -- well, I don't want to
22 get into what --
23 Q. I don't want to get into that.
24     Funds have been advanced, of considerable
25 amounts, to Mr. Bucknell's law firm, haven't they, on

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Case 16-11767-CMA    Doc 576-1    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 20 of 20