```
 1              UNITED STATES BANKRUPTCY COURT
 2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE
 3
 4
 5   _____
 6   IN RE:                                    )
 7   NORTHWEST TERRITORIAL MINT, LLC,          )
 8           Debtor.                           )   16-11767-CMA
 9                                             )
10   _____
11              EXAMINATION OF MICHAEL PARISH
12                      PURSUANT TO
13                   BANKRUPTCY RULE 2004
14   _____
15
16
17                       1:02 P.M.
18                     JULY 27, 2016
19           1201 PACIFIC AVENUE, SUITE 1900
20                   TACOMA, WASHINGTON
21
22
23
24
25   REPORTED BY:  SHARI L. WHEELER, CCR NO. 2396
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1              A P P E A R A N C E S
 2
 3   FOR THE CHAPTER 11 TRUSTEE:
 4        DAVID C. NEU
 5        K&L Gates, LLP
 6        925 Fourth Avenue, Suite 2900
 7        Seattle, Washington 98104
 8        206.623.7580
 9        david.neu@klgates.com
10
11   FOR THE DEPONENT:
12        JAMES A. KRUEGER
13        Vandeberg Johnson & Gandara, LLP
14        1201 Fourth Avenue, Suite 1900
15        Tacoma, Washington 98401
16        253.383.3791
17        jkrueger@vjglaw.com
18
19   ALSO PRESENT:
20        ROSS HANSEN
21
22
23
24
25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1       Q. Are you talking about the check for the --
 2       A. That the judge required that he have to make
 3  a --
 4       Q. We can talk about that in a bit.
 5       A. Other than that, no.
 6       Q. Okay.  Have you ever loaned any money to
 7  Northwest Territorial Mint?
 8       A. No.
 9       Q. What about Diane Erdmann?
10       A. No.
11           (Exhibit Number 6 was marked for
12             identification.)
13       Q. (BY MR. NEU)  If you can take a moment to
14  review Exhibit 6, Mr. Parish, I'd appreciate it.
15       A. Okay.
16       Q. It appears to be an email from you to Ross
17  Hansen that says:  I am Mike Parish, and I am executive
18  vice president of Olympic Trading Corp and have the
19  financial wherewithal to complete the transaction in
20  question.  Mike Parish.
21         Do you see that?
22       A. Yes.
23       Q. Why did you write this email?
24       A. That was for the -- when he took the check to
25  the judge, they wanted to make sure that he had
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

B - 3    Case 16-11767-CMA    Doc 576-2    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 3 of 8

```
 1   something else behind it to fulfill that.
 2        Q. So do you recall what transaction you're
 3   referring to in this email?
 4        A. I think you have a copy of it there.  It was
 5   his offer to try and buy back Medallic Art.
 6        Q. And who came up with the language that you
 7   typed in this email?
 8        A. I don't know.  This was something I wrote up
 9   for them -- for whoever needed it.  So ...
10        Q. Let's actually talk about that transaction.
11                (Exhibit Number 7 was marked for
12                 identification.)
13        Q. (BY MR. NEU)  You've been handed what has been
14   marked as Exhibit 7.  Do you recognize that document?
15        A. Yeah.  I've read through that.
16        Q. Can you tell me what is it?
17        A. An asset purchase agreement.
18        Q. What's your understanding of the transaction
19   represented in this asset purchase agreement?
20        A. Well, I understand that this is what Ross had
21   given to the bankruptcy court to try and buy back
22   the -- or to the committee, or whatever it is, to try
23   and buy back his business or make a bid for his
24   business.
25        Q. So going back to -- I think it was Exhibit 6.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

B - 4    Case 16-11767-CMA    Doc 576-2    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 4 of 8

```
 1   Going back to Exhibit 6, is this purchase agreement the
 2   transaction you're referring to in your email?
 3        A.  I believe so.
 4        Q.  Do you remember when Ross contacted you to talk
 5   about this purchase agreement?
 6        A.  We talked very little on it.  He sent it to me,
 7   and I read it.
