**Below is a Memorandum Decision of the Court.**

_____
**Christopher M. Alston
U.S. Bankruptcy Judge**
**(Dated as of Entered on Docket date above)**

_____

Christopher M. Alston
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Suite 6301
Seattle, WA 98101
206-370-5330

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| In re | Chapter 11 |
|---|---|
| Northwest Territorial Mint, LLC, | Case No. 16-11767 |
| Debtor. | MEMORANDUM OPINION AND FURTHER ORDER ON MOTION FOR AUTHORITY TO WITHDRAW AS ATTORNEY FOR DEBTOR |

This matter came before the Court on the Motion for Authority to Withdraw as Attorney for Debtor [Dkt. 76] (the "Withdrawal Motion"). In the Withdrawal Motion, The Tracy Law Group ("TTLG") sought an order directing what steps it should take regarding the funds remaining from an advance fee deposit (the "Deposit Funds") provided by Diane Erdmann prior to the commencement of this case. At the initial hearing on May 6, 2016, the Court determined that the matter required an evidentiary hearing. The Court conducted an evidentiary hearing on

Order - 1

June 22 and July 6, 2016. Diane Erdmann was represented Daniel J. Bugbee and Dominique Scalia of DBS Law. Mark Calvert, the Chapter 11 Trustee (the "Trustee") of the bankruptcy estate of Northwest Territorial Mint, LLC (the "Mint") was represented by David C. Neu and K&L Gates LLP. After hearing testimony, the Court took the matter under advisement.

The purpose of the hearing was to determine whether the bankruptcy estate has any interest in the Deposit Funds. The Trustee asserts the Deposit Funds constitute property of the bankruptcy estate of the Mint because the source of the Funds was precious metals and cash stolen from the Mint. The Trustee alternatively contends that, even if the Deposit Funds were not the proceeds of property taken from the Mint, the Funds constituted an advance fee deposit in which the Mint possessed at least a beneficial interest that brings the Funds into the estate. Diane Erdman subsequently sought to obtain possession of the Funds, and the Trustee contends that she violated the automatic stay and should be sanctioned. Diane Erdmann asserts that the source of the Deposit Funds was life insurance proceeds received by Ms. Erdmann in 1993. She further contends that even if the estate has a beneficial interest in the Deposit Funds she is entitled to have the balance returned to her. She denies that her conduct constituted a violation of the automatic stay.

For the reasons stated below, the Court has determined that the Deposit Funds remaining after compensating TTLG for post-petition services must be returned to Ms. Erdmann. The Court also has determined that Ms. Erdmann violated the automatic stay, but the Trustee has not demonstrated the violation caused any damage to the bankruptcy estate. Nonetheless, Ms. Erdmann's stay violation was intentional and egregious, and her conduct did harm TTLG and its owner, J. Todd. Tracy. He and his firm shall have an opportunity to present evidence of

```
Order - 2
```

damages, and the Court will determine the amount of sanctions to be imposed upon her at a subsequent hearing.

I. <u>FINDINGS OF FACT</u>

A. <u>Diane Erdmann Forms a Relationship with the Mint.</u>

The Mint is a private mint. Its business operations include custom minting of medals and commemorative coins as well as on-line and walk-in sales of precious metals and coins. Prior to filing bankruptcy, the Mint was a dealer of gold, silver, platinum, and palladium bullion (the "<u>Bullion Business</u>"). Until recently, Ross Hansen was the President and owner of the Mint.

In 2010, the Mint leased a building in Federal Way, Washington (the "<u>Federal Way Building</u>"). As well as serving as the Mint's corporate headquarters, the Federal Way Building is the site at which the majority of the Bullion Business was conducted. The Federal Way Building contains a vault room (the "<u>Vault</u>"), with several safes containing bullion, coins, and cash. The Vault also contains additional storage drawers that are not individually locked. Walk-in sales of bullion to customers of the Mint were also offered at the Federal Way Building.

