**Below is the Order of the Court.**

**Christopher M. Alston**
**U.S. Bankruptcy Judge**
(Dated as of Entered on Docket date above)

Christopher M. Alston
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Suite 6301
Seattle, WA 98101
206-370-5330

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In re | Chapter 11 |
| Northwest Territorial Mint LLC, | Case No. 16-11767-CMA |
| | MEMORANDUM DECISION ON TRUSTEE'S MOTION TO ASSUME DAYTON, NEVADA LEASE |
| Debtor. | |

This matter came before the Court on the Trustee's Motion to Assume Dayton, Nevada Lease and Acknowledge Validity of Security Agreement (Dkt. No. 740) (the "Motion") and the Order Granting Trustee's Motion to Assume Lease for Dayton Facility (Dkt. No. 1018) (the "Assumption Order"). The Court conducted an evidentiary hearing on June 30, July 5, July 25, and July 26, 2017. K&L Gates LLP appeared for Mark T. Calvert, the Chapter 11 Trustee (the "Trustee"), and Perkins Coie LLP appeared for Robert and Connie Hoff (the "Hoffs"). The Court heard closing arguments on July 26 and took the matter under advisement.

For the reasons stated below, the Court has determined that there are some defaults that must be cured, but not to the extent alleged by the Hoffs. The Trustee also need not assume a security agreement, perfect any security interests the Hoffs may have, or provide the Hoffs with any additional security.

MEMORANDUM DECISION ON TRUSTEE'S MOTION TO ASSUME DAYTON, NEVADA LEASE – 1

## I.    FINDINGS OF FACT

**A.    Shortly after the Commencement of the Case, the Court Orders the Appointment of a Trustee.**

Northwest Territorial Mint LLC (the "Mint") commenced this case under chapter 11 on April 1, 2016.  Ross Hansen owned and controlled the Mint at the time of the bankruptcy filing.  Just a week later, Mr. Hansen stipulated on behalf of the Mint to the appointment of a chapter 11 trustee.  Upon the application of the Office of the United States Trustee, the Court approved Mr. Calvert as the Trustee.  The Trustee subsequently obtained permission to employ K&L Gates as his general counsel and to employ his firm, Cascade Capital Group, Inc. ("Cascade"), to provide financial and forensic accounting services.

**B.    The Trustee Determines the Lease is Critical to the Success of the Case.**

At the time of the appointment of the Trustee, the Mint maintained its corporate headquarters in Kent, Washington, and operated in multiple locations across the country.  One of those locations was Dayton, Nevada, where the Mint operated in a 100,000 plus square foot facility owned by the Hoffs (the "Dayton Premises").  Very early in the case, the Trustee determined that he would focus on operations in Dayton.  He moved to sell the business assets in Texas three weeks after his appointment. Dkt. No. 200.  At the hearing in support of the sale motion, the Trustee confirmed the he decided to liquidate the Texas operations to generate cash to invest in the Dayton operations.  The Court approved the sale of the Texas business assets in early June. Dkt. No. 374.  The Trustee declared the Dayton facility "is critical to the Debtor's minting operations and the Debtor's business as a whole" and will be the focus of a chapter 11 plan.  Exhibit 122, at 1–2, 5.

The Trustee, however, faced a significant hurdle to assuming the Dayton Lease: the Mint was not the tenant under the written agreement with the Hoffs[1].  In 2009, as part of a sale of the Hoffs' business, the Hoffs and Mr. Hansen entered into a lease for the Dayton Premises (the "Lease").  The day the parties executed the Lease, the parties executed a written amendment that acknowledged Mr. Hansen had assigned his interests to an entity he controlled, Medallic Art Limited Partnership ("MALP").  Exhibit 124.

---

[1] The landlord under the original lease was Medallic Art Company, Ltd., a South Dakota corporation wholly owned by the Hoffs.  That entity no longer exists, and the Hoff hold title to the Premises and hold all rights and obligations under the Lease.  Unless stated otherwise, any reference to the Hoffs means either the Hoffs or their defunct corporation.

Key terms of the Lease as amended include the following:

- Rent is $30,000 per month for the first six months, then $40,000 per month, subject to annual adjustments for inflation.

- The term of the lease is ten years commencing July 10, 2009.

- Lessee is permitted to use the premises for office, storage, manufacture, and minting of precious metals and custom-minted products.

- Lessee is responsible for insurance, real property taxes, and utilities.

- A security agreement and UCC-1 Financing Statement creating a first priority security interest in collateral identified in the security agreement secures the lessee's obligations. MALP executed a security agreement dated July 10, 2009 (the "Security Agreement"), that granted the Hoffs a security interest in various pieces of equipment, dies, tools, and molds they sold to Mr. Hansen. The parties produced no evidence that Mr. Hansen ever assigned title to the personal property to MALP, but it appears the parties operated as if MALP owned the collateral and possessed the right to grant the security interests.

Under the Lease, a "default" is a failure by the lessee to observe, comply with, or perform any of the terms, covenants, conditions, or rules applicable to the lessee. Exhibit 106 at section 13.1. The Lease imposes the following repair and maintenance obligations on the lessee:

> Lessee shall…keep the Premises and every part thereof in good order, condition and repair, and non-structural [sic]…including…all equipment or facilities serving the Premises, such as plumbing, heating, air conditioning, ventilating, electrical, lighting facilities, boilers, fired or unfired pressure vessels, fire sprinkler and/or standpipe and hose or other automatic fire extinguishing system, including fire alarm and/or smoke detection systems and equipment, fire hydrants, fixtures, walls (interior and exterior), non-structural portions of the roofs, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks, and parkways located in, on, about, or adjacent to the Premises…. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.

Exhibit 106 at section 7.1(a). The Lease also requires the lessee to maintain contracts for inspection, maintenance, and service of the HVAC and the fire extinguisher systems. *Id*. at section 7.1(b). The Hoffs must maintain and repair the structural portions of the buildings and improvements on the Premises, including structural walls, foundations, and the structural

portions of the roof. *Id*. at section 7.2.

The Trustee also draws the Court's attention to a provision that states when the lessee surrenders the Premises at the end of the Lease term, all of the improvements, parts and surfaces must be clean and free of debris and in good operating order, condition and state of repair, but ordinary wear and tear is excepted. *Id*. at section 7.4(c). The Trustee contends this "ordinary wear and tear" exception modifies his repair and maintenance obligations during the term of the Lease. The Court declines this interpretation of the Lease. This "ordinary wear and tear" provision applies only upon surrender, so the Court need not consider it at this time.

