Joshua Gibbons
or boxholder
PO Box 821
Westborough, MA 01581

April 5, 2018

The Honorable Christopher M. Alston
United States Bankruptcy Court
700 Stewart Street #6301
Seattle, WA 98101

**FILED**
Western District of Washington
at Seattle

APR - 9 2018

Re: 16-11767-CMA, Northwest Territorial Mint

MARK L. HATCHER, CLERK
OF THE BANKRUPTCY COURT

Dear Judge Alston,

**I am writing today to provide information and concerns** (mostly facts, with some allegations) that I feel that you (and all interested parties) should be aware of, that may not have made it to court records. I am not opposing or objecting to any motions.

I act as an advocate (in an unpaid, unofficial capacity) for those harmed by bullion bankruptcies and frauds. I provide information to creditors, and provide details about the bankruptcies (with over 150 posts about NWTM). My work is read by creditors, trustees, owners of debtors, investigators, attorneys, and others. I have spent over 1,000 hours investigating the NWTM case. I have spoken to or E-mailed many of the interested parties in this case. This is the first time in over 4 years of doing this that I have felt the need to write directly to a court. For the purpose of writing, I consider myself a creditor[1].

Many of the people who have important information about this case are afraid to speak out about wrongdoing in this case, due to express, implied, or imagined threats. I am attempting to act as their voice. Some of this is simply hearsay, but much can be verified by public documents. **I include the hearsay mainly because much of it cannot be proven or disproven without records that Mr. Calvert could have (and in one case, promised to) provide.**

One of the most common themes I have heard from many sources is that people believe that Mark Calvert and/or Paul Wagner intended to run NWTM into the ground (by firing key employees, keeping the "old guard", stymying bidders, hiding their actions and so forth).

Hopefully, it is just a matter of Mr. Calvert being very sloppy[2].

---

[1] I made a token $5 order the day before the bankruptcy filing solely for the purpose of becoming a creditor, and have not received the uncashed money order back.

[2] e.g. giving away silver to customers that didn't store silver, giving more silver to customers than they had stored, 'forgetting' offers, not responding to people, and the recent motion to destroy records before *2012* with the proposed order to destroy records before *2013*. Read further for more details.

**Mark Calvert's Connections with Ross Hansen**

As you know, Mark Calvert was chosen by the U.S. Trustee to be the Chapter 11 Trustee. Mr. Calvert was forthcoming that he *"met with representatives of the Debtor to discuss whether my firm, Cascade Capital Group, would be engaged to provide restructuring services to the Debtor. I met with the Debtor's principal Ross Hanson [sic]. After meeting with Mr. Hanson, my firm declined to undertake the engagement. Neither my firm nor I were paid any fees by the Debtor. Neither my firm nor I have any relationship with the Debtor or Mr. Hanson.[3]"*

However, the ties appear to go beyond that. I have been told that Mr. Calvert was involved with NWTM for about a month before the bankruptcy, and attended several manager's meetings, where he was introduced as a consultant. In the 341 meeting, Ross Hansen testified that before the bankruptcy filing, Mr. Calvert "instructed" Ross Hansen to take any asset and make the value "look as small as possible[4]." If true, that sounds like advice that goes well beyond what a firm would typically provide before being hired.

**Allegations of Attorney Obstruction**

As you know, the former co-chair of the Unsecured Creditors Committee (UCC) states[5] that he wrote to the UCC attorney, Mark Northrup, asking for the removal of Mark Calvert. The implication is that Mr. Northrup refused to comply with the ex-co-chair's instructions, and inappropriately shared the letter with the Trustee's attorney (Mr. Gearin), who then reportedly threatened the ex-co-chair. If true, this suggests collusion between the attorneys and obstruction of the UCC's wishes to remove the Trustee.

While Mr. Gearin and Mr. Northrup suggested in court that Ross Hansen was behind this[6], that should be irrelevant. I believe that even if Ross Hansen was behind the letter, the Trustee's attorney cannot be the one to decide if removal of the Trustee is appropriate.

**Medallic and Medalcraft**

In July, 2017, one of Medallic's top salespeople was let go, and took a job at Medalcraft[7]. Mark Calvert referred to this employee damningly in the August, 2017 Monthly Financial Report[8]: *"The former employee appears to be contacting customers of the estate and attempting to divert business to the*

---

[3] Docket 48-1
[4] 341 Creditors' Meeting transcript p12.
[5] Docket 1405. The letter was also mysteriously referenced in Docket 1230, leading to the letter being brought up at the October 6, 2017 hearing.
[6] At the October 6, 2017 hearing
[7] Per the salespersons' LinkedIn page
[8] Docket 1211, Exhibit 11, page 49. Mr. Calvert should be able to confirm the employee and company.

