UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>NORTHWEST TERRITORIAL MINT, LLC<br><br>Debtor | Case No. 16-11767-CMA<br>Chapter 11<br><br>**MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM** |

COMES NOW Bill Atalla, former CEO of the debtor, and moves the Court for an order allowing his claim for unpaid compensation and unreimbursed expenses with priority as a cost of administration, and directing the trustee forthwith to pay the claim in full. To the extent necessary for allowance of this claim, Atalla also requests that his employment by the estate after December 29, 2017 be approved *nunc pro tunc*. This motion is made pursuant to Bankruptcy Code §503(a) and is based on the following:

Atalla was hired by the trustee, Mark Calvert, to be the CEO of the debtor during the Chapter 11 case. Atalla's employment was approved by order dated February 7, 2017 (ECF #897). The terms of Atalla's employment and compensation are set forth in the employment agreement attached to the order for employment. A copy of the Employment Agreement is attached hereto as Exhibit A for the Court's convenience.

Atalla's claim is in the amount of $220,209, consisting of the following elements:

| | |
|---|---|
| Deferred salary | $12,500.00 |
| Vacation pay | $25,000.00 |
| Severance pay | $100,000.00 |
| Un-reimbursed expenses | $2,909.00 |

MOTION FOR ALLOWANCE AND
PAYMENT OF ADMINISTRATIVE
EXPENSE CLAIM - 1

**DONALD A BAILEY**
720 Olive Way, #1000
Seattle WA 98101
206 682 4802
donald.bailey@shaferbailey.com

| | | |
|---|---|---|
| Late payment fee for last paycheck | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $25,000.00 |
| Additional services rendered after 12/29/17 (at $400/hour): | | |
| Phone calls with prospective investors (49 hours) | . . . . . . . . . . . . . . . . . . . | $19,600.00 |
| Meetings, tours, proposals, travel (88 hours) | . . . . . . . . . . . . . . . . . . . . . . | $35,200.00 |
| TOTAL | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $220,209.00 |

In addition, Atalla is entitled to recover a reasonable attorney's fee for enforcement of the Employment Agreement, pursuant to section 20 of the Agreement. If this motion is unopposed, Atalla's attorney fee claim will be $3500.00. If it is opposed, Atalla seeks leave to amend this claim at the conclusion of the motion to include the actual attorney's fees incurred.

**Deferred salary, $12,500.00**: Atalla's salary was $300,000 per year, or $25,000 per month (Employment Agreement sec. 3.1). To alleviate the estate's cash flow issues, the trustee requested that Atalla defer 10% of this salary for six months. He agreed to the trustee's request. Six months of deferred salary is $12,500.

**Vacation pay, $25,000.00**: Atalla accrued 20 days of paid vacation on his first day of employment (Employment Agreement sec. 3.6). Atalla did not take any vacation during his tenure as CEO of the debtor. He did not have the chance to use any of his vacation pay prior to his termination. He is therefore entitled to one month's salary as vacation pay.

**Severance pay, $100,000.00**. Atalla earned $25,000 of severance pay per calendar quarter. Atalla was terminated on December 29, 2017, which was the last business day of the calendar quarter. In other words, Atalla worked the entire fourth quarter of 2017. The trustee's purported termination of Atalla on December 29 was simply a ruse to avoid paying an additional quarter of severance pay. The trustee's action in this regard was not in good faith. Atalla should be awarded severance for the fourth quarter of 2017,

MOTION FOR ALLOWANCE AND
PAYMENT OF ADMINISTRATIVE
EXPENSE CLAIM - 2

**DONALD A BAILEY**
720 Olive Way, #1000
Seattle WA 98101
206 682 4802
donald.bailey@shaferbailey.com

Case 16-11767-CMA    Doc 1609    Filed 04/20/18    Ent. 04/20/18 15:13:21    Pg. 2 of 20

as well as for the first three quarters of the year.

Moreover, Atalla was employed in the state of Nevada and section 19 of the Employment Agreement specifies a choice of Nevada law. Under Nev. Rev. Stat. 608.040, if an employee is terminated and their final paycheck is not paid within three days, the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit or was discharged until paid or for 30 days, whichever is less. Thus, by failing to pay Atalla within three days of his termination, the trustee in effect continued his employment past December 31, 2017, such that his severance pay for the fourth quarter of 2017 became fully vested.

Atalla's severance pay is not subject to the limitations of Bankruptcy Code §503(c), because he is not an insider "of the debtor", but rather a professional person employed pursuant to court order. His severance pay was specifically provided for in his employment agreement which was approved by the court.

**Un-reimbursed expenses, $2,909.00**: section 3.8 of the Employment Agreement provides that Atalla shall be reimbursed "for reasonable authorized business expenses incurred in connection with the performance of NWTM duties". Atalla has previously submitted to the trustee documentation of his expenses in compliance with the Employment Agreement.

