Richard and Paula Pehl
813 Barnhart St.
Raymond, WA 98577

April 23, 2018

To:
The Honorable Judge Christopher Alston
Bankruptcy Court, Western District of Washington
700 Stewart St.
Seattle, Washington 98101

FILED
Western District of Washington
at Seattle

APR 26 2018

MARK L. HATCHER, CLERK
OF THE BANKRUPTCY COURT

Case # 16-11767-CMA (Northwest Territorial Mint)
**Response to Motion to Convert to Ch 7, Docket #1546,** hearing May 4, 2018

## STATEMENT

We, the undersigned, Richard H. Pehl and Paula Pehl, are creditors of NWTM/Medallic. We are also on the Unsecured Creditors' Committee. We wish to make some observations with respect to the issues and considerations involved in the conversion to Ch 7.

First, we ask the Court to have counsel(s) to the Trustee explain how this conversion is "in the best interests of the creditors." [Docket #1546, p. 1, line 24] We marvel at this statement, since thus far the unsecured creditor body has been used as a doormat. And since the trustee's attorneys have expended considerable legal energy and cost in discrediting the claims of the secured creditors, we are doubly confounded by this statement. The projected revenues from the disposal of assets presented to the Court are reported to be in the amount of about 3.3 million while the total obligation for professional fees runs over 5 million and counting, in addition to non-fee administrative claims that now must be over an additional million, at the very least, without considering any potential WARN Act liabilities. The math does not work for any "interest of the creditors." We ask for transparency.

We do plead, with reference to the May 4 hearing, that if a conversion to Ch 7 is procedurally required to terminate this bankruptcy, that it be done under a different trustee with powers to examine and assess Calvert's administration of the Ch 11. The documents submitted for the conversion do not specify anything about the choice of trustee, but we fear the potential for more outcomes not in the best interests of the creditors.

We have been advised that typically the Ch 7 trustee is different from the Ch 11 trustee. We ask that there be no deviation from this standard and that, moreover, the new trustee be given the powers and the charge to investigate and determine what has been going on. Already an exception was made for Mr. Calvert in allowing him to retain his own company, Cascade, as accountant/auditor. This accommodation was deleterious to the integrity of the estate both because there existed no inherent system of checks and balances and because of the lack of the requisite arms-length independence. The undersigned also question the competency of Cascade.

A second exception is not warranted. To the contrary, it is imperative that the Ch 7 trustee be disinterested. It is also necessary to prevent the loss of information. We are therefore completely opposed to the destruction of documents currently in progress. This may include destruction of proof of the creditors' rights to claims, the records of the process of die procurement and ownership, as well as destruction of evidence pertinent to any future investigation into the conduct of the present administration. We beg that the new trustee secure shipping records from third parties to examine what has shipped out of Kent and Dayton and the destinations of those shipments over the course of the last 5 months.

We fully and totally agree with the position taken by the USGA, Docket #1580, presented for the April 20 hearing in regards to the non-chronological sequence of events wherein the disposal and disposition of assets is taking place prior to Ch 7. Mr. Calvert seems to have assumed the right to dispose as he proposes ahead of the Ch 7 trustee, possibly to secure outcomes that he has committed to, which may not be known to the Court.

## BACKGROUND

The members of the Unsecured Creditors' Committee have a statutory right to investigate. The Bankruptcy Code, Ch 11, specifically states at 1103 (C)(2) that the Committee may investigate the acts, conduct,.... and financial condition of the debtor, the operation of the debtor's business ... and any other matter relevant to the case ...." This investigative authority has been upheld by the courts, as explained in one handbook for Committee members:

> An unsecured creditors' committee's investigatory role is twofold: the committee must investigate the financial condition of the debtor, including its assets and liabilities, as a prerequisite to negotiating a plan for distributing the debtor's assets, and the committee must investigate the management and operation of the debtor's business to ensure that the debtor's available assets will be responsibly handled during the course of the bankruptcy. *Id.* (stating that an unsecured creditors' committee may investigate the "assets, liabilities, and financial condition of the debtor" and

the "acts, conduct . . . and operation of the debtor's business"). An unsecured creditors' committee's fulfillment of both investigatory roles is essential if the committee is to live up to its responsibility to constituents and uphold the fiduciary duty it owes to those constituents. *See, e.g., Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262 (1941); *Bohack Corp. v. Gulf & W. Indus. Inc.*, 607 F.2d 258 (2d Cir. 1979); *Mirant Americas Energy Mktg. v. Official Comm. of Unsecured Creditors of Enron Corp.*, 51 Collier Bankr. Cas. 2d (MB) 903, *22 (2003).

