FILED
UNITED STATES BANKRUPTCY COURT
2018 JUN -8 PM 4:22
WESTERN DISTRICT OF WASHINGTON AT SEATTLE
M. L. HATCHER, CLK
U.S. BANKRUPTCY COURT
W.D. OF WA AT SEATTLE
BY_____DEP. CLK.

| In re: | Case No. 16-11767-CMA |
|---|---|
| NORTHWEST TERRITORIAL MINT, LLC,<br><br>Debtor. | PRO SE ADVERSARY LETTER<br>TO JUDGE CHRISTOPHER M. ALSTON |

June 6, 2018

Dear Judge Christopher M. Alston:

    I have been, to the best of my pro se ability, attempting to find out what happened to certain precious metals that had been stored and insured at NWTM vaults. As well, since I've been involved in the matter, a few other incidents have occurred which have left me feeling that this court process is not a fair proceeding and is perhaps agenda-driven.

    Since August 2016 I have essentially asked Trustee Mark Calvert the same question over and over again: <u>What do I have to do to get stored metals back?</u> Mr. Calvert didn't say anything such as that I'd have to pay him an amount of money to essentially buy them back, or that they had been melted and I'd have to un-melt them, or he had sold them, or he lost them in a poker game, or he tripped over them and scratched them up and threw them away, or the dog ate them, that I'd have to dig up the dog, or any other explanation about where the metals were. He was usually always quick to indicate that the precious metals were likely "stold" [sic, Mr. Calvert's word] by the Debtor. Trustee Mark Calvert has simply stonewalled the question and allegedly lied to me by, in essence, telling me there had not been any metals under my name or under any other name or business name I gave him, and he attempted to blame the Debtor. He refused to show me the Inventory which would have shown if the metals were handed over to him or not handed over to him and listed in the Inventory.

    On or about February 9, 2018 I was stonewalled by Mr. Calvert and his crew of attorneys, as well as FBI security as I attempted to find out if certain serial numbered and otherwise identifiable precious metals had been listed in Mr. Calvert's Inventory from NWTM. It seemed as if Mr. Calvert controlled the FBI security so that I could not speak to an agent or even the receptionist at FBI after the February 9th hearing whereby I voiced concerns about the Trustee's integrity. I continued to try to get an answer from anybody who would talk to me as to how I would go about getting my metals and dies

returned, and to find out if my family's allocated precious metals stored at NWTM had been stolen as Mr. Calvert had usually alluded to each time I spoke to him.

I come to court at great peril to myself; there are people who don't want me to testify or write about them, what they've done, allegedly. At least once a year, but usually twice, there is an attempt to kill me or make me ill so that I die from unrelatable causes.

On or about the hearing date of April 20, 2018, one of Trustee Mark Calvert's attorneys, Mr. Neu, allegedly lied to you by saying that I refused to give him my email address, which at that time was not true, and he knew it wasn't true, but this lie he told achieved his objective of having me silenced at the hearing. Your Honor would not allow me to testify or speak at the hearing because Mr. Neu told you that lie, and, as instructed by Your Honor I was not allowed to refute it or say anything.

Trustee Mark Calvert had refused to speak to me since the February 9, 2018 hearing whereby I questioned his integrity.

I had called Mr. Neu on April 5, 2018 to discuss NWTM Inventory and find out if Mr. Calvert would continue to deny that the precious metals which I asked about had been listed in the Inventory under his control. During my call to attorney Neu I mentioned that I was uncomfortable talking to him because he was a practiced attorney and I was "just a toad". I told him that I felt that Mr. Calvert should be the one I should speak to. I recall at a hearing on approximately October 6, 2017 that His Honor admonished Trustee Mark Calvert for charging for attorneys' fees rather than his capped Trustee fees, so I asked Mr. Neu if he would be charging for his time to speak to me. I asked if he is the attorney that charges $690 per hour for his time to talk to me and to go through the files. He said that he always charges for everything, but his rate is $450 per hour. We agreed that I would be able to speak to Mark Calvert, and Mr. Neu said he would help facilitate a conversation between Mr. Calvert and me. Mr. Neu did not ask me for my email address and I certainly did not refuse, but he wouldn't give me information about the Inventory or my metals. He told me that he would arrange for a time that I could speak to Mr. Calvert, but Mr. Calvert kept his phone messages full so that nobody could contact him on his regular phone.

