1   Mark D. Northrup                                      Honorable Christopher M. Alston
    Miller Nash Graham & Dunn LLP                                              Chapter 11
2   2801 Alaskan Way, Suite 300                          Hearing Date: December 7, 2018
    Seattle, WA  98121-1128                                Hearing Time: 9:30 a.m.
3   Telephone:  (206) 624-8300                          Response Date: November 30, 2018
    Facsimile:  (206) 340-9599
4   Email:  mark.northrup@millernash.com
    *Attorneys for The Official Unsecured*
5   *Creditors' Committee*

6

7

8                      UNITED STATES BANKRUPTCY COURT
                  WESTERN DISTRICT OF WASHINGTON AT SEATTLE
9

10  In re                                               Case No. 16-11767-CMA

11  NORTHWEST TERRITORIAL MINT, LLC,                    REPLY OF COUNSEL FOR THE
    EIN:  30-0143641                                    OFFICIAL UNSECURED CREDITORS'
12                                                      COMMITTEE TO LETTER
                        Debtor.                         SUBMISSIONS TO COURT
13

14

15          Miller Nash Graham & Dunn, LLP, and Mark D. Northrup, counsel for the Official

16  Unsecured Creditors' Committee (the "Committee") in this case, hereby respond as follows to the

17  following letters filed with the Court: Letter dated November 20, 2018, submitted by William

18  Hanson (Dkt. #1941; the "Hanson Letter"); and Letter dated November 27, 2018, submitted by

19  Joshua Gibbons (Dkt. #1940; the "Gibbons Letter"):[1]

20

21          **Hanson Letter**.  William Hanson's two-page Letter to the Court is apparently intended to

22  be a blanket objection to the fee applications (collectively, the "Applications") currently pending

23  before the Court and submitted by Mark Calvert, as Chapter 11 Trustee (the "Trustee"), Cascade

24

25  _____

26  [1] A third letter, submitted by John W. Peterson on November 29, 2018 as Dkt. #1939, appears not to address the
    pending Applications and is therefore not discussed here.

REPLY OF COUNSEL TO THE OFFICIAL UNSECURED CREDITORS'          **MILLER NASH GRAHAM & DUNN LLP**
COMMITTEE TO LETTER SUBMISSIONS TO COURT - 1                            ATTORNEYS AT LAW
                                                                T: 206.624.8300 | F: 206.340.9599
                                                                            PIER 70
4850-6430-6561.1                                                2801 ALASKAN WAY, SUITE 300
                                                                SEATTLE, WASHINGTON  98121

1   Capital Group LLC (the "Trustee's Accountants"), and K&L Gates LLP (the "Trustee's Counsel").

2   As a threshold matter, the Hanson Letter should be dismissed out of hand because it is completely

3   devoid of any detailed legal or factual analysis of the specific contents of Committee counsel's

4   Application or the statutory standards that control bankruptcy courts' reviews of professional fee

5   applications.

6

7           To be clear: at the outset of this case Mr. Hanson served as Co-Chair of the Committee.  In

8   March 2017, however, Hanson was removed from the Committee because he had provided—in a

9   flagrant breach of his duties as a Committee member—confidential information to Ross Hansen.

10  On March 14, 2017, Committee counsel transmitted to the members of the Committee the following

11  email message, describing what had occurred:

12

13          Last night at 6:34 I transmitted to the five of you the email
            message and information set forth below.  I transmitted this
14          message, including information about the Bressler issue, to the five
            of you alone.  No one else.  This morning I received a call from
15          Gearin.  Gearin advised me that Bressler's lawyer (Tom Lerner)
            had called him and had informed Gearin that Medallic's lawyer
16          (Bucknell) had called Lerner and wanted to know about the
            agreement between Bressler and Calvert.  To be more specific,
17          Lerner said that Bressler had received an email this morning from
            Ross Hansen stating that "Northrup said that you have sold your
18          interest in Medallic to Calvert."  At our last Committee call, I
            made it very clear that such information was confidential and never
19          to be revealed to Ross.  I am sorry to say it but this morning's
            events strongly suggest the obvious: one of you disclosed my email
20          to Ross Hansen.  This is intolerable…Communicating with Ross is
            not a violation of Committee members' fiduciary duty but
21          disclosing strategic confidential Committee information to Ross
            certainly is.
22

23

24  Hanson subsequently admitted that he had revealed the Bressler settlement to Ross Hansen and his

25  departure from the Committee followed shortly thereafter.

