Michael J. Gearin, WSBA # 20982
David C. Neu, WSBA # 33143
Brian T. Peterson, WSBA # 42088
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580

Honorable Christopher M. Alston
Chapter 11
Hearing Location: Seattle, Rm. 7206
Hearing Date: Friday, December 7, 2018
Hearing Time: 9:30 a.m.
Response Date: November 30, 2018

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| In re: | Case No. 16-11767-CMA |
|---|---|
| NORTHWEST TERRITORIAL MINT, LLC, <br><br> Debtor. | REPLY DECLARATION OF MARK CALVERT IN SUPPORT OF FEE APPLICATIONS OF CHAPTER 11 TRUSTEE AND TRUSTEE'S PROFESSIONALS |

Mark Calvert declares as follows:

1.      I am the Chapter 11 Trustee of Northwest Territorial Mint, LLC ("NWTM" or "Debtor"). I am over eighteen (18) years of age and I am competent in all ways to testify. Unless otherwise stated herein, the following declaration is based on my personal knowledge. I submit this Declaration in Support of the Trustee's First Application for Compensation (Dkt. No. 1926) (the "Trustee Application"); the First Application for Compensation of Cascade Capital Group LLC as Accountants for the Chapter 11 Trustee (Dkt. No. 1924) (the "Cascade Application"); and K&L Gates LLP Application for Compensation (Dkt. No. 1928) (the "K&L Gates Application," and together with the Trustee's Application and the Cascade Application, the "Fee Applications").

2.      On April 1, 2016, the Debtor filed its chapter 11 petition commencing this case. The Court ordered my appointment as chapter 11 Trustee on April 11, 2016.

3.      This Declaration addresses concerns raised in Response of Counsel for the Official Unsecured Creditors' Committee to Fee Applications of Trustee and Trustee's Professionals (Dkt. No. 1943) ("Committee Counsel Fee Response") and unsworn letters submitted to the Court by

REPLY DECLARATION OF MARK CALVERT IN
SUPPORT OF FEE APPLICATIONS OF CHAPTER 11
TRUSTEE AND TRUSTEE'S PROFESSIONALS- 1

501981820 v8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

creditors John Peterson, and Bill Hanson which appear to be intended as responses to the Fee Applications.[1]

### A. The Complexities of this Bankruptcy Case.

4. It is an understatement to say that this case has been challenging. Prior to the filing of the bankruptcy case, the custom minting aspects of Northwest Territorial Mint's business, while generating quality and valued products, were unprofitable, without necessary financial oversight tools, and were subject to extremely poor management practices. NWTM was the subject of investigations and lawsuits by multiple regulatory agencies, including the Equal Opportunity Commission (employee discrimination and harassment) and state regulatory agencies (environmental contamination) that asserted tens of millions of dollars of claims against the company. Additionally, there are more than three thousand creditors who filed claims in this case in amounts in excess of $83 million. The vast majority of creditors are customers whose orders have not been fulfilled or whose stored or leased inventory has been consumed or transferred by the Debtor prior to my appointment.

5. My efforts to help provide a return to creditors was made even more difficult by the incredibly poor state of the Debtor's financial records and controls. In particular, I learned that the Debtor had not prepared financial statements for at least five years; the Debtor had not prepared tax returns for at least five years; there were no inventory controls in place for precious metals; there was no inventory of precious metals; there was no cost accounting and no understanding by management of whether individual customer orders were profitable; there was no cash management system in place; there was no forecasting of monthly sales, working capital requirements, or

---

[1] A third unsworn letter was filed with the Court by Joshua Gibbons. Mr. Gibbons is not a creditor or party in interest, and lacks standing as he has no pecuniary interest in the dispute. *In re Fondiller*, 707 F.2d 441, 442 (9th Cir. 1983) ("Only those persons who are directly and adversely affected pecuniarily by an order of the bankruptcy court have been held to have standing to appeal that order"). Furthermore, Mr. Gibbons, a blogger, does not offer admissible evidence relevant to the Court's inquiry. His letter is full of factual inaccuracies, hearsay, innuendo, and irresponsible speculation.

REPLY DECLARATION OF MARK CALVERT IN
SUPPORT OF FEE APPLICATIONS OF CHAPTER 11
TRUSTEE AND TRUSTEE'S PROFESSIONALS- 2

501981820 v8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

profitability; and the business and financial records of the Debtor that did exist were in disarray. The Debtor's lack of financial records and controls meant that this case required that I employ an extraordinary amount of financial accounting resources, and utilize the assistance and financial accounting resources of my firm, Cascade Capital Group for that purpose.

6. I was forced to construct a financial reporting system for the Mint's business and reconstruct historical financial records. I immediately implemented a day-by-day cash flow tracking and reporting system in order to manage the cash needs of the business, and I created a cost accounting system for the business in order to confirm the profitability of all aspects of the custom minting and manufacturing business.

7. At the outset of the case, I determined that there appeared to be significant quantities of precious metal inventory that had not been accounted for by the Debtor. Creditors and the creditors committee urged me to investigate whether there was missing precious metal inventory. Cascade assisted me in my efforts to secure all inventory that was on hand at the time of my appointment, to account for the inventory, and to conduct a detailed accounting for storage inventory held by the Debtor. Pictures were taken of every vault, safe, shelf and box of precious metals. In total, I believe that thousands of pictures were taken documenting the precious metals that existed when I took over the estate. We also retained video of the vaults during the inventory process.

8. As a result of this detailed and significant body of work, I confirmed that there is more than $13.8 million in missing precious metal inventory, including approximately $5 million of missing storage inventory, approximately $1.1 million of inventory that was the consigned property of a custom metal customer, approximately $540,000 of precious metal inventory provided by customers to complete custom orders, and approximately $1.8 million in missing gold sent to the Mint's Federal Way, Washington facility in October, 2015 to be exchanged for Canadian gold maple leafs, all of which totals approximately $13.8 million.

REPLY DECLARATION OF MARK CALVERT IN
SUPPORT OF FEE APPLICATIONS OF CHAPTER 11
TRUSTEE AND TRUSTEE'S PROFESSIONALS- 3

501981820 v8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA    Doc 1950    Filed 12/04/18    Ent. 12/04/18 22:05:49    Pg. 3 of 22

### B. Financial Circumstances of the Estate at the Time of My Appointment.

9.     At the time of my appointment, the estate had approximately one thousand dollars in its bank accounts and limited current assets with which to satisfy its considerable operating expenses. The estate was not remotely capable of fulfilling outstanding customer orders, which totaled approximately $25.5 million dollars.  I concluded that an immediate shutdown would not result in any distribution to creditors of the case, and that only through the restructuring of the business and preservation of the enterprise value of the company would the estate bring any return to creditors.  If the assets of the bankruptcy estate had been liquidated at the time of my appointment, the estate would have been administratively insolvent. I prepared a liquidation analysis assessing the expected financial results of a liquidation as of August 31, 2016. A copy of that analysis is attached hereto as Exhibit A.  In part due the disputes regarding ownership of significant assets of the estate, and the high costs that would have been incurred in a winddown of the business, the liquidation analysis disclosed that the estate would be administratively insolvent. Only administrative creditors, principally administrative wind down expenses of employees, landlords and professionals would have received any distribution from the estate and those administrative creditors would not have been paid in full. The anticipated results of a liquidation of the assets of the estate were discussed in detail with the Committee. Based upon the fact that unsecured creditors would not receive any dividend in a liquidation, the Committee and I focused on whether the business of the debtor could be reorganized so as to bring a return to creditors.

### C. My Efforts to Reorganize the Debtor and Drive a Return to Creditors.

10.     Certain parties have argued that services performed by me and my professionals that related to the creation of a draft plan of reorganization did not provide benefit to the estate. I prepared the plan believing that reorganization was feasible.  My decision to work to reorganize the company and seek to confirm a reorganization was supported by the Committee and other creditors that I consulted with. In fact, the Committee demanded that a draft plan be prepared in the Fall of 2016.  My work, and the work of my professionals as it relates to the preparation of the plan of

REPLY DECLARATION OF MARK CALVERT IN
SUPPORT OF FEE APPLICATIONS OF CHAPTER 11
TRUSTEE AND TRUSTEE'S PROFESSIONALS- 4

501981820 v8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

reorganization should not be judged with the benefit of 20-20 hindsight, and should instead recognize the anticipated value of the services at the time they were performed.

11.     The success of this case has always depended upon the preservation and realization of the enterprise value of the minting operations of the bankruptcy estate. From the time I was appointed through the Spring of 2017, my efforts were singularly focused on this goal, with the aim being to reorganize the Debtor's business. My evaluation of the estate's potential enterprise value led to the conclusion that the estate's business as a going concern was worth approximately $14 million.

12.     I concluded that a reorganization would be challenging. Nevertheless, I identified a number of cost-cutting measures and ultimately determined that the Debtor's underlying business enterprise value was significant and warranted an attempt at reorganizing the business for the benefit of creditors. Based on my assessment, I determined that a successful reorganization or sale as a going concern that resulted in a distribution to unsecured creditors was reasonably likely.

13.     I immediately undertook a number of cost-cutting measures. I ceased the Debtor's bullion operations, reduced employee numbers by over 50 people in the first 30 days, closed the Debtor's Federal Way and Auburn, Washington offices, and consolidated the Debtor's manufacturing operations to Dayton, Nevada and Green Bay, Wisconsin. In addition, I located and sold the assets of the Debtor's Tomball, Texas facility for $1 million. In February 2017, I obtained Court approval to engage Bill Atalla as CEO for the Company. Mr. Atalla's primary responsibility was to grow sales.

14.     In April of 2017, the Company suffered extremely poor sales. This was surprising to me and the rest of the company management. The month of April is usually a strong month for custom minting sales due to college and university customer orders. The anticipated sales orders did not occur due to a variety of circumstances. The unexpected poor sales results for April 2017 caused me to believe that cash flow could become a serious problem. Based on the daily cash flow, it became clear that the estate needed more working capital. Thus, I refunded the distribution made to

REPLY DECLARATION OF MARK CALVERT IN
SUPPORT OF FEE APPLICATIONS OF CHAPTER 11
TRUSTEE AND TRUSTEE'S PROFESSIONALS- 5

501981820 v8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Cascade Capital Group in December back to the estate to help resolve the cash flow shortfall. In addition I lined up DIP financing and factored the AR to buy time to sell the business as a going concern. At that point, I shifted my focus from a reorganization to marketing efforts for a sale as a going concern. A list of approximately fifty potential purchasers was assembled by my financial consultants, Cascade Capital Group and, with the assistance of Cascade, I solicited offers to purchase the company over a several month period.

15.     With the assistance of my professionals, I performed the analysis of issues necessary to formulate a reorganization plan, including the assessment of operational, financial and tax related issues relevant to a plan. At the time that the work related to the plan of reorganization was performed, I thought it was likely that the plan was achievable and that it would be presented to the Court. I determined, however, that I could not file the plan until the litigation with Medallic Art Company, LLC was resolved. I subsequently delayed the filing of the plan due to the unexpected results from the business operations during the Spring of 2017.

16.     I consistently communicated with the Official Unsecured Creditors' Committee (the "Committee"), keeping it advised as to important issues and developments in the case and consulting with the Committee regarding key decisions. I attended Committee meetings at the invitation of the Committee to make presentations about case progress and objectives. The Committee was consistently supportive of my decision to attempt to preserve the enterprise value of the business rather than shut it down. In fact, the Committee was insistent on a reorganization as they knew that there was no recovery for unsecured creditors without it.

**D.     Bill Hanson Letter Dated November 20, 2018.**

17.     Mr. Bill Hanson alleges that the creditors in this case never received any reports. This is not a true statement. I filed monthly operating reports throughout the case, prepared detailed schedules of the Debtor's assets and liabilities, and filed numerous pleadings in this Bankruptcy Case that informed the Court and parties in interest of my efforts in this case. Moreover, I made approximately 15 presentations to the Committee at its scheduled meetings. At those presentations, I

REPLY DECLARATION OF MARK CALVERT IN
SUPPORT OF FEE APPLICATIONS OF CHAPTER 11
TRUSTEE AND TRUSTEE'S PROFESSIONALS- 6

501981820 v8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

always presented a substantial amount of financial information and analyses to the members of the Committee on the physical inventory as of the date of my appointment, information being produced to the FBI, cash flow, operating results of the business if sales levels could be achieved, and what the value of the business could be if sales could be grown. In addition, I informed the Committee with respect to my efforts to pursue litigation against Ms. Erdmann, and my efforts to respond to informational requests made by the United States Government. The following is a sample of agenda items from some of the meetings:

- Year to date day by day cash flow and cash balance of $1.5 million
- Meeting with the FBI
- Company payment of Diane American Express bills
- Bank Data Base on hold / Need additional bank statements
- Todd Tracy Retainer Hearing
- Release of Customer Inventory hearing held
- Storage Customers
- Lease Inventory Customers
- Move from Federal Way to Kent
- Motion to accept Dayton Lease
- Tomball Settlement
- Wisconsin Operations
- EEOC claims / Settlement / culture change / leadership training
- State of Nevada Department of EPA on compliance matters
- Medallic Status
- Legal team focus going forward
- Review of Core Operations and profitability
- Key Operational Matters to completion of the propose plan
- Review of Proof of Claim Analysis

REPLY DECLARATION OF MARK CALVERT IN
SUPPORT OF FEE APPLICATIONS OF CHAPTER 11
TRUSTEE AND TRUSTEE'S PROFESSIONALS- 7

501981820 v8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

- Status of Cohen matters
- Claim Determination for voting and distribution purposes
- Plan of Reorganization Structure
- Proposed Restructuring Plan
- Review of Financial Model of the reorganization
- Proposed Time line (subject to resolution of Medallic)
- Claw back actions analysis

In addition, the following is a sample of schedules I provided for the meetings:

- Cash Flow YTD and projected to December 31, 2016
- Meeting with FBI Agenda
- American Express Pivot Table
- Storage Customer Summary
- Lease Termination Claims Summary
- Motion to Accept Dayton Lease
- Tomball Settlement
- EEOC Settlement
- State of Nevada Settlement
- Medallic Response file with the court
- Review of Profitability YTD
- Review of Proof of Claim Analysis
- Reorganization Structure
- Financial Model / Presentation via "Go to Meeting"
- Claw back Analysis

18. Mr. Bill Hanson also alleges that I did not account for storage inventory held by the Debtor upon my appointment, stating that "creditors have no idea what existed in the vaults at the time of the initiation of the BK." This is not true. I fully accounted for inventory on hand, and I

REPLY DECLARATION OF MARK CALVERT IN
SUPPORT OF FEE APPLICATIONS OF CHAPTER 11
TRUSTEE AND TRUSTEE'S PROFESSIONALS- 8

501981820 v8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

prepared a detailed accounting of storage inventory on hand. That storage inventory was presented to the Court in connection with the Trustee's multiple motions to return storage inventory to customers and the voluminous and detailed supporting evidentiary declarations.

19.    Mr. Bill Hanson also alleges that no reorganization plan was presented to creditors. This is false. With the assistance of my counsel, I prepared, a draft plan of reorganization that was presented to the Unsecured Creditors Committee at its meeting on November 29, 2016. This is evidenced by my time entries, and the time entries of K&L Gates LLP, submitted in connection with our respective fee applications.

**E.    Letter from John Peterson Dated November 25, 2018.**

20.    Mr. Peterson's unsworn letter to the Court contains some of the allegations that appear in the Hanson letter. Mr. Peterson makes statements that are not based on his personal knowledge.  In addition, Mr. Peterson argues that he has requested he would like a "receipt" for his individual losses in the case. I have made it clear in filings in this Court that this case is administratively insolvent and that unsecured creditors will not receive any money on their claims. I can confirm by this Declaration that no distribution will be made to unsecured creditors. It is unnecessary for me to send thousands of individualized "receipts" to individual creditors in this case confirming their losses; the foregoing statement in this Declaration should be sufficient.

**F.    Letter from Joshua Gibbons Dated November 27, 2018.**

21.    Mr. Gibbons is not a creditor of the estate.  He apparently attempted to artificially create creditor status by placing an order with the Debtor shortly before the Debtor filed for bankruptcy. Based on my review of the Debtor's order records, Mr. Gibbons placed a purchase order on March 30, 2016, two days before the Debtor's petition date. The order was for 2 1/10th ounce war pennies, for approximately $2.60 each. The order was never accepted by the estate. Mr. Gibbons sent in a "money order" that was returned unnegotiated on or about April 13, 2016.

REPLY DECLARATION OF MARK CALVERT IN
SUPPORT OF FEE APPLICATIONS OF CHAPTER 11
TRUSTEE AND TRUSTEE'S PROFESSIONALS- 9

501981820 v8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

### G. The Committee Counsel's Fee Response.

22. Committee Counsel references the submission of Paula and Richard Pehl (Dkt. No. 1901), and an email it received from David James. The David James provides no substantive basis for objection to payment of my fees and expenses. It only expresses Mr. James desire that my fees and those of Cascade should not be paid. The excerpts from the Pehl submission are inaccurate and untruthful. The Court has already reviewed the Paula and Richard Pehl submission and raised concerns with respect to Trustee's administration of the so-called "China dies." Those concerns were addressed in the declarations submitted at Docket Numbers 1915-1918 which I incorporate by reference. In addition, I have sought, and expect to file shortly, a supplemental declaration from Ms. Jennifer Baker further addressing the Court's questions regarding Ms. Baker.

23. Committee Counsel specifically takes issue with the time spent cooperating with requests from the FBI suggesting that those efforts benefitted only the FBI. The United States Government issued at least 10 subpoenas from April of 2016 to August of 2018 compelling my production of numerous documents and the FBI made other detailed informational requests of me throughout the case. The requests were expansive in nature requiring a broad amount of information, that took me and my staff a considerable amount of time to respond to. The requested information required searches of the data base, searches of certain emails, recovery of records of all bullion transaction, production of records of all customer order, production of recordings all security tapes etc. I had a legal obligation to comply with the government's subpoenas. The materials that I produced were business records that I had in my custody or materials I created in the course of my investigation of the financial affairs of the debtor. In short, the fees incurred in the category "Fraud Analysis" were incurred in performance of my statutorily-mandated or other legal duties, and I believe that I should be compensated for them regardless of whether they provided a direct, tangible, monetary benefit to this estate.

24. I pursued litigation against Ross Hansen and Diane Erdmann because I believed that those efforts were necessary to preserve the value of the business and estate assets. I filed a motion

REPLY DECLARATION OF MARK CALVERT IN
SUPPORT OF FEE APPLICATIONS OF CHAPTER 11
TRUSTEE AND TRUSTEE'S PROFESSIONALS- 10

501981820 v8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

to hold Mr. Hansen in contempt in response to Hansen's efforts to destroy my efforts to preserve the Debtor's business. Mr. Hansen communicated with employees postpetition in an attempt to persuade them to "walk out" and tried to convince one employee to, among other things, sabotage valuable machinery and software belonging to the estate. I did not see how I could stand by without taking action to curtail Ross Hansen's efforts to sabotage the estate's business. I consulted with the Committee about my intentions to file a motion with the Court holding Mr. Hansen in contempt. The Committee supported my efforts. Although the Court did not hold Mr. Hansen in contempt, the Court cautioned Hansen regarding his actions. Ultimately, the motion some beneficial effect I curtailing Mr. Hansen's obstructive actions as, at least to my knowledge, he ceased his contacts with employees and did not seek to have equipment of the business destroyed again.

25. The Committee Counsel expresses concern regarding fees is the "Trustee v. Erdmann" and "American Express Fraudulent Transfer Action" billing categories of my counsel, K&L Gates, LLP. At the time the fees in both categories were incurred, I believed that they were likely to benefit the estate and were reasonable and necessary to incur in the course of my obligations as Trustee. The fees in the "Trustee v. Erdmann" category were not limited to an evidentiary hearing on the source of the advance fee deposit paid to the Tracy Law Group. The issue of the source of gold coins liquidated to fund the advance fee deposit came up mere weeks into the proceeding. Diane Erdmann testified at trial that the bag of gold that was taken to the Seattle Coin Shop for liquidation contained more than the $100,000 of gold that the Coin Shop purchased. Rather, it contained approximately $200,000 in gold. Accordingly, my investigation encompassed not only the source of the gold sold to the Coin Shop, it also encompassed the source of disposition of significantly more precious metal as I knew that there was additional unaccounted for metal. Moreover, given the stage of the bankruptcy, my investigation was by necessity a broad inquiry into Diane Erdmann's role at the company and how the company managed and tracked bullion.

26. With respect to the American Express Fraudulent Transfer Action, Committee Counsel raises concern that Ms. Erdmann is effectively destitute and no ability to satisfy a judgment.

REPLY DECLARATION OF MARK CALVERT IN
SUPPORT OF FEE APPLICATIONS OF CHAPTER 11
TRUSTEE AND TRUSTEE'S PROFESSIONALS- 11

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

501981820 v8

The veracity of this observation is questionable, given large sales of hundreds of thousands of dollars in bullion by Ms. Erdmann over the course of the case. *See* Dkt. No. 1053. Also, the benefit of obtaining a judgment against Ms. Erdmann is not limited to the ability to recover against her. Given Ms. Erdmann's transfers of assets, the judgment allows me to evaluate and pursue potential sources of recovery other than Ms. Erdmann. One additional source of recovery for the estate is the precious metals that was seized by the King County Sheriff to which Ms. Erdmann claims ownership.

27. Committee Counsel argues that I may obtain a windfall by receiving compensation twice for the same services, once in the Trustee Application and again in the Cascade Application. Committee Counsel suggests that an unspecified amount of Cascade's billings are actually Trustee services that should be included in the Trustee Application and be subject to the Section 326 cap on the Trustee's fees. The Committee Counsel's assertion, which fails to cite any specific examples of objectionable entries is inaccurate. I have taken painstaking efforts to properly segregate my time for services provided as Trustee from time for financial services provide by Cascade. During the Court's hearing of October, 2017, the Court raised this issue and I revised the billings from my prior time to move substantial amounts of time from the Cascade application to the Trustee application.

28. The Cascade Capital fees are for financial services. As explained above, my efforts in this case required an unusual amount of accounting and financial expertise that necessitated my use of Cascade Capital Group to provide those services. Additionally, the services provided by Cascade were cost effective compared to other firms that would have required large deposits and the rates per hour would be much higher.

29. Committee Counsel has questioned whether the fees of Ms. Chappel and Ms. Gilmore should be in the Trustee Application rather than the Cascade Application. Cascade Capital Group utilized junior level support for its accounting and financial services, just as any accounting firm would under the circumstances. Contrary to the assertion of Committee Counsel, both Ms. Gilmore and Ms. Chappel have education and experience in providing financial and accounting services and are well qualified to provide the supporting services they did provide. Ms. Chappel worked at

REPLY DECLARATION OF MARK CALVERT IN
SUPPORT OF FEE APPLICATIONS OF CHAPTER 11
TRUSTEE AND TRUSTEE'S PROFESSIONALS- 12

501981820 v8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Cascade as an intern, while she completed here studies at the University of Washington and has since been hired by a major accounting firm. Ms. Gilmore, prior to being hired by Cascade Capital, graduated from the University of Washington with a BA in accounting and started work with Cascade thereafter. She passed her CPA exam in the fall of 2017 and her CPA credentials were finalized and sent to her on February 1, 2018.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 4th day of December 2018 at Sonoma, California.


/s/ Mark Calvert
Mark Calvert

REPLY DECLARATION OF MARK CALVERT IN
SUPPORT OF FEE APPLICATIONS OF CHAPTER 11
TRUSTEE AND TRUSTEE'S PROFESSIONALS- 13

501981820 v8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

## <u>CERTIFICATE OF SERVICE</u>

The undersigned declares as follows:

That she is a paralegal in the law firm of K&L Gates LLP, and on December 4, 2018, she caused the foregoing document to be filed electronically through the CM/ECF system which caused Registered Participants to be served by electronic means, as fully reflected on the Notice of Electronic Filing.

I declare under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

Executed on the 4th day of December, 2018 at Seattle, Washington.

*/s/ Denise A. Lentz*
Denise A. Lentz

REPLY DECLARATION OF MARK CALVERT IN
SUPPORT OF FEE APPLICATIONS OF CHAPTER 11
TRUSTEE AND TRUSTEE'S PROFESSIONALS- 14

501981820 v8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

# EXHIBIT A

# Northwest Territorial Mint, LLC
### Liquidation Analysis
### As of August 31, 2016

### &

### Reorganization Allocation
### Assuming Confirmed Plan of Reorganization
### Sale of Company in August of 2020
### Exhibit 3



3-2

Case 16-11767-CMA    Doc 1229    Filed 10/03/17    Ent. 10/03/17 18:11:33    Pg. 29 of 45
Case 16-11767-CMA    Doc 1950    Filed 12/04/18    Ent. 12/04/18 22:05:49    Pg. 16 of 22

## Northwest Territorial Mint, LLC
## Balance Sheet - Plan & Liquidation Analysis
## As of September 1, 2016

| | Chapter 7 Liquidation Analysis | | | |
|---|---|---|---|---|
| | September 1, 2016 Projection | % Recovery | Amount | Notes |
| **Current Assets** | | | | |
| Cash | $1,435,050 | 100% | $1,435,050 | 1 |
| Accounts Receivable, net | $947,532 | 70% | $663,272 | 2 |
| Pre-Petition Accounts Receivable | $249,374 | 70% | $174,562 | 2 |
| Inventory - Auburn | $1,462,560 | 50% | $731,280 | 3 |
| Inventory - Dayton | $574,286 | 90% | $516,858 | 4 |
| Inventory - Vault | $90,772 | 90% | $81,695 | 4 |
| Pre-Paid Expenses | $151,799 | 50% | $75,900 | 5 |
| Legal Receivable | $253,829 | 0% | $0 | 6 |
| Deposits/Advances | $43,850 | 50% | $21,925 | 7 |
| **Total Current Assets** | **$5,209,052** | **71%** | **$3,700,541** | |
| | | | | |
| **Fixed Assets** | | | | |
| Equipment, net | $1,024,836 | 60% | $614,902 | 8 & 9 |
| | | | | |
| | | | | |
| **Cause of Action: Claw back and Fraudulent Transfers** | | | | |
| Avoidance Action Recoveries | TBD | 100% | TBD | |
| | | | | |
| **Total Assets** | **$6,233,888** | **69%** | **$4,315,443** | |

3-3

Case 16-11767-CMA   Doc 1229   Filed 10/03/17   Ent. 10/03/17 18:11:33   Pg. 30 of 45
Case 16-11767-CMA   Doc 1950   Filed 12/04/18   Ent. 12/04/18 22:05:49   Pg. 17 of 22

## Northwest Territorial Mint, LLC
## Notes to the Liquidation Proceeds

**Notes:**

1 Gross Cash Balance

2 Account Receivable balance is assumed to experience collection issues with the liquidation of the company.

3 Inventory-Auburn would be liquidated via an auction or controlled sale. The discount is assumed to be approximately 50% off of the adjusted fair market value due to the 'odds and ends' nature of the inventory making it more difficult to find an active market upon liquidation less an additional auction commission fee.

4 Inventory-Dayton and Vault would be liquidated via an auction or controlled sale. The discount is assumed to be 10% off of the adjusted fair market value due to the highly active market available for precious metals.

5 Pre-paid expense balance is assumed to experience collection issues with the liquidation of the company.

6 Legal Receivable does not expect to be recovered upon liquidation.

7 Deposits/Advances balance is assumed to experience collection issues with the liquidation of the company.

8 Equipment would be liquidated via an auction or controlled sale. The discount is assumed to be approximately 40% off of the adjusted fair market value less an additional auction commission fee.

9 A complete equipment appraisal was done by James G. Murphy Co. and the fair market value of all of the equipment was $1,886,000. Without pursuing the Medallic Litigation NWTM would not have been able to liquidate the assets that Medallic alleged were owned by it. Therefore the entire appraised amount of alleged Medallic owned equipment is excluded. Appraised value of the non Medallic appraised assets is approximately $1,024,836.

3-4

# Northwest Territorial Mint, LLC
## Balance Sheet - Plan & Liquidation Analysis
### As of September 1, 2016

Ties to actual amount or confirmed to supporting documents
Estimated amount, subject to additional analysis

|  | Chapter 7 | | | |
|---|---|---|---|---|
|  | Claims | Allocation | % Recovery | Notes |
| **Total Funds to be Allocated to Secured Claims** | | **$4,315,443** | | |
| **Secured Claims:** | | | | |
| 1 Tomball Independent School District | $0 | $0 | 0% | 1 |
| 2 City of Tomball | $0 | $0 | 0% | 1 |
| 3 Pan American Silver Corp | $43,250 | ($43,250) | 100% | 2 |
| **Total Secured Balance** | **$43,250** | **($43,250)** | **100%** | |
| **Remaining Funds Available** | | **$4,272,193** | | |
| | | | | |
| **Total Funds to be Allocated to Administrative Claims** | | | | |
| **Post-Petition Payables:** | | | | |
| 1 Accrued Liabilities | $367,084 | ($281,470) | 77% | 3 |
| 2 Medallic Equipment Rental Payable | $250,000 | ($191,693) | 77% | 4 |
| 3 Close Down Salaries and Health Benefits | $220,156 | ($168,810) | 77% | 5 |
| 4 Customer Deposits | $193,013 | ($147,997) | 77% | 3 |
| 5 Dayton Lease Payable | $192,631 | ($147,705) | 77% | 6 |
| 6 Medallic Royalty Payable | $150,000 | ($115,016) | 77% | 7 |
| 7 Unpaid Payroll / one week lag period | $105,877 | ($81,184) | 77% | 8 |
| 8 WARN' Act | $1,011,377 | ($775,497) | 77% | 9 |
| 9 Environmental Payable | $100,000 | ($76,677) | 77% | 10 |
| 10 Vacation Payable Accrued Post Petition | $65,000 | ($49,840) | 77% | 11 |
| 11 Health Benefits Payment | $53,777 | ($41,235) | 77% | 12 |
| 12 Other Accounts Payable | $48,947 | ($37,531) | 77% | 3 |
| 13 Dayton IT Web/Hosting Payable | $27,008 | ($20,709) | 77% | 13 |
| 14 Kent IT Web/Hosting Payable | $25,443 | ($19,509) | 77% | 13 |
| 15 Environmental Payable Close Down | $25,000 | ($19,169) | 77% | 14 |
| 16 Auburn Lease Payable | $19,657 | ($15,072) | 77% | 6 |
| 17 Kent Lease Payable | $5,043 | ($3,866) | 77% | 6 |
| 18 Virginia Lease Payable | $3,598 | ($2,759) | 77% | 6 |
| 19 Wisconsin Lease Payable | $2,295 | ($1,760) | 77% | 6 |
| 20 Hawaii Lease Payable | $138 | ($106) | 77% | 6 |
| **Total Post-Petition Balance** | **$2,866,043** | **($2,197,606)** | **77%** | |
| **Net Funds to Distribute** | | | | |

3-5

# Northwest Territorial Mint, LLC
## Balance Sheet - Plan & Liquidation Analysis
## As of September 1, 2016

**Professional Fees:**

| | | | | |
|---|---|---|---|---|
| 1 K&L Gates Fee's | $854,608 | ($655,291) | 77% | 15 |
| 2 Cascade Capital Group Fee's | $459,779 | ($352,546) | 77% | 15 |
| 3 Creditors Committee Fee's | $169,259 | ($129,783) | 77% | 15 |
| 4 Trustee Fee's | $146,960 | ($112,685) | 77% | 15 |
| 5 Estimated K&L Gates Fee's | $250,000 | ($191,693) | 77% | 16 |
| 6 Estimated Cascade Capital Group Fee's | $300,000 | ($230,032) | 77% | 16 |
| 7 Estimated Creditors Committee Fee's | $50,000 | ($38,339) | 77% | 16 |
| 8 Estimated Trustee Fee's | $120,000 | ($92,013) | 77% | 17 |
| 9 Medallic Litigation Resolution | $125,000 | ($95,847) | 77% | 18 |
| 10 Proof of Claim Reconciliation | $75,000 | ($57,508) | 77% | 19 |
| 11 Return of Inventory Analysis | $75,000 | ($57,508) | 77% | 20 |
| 12 Investigation Fee's Payable for FBI Subpoena's | $30,000 | ($23,003) | 77% | 21 |
| 13 Tomball Admin Claim for Lease Termination | $25,000 | ($19,169) | 77% | 22 |
| 14 EPA Settlement Analysis | $15,000 | ($11,502) | 77% | 23 |
| 15 EEOC Settlement Analysis | $5,000 | ($3,834) | 77% | 24 |
| 16 Pan American Property Lien Analysis | $5,000 | ($3,834) | 77% | 25 |
| **Total Professional Fee's Balance** | **$2,705,606** | **($2,074,587)** | **77%** | |
| **Net Funds to Distribute** | | **$0** | | |

**Pre-Petition Priority Payables:**

| | | | | |
|---|---|---|---|---|
| Accrued Vacation Liability Payable Tomball | $48,849 | $0 | 0% | 26 |
| Accrued Vacation Liability for all other employees | $50,000 | $0 | 0% | 27 |
| Priority Claims | $1,213,168 | $0 | 0% | 28 |
| **Total Pre-Petition Balance** | **$1,312,017** | **$0** | **0%** | |
| **Net Funds to Distribute** | | | | |

**General Unsecured Creditors:**

| | | | | |
|---|---|---|---|---|
| **Unsecured Claims:** | $59,834,463 | **$0** | 0.00% | 29 |

3-6

**Notes:**

1 Amount paid from the proceeds collected for the sale of Tomball, prior to August 31, 2016.

2 The claim filed by Pan American Silver Corp is $1,072,661.12. The estimated value of the equipment Pan American alleges as collateral is $86,500. The Trustee used a 50% probability allowance for the estimated value of the lien.

3 Figures are taken from the Balance Sheet as of 8/31/16 per the MOR filed with the Court.

4 Absent substantive consolidation Medallic asserted equipment rental payments at a rate of $50,000/month starting from the bankruptcy date: April 1, 2016 to shut down at September 1, 2016.

5 See the 'Close Down Labor' tab for details

6 See the 'Rent' tab for details

7 Absent substantive consolidation Medallic asserted the right to recover royalty payments as administrative claims calculated as 10% of the Medallic Sales every month. Per last year's reports Medallic sales per month are approximately $300,000.

8 This figure represents the August 25, 2016 payroll from the monthly statement of cash flows divided by 2 to account for the one week of unpaid payroll that would have been accrued as of the close down date of September 1, 2016. Payroll is paid bi-weekly.

9 The 'WARN' Act would apply in this case requiring the Trustee to pay two months in additional salary to all employees at the Dayton facility. The monthly payroll and benefits in August of 2016 for the entire month was $561,854. Assume 90% of the employee's workforce is laid off. 90% of monthly payroll is approximately $505,667, making two months equate to $1,011,337.

10 This figure represents the total estimated fee to deliver, contain and dispose of hazardous waste that was shipped from Auburn to Dayton in accordance with EPA rules. If the company would have been liquidated as of September 1, 2016 none of the employee's would have been retained and an expert EPA consultant would have been hired incurring higher fees than the internal employee labor expense.

11 This figure represents April through August's post petition accrued vacation.

12 NWTM pays health care benefits on the first of each month for the month. With the close down the Trustee has assumed one additional month of health care to be paid on behalf of terminated employee's based upon the actual payments made in the month of September 2016.

13 See the 'IT' tab for details.

14 As of the bankruptcy date NWTM had a plating operation. Upon the close down of the company proper disposal of the plating operations fluids would be required. The estimated cost per the NWTM's EPA compliance officer is $25,000.

15 These figures are representative of invoices received as of August 31, 2016 that are reflected in the Monthly Operating Reports.

16 These are the estimated fees that would be incurred by all professionals to conclude the liquidating case.

3-7

Case 16-11767-CMA    Doc 1229    Filed 10/03/17    Ent. 10/03/17 18:11:33    Pg. 34 of 45
Case 16-11767-CMA    Doc 1950    Filed 12/04/18    Ent. 12/04/18 22:05:49    Pg. 21 of 22

17 Total distributions would have been approximately $4 Million. Trustee fees are capped at 3% of total distributions made to creditors.

18 The Trustee has assumed for the purpose of this analysis that the Medallic equipment could be segregated and identified but there would still be issues associated with cannibalized equipment and ongoing dispute regarding ownership of specific assets. Additionally, we would anticipate disputes with Medallic related to the claw back that would be pursued. This figure is an estimate of the legal fee's associated with the separation analysis.

19 This figure is an estimate of the professional fee's that would be incurred to determine which claims are valid for distribution purposes.

20 This figure is an estimate of the professional fee's associated with the determination and confirmation of ownership of inventory and the subsequent release of that inventory per court approval.

21 NWTM has been served a number of subpoenas from the FBI. While we have been able to comply with these subpoenas using primarily employee knowledge and labor additional fees would be incurred by professionals after liquidation to obtain the necessary

22 This figure represents a post petition environmental clean-up claim from the close down and flood damage relating to the Tomball facility. The Trustee believes the settlement value of the claim is $25,000.

23 NWTM would incur costs to reduce the EPA settlement claim.

24 NWTM would incur costs to reduce the EEOC settlement claim.

25 NWTM would incur costs to determine the value of the secured claim of Pan American.

26 This figure represents the amount of accrued vacation owed to Tomball employee's after the close down of the factory.

27 The amount of accrued vacation owed to employees taking into account priority claim cap.

28 This figure ties to the amount of priority claims filed with the court, see other spreadsheet for details.

29 This figure ties to the amount of unsecured claims filed in the proof of claim after preliminary scrubbing, elimination of duplicate claims and claims the Trustee anticipates objecting to.

3-8

Case 16-11767-CMA    Doc 1229    Filed 10/03/17    Ent. 10/03/17 18:11:33    Pg. 35 of 45
Case 16-11767-CMA    Doc 1950    Filed 12/04/18    Ent. 12/04/18 22:05:49    Pg. 22 of 22