# EXHIBIT C

**From:** Northrup, Mark D. [mailto:Mark.Northrup@millernash.com]
**Sent:** Wednesday, March 29, 2017 1:31 PM
**To:** Gearin, Mike
**Subject:** Committee Document Production Request

Paula has apparently intended for me to pass this on to you.

**Mark D. Northrup**
Partner

**Miller Nash Graham & Dunn LLP**
Pier 70 | 2801 Alaskan Way - Suite 300 | Seattle, Washington 98121
*Direct*: 206.777.7536 | *Office*: 206.624.8300 | *Fax*: 206.340.9599
**E-Mail | Web | Social | Blogs**

*Please consider the environment before printing this e-mail.*

**CONFIDENTIALITY NOTICE:** This e-mail message may contain confidential or privileged information. If you have received this message by mistake, please do not review, disclose, copy, or distribute the e-mail. Instead, please notify us immediately by replying to this message or telephoning us. Thank you.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com.

**Subject:** phone call
**From:** Ross Hansen (rosshansen1984@outlook.com)
**To:** paulapehl@yahoo.com;
**Date:** Wednesday, February 22, 2017 9:14 PM

Dear Dick and Paula,

Bill Hanson has told me on numerous occasions that one or both of you would be calling me. Yesterday, he told me that you'd be calling after 4:00, and he sounded surprised when he found out that you hadn't. I was then told that I could expect that call this evening, but it's now 9 p.m. and I haven't received one. I do stay up late, and you can call me up until midnight if you would like to.

I think it's important that we speak so that we can start to move forward with a positive plan to get the company back to profitability and shake off the huge and unsustainable administrative debt that the company is incurring. I very much want to put together a plan that would be good for the creditors first, and also help Diane and me. Currently, the trajectory of the company is one where everyone loses.

Let us set aside our negative emotions and treat this as the business deal that it is. I understand that you are upset with me for involving you in this mess, and believe me when I say that it has been no fun for Diane and me either. I still consider both of you friends and hope that we can repair our relationship.

Please give me a call.

Sincerely, Ross
253-261-6393

UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

IN RE:                              )
NORTHWEST TERRITORIAL MINT, LLC,    )
        Debtor.                     )   16-11767-CMA

TRANSCRIPT OF THE DIGITALLY RECORDED PROCEEDINGS

BEFORE THE HONORABLE CHRISTOPHER M. ALSTON

FEBRUARY 3, 2017

(RULING ONLY)

PREPARED BY: SHARI L. WHEELER, CCR NO. 2396

1                          APPEARANCES
2

3

FOR THE CHAPTER 11 TRUSTEE:
4
       MICHAEL J. GEARIN
5      K&L Gates, LLP
       925 Fourth Avenue, Suite 2900
6      Seattle, Washington 98104
       206.623.7580
7
FOR THE OFFICIAL UNSECURED CREDITORS COMMITTEE:
8
       MARK D. NORTHRUP
9      Miller Nash Graham & Dunn, LLP
       2801 Alaskan Way, Suite 300
10     Seattle, Washington 98121
       206.777.7536
11
ALSO PRESENT:
12
       MARK CALVERT
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              SEATTLE, WASHINGTON; FEBRUARY 3, 2017
 2                          --oOo--
 3              (Other proceedings took place.)
 4                       *  *  *  *  *  *
 5         THE COURT:  All right.  Let's see.  Thank you
 6  both.
 7         Mr. Gearin -- either one of you can answer.  I
 8  understand the committee's position.  Here are just a couple
 9  of reactions that I have.  And you may not be surprised at
10  this reaction, which is, Mr. Calvert is the trustee and is
11  effectively the CEO.  And at $30,000 a month, that's about
12  360,000 a year.  And this is a request to hire someone else,
13  who is going to be effectively the CEO, at $300,000 a year.
14         Notwithstanding that, economically, it may seem
15  to work out, just as a visceral reaction, this is unusual, I
16  think, given that there's no plan in sight.  If the plan was
17  before me and it was clear that there was about to be an
18  emergence from Chapter 11, when Mr. Calvert isn't going to run
19  the company thereafter, it might make some sense.  And don't
20  get me wrong.  I'm not saying that this doesn't make any
21  sense.  But help me address that concern.  I'm sure you
22  probably anticipated I might have it.
23         MR. GEARIN:  We did, Your Honor, so I
24  understand.  Well, I think that -- I don't think it is
25  unusual, honestly, when you have a company of the size of this
```

1   company -- a 150-employee company with a manufacturing
2   facility.  I don't think it's unusual to have the executive
3   staff of the company stay on board, even when a trustee gets
4   appointed.
5           I think that the trustee comes in and steps in
6   and takes over a management role, a supervisory role, which he
7   will still continue to have.  But what Mr. Atalla will do is
8   the sort of day-to-day business operations.  He'll try to
9   drive the company through to profitability.  So I think that
10  it's not unusual.
11          I think it's also -- the issue about, do we do
12  it before the plan or after the plan, we absolutely talked
13  about that; and we discussed it with the committee as well.
14  And what we think is we can't wait.  We think we have a sales
15  growth trajectory that needs to be achieved.  And if we don't
16  start to patch that up and start to move that trajectory in
17  the right direction, we'll have a difficult time with the
18  plan.  But if we can move things in the right direction, we
19  could have a very successful plan.
20          THE COURT:  And he will be in Nevada, which
21  helps, because that's where the primary operations are and
22  will be for the foreseeable future.
23          MR. GEARIN:  Right.  Which has been an issue,
24  with Mr. Calvert having to go down frequently -- you know, go
25  down and visit Nevada all the time.  So he will be full-time

1   in Nevada on-site.  He's actually going to buy a house very
2   close to the facility, which is going to give him access.
3               THE COURT:  Okay.  Normally, when the committee
4   comes in, I would just say, Well, it's the unsecured's money;
5   and if the committee is supporting it, who am I to say no?
6               The only concern I have is, as I see the
7   administrative expenses in this case -- and I did see the
8   monthly report -- I do have some concerns that if the
9   litigation with Medallic doesn't go the way the parties
10  hope -- or the way the parties in this room hope, might this
11  case be administratively insolvent?
12              MR. GEARIN:  Well, I don't think so even yet,
13  Your Honor.  I think we still have an operating business that
14  can be sold through a 363 sale if things fall apart.  So I
15  think that would be the direction that we would choose to
16  take.  And there are also other hard assets still there.
17              THE COURT:  All right.
18              MR. GEARIN:  I acknowledge the growth of the
19  administrative expenses.  We're concerned about that, too.
20              THE COURT:  I'm not being critical.  It is what
21  it is.
22              MR. GEARIN:  I'm telling you, we understand it,
23  and we know that it's an issue that has to be dealt with in
24  the plan.  You know, it has been a heavily litigated case with
25  a lot of issues that have cropped up.  That's why things have

1  grown to the level they have.  We are appreciative of that.
2              But I will tell you, I don't think it's
3  administratively insolvent.  And I don't think Mr. Atalla's
4  engagement -- he's got a compensation -- well, his severance
5  package, as it vests over the course of the year -- you know,
6  we think we should be emerging -- or we hope to emerge from
7  bankruptcy this year.  So it would be a relatively low number
8  to grant him a severance if we could not go forward with a --
9  you know, if we were going to sell the company or if some
10 other development occurred.
11             THE COURT:  All right.  That's the only other
12 issue I had, is that -- I have to be concerned about people
13 that may hold administrative expenses if there's a
14 possibility.  I just wanted to hear that that's currently the
15 plan, even if the Medallic litigation does not go well.  I
16 mean, the committee said it pretty well.  If the Medallic
17 litigation does not go well, there's probably not a
18 reorganization.  But even with a liquidation, you believe it's
19 sufficient to pay all administrative expenses, including this
20 additional $300,000-plus expense.
21             MR. GEARIN:  Well, I think we do, Your Honor.
22 But I think the 300,000 -- he's an at-will employee.
23             THE COURT:  Right.  So if he's terminated, it's
24 the severance that the estate might be --
25             MR. GEARIN:  That was vested to that point,

1  correct.
2              THE COURT:  And up to -- well, it's up to
3  100,000.  I did notice the change.  I do think the new
4  agreement is an improvement over the prior version and
5  tightens things up.
6              So given what you've said, and given the
7  committee's support, I will approve it.
8              To the extent the document that Mr. McMeel filed
9  was intended to be an objection, it is overruled as not
10 relevant, not with merit, not with sense.  Your order can just
11 say that all objections have been overruled.
12             MR. GEARIN:  All right.  Thank you, Your Honor.
13             THE COURT:  All right.  So do you just want to
14 submit a received unsigned order?
15             MR. GEARIN:  I think I will do that.  And I will
16 attach the additionally revised employment agreement to that.
17             THE COURT:  Terrific.
18             MR. CALVERT:  To close this out, can I make one
19 comment?
20             THE COURT:  Sure.
21             MR. CALVERT:  Your Honor, I think the truth of
22 the matter is, I don't have the skill set to grow a sales and
23 marketing team; i.e., I can't hire somebody because I'm not
24 going to be there permanently.  He is the one that really
25 needs to do that, and that's where it really needs to go to

1  make this happen.
2          THE COURT: Okay. Yet another reason to employ
3  him, and I will approve that.
4
5              (Ruling concluded.)
6              (Other proceedings took place which are not part
7               of the Court's ruling.
8                  * * * * * *

CERTIFICATE

I, Shari L. Wheeler, court reporter and court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter. Some editing changes may have been made at the request of the Court.

These pages constitute the original or a copy of the original transcript of the proceedings, to the best of my ability.

Signed and dated this 23rd day of February, 2017.


by /s/ Shari L. Wheeler
SHARI L. WHEELER, CCR NO. 2396

**Subject:** court transcript
**From:** Ross Hansen (rosshansen1984@outlook.com)
**To:** bill.beach101@gmail.com; paulapehl@yahoo.com;
**Date:** Thursday, February 23, 2017 2:33 PM

This is a copy of the transcript from the hearing for approval to hire a new CEO. As you can see, the Judge brought up the insolvency of NWTM. These comments were made *before* the most recent financial report, which showed another $500,000 loss.

Ross

## Attachments

- Digi NWTM Feb 3 2017 Appt of CEO Ruling Only Final.pdf (24.19KB)

**Subject:** liquidation of gold and silver

**From:** Ross Hansen (rosshansen1984@outlook.com)

**To:** bill.beach101@gmail.com; paulapehl@yahoo.com;

**Date:** Friday, March 10, 2017 9:11 PM

To All,

It was recently brought to my attention that Mark Calvert liquidated the contents of the Vault Room at the Auburn, WA facility, known as Bldg. B. The Vault Room was the high-security area that contained US mint and proof sets and other high value minted items that NWTM carries in inventory and sells online. There were tens of thousands of proof coins, sets reflecting hundreds of different items from the 1950s to date, mostly made from silver and gold. The estimated value of this inventory was in excess of $500,000.

The manager of this inventory was an employee named Cathy Kelso, who has been laid off. I personally spoke with her and she confirmed that the liquidation was ordered by Calvert and occurred about two months ago. Most of the product was sold to John Drummy from the Seattle Coins Shop, who I have known for 30 years. I spoke with Mr. Drummy and he confirmed his purchase, but he was reluctant to share details of his purchase absent a subpoena. My attorney Tom Bucknell sent him a subpoena this week.

The sale of these important stock items is very troubling. Not only does it eliminate hundreds of stock items from our website, but the sale was made to a local coin dealer who would have purchased them at below-wholesale prices. A sale of this size and importance is definitely out of the ordinary course of business and in my opinion should have required court approval. To my knowledge, none was asked for or obtained.

Since assuming control of NWTM on April 10, 2016, Mr. Calvert has sold off millions of dollars worth of gold, silver, platinum and palladium. Some of which I believe was being held as customer storage. We have asked Mr. Calvert for an accounting listing the description and value of the items sold, but to date he has refused to provide any details or accounting.

Current employees have been ordered not to discuss any details of the business with anyone, or to have any conversations with me under penalty of being fired.

Ross

**Subject:** dial in meeting
**From:** Ross Hansen (rosshansen1984@outlook.com)
**To:** bill.beach101@gmail.com; paulapehl@yahoo.com;
**Date:** Saturday, March 11, 2017 10:40 AM

# New Meeting
Sat, Mar 11, 2017 10:45 AM - 11:45 AM PST

**Please join my meeting from your computer, tablet or smartphone.**
https://global.gotomeeting.com/join/186857653

**You can also dial in using your phone.**
United States: +1 (872) 240-3212

**Access Code: 186-857-653**

First GoToMeeting? Try a test session: http://help.citrix.com/getready

**Subject:** Re: dial in meeting
**From:** Ross Hansen (rosshansen1984@outlook.com)
**To:** paulapehl@yahoo.com;
**Date:** Saturday, March 11, 2017 11:32 AM

We will set up a dial in call for 3pm. Just follow the instructions

---

**From:** paulapehl@yahoo.com <paulapehl@yahoo.com>
**Sent:** Saturday, March 11, 2017 11:26:20 AM
**To:** Ross Hansen
**Cc:** Bill Hanson
**Subject:** Re: dial in meeting

It is impossible for us to have a reasonable stretch of time this AM.
Let's schedule a conference call for 3pm, today.

Last time your "computer, tablet" access did not work.
Please clarify.

Paula

---

**From:** Ross Hansen <rosshansen1984@outlook.com>
**To:** Bill Hanson <bill.beach101@gmail.com>; "paulapehl@yahoo.com" <paulapehl@yahoo.com>
**Sent:** Saturday, March 11, 2017 10:40 AM
**Subject:** dial in meeting

### New Meeting
Sat, Mar 11, 2017 10:45 AM - 11:45 AM PST

**Please join my meeting from your computer, tablet or smartphone.**
https://global.gotomeeting.com/join/186857653

**You can also dial in using your phone.**
United States: +1 (872) 240-3212

**Access Code: 186-857-653**

First GoToMeeting? Try a test session: http://help.citrix.com/getready

**Subject:** 3 pm conference call

**From:** Ross Hansen (rosshansen1984@outlook.com)

**To:** bill.beach101@gmail.com; paulapehl@yahoo.com; david@stollpetteys.com;

**Date:** Saturday, March 11, 2017 2:10 PM

## New Meeting

Sat, Mar 11, 2017 3:00 PM - 4:00 PM PST

**Please join my meeting from your computer, tablet or smartphone.**
https://global.gotomeeting.com/join/557507701

**You can also dial in using your phone.**
United States: +1 (571) 317-3122

**Access Code: 557-507-701**

First GoToMeeting? Try a test session: http://help.citrix.com/getready

# Official GoToMeeting Help and Support

help.citrix.com

GoToMeeting support is here to help. Download, install and test GoToMeting software, read popular topics, user guides, and find resources that will help you host a successful online meeting.