 8        Q.  So then he asked you to give him money?
 9        A.  He told -- let me think about that, just to
10   make sure.  He contacted me and said that the
11   bankruptcy court would not even allow him to do that
12   unless he could produce a check for $100,000.  So I
13   procured a $100,000 cashier's check for him to take to
14   court.  It was never used and never pursued after that,
15   so it went back into the account.
16        Q.  Do you know what Mr. Hansen was trying to
17   purchase under this agreement?
18        A.  From what I understand, Medallic Art.
19        Q.  Did he ever talk to you about purchasing
20   Northwest Territorial Mint's operations in the Houston,
21   Texas area?
22        A.  Well, I'd have to take time to read this, to
23   find out if it's in here or not.  I don't know.  I
24   never talked to him about it.  I never talked to him
25   about Texas, that I'm aware of.
```



```
 1      Q. Just so I'm clear, what was your understanding
 2  of why you were giving Ross $100,000?
 3      A. Mainly for Medallic Art.
 4      Q. I'm sorry?
 5      A. Mainly for Medallic Art.
 6      Q. So he could purchase Medallic Art; is that
 7  right?
 8      A. Well, whatever it says in this thing here.
 9  Okay?
10      Q. Did he tell you he was trying to purchase
11  Medallic Art?
12      A. He was making a -- trying to make an agreement
13  to buy it back.
14      Q. Okay.  And you were willing to give him
15  $100,000 to make a down payment on that purchase?
16      A. No.  The Court required $100,000 so he could
17  present that to them, from what I understand.
18      Q. Okay.
19      A. They weren't even going to talk to him unless
20  he could have a $100,000 check in his hand.
21      Q. Did you know what that $100,000 was for?
22      A. It was for this here.
23      Q. I'm sorry.  For what?
24      A. This exhibit right there.
25              MR. KRUEGER:  Let's have the number of it.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1          THE WITNESS:  Seven.
2      Q.  (BY MR. NEU)  Okay.  Did you have any
3  understanding of whether the $100,000 would be repaid
4  to you?
5      A.  No.
6      Q.  Did you have any discussions about whether it
7  was a gift or a loan?
8      A.  No.
9      Q.  Did Ross offer you any interest in Medallic
10 after he purchased it?
11     A.  No.
12     Q.  Just so I'm clear, it was your understanding
13 that you were just giving Ross $100,000?
14     A.  Like I said, I'm very much glad to be alive
15 because of that man sitting over there.
16     Q.  Okay.  I want to go back to Exhibit 6.  Do you
17 see where it says:  I have the financial wherewithal to
18 complete the transaction in question?
19     A.  Yes.
20     Q.  Do you know how much Ross was offering to pay
21 for the assets identified in Exhibit 7 under the
22 purchase and sale agreement?
23     A.  No.
24     Q.  Were you representing, in this email, that you
25 would pay the entire purchase price?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1       A. No.
 2       Q. So what was your understanding of what you were
 3  saying in the email?
 4       A. That I was helping him the best I could.
 5       Q. Did you have any discussions with Mr. Hansen
 6  about how he was going to pay the full purchase price?
 7       A. Ross had people he could probably talk to, I'm
 8  sure.
 9       Q. Did you have any understanding about whether
10  you were going to pay any more than $100,000?
11       A. No.
12       Q. How much would you have given Mr. Hansen?
13       A. I don't know.  I'd have to sit and talk with my
14  wife on that.  She's not happy right now, so I don't
15  know.
16       Q. Do you see, at the bottom of this Exhibit 6,
17  where it's clear that there was a continuation of an
18  email string?  Do you see where it says:  On Friday --
19  then there's a date -- at 1:32 a.m.?
20       A. On 6?
21       Q. Correct.  It says:  Ross Hansen, sent.
22          Then it's blank.  Do you see that?
23       A. No, I don't.
24             MR. KRUEGER:  Right here.
25       A. I have no idea what that was.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

B - 8    Case 16-11767-CMA    Doc 576-2    Filed 08/02/16    Ent. 08/02/16 20:27:12    Pg. 8 of 8