Diane Erdmann's husband passed away in 1993. In May of that year, Ms. Erdmann received a check for $133,900 (the "<u>Life Insurance Proceeds</u>") from Servicemen's Group Life Insurance. Several years later she met Ross Hansen. The two of them began dating and have been in a committed relationship since 2000.

In that same year, Ms. Erdmann started working at the Mint. Initially she was given the responsibility and job title of "shipping manager." In 2005, she was given the responsibility of managing the Mint's vault, where her duties included managing the cash and bullion, and shipping for certain locations. In 2010, when the Mint moved into the Federal Way Building,

Order - 3

Ms. Erdmann was put in charge of the Vault at that location. Ms. Erdmann received no salary for her work at the Mint.

B.  A Large Judgment is Entered Against the Mint.

In August, 2012, Bradley Stephen Cohen and Cohen Asset Management Inc. (collectively, the "Cohen Parties") commenced a lawsuit in the United States District Court for the District of Nevada (the "Cohen Lawsuit"). Three and half years later, the jury returned a verdict finding Ross Hansen, the Mint, and the other defendants liable for damages. On March 1, 2016, a judgment was entered in favor of the Cohen Group in the amount of $12,500,000 against the Mint and in the amount of $25,500,000 against Ross Hansen (the "Judgment").

After entry of the Judgment, Mr. Hansen consulted with professionals to determine possible options for preserving the Mint. These professionals included Mark Calvert, who now serves as the Trustee. Mr. Hansen was advised by Mr. Calvert "don't keep all of your eggs in one basket" because the Cohen Parties "could walk through the door at any time." Mr. Hansen understood this advice to mean that assets of the Mint should be moved from the company headquarters. The security cameras at the Mint recorded Mr. Hansen, Ms. Erdmann, and two other employees of the Mint removing boxes from the Vault on March 26, 2016. Those cameras recorded Mr. Hansen and Ms. Erdmann again the next day filling a box with items from the Vault and departing with those boxes. Mr. Hansen and Ms. Erdmann testified that they were taking personal items and also moving valuable assets of the Mint to another facility located in Auburn, Washington ("Building B") to thwart any efforts of the Cohen Parties to collect on its Judgment.

C. <u>Ms. Erdmann Provides a Fee Deposit to the Mint's Bankruptcy Counsel</u>.

The Mint eventually determined that it would seek protection under the Bankruptcy Code. Todd Tracy of TTLG spoke with Mr. Hansen on March 25, and informed Mr. Hansen that his firm would require a $150,000 deposit to commence the engagement. On March 28, Mr. Hansen brought to Mr. Tracy a $150,000 check drawn on the account of the Mint. Mr. Tracy determined that, due to a restraining order issued in the Cohen Lawsuit, he could not accept a check from the Mint. On March 29, Mr. Tracy informed Mr. Hansen in a telephone conversation the deposit must be paid with funds from a source other than the Mint, and that he needed the deposit in available funds by no later than 4:30 p.m. on March 31 in order to file the petition that day. Ms. Erdmann claims that she was a part of this telephone call; Mr. Tracy testified that he was unaware the Ms. Erdmann was on the call.

In accordance with Mr. Tracy's instructions, the Mint delivered the Deposit Funds to TTLG by the 4:30 deadline on March 31, all of which came from Mr. Erdmann. $50,000 of the Deposit Funds consisted of a wire transfer from Ms. Erdmann's bank account at Wells Fargo Bank. Ms. Erdmann testified that on March 31 she removed $50,000 in cash that she had kept in a safe deposit box at Wells Fargo Bank, deposited the funds in her personal account, and wired that amount to TTLG on the same date. The Court also notes that two weeks earlier Ms. Erdmann removed $25,000 in cash from her safe deposit box and wired those funds to another law firm for a retainer or advanced fee deposit, meaning that she was holding at least $75,000 in cash.

Ms. Erdman provided the rest the Deposit Funds by endorsing to TTLG a cashier's check that was payable to her. How she obtained the check was the subject of considerable testimony. On March 31, 2016, Diane Erdmann gave to David Huffman, a Mint employee, a bag (the

Order - 5

"Black Bag") containing gold bullion. Mr. Huffman took the Black Bag to the Seattle Coin Shop in Wedgewood. There, John Drummey, the owner, "picked through" the bag and took eighty (80) 1 oz. gold coins. Mr. Huffman testified that the gold coins taken by Mr. Drummey were about half of the bullion in the Black Bag. Mr. Drummey and Mr. Huffman, who was carrying the Black Bag with the remaining bullion, walked to a nearby branch of Key Bank, where a cashier's check in the amount of $99,460 (the "Check") was issued, made out to Diane Erdmann. Mr. Huffman took the Check back to the Federal Way Building, where Ms. Erdmann endorsed it to TTLG. Mr. Huffman drove the Check to Seattle and delivered it to Todd Tracy. Since Mr. Drummer paid nearly $100,000 for half of the contents of the Black Bag, the Black Bag must have contained approximately $200,000 worth of gold bullion. Ms. Erdmann testified that all of the gold bullion in the Black Bag came from her personal collection.

        D.        <u>Lack of Records Create Questions Over the Source of the Deposit Funds</u>.

Ms. Erdmann testified that the source of her $75,000 in cash and approximately $200,000 in gold bullion was the Life Insurance Proceeds she received in in 1993. Ms. Erdmann has one receipt from February 1997 showing she purchased gold and silver from the Mint for $15,798. She has no other records showing any other purchases of silver and gold. She testified that she had documents proving she made additional purchases, but those records were stored at the home of her grandparents, and she believes the records were lost or destroyed in 2012. Nonetheless, Ms. Erdmann asserts that with strategic sales, trades, and purchases of gold and silver, she used the Life Insurance Proceeds to amass the above-described $275,000 in gold and cash *plus* even more silver and gold bullion that she testified was kept at her home and in her safe deposit boxes. When asked on cross-examination if she disclosed any gains in federal tax returns, she refused to answer and asserted, "It's my business."

Order - 6

**Below is a Memorandum Decision of the Court.**

The Trustee demonstrated that Ms. Erdmann, who was the "gatekeeper" of the bullion and the cash at the Mint, did not keep very good records. For example, she did not keep complete list of inventory of precious metals. Instead, she maintained a stock sheet that listed the more common items that were available for sale but did not include uncommon items such as palladium and platinum. And when the stock sheet was updated she would copy over the existing one—meaning that there was never any way to keep track of items possessed by the Mint. Given this lack of record keeping, it would be easy to for someone with access to the Vault to take precious metals. Ms. Erdmann had access to the Vault. And there is no doubt that she and Mr. Hansen removed items from the Vault prior to Ms. Erdmann providing nearly $150,000 to TTLG. But there is no evidence that the $50,000 wired by Ms. Erdmann was either cash taken from the Vault or the proceeds of assets stolen from the Mint. Similarly, there is no evidence that any the items removed by Ms. Erdmann and Ms. Hanson from the Mint in late March ended up in the Black Bag that contained about $200,000 in gold bullion.

E. <u>The Mint Executes an Engagement Letter and then Files Under Chapter 11.</u>

In connection with delivering the Deposit Funds, on March 31 Mr. Hansen executed a letter engaging TTLG to represent the company in a case under Chapter 11 of the Bankruptcy Code (the "<u>Engagement Letter</u>"). Amongst other things, the Engagement Letter contained a number of provisions relating to a $150,000 "retainer" that include the following:

- **"We will not open a file until we have a signed engagement letter and a retainer from you."**
- **"<u>TTLG will draw on the below retainer to pay all fees and costs incurred prior to any bankruptcy filing so that TTLG will not be a pre-petition creditor of the estate.</u>"**
- "TTLG must apply to the Bankruptcy Court for approval of its attorneys' fees and costs."

Order - 7

- "Payment of allowed fees and costs shall be paid from any retainer below and any balance shall be paid by the Mint."
- "TTLG requests an initial security retainer of $150,000.00. This retainer will be deposited into our firm's IOLTA Trust Account. **TTLG will not file any bankruptcy case until said retainer has been paid and has cleared TTLG's bank as available funds.**"

[Emphasis in original.] Mr. Tracy acknowledged at trial that "retainer" was the incorrect term, and that he meant advanced fee deposit. It is clear from the terms of the Engagement Letter that TTLG did not take title to the Deposit Funds upon receipt as it would in the case of a true retainer. TTLG instead promised to hold the Deposit Funds in trust for payment of services to be provided in the future, meaning the Deposit Funds constituted an advanced fee deposit. Notably, the Engagement Letter does not require that the funds come from someone other than the Mint, does not acknowledge that a third party will be providing the funds, and does not mention Mr. Erdmann. There is no other writing reflecting any terms of the engagement. There is no evidence suggesting that Mrs. Erdmann either loaned or gifted the monies to the Mint. Ms. Erdmann testified she understood that the Deposit Funds would be used to pay for work performed by TTLG for the Mint if the Court let TTLG "stay in," but she contends Mr. Tracy told her the monies would remain her property.

On behalf of the Mint, TTLG filed the petition under Chapter 11 a little after midnight on April 1, 2016. A few days later, the Mint filed a Motion for Entry of an Order Authorizing the Retention of Bill Weisfield and Stuart Heath of Elliott Bay Asset Solutions, LLC as Chief Restructuring Officers [Dkt. 12], but withdrew the motion the next day [Dkt. 29]. On April 7,

the Court entered a Stipulated Order Directing the Appointment of a Chapter 11 Trustee, and the Court entered an order appointing the Trustee on April 11.

F. <u>The Chapter 11 Trustee and Ms. Erdmann Assert an Interest in the Deposit Funds</u>.

Shortly after the appointment of the Trustee, TTLG filed the Withdrawal Motion. In that Motion, TTLG disclosed that prior to the filing of the Chapter 11 Petition it drew down $21,885.50 from the Deposit Funds for prepetition services provided to the Mint in connection with the bankruptcy filing. An additional $1,717.00 for the Chapter 11 filing fee was paid from the Funds. TTLG thus held in trust $125,857.50 when it filed the petition for the Mint. TTLG also declared an intention to seek Court approval for fees incurred between the filing and the appointment of the Trustee in the approximate amount of $36,000. In addition to withdrawing to the representation of the Mint, TTLG sought permission from the Court to hold the balance of the Deposit Funds in its trust account pending a resolution of the ownership of the Funds.

In response to the Withdrawal Motion, the Trustee asserted that the estate had an interest in the Deposit Funds [Dkt. 89]. Similarly, Ms. Erdmann asserted that she was entitled to receive all of the Deposit Funds [Dkt. 164].

G. <u>Ms. Erdmann Attempts to Obtain the Deposit Funds</u>.

Shortly after the appointment of the Trustee, Ms. Erdmann and Mr. Hansen went to see Mr. Tracy. Ms. Erdmann waited in the car while Mr. Hansen went into the office. Mr. Tracy testified that, in a "heated conversation," Mr. Hansen demanded that balance of the Deposit Funds be returned to Ms. Erdmann. Mr. Tracy informed Mr. Hansen that due to the competing interests in the Funds, he would continue holding the funds in trust. Ms. Erdmann testified that she knew that Mr. Tracy informed Mr. Hansen the Deposit Funds would not be turned over to her because the Trustee asserted an interest in the Funds.

After this unsuccessful effort to get the Deposit Funds directly from Mr. Tracy, Ms. Erdmann filed a consumer protection complaint with the Attorney General for the State of Washington. In this complaint, she asserted that Mr. Tracy had promised to return the balance of the Deposit Funds to her and he was breaking his promise. A few days later, she filed a grievance against Mr. Tracy with the Washington State Bar Association, and made the same assertions. Ms. Erdmann actively pursued the Bar Association complaint and filed a follow-up letter on June 3, again insisting that Mr. Tracy's refusal to turn over the Deposit Funds constituted a violation of the Washington Rules of Professional Conduct.

Ms. Erdmann testified she filed the complaints because she felt Mr. Tracy had misled her and wanted his conduct to be examined, but she did not think she would get the Deposit Funds back. This testimony is self-serving and not credible, as the statements in her complaints and the demands by Mr. Hansen confirm that Ms. Erdmann was attempting to gain possession of the Deposit Funds.

## II. ISSUES

1. Does the Mint bankruptcy estate have an interest in the Deposit Funds?

2. If so, what is the nature of the estate's interest in the Deposit Funds?

3. Do any of Ms. Erdmann's actions constitute violations of the automatic stay of 11 U.S.C. §362?

4. If she has violated the automatic stay, whether Ms. Erdmann should be sanctioned for violating 11 U.S.C. §362, and if so, in what amount?

### III. CONCLUSIONS OF LAW

A. <u>Jurisdiction and Venue.</u>

Jurisdiction is vested in this court by virtue of 28 U.S.C. §1334 and 28 U.S.C. §157. Venue lies in this Court by virtue of 28 U.S.C. §§1408 and 1409. This proceeding is core within the meaning of 28 U.S.C. §157(b)(2)(A) and (O).

B. <u>Ms. Erdman Owns the Deposit Funds.</u>

The Debtor's bankruptcy estate is comprised of both its legal and equitable interests in property. See 11 U.S.C. § 541(a). Washington State law determines the nature and extent of the debtor's property interests. *Butner v. United States*, 440 U.S. 48, 55 (1979); *In re Pettit*, 217 F.3d 1072, 1078 (9th Cir. 2000).

    1. *The Deposit Funds Constitute an Advance Fee Deposit.*

Washington law distinguishes fees collected by attorneys as either "classic" or "true" retainers and "advance fee deposits." Washington State Bar Ass'n, Ethics Opinion 186 (1990); *In re Bigelow*, 271 B.R. 178, 187 (B.A.P. 9th Cir. 2001). A "classic" retainer is a sum of money paid by a client to secure an attorney's availability over a given period of time and is considered earned by the attorney upon receipt whether or not services are actually provided. *SEC v. Interlink Data Network*, 77 F.3d 1201, 1205 (9th Cir. 1996); *Bigelow*, 271 B.R. at 187.

"Advance fee deposits" are refundable funds given to a lawyer for providing future services, as necessary, and are to be held in trust for the client until such services are rendered. See Washington State Bar Ass'n, Ethics Opinion 186 (1990); *Bigelow*, 271 B.R. at 188 ("The fee is a one-time or periodic advance payment for certain well-defined legal services and is not earned until the services are actually performed."); *In re Radulovic*, 2006 WL 6810999 at *3 (B.A.P. 9th Cir. 2006).

      2.    *Ms. Erdmann Provided the Deposit Funds so the Funds Remain Her Property*.

In Washington, an advance fee deposit is the property of the client or third party who pays the deposit, and is held in trust until fees have been earned or expenses incurred. RPC 1.15A(c)(2); *In re Escalera*, 171 B.R. 107, 111 (Bankr. E.D. Wash. 1994). Interpreting a prior version of RPC 1.15A, the Washington State Bar Association opined that when a non-client provides the deposit for the benefit of a client, the non-client is entitled to a refund of the unused portion of the deposit. Washington State Bar Ass'n, Advisory Opinion 1575 (1994). If the Mint did not own the Deposit Funds when it commenced the case, it did not acquire title to the Funds when it filed. *In re Braker*, 125 B.R. 798, 801 (B.A.P. 9th Cir. 1991) (the bankruptcy code does not enhance the debtor's rights after the time of filing).

There is no dispute the $50,000 wire came from Ms. Erdman's personal bank account, and there is no dispute she endorsed a cashier's check that was payable to her over to TTLG. Ms. Erdman is therefore entitled to a return of the unused portion of the Deposit Funds.

      2.    *The Trustee Has Not Met His Burden to Trace the Deposit Funds to Property Stolen from the Mint*.

The parties do not agree on who bears the burden of proof. Ms. Erdmann contends the bankruptcy trustee has the burden of proving that the debtor had an interest in property and that the property thus belongs to the bankruptcy estate, relying on *In re Dunn*, 436 B.R. 744, 747 (Bankr. M.D.Ga. 2010). The Trustee asserts the burden of proof as to what is property of the estate rests with the non-debtor, and relies on *In re Altman*, 230 B.R. 6, 11 (Bankr. D. Conn. 1999). The Court concludes that Ms. Erdmann has the initial burden to prove an interest in property, and she has met this burden. It is undisputed that she wired funds from her own bank account and that she endorsed over to TTLG a cashier's check that was payable to her. In short, Ms. Erdmann provided the Deposit Funds.

Order - 12

If the Trustee contends the funds Ms. Erdmann provided to TTLG were stolen from the Mint, the Trustee bears the burden to prove this allegation. *In re Neidorf*, 534 B.R. 369, 372 (B.A.P. 9th Cir. 2015) (the party seeking to include property in the estate bears the burden of showing that the item is property of the estate); *see also, In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 708 (11th Cir. 2005) ("In an action seeking recovery, the plaintiff has the burden of tracing funds it claims to be property of the estate."). Imposing this burden on the Trustee is logical and appropriate; if the burden was reversed, Ms. Erdmann would be required to prove a negative, e.g., that she did not steal her property. *U.S. v. Cortez-Rivera*, 454 F.3d 1038, 1041-42 (9th Cir. 2006) (fairness and common sense often counsel against requiring a party to prove a negative fact).

The Court concludes the Trustee has not met his burden. It is true that Ms. Erdmann (along with Mr. Hansen) removed property from the Mint on the eve of the bankruptcy filing. She has no records to prove that she acquired hundreds of thousands of dollars in cash, gold, and silver. She refused to answer questions about her tax returns, suggesting she either has failed to disclose gains or did not actually amass the fortune she now claims to have. Further, she was in charge of the Vault and managed the Mint's cash and bullion, so her inadequate record keeping would allow her to take items from the Mint without raising suspicion. Ms. Erdmann, however, does not need to prove how she acquired her property. The Trustee did not prove that the $50,000 wire or the nearly $100,000 in gold bullion purchased by Mr. Drummey was either stolen from the Mint or the proceeds of property stolen from the Mint. The Court must conclude the Deposit Funds constitute the property of Ms. Erdmann and she is entitled to the unused portion of the Funds. That amount has yet to be determined, as TTLG has not sought approval and payment for the post-petition services provided to the Mint.

C.   While Ms. Erdmann Owns the Deposit Funds, the Estate Has a Beneficial Interest Protected by the Automatic Stay.

Property of the estate includes property in which the debtor holds a beneficial interest. *In re Brown*, 2006 WL 6810938 at *9 (B.A.P. 9th Cir. 2006) There is no dispute that Ms. Erdmann delivered the Deposit Funds for the benefit of the Mint and to be used by the Mint to satisfy its obligations under the Engagement Letter. Upon the filing of the Mint's bankruptcy proceeding, the Deposit Funds became property of the bankruptcy estate. *Radulovic*, 2006 WL 6810999 at *3 ("we conclude that the retainer fee was an advance fee deposit that became property of the estate within the meaning of §541"); *In re Datesman*, 1999 WL 608856 at *4 (Bank. E.D. Pa. 1999) (even though the debtor's girlfriend provided the advance fee deposit to the debtor's attorney prior to bankruptcy, the court held the source of the payment does not preclude debtor's interest in it from being property of his estate).

Ms. Erdmann testified that she knew the Deposit Funds would be used to pay for the legal services provided by TTLG in connection with bankruptcy filing. TTLG stated in the Withdrawal Motion that it intended to seek Court approval for fees incurred between the bankruptcy filing and the appointment of the Trustee in the approximate amount of $36,000. The estate possesses a beneficial interest in the Deposit Funds, which may be used to pay TTLG for those post-petition services.

D.   Ms. Erdmann Violated the Automatic Stay.

Upon the filing of the petition, an automatic stay was imposed to enjoined any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. 11 U.S.C. §362(a)(3). This automatic stay does not prevent Ms. Erdmann from asserting she owns the Deposit Funds in this contested matter. But the stay does prevent her from attempting to obtain the Deposit Funds without first obtaining relief from the

Order - 14

stay or seeking a determination from the Court of her rights to the Funds. And the demands by Mr. Hansen on her behalf to Mr. Tracy and her filing of the complaints against Mr. Tracy constituted attempts to obtain the Deposit Funds.

In her trial briefs, Ms. Erdmann ignores the fact that she and Mr. Hansen together went to see Mr. Tracy to demand the return of the Deposit Funds. Such conduct is not defensible and alone constitutes a violation of the stay. Ms. Erdmann chooses to focus on the complaints and asserts these acts were privileged and not stayed. First, she contends a bar complaint to a regulatory agency is a privileged action that comes with civil immunity. Washington Rule for Enforcement of Lawyer Conduct 2.12 provides that communications to the Washington State Bar Association are "absolutely privileged, and no lawsuit predicated thereon may be instituted against any grievant, witness, or other person providing information." This rule does not help Ms. Erdmann. If she was simply reporting actions that she thought violated the Washington Rules of Professional Conduct, then there would be no issue with her bar complaint. But the purpose of the complaint was, contrary to her self-serving testimony, to obtain the Deposit Funds. State laws authorize persons to take acts, such as conducting a foreclosure sale, that are stayed upon the filing of the bankruptcy. While she had the right to file a bar complaint, the automatic stay enjoined her from filing a bar complaint aimed at obtaining control over property of the estate. And even if the bar complaint was privileged, Ms. Erdmann does not identify any similar immunity applicable to the filing of a complaint with the Attorney General.

Next, Ms. Erdmann contends the pursuit of the two complaints falls within the scope of the police or regulatory power exception to the automatic stay. 11 U.S.C. §362(b)(4). A decision from the First Circuit Court of Appeals describes this exception in the context of a complaint to an agency:

Order - 15

> A private party's reporting of wrongful conduct to governmental regulatory authorities is neither the commencement of a proceeding under subsection 362(a)(1), nor necessarily an 'act to collect' under subsection 362(a)(6)… [T]he same sound public policy reasons which undergird the subsection 362(b)(4) exception counsel against any rule which might dissuade private parties from providing governmental regulators with information which might require enforcement measures to protect the public from imminent harm.

*In re McMullen*, 386 F.3d 320, 328 (1st Cir. 2004). Again, the Court finds and concludes that Ms. Erdman was not merely reporting conduct she believed was wrongful; rather she was attempting to gain control of the Deposit Funds despite knowing the Trustee asserted the Mint's bankruptcy estate asserted an interest in the assets. Her conduct did not constitute a commencement of a proceeding described subsection 362(a)(1) or an act to collect under subsection 362(a)(6), but her conduct was an effort to exercise control over property of the estate under subsection 362(a)(3). Thus, her filing of the two complaints, in addition to the attempt by her and Mr. Hansen to obtain the Deposit Funds directly from Mr. Tracy, violated the automatic stay.

      E.    <u>Ms. Erdmann's Conduct Warrants the Imposition of Sanctions</u>.

The Court has inherent authority under its 11 U.S.C. §105(a) contempt powers to impose sanctions for violations of the automatic stay. *In re Dyer*, 322 F.3d 1178, 1190 (9th Cir. 2003); *In re Del Mission Ltd.*, 98 F.3d 1147, 1152 (9th Cir. 1996). In order to impose such sanctions, a court must find the violation was willful. *Dyer*, 322 F.3d at 1191. "Willful" does not require intent to violate the stay; rather the court need only find that actor knew of the automatic stay and that the actions which violated the stay were intentional. *Id*. The party seeking sanctions has the burden to show a violation by clear and convincing evidence. *F.T.C. v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999).

Order - 16

Ms. Erdmann was aware of the automatic stay: she provided the Deposit Funds to TTLG so the Mint could file bankruptcy, thereby receiving the protection of the stay under section 362. Her efforts to obtain possession of the Deposit Funds—contacting Mr. Tracy and filing the complaints—were intentional. Thus, the Court concludes the Trustee has shown by clear and convincing evidence that Ms. Erdmann committed a willful violation of the automatic stay, and she has not demonstrated why she was unable to comply with the automatic stay. The Court further notes that while Ms. Erdmann owns the Deposit Funds, she only has a right to the return of the *unused* portion of the Funds. Up to $36,000 of these Funds may be used by the Trustee to pay for post-petition services provided by TTLG. Ms. Erdmann's attempt to obtain all of the Deposit Funds without first seeking permission from the Court is problematic; the fact that at least some of the monies could be used to pay TTLG makes the stay violation more egregious.

Civil contempt sanctions must be wholly remedial and serve either to coerce an individual into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829(1994); *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04, (1947). The Trustee asserts he should be compensated for the fees and costs expended to recover the Deposit Funds. The Court declines to award any amount to the Trustee because he did not incur any legal fees as a result of Ms. Erdmann's stay violations. She made a demand on Mr. Tracy and filed the complaints against Mr. Tracy. The Trustee has not identified any action by him or his counsel in response to these acts. Mr. Tracy refused the demand, has maintained the Deposit Funds in his trust account, and had to respond to the complaints—he clearly has expended effort to preserve the Funds and defend himself against the efforts to force him to turn over the Deposit Funds. But Ms. Erdmann had the right to assert a claim to the

Order - 17

Deposit Funds, so costs incurred by the Trustee to litigate the ownership issue would have been expended whether or not she engaged in the conduct that violated the stay. The Court therefore denies the Trustee's request for compensatory sanctions.

TTLG and Mr. Tracy, however, should be compensated for the efforts expended to respond to the acts of Ms. Erdmann and secure the Deposit Funds pending a resolution of the dispute over ownership. The Withdrawal Motion was more complicated and required additional declarations to address Ms. Erdmann's improper bar complaint and improper demands. Mr. Tracy has spent time responding to the demands and the two complaints, and may have suffered other quantifiable damages as a result of the two complaints. While Mr. Tracy was a witness as trial, he was not a party to this contested matter and did not have an opportunity to provide evidence. TTLG and Mr. Tracy shall be entitled to submit declarations in support of any claim for damages. Ms. Erdmann shall be allowed to respond to the declarations, and she shall have an opportunity to state her position on the amount of sanctions at a subsequent hearing.

NOW THEREFORE, for the reasons set forth above, it is hereby ORDERED as follows:

1. Diane Erdmann is held in contempt for her violations of the automatic stay.

2. Within 21 days of the entry of this Order, TTLG and J. Todd Tracy shall file and serve on counsel for Diane Erdmann one or more declarations, and an optional supporting memorandum, stating the actual damages for which TTLG seeks as compensation for Diane Erdmann's a) direct demand on TTLG to return the Deposit Funds, b) filing and pursuing the complaint with the Washington Attorney General against Mr. Tracy, and c) filing and pursuing the complaint with the Washington State Bar Association against Mr. Tracy. If either Mr. Tracy or TTLG do not wish to seek any award, notice of that intention shall be filed promptly. Ms. Erdmann may file a response by no later September 9, 2016, and Mr. Tracy and TTLG may file a

Order - 18

reply no later than September 13, 2016. The Court will conduct a hearing to determine the amount of the sanctions to be imposed on Ms. Erdmann on **September 16, 2016, at 11:00 a.m.**

3. Within 21 days of the entry of this Order, TTLG shall file, serve on all parties as required by the Case Management Order [Dkt. 232], and note for hearing on **September 16, 2016, at 11:00 a.m.** a request for allowance and payment of fees and costs incurred during the case as an administrative expense under 11 U.S.C. §503, which request shall comply with LBR 2016-1.

4. The Deposit Funds remaining after compensating TTLG for post-petition services shall be returned to Ms. Erdmann not later than 14 days after entry of the order determining the amount to be paid TTLG from the Deposit Funds.

/// END OF ORDER ///