At some point after the execution of the assignment of the Lease, the State of Nevada permanently revoked the corporate status of MALP. Exhibit 123. Consequently, there was uncertainty as to who held the rights and obligations of the lessee under the Lease. The Mint always operated at the Dayton Premises and paid rent due under the Lease directly to the Hoffs. At the outset of this case, however, Mr. Hansen asserted that either he or Medallic Art Company LLC ("Medallic"), another entity he controlled, was the tenant under the Dayton Lease and the Mint was a mere sub-lessee. *See* Transcript of Section 341 Meeting, Dkt. No. 265, at 44:12–23 and at 46:17–47:8, and Dkt. No. 428.

The Trustee first acknowledged this problem when he filed schedules on May 10, 2016. On Schedule G, he listed the "Medallic Art Company, LTD/Hoff Lease" and described the Mint's interest in the Dayton Lease as "undetermined." Dkt. 225-1. At the case management conference in early June, the Court expressed concern over this issue and informed the Trustee he needed to resolve the dispute sooner rather than later. The Trustee's counsel acknowledged that the Lease along with other ownership disputes with Mr. Hansen presented "one big, gooey mess." In an email to Mrs. Hoff in August 2016, the Trustee identified various legal theories for obtaining control of the Dayton Lease and other disputed assets, noting that all of these approaches involved risk, costs, and time. Exhibit 130. In short, the Trustee knew from the outset that he would have to expend time and resources to resolve the Lease ownership issue.

C.     **The Trustee and the Hoffs Initially Attempt to Settle a Pre-petition Lawsuit.**

In 2012, the Hoffs sued the Mint, MALP, Medallic, Medallic Art Corporation (another entity controlled by Mr. Hansen), and Mr. Hansen in Nevada state court to recover alleged damages for defaults under the Lease (the "Nevada Lawsuit"). The Hoffs prevailed on some issues and obtained an attorneys' fees award of $93,619.15 as the prevailing party against all

defendants (the "Pre-Petition Attorneys' Fees"). Subsequently, the Nevada Supreme Court overturned the fee award and remanded the matter back for further determinations. Exhibits 110–113.

In early August 2016, the Trustee's counsel sent him an email explaining this background on the Nevada Lawsuit, the award of the Pre-Petition Attorneys' Fees, and the reversal and remand. The Trustee forwarded his counsel's email to Connie Hoff with his own email that stated, "I have no desire to fight let's settle . . . . what do u want to do." Exhibit 126.

In response to the Trustee's overture, Mrs. Hoff asked the Trustee to take care of 14 specific items at the Dayton Premises (the "Original Repair List") in exchange for resolving their claim for the Pre-Petition Attorneys' Fees. Exhibit 126. She noted the Dayton Lease required the tenant to take care of all of these items anyway. *Id.* She did not connect any dollar amount with these repairs in her email. The Trustee responded that he would agree to 13 of the items, but given his cash flow, wanted to cap the expenditures at $125,000. *Id.* The Trustee acknowledged he was planning to do the 13 items to get back in compliance. *Id.* He explained the proposed $125,000 cap was "an increase above the settlement amount of $100K by $25K or 25%." *Id.* This statement demonstrates the Trustee tied his settlement offer to the Pre-Petition Attorneys' Fees. Mrs. Hoff agreed to the cap and to the removal of the one item if the Trustee agreed to work cooperatively on the timing and budget for the remaining repair items. The Trustee accepted and asked his counsel to draw up a settlement agreement. *Id.* Mrs. Hoff replied that once the Court approved the settlement, they would cause dismissal of the Nevada Lawsuit. *Id.*

The Trustee asserts that this email exchange evidenced his intention to obtain a global settlement of all defaults he needed to cure in order to assume the Dayton Lease. He testified that he was seeking a total cure number because he was conducting an analysis of whether he should stay or reject the Lease and relocate. The Hoffs testified that they did not understand that the Trustee sought in this email exchange a list of all defaults, but instead believed that he sought a resolution of the Nevada Lawsuit. The Court finds the Hoffs' interpretation of the email reasonable and credible. Nowhere in the email does the Trustee convey a desire to obtain a list of all defaults under the Lease. The Trustee knew to assume a lease he would need to cure all defaults. If he wanted a list of defaults, he could have simply asked the Hoffs to provide one, but he did not. The exchange confirms the Hoffs provided the Original Repair List in response to the

Trustee's request to settle the Nevada Lawsuit, not as a list of defaults the Trustee needed to cure.

**D.    The Trustee and Hoffs' Discussions Evolve from Settlement of the Pre-Petition Attorneys' Fees to Assumption of the Dayton Lease.**

Shortly after the early-August email exchange, the Trustee's counsel informed him that he could not enter into the settlement with the Hoffs.  Mr. Hansen alleged that he or his company was the actual tenant under the Dayton Lease, so that issue needed to be resolved first.  Exhibit 127.  Once again, the Trustee forwarded this privileged communication directly to Mrs. Hoff and told her that he could not cut a deal with her but nonetheless was prepared to do the agreed-upon repairs to show good faith.  *Id.*

Soon after this exchange, the parties re-commenced their settlement discussions based on some new information.  The Hoffs provided the Trustee answers to interrogatories in the Nevada Lawsuit that indicated the Mint, rather than Mr. Hansen or one of his other entities, was the actual tenant under the Dayton Lease.  Exhibits 129 and 130.  The Trustee emailed Mrs. Hoff requesting her to agree  "[t]hat I would not pay the attorney fees if I do improvements based upon the interrogatories that I have ownership of the lease."  Exhibit 129.  After conferring with her Nevada counsel, Mrs. Hoff replied that they would agree the Trustee and the Mint "are the rightful assignees and tenants" of the Dayton Lease and to waive the Pre-Petition Attorneys' Fees in exchange for the Trustee honoring the existing Lease and spending up to $125,000 in repairs, subject to bankruptcy approval.  *Id.*  Later that same day, the Trustee responded that his counsel believed they needed to "submit something to the Bankruptcy court on the settlement . . . .  The court will need to approve and naturally we have exposure with his approval."  *Id.* [ellipses in the original].  This email exchange confirms that, at least as of late August, the parties' focus remained on resolving the Pre-Petition Attorneys' Fees, not curing all defaults in anticipation of assumption.

The Trustee continued his dialogue with Mrs. Hoff and included Paula Pehl, a member of the unsecured creditors' committee, in the email conversations.  He explained to them the various approaches under consideration to obtain control of the Dayton Lease and asked for their thoughts.  Exhibit 130.  His counsel sent him an email with a draft complaint against Mr. Hansen and his company, noting it was a work in progress and asking the Trustee not to forward it yet.  The Trustee ignored his attorney and promptly forwarded the draft to Mrs. Hoff and Ms. Pehl

and asked for their thoughts. Exhibit 131. He also informed them that he was contemplating "filing a motion to accept the HOFF Lease with some changes . . . then push it to court for approval . . . . This would be a CRITICAL motion . . . . But if we could win this we would have control of the case . . . ." *Id.* [ellipses and capitalized words in original].

The Trustee decided to pursue the assumption motion, and he continued his discussions with the Hoffs about the Dayton Lease. On September 8, the Trustee forwarded a draft of a declaration for Mrs. Hoff prepared by his counsel. That draft declaration stated she and the Trustee had agreed to the following terms provided the Trustee assumed the lease on behalf of the Mint estate: (a) monthly rent would be reduced $10,000 per month for 18 months; (b) the Trustee would fund $120,000 worth of certain repairs; and (c) any damages arising from rejection after assumption of the lease would not be treated as general unsecured claims as opposed to administrative expenses. Exhibit 136. The proposal in this draft declaration caught the Hoffs off guard, as Mrs. Hoff responded that she was "distressed" to see these proposed terms. *Id.* Mr. Hoff subsequently confirmed that they would not agree to any rent reduction. Exhibit 135.

Mrs. Hoff eventually signed a declaration in support of the Assumption Motion on September 17 (described in more detail below) but was soon distressed again. In an email dated September 19, the Trustee's counsel warned him that while he had agreed to support the acknowledgement of the Security Agreement, it was very possible he would face resistance from either the Court or the unsecured creditors' committee. Exhibit 139. The Trustee forwarded this privileged communication directly to Mrs. Hoff with comments that included, "[w]hat we wanted to make sure is we are all on board to giving you a lien position . . . . But . . . the judge may not approve it . . . ." *Id.* [ellipses in the original]. Mrs. Hoff was irate and responded that the Trustee's representations to assume the lease and security agreement were "nothing more than a charade." *Id.*

**E.** **The Trustee Seeks Authority to Assume the Lease and the Settle Alleged Disputes with the Hoffs.**

Despite the negative comments from Mrs. Hoff, the Trustee ultimately obtained her agreement to file her declaration and proceed to seek authority to assume the Lease. The initial deadline for the Trustee to assume or reject unexpired leases of non-residential real property was July 30, 2016. The Trustee requested and obtained the maximum extension of the deadline to

October 28, 2016.  Dkt. No. 530.  A month before the expiration of the extended deadline, the Trustee filed the Motion and supporting declarations.  The Trustee's declaration states the terms of a compromise he believes he reached with the Hoffs:

- The Hoffs will waive their Pre-Petition Fee Claim;

- The estate will make $120,000[2] in maintenance and repairs to the facility which, according to the Hoffs, are obligations of the tenant under the lease which are in default, and make other capital improvements on a mutually agreeable schedule; and

- Conditioned on approval of the Motion and other terms of the compromise, the Trustee will recognize the validity of the grant of the Security Agreement and, if necessary, grant a security interest on the same collateral as described in the Security Agreement.

Exhibit 122 at 4–5.

In her declaration, Mrs. Hoff also describes the proposed settlement as an agreement regarding assumption of the Dayton Lease and Security Agreement. She states she and her husband agreed to waive their claim for Pre-Petition Attorneys' Fees, the Trustee agreed to fund $120,000 worth of certain repairs and improvements to the Dayton Premises that have been the subject of prior disputes between the landlord and the Mint, and they agreed to determine a budget and schedule for the repairs and improvements.  She and her husband will consent to the assumption of the Dayton Lease and Security Agreement by the Trustee on these terms and that she does not consent to these terms of assumption of the lease for any party other than the Trustee.  Exhibit 124.

Notably, these declarations neither identify the repairs and improvements nor state that the repairs represent all of the defaults under the Lease.  Rather, the declarations show an agreement by the Hoffs that if the Trustee made certain unidentified repairs *and* if the Court approved the other terms of their compromise, then they would consent to the Trustee's assumption of the Lease.  Further, the Trustee's agreement to grant security interests in certain collateral "if necessary" is unclear—he identifies no condition that would trigger the need to convey additional security interests.

The proposed order submitted with the Motion also does not identify the existing defaults the Trustee must cure.  Instead, that proposed order contained a vague description of the agreement: "The compromise between the Trustee and Landlord regarding the terms of

---

[2] The parties apparently agreed to reduce the cap on repairs by $5,000.

assumption, cure and satisfaction of alleged defaults under the lease is hereby approved and the Trustee may perform such repairs and maintenance as may be required to perform under that compromise." Exhibit 23. The proposed order neither stated the terms of the compromise nor identified a settlement agreement that contains the terms. This proposed order differs from five other orders approving compromises presented by the Trustee in this case that all specifically identified a settlement agreement with specific terms approved by the trustee and the non-debtor party. Dkt. Nos. 792, 799, 864, 970, and 1069. The Motion also stands in contrast to two other motions to assume filed by the Trustee in which he stated whether or not there were any defaults that needed to be cured and the proposed cure amount in order to assume an executory contract or unexpired lease. Dkt. Nos. 238 and 806.

The Trustee testified that he exchanged emails and had communications with the Hoffs regarding a global settlement that included curing all defaults under the Lease. The Trustee could not, however, point to any emails or describe any specific conversation in which he sought to identify all defaults under the Lease or the Hoffs acknowledged the Original Repair List constituted all defaults. The Hoffs testified that they understood they had agreed to assumption of the Lease if the Trustee performed certain repairs, but they never agreed those certain repairs constituted all of the defaults that existed in late September 2016. The evidence in the record supports their contention—the emails and moving papers confirm the lack of any clear statement the Hoffs had provided the Trustee a list of all alleged defaults prior to the filing of the Assumption Motion.

**F.** **The Trustee Continues the Assumption Motion Hearing for Many Months to Litigate the Estate's Rights to the Lease.**

Medallic commenced an adversary proceeding against the Trustee in early August 2016. Dkt. No. 602. Medallic sought, among many other things, a declaratory judgment that it held the rights as the tenant under the Lease. The Trustee filed an answer denying the requested relief and asserting counterclaims that included an action for substantive consolidation of Medallic with the estate of the Mint. *Medallic Art Company LLC v. Calvert*, Adv. Proc. No. 16-01196 (the "Adv. Proc.") at Dkt. No. 6. Despite the existence of the disputes in the pending adversary proceeding, the Trustee filed the Motion to assume the Lease and noted it for hearing in late October 2016. The Trustee also filed a motion for partial summary judgment in the adversary proceeding on the issue of whether the Mint is the tenant under the Lease. Adv. Proc. Dkt. No.

14.  Medallic filed the only objection to the Motion, correctly noting the Trustee could not assume the Lease unless and until the Mint was deemed the tenant with rights that could be assumed, and that issue was to be resolved in the adversary proceeding.  Dkt. No. 832.  Consequently, the Trustee continued the hearing on the Motion until December 1, 2016, to coincide with the hearing on his partial summary judgment motion.

The Trustee and Medallic vigorously contested the Trustee's partial summary judgment motion.  The Trustee filed over 350 pages in support of the motion, and Medallic filed nearly 500 pages of documents in support of its position.  Adv. Proc. Dkt. Nos. 16–20, 24, and 27–30.  Finding issues of material fact, the Court denied the Trustee's summary judgment motion.  Adv. Proc. Dkt. No. 38.  Realizing that he might not obtain a resolution of the Lease issues until after the trial, the Trustee obtained an order that continued the hearing on the Motion to May 2, 2017.  Dkt. No. 845.

The Trustee and Medallic litigated over withdrawal of the reference, bifurcation of the trial, jury trial rights, and discovery issues.  The Trustee produced over 82,000 pages of documents.  Adv. Proc. Dkt. No. 58.  In April 2017, with trial just a few weeks away, Medallic moved for a voluntary dismissal of its claims.  Adv. Proc. Dkt. No. 72.  On April 19, the Court granted the motion and dismissed with prejudice Medallic's claims as well as its affirmative defenses to the Trustee's counterclaims.  The Court subsequently entered a judgment that substantively consolidated Medallic, including its assets and liabilities, with the chapter 11 estate of the Mint.  Adv. Proc. Dkt. No. 86.  Therefore, it no longer mattered whether Medallic or the Mint was the tenant under the Lease; if Medallic held the tenant's rights, the Trustee now controls those rights.

**G.      On the Eve of the Continued Hearing on the Motion, the Parties Recognize They Do Not Have an Agreement on Defaults and Cure.**

After Medallic conceded on the substantive consolidation issue, the Trustee confirmed the Motion for hearing on May 2, 2017.  The Trustee did not file anything new in support of the Motion, thus indicating that the parties were ready to move forward with the compromise they allegedly reached in August 2016.  The Hoffs, however, filed a statement a few days before the hearing that suggested otherwise.  According to the statement, the Hoffs believed they had reached an agreement with the Trustee last Fall respecting the assumption of the Lease as reflected in Mrs. Hoff's declaration filed in support of the Motion.  However, while there may

have been an agreement at that time on the repairs, the Hoffs asserted other issues had arisen since then. The Hoffs declared that they would continue discussions with the Trustee but requested that any order approving assumption leave open all issues respecting the non-monetary cures required under the Dayton Lease.  Dkt. No. 1000.

The documents and testimony at the evidentiary hearing confirmed that not only did the parties dispute the defaults the Trustee must cure, but the Hoffs and the Trustee never reached an agreement on all defaults under the Lease.  Not long after the Trustee filed the Motion, the lack of agreement became evident, as the Hoffs began sending letters and emails demanding repairs and asserting defaults. The communications began in November 2016, when the Hoffs informed the Trustee that he needed to replace the carpet before vacating the space.  Exhibit. 147.  In response, the Trustee attempted to negotiate a resolution.  *Id.*

The Hoffs continued to assert lease defaults right to the hearing on the Motion.  On February 14, 2017, the Hoffs emailed the Trustee a Notice of Default that listed 16 items the Lease required the tenant to perform needing immediate attention.  Exhibit 151.  This list included many of the items on the Original Repair List but added two new and significant items: (1) repairing, resealing, and restriping the parking lot, curbing, and sidewalks; and (2) repairing the roof.  In response to the notice, two days later, the Trustee replied, "I assume this is part of getting an understanding for the courts . . . .  Yes, we have working on the list, and we have done a number of the items you mention below.  We will get you a status update on our progress . . . ." *Id.*  The Trustee ended the email exchange that day by saying, "[h]ave no issues with you and will do what we need to do to get you taken care of.  Thank you in advance for your help." *Id.*

The next day, the Trustee sent the Hoffs a detailed response to all of the alleged defaults identified in the February 14 email. Exhibit 152. Notably, the Trustee did not point to the Motion and the supposed agreement that he needed to fix only the items on the Original Repair List and had no obligation to repair the parking lot and the roof.  Instead, he said the parties needed to talk about timing and costs of fixing these additional, large-ticket items.  *Id.*  After visiting the Premises later that month, the Hoffs sent an email to the Trustee on February 26, which generally stated that virtually all of the items identified in the first February notice remained in default.  Exhibit 157.  A few weeks later, the Hoffs sent a letter dated March 20, 2017, to Mr. Hansen, Bill Atalla (the Mint's Chief Executive Officer), and the Trustee that provided formal notice of breach based on the defaults identified in the February notice.  Exhibit 1.

In late April, after Medallic had conceded in the adversary proceeding, the Trustee and the Hoffs exchanged emails again in anticipation of the continued hearing on the Motion. Exhibit 163. The Trustee acknowledged that, while he had already invested $50,000 in repairs, he would need to make more repairs "once we own the lease." *Id*. In response, Mrs. Hoff sent an email that confirmed the parties were still negotiating a compromise:

> In order to come [to] agreement before the hearing on May 2, I think we should earmark the $120,000 for the roof repairs and parking lot resealing . . . . We agreed to forgo our court awarded attorney fees to assist you in coming into compliance with the lease provided the designated repairs for the $120,000 were priorities for us in preserving the integrity of our building . . . . We understand you have limited resources so we are willing to pay for these repairs (estimated at $120,000), up front and allow you to pay an additional $10,000 per month along with your lease payment until we have been fully reimbursed . . . .

> *Id*.

The Hoffs sent other emails complaining about the condition of the Premises and insisting the Lease required the Trustee to make repairs and take other actions. Exhibits 159 and 160. In each case, the Trustee or Mr. Attalla responded in a way to diffuse the situation and appease the Hoffs. The Trustee did not offer any evidence showing he asserted to the Hoffs that he had no obligation to fix the items other than those on the Original Repair List because the Hoffs supposedly agreed that prior list identified all defaults under the Lease.

## H.    The Court Authorizes Assumption of the Lease and Sets an Evidentiary Hearing to Determine the Defaults the Trustee Must Cure.

The Court proceeded with the hearing on the Motion on May 2. Counsel for the Trustee and the Hoffs appeared and confirmed their clients were still in discussion over the cure obligations and had not yet reached an agreement. The Hoffs objected to any further continuance of the hearing and insisted that the Trustee either agree to assume the Lease or withdraw the Motion and allow rejection by operation of law. The Trustee contended that he could continue the Motion and decide whether to go forward with assumption after the Court determined his cure obligations.[3]   The Court agreed with the Hoffs and required the Trustee to

---

[3] Since the Trustee previously obtained a 90-day extension of the 120-day deadline to assume or reject, any further extension required written consent from the Hoffs. 11 U.S.C. § 365(d)(4)(B)(ii). The Hoffs agreed to an extension up to May 2, 2017, but not beyond. Dkt. No. 1000. At the hearing, the Trustee asserted he timely assumed the Lease prior to the expiration of the deadline by filing the Motion and, therefore, did not need the Hoffs' consent to a further extension. *In re Victoria Station Inc.*, 840 F.2d 682, 684 (9th Cir. 1988) (filing a motion to assume prior to the expiration of the deadline satisfies requirements for assumption under section 365(d)(4)(A) and avoids rejection

choose between the two alternatives: either assert the Motion constituted a commitment to assume the Lease within the meaning of section 365(d)(4)(A), or contend the Motion did not represent a commitment to assume the Lease. Knowing that the latter option required the Hoffs' consent to a further continuance, the Trustee chose the former and committed to assuming the Lease. The Trustee then stated that, given his understanding of the defaults alleged by the Hoffs, he believed the estate could promptly cure the defaults. Based on this representation, the Court entered the Assumption Order authorizing the Trustee to assume the Lease and set an evidentiary hearing on the defaults the Trustee must cure. Dkt. No. 1018. The Assumption Order further required the Hoffs to provide, within seven days, a writing identifying all defaults they assert the Trustee must cure, including dollar amounts associated with the proposed cure for each alleged default. *Id.*

The Trustee criticized the Hoffs for failing to raise any specific defaults in their Statement filed prior to the May 2 Hearing. Dkt. No. 1115. At the evidentiary hearing, the Hoffs' counsel stated he had served the Trustee's counsel with a draft statement he intended to submit that did identify specific defaults, but the Trustee's counsel asked him not to file the more detailed statement because doing so would make it more difficult to resolve the matter. The Trustee's counsel admitted that he received the draft pleading with the list of defaults and did not deny that he convinced his opposing counsel to file the more benign placeholder statement.

## I. At the Evidentiary Hearing, the Trustee Discloses He Could Have Relocated from the Dayton Premises.

In his opening statement, the Trustee's counsel declared they would demonstrate the Trustee sought to establish with the Hoffs a definitive amount for repairs and maintenance because he was deciding whether to stay or move to new space. Counsel asserted the Dayton Lease was "bad" and the Trustee needed far less space for the operations. The Trustee, according to his counsel, was strongly considering moving out, and stayed only because he believed he had an assurance that he needed to spend only $120,000 to cure all defaults.

The Trustee presented evidence in an attempt to support this estoppel argument. One of his experts, George Humphrey, testified there was a significant vacancy rate in the local market in the Summer of 2016 and the Trustee could have substantially reduced his leasing costs had he

---

by operation of law); *In re R. Ring Enters., Inc.*, 2009 WL 779800, *2 (Bankr. N.D. Cal. 2009) (Bankruptcy Code amendments in 2005 did not overrule *Victoria Station*). At the same time, however, the Trustee argued the Court should not require him to commit to assuming the Lease until after the evidentiary hearing.

moved.  The Trustee then testified that he actually had identified a new location—a former grocery store—that had the right amount of space for the operations.  According to the Trustee, the monthly rent at the grocery store would have been $20,000, which would have reduced the rental expense by $25,000 per month.  On cross-examination, the Trustee added that he had gone so far as to determine that the grocery store possessed an adequate power supply for the operations.  The Trustee estimated that the costs to move plus the loss in revenue from such a move would total $750,000.  He testified that he sought "a total number" from the Hoffs because he needed the amount for his "move versus stay analysis."

After his lawyer conducted re-direct examination, the Court asked the Trustee to review his "move versus stay" calculations.   First, the Trustee reiterated that it would have cost the estate $750,000 to move and acknowledged the estate would face an unsecured rejection damages claim from the Hoffs.  By moving from the Dayton Premises, the Trustee conceded the estate would have saved approximately $25,000 per month in rent over the three years remaining on the Lease, resulting in a total savings of $900,000.  The Trustee also acknowledged he would have saved the $120,000 in repair and maintenance costs he negotiated, along with $40,000 he had already spent to clean up solvents.

The Court then asked the Trustee how much he budgeted for legal fees to resolve the dispute with Medallic and Mr. Hansen over the Lease.  He responded that he did not estimate legal costs in August 2016 because by that time he lacked the funds to move.  The Trustee proceeded to revise his testimony to state when he was seeking "a total number" from the Hoffs in August 2016, he was not conducting a "move versus stay analysis" but instead was deciding whether to assume the lease or shut the company down.  Given he had provided evidence that he expended time and effort to find a cheaper and more suitable space, the Court asked him to specify when he had the financial ability to relocate operations.  The Trustee testified that he was deciding to move in the April–May timeframe rather than later in the summer.  He admitted that he knew by May that he would have to litigate with Mr. Hansen before he could assume the Dayton Lease, but declared he was confident that he would prevail in any litigation and decided to stay rather than relocate.

The Court finds this change in testimony not credible, as the Trustee's own statements and records show he did not have the financial ability to move in April or May 2016.  He testified that he inherited very little cash when he took over in mid-April, and the estate did not

receive the proceeds from the sale of the Tomball, Texas plant assets until June. June Monthly Financial Report, Dkt. No. 591, at 15. The Trustee's monthly financial reports confirm that he virtually had no cash at the end of April but after the asset sale held a little over $1.4 million in cash at the end of June. September Monthly Operating Report, Dkt. No. 788, at 18–20. Notably, the Trustee held almost as much cash at the end of July as he had at the end of June; by the end of August, he was holding *more* cash than at the end of June. *Id.* Even as of the end of September, the Trustee still held over $1.3 million in cash. *Id.*

The record does not support the Trustee's revised testimony that the opportunity to relocate operations existed in April and evaporated at the end of May. He initially attempted to prove that he needed a final cure number to decide whether to stay or move, but then abandoned the argument on the stand and asserted he possessed no ability to move when he began negotiations with the Hoffs. The lack of credibility on this issue further supports rejection of the Trustee's testimony that he believed the Original Repair List represented all of the defaults under the Lease.

## II.  DISCUSSION

### A.  Jurisdiction.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (M), and (O).

### B.  The Court Will Admit Exhibits 131 and 136.

At the evidentiary hearing, the Court reserved its ruling on the admission of two exhibits offered by the Hoffs until they provided the attachments referenced in those documents. After the conclusion of the hearing, the Hoffs provided those exhibits to the Court, and the Trustee raised no objections. The Court may reopen a proceeding to admit evidence under appropriate circumstances and if no party suffers prejudice. *Keith v. Volpe*, 858 F.2d 467, 478–79 (9th Cir. 1988); *Moore v. Greene*, 421 F.2d 584, 588 (9th Cir. 1970). The Court now admits Exhibits 131 and 136 as modified by the attachments provided by the Hoffs.

### C.   There is No Agreement for the Court to Enforce.

Both parties assert that they formed an agreement in September 2016 and the Court should enforce that agreement. The problem is that the parties never documented the agreement, and instead rely on two declarations that do not contain the same terms. For example, the Trustee's declaration states he agrees, conditioned on approval of the assumption of the Lease, to

acknowledge the Security Agreement. Mrs. Hoff's declaration identifies certain conditions for consent to the assumption of the Lease by the Trustee, but notably absent is any mention of the Security Agreement. Further, while the declarations state the Trustee will fund $120,000 worth of certain improvements, neither declaration identifies these improvements. If the parties agreed upon the specific improvements at the time, they did not share their understanding with the Court and other interested parties.

The Court further notes that the Trustee did not submit a declaration from Mr. Hoff, who co-owns the Dayton Premises with Mrs. Hoff. Nevada is a community property state, and neither spouse may acquire, purchase, sell, convey, or encumber community business assets without the consent of the other. N.R.S. 123.230(6). Even if the Court construed Mrs. Hoff's declaration as an agreement in writing, neither party provided evidence to support a conclusion that her writing alone could be sufficient to encumber the Dayton Premises.

Even if the parties reached an agreement, the Court did not approve it. Because the declarations indicate the parties conditioned their agreement on the Court approving all terms, neither party was bound to any of its terms. Axiomatically, neither party could have breached the agreement, so the Court rejects the Trustee's claims for damages arising from the Hoffs' alleged breaches. As evidenced by the late April 2017 email exchange, the Trustee and the Hoffs were still negotiating the allocation of the $120,000, the timing of the repairs, and the funding of the repair and maintenance costs. Exhibit 163.

Finally, the passage of time made any agreement obsolete. The Trustee acknowledges that he must cure defaults that arose after September 2016. Thus, even if he had capped his cure costs at $120,000 when he filed the Motion, he knew the cure costs eight months later could exceed that amount. As of April 2017, the parties could not even agree on what repair items were "new" and which ones were "old" (arising prior to September 2016 but not included on the Original Repair List). In sum, the parties did not have an agreement when they appeared at the hearing on May 2. There was no agreement for the Court to enforce or for any party to breach.

**D.**    **The Hoffs May Seek Cure of Lease Defaults Beyond Those Items on the Original Repair List.**

The Trustee concedes that he must cure any new defaults under the Lease that arose after he filed the Motion. He still insists, however, that he need not cure any defaults that existed as of September 2016 that the Hoffs did not identify on the Original Repair List because they did not

object to the Motion prior to April 2017. The Trustee's position lacks merit.

First, it would have made no sense for the Hoffs to file an objection. The Motion did not identify defaults and propose a cure that required the Hoffs to either respond or waive their rights to seek some other cures. Instead, the Trustee sought approval of compromise with the Hoffs: if he made $120,000 worth of repairs and provided other consideration, then the Hoffs would not oppose assumption. The Court did not approve the compromise, so neither side is bound to its prior offers. The Trustee certainly believes he is not bound by the alleged agreement since he argues that he no longer must recognize the Security Agreement. Similarly, it would be unreasonable and illogical to conclude the Hoffs are bound to the Original Repair List because they did not file a response to the Motion.

Second, the Hoffs did in fact identify other defaults well before the hearing on the Motion. Starting as early as November 2016, the Trustee knew the Hoffs asserted other issues the Lease required the tenant to address, like the damage to the parking lot and the roof. The Hoffs sent several emails and notices of default well before May 2017—and the Trustee did not respond that the Motion barred the Hoffs from asserting additional defaults. In late April 2017, the Hoffs' attorney even sent a draft pleading that identified specific repairs, but the Trustee's counsel persuaded him to file a simple "placeholder" objection instead. After convincing the attorney not to file the list of repairs, the Trustee's counsel argues the Hoffs' failure to identify any specific cure items in the late April statement should bar them from asserting these items now. This inequitable conduct precludes the imposition of the equitable remedy of estoppel in favor of the Trustee and against the Hoffs.

The decisions on which the Trustee relies for his estoppel argument are inapposite. In those cases, the non-debtor parties waited until after the bankruptcy court authorized assumption to assert defaults requiring cure. *See In re Hathaway*, 401 B.R. 477, 484 (Bankr. W.D. Wash. 2009) (where non-debtor party negotiated a cure amount and the court approved the assumption, claim preclusion barred the party from later claiming additional defaults); *In re Diamond Manf. Co. Inc.*, 164 B.R. 189, 198–99 (Bankr. S.D. Ga. 1994) (where the non-debtor party did not oppose the trustee's motion to assume a lease which explicitly stated the trustee was unaware of any defaults that required cure, the non-debtor party was precluded from asserting defaults after the court approved the assumption of the lease). The Hoffs did not wait to assert defaults under the Lease until after the entry of the order approving the assumption. On the contrary, the Hoffs

repeatedly pestered the Trustee with complaints about his failure to comply with the repair and maintenance obligations under the Lease well before the hearing on the Motion.

**E.    The Trustee Must Promptly Cure a Number of Defaults Under the Lease.**

The Bankruptcy Code authorizes a trustee to assume or reject any executory contract or unexpired lease of the debtor.  If there has been a default, the trustee may not assume the contract or lease unless, at the time of assumption, the trustee (A) cures, or provides adequate assurance that the trustee will promptly cure, such default, (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease for any actual pecuniary loss to such party resulting from such default, and (C) provides adequate assurance of future performance under such contract or lease.  11 U.S.C. § 365(a) and (b).

Both the non-debtor party and the trustee have independent but dual responsibilities of asserting defaults.  *Diamond Manf. Co. Inc.*, 164 B.R. at 200.  The non-debtor party bears the burden to (1) assert any defaults prior to assumption, and (2) prove the existence of default.  *In re Arriva Pharmaceuticals, Inc.*, 456 B.R. 419, 424 (Bankr. N.D. Cal. 2011); *In re Patriot Place, Ltd.*, 486 B.R. 773, 795 (Bankr. W.D. Tex. 2013).  The trustee then bears the burden of proof on the issues of prompt cure and adequate assurance of future performance.  *In re F.W. Rest. Assocs., Inc.*, 190 B.R. 143, 147 (Bankr. D. Conn. 1995).

The Hoffs assert a number of defaults under the Lease based on the alleged failure to maintain certain items in good order, condition, and repair.  Exhibit 119.  The parties presented numerous photographs to show the condition and state of these items.  The Hoffs also provided emails from the Trustee and the CEO hired by the Trustee responding to the Hoffs' assertions that certain items required attention.  While the Court does not conclude the Trustee is bound to any apparent agreement that he has an obligation to cure any particular default, the Court does find and conclude that the Trustee acknowledged in emails that certain items are in poor shape, worn, damaged, or need replacing.  Exhibits 152, 153, and 160.  The Trustee also testified that some of the items were not in good order, condition, and repair.

Based on the Trustee's acknowledgement in the emails and in his testimony, and on the Court's review of photographic evidence, the Court concludes the Trustee must promptly take the following actions to cure non-monetary defaults under sections 7.1(a) and (b) of the Lease that the Hoffs identified on Exhibit 119:

1.  Repair and seal the parking lot asphalt

2.  Cleanup landscape and make general landscape repairs

3.  Replace evaporative cooler

4.  Enter into long-term maintenance contracts for the HVAC and fire suppression systems

5.  Repair broken and damaged plumbing fixtures

6.  Replace damaged ceiling tiles

7.  Repair overhead door and dock leveler

8.  Replace HVAC server room

9.  Replace two broken crash bars on security doors

10. Remove and replace broken up concrete pad and concrete sidewalk

11. Replace non-working lights

12. Replace or refinish metal and wood doors

13. Epoxy approx. 9600 square feet of chemically damaged floors

14. Replace lower floor office area carpet

15. Replace damaged vinyl tile on first floor

16. Replace 4 inch rubber base on first and second floors

17. Install vinyl tile over poorly-applied epoxy by Tenant

18. Replace damaged second floor carpet

19. Repair water damaged wood floor in board room on second floor

20. Replace broken ceramic tile

21. Repair sheetrock throughout the building

The Court disagrees with the Trustee's contention that the parking lot, concrete pad, and concrete sidewalk are structural issues. While the Lease does not define the term, a common-sense interpretation of the meaning of "structural" when applied to a leased building would not include sidewalks or a parking lot.[4] The Court also declines to accept the Trustee's argument that he need not replace the evaporative cooler because doing so would constitute a capital improvement that is not the lessee's responsibility. The Lease requires the lessee to restore, replace, and renew various items, including the HVAC system. Further, the Trustee acknowledges that the cooler has been "out of business" for years and there has not been a

---

[4] *See* BLACK'S LAW DICTIONARY, 1650 (10th ed. 2014) (defining "structure" as "Any construction, production, or piece of work artificially built up or composed of parts purposefully joined together <a building is a structure>.").

maintenance contract in place. Exhibit 160. The Court concludes the Trustee must fix this problem by replacing the cooler.

As to the other repairs demanded by the Hoffs on Exhibit 119, the Court determines the Lease does not require the Trustee to perform these tasks at this time in order to cure defaults. While the Hoffs want the Trustee to paint the entire interior and exterior of the building, the photographs admitted into evidence show that, while perhaps not perfect, these items are in good order, condition, and repair. Although the Trustee acknowledges the lighting is not in good condition, he need only replace the non-working lights. Contrary to the implication in an email from Mrs. Hoff (Exhibit 151), the Lease does not require the lessee to maintain a certain wattage of lighting. The Hoffs' insistence that the failure to replace all lighting and repaint the entire exterior and interior of the building constitutes a default seems to be an attempt to have the Trustee maintain the building in new condition, which the Lease does not require.

As for the roof, the Lease imposes on the lessee responsibility for "non-structural portions" and on the Hoffs responsibility for "structural portions." The Lease provides no guidance on which portions of the roof fit within which category. In the Nevada Lawsuit, the Hoffs sought, among other things, a judgment against the lessee for the costs of repairs the Hoffs had done on the roof. Exhibit 14, at 4. The trial court ruled that the roof damage was structural in nature. Exhibit 110, at 11. The Hoffs' own expert stated that he was not sure whether poor maintenance or the poor prior work caused the current issues with the roof. The Trustee's expert testified and stated in his written report that the current roof issues were the result of (1) poor work previously performed at the direction of the Hoffs and (2) a poorly performing roof system. The Hoffs have not met their burden to prove a default relating to the roof. Finally, while the Hoffs may want a complete cleaning of the building now, the Court concludes there is no current default that the Trustee must cure.

As for timing, the Court declines to set a hard deadline for the completion of any or all the tasks. The Trustee has been aware for some time of the defaults alleged by the Hoffs. He should immediately undertake efforts to address all of these issues. The Court expects the parties to work together on a schedule to complete these tasks.

F.      **Cure of the Lease Defaults Does not Require the Trustee to Pay the Pre-Petition Attorneys' Fees.**

The Assumption Order required the Hoffs to identify in writing all defaults they contend

the Trustee needed to cure. The Hoffs sent the Trustee a list of alleged defaults and sent a modified list two more times prior to the evidentiary hearing. Exhibits 103, 104, and 119. The Hoffs also attached a list of repairs to their trial brief. Dkt. No. 1116. Not one of these lists included the Pre-Petition Attorneys' Fees. The Court does note that in two letters accompanying those lists, the Hoffs' counsel noted the Pre-Petition Attorneys' Fees was still an issue and suggested that the parties should lift the stay to allow the Nevada court to resolve the issue. Exhibits 103 and 104. The four lists, however, failed to include the Pre-Petition Attorneys' Fees on the list of defaults that the Trustee must cure.

In their trial brief, the Hoffs asserted assumption of the Lease requires payment of the Pre-Petition Attorneys' Fees. At the evidentiary hearing, the Hoffs did little to show why they were the prevailing party entitled to all or any of the Pre-Petition Attorneys' Fees. Instead, they argued this Court should lift the automatic stay and send the matter back to the Nevada state court. The Hoffs did not make a motion for relief from stay or abstention, and the Court declines to *sua sponte* order that relief.

The purpose of the evidentiary hearing was determine defaults under the Lease that the Trustee must cure in connection with assumption. If the Hoffs wanted this Court to determine they are entitled to payment of the Pre-Petition Attorneys' Fees as a pecuniary loss under the Lease, it was incumbent upon the Hoffs to demonstrate they are so entitled. The Lease provides that the prevailing party in any proceeding to enforce the terms of the Lease shall be awarded their attorneys' fees. Exhibit 106 at section 31. The Nevada Supreme Court reversed and remanded the trial court's decision that the Hoffs were the prevailing party in the Nevada Lawsuit. The Hoffs did not address the issues raised in the appellate decision. Given they bore the burden to prove the existence of a default, the Court concludes the Hoffs are not entitled to payment of the Pre-Petition Attorneys' Fees in order for the Trustee to assume the Lease.[5]

**G.    Assumption of the Lease Does Not Require the Trustee to Assume the Security Agreement or Provide Any Additional Security to the Hoffs.**

The Lease provided the obligations of the lessee under the Lease "are to be . . . secured by a security agreement and UCC-1 financing statement in the aggregate amount of $2,000,000 creating a first priority security interest in the collateral identified in the security agreement . . . ."

---

[5] In his trial brief, the Trustee suggested the Court could find the lessee is the prevailing party and the Trustee is entitled the attorneys' fees incurred by the lessee in the Nevada Lawsuit. The Trustee, like the Hoffs, did not demonstrate how the lessee emerged as the prevailing party in that litigation.

Lease, at section 38.  Notably, the parties completely replaced that provision in the First Amendment to Lease Agreement with the following:

> The obligations of the Lessee under this Lease are secured by a security agreement executed by the Lessee and UCC-1 financing statement in the aggregate amount of $2,000,000 of even date creating a first priority security interest in the collateral identified in the security agreement in accordance with that certain Security Agreement attached hereto as Exhibit "B" as a part hereof (the "Security Agreement").

Exhibit 107.  MALP, the lessee by virtue of the assignment by Mr. Hansen, executed the Security Agreement.  Exhibit 108.  While the original section 38 arguably imposed on the lessee some duty to make certain its obligations to the Hoffs remained secured by a first priority security interest in specified collateral, the new section 38 does not impose that duty.  The Lease does not require the lessee to ensure the Security Agreement remains in effect or to take any action to perfect the Hoffs' security interest.  The Hoffs have not identified any breach under the Lease relating to the Security Agreement that the Trustee must cure.

The Hoffs further argue that the Security Agreement is part of the Lease and therefore the Trustee must assume it.  The Trustee responds that the Security Agreement is not an executory contract subject to assumption.  Both parties seem to ignore the fact that the Mint is not a party to the contract.  MALP, not the Mint or Medallic, executed the Security Agreement.  Neither the Trustee nor the Hoffs proved the Mint or Medallic acquired MALP's assets, rights, and obligations by assignment, by merger, by virtue of MALP's dormant corporate status, or by any other means.  While MALP may be defunct, under Nevada law permanently revoked entities may be revived even after the passage of years.  N.R.S. 86.580; *AA Primo Builders, LLC v. Washington*, 126 Nev. 578, 587–88 (Nev. 2010).  Therefore, there is a possibility that MALP may still assert rights and title to various assets and may be still liable on obligations such as the Security Agreement.  The assumption (or rejection for that matter) of the Lease has no effect on the enforceability or validity of the Security Agreement that was executed by MALP.  The Trustee neither assumed the Security Agreement nor needs to assume it to avoid default because he has no interest in the Security Agreement.

The Hoffs also contend that assumption of the Lease automatically perfects their pre-petition lien.  Given the above reasoning of the Court, that result seems unlikely.  However, the Court does not need to determine either the legal effect of assumption on the Hoffs' lien or

whether the Hoffs have a perfected security interest. The only issue to determine is whether assumption requires the Trustee to take some act to cure a default, and the Court concludes no such requirement exists.

The Court also declines to require the Trustee to provide any security to the Hoffs as adequate assurance of future performance. If the Trustee rejects the Lease after he assumes it, the Hoffs will have an administrative expense claim for all liabilities that flow from the breach, including future rent. *In re Frontier Properties, Inc.*, 979 F.2d 1358, 1367 (9th Cir. 1992). Further, at this time the Court has no ability to order the Trustee to grant or perfect a security interest in the collateral described in the Security Agreement. The collateral consists of items that Mr. Hansen acquired from the Hoffs when they sold him the business in 2009. The parties have not provided any documents that show Mr. Hansen conveyed title to these assets to MALP, and this Court has never determined that Medallic or the Mint acquired any of MALP's assets. The Trustee cannot convey a security interest in property that may not be part of the estate.

### III.    CONCLUSION AND ORDER

For these reasons, it is hereby

ORDERED that the Trustee shall promptly cure the defaults under the Lease identified in Section II.E above.

IT IS FURTHER ORDERED that in the event of any dispute over the adequacy or promptness of a cure of any of these defaults, the Trustee or the Hoffs may seek further orders from the Court by filing and serving a motion on the other party in compliance with Local Bankruptcy Rule 9013-1. Notice need not be provided to any other interested party in the case.

///END OF ORDER///