*competitor. The competitor's violation of its nonsolicitation agreement with the estate may adversely impact operational results and give rise to actionableeeds.ges [sic] claims.*" About 6 months later, Calvert managed to get the ex-employee to sign a declaration regarding die ownership[9], and Mr. Gearin offered to accept an old $700K offer from Medalcraft (who had already bid $910K, with another $1.25M bid on the table) if it would get the sale to go through.

It also seems that **Medalcraft has essentially taken over the Medallic business**. They started stealing Medallic customers at least as early as August, 2016[10], and have been taking orders for "a lot of [Medallic] customers"[11] recently. Mr. Moran even suggested that he has more knowledge of Medallic business than Mr. Gearin or Mr. Calvert[12]. Although NWTM is shut down, the Medallic website is up and running, along with their phone number. How is Medallic getting a lot of Medallic customers? What are Medallic employees telling callers?

I have heard a credible report that some dies have been shipped from NWTM's location in Dayton to Medalcraft, in anticipation of the sale.

### Trustee Stymying non-Medalcraft Offers

Mr. May has alleged that his partner, Mr. Holabird, attempted to contact Mr. Calvert in 2017, but Mr. Calvert never responded[13].

One company made an offer (with a deposit) for historic dies and the Medallic name, in February, 2018. The company expressed concern to Mr. Calvert about dies, after finding out that the NWTM sale included the shelving of dies: "*I would like to make sure both the shelving is preserved for the historic dies, galvanos and plasters, and that these items are not disturbed, disorganized or damaged.*" to which Mr. Calvert responded "*Did not realize you wanted the shelving... Some buyer [sic] already have the shelving and do not want it... Sorry I did not know your interest sooner...*" **The same company states that Mr. Calvert doesn't reply to E-mails or phone messages.**

Further, the company that made the offer for the historic dies also was looking at purchasing the Medallic name. Yet Mr. Calvert is including the Medallic name as part of the "Medallic assets" auction. If Mr. Calvert is going to "slice and dice" the assets, he needs to pay attention to make sure that he does not either sell the same asset twice or cause an offer to be taken off the table because Mr. Calvert accidentally sold key assets to the offer. The Medallic name is not a trivial asset; this is sloppy work.

---

[9] Docket 1458
[10] Docket 1211, as referenced above, although Medalcraft was not mentioned by name.
[11] Per Medalcraft owner and CEO Jerry Moran, at the March 16, 2018 hearing
[12] At the March 16, 2018 hearing, Mr. Moran offered to share information on the Medallic business and how it is operating.
[13] Docket 1533 p40, and the March 16, 2018 hearing

In another case, I am aware of a party that was interested in purchasing the Medallic dies, that approached Mr. Calvert -- only to get a copy of the Industrial Assets APA. That party also claims that Mr. Calvert did not return phone calls.

### Trustee Bid Communication (Stymying, Part II)

Mr. Calvert has shown a pattern of sharing bidding information in odd ways. For example, in the Medallic asset sale, after the auction, Mr. May presented what Mr. Calvert stated was an "unsolicited offer" for $900K at a point where Mr. Gearin said that the bidding was closed[14]. Despite considering the offer unsolicited at a point where bids would not be accepted, Mr. Calvert relayed this information to Mr. Moran on a phone call to tell Mr. Moran that his $810K bid won... and somehow after hearing that his $810K bid won, Mr. Moran offered to pay $910K if it would make a difference[15]. This just boggles the mind.

Similarly, the company that made an offer for the historic dies and the Medallic name presented a $400K offer, and the Trustee accepted a deposit. Somehow, the Trustee now believes that NWTM will receive $420K from someone else for those dies[16]. It sounds like Mr. Calvert shared the original $400K offer (without the bidder's knowledge), and then accepted a new slightly higher offer without informing the original bidder. And if he *did* accept a slightly higher bid, shouldn't he [1] ask the original bidder for a higher offer, and/or [2] return the deposit?

### Paul Wagner Started Sierra Mint

Paul Wagner, who was hired by NWTM in December, 2012, was the Chief Information Officer (CIO) of NWTM. He has a Computer Science degree, and spent his career prior to NWTM in information systems[17]. His office was right next to Ross Hansen, and at $170,000/year, he was the highest paid employee of NWTM at the time of the bankruptcy filing[18]. Shortly after the bankruptcy filing, Mr. Calvert promoted him from CIO to President[19]. He was also fired by Mr. Atalla, and then subsequently re-hired by Mark Calvert.

I have heard that before the bankruptcy filing Paul Wagner was also in charge of NWTM's Chinese business (where NWTM would provide artwork to a Chinese company that would create the dies and medals, which reportedly accounted for about 30% of NWTM's business). I have heard from multiple

---

[14] Mr. Gearin said this at the March 16, 2018 hearing
[15] Per Mr. Gearin at the March 16, 2018 hearing
[16] Exhibit A to docket 1519 has an accounting category "Sale of Older Dies NY Numismatic Assoc" [sic]
[17] Per his CV.
[18] Docket 15-1.
[19] He did declare that he was CIO as recently as February 7, 2018 per Docket 1428, but on June 28, 2016 he declared in Docket 464 that he was the President of NWTM.

sources that he had a business plan where he would "take over" the Chinese business.

Mr. Wagner knew several NWTM employees well enough to know that Ross Hansen had tried to contact him[20]. One such employee spent the past decade at NWTM, but prior to that worked at Medalcraft for 24 years. Another reportedly started working with Medalcraft at some point after the bankruptcy.

I also understand that Mr. Wagner has frequent conversations with Jerry Moran (President/Owner of Medalcraft), and has discussed his progress with Sierra Mint with Mr. Moran.

I have also heard that Mr. Wagner has taken at least 2 NWTM employees with him to Sierra Mint, and has been recruiting more.

Mr. Wagner was retained to be on the "skeleton staff" at NWTM, and was believed to have been aware well before the bankruptcy filing that NWTM was using customer metal and money[21]. However, **Mr. Wagner started his own mint on about February 13, 2018**[22] (with planning apparently going back at least to January 16, 2018[23]), **while still on the NWTM payroll**[24]. **Mr. Wagner authorized Greg Fullington to file the corporate Sierra Mint documents**[25]. **Mr. Fullington was corporate counsel for NWTM from 2013-2017. Mr. Fullington was aware in 2014 that NWTM was violating the 2008 Consent Decree**[26]. He was also aware that NWTM was in serious debt, and that taxes were not being filed[27].

Chinese Business

Next comes the Chinese business. I have seen nearly no references in court documents to the Chinese business, despite about 30% of NWTM product being made in China, and 10,000s of dies located there[28]. NWTM had Yong Tuo Emblem Co and Kunshan Top Tree Decoration Co create dies and medals for them. I have been told by employees that this is a high profit business, with

---

[20] Docket 570-4 p16

[21] I understand that Mr. Calvert has information that can confirm this, but I do not feel comfortable including the details in this letter.

[22] The "Certificate of Formation" of Sierra Mint, LLC, from the Washington Secretary of State, lists Paul Wagner as the Executor, with Paul Wagner also listed as the Registered Agent, and states "Effective Date: 02/13/2018"..

[23] The domain name sierramint.com was registered on January 16, 2018

[24] He signed docket 1459 on February 16, 2018

[25] See "Certificate of Formation"

[26] Mr. Fullington responded to Washington State Attorney General complaint #450935, who claimed he received the 30-day notice on July 3, 2014, meaning that NWTM was required to ship the order by August 2, 2014, or provide an immediate refund. Mr. Fullington stated to the Attorney General that as of August 4, 2014, NWTM had not shipped the order.

[27] Mr. Fullington claims that he was the Acting CFO of NWTM from September 2014 through June 2015, per his LinkedIn page. He was also in charge of the legal department, which Ross Hansen stated at the 341 meeting was responsible for storage and lease agreements. He does not, however, appear in Schedule B13.26a (Docket 227).

[28] Ross Hansen stated "About 30% of our product is in made in China" at the 341 Creditors' Meeting, and claimed that there were $2M-$4M worth of dies there.

little overhead. I noted above that Mr. Wagner has expressed interest in silently taking over this business. There is also an NWTM employee who has sent E-mails to NWTM customers saying that she can take orders for them with the original artwork, which appears to be related to the Chinese business.

It should also be noted that the recently filed budget[29] does not hint at the Chinese operations.

### Lost/Stolen Items

Then there are the allegations that items belonging to NWTM have disappeared from the company. For example, there are rumors circulating that historic dies were taken from the mint by an employee (but then later returned after it was discovered that they were missing). There are also concerns that valuable CAM (Computer Aided Manufacturing) computers at the Kent location (used for art) that were supposed to have been moved to the Dayton location never got there, and may have been stolen by an NWTM employee.

### Inventorying of the Dies and Related Items

The problem with the die and related inventory is that while Ross Hansen claimed that the Chinese dies alone had a value of $2M-$4M[30], and Mr. Calvert has admitted that there are at least 400,000 dies[31], and they appear to have a scrap value of at least $700,000[32], *the dies do not appear to be listed in any inventory*[33].

Worse, when it came time to sell the NWTM and Medallic assets, the only mention of dies was *"Medallic Company owned Dies, Trim Tools and Associated Racks associated with any customer for which there has been a sale within the past twenty years."* There is no mention of the number of dies, so interested parties cannot ascertain whether there is a problem (e.g. if Medallic is getting all 400,000+ dies), nor is there any mention of the weight of the dies (to determine the scrap value). A problem is very likely, given the purported separation of Medallic and NWTM.

Mr. Calvert has stated that there are over 400,000 dies, but there is no breakdown of the dies, such as the sources of the dies (Medallic, NWTM,

---

[29] Docket 1519
[30] 341 Creditors' Meeting
[31] Docket 1494 p3
[32] Assuming 40,000 Medallic dies at 20 pounds of tool steel each, with tool steel at $.20/lb is $160,000. 20,000 die shells and galvanos at 12 pounds of 90% copper each at $2.50/lb is $540,000. That does not include the value of lead mixed with the copper, or the 100,000s of small dies.
[33] The inventory was listed in bankruptcy Schedule A Part 5. Searching the inventory for "die" shows *what* dies were used for many medals (a total of less than 1,000 dies), but it appears to be the medals listed in the inventory, not those less than 1,000 dies. There is no large group of dies listed.

China, Balfour, other), or the type of dies (e.g. heavy dies versus light dies, which is important for determining scrap value). I am not aware of him mentioning whether any dies were sold in the Tomball sale (the APA states that the sale included dies related to the Graco business[34], but no dies are listed in the attached Schedule).

### No Inventorying of Medallic Assets

As you are aware, Medallic Art Company, LLC was consolidated with NWTM. However, the question about the assets remains. Mr. Calvert filed an inventory in the bankruptcy schedules, but it appears that inventory was based on information supplied by NWTM (effectively Ross Hansen), not an inventory conducted by Mr. Calvert (who appears to have limited his inventory process to bullion). If Medallic assets had been separated from NWTM assets prior to the bankruptcy, the schedules may only show assets that Ross Hansen believed to be NWTM assets. This is not a trivial issue, since the inventory Mr. Calvert filed did not include the $100,000s worth of Medallic dies and related items.

### Lack of Communication with Creditors

Early on, Mr. Calvert told creditors *"My goal is to share as much information as possible.[35]"*

Despite his bold statement, however, Mr. Calvert has shared almost zero information with creditors. He initially set up a website existingbullionorders.com, but the only updates there are a handful of court documents (usually posted weeks or months after they are filed with the court). And much information doesn't even make it to court documents, and can only be obtained through audio of the hearings (by the way: *thank you* to whoever was responsible for getting new hearings on PACER; it is very helpful).

### Unsecured Creditors' Committee Attorney

The Unsecured Creditors' Committee naturally has an attorney, Mark Northrup. As of the latest fee application[36], he has billed $325,615 in fees and $3,229.25 in costs.

I cannot see much that the UCC's attorney has done that has benefitted creditors. Over $50,000 of that cost was for communicating with non-committee creditors, but that is something that could have been done by the Trustee on

---

[34] Docket 374-1
[35] 341 Creditors' Meeting transcript, p131
[36] Docket 1196

the website at very little cost. I'm not even sure how people are finding Mr. Northrup's contact information.

Further, the records show that the ex-Co-Chair of the UCC instructed Mr. Northrup to take certain actions that he did not (and accuses him of sharing information with Mr. Gearin)[37], and the records do not yet show any valid reason for Mr. Northrup not taking action. The ex-Co-Chair also claims that the UCC was "basically opposed" to the hiring of the CEO, yet Mr. Northrup wrote "the Committee has concluded that the engagement of Mr. Atalla is warranted"[38].

It is also important to remember that for every E-mail and phone call between Mr. Northrup and one of the other attorneys, the other attorney is billing time as well.

### Accounting Discrepancies - Storage Inventory

In his fee application[39], Mr. Calvert wrote *"I had an urgent need to conduct an inventory of the precious metals..."* and *"Cascade is well qualified to provide the services which are needed by this estate"* and then *"Cascade had the ability to immediately conduct a thorough detail [sic] inventory of precious metals and coins of the estate"* and *"Cascade has already provided valuable services ... [including] the thorough inventory of precious metals which has been done for the benefit of creditors."* What he failed to mention is that **his company completely botched the storage inventory**[40], and he never even provided the promised detailed storage inventory[41].

We see inventory to be returned to customers in Docket 458 Exhibit A, and Docket 709. Typically, any two documents of the same type produced by an accountant will be very similar. Two balance sheets, for example, will be formatted the same but have different categories and numbers.

However, Docket 458 has 6 columns: Owner, Location, Contents, Quantity, Gold Oz, and Silver Oz, and the document also was titled (company name, document name, date). Docket 709 just has 2 columns: Customer Name and Storage Inventory to Be Returned, the document is not titled, and lines were added to the sides of the table. Looking carefully, you'll also see that the **inventory was completely re-entered** (e.g. "Pan American Silver Rounds" in Docket 458 was entered as "Pan American silver rounds" in Docket 709, using

---

[37] Docket 1405
[38] Docket 888
[39] Docket 375
[40] I will show this below
[41] Promised in Docket 227 (Form 207 Part 11). He did provide a detailed inventory of *some* of the stored metal in Docket 458, but Mr. Calvert admitted in Docket 1142 (p2 lines 13-16) that Docket 458 excluded some metal identified as belonging to storage customers.

lowercase). In fixing the errors in Docket 458, they also reduced the amount of information. Why purposely reduce the amount of information?

It is clear that **Mr. Calvert's accounting firm had nearly no input or help from anyone familiar with bullion.** They weighed the metal using an Adam CBC 70a Bench Counting Scale[42], in avoirdupois ounces (bullion dealers refer to scales that measure in avoirdupois ounces as "bathroom scales"). **If NWTM sold a silver bar based on the number of ounces shown on that scale, they would almost certainly be committing fraud**[43]. In a few minutes, a simple Internet search would show this.

Further, when the accountants weighed the metals, **they included the packaging materials** (plastic bags, plastic flips, hard plastic cases, tubes, canvas bags, cardboard boxes). Therefore, the weights turn from the weight of the metal into weights that *might* approximate the weight of the metal. **Again, if NWTM sold a silver bar including the weight of the packaging, they would again almost certainly be committing fraud**[44].

The accountants also did not include the serial number of bars that had one[45]. This is critical, because **a serial number can prove who a bar belongs to** (that is the entire reason for having serial numbers on bullion bars), in a way that a sticky note or magic marker cannot. Ross Hansen could have easily swapped sticky notes or wrote a new name on a plastic bag, but there would be evidence if a serial number were altered -- and the customer would likely have the serial number.

Finally, the **storage inventory was fraught with accounting errors**[46]. Of the 29 customers identified in Docket 458, I found that **38% had major accounting errors**. As one example, both the Creditor List and Proof of Claim for one customer show she is owed 6,200oz of silver[47]. Yet Docket 458 shows NWTM has 6,008oz of her silver to return, while in Docket 625 an accountant says she found 6,500oz of silver marked for the customer. **NWTM attempted to send 6,500oz of silver to a customer owed 6,200oz of silver.** As another example, **an accountant added 1,106 plus 1 and came up with 1,299**[48].

*If you didn't read that last paragraph, please re-read it.* Mr. Calvert wasn't dealing with thousands of customers, where mistakes would necessarily creep in. There were just 30 customers with metal being returned. How hard can it be to limit yourself to perhaps just a few major errors?

---

[42] Scale name determined by comparing image of the actual scale used (e.g. Docket 629-15) with https://www.adamequipment.com/cbc-70a.

[43] Precious metals in the United States are normally sold in troy ounces (31.1 grams), never in avoirdupois ounces (28.3 grams). 1 troy ounce is about 9.7% heavier than 1 avoirdupois ounce. In other countries they are sold in grams. But precious metals are not sold anywhere in avoirdupois ounces or avoirdupois pounds.

[44] Common sense dictates that when buying precious metals, the weight you pay for is the precious metal content.

[45] e.g. Docket 629-19, showing 2 100g gold bars with serial numbers

[46] For a detailed list, I refer you to my 2 "Accounting Nightmare" posts at http://about.ag/NWTMint.htm.

[47] Schedule EF2.3 (Docket 224-1) line 3.48 ($96,100 divided by the $15.50/oz price the Trustee used is 6,200oz), Claim 1157 shows 6,200oz.

[48] Docket 629, paragraph 11.

In another example, Mr. Calvert identified stored metal as belonging to a specific customer, when it had the names of 2 other customers crossed out[49]. One of those customers (#3.124) is listed in the Creditor List as being owed $0.00. The most obvious explanation is that she got a refund or different silver back before the bankruptcy filing. This brings up the question: did NWTM have a habit of selling storage customers boxes of metal with someone else's name on them? **It looks like this may not be the silver the original customer stored.** Can someone just cross one name off and write the name of another customer to make it legally their property?

Worse, Mr. Calvert included in the list of metal identified to belonging to stored metal customers a customer who apparently never stored metal with NWTM[50]. Traditionally, since silver is fungible, leased metal is used by a mint to produce other products, and as a result, the mint owes an amount of metal (not the specific piece(s) of metal) to the lessor, and the lessor doesn't own any actual metal until metal is returned to them. That is much different than a storage arrangement, and likely would need separate court approval to return.

**General Accounting Irregularity**

I recently stumbled across an oddity in the accounting. Calvert appears to have done an inventory of brass and copper in February, 2017 showing $150,000 of such inventory[51]. In March, he shows a loss of $950K of brass/copper inventory[52]. According to those financial statements, NWTM lost $950K of brass/copper inventory the month after they did an inventory showing $150K of brass/copper inventory. If what I write doesn't seem to make sense, that is because the accounting does not make sense. It appears that Mr. Calvert treated metal return to storage customers the same as brass/copper inventory that wasn't included in the original bankruptcy schedules.

**Mr. Calvert and Mr. Wagner Ignoring E-mails and Phone Calls**

Mr. Calvert and Mr. Wagner have shown a habit of not returning E-mails and phone calls. **I am aware of at least 6 people who have complained to me that their E-mails and phone calls were not returned.** I'm not talking about a creditor asking where his metal is. This includes 3 bidders, 2 employees that

---

[49] Docket 629-12

[50] The customer who filed Claim #2281 had a silver lease, and did not claim to have any stored metal, yet Docket 458 shows 6,000oz to be returned to him. Docket 629 shows that the accountant actually found 7,000oz. The actual weight, per the images, was 6,714.9 troy ounces, yet another discrepancy.

[51] Docket 950 p19: "At the time of bankruptcy no physical inventory had been done for Copper and Brass. We now have a value and inventory and made the adjustment this month with a 25% reserve." The Income Statement shows a $150,001 entry in "Inventory Brass-Copper Adjustment".

[52] Docket 985 p25

NWTM had paid to use their property or had offered to buy it, and a customer who the court ordered Mr. Calvert to return dies to.

For example, Mr. May's attorney stated in an E-mail to Mr. Gearin that **"The Trustee refused to return communications** from Fred Holabird in 2017[53]" (regarding bidding on assets), and later reiterated that at a hearing[54]. Another bidder (who Mr. Calvert accepted a $100K deposit from) told me that **the Trustee "doesn't reply to E-mails or to phone messages."**

One ex-employee had domain names that he purchased prior to working at NWTM, and NWTM paid him to use them. He tried contacting Mr. Calvert via phone and E-mail, to see if he would continue the arrangement, and did not get a response (or payment). Later, the ex-employee received an offer for the domains (not from NWTM). Before accepting the offer, **he tried again contacting Mr. Calvert, again with no response.**

Similarly, another ex-employee had tens of thousands of dollars of photography equipment that he brought with him when he started working at NWTM. After the employee was laid off (shortly after the bankruptcy filing), Paul Wagner offered to buy the equipment back. The employee agreed, sent the invoice as instructed, and almost 2 years later has not received payment despite many attempts to collect the money. The equipment is part of the equipment that was recently sold as part of the NWTM assets, opening up the question of who the true legal owner of those assets was.

NWTM was ordered to return dies to a customer who owned them[55]. The customer contacted Mr. Calvert about 16 months later, as the dies had not been returned. Mr. Gearin acknowledged that Mr. Calvert forgot to return the dies, but as of a month later, they still had not been returned. The customer felt compelled to file a letter with the court 18 months later in an attempt to get the dies back[56].

Finally, Ross Hansen claims that the Trustee did not respond to what seems to have been a bona fide Asset Purchase Agreement submitted through his attorney[57]. Mr. Hansen certainly is disliked by many (including the Trustee), but **that is no reason to ignore a $1M offer**. The Trustee could simply respond that he is unwilling to accept an offer that Mr. Hansen would be involved in. That's just common courtesy. In a previous incident, Mr. Calvert reportedly instructed an employee not to respond promptly to Mr. Hansen[58], and Mr. Calvert reportedly did not respond when Mr. Hansen's counsel sent Mr. Calvert a demand letter.[59].

---

[53] Docket 1533 p40

[54] Hearing of March 16, 2018.

[55] Docket 728 contains the Order, allowing the return of the dies: "The Trustee may return the Coining Dies..."

[56] Docket 1494.

[57] Dockets 1359, 1360.

[58] Docket 285 paragraph 4

[59] Docket 285 paragraph 9

### Five Months go by with No Compliance With Court Order

On September 1, 2017 it was ordered that "the Trustee shall promptly cure the defaults under the Lease identified in Section II.E above.[60]" However, on February 20, 2018, the Hoffs stated that their visit to the building "*evinced no progress in any repairs or other compliance with the Court's September 1, 2017 Cure Order, Dkt. 1185*[61]"

### Price Gouging when Returning Dies

On September 21, 2016, the court ordered that "*To the extent that the Trustee determines that there are additional coining dies that are not owned by the Debtor, the Trustee may, without further order of the Court, return them...*[62]"

However, Mr. Calvert appears to be charging $250-350 per die for research/shipping fees[63]. From what employees have told me, it shouldn't take more than a few minutes to find dies for customers. Some of the dies are quite heavy, but should have a shipping cost of no more than about $50. Given the variety of weights of the die, a fair price would involve actual shipping costs plus a small fee for research/packaging. Even if it took a full hour of time to research and package a die, that's less than about another $30.

### Medallic APA "Arms Length"?

I have information that strongly suggests that NWTM and Medalcraft have a tighter bond than one would expect given an "arms length negotiation[64]" for a transaction that may well not go through (as Medalcraft does not have the highest offer[65]).

The information I have suggests that sensitive[66] information is flowing both ways between NWTM and Mr. Moran. I believe that Mr. Moran has details about Sierra Mint, the mint that Paul Wagner has formed, and that Mr. Moran has provided at least a minor level of information to assist Mr. Wagner. If this is true, it would strongly suggest collusion (they should be competitors).

---

[60] Docket 1185 p23
[61] Docket 1465 p3
[62] Docket 728
[63] Docket 1494 p3 shows an E-mail from Mr. Calvert quoting $250-$350 per die, and docket 1500 shows a fee of $300 per die (also transferring any rights NWTM/Medallic might have in the dies).
[64] Mr. Calvert said that the APA was "the result of arms-length negotiations between the Trustee and Medalcraft" in Docket 1457, and Mr. Moran declared that the negotiations "were free from any fraud, collusion or bad faith."
[65] As I update this, Mr. Calvert has requested that a new $1M APA from Medalcraft be approved.
[66] Not necessarily confidential, but information that certain parties would prefer not become public.

Further, where it is abundantly clear that the Trustee is providing minimal information to other bidders[67], it appears that **the Trustee is not treating Medalcraft the same way.** Just because Medalcraft provided the stalking horse bid should not give them any special privileges regarding access to information.

The new "Medalcraft APA[68]" shows that after the craziness with the original auction and subsequent unofficial bidding, Mr. Moran is willing to pay $1M for the Medalcraft assets. They say not to look a gift horse in the mouth, but why the extra $190K over the highest he was willing to pay at auction[69]? **If Mr. May is not considered qualified to take over the Medallic business, why should Mr. Moran raise his bid? And if Mr. May is qualified, why not go with his $1.25M offer?**

Finally, why is it that Mr. Gearin and the Trustee are asking about Mr. May's management team, when Mr. Gearin does even not know who is on Medalcraft's management team (and refers to Mr. Wagner, not Mr. Calvert, as the person who does know)[70]? Given the claims that the Medalcraft APA was an arms-length transaction between the Trustee and Medalcraft, why is it Mr. Wagner who is aware of the Medalcraft team -- yet not Mr. Wagner who is looking into Mr. May's management team? This further suggests people are acting as if this deal has already been done, and shows how Medalcraft is being treated differently from other bidders.

Also see "Medallic and Medalcraft" above for further details about the connections between Medallic and Medalcraft.

### Medalcraft's New "Poison Pill" Strategy

In the new "Medalcraft APA"[71] the Trustee states that new Medalcraft APA should be consummated quickly, because the peak MACLLC business is in the spring, so he is concerned that "*the value to Medalcraft will decrease*" or that "*Medalcraft will lose interest in acquiring the dies[72]*".

Mr. Calvert backs this up by saying that "*In fact, Medalcraft has informed me that unless a sale had been approved by the Court by close of business on May 4[73], they will walk away.*" This is very similar to "poison pill" strategies to prevent hostile takeovers. It seems that Mr. Moran is essentially telling the court "If you don't accept this offer, I will walk away."

---

[67] See the section of this letter "Mr. Calvert and Mr. Wagner Ignoring E-mails and Phone Calls" above.
[68] The $1M APA from Docket 1556, not to be confused with the now-renamed $700K "Initial Medalcraft APA."
[69] At the auction, Mr. Moran's highest bid was $810K, and when Mr. May bid $825K, Mr. Moran chose not to bid higher, presumably assuming he would (or could) lose the Medallic purchase without placing a bid over $825K.
[70] Per the March 16, 2018 hearing
[71] Docket 1556
[72] Docket 1556, p3
[73] The date of the hearing to approve the APA.

This strategy is odd, because **Mr. Moran has already lost the business he claims is preventing him from considering buying after May 4**. Mr. Moran had previously stated that 75% of the Medallic business is done between February 1 and May 1[74]. Why is Medalcraft rushing to close *after* the peak business season is over? This doesn't pass the "sniff test".

## Unanswered Questions

The information we do have leaves a lot of unanswered questions.

Two of the big ones are [1] where the inventory of storage metals is, and [2] where the inventory of *all* the precious metals is (including non-storage metal). **Mr. Calvert promised the inventory of storage metals[75], so where is it?**. And unless every bar with a serial number was returned to a creditor (which seems impossible), Mr. Calvert would also need to release the entire bullion inventory to fulfill his promise (without the entire inventory, storage customers would have no way of knowing if their metal was accidentally listed as being owned by NWTM). **There are rumors that plenty of bullion was sold after the bankruptcy petition, but nothing in court documents seems to show how much (if any) was sold.**

We also need to know what assets are left. Since Calvert never really filed a list of key assets[76], we have no idea what may be left to sell... or if Calvert has already sold items that should have been separate. That's the whole point of having the assets in the bankruptcy schedules. Individuals in bankruptcy are clearly warned that if they forget to list assets, they need to immediately inform the court to avoid fraud.

Then there is the related question of the bullion. Mr. Calvert states that he immediately shut down the bullion operations[77]. **So what happened to the bullion NWTM had?** I do not recall seeing any court documents stating any amount of bullion NWTM inventoried aside from what was returned to storage customers.

Also, we need to know if Mr. Calvert is properly distinguishing between Medallic dies and NWTM dies. He has made it clear that the Medallic dies belong to NWTM (whereas several employees have stated to me that employees were told to tell customers that the NWTM dies were their property). The Medallic APA discusses "Medallic company owned dies," but **given that Mr.**

---

[74] In Docket 1556, he just states "the peak business season for MACLLC was traditionally in the spring", but Mr. Moran clarified at the March 16, 2018 hearing (Docket 1538, at 37:20) that 75% of the business was from February 1 to May 1.

[75] Mr. Calvert promised a "detailed storage inventory" in Docket 227, Form 207 Part 11.

[76] The bankruptcy schedules included an extensive inventory of items, but do not appear to include the full bullion inventory, NWTM's dies, Medallic's dies, dies in China, breakdown/valuation of IP (customer list, websites, etc.).

[77] e.g. Docket 1229 p8. By April 6, 2016, the NWTM website no longer offered bullion per archive.org.

**Calvert appears to have sold items twice**[78], we need to make sure he doesn't give away the NWTM dies by mistake.

Of course, this letter may bring up many more questions.

Sincerely,

Joshua Gibbons

---

[78] The Industrial Assets APA (Docket 1433-1) includes " Group of (70) sections of heavy duty adjustable shelf units w/(21) sections of die bins", and the new Medalcraft APA includes "racks" associated with the dies. If Industrial Assets gets the shelf units and bins, what is left for Medalcraft? Really, try figuring that one out. Mr. Calvert was informed that the shelving units were sold before the new Medalcraft APA was drafted.