**Late payment penalty for last paycheck, $25,000.00:** Pursuant to Nev. Rev. Stat. 608.020, whenever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately. Pursuant to Nev. Rev. Stat. 608.040, if the employee's compensation is not paid within three days of termination, such compensation continues until paid, or for 30

MOTION FOR ALLOWANCE AND
PAYMENT OF ADMINISTRATIVE
EXPENSE CLAIM - 3

**DONALD A BAILEY**
720 Olive Way, #1000
Seattle WA 98101
206 682 4802
donald.bailey@shaferbailey.com

days, whichever is less[1]. Thus, by failing to pay Atalla within three days of termination, the trustee obligated the estate to pay him an additional month's salary.

**Additional services rendered after 12/1/17 (at $400/hour): $54,800.00**: After terminating Atalla as part of the shut-down of the debtor's business, the trustee continued to employ his services. The trustee asked Atalla to help secure investors and buyers for the debtor's business. Atalla spent over 90% of the 137 hours for which he seeks compensation on the phone, in email, in preparing presentations, traveling, and in meetings with investors, all in an effort, specifically requested by the trustee, to secure an investor. Much of this travel and meeting time was actually accompanying the trustee. Atalla had the contacts and the operational knowledge that the trustee needed in his efforts to secure investors.

The remaining roughly 10% of this time was spent dealing with former employees and vendors who had been blindsided by the trustee's sudden shut-down of the business on December 29, 2017. As Atalla says, "You can't just walk away and not address the concerns of the 112 employees who just lost their jobs."

The hourly rate of $400 claimed by Atalla is the same rate charged by the trustee. The actual time spent and is detailed on a time log, attached hereto as Exhibit B.

Atalla's employment as CEO of the debtor was purportedly terminated on December 29, 2017. However, his employment by the estate pursuant to the order of February 7, 2017, was not terminated. He was still authorized to be employed, and

---

[1] See also Nev. Rev. Stat. 608.050, which provides: "Whenever an employer of labor shall discharge or lay off employees without first paying them the amount of any wages or salary then due them . . . . Each of the employees may charge and collect wages in the sum agreed upon in the contract of employment for each day the employer is in default, until the employee is paid in full, without rendering any service therefor; but the employee shall cease to draw such wages or salary 30 days after such default.

MOTION FOR ALLOWANCE AND
PAYMENT OF ADMINISTRATIVE
EXPENSE CLAIM - 4

**DONALD A BAILEY**
720 Olive Way, #1000
Seattle WA 98101
206 682 4802
donald.bailey@shaferbailey.com

could have, for instance, been rehired without further court order if an investor had materialized with funds to keep the business alive. In seeking Atalla's services after his purported termination, the trustee was continuing to employ him. The trustee certainly did not ask, and presumably did not expect, Atalla to volunteer his services.

This is not a case where a stranger to the case comes in seeking compensation for work that was not requested. It was up to the trustee to get Atalla's post-termination employment approved by the court. The consequences of his failure to fulfill that duty should not rest on Atalla. To the extent necessary for Atalla's post-termination compensation to be approved, his employment by the estate on an hourly basis should be approved *nunc pro tunc*.

Finally, Atalla requests that the court order payment of his claim, other than his claim for post-termination services, in full, immediately, without pro-ration with other administrative expenses. Had the trustee fulfilled his legal duty as an employer under Nevada law, Atalla would have been paid these sums by December 31, 2017. As a regular employee of NWTM (as opposed to a professional who had received interim compensation), his compensation would not have been subject to disgorgement in the event of subsequent administrative insolvency. *In re Home Loan Serv. Corp.*, 533 B.R. 302, 304-06 (Bankr. ND CA 2015). Atalla should not be placed in a worse situation, and the estate placed in a better situation, by virtue of the trustee having violated a legal duty.

Dated: April 20, 2018

        DONALD A BAILEY
        Attorney at Law

        /s/ Donald A Bailey
        WSB#12289
        Attorney for Atalla

MOTION FOR ALLOWANCE AND
PAYMENT OF ADMINISTRATIVE
EXPENSE CLAIM - 5

**DONALD A BAILEY**
720 Olive Way, #1000
Seattle WA 98101
206 682 4802
donald.bailey@shaferbailey.com

**Below is the Order of the Court.**

_____
**Christopher M. Alston**
**U.S. Bankruptcy Judge**
**(Dated as of Entered on Docket date above)**

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

In re:

NORTHWEST TERRITORIAL MINT, LLC,

Debtor.

Case No. 16-11767-CMA

**ORDER GRANTING MOTION TO APPROVE EMPLOYMENT OF CHIEF EXECUTIVE OFFICER**

This matter having come on for hearing on the motion (the "Motion") of Mark Calvert, the Chapter 11 Trustee (the "Trustee") to Approve Employment of Chief Executive Officer (the "Motion"), and the Court having considered the Motion, any responsive and reply materials, argument of counsel, and the pleadings and papers herein, NOW, THEREFORE, it is hereby ORDERED:

1. The Motion is Granted.

2. The Trustee is authorized to employ Mr. Bill Attala on the terms expressed in the Employee Agreement attached hereto as <u>Exhibit A.</u> The terms of the Trustee's Employment Agreement, including the Severance Payment, Incentive Payment, and Relocation Payment, as those terms are defined in the Motion, are approved.

///END OF ORDER///

ORDER GRANTING MOTION TO APPROVE
EMPLOYMENT OF CHIEF EXECUTIVE OFFICER - 1

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Presented by:

K&L GATES LLP

*/s/ Michael J. Gearin*
 Michael J. Gearin, WSBA #20982
 David C. Neu, WSBA #33143
 Brian T. Peterson, WSBA #42088
Attorneys for Mark Calvert, Chapter 11 Trustee

Agreed as to Form
Notice of Presentation Waived
MILLER NASH GRAHAM & DUNN LLP

*/s/ Mark D. Northrup*
 Mark D. Northrup, WSBA #16947
 Geoffrey Groshong, WSBA #6124
Attorneys for the Official Unsecured Creditors' Committee

ORDER GRANTING MOTION TO APPROVE
EMPLOYMENT OF CHIEF EXECUTIVE OFFICER - 2

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 1809    Filed 02/20/18    Ent. 02/20/18 16:32:25    Pg. 2 of 20

# EXHIBIT A

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** ("**Agreement**") is made effective as of the ___ day of February 2017, by and between NWTM by and through Mark Calvert ("**Trustee**") in his capacity as Chapter 11 Trustee of Northwest Territorial Mint, LLC, a Washington limited liability company ("**NWTM**" or the "**Debtor**") in Case No. 16-11767, United States Bankruptcy Court for the Western District of Washington (the "**Bankruptcy Case**"), and Bill M. Atalla ("**Employee**"). Employee and the Trustee are referred to in this Agreement together as the "**Parties**" or individually as a "**Party**."

## RECITALS

A. The Trustee desires to hire Employee as Chief Executive Officer ("**CEO**") of NWTM, and Employee desires to accept such employment and agrees that such employment is of significant benefit to Employee; and

B. The Parties desire to set forth in writing their agreement regarding the terms of the employment relationship between NWTM and Employee.

## AGREEMENT

**NOW, THEREFORE**, as an express condition of Employee's employment and continued employment with NWTM and in consideration of the covenants hereinafter set forth, including Employee's employment with NWTM, the compensation and benefits now and hereafter paid to Employee by NWTM, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

1. **Employment**. Employee agrees to be employed by NWTM. Employee will report to the Trustee until confirmation of NWTM's chapter 11 plan of reorganization in the Bankruptcy Case (the "**Plan**"). Thereafter, Employee will, unless otherwise specified in NWTM's confirmed Plan, report to the reorganized Debtor's board of directors (the "**Board**"). Without qualifying the ultimate authority of the Trustee or the Board as applicable, Employee will have the power to make such personnel decisions as are necessary to maximize the labor efficiency and productivity of NWTM. Employee's duties as CEO include, but are not limited to the following: responsibility for the operations and management of NWTM, day-to-day management decisions, business development, overseeing employment-related issues, rebuilding the sales organization, redefining the sales pipeline and commission structure for NWTM, rebuilding the reputation with NWTM's customer base, helping NWTM achieve specific sales and profit milestones, maintaining and developing business with new and existing accounts, increasing the profitability of NWTM, and other responsibilities as the Trustee (or the Board as applicable) will assign Employee from time to time, including all directly and indirectly correlated activities; provided, however, that Employee will report to the Trustee (or the Board as applicable), and is required to obtain the approval of the Trustee (or the Board as applicable) on all major business decisions. Major decisions may also require court approval from the bankruptcy court. Employee will devote Employee's full time and attention to achieving NWTM's purposes and discharging Employee's responsibilities. Employee will not directly or indirectly engage in outside consulting activities or outside work of any kind without the advance authorization of the Trustee (or the Board as applicable), and in no event will such direct or indirect outside activities interfere with Employee's duties and obligations as NWTM's CEO. Employee will comply with all NWTM rules, policies and procedures, as modified from time to time, including without limitation its personnel policies. Employee will perform Employee's responsibilities in a way that is in compliance with all applicable laws.

**2. At-Will Employment**. Employee's employment with NWTM is "at will" and for no specific term, and NWTM may terminate the employment relationship at any time, with or without reason or advance notice. Any representations to the contrary, whether written, oral, or implied by any NWTM communication, conduct, policy or practice, are unauthorized and void unless contained in a formal written agreement signed by Employee and approved or authorized by the Board or the Trustee.]

**3. Compensation and Benefits**. Employee will receive the following compensation and benefits during Employee's employment with NWTM under this Agreement effective retroactively to January 1, 2017.

**3.1 Base Salary**. Employee will receive an initial base salary at a gross rate of Three Hundred Thousand Dollars (U.S.) ($300,000) per year ("**Base Salary**"), with the actual amount paid to be prorated for the actual period of employment and payable in equal installments in accordance with normal payroll practices, and subject to appropriate deductions and withholding. Employee's position is exempt, and not subject to federal or state minimum wage or overtime laws.

**3.2 Bonus Compensation.** Employee will be entitled to receive a maximum of $150,000 in bonus compensation per year, according to the terms and conditions set forth in subsections (a) and (b) below. For fiscal year 2019, Employee will be eligible for the bonus compensation described below only if a replacement for Employee as CEO is located. Bonus compensation is earned and vests annually on January 1, 2018, January 1, 2019 and January 1, 2020 for fiscal years 2017, 2018 and 2019 respectively.

    (a) NWTM will pay Employee a bonus for each fiscal year beginning on January 1, 2017 and through December 31, 2019, in the amount of $125,000 in the event that the following conditions are both met for each applicable fiscal year:

        (i) NWTM must achieve the following annual increases in "**Gross Profit from Sales**,"[1]: $1,096,000 increase in Gross Profit from Sales for fiscal year 2017, $1,286,000 increase in Gross Profit from Sales for fiscal year 2018, and $1,491,000 increase in Gross Profit from Sales for fiscal year 2019; and

        (ii) NWTM must achieve gross profit margins of at least 42% in fiscal year 2017, 44% in fiscal year 2018, and 46% in fiscal year 2019.

    (b) NWTM will pay Employee a bonus of $25,000 per year in the event that NWTM has annual operating expenses of $5 million or less for the previous fiscal year.

**3.3 Profit Sharing.** In addition to the bonus compensation described in paragraph 3.2 above, Employee is entitled to a profit sharing incentive right equal to 5% of the net income of NWTM before bonuses to employees other than Employee and excluding depreciation ("**Net**

---

[1] Gross Profit from Sales is defined as gross income from sales, less costs of goods sold, less sales commissions, and measured from a base line Gross Profit from Sales of $5.25 million at fiscal year end 2016.

Case 16-11767-CMA    Doc 1807    Filed 04/20/18    Ent. 04/20/18 15:13:25    Pg. 13 of 21

**Distributable Income**").[2] The profit sharing incentive payment will be payable from the sale proceeds of NWTM in connection with any sale of NWTM on or before 2022. Employee will be entitled to a 5% profit sharing payment based upon NWTM's generation of Net Distributable Income of at least $7.5 million in total for calendar years 2017 through 2019. If NWTM achieves at least $5 million in Net Distributable Income (but less than $7.5 million), the profit sharing right shall be adjusted downward to 2.5% of Net Distributable Income. In addition to the profit sharing incentive payment, Employee will be entitled to a share of the sales proceeds of NWTM in connection with any sale of NWTM on or before 2022 in the amount of 5% (unless reduced to 2.5% as described above) of the net sales proceeds received by NWTM as a result of the closing of such sale. NWTM has already identified and may identify additional possible merger or acquisition targets. If such a merger or acquisition transaction is completed during the course of Employee's employment, this profit sharing bonus calculation may need to be adjusted and the adjustment will need to be mutually agreed upon based upon the impact of such transaction.

    **3.4**  **Relocation Expenses**. NWTM agrees to pay Employee reasonable relocation expenses incurred by Employee in connection with his relocation to NWTM's offices in Dayton, Nevada. In no event shall the amount of relocation expenses paid by NWTM to Employee exceed $50,000.

    **3.5**  **Severance**. In the event that NWTM terminates Employee's employment prior to December 31, 2019, for any reason, Employee shall not be entitled to any bonus compensation for the fiscal year in which his employment is terminated or subsequent years or profit sharing as described in Paragraphs 3.2 and 3.3 of this Agreement; provided, however, that upon termination of Employee's employment prior to December 31, 2019 without Cause, as defined below, Employee will be entitled to a severance payment in the maximum amount of $100,000 which will vest over time, according to the following schedule: $25,000 on March 31, 2017; $50,000 on June 30, 2017; $75,000 on September 30, 2017, and $100,000 on December 31, 2017. In the event that Employee is terminated for "Cause," as defined in this Agreement, Employee will not be entitled to the Severance payment described herein.

    **3.6**  **Vacation.** During Employee's employment with NWTM under this Agreement, Employee will be awarded twenty (20) days of fully paid vacation time per year each January 1 for use during that calendar year. For Employee's first year of employment in 2017, Employee will receive such paid vacation time on Employee's first day of employment.

    **3.7**  **Benefits**. Employee will be eligible to participate in employee benefit programs and policies of NWTM on a basis commensurate with Employee's position, subject to the eligibility requirements of any such programs and policies, provided that nothing herein requires the adoption or maintenance of any such program or policy by NWTM and NWTM may modify or eliminate benefit programs and policies at its sole discretion.

    **3.8**  **Expenses**. NWTM will reimburse Employee for reasonable authorized business expenses incurred in connection with the performance of NWTM duties. Reimbursement for expenses is conditioned upon Employee's submission of appropriate receipts and vouchers indicating the specific business purpose for each such expenditure. In all cases, business expenses and receipts and other documentation for expense reimbursement must be in accordance with NWTM's policies and practices, and NWTM may implement and/or modify such policies from time to time at its sole discretion.

---

[2] Net Distributable Income is intended to be an approximation of revenues available for distribution to creditors of NWTM's bankruptcy estate and shall be calculated based upon NWTM's total income less total expenses without depreciation. Bonuses to Employee shall be included in total expenses for purposes of calculating Net Distributable Income, but bonuses to employees other than Employee pursuant to a plan of reorganization or as approved by the Board shall not be so included.

Page 3 of 10

Case 16-11767-CMA   Doc 1891   Filed 04/20/18   Ent. 04/20/18 15:13:25   Pg. 14 of 20

4. **Termination**.

    4.1 **For Cause**. NWTM may terminate Employee's employment under this Agreement for Cause without advance notice, effective immediately upon notice of termination. "**Cause**" as used herein means that Employee has: (i) willfully engaged in conduct constituting dishonesty, disloyalty, fraud, or theft; (ii) willfully or repeatedly failed to carry out the reasonable directions of the Trustee and/or the Board of NWTM (iii) engaged in conduct in clear violation of material policies of NWTM; (iv) been convicted of, or pled *nolo contendere* to, a felony or any other act of moral turpitude; (v) materially breached the terms of this Agreement; (vi) materially failed to perform and carry out Employee's duties and responsibilities including the failure to procure new business; (vii) failed to perform his duties in a satisfactory manner; (viii) breached his duty of loyalty, including by diverting or usurping corporate opportunities belonging to NWTM; or (ix) used illegal drugs or alcohol at the workplace in violation of NWTM policy. Upon termination of Employee's employment for Cause, all compensation described herein will cease as of the termination date, and Employee will have no rights to any other compensation, severance, or payments, other than salary and bonus compensation earned on or prior to the termination date according to Paragraph 3 of this Agreement.

    4.2 **Without Cause**. NWTM may terminate Employee's employment under this Agreement without Cause immediately upon notice. Upon termination by NWTM without Cause, Employee will not be entitled to any further compensation, payments or severance, except that Employee shall be entitled to any salary earned on or prior to the termination date, any bonus compensation earned prior to the termination date according to Paragraph 3 of this Agreement, and severance vested pursuant to Paragraph 3.5 of this Agreement.

    4.3 **Death or Disability**. Employee's employment under this Agreement will terminate automatically upon the death or Total Disability of Employee. The term "**Total Disability**" as used herein means Employee's inability (with or without such accommodation as may be required by laws protecting persons with disabilities and that places no undue burden on NWTM) as determined in good faith by the Trustee or Board, to perform Employee's duties hereunder for a period or periods aggregating ninety (90) calendar days in any twelve (12) month period as a result of physical or mental illness. Employee and NWTM acknowledge that Employee's ability to perform the duties contemplated by Paragraph 1 herein is of the essence of this Agreement. Upon termination as a result of the Employee's death or Total Disability, all compensation described herein will cease as of the termination date, and Employee will have no rights to any other compensation or payments, other than salary and bonus compensation earned on or prior to the termination date pursuant to Paragraph 3 of this Agreement.

    4.4 **Voluntary Resignation.** Employee may voluntarily resign his employment with NWTM under this Agreement immediately upon notice. With respect to voluntary resignation, all compensation described herein will cease as of the termination date, and Employee will have no rights to any other compensation or payments including severance, other than salary earned on or prior to the resignation date, and any previously vested bonus compensation earned by Employee pursuant to Paragraph 3 of this Agreement.

    5. **Non-Disclosure**. During the course of Employee's employment with NWTM, Employee may receive confidential and proprietary information of NWTM, including but not limited to information regarding business plans, marketing and sales data and plans, pricing information, supplier information, customer and prospect lists and information, designs, equipment, equipment data, operational data, personnel information, trade secrets, and forecasts (collectively, "**Confidential Information**"). Unless otherwise directed by the Trustee or by order entered in the Bankruptcy Case, at all times during Employee's employment with NWTM and thereafter, Employee will not disclose to anyone outside of

NWTM, nor use for any purpose other than Employee's work for NWTM, such Confidential Information. The foregoing obligations supplement any additional obligations available under applicable law. Employee acknowledges that he has received notice of the immunity from liability to which he is entitled for the disclosure of confidential information or a trade secret to the government or in a court filing as provided by Federal law, as set forth in **Exhibit A**.

      **6.**    **Third Party Information**. NWTM has received and will receive confidential or proprietary information from clients, customers, suppliers and other third parties subject to a duty on NWTM's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee will not use or disclose such confidential or proprietary information except as necessary in carrying out Employee's work for NWTM and consistent with NWTM's agreement with such clients, customers, suppliers and/or other third parties.

      **7.**    **Prior Employer Information**.  During Employee's employment with NWTM, Employee will not use improperly or disclose any confidential or proprietary information or trade secrets of Employee's former or current employers, principals, partners, co-venturers, clients, customers, or suppliers, and Employee will not bring onto the premises of NWTM any unpublished document or any property belonging to any such person or entities unless such persons or entities have given their consent. Employee will not violate any non-disclosure or proprietary rights agreement Employee may have signed in connection with any such person or entity.

      **8.**    **Intellectual Property.**

      **8.1**    **Copyrights.** All copyrightable works prepared by Employee within the scope of employment are works made for hire.  NWTM owns all rights under copyright in and to such works, and NWTM shall be considered the author of such works.  If and to the extent that any such works are deemed not to constitute a work made for hire, and with respect to any other works that Employee has prepared or will prepare during working hours or using NWTM resources, Employee hereby irrevocably assigns to NWTM all right, title, and interest in and to such work. To the extent any of Employee's rights in such works, including any Moral Rights, are not capable of assignment under applicable law, Employee hereby irrevocably and unconditionally waives all enforcement of those rights to the maximum extent permitted under applicable law.

      **8.2**    **Inventions.** Employee will make prompt and full written disclosure to NWTM, and hereby irrevocably assigns exclusively to NWTM, all of Employee's rights, title, and interest in and to, any and all inventions, discoveries, designs, developments, concepts, techniques, procedures, algorithms, products, improvements, business plans, and trade secrets (collectively, "**Inventions**") that Employee solely or jointly conceives, develops, reduces to practice, or otherwise produces during Employee's employment.

      **8.3**    **Prior Inventions.** As to any Invention developed at any time prior to Employee's employment with Employer in which Employee has an interest, if Employee uses or incorporates such an Invention in any released or unreleased NWTM product, service, program, process, development, or work in progress, or if Employee has permitted or in the future permits NWTM so to use or incorporate such an Invention, or if such an Invention pertains to NWTM business, Employee irrevocably grants (to the extent Employee has authority to do so) a perpetual, royalty-free, fully paid up, worldwide license to exercise any and all rights with respect to such Invention, including without limitation the right to protect, make, have made, import, use, and sell that Invention without restriction and the right to sublicense those rights to others (with the right to grant further sublicenses).  This license will be exclusive, subject only to any preexisting non-exclusive licenses or other pre-existing rights not subject to Employee's control.

**8.5 Assistance.** Employee will execute all documents and take all other actions reasonably requested by NWTM in order to carry out and confirm the assignments contemplated by this Agreement, including without limitation applications for patents, registered designs, certificates of authorship, and other instruments or intellectual property protections appropriate to protect and enforce intellectual property rights throughout the world. If Employee fails to execute, acknowledge, verify, or deliver any such document reasonably requested by NWTM, Employee irrevocably appoints NWTM and its authorized principal, officers, members, managers, and agents as Employee's agent and attorney-in-fact to act in Employee's place to execute, acknowledge, verify, and deliver any such document on Employee's behalf. Employee's obligations under this Paragraph 8.5 apply during employment and at all times thereafter.

**9. Non-Competition**. During the course of Employee's employment with NWTM, and for a further period of one (1) year following any termination of such employment, whether voluntary or involuntary, Employee will not directly or indirectly perform any services in any way similar to the services he performs for NWTM, for any Competing Business that produces, markets or sells products or services in any state] where, at the time of Employee's termination, NWTM or any of its affiliates produces, markets or sells NWTM's products or services. "**Competing Business**" means any business engaged in or preparing to engage in the design, manufacture, or sale of precious metals, custom coins, medals, dies, ribbons, or any other product or service that is produced, marketed or sold by NWTM at the time of Employee's termination. Employee acknowledges that the covenants in this Paragraph 9 are reasonable in relation to Employee's position and the nature of NWTM's business, are necessary for the protection of NWTM's Confidential Information, trade secrets and customer relationships, and that compliance with such covenants after Employee's employment with NWTM ends will not prevent Employee from pursuing Employee's livelihood.

**10. Non-Solicitation of Employees**. During the course of Employee's employment with NWTM, and for a further period of one (1) year following any termination of such employment, whether voluntary or involuntary, Employee will not directly or indirectly (including through other entities or persons) solicit any employee or consultant who performed work for NWTM or its affiliates during the one (1) year period prior to termination of Employee's employment with NWTM to terminate their employment or engagement with NWTM, nor will Employee assist others in doing so.

**11. Non-Solicitation of Customers**. For a period of one (1) year following any termination of Employee's employment with NWTM, whether voluntary or involuntary, Employee will not, on behalf of any Competing Business, directly or indirectly (including through other entities or persons) call on or otherwise solicit, or accept business from any actual customer of NWTM or its affiliates or any active prospects of NWTM or its affiliates with which Employee had contact or about whom Employee had Confidential Information during the time that Employee worked for NWTM, nor will Employee assist others in doing so. Employee acknowledges that the covenants in this Paragraph 11 are reasonable in relation to Employee's position and the nature of NWTM's business, are necessary for the protection of NWTM's Confidential Information, trade secrets and customer relationships, and that compliance with such covenants after Employee's employment with NWTM ends will not prevent Employee from pursuing Employee's livelihood.

**12. Return Of Materials Upon Termination of Employment**. At the time Employee leaves the employ of NWTM or at any time upon NWTM's request, Employee will return to NWTM all NWTM documents, manuals, books, tapes, and any other material, whether on paper, in electronic form or in any other media. Employee will also return any keys, equipment, identification or credit cards, or other property belonging to NWTM.

**13.    Representation of Employee**.  Employee represents and warrants to NWTM that Employee is free to enter into this Agreement and that Employee has no commitment, arrangement or understanding to or with any party that restrains or is in conflict with Employee's performance of the covenants, services and duties provided for in this Agreement.

**14.    Assignability and Third Party Beneficiary**.  This Agreement is binding upon Employee, Employee's heirs, personal representatives and permitted assigns and inures to the benefit of NWTM, its successors and assigns.  During Employee's employment hereunder, this Agreement may not be assigned by Employee without the prior written consent of the Board.  This Agreement may be assigned by NWTM at any time, at its sole discretion.

**15.    Injunctive Relief**.  Employee acknowledges that the breach or threatened breach of Paragraphs 5-12 of this Agreement by Employee would cause irreparable injury to NWTM that could not be adequately compensated by money damages.  Accordingly, NWTM may obtain a restraining order and/or injunction, prohibiting Employee's breach or threatened breach of Paragraphs 5-12 of this Agreement, in addition to any other legal or equitable remedies that may be available to NWTM.  Such injunctive relief may be sought in any appropriate court with jurisdiction.

**16.    Severability**.  In the event that any provision of this Agreement or compliance by either of the Parties with any provision of this Agreement constitutes a violation of any law, or is deemed overbroad, unenforceable or void, then such provision shall be deemed modified to the extent necessary so that it is enforceable to the fullest extent permitted by law.  If such modification is not possible, said provision shall be severable from the remaining provisions of this Agreement, which will remain binding on the Parties.

**17.    Entire Agreement; Nonwaiver**.  This Agreement contains the entire agreement of the Parties as to the subjects addressed herein and, except as otherwise expressly provided herein, supersedes any prior or contemporaneous oral or written statements or understandings, whether express or implied, by or between the Parties.  This Agreement may be changed only by an agreement in writing signed by both Parties.  Failure of NWTM to insist upon strict adherence to any provision of this Agreement or to enforce any provision, on one or more occasions, will not be deemed to be a waiver of its right to enforce any provision in the future.

**18.    Compliance with Section 409A**.  The intent of the Parties is that all payments and benefits under this Agreement comply with Section 409A of the Internal Revenue Code of 1986, as amended ("**Section 409A**"), that this Agreement be interpreted to be in compliance with Section 409A, and that all payments and benefits under this Agreement not be subject to any tax or interest under Section 409A.  In the event any term or provision of the Agreement would be prohibited by or inconsistent with the requirements of Section 409A, or cause any payments or benefits to be subject to tax or interest under Section 409A, such term or provision will be deemed reformed and modified to the minimum extent reasonably appropriate to conform with Section 409A.  In no event will NWTM or any of its employees or representatives have any liability to Employee in the event that any payment or benefit provided under this Agreement becomes subject to tax or interest under Section 409A.

**19.    Governing Law/Jurisdiction**.  This Agreement will be governed by and construed in accordance with the laws of the State of Nevada, excluding its choice of law provisions.  Except as stated in Paragraph 15 of this Agreement, so long as the bankruptcy case for NWTM remains open, the Parties irrevocably and unconditionally agree to submit any legal action or proceeding relating to this Agreement to the United States Bankruptcy Court for the Western District of Washington and, in any such action or proceeding, consent to the jurisdiction of such court and waive all objections as to venue.  After closing of

the NWTM bankruptcy case, relief may be sought in any appropriate court with jurisdiction in the State of Nevada.

**20.** **Attorneys' Fees**. If any action or proceeding is commenced to construe or enforce this Agreement or the rights and duties of the Parties hereunder, the Party or third party beneficiary prevailing in such action will be entitled to recover from the other Party its reasonable attorney's fees and costs in that action or proceeding.

**21.** **Counterpart Signatures**. This Agreement may be executed in two executed counterparts, each of which will be deemed an original and will bind the signatory, but both of which together will constitute but one and the same instrument.

**22.** **Court Approval.** Notwithstanding anything herein to the contrary, the effectiveness of this Agreement shall be subject to, and contingent upon entry by the Bankruptcy Court for the Western District of Washington in the Bankruptcy Case, of an order approving the Trustee's employment on the terms set forth here.

*[Signature Page – Employment Agreement follows]*

**SIGNATURE PAGE – EMPLOYMENT AGREEMENT**

  **IN WITNESS WHEREOF**, the Parties have executed this Agreement, effective as of the date first set forth above.

**EMPLOYEE**               **MARK CALVERT, AS CHAPTER 11 TRUSTEE FOR NORTHWEST TERRITORIAL MINT, LLC**

_____   _____
Signature                  Signature

_____   _____
Bill Atalla                  Date

_____
Date

**Exhibit A**

**NOTICE OF IMMUNITY - DEFEND TRADE SECRETS ACT**

18 U.S.C. 1833(b) provides:

> (1) IMMUNITY.—An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—
>
> > (A) is made—
> >
> > > (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and
> > >
> > > (ii) solely for the purpose of reporting or investigating a suspected violation of law; or
> >
> > (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.
>
> (2) USE OF TRADE SECRET INFORMATION IN ANTI-RETALIATION LAWSUIT.—An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual—
>
> > (A) files any document containing the trade secret under seal; and
> >
> > (B) does not disclose the trade secret, except pursuant to court order.

EMAIL LOG: 12/29 - 2/10 POST TERMINATION EFFORTS

Exhibit B

1/19  1/21  1/22²  1/25⁴  1/26²  1/29  1/30⁵  1/30  1/30³  1/31  2/1⁷  2/2²  2/2³
2/2²  2/7  2/7  2/11⁸  2/13

12/29 - 1/19 ARE ON COMPANY EMAIL SERVER WHICH I DON'T HAVE ACCESS TO.

1/30  RE: INDUSTRIAL ASSETS (WHO BOUGHT EQUIPMENT) FACTORY TOUR, PROPOSAL
1/30  HERFF JONES INVESTOR PROSPECT - VISIT TO INDIANA
1/31  FRANK NOLAND  "  "  FACTORY TOUR, PROPOSAL ON 2
12/29 - 1/19  JOSEPH TOFOYA INVESTOR PROSPECT  LUNCH, TOUR, PROPOSAL

TEXT LOG:

1/12  2/2  12/30  1/2  1/7  1/9  1/10  1/12  1/13  1/17  1/19  1/21  1/29
2/1  2/2  2/2  2/2  2/3  2/3  2/4  2/4  2/5  2/7  2/7  2/8

EMPLOYEES, PROSPECTS, POSSIBLE BUSINESS OPPORTUNITIES
THERE WERE MORE BUT DELETED SOME FOR SPACE

PHONE LOG:

MARK CALVERT (MY PERSONAL PHONE) (TRUSTEE)
1/3  1/3  1/4  1/9  1/10  1/12  1/12  1/15  1/16  1/18  1/18  1/18
1/24  1/24  1/26  2/1  2/7  2/10  2/16  2/16                          5.5 hrs
INVESTOR & CO MATTERS

MARK KINDREE  1/13  1/18  1/25  1/29  1/31  (OUTSIDE FINANCE)
INVESTOR & PRO FORMA preparation                                       2.5 hrs

MATT LEE  2X DAILY (60 CALLS) (HR DIRECTOR)
EMPLOYEE ISSUES, INVESTORS, CO. ISSUES                                 15 hrs

Michael White  4X (PRODUCTION MANAGER)
INVESTORS, EQUIPMENT EVALUATION                                        1 hr

ANITA LAURENCE  1/2  1/9  1/12  1/15  1/19  1/24  2/2  (outside NNDA)
2/12  2/16  2/16
INVESTOR LEADS                                                         5 hrs

EMPLOYEES  IRINA (4)  CINDY (4)  ROGER (11)  CATHY (4)  DARLENE (6)
MARTY (4)  ERICA (2)  RANDY (5)  ASHLEY (2)  ALI (4)
RUSS (1)  STEVE (1)                                                    10.5 hrs

Phone Log Continued:

### VENDORS
PATRICK (2)   RYAN (1)   LYNN (NNOA)(3)   RYAN B (2)        2 hrs

### CUSTOMERS
DON STRUBE (8)                                              4 hrs

### INVESTORS
ROD JORGENSON (2)   ZACH HARRISON (3)
VINCE SCOTT (6)   NICK-INDUSTRIAL ASSETS (2)               3.5 hrs

                                                TOTAL   49 hours

### INVESTOR MEETINGS:

Joseph TOFOYA, FRANK NOLAND +3, Industrial Assets, HERFF JONES
FRAMING SUCCESS, VINCE SCOTT, GARY ANDERSON & ASSOC. BRADFORD
TRAVEL TO INDIANA, FACTORY TOURS, RENO MEETINGS ETC.

                                                TOTAL   88 hours

| | |
|---|---|
| Joseph TOFOYA | 13 hrs |
| Frank NOLAND | 14 hrs |
| Industrial Assets | 13 hrs |
| BRADFORD | 7 hrs |
| HERFF JONES | 29 hrs |
| VINCE, CARY, ANITA, ZACH, FERG, NNOA | 12 hrs |