[Ito, "The Role of Creditors' Committees in Chapter 11 Bankruptcies," p. 7]

It is this function that Mark Calvert and Mike Gearin have so aggressively sought to squelch. Unfortunately, at the same time, it seems to us that counsel to the Committee subordinated himself to Trustee's counsel. In retrospect, we feel that the Trustee has attempted to maneuver to be the only voice heard in Court and acted to block the statutory authority and charges of the Unsecured Creditors' Committee.

If the members of the Committee have an obligation to represent the interests of the creditors, it does not however follow that they have the obligation to personally hire a lawyer at $600/hr to bring about legal or investigative action. We submit that these matters are best handled by those in authority who have oversight over bankruptcies. We further submit that the administration of Mark Calvert as Ch 11 trustee may have been negligent, or erratic, at best; consequently, a different trustee is required to examine and conclude the business of the estate.

Bizarre events have occurred that require investigation and explanation. Some of these events raise doubts as to how and why the company crashed and how and why the company is being sold off in segments, with not all segments or actions reported to the Court. The suspicions and/or allegations voiced by the creditor body, by the employees, and even an independent blog site, make it necessary for there to be an objective and independent review of the issues by competent authority.

1. **Reporting and Accounting Deficiencies**

On October 6, 2017, Gearin and Calvert asserted before the Court that the Company had an "enterprise value of 14-15 million" and that the Company could be sold in 2018 for 17-18 million. Concurrently, the Trustee posted to the website a Status Report that was filed as Docket #1229. We will not comment on the narrative, which was subjected to extensive review by the Court at the Oct 6, 2017 hearing, but on the financial reports appended thereto.

This document does not meet professional standards. Exhibit 1 is marked "Draft". It is dated March 30, 2017 and contains material no longer relevant as of Oct 3, 2017 because it dwells on arguments for merging MAC into NWTM. Almost two years after the beginning of the bankruptcy estate, we stare at a text that cannot fill in the blanks on the assets and liabilities as of April 1, 2016. ("At the time of the bankruptcy filing [April 1, 2016], the Company held assets _____ and liabilities of _____.") Then there intervenes an index page that goes with nothing. [Exhibit A]

That same Status Report, in the CEO's review, implies the potential for $60 million of distributable income in 5 years:

> I forecast revenues of $15-18M for 2018 and in the range of $25M by 2020. (3) Achievement of these forecasts would well position the company for an event, possibly a sale or merger that would benefit all parties, including the creditors. At $18M and EBITDA of $4M the company would be valued at $20M. Needless to say in five years, based on the current revenue trajectory, the valuation will be three times greater. *(p. 24 of Oct 3 Status Report, Docket # 1229, Exhibit 2, posted to the bankruptcy website)* [Exhibit B]

The accompanying enterprise cash flow analyses, attached as Exhibit 4 to this same Status Report (pp. 37-45) are somewhat more modest than the CEO's, but still in the same rosy direction [Exhibit C]. On which "current revenue trajectory" was all this based? We ask because at the same time, or nearly, the Trustee's Declaration in support of his fees (Docket #1201, filed Sept. 15, 2017) states on p. 9:

> In April 2017, the sales for the business imploded and the Trustee was forced to defer the chapter 11 plan as contemplated. Since April 2017, the Trustee has made efforts to market the business for a potential § 363 sale to an interested buyer.

This kind of reporting is not acceptable. So, the Trustee states before the Court on Oct 6, 2017 that he can sell the company in 2018 for 17-18 million, while on Sept 15, 2017 he is already talking 363 liquidation while the CEO bases his revenue trajectory on a stream of hot air. These reports are not at the level required and have been injurious to creditors who have been whipsawed by conflicting statements and have not known till now whether to file losses on their tax returns or await compensatory disbursements.

Additionally, there are some serious fundamental problems with the reporting of the assets of the estate. For example, in the financial reports to the Court, proper accounting was not given of the customer storage inventory. Our February 2018 filing (Docket #1404) attempted to bring some of these issues before the Court. Since then, we made an extensive search of the public documents and have confirmed that, in reference to customer storage inventory, the only reporting done was to obtain approval and official release of named and identifiable precious metal. However, there were other categories of precious metal different from the tagged and

identified precious metal (in storage) and the vault-store, which constituted company inventory for sale. The Trustee testified in his application for fee that

> The Trustee took extensive and careful efforts to identify all precious metal that belonged to individual creditors. The Trustee located only approximately $.9 million in gold, silver, and precious metals that he was able to obtain sufficient support to confirm the ownership of and return, after verifying whether certain creditors had been paid and/or owed sums to the estate. This was not a simple task, as in certain instances, the Trustee found inventory with a customer name on the precious metals when, in fact, the customer had been paid in full for the precious metals. (*Docket #1201, p. 4, lines 3-8*)

At the Oct 6, 2017 hearing Mr. Gearin stated,

> But what the Trustee has done is he has clearly identified what is there that actually belongs to customers of the mint and he came forward with you on two separate motions and got authority and returned about $900,000 worth of metal to customers who owned that metal. The rest of it the Trustee has confirmed is gone." (*Transcript, para. 6-7*)

At the February 9, 2018 hearing, Mr. Gearin repeated the assertion that all the storage precious metal had been distributed and reiterated there was none left. There may be none left, but since it was not all named and therefore identifiable, as indicated in the referenced quotes, and some of it had the names of people who had cashed out, or did not file claims, what happened to this precious metal that was there, if it is now "gone"? Where did it go to?

Having had some considerable accounting experience, I, Paula Pehl, wish to assure the Court that I have reviewed various inventory iterations done by the people assigned to the job, and have identified this precious metal at least to the extent that it was reported in the original inventories. The value of this metal does not appear in any Monthly Operating Report (MOR) as income or liquidated asset. However, given the Confidentiality Agreement, already referenced in our prior letter to the Court, Docket #1404, I cannot present material obtained through the Committee. Therefore, I must here limit myself to what is disclosed in the public record, as reported to the Court. We do nonetheless believe that a confidentiality agreement cannot stand when used to shield potential irregularities, or just negligence, when they constitute accounting documents related to company/customer assets.

This brings us to the matter of one very interesting entry in the March 2017 Monthly Financial Report submitted to the Court. Looking at Docket #1325, p. 24, under "restructuring operations" there is an inventory brass-copper adjustment in March 2017 for $ 938,844 [Exhibit D]. When seen in April 2017, the entry jumped out as strange as there was no way the company had anywhere near that type of inventory in brass and copper and no such inventory asset had been previously posted. With brass prices then hovering at $1.34/lb and copper at

2.91/lb, that averages into some 447,069 lbs, or 203 metric tons of material. That's a pile that wouldn't escape attention. A write-off cannot be taken against something that never existed. To the question, in writing, *"In reference to the March financials, could we please get an explanation of the p. 25 entry 'Inventory Brass-Copper Adjustment ($938,844) '? "* The first reply came as a verbal, *"this was customer inventory that they thought they had but then realized they didn't."* Oh, my! The written answer, April 27, 2017: *"Calvert advises that the $938,844 item has nothing to do with current operations. It represents the final reconciled amount of inventory that existed when the bankruptcy case was filed and that was eventually identified as belonging to specific customers and returned to them."* Rebuttal: *"If so, why is this marked 'brass-copper adjustment'? Storage inventory returned refers to gold and silver (i.e., precious metals)."* (April 27, 2017) On May 10 an annoyed verbal response shouted: OK, so it was a mistake, *"so what?"* The *what* is something close to 1 million dollars. But it wasn't a mistake. It could not have been a mistake. In the March MOR, the Trustee explicitly states,

> One of the significant adjustment [sic] is a $932k [sic] adjustment to inventory, that is the amount of inventory that existed as of April 11, 2016, when the trustee took over that has been or will be returned to customers who own the inventory. This is a large adjustment that could not have been booked until all ownership of inventory was determined and confirmed. [Docket #0985, p. 48]

There is a huge problem with the statement: *"that is the amount of inventory that existed as of April 11, 2016."*

If it was a "mistake," why was it not corrected? Actually, it would have been well nigh impossible to correct because the Trustee nowhere reported on the books the storage inventory assets and therefore their subsequent depletion and/or distribution could not be correctly booked. This raises some additional troubling questions.

By generally accepted accounting principles, a write-off cannot be taken against what previously did not exist (brass & copper). But this is customer gold and silver that is being written off on the books where customer storage inventory was never reported on the books. **Succinctly stated, you cannot take a write-off (adjustment) against something that never existed for something that was never reported.**

And if precision is prized, we should add that the actual amount of precious metal returned to customers was $772,646.87, not $938,844, (specifically, 240.23 oz of gold and 31,288 oz of silver priced at the London fix of April 1, 2016). Further, it is not possible, as stated above, that this amount was "the amount of inventory that existed as of April 11, 2016." There is good reason to believe that there was at least an additional $1.3 million in precious metal.

We request that these observations, admittedly done under the constraints of limited access and limited resources, be analyzed by a disinterested and qualified appointment of the Court, which could very well be a successor trustee.

## 2. The Carryover Effect

We have taken note of how much Mr. Calvert likes to give lectures on white collar crime. He features himself, NWTM, and Ross Hansen [Exhibit E]. Ross Hansen has indeed been indicted this past April 16, 2018. That indictment states that *"BERNARD ROSS HANSEN and DIANE RENEE ERDMANN, and others known and unknown, devised and intended to devise a scheme to defraud..."* (p. 4). Further down (p. 5), the indictment repeats *"...and others working at their direction made material misrepresentations and material omissions ..."* but there are presently no other indictments beyond that of Ross Hansen and Diane Erdmann [Exhibit F]. Not even a mention of "unindicted co-conspirators". Strange. The indictment makes clear that Ross and Diane did not act alone in a vacuum. So it surprises the creditors that no one else was indicted; it doubly surprises that those people, the lieutenants of Ross Hansen, were retained by Mark Calvert, some actually hired back; in many cases advanced, with hefty salary increases and fancy titles, and placed in control of the company! Why? *"Because they know how to run the Company."*

We suspect, rather, that the reasons were geared to secure an indictment. But we ask, What is the primary purpose of the Trustee? Wherein lie his duties and obligations? Is it his role to rescue the company and serve the interests of the creditors? Who should carry the cost and burden of a criminal investigation? What were the consequences to the estate?

The first cost was that management was left under the control and direction of people who were Ross Hansen drones and really had no knowledge of the minting business. After all, it is clear that, under Ross, production--as opposed to churning-- had fallen dramatically.
At the Oct 6, 2017 hearing Mr. Gearin spoke eloquently about how much effort the Trustee made to straighten out the company. He stated, *"We hired a new plant manager with a motion that we brought before the Court that's furthered the profitability and the productivity of the business."* [transcript, para 9] Yes, the approval for a new plant manager was brought before the Court in about Sept 2016, but when Mike White arrived at the Dayton plant he found the position occupied by Jeff Goodfellow. Mike was relegated to an inferior, subordinate position where he was blocked from acting to make the necessary changes. That was the point at which the company would really have benefited from an experienced production manager. Mike White was appointed production manager only when the company had collapsed and was beyond rescue. Our protests over this bait-and-switch tactic were drowned out by the refrain, "the Trustee can do what he wants." Gearin's stated *"that's furthered the profitability and productivity of the business"* simply cannot be explained. The facts indicate otherwise.

One of the issues that we personally battled over was the retention of Paul Wagner, who recently presented himself to the Court as CIO ("chief information officer") of NWTM/Medallic,

but that was his position under Ross Hansen. Calvert immediately promoted him to be President of NWTM, or at least he signed paperwork as such, but then was officially anointed "president" when Bill Atalla was hired as CEO. This in itself is confusing. When Atalla was hired, we were promised that his extremely high salary would be offset by eliminating Wagner's and Don Routh's employment. Only the latter was terminated. The estate thus was saddled with two executive salaries, at $300,000 (+125,000 in bonus pay) and $170,000 when neither had experience in the production processes and marketing in the NWTM/Medallic sectors. There was no reason to believe that Mr. Wagner brought the necessary skills to the Company (he had previously worked at Sunglass Hut), though it was given that he was really good at retrieving information from the computer system. His area of expertise is IT, admittedly transferable to any company, but not qualifying to be the director of a minting operation. We maintain that the company was *de facto* run by Paul Wagner after the bankruptcy filing, even though Calvert knew well his precedents.

The indictment states it thus:

> 25. HANSEN and ERDMANN concealed their misuse of customer funds by, among other things, manipulating NWTM's enterprise software. HANSEN and ERDMANN fraudulently inflated the amount of precious metals inventory in the enterprise software to allow additional sales to be entered into the system. Further, the amounts of raw materials that were purchased were not accurately tracked in the enterprise software system. In this manner, they concealed that they were running the business like a Ponzi scheme. HANSEN demanded to other employees that both he and

INDICTMENT/HANSEN, et al. - 9

Concluding on the next page, page 10, for count 25:

Case 2:18-cr-00092-RAJ   Document 1   Filed 04/12/18   Page 10 of 20

> ERDMANN be allowed to manipulate the software in this manner, and HANSEN told an employee that NWTM should have a system that HANSEN could "fudge."

Wagner was hired towards the end of 2012, just as Ross and Diane needed a computer system capable of being "fudged."

Pehl Statement page 8 of 18

Case 16-11767-CMA    Doc 1616    Filed 04/26/18    Ent. 04/26/18 10:34:04    Pg. 8 of 18

By early 2017 it was being reported by the "undercurrent" (honest employees who were appalled at the shenanigans) that Mr. Wagner had no use for the creditors but was highly interested in the taking over the Chinese segment of the business. The Chinese segment was, and remains, the most profitable operation of the NWTM/Medallic enterprise, per Calvert, contributing about 30% of the company's revenue. It had the benefit of next to no overhead, no requirement to have a physical footprint, employees, or machinery. Therefore, it could be operated out of a garage and home office. This segment consists of two Chinese production subcontractors to whom orders are outsourced and dies either provided or made on location, and from whom finished product is delivered ready to be shipped or drop shipped or sold on Amazon and eBay.

Mr. Calvert did know or should have known of Mr. Wagner's designs on the business as early as 2017. What we specifically know on that score is hampered by a Confidentiality Agreement whose purpose has been perverted. Be that as it may, and not being able to speak more plainly, we ask the Court, Why was the Chinese business not reported to the Court as a marketable asset?

When the undersigned asked that same question, we were advised that the current action was the liquidation of physical assets. However, shouldn't a listing of **all the assets** and their value have been submitted to the Court when the 363 liquidation started? And why initiate 363 liquidations if a Ch 7 conversion was foreseen or was known to be procedurally necessary? And why not start the Ch 7 conversion process in January of 2018 when it made more sense?

Rumor is rampant on what Mr. Wagner has done and is doing. He has set up his own mint, an entity called Sierra Mint, registered in his name, located at his home address [Exhibit G]. This is certifiable. It is certifiable that he filed his business enterprise with Greg Fullington registered as legal counsel [Exhibit H]. Greg was the former chief legal counsel to Ross Hansen who quit or was fired in about Sept 2015. To our astonishment, we heard Greg was rehired by Calvert at NWTM sometime in 2017. We have reason to believe that Wagner is still drawing his full salary at NWTM.

At the same time we hear that the highly sophisticated art and design computers at Dayton and Kent have disappeared. Is this true? Are they unaccounted for? These computers are worth upwards of $20,000 each. With art computers, dies, and subcontractors, the business model takes shape. Sell off and dispose of the encumbering physical assets, liberate yourself from the rent load, and rid yourself of the employees -- and a business is transmuted into a digital operation with production overseas.

Pehl Statement page 9 of 18

Case 16-11767-CMA    Doc 1616    Filed 04/26/18    Ent. 04/26/18 10:34:04    Pg. 9 of 18

Enter Medalcraft. This one is so strange that we declare ourselves incapable of reaching conclusions. We do however invoke the anthropic principle, which states: For a situation to exist, certain conditions have to be met. Conversely, if certain conditions have been met, the situation probably exists.

In about mid-2017 the Trustee reported that

> One former sales employee has taken a position with a direct competitor who had executed a nondisclosure and nonsolicitation agreement with the estate in connection with its expression of interest in acquiring the estate's business. The former employee appears to be contacting customers of the estate and attempting to divert business to the competitor. The competitor's violation of its nonsolicitation agreement with the estate may adversely impact operational results and give rise to [actionable] claims. (*Docket #1212, Amended Aug 2017 MOR, p. 49*)

No name was given for this entity, but our own research revealed and confirmed it was Medalcraft. No name was given for the employee, but we ascertained the person to be Susan Skaggs, the head salesperson for Medallic sales.

Jerry Moran declared in court on March 16, 2018 that Medalcraft was really the only entity in the US that could satisfy the orders of the colleges historically put to Medallic. Absolutely!

The activity indicated in the Calvert statement quoted above, has, we believe, accelerated over the past eight months. But it goes beyond that. By some incomprehensible mechanism, Medalcraft staff seems comfortable emailing NWTM/Medallic and requisitioning dies, and by some equally incomprehensible mechanism NWTM/Medallic has been responding.

Please consider the following two emails supplied anonymously:



Email 1: From Medalcraft's Alyssa Rakun to Jennifer Baker of Medallic.

This email is very specific on the dies requested. In response, there is no pause button or questioning of the demand because Jenifer sends the requisition to Edgar to pull the dies from the Medallic shelves within 13 minutes. Jenifer also requests Alyssa for artwork or images to quickly identify the dies. The Contra Costa Sheriff's Office Coin dies, listed at the very bottom of the email shown above, are NWTM dies and not even part of the Medallic dies group for which Medalcraft placed an offer before the Court.

Returning to Mr. Moran's testimony in Court on March 16, we hear him stating:

> If you want to know and need to know a little about the Medallic Art business and how it is operating, I would be able to share that with you.... [*Audio, starting minute 37*]

Then he continues,

> ...because we have had a lot of customers calling us since the Mint closed January. We've been servicing a lot of those customers through cutting our own dies and producing product for them... [*ibid.*]

Pehl Statement page 11 of 18

Oops! If he is producing his own dies, why is Medalcraft requisitioning those dies from NWTM/Medallic? (What he does not say, more importantly, is that customer calls to Medallic have been and are being directly shunted to Medalcraft.)



Oops! Alyssa adds another long list of dies, and the NWTM/Medallic person answers, "Thank you Alyssa. That helps a lot." How does that help? Who is the recipient of all this help? These emails are all copied to Paul Wagner. Did Calvert know? If he did not know, he should have known. Calvert has oft stated that he approves each and every expenditure. So he sees

Pehl Statement page 12 of 18

the UPS bills, we assume. Outside review of the UPS billing statements is now necessary. And who arranged all these cozy accommodations? Under whose oversight and under whose instructions is the skeleton crew at Dayton operating?

It has also been reported that large wooden crates have been seen leaving the Dayton facility, addressed to Jerry Moran and Medalcraft Mint. They purportedly contained not just dies, but trim tools, collars, and general tooling. So, quite likely, Mr. Moran already has been given what he wants, or most of what he wants. That means that if he enacts his threat to pull out of the deal if it is not approved on May 4th it all still works out very nicely for him. What about the creditors? Who is going to reimburse the estate for what has walked out the door? How do we reconstruct what was handed over to establish value?

In terms of the current action in Court regarding the IP issues and die ownership, we have no idea how the individual die owners have been affected. We have no idea how the IP interests of individual artists may have been violated. We do have reason to believe, based on information available within our limited scope, that Medalcraft has not only requisitioned, and received, current production dies (last 20 years) but has also asked and obtained dies going back to the early 1900's. (You will note in Email 1, page 11, the first die on the list dates back to 1917.) This is in direct conflict with Gearin's statement that they had made a deal with the New York Numismatic Society to buy all the Medallic dies prior to the last twenty years.

As if this transfer of physical property of the estate without the approval and knowledge of the Court were not enough, we hear that, apparently, customer files are already in the hands of Medalcraft. A customer reported (he does not wish to be identified) that he called Medallic and had to leave a voicemail. A person that we presume to be Jenifer returned the call, advising him to turn to Medalcraft and gave its telephone number. Medalcraft staff assured him that they had the dies, all the numbers, and were able to execute his order. Thus we conclude that the situation goes well beyond the fact that the former head salesperson from Medallic went to work for Medalcraft and the Trustee took no action to stop the breach by both parties.

Good will is a very marketable asset and, apparently, it is also being lost to the estate. That includes customer lists and customer files. We simply cannot phantom any scenario by which Medalcraft could be receiving NWTM/Medallic assets without a Court order.

Pehl Statement page 13 of 18

Case 16-11767-CMA    Doc 1616    Filed 04/26/18    Ent. 04/26/18 10:34:04    Pg. 13 of 18

And what about the following:

> From: Jenifer Baker
> Sent: Friday, February 02, 2018 10:42 AM
> To: Paul Wagner
> Cc: mark@cascadecapitalgroup.com
> Subject: Brenda Johnson - FW: P2259 CUSTOM COINS / UPDATED CONTACT INFO
>
> Paul –
>
> See below an email that was sent to one of Brenda Johnson's customers.
>
> This is the 2nd call from one of Brenda's customers questioning the status of Northwest Territorial Mint.
>
> Thank you –
> Jenifer
>
>
> From: Brenda Johnson [mailto:brenda@universalproonline.com]
> Sent: Friday, January 26, 2018 9:55 AM
> To: Nephew, Kelly L Civ USAF USAFA USAFA/DFF
> Subject: P2259 CUSTOM COINS / UPDATED CONTACT INFO
>
> Good afternoon,
>
> Brenda here with your custom coins! Happy New Year!
>
> Long story short, Northwest Territorial Mint filed for bankruptcy in April 2016 and has since then not been able to work its way out, this is all public knowledge on the internet. Unfortunately, Northwest Territorial Mint shut down on 12/29, doors are closed and all systems are shut down; THE GREAT NEWS is your designs are still on file and you have the ability to continue to work with me under a new company that has all the same capabilities, quality and even faster turnaround times! I would be happy to continue working with you if you'd like, please call or email me at anytime if there is anything I can do for you. PLEASE BE SURE TO EMAIL ME AT THIS EMAIL ADDRESS, THE PREVIOUS EMAIL HAS BEEN SHUT DOWN AND DEACTIVATED.
>
> Same contact # 703 597 1288
>
> Brenda
> 703 597 1288

Who is UniversalProOnline? This email was copied by the aforementioned Jenifer to Paul Wagner and Mark Calvert. Is UniversalProOnline the predecessor of Sierra Mint?

Returning to the anthropic principle: if the conditions are met, then the situation most likely exists. To be able to derail part of the business into a digital enterprise requires blocking offers for the whole enterprise where someone looking at the accounts would spot the revenue from products made in China. One way to do that is to set up a shield of phony offers at above-market prices. Too extreme, you say?

### 3. Marketing the Company: Two Clowns and a Three-Ring Circus

On Oct 26, 2017, some twenty days after the Oct 6, 2017 hearing, it was announced that there was a buyer for the Company at $10 million. That buyer, Gary Anderson, owner of RNO Financial and Eureka Metals, professed the intention of closing a deal by Jan 1, 2018. When this was announced, the undersigned looked up Mr. Anderson's credentials. We were immediately suspicious that he was a fraudster. Paula Pehl sent an email on 10/28 warning Mr. Northrup *"Nothing about Anderson and the 'variants' of his companies checks out."* Nevertheless, Anderson was allowed to have the run of the Dayton plant, act out his role as big-shot and future boss, where he promised the employees fully paid Christmas vacation leave and a prosperous future. Bill Atalla, the CEO, threw a big pizza party on Dec 7 ( Exhibit I, taken from Gary Anderson's website), while Anderson was allowed full access to Medallic resources which he spread all over his website, without having placed one dime on the table. The agreed upon due date for the initial deposit came and went without comment. The days oozed by with Anderson prancing about the Dayton plant, playing out the role of new owner. On Monday, Dec 18, 2017 Paula found a Go-Fund-Me page put up the prior weekend by Anderson. That Go-Fund-Me page sought to raise $500,000 (coincidentally the non-refundable deposit sum) to fund a "public benefit museum." The live-link page copied to Messrs. Calvert, Gearin, and Northrup stated, "Click here to support Public Benefit Trust Museum organized by Gary Anderson". Clicking opened a proprietary Medallic production video. Here we can only provide a screenshot, of the accompanying text [Exhibit J]. Within an hour of Paula's rebuke, the link and Go-Fund-Me page were shut down. Not a word of explanation was given. Dead silence. But that left on Anderson's website another page, linked directly to Medallic, to collect mercy funds for the Sonoma, California fire victims [Exhibit K]. Shortly after the Go-Fund-Me caper, Anderson disappeared like dew on the high desert.

We were told from a source at Dayton that when one of the employees mentioned the Go-Fund-Me page, Calvert changed complexion, swelled, and hollered, "That f___er did not have permission to do that!"

Did not have "permission"? Permission??! What does that mean?

Because of Anderson's unfettered access, after a few groping hypotheses, we began to suspect that Anderson was being fielded from the inside, but we could not make out the purpose of this routine or guess who set in motion the play. It is simply stupefying that anyone could fall for

Pehl Statement page 15 of 18

Case 16-11767-CMA    Doc 1616    Filed 04/26/18    Ent. 04/26/18 10:34:04    Pg. 15 of 18

such an outlandish performance and for so long, and also allow this character internal unlimited access and perpetuate the gaslighting of the employees. Only when the WARN Act bombshell dropped did we get an inkling of the possibilities.

That not being enough, when Anderson dematerialized, a second clown hopped into the ring, this one named Joe Tofoya. He started out with a bang. Whereas Anderson initially claimed that he controlled about 23 million in investment funds, and with each failure to perform his resources increased to end in the range of 36 or 37 million, Tofoya stated he had 500 million in personal funds and controlled 3 **trillion** in investment funds. He assured the employees he would salve their wounds, increase their pay, and put all right. Not to worry.

When the undersigned heard from Dayton about the financial might of Tofoya, we burst out laughing. Just imagine, the biggest investment fund in the US (Bridgewater) does not surpass the 130 billion mark. The Federal Reserve's paper portfolio is about 4.4 trillion. Tofoya put himself right up there with Uncle Sam. No point talking small. But then he also disappeared, vanishing into thin air for the performance date of January 8, 2018.

Whatever the origins and circumstances, this charade should not have been permitted to continue. Grave harm, emotional and financial, was done to the employees. Many of them live from paycheck to paycheck. They were told that they would get Christmas with a week off paid, then when Anderson vanished –or was yanked out of the scene--Calvert flew down and held a meeting on the 21st of December to give a quasi-notice of shut down. Except it wasn't clear. Some thought they were supposed to return on the 8th of January; others received pink slips. Just before Christmas, the employees didn't know if they even had a job. The reports were coming in so confused, garbled, and anguished that we started reading the public blog site About.ag/NWTMint.htm where employees obviously had turned to vent spleen and report what they knew. The angst and anger were palpable.

Profound shame should be felt for this disgraceful termination of the Medallic employees.

Bill Atalla, the CEO, was apparently the lead in the Joe Tofoya efforts. Now he has filed with the Court (Docket # 1609, 1610) to get extra compensation at $400/hr for this fine piece of work. He openly posted on the About.Ag website (Exhibit L) about the upcoming "truth" and the shadowy event expected for January 8, insinuated as a purchase and revival, to counter the employee spill. Was Atalla was being duped, along with the employees?

Amongst Atalla's exhibits to Docket #1609(1) is a strange one from Trustee Mark Calvert. This email is extraordinary because it shows that on December 31, 2017 Calvert was enticing Atalla to move forward, and we can only deduce by the process of elimination that this was connected to the Tofoya staging:



With the production plant shut down, the employees sent packing, and the investors served notice that they would not see a red cent, why is Calvert on Dec 31, 2017 talking about the "potential of this company for the employees and the investors"? That horse had left the barn.

The only statement in that email that rings true is the last line.

## Summation:

All the matters here brought to the attention of the Court need careful investigation by a disinterested party who has the authority, power, and access to investigate. We have been hindered in our own investigation by limited access and by having to rely on reports of witnesses afraid to give testimony but burning to have the truth be known. Even a customer, who reported calling Medallic and being shunted to Medalcraft to be told that Medalcraft had all the order numbers and die numbers (well before any approval of sale by the Court), does not wish to come forward with an affidavit. The picture we get from both what we have witnessed and what we have heard is an administration simply out of control, under the most generous interpretation.

We have limited the present discussion not to burden the Court, and even limited the physical exhibits to items not already recorded on the Court docket in consideration of the meters of depth the paperwork in this case has generated. However, we must declare that we and other creditors had expected the truth to be stated in Court. We had expected that Court orders would be observed. We are therefore utterly aghast and dismayed at what we find necessary to report.

We therefore beg the Court to appoint a new trustee, to not only close the final chapter of this sad saga, but also to investigate with honesty and transparency the many accounting and other irregularities that have come to light.

We also ask that no payments whatever be issued to the professionals and the NWTM/Medallic CEO until an investigation has been duly completed and the bar of accountability has been met.

Respectfully submitted,

*Paula Pehl*

Paula Pehl
paulapehl @ yahoo.com

*Richard N Pehl*

Richard Pehl
865-414-5434