Some of the attorneys in Mr. Calvert's crew charge $690, and apparently even up to $900 per hour. To sum it up, no, I didn't refuse to give Mr. Neu my email address; however, he did not ask, but if he had, I would have declined so that the $900 per hour door would not be opened, lest the estate be unnecessarily further depleted by the three attorneys and Mr. Calvert. As well, I didn't want to hazard that later on I'd have to pay their exorbitant attorney fees if I had to fight them on my own in what I believe to be a corrupt legal system, and end up having to pay their legal fees. I feared getting "papered-to-death" via email by a huge law-firm such as K&L Gates and be thrown into costly $2000 per hour legal proceedings against them only to be ordered to pay their attorney fees in a corrupt system, allegedly. Additionally, as one of their expertises is in Communications, I certainly didn't want to risk having my communications hacked into, which most all of us know can happen with emails, plus another of their expertises being oil and gas is troublesome, as I learned by being in their office.

During Mr. Neu's and my April 5, 2018 conversation we agreed that Mr. Neu would try to make Mark Calvert available for me to call on the phone, but he did not do that; instead he told you that I refused to give him my email address.

Additionally, as I mentioned in my initial pleadings, I am being stalked, and I don't want to

hazard giving out email addresses because doing so enables stalkers to know one's I.P. address and exact location, inviting harm, more harm. This is not stuff in my imagination: I've had bones broken and have been provably poisoned multiple times, etc, etc.

I OBJECTED on paper and during the hearings to Mr. Calvert selling or distributing my contact information. I believe that Mr. Calvert and Mr. Neu have lied to me and as well have lied about me, therefore I don't trust them with my information, and it will be difficult to hire an attorney at this late date, especially an attorney who is willing to risk his or her career to stand up to these bullies who work at such a huge and powerful law firm in a system filled with "regulatory capture,"allegedly.

I attempted to call both David Neu and Mark Calvert again on April 12, 2018 but apparently Mr. Neu's phone number that he gave me, 206-623-7580, cannot be called from any type of phone except a land-line; it plays a recording advising to call from a land-line; and I attempted to call Mark Calvert and got the usual full message box, can't leave a message or speak to him. I have repeatedly tried to see him at his office, to no avail. I have never seen him in his office on Fourth Ave. I believe I should have been able to speak at the hearing of April 19th or 20th, 2018 rather than having been told I could not speak because I failed to give an email address to Mr. Neu.

Mr. Gearin, on May 4, 2018 was similarly able to stifle my testimony by lying to you. The hearing of May 4, 2018 was another example of what I mean by Your Honor's court being unfair. Mr. Gearin, allegedly lied to you by telling you that the three attorneys in his law firm had been trying to get a hold of me. This whopper on the part of Mr. Gearin would have been easily refuted because I had been in their office the day before he said this in court, and I had been in their office each time I filed something with the court. I was in their office on May 3rd, the day before the hearing of May 4th, and the receptionist, Tiffany, contacted each of the three attorneys one by one, while I was at their office; nobody said that anybody was trying to reach me. They could have reached me or given me a message right then and there or before that or after that.

On May 3rd I needed to find out about an important document I'd seen in the court's electronic file on or about April 27, 2018 that Mr. Neu filed on behalf of Mr. Calvert, as best as I recall, that stated they had found two more customers' metals. Said pleading allegedly disappeared from the court file AFTER having been docketed. I attempted to locate it, to no avail, at the courthouse on May 2nd. In preparation for the May 4, 2018 hearing, I attempted to speak to any or all of Mr. Calvert's three attorneys on May 3rd. According to the receptionist, as she called each attorney, each of the three declined to speak to me; however, Mr. Neu decided to come out and speak to me after being called by the receptionist a second time for permission to print a document from the file for me. I explained to Mr. Neu that I would like to get a copy of what they recently filed regarding two people's metals that were recently found. I made sure that Mr. Neu understood that I was not referring to any old documents, not in 2016, not in 2017, but more like last week, approximately April 27, 2018, give or take a few days or even a week. At first Mr. Neu acted as if he didn't know what I was talking about but when I told him that it had just been very recent, he acted as if a bell went off in his head and that he remembered exactly what it was; he said he knew what I was talking about, and that he would go and get it. He left and came back with a document dated in 2017, exactly as I had only minutes before carefully explained that I was not looking for an old pleading.

If Mr. Calvert's law team might be trying to claim that metals were suddenly found, the missing document would have negated the law firm's own statements that present day complaints are

16-11767-CMA: PRO SE ADVERSARY LETTER
TO JUDGE CHRISTOPHER M. ALSTON

unfounded and mere conspiracy theories, as purported by the Trustee's team during the May 4, 2018 hearing, although they didn't mention my allegations as being a mere conspiracy theory or unfounded. The finding of previously undiscovered metals would give credence to all complaints and innuendos about metals having been "stold" [Mr. Calvert's word] before Mr. Calvert took over. A wise elderly pastor who had previously been a banker once told me that thieves are usually caught, not when they steal the money, but when they attempt to put back what they've stolen. I allege that the previously filed, now missing, or stold, docketed-document, if indeed it was missing, was removed from the docket so as not to bolster allegations against Mr. Calvert and his attorneys. I allege that it was removed after the April 27th deadline to file OBJECTIONS because as far as Mr. Calvert's side would have known at the time, I had not filed any objections; that's because I had been confused about deadline dates and hearing dates, and I only managed to get a handwritten OBJECTION filed approximately five minutes before court business on April 27th closed.

I had gone to the courthouse on April 27th thinking there was a hearing on that date, but in fact the date was really the date that responses were due. I utilized the time to look through the dockets and related cases, etc. There wouldn't have been any of my writing of objections on a computer because I had no computer at the courthouse when I realized I needed to file an objection. My opposition, even if they were spying on my computer, couldn't know objections were going to be filed by me. My objections to matters to be heard at the hearing of May 4, 2018, had to be hurriedly handwritten at the end of the day on April 27th, which I filed right before 4:30 PM, closing. I am surmising that the document was removed after I filed my objections because there might now be scrutiny of those so called "found" metals if anybody objected to the again renewed Motion for Mr. Calvert's sale free and clear of liens.

I believe that if there had been no objections filed as of April 27, 2018 then a dishonest crew, if any, would have given notice that they found the missing metals and likely sold them or melted them, thereby washing evidence against themselves. But, because Mr. Calvert's team realized only at the last minute that there were objections, they, Mr. Calvert's team, wished that they had not filed the document about having found two customer's metals. The "purged" document would have given my potential allegations of the Trustee and his legal eagles being allegedly "dirty", more foundation and greater culpability.

Mr. Calvert's team likely realized the bad timing of telling the court about finding the metals and then quickly arranged to remove the document from the file, I so allege, likely sometime between April 27th and May 2nd. I believe this because I am thinking that I saw the docketed documents on April 27th and went back to the courthouse on May 2nd to look for the document and get a copy. I opened every document filed on May 2, 2018 back to April-something, that is, back to approximately docket number 1605. I did find some circumstantial evidence that this had occurred. It would take an honest IT person to track down whether K&L Gates, if I recall correctly, Mr. Neu, had filed something on behalf of Mark Calvert and had it removed. I believe that the three attorneys' secretary, "D" is too close to the clerks at the federal courthouse.

So, if anybody was really trying to get a hold of me, surly could have mentioned it on May 3rd before falsely reporting to your Honor on May 4th that they couldn't reach me; the K&L Gates receptionist on the 29th floor had let Mr. Neu, Mr. Gearin, and Mr. Peterson know I was there on May third when I was looking for the document.

On May 4th Your Honor asked me if I had given my email address to "Mr. Calvert", whereby I said that I had not. These attorneys are allowed to say things that they know are untrue. They profit from their own lies, allegedly. They allegedly hide the Inventory so that nobody knows if their

16-11767-CMA: PRO SE ADVERSARY LETTER
TO JUDGE CHRISTOPHER M. ALSTON

valuables are there. I sure don't know, at least from Mr. Calvert or his attorneys. I allege that the so called exigent circumstances that exist for the Trustee and his crew to rush an auction on June 6, 2018 with very little notice is that they know they are caught messing with the court files and hiding and misappropriating inventory and witness tampering, and insurance is likely getting expensive.

Mr. Calvert and his attorneys keep changing story(s). Approximately October 6, 2017, after handing in a bill for six million dollars, by my cursory calculations, Mr. Calvert wanted to sell 2,700 dies, and testified that there were 350,000 dies, whereby I OBJECTED to the miscounting of the dies and asked about where the other 50,000 dies went. The attorneys explained it away as being a difference in types of dies, that there are "350,000" of one type and "50,000" of another type, thereby totaling 400,000. It surly seemed as though the dies had been counted and even categorized, and out of six million dollars in charges, perhaps this should have been enough money to cover some counting-peoples' time. Conversely, in opposition to the Trustee and his attorneys' own testimony, in recent times on or about May 4, 2018, the team's testimony was that there were only 80,000 to 100,000 dies, that the 400,000 number was just a "Ross" number. They are contradicting their own testimony from approximately October 6th, 2017.

At the May 4th 2018 hearing Your Honor asked Trustee Mark Calvert if anyone had any interest in the Chinese dies. Mr. Calvert stated that he doesn't know of anybody that planned to use the Chinese dies. At first Mr. Calvert testified, "No, I have no knowledge of anyone who plans to use the dies in China." Then, within a minute or two, contradicting his own testimony, Mr. Calvert testified that Mr. Wagner "is looking at the possibility of manufacturing items in China and selling them on the internet or to other buyers."

Most recordings of the May 4, 2018 hearing would not show what really happened because on that day of multiple hearings, Your Honor made an unusual decision to hear the lengthy NWTM hearing first, before hearing the few shorter fifteen minute or half-hour matters. You, Your Honor, would not allow me to say anything during the hearing of May 4, 2018 whereby at that point there seemed to be over 300,000 dies missing and yet another alleged lie about the Debtor as well as about me, and likely a disappearing very pertinent document that I was certain I had seen previously in the Court file, and attorneys contradicting their own testimony.

As for my getting my dies returned, Mr. Calvert initially told me in approximately July 2017 that there were "a million dollars worth of dies", "four hundred thousand dies". I calculated his figures and questioned him about the dies being worth only about $2 each. He said that was about right because he was going to melt them all down and sell them for scrap steel prices. In more than one conversation Mr. Calvert told me that ten people had tried to get their dies back but none were successful. Mr. Calvert's tale about nobody getting their dies returned falls flat in light of a customer who won the privilege of owning the dies that he had already bought and paid for years ago, that is, if he was prepared to pay Mr. Calvert $250 to $350 per die to find them, a research fee. I allege that he lied to me about having a plan to melt down the dies, and that nobody had been successful getting them; he lied in order to promote a profitable legal battle for himself and company and attorneys and make it impossible for somebody to set a precedent of simply asking for what they had stored and have it returned. These are dies that we, as customers, already paid for. A subsequent conversation between Mr. Calvert and myself elicited a different response; he told me he didn't say he was going to melt down the dies, (which is another alleged lie, he did say that to me), that maybe he said he was going to

melt gold and silver, but not the dies.

Mr. Calvert has told me several times that there were no metals with my name or my family's name or business name; he insisted that there were very few metals at all, just a little bit of silver. He said there were only "two hundred thousand dollars" worth of metals, but within the next sentence or two he said "three hundred thousand dollars" worth that had been in the vaults and only $1,011 left in a checking account. This 200k or 300k would equate to being roughly a couple hundred one ounce gold coins that could easily fit into one brief case.

On June 5, 2018, after many months of trying to speak to Mr. Calvert since the February 9, 2018 hearing, and after two of his attorneys allegedly lied to the Court about they themselves having been trying to contact me, Mr. Calvert finally answered his phone, but only briefly before hanging up on me, still holding to his story about my metals being missing, but this time he admitted to having gone through a bag of silver coins and selling them for numismatic value. Said silver bag is likely my bag of coins which are (10,000 pre-1965 90% silver dimes) that the FBI told me they could not find in the Inventory. In the same June 5, 2018, conversation, Mr. Calvert dramatically changed his story. He told me he sold "a lot" of gold, silver, platinum (after having maintained since mid-2016 that there had been so very little in the vault). I asked if he had melted any metals, if any of mine had been melted or sold. He indicated that mine had not, but essentially because they didn't exist.

Considering attending hearings, almost a year has transpired. I am handicapped, slow in my thinking processes, and I am no match for these practiced attorneys and Trustee who seem to operate with impunity.

I mentioned that the May 4th, 2018 hearing was held in reverse order of smaller hearings being last after the NWTM lengthy hearing instead of the usual first heard. As you know, I stayed to see the other hearings whereby one of the hearings was about an attorney who failed to tell her client that there was an offer on a patch of land, or something pertinent to her client. The offending attorney stood so humbly, shaking in her boots, as you told her that you would need to sanction her law firm, perhaps $100,000 for her omission. I see Trustee Mark Calvert and at least two of his attorneys allegedly KNOWINGLY lying in your courtroom, and blatantly on record saying things that on their face are provable intentional inaccuracies and even lies, provable simply by looking at their own testimony.

From my conversations with Mr. Calvert, in my informed opinion, he has said whatever he can in order to set up the Debtor and his girlfriend/vault manager for criminal charges. He can pillage the estate without scrutiny of the mint owner's knowing eye. Mr. Calvert keeps the Debtor away from the business so that the Debtor cannot testify about what Mr. Calvert and his crew of attorneys are very likely skimming from the estate, I so allege. There are no attorneys brave enough to take on such a law firm as K&L Gates. Mr. Calvert misinformed me on January 5, 2018 that my attorney was Mark Northrup.

Respectfully submitted,

*Betty Carey*
Betty Carey