26

REPLY OF COUNSEL TO THE OFFICIAL UNSECURED CREDITORS'
COMMITTEE TO LETTER SUBMISSIONS TO COURT - 2

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4850-6430-6561.1

Case 16-11767-CMA    Doc 1944    Filed 12/04/18    Ent. 12/04/18 16:25:09    Pg. 2 of 6

1    Mr. Hanson now re-surfaces as a disgruntled creditor, who, as a Committee member,

2    championed Ross Hansen and attempted to engineer the removal or marginalization of the Trustee

3    so that Ross Hansen could move forward to propose—as Hanson described it—a "viable

4    reorganization plan."[2]  Hanson Letter at p. 1.  It was this Hanson "plan" that Committee counsel

5    reviewed and described as "garbage" in an email referenced in the Gibbons Letter (p. 20).  In

6    reality, Ross Hansen had no provable funding for any "plan" and—as the FBI had conveyed to the

7    Committee and Trustee—was also likely to be criminally indicted.

8

9    In his Letter, Hanson complains that Committee Counsel was somehow responsible for

10   preventing Elaine Barrick, the Committee's financial advisor, from ever "examining Mark Calvert's

11   accounting and books."  Letter at p. 2.  This is false.  The Court approved Ms. Barrick's engagement

12   on April 25, 2017 (Dkt. #992).  In fact, Ms. Barrick's anticipated primary professional function was

13   to analyze the financial projections that the Committee expected to see in the Trustee's supposedly

14   then-forthcoming Plan of Reorganization.  In the weeks following Barrick's appointment, however,

15   the Medallic litigation was successfully concluded and the cry of some Committee members for an

16   "audit" of the Trustee's work abated.  Unfortunately, in a relatively short period of time thereafter

17   the Debtor's business also failed;[3] the Trustee never proposed a Plan of Reorganization; and no Plan

18   projections analysis by Ms. Barrick was ever required.

19

20   Hanson's further assertion (Letter, p. 2) that Committee counsel "did not work for the

21   creditor's committee but did report to Mark Calvert and Mike Gearin" is sadly inaccurate,

22

23

24   [2] Hanson admits to this effort at p. 2 of his Letter, where he states that "I wrote to Mark Northrup, asking him to inform the court that several members of the Creditors Committee wanted Mark Calvert removed as Trustee."

25   [3] In April 2017, the Debtor experienced an operating loss of $242,368—in a month that was historically one of the Debtor's best months for sales.  The estate never really recovered from this operating loss; was forced to obtain DIP financing to remain operational; and began a slide into liquidation.

26

REPLY OF COUNSEL TO THE OFFICIAL UNSECURED CREDITORS'
COMMITTEE TO LETTER SUBMISSIONS TO COURT - 3

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4850-6430-6561.1

particularly when viewed in the peculiar context of the case. This is a Chapter 11 case in which a trustee was appointed. There was no debtor-in-possession or powerful secured creditor for the unsecured creditors to fight with. In cases with a trustee like this one, there is virtually never a difference between the ultimate goal of the trustee and the ultimate goal of the Committee: to maximize a return for creditors. That was certainly the case here. Committee counsel and the Trustee were equally focused on creating value for unsecured creditors.

The Trustee in this case did not control the Committee but the Trustee did have (and continues to have) singular statutory power to control the case and administer it in accordance with his professional business judgment. Throughout the case, various Committee members were critical of the Trustee, albeit for different, specific root reasons: the Trustee refused to terminate the employment of Erin Robinson and Paul Wagner; the Trustee did not pursue an adequate forensic accounting of pre-bankruptcy metal sale and shipment transactions; the Trustee refused to deal with Ross Hansen as a potential Plan proponent. On the major objectives of the case, however—namely, to bring Medallic into the bankruptcy estate and to grow sales in the Dayton facility, there was no disagreement. Perhaps it is for this reason that Mr. Hanson's Letter never directly asserts that the Trustee has not operated the bankruptcy estate based on his best "business judgment." In the end, the Trustee's "business judgment" failed to produce a reorganized business—a statistically frequent outcome in Chapter 11 cases[4]—but the Trustee and Trustee's Counsel poured millions of dollars of professional services—at great economic risk to

---

[4] *See, e.g.*, Michelle M. Arnopol, "Why Have Chapter 11 Bankruptcies Failed So Miserably?: A Reappraisal of Congressional Attempts to Protect a Corporation's Net Operating Losses after Bankruptcy," 68 *Notre Dame Law Review* 133, 134 (1992) ("[O]nly between ten and twenty-seven percent of all businesses that file for Chapter 11 bankruptcy relief successfully reorganize.").

REPLY OF COUNSEL TO THE OFFICIAL UNSECURED CREDITORS'
COMMITTEE TO LETTER SUBMISSIONS TO COURT - 4

4850-6430-6561.1

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON 98121

themselves personally and to their firms—into their efforts to achieve a different result.

**Gibbons Letter**.  As a threshold matter, it is not clear what the Gibbons Letter is intended to represent.  Is it intended to be an objection to one or more of the fee Applications?  Nowhere in the Letter does Mr. Gibbons specifically address the Applications, their content, or object to their allowance.  Moreover, review of the Claims Register reveals that Mr. Gibbons is, apparently, not even a creditor in this case.  Based on what standing or in what capacity is he appearing?

Mr. Gibbons was not a member of the Committee and has no personal knowledge of any of the Committee events he incompletely or inaccurately describes:

- Gibbons claims (Gibbons Letter, p. 3) that in 2016 Committee counsel advised Ms. Pehl that Paul Wagner had a plan to take over the China business.  Committee counsel shared this information with Ms. Pehl in order to explain why the Trustee did not terminate Wagner at the outset of the case, as Ms. Pehl had adamantly demanded.[5]  The Trustee was concerned that Wagner had no prepetition non-compete agreement with the Mint and might therefore be free, as a matter of law, to approach the Mint's Chinese suppliers on his own.  The Trustee thus wanted to retain Wagner as an employee of the estate until the Mint's ongoing operation and Wagner's relationship with the reorganized Debtor could be solidified on new, binding terms.

- Committee counsel has addressed the Committee "financial advisor" issue (Gibbons Letter, p. 20) above, p. 3.

- Gibbons (Letter, p. 20) apparently finds it complaint-worthy that Committee counsel did not assist Ms. Pehl in the production of her 70-page submission to the Court (Dkt. #1901).  In

---

[5] The primary reason the Trustee retained Wagner was that Wagner was the only person who was familiar with the Mint's pre-bankruptcy computer and operating systems.

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1    reality, Ms. Pehl never discussed her submission with Committee counsel; nor did she ever solicit

2    the assistance or advice of Committee counsel prior to her filing.

3        ● Gibbons' assertion (Letter, p. 20) that it was Gearin—not Committee counsel—who

4    demanded that Bill Hanson resign from the Committee is completely inaccurate.  It was in fact

5    Committee counsel, not Gearin, who initiated Hanson' departure from the Committee with the

6

7    approval of other Committee members.  *See*, email correspondence above, p. 2.

8                              **Conclusion**

9        To the extent the Hanson Letter and the Gibbons Letter constitute objections to Committee

10   counsel's fee Application, the Court should overrule them summarily.  Committee counsel is aware

11   of no other objections to his Application.

12       DATED this 4th day of December, 2018.

13

14                         MILLER NASH GRAHAM & DUNN LLP

15                         */s/ Mark D. Northrup*
                            Mark D. Northrup, WSBA No. 16947
16                         mark.northrup@millernash.com
                            (206) 624-8300
17                         Attorneys for the Unsecured Creditors' Committee

18

19

20

21

22

23

24

25

26

REPLY OF COUNSEL TO THE OFFICIAL UNSECURED CREDITORS'
COMMITTEE TO LETTER SUBMISSIONS TO COURT - 6

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4850-6430-6561.1

Case 16-11767-CMA    Doc 1944    Filed 12/04/18    Ent. 12/04/18 16:25:09    Pg. 6 of 6