1   Michael J. Gearin, WSBA # 20982
    David C. Neu, WSBA # 33143
2   Brian T. Peterson, WSBA # 42088
    K&L GATES LLP
3   925 Fourth Avenue, Suite 2900
    Seattle, WA 98104-1158
4   (206) 623-7580

Honorable Christopher M. Alston
Chapter 11
Hearing Location: Seattle, Rm. 7206
Hearing Date: Wednesday, March 13, 2019
Hearing Time: 9:30 a.m.
Response Date: March 4, 2019

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

In re:

NORTHWEST TERRITORIAL MINT, LLC,
            Debtor.

Case No. 16-11767-CMA

SECOND SUPPLEMENTAL
DECLARATION OF MICHAEL J.
GEARIN IN SUPPORT OF
CONSOLIDATED SUPPLEMENTAL
REPLY IN SUPPORT OF FEE
APPLICATIONS OF TRUSTEE AND
TRUSTEE'S PROFESSIONALS

I, Michael J. Gearin, declare as follows:

1.      I am a partner in the law firm of K&L Gates LLP ("K&L Gates"), attorneys for

Chapter 11 Trustee Mark Calvert ("Trustee") and have been duly authorized to practice law in this

Court for more than twenty-seven years. I submit this Second Declaration in Support of the

Trustee's First Application for Compensation (Dkt. No. 1926) (the "Trustee Application"); the First

Application for Compensation of Cascade Capital Group LLC as Accountants for the Chapter 11

Trustee (Dkt. No. 1924) (the "Cascade Application"); and K&L Gates LLP Application for

Compensation (Dkt. No. 1928) (the "K&L Gates Application," and together with the Trustee's

Application and the Cascade Application, the "Fee Applications").

2.      This declaration supplements my Supplemental Declaration of Michael J. Gearin in

Support of K&L Gates LLP First Application for Compensation for Continued Hearing February 1,

SECOND DECLARATION OF MICHAEL J. GEARIN IN
SUPPORT OF CONSOLIDATED SUPPLEMENTAL
REPLY IN SUPPORT OF FEE APPLICATIONS OF
TRUSTEE AND TRUSTEE'S PROFESSIONALS - 1
502104464 v3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA   Doc 2036   Filed 03/04/19   Ent. 03/04/19 18:22:50   Pg. 1 of 75

2019 [Dkt. 1980], which was filed on January 18, 2019 (the "January 18 Declaration") and my

Declaration of Michael J. Gearin in Support of Consolidated Supplemental Reply in Support of Fee

Applications of Trustee and Trustee's Professionals [Dkt. 2015].

　　　　3.　　　The Court has directed me to address the representations I made to the Court at a

hearing on February 3, 2017 in connection with the Trustee's motion to employ Mr. Atalla.  At that

hearing, the Court expressed concern that if the litigation with Medallic was not successful, the

estate might be administratively insolvent.  My response to the Court was: "Well, I don't think so

even yet, Your Honor.  I think we still have an operating business that can be sold through a 363 sale

if things fall apart.  So I think that would be the direction that we would choose to take."  The Court

then asked: "But even with a liquidation, you believe it's sufficient to pay all administrative

expenses, including this additional $300,000-plus expense."  To which I replied "Well, I think we do

Your Honor."  At the time of that hearing, I believed those statements were true.

　　　　4.　　　The information available to me at the time of the February 3, 2017 hearing supported

these statements.  I have consulted with the Trustee and reviewed my records to confirm whether

liquidation analyses were prepared by the Trustee prior to the February 3, 2017 hearing.  I have not

found any formal liquidation analysis.  However, on May 3, 2016, the Trustee made a presentation to

the Creditors' Committee.  In that presentation, the Trustee provided the Committee with an

"Estimated Recovery Analysis."  That estimated recovery analysis projected a roughly $800,000

surplus above administrative claims under a conservative liquidation scenario.  In addition, I had

reviewed the December, 2016 monthly operating report which was filed with the Court and which

reflected approximately $5.9 million assets against approximately $3 million in post-petition

liabilities.

　　　　5.　　　The Court has directed me to reconcile the statements I made at the February 3, 2017

hearing with my recent comment that the Trustee and the Committee knew that the estate was

administratively insolvent on a liquidation basis from the outset of the case.  Based upon my review

SECOND DECLARATION OF MICHAEL J. GEARIN IN
SUPPORT OF CONSOLIDATED SUPPLEMENTAL
REPLY IN SUPPORT OF FEE APPLICATIONS OF
TRUSTEE AND TRUSTEE'S PROFESSIONALS - 2
502104464 v3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 16-11767-CMA   Doc 2036   Filed 03/04/19   Ent. 03/04/19 18:22:50   Pg. 2 of 75

of my records and further reflection, I have concluded that I was in error when I asserted that the committee and the Trustee knew the estate was administratively insolvent at the earliest stages of the case. I wish to correct the record in that regard. While we now know, with the benefit of hindsight as to the values of assets and the level of administrative claims that the estate became administratively insolvent on a liquidation "meltdown" basis, it is not the case that the Trustee, Trustee's counsel, or the Committee knew that to be the case as of February, 2017 and no analysis suggesting administrative insolvency was ever prepared or communicated to the Committee until long after the February 3, 2017 hearing. I apologize to the Court for creating confusion over this issue.

6.    The Court made an inquiry regarding my email to Ms. Pehl, copying Mr. Northrup, dated May 10, 2017 in which I sought to complete the Trustee's investigation of communications between members of the Committee and Mr. Ross Hansen. Previously, on March 21, 2017, I had emailed all members of the Committee requesting disclosure of such communications. Each of the other committee members had cooperated in providing copies of communications with Ross Hansen and providing statements describing any contacts they may have had with Ross Hansen. On March 29, 2017, I did receive an email from Mr. Northrup forwarding certain emails provided by Ms. Pehl in response to the request for disclosures of communications with Ross Hansen, but I did not receive any other communications from the Pehls. The Trustee could not verify that the production received from Ms. Pehl was complete. Absent a direct statement from Ms. Pehl the Trustee could not conclude that Ms. Pehl had not been sharing information with Ross Hansen or cooperating with Ross Hansen in his efforts to sponsor a campaign to terminate the Trustee's employment. Ms. Pehl knew that these were the Trustee's concerns but she was not forthcoming in providing any additional information other than the materials she produced to Mr. Northrup. In my email to Ms. Pehl of May 10, 2017, I reiterated my request to Ms. Pehl that she provide a full and complete disclosure of her communications with Ross Hansen and to provide a written statement confirming the content of

SECOND DECLARATION OF MICHAEL J. GEARIN IN SUPPORT OF CONSOLIDATED SUPPLEMENTAL REPLY IN SUPPORT OF FEE APPLICATIONS OF TRUSTEE AND TRUSTEE'S PROFESSIONALS - 3
502104464 v3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

any communications, meetings or teleconferences with Ross Hansen.  It appears that I had forgotten about Mr. Northrup's prior disclosure of documents to me at the time of my May 10, 2017 email to Ms. Pehl based upon the statement in the email that the Trustee and I had not received any disclosures from the Pehls.  This statement was not made to deceive Ms. Pehl and it clearly did not deceive her based upon her response of the next day, May 11, 2017, in which she reminded me that she had produced materials to Mr. Northrup.  In her email of May 11, 2017, Ms. Pehl did provide a written statement and disclosures regarding her interactions with Ross Hansen.  From the perspective of the Trustee, the written statement and additional disclosures concluded the investigation of the communications between the Pehls and Ross Hansen and thereafter the Trustee agreed to share confidential information to the Committee and its members including the Pehls.

7.      The Court has directed me to provide copies of my communication with Mr. Bressler or his counsel between March 1, 2017 to present.  I have had no such contacts with Mr. Bressler directly.  Attached hereto as Exhibit A is a copy of all such communications with Mr. Bressler's counsel Mr. Lerner.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

DATED this 4th day of March, 2019.


*/s/Michael J. Gearin*_____
Michael J. Gearin

SECOND DECLARATION OF MICHAEL J. GEARIN IN
SUPPORT OF CONSOLIDATED SUPPLEMENTAL
REPLY IN SUPPORT OF FEE APPLICATIONS OF
TRUSTEE AND TRUSTEE'S PROFESSIONALS - 4
502104464 v3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**CERTIFICATE OF SERVICE**

The undersigned declares as follows:

That she is a paralegal in the law firm of K&L Gates LLP, and on March 4, 2019, she caused the foregoing document to be filed electronically through the CM/ECF system which caused

Registered Participants to be served by electronic means, as fully reflected on the Notice of Electronic Filing.

I declare under penalty of perjury under the laws of the State of Washington and the United

States that the foregoing is true and correct.

Executed on the 4th day of March, 2019 at Seattle, Washington.

_/s/ Denise A. Lentz_

Denise A. Lentz

SECOND DECLARATION OF MICHAEL J. GEARIN IN
SUPPORT OF CONSOLIDATED SUPPLEMENTAL
REPLY IN SUPPORT OF FEE APPLICATIONS OF
TRUSTEE AND TRUSTEE'S PROFESSIONALS - 5

502104464 v3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

# EXHIBIT A

| | |
|---|---|
| **From:** | Tom Lerner |
| **To:** | Gearin, Mike |
| **Subject:** | RE: NWTM/Bressler [KLG-USW_Active01.FID237675] |
| **Date:** | Tuesday, March 7, 2017 5:02:21 PM |
| **Attachments:** | 914794_2.docx |

Mike,

     Here are some edits to your markup, and the whole document remains subject to my client's approval. I am around tomorrow. Let me know if these revisions are ok, and I will go through it all with Dick.

Thanks, Tom

**From:** Gearin, Mike [mailto:Mike.Gearin@klgates.com]
**Sent:** Tuesday, March 07, 2017 4:46 PM
**To:** Tom Lerner
**Subject:** NWTM/Bressler [KLG-USW_Active01.FID237675]

Tom: Apologies for delay, but we have had a couple of other cases that have consumed much of my time for the past few days. Here is a redline to the version that you sent me, accepting many of your changes and taking a stab at the language you were looking for to assist with Mr. Bressler's intended tax treatment. I am around all day tomorrow if you want to discuss.

Regards

**Michael J.Gearin**

**K&L Gates LLP**

925 Fourth Avenue, Suite 2900

Seattle, WA 98104

(206) 370-6666 Direct

(206) 940-2500 Mobile

Fax (206) 370-6067 Direct

michael.gearin@klgates.com

http://www.klgates.com

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com.

A-2

**From:** Gearin, Mike
**To:** Tom Lerner (Tom.Lerner@stokeslaw.com)
**Subject:** Mint/Bressler [KLG-USW_Active01.FID237675]
**Date:** Tuesday, March 7, 2017 5:21:03 PM
**Attachments:** 914794_2.docx

Accepted all your changes except for this one issue.

| From: | Gearin, Mike |
|---|---|
| To: | "Tom Lerner" |
| Subject: | RE: Mr. Bressler |
| Date: | Wednesday, March 8, 2017 1:14:41 PM |

Tom: I do not think the Trustee will agree to that, but I will ask.

**From:** Tom Lerner [mailto:Tom.Lerner@stokeslaw.com]
**Sent:** Wednesday, March 08, 2017 12:43 PM
**To:** Gearin, Mike
**Subject:** Mr. Bressler

Mike,

I shared our draft and discussions with Dick, and he would like to see if we can get court approval with the immediate release rather than have it be dependent upon the outcome of your litigation.

Tom

**Thomas A. Lerner** (v-card | bio)
Shareholder
Stokes Lawrence, P.S. - *Realizing your vision.*
1420 Fifth Avenue, Suite 3000 | Seattle, WA 98101-2393
Tel.: (206) 892-2147 | Fax: (206) 464-1496 | Cell: (206) 390-0470
Email: tom.lerner@stokeslaw.com | Web: www.stokeslaw.com

This e-mail may contain confidential information which is legally privileged. The information is solely for the use of the addressee(s) named above. If you are not the intended recipient, any disclosure, copying, distribution or other use of the contents of this information is strictly prohibited. If you have received this e-mail in error, please notify us by return e-mail and delete this message. Thank you.

| | |
|---|---|
| **From:** | Tom Lerner |
| **To:** | Gearin, Mike |
| **Subject:** | RE: Bressler [KLG-USW_Active01.FID237675] |
| **Date:** | Thursday, March 9, 2017 10:01:47 AM |
| **Attachments:** | 914817.docx |

Here you go. Just accepted the remaining tracked changes.

---

**From:** Gearin, Mike [mailto:Mike.Gearin@klgates.com]
**Sent:** Wednesday, March 08, 2017 6:01 PM
**To:** Tom Lerner
**Subject:** RE: Bressler [KLG-USW_Active01.FID237675]

Tom: That is great. Thanks. If you want to make your final cleanups and send that to me, I will confirm that we have agreement on form and we can exchange signatures. Appreciate your good work on this.

Mike

---

**From:** Tom Lerner [mailto:Tom.Lerner@stokeslaw.com]
**Sent:** Wednesday, March 08, 2017 5:12 PM
**To:** Gearin, Mike
**Subject:** Bressler

Mike,

Mr. Bressler will cast his lot with your trial skills and await the release pending subcon. Shall I just clean up formatting on the last version that you sent, accept changes and have that signed, or would you prefer to send a signature version?

Tom

**Thomas A. Lerner** (v-card | bio)
Shareholder
Stokes Lawrence, P.S. - *Realizing your vision.*
1420 Fifth Avenue, Suite 3000 | Seattle, WA 98101-2393
Tel.: (206) 892-2147 | Fax: (206) 464-1496 | Cell: (206) 390-0470
Email: tom.lerner@stokeslaw.com | Web: www.stokeslaw.com

This e-mail may contain confidential information which is legally privileged. The information is solely for the use of the addressee(s) named above. If you are not the intended recipient, any disclosure, copying, distribution or other use of the contents of this information is strictly prohibited. If you have received this e-mail in error, please notify us by return e-mail and delete this message. Thank you.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com.

**From:** Gearin, Mike
**To:** Tom Lerner (Tom.Lerner@stokeslaw.com)
**Subject:** Bressler/Mint Settlement [KLG-USW_Active01.FID237675]
**Date:** Thursday, March 9, 2017 10:20:14 AM
**Attachments:** 914817.docx

Tom: Adding a sentence to paragraph 2, clarifying that the manager of Medallic is actually Medallic Art Corporation and cleaning up some nits. If you are good with these, I will circulate a signature version.

| From: | Gearin, Mike |
|---|---|
| To: | Tom Lerner (Tom.Lerner@stokeslaw.com) |
| Subject: | Revised Bressler/Mint Settlement [KLG-USW_Active01.FID237675] |
| Date: | Thursday, March 9, 2017 11:19:30 AM |
| Attachments: | 914817.docx |

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into and effective as of this ——9th day of March, 2017, upon the terms and conditions set forth below, by and between Mark Calvert as Chapter 11 Trustee for Northwest Territorial Mint, LLC ("Trustee") in bankruptcy case no. 16-11767, United States Bankruptcy Court for the Western District of Washington and Richard Bressler on behalf of himself and his marital community ("Bressler"). The Trustee and Bressler are collectively referred to herein as the "Parties."

## RECITALS

A.    On April 1, 2016, Northwest Territorial Mint, LLC (the "Debtor" or the "Mint") filed a chapter 11 voluntary bankruptcy petition, commencing Case No. 16-11767-CMA (the "Bankruptcy Case") in the United States Bankruptcy Court for the Western District of Washington (the "Bankruptcy Court"). On April 11, 2016, the Bankruptcy Court appointed Mark Calvert as chapter 11 Trustee.

B.    Bressler is a member and fifty percent interest holder in Medallic Art Company LLC, a Nevada ~~LLC~~ limited liability company ("Medallic"). Bressler invested Three Million Dollars ($3,000,000) to acquire his interest in Medallic in July, 2009. Bressler's intent in making his investment in Medallic was to become a financial member only, with no management or operational role, for the purpose of realizing a desired rate of return analogous to a capital lease. The remaining fifty percent interest in Medallic is nominally held by Ross Hansen ("Hansen") and a corporate affiliate of Hansen, Medallic Art Corporation. Under the terms of the Medallic Limited Liability Company Agreement, managerial control over Medallic is presently vested in Medallic Art Corporation which is solely owned and controlled by Hansen.

C.    Medallic, under the exclusive control of Hansen, filed a complaint against the Trustee under Adversary No. 16-01196, United States Bankruptcy Court for the Western District of Washington (the "Medallic Litigation"). The Trustee has answered and counterclaimed. Among the claims at issue in the Medallic Litigation, is the Trustee's claim that Medallic should be substantively consolidated with the bankruptcy estate of the Mint or alternatively, that Medallic should be deemed an alter ego of the Mint (collectively these claims are the "Substantive Consolidation Claims"). If the Court orders substantive consolidation of Medallic and the Mint, the assets and liabilities of Medallic and the Mint will be consolidated into a single pool to satisfy claims of creditors of both entities and intercompany claims between Medallic and the Mint will be extinguished.

D.    In the Medallic Litigation, the Trustee has also alleged the existence of fraudulent transfers to include the more than $3.3 million in direct transfers from the Mint to Medallic and transfers by the Mint for the benefit of Medallic. Bressler is not a party to the Medallic Litigation. Medallic ceased making distributions to Bressler on account of his investment in 2013.

E.     The Trustee asserts that, without Bressler's knowledge, the Mint and Medallic were operated by Hansen prior to the bankruptcy in a manner which exhibited attributes of a Ponzi scheme in that orders of bullion customers of the Mint were fulfilled primarily from later customer deposits while the Mint made false and misleading statements and concealed material facts from bullion customers in order to induce them to extend credit to the Mint.

F.     The Trustee has formulated a plan of reorganization for the consolidated Mint which is premised on the continued operations of the substantively consolidated Mint to drive profits which will be distributed to pay the claims of creditors. The plan has been drafted, but not yet filed with the Court and the Court has not yet considered the approval of a disclosure statement for the plan. Resolution of the Substantive Consolidation Claims is important to the furtherance of the estate's interests in achieving confirmation of a plan of reorganization.

G.     The parties to this Agreement wish to resolve potential claims and issues between them as reflected by the terms contained below.

## AGREEMENT

In consideration of the mutual promises and covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties to this Agreement agree as follows:

1.     Recitals.  The Recitals set forth above constitute an integral part of this Agreement and the parties hereby affirm the facts set forth therein and agree to the incorporation of the Recitals by this reference with the same force and effect as if set forth herein as agreements of the Parties.

2.     Stipulation to Substantive Consolidation.  Bressler stipulates to and agrees not to oppose the Trustee's proposed substantive consolidation of Medallic with the bankruptcy estate of the Mint. To the extent that Bressler obtains management control over Medallic, he will cause Medallic to stipulate to and not oppose the Trustee's proposed substantive consolidation of Medallic with the bankruptcy estate of the Mint. If the Court does not order substantive consolidation of Medallic with the bankruptcy estate of the Mint, Bressler stipulates to and agrees not to oppose the Court's determination that Medallic is an alter ego of the Mint. To the extent that Bressler obtains management control over Medallic, he will cause Medallic to stipulate to and not oppose a determination that Medallic is an alter ego of the Mint. Nothing in this Agreement presumes or shall be interpreted to compel Bressler to become the Manager of Medallic.

3.     Allowance of Claim.  If the Court substantively consolidates the Mint with Medallic, or finds that Medallic is an alter ego of the Mint, Mr. Bressler will be granted an allowed general unsecured claim in the Bankruptcy Case in the amount of Three Million Dollars ($3,000,000). Other than this Three Million Dollar allowed general unsecured claim, Bressler will not be entitled to any claim or interest in the bankruptcy

case.

     4.    <u>Release of Claims by Trustee against Bressler</u>. Contingent upon the fulfillment by Bressler of his obligations under this Agreement, and the Court's substantive consolidation of Medallic with the bankruptcy estate of the Mint or the Court's substantive consolidation of Medallic with the bankruptcy estate of the Mint, the Trustee, on behalf of the Bankruptcy Estate, its respective agents, affiliates, parents, subsidiaries, officers, directors, shareholders, legal representatives, successors and assigns, shall be deemed to have fully and forever released, compromised and discharged Bressler and his current, former, and future, agents, lawyers, employees, predecessors, successors, assigns, affiliates, and representatives from all actions, claims, demands, damages, debts, losses, liabilities, indebtedness, causes of action (whether at law or in equity) and obligations of whatever kind or nature, whether now known or hereafter discovered, direct or indirect, new or existing, foreseen or unforeseen, by reason of any matter, cause or thing whatsoever occurring on or prior to the date hereof, arising out of or relating to the affairs of Medallic and the Mint.

     5.    <u>Release of Claims by Bressler</u>. Contingent upon the fulfillment by the Trustee of his obligations under this Agreement on behalf of the Bankruptcy Estate and the Court's substantive consolidation of Medallic with the bankruptcy estate of the Mint or the Court's finding that Medallic is the alter ego of the Mint, Bressler, his respective agents, affiliates, parents, subsidiaries, officers, directors, shareholders, legal representatives, successors and assigns shall be deemed to have fully and forever released, comprised and discharged the Bankruptcy Estate, the Trustee, and the Trustee's current, former, and future, agents, lawyers, employees predecessors, successors, assigns, affiliates, and representatives from all actions, claims, demands, damages, debts, losses, liabilities, indebtedness, causes of action (whether at law or in equity) and obligations of whatever kind or nature, whether now known or hereafter discovered, direct or indirect, new or existing, foreseen or unforeseen, by reason of any matter, cause or thing whatsoever occurring on or prior to the date hereof arising out of or relating to the affairs of Medallic and the Mint, excepting only his allowed $3 million claim as described in paragraph 3 above.

     6.    <u>Agreement Subject to Court Approval.</u> This agreement is binding on the parties, subject only to the approval of the Bankruptcy Court. The Trustee agrees to promptly apply to the Court for such approval.

     7.    <u>Representation</u>. The Parties to this Agreement have had the opportunity to review this Agreement and acknowledge that they fully understand and agree to the contents herein. The Parties have had the opportunity to consult with their own attorneys concerning this Agreement and have not entered into this Agreement under any undue influence. Each of the individuals signing this Agreement specifically represents and warrants that they have authority to bind the parties to this Agreement.

     8.    <u>Governing Law; Jurisdiction and Venue</u>. This Agreement is entered into in Washington and shall be governed by and construed in accordance with the substantive laws of the State of Washington, without giving effect to conflicts of laws rules. The

Parties agree that the Bankruptcy Court for the Western District of Washington shall have jurisdiction and shall be the sole venue for the determination of any disputes arising out of this Agreement.

9.     Successors and Assigns.  This Agreement shall inure to the benefit and be binding upon the parties to this Agreement and their successors and assigns.

10.     Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior agreements, representations, warranties, statements, promises, information, arrangements and understandings, whether oral or written, express or implied, with respect to the subject matter hereof.  No variations, modifications, or changes herein shall be binding upon any party unless set forth in a document executed by the Parties.

11.     Counterparts; Signature Pages.  This Agreement may be executed in one or more counterparts, each of which shall constitute an original document but all of which when taken together shall constitute one and the same agreement.  Delivery of an executed copy facsimile or email transmission or other means of electronic communication producing a printed copy will be deemed to be an execution and delivery of this Agreement on the date of such communication by the parties so delivering such a copy.  Any party so delivering such a copy via electronic communication shall deliver an executed original of this Agreement to the other parties upon request.

12.     Headings.  The captions or headings provided in this Agreement are for convenience only and shall not be deemed to be a part of this Agreement.

13.     Further Assurances.  From time to time and without further consideration, the parties hereto shall execute and deliver such other instruments of conveyance, assignment, transfer, delivery, security and take such other action as may be reasonably necessary in order to consummate the transactions contemplated by this Agreement, providing however that any such instruments shall be without warranty.

14.     No Waiver.  A party does not waive any right under this Agreement by failing to insist on compliance with any of the terms of this Agreement or by failing to exercise any right hereunder.  Any waivers granted hereunder are effective only if recorded in a writing signed by the party granting such waiver.

15.     Severability.  If any provision of this Agreement is determined by any court or governmental authority to be unenforceable, this entire Agreement shall be null and void.

16.     Rules of Construction. Each of the Parties and/or counsel for each party have reviewed this Agreement and accordingly the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

17. <u>Cumulative Rights/Construction</u>. The rights and remedies of the Parties under this Agreement are cumulative, and any party may enforce any of its rights or remedies under this Agreement or other rights and remedies available to it at law or in equity.

MARK CALVERT, CHAPTER 11 TRUSTEE OF THE BANKRUPTCY ESTATE OF NORTHWEST TERRITORIAL MINT, LLC

By_____

_____Mark Calvert

Date_____

RICHARD BRESSLER

_____

Date_____

OK with me.

---

**From:** Gearin, Mike [mailto:Mike.Gearin@klgates.com]
**Sent:** Thursday, March 09, 2017 3:57 PM
**To:** Tom Lerner
**Subject:** RE: Revised Bressler/Mint Settlement [KLG-USW_Active01.FID237675]

Agreed.  I will send you the execution version.  Perhaps we can exchange emailed signatures so I can start on the motion and when we can get original signatures we can exchange those later.

---

**From:** Tom Lerner [mailto:Tom.Lerner@stokeslaw.com]
**Sent:** Thursday, March 09, 2017 3:54 PM
**To:** Gearin, Mike
**Subject:** RE: Revised Bressler/Mint Settlement [KLG-USW_Active01.FID237675]

We have a deal.  If we try to revise again, may our keyboards freeze up!

---

**From:** Gearin, Mike [mailto:Mike.Gearin@klgates.com]
**Sent:** Thursday, March 09, 2017 11:20 AM
**To:** Tom Lerner
**Subject:** Revised Bressler/Mint Settlement [KLG-USW_Active01.FID237675]

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com.

| | |
|---|---|
| **From:** | Gearin, Mike |
| **To:** | Tom Lerner (Tom.Lerner@stokeslaw.com) |
| **Subject:** | Mint/Bressler Settlement Agreement/Signature Version [KLG-USW_Active01.FID237675] |
| **Date:** | Thursday, March 9, 2017 3:58:35 PM |
| **Attachments:** | 914817.docx |

I will forward this to Calvert for signature.


**Michael J.Gearin**

**K&L Gates LLP**

925 Fourth Avenue, Suite 2900

Seattle, WA 98104

(206) 370-6666 Direct

(206) 940-2500 Mobile

Fax (206) 370-6067 Direct

michael.gearin@klgates.com

http://www.klgates.com

| From: | Gearin, Mike |
|---|---|
| To: | "Tom Lerner" |
| Subject: | RE: Calvert Signature on Settlement Agreement [KLG-USW_Active01.FID237675] |
| Date: | Friday, March 10, 2017 11:30:47 AM |

OK. Thanks.

-----Original Message-----
From: Tom Lerner [mailto:Tom.Lerner@stokeslaw.com]
Sent: Friday, March 10, 2017 11:29 AM
To: Gearin, Mike
Subject: RE: Calvert Signature on Settlement Agreement [KLG-USW_Active01.FID237675]

I have his signature, but awkwardly scanned. Dick said I was pushing his technological skills. I also have asked that he mail the original to me, and can likely have a good scan and an original signature by Monday. He has signed.

-----Original Message-----
From: Gearin, Mike [mailto:Mike.Gearin@klgates.com]
Sent: Friday, March 10, 2017 11:27 AM
To: Tom Lerner
Subject: Calvert Signature on Settlement Agreement [KLG-USW_Active01.FID237675]

Tom: Mark Calvert is travelling today and can't get to a scanner. Attached is a photo of his signature on the settlement agreement. I'll get you an original signature next week. Will you be able to get me a signature from Mr. Bressler today?


Michael J.Gearin
K&L Gates LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 370-6666 Direct
(206) 940-2500 Mobile
Fax (206) 370-6067 Direct
michael.gearin@klgates.com
http://www.klgates.com


This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com<mailto:Mike.Gearin@klgates.com>.-5

| From: | Tom Lerner |
| To: | Gearin, Mike |
| Subject: | RE: Calvert Signature on Settlement Agreement [KLG-USW_Active01.FID237675] |
| Date: | Monday, March 13, 2017 12:57:41 PM |
| Attachments: | 915259.pdf |

Here is what I have. I expect to have the original in today or tomorrow's mail.

-----Original Message-----
From: Gearin, Mike [mailto:Mike.Gearin@klgates.com]
Sent: Monday, March 13, 2017 12:56 PM
To: Tom Lerner
Subject: RE: Calvert Signature on Settlement Agreement [KLG-USW_Active01.FID237675]

Did you get a clean scan from Dick on the agreement?

-----Original Message-----
From: Tom Lerner [mailto:Tom.Lerner@stokeslaw.com]
Sent: Friday, March 10, 2017 11:29 AM
To: Gearin, Mike
Subject: RE: Calvert Signature on Settlement Agreement [KLG-USW_Active01.FID237675]

I have his signature, but awkwardly scanned. Dick said I was pushing his technological skills. I also have asked that he mail the original to me, and can likely have a good scan and an original signature by Monday. He has signed.

-----Original Message-----
From: Gearin, Mike [mailto:Mike.Gearin@klgates.com]
Sent: Friday, March 10, 2017 11:27 AM
To: Tom Lerner
Subject: Calvert Signature on Settlement Agreement [KLG-USW_Active01.FID237675]

Tom: Mark Calvert is travelling today and can't get to a scanner. Attached is a photo of his signature on the settlement agreement. I'll get you an original signature next week. Will you be able to get me a signature from Mr. Bressler today?


Michael J.Gearin
K&L Gates LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 370-6666 Direct
(206) 940-2500 Mobile
Fax (206) 370-6067 Direct
michael.gearin@klgates.com
http://www.klgates.com

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com<mailto:Mike.Gearin@klgates.com>.-5

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com<mailto:Mike.Gearin@klgates.com>.-5

under this Agreement are cumulative, and any party may enforce any or its rights or
remedies under this Agreement or other rights and remedies available to it at law or in
equity.

MARK CALVERT, CHAPTER 11 TRUSTEE OF THE
BANKRUPTCY ESTATE OF NORTHWEST TERRITORIAL
MINT, LLC

By: _____

Mark Calvert

Date _____

_____

RICHARD BRESSLER

_____

Date  3/9/2011

| From: | Tom Lerner |
| To: | Gearin, Mike |
| Subject: | Bressler |
| Date: | Monday, March 13, 2017 3:34:35 PM |
| Attachments: | Settlement Agreement - Bressler Sig Page.pdf |

Mike,

    The original signature page arrived today and we can marry it to the rest of the document if you want to swap originals. In these days of electronic filing, I tend to rely on PDFs, but defer to you. Better scan attached.

Tom

**Thomas A. Lerner** (v-card | bio)
Shareholder
Stokes Lawrence, P.S. - *Realizing your vision.*
1420 Fifth Avenue, Suite 3000 | Seattle, WA 98101-2393
Tel.: (206) 892-2147 | Fax: (206) 464-1496 | Cell: (206) 390-0470
Email: tom.lerner@stokeslaw.com | Web: www.stokeslaw.com

This e-mail may contain confidential information which is legally privileged. The information is solely for the use of the addressee(s) named above. If you are not the intended recipient, any disclosure, copying, distribution or other use of the contents of this information is strictly prohibited. If you have received this e-mail in error, please notify us by return e-mail and delete this message. Thank you.

under this Agreement are cumulative, and any party may enforce any of its rights or remedies under this Agreement or other rights and remedies available to it at law or in equity.

MARK CALVERT, CHAPTER 11 TRUSTEE OF THE
BANKRUPTCY ESTATE OF NORTHWEST TERRITORIAL
MINT, LLC


By_____

    Mark Calvert

Date_____


RICHARD BRESSLER


Date_____3/9/2017_____

Thanks Tom. Calvert is in Nevada and back Thursday and I can send you his original Friday. We are working up the motion to approve the settlement and plan on filing this week for hearing on April 14.

---

**From:** Tom Lerner [mailto:Tom.Lerner@stokeslaw.com]
**Sent:** Monday, March 13, 2017 3:34 PM
**To:** Gearin, Mike
**Subject:** Bressler

Mike,

    The original signature page arrived today and we can marry it to the rest of the document if you want to swap originals. In these days of electronic filing, I tend to rely on PDFs, but defer to you. Better scan attached.

Tom

**Thomas A. Lerner** (v-card | bio)
Shareholder
Stokes Lawrence, P.S. - *Realizing your vision.*
1420 Fifth Avenue, Suite 3000 | Seattle, WA 98101-2393
Tel.: (206) 892-2147 | Fax: (206) 464-1496 | Cell: (206) 390-0470
Email: tom.lerner@stokeslaw.com | Web: www.stokeslaw.com

This e-mail may contain confidential information which is legally privileged. The information is solely for the use of the addressee(s) named above. If you are not the intended recipient, any disclosure, copying, distribution or other use of the contents of this information is strictly prohibited. If you have received this e-mail in error, please notify us by return e-mail and delete this message. Thank you.

| From: | Gearin, Mike |
| --- | --- |
| To: | Tom Lerner (Tom.Lerner@stokeslaw.com) |
| Subject: | Signed Settlement Agreement [KLG-USW_Active01.FID237675] |
| Date: | Tuesday, March 14, 2017 11:31:23 AM |
| Attachments: | 03-14-17 Settlement Agreement.pdf |

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into and effective as of this 9th day of March, 2017, upon the terms and conditions set forth below, by and between Mark Calvert as Chapter 11 Trustee for Northwest Territorial Mint, LLC ("Trustee") in bankruptcy case no. 16-11767, United States Bankruptcy Court for the Western District of Washington and Richard Bressler on behalf of himself and his marital community ("Bressler"). The Trustee and Bressler are collectively referred to herein as the "Parties."

## RECITALS

A.     On April 1, 2016, Northwest Territorial Mint, LLC (the "Debtor" or the "Mint") filed a chapter 11 voluntary bankruptcy petition, commencing Case No. 16-11767-CMA (the "Bankruptcy Case") in the United States Bankruptcy Court for the Western District of Washington (the "Bankruptcy Court"). On April 11, 2016, the Bankruptcy Court appointed Mark Calvert as chapter 11 Trustee.

B.     Bressler is a member and fifty percent interest holder in Medallic Art Company LLC, a Nevada limited liability company ("Medallic"). Bressler invested Three Million Dollars ($3,000,000) to acquire his interest in Medallic in July, 2009. Bressler's intent in making his investment in Medallic was to become a financial member only, with no management or operational role, for the purpose of realizing a desired rate of return analogous to a capital lease. The remaining fifty percent interest in Medallic is nominally held by Ross Hansen ("Hansen") and a corporate affiliate of Hansen, Medallic Art Corporation. Under the terms of the Medallic Limited Liability Company Agreement, managerial control over Medallic is presently vested in Medallic Art Corporation which is solely owned and controlled by Hansen.

C.     Medallic, under the exclusive control of Hansen, filed a complaint against the Trustee under Adversary No. 16-01196, United States Bankruptcy Court for the Western District of Washington (the "Medallic Litigation"). The Trustee has answered and counterclaimed. Among the claims at issue in the Medallic Litigation, is the Trustee's claim that Medallic should be substantively consolidated with the bankruptcy estate of the Mint or alternatively, that Medallic should be deemed an alter ego of the Mint (collectively these claims are the "Substantive Consolidation Claims"). If the Court orders substantive consolidation of Medallic and the Mint, the assets and liabilities of Medallic and the Mint will be consolidated into a single pool to satisfy claims of creditors of both entities and intercompany claims between Medallic and the Mint will be extinguished.

D.     In the Medallic Litigation, the Trustee has also alleged the existence of fraudulent transfers to include the more than $3.3 million in direct transfers from the Mint to Medallic and transfers by the Mint for the benefit of Medallic. Bressler is not a party to the Medallic Litigation. Medallic ceased making distributions to Bressler on account of his investment in 2013.

E.    The Trustee asserts that, without Bressler's knowledge, the Mint and Medallic were operated by Hansen prior to the bankruptcy in a manner which exhibited attributes of a Ponzi scheme in that orders of bullion customers of the Mint were fulfilled primarily from later customer deposits while the Mint made false and misleading statements and concealed material facts from bullion customers in order to induce them to extend credit to the Mint.

F.    The Trustee has formulated a plan of reorganization for the consolidated Mint which is premised on the continued operations of the substantively consolidated Mint to drive profits which will be distributed to pay the claims of creditors. The plan has been drafted, but not yet filed with the Court and the Court has not yet considered the approval of a disclosure statement for the plan. Resolution of the Substantive Consolidation Claims is important to the furtherance of the estate's interests in achieving confirmation of a plan of reorganization.

G.    The parties to this Agreement wish to resolve potential claims and issues between them as reflected by the terms contained below.

## AGREEMENT

In consideration of the mutual promises and covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties to this Agreement agree as follows:

1.    <u>Recitals</u>. The Recitals set forth above constitute an integral part of this Agreement and the parties hereby affirm the facts set forth therein and agree to the incorporation of the Recitals by this reference with the same force and effect as if set forth herein as agreements of the Parties.

2.    <u>Stipulation to Substantive Consolidation</u>. Bressler stipulates to and agrees not to oppose the Trustee's proposed substantive consolidation of Medallic with the bankruptcy estate of the Mint. To the extent that Bressler obtains management control over Medallic, he will cause Medallic to stipulate to and not oppose the Trustee's proposed substantive consolidation of Medallic with the bankruptcy estate of the Mint. If the Court does not order substantive consolidation of Medallic with the bankruptcy estate of the Mint, Bressler stipulates to and agrees not to oppose the Court's determination that Medallic is an alter ego of the Mint. To the extent that Bressler obtains management control over Medallic, he will cause Medallic to stipulate to and not oppose a determination that Medallic is an alter ego of the Mint. Nothing in this Agreement presumes or shall be interpreted to compel Bressler to become the Manager of Medallic.

3.    <u>Allowance of Claim.</u> If the Court substantively consolidates the Mint with Medallic, or finds that Medallic is an alter ego of the Mint, Mr. Bressler will be granted an allowed general unsecured claim in the Bankruptcy Case in the amount of Three Million Dollars ($3,000,000). Other than this Three Million Dollar allowed general unsecured claim, Bressler will not be entitled to any claim or interest in the bankruptcy case.

4.  <u>Release of Claims by Trustee against Bressler</u>. Contingent upon the fulfillment by Bressler of his obligations under this Agreement, and the Court's substantive consolidation of Medallic with the bankruptcy estate of the Mint or the Court's finding that Medallic is the alter ego of the Mint, the Trustee, on behalf of the Bankruptcy Estate, its respective agents, affiliates, parents, subsidiaries, officers, directors, shareholders, legal representatives, successors and assigns, shall be deemed to have fully and forever released, compromised and discharged Bressler and his current, former, and future, agents, lawyers, employees, predecessors, successors, assigns, affiliates, and representatives from all actions, claims, demands, damages, debts, losses, liabilities, indebtedness, causes of action (whether at law or in equity) and obligations of whatever kind or nature, whether now known or hereafter discovered, direct or indirect, new or existing, foreseen or unforeseen, by reason of any matter, cause or thing whatsoever occurring on or prior to the date hereof, arising out of or relating to the affairs of Medallic and the Mint.

5.  <u>Release of Claims by Bressler</u>. Contingent upon the fulfillment by the Trustee of his obligations under this Agreement on behalf of the Bankruptcy Estate and the Court's substantive consolidation of Medallic with the bankruptcy estate of the Mint or the Court's finding that Medallic is the alter ego of the Mint, Bressler, his respective agents, affiliates, parents, subsidiaries, officers, directors, shareholders, legal representatives, successors and assigns shall be deemed to have fully and forever released, comprised and discharged the Bankruptcy Estate, the Trustee, and the Trustee's current, former, and future, agents, lawyers, employees predecessors, successors, assigns, affiliates, and representatives from all actions, claims, demands, damages, debts, losses, liabilities, indebtedness, causes of action (whether at law or in equity) and obligations of whatever kind or nature, whether now known or hereafter discovered, direct or indirect, new or existing, foreseen or unforeseen, by reason of any matter, cause or thing whatsoever occurring on or prior to the date hereof arising out of or relating to the affairs of Medallic and the Mint, excepting only his allowed $3 million claim as described in paragraph 3 above.

6.  <u>Agreement Subject to Court Approval.</u> This agreement is binding on the parties, subject only to the approval of the Bankruptcy Court. The Trustee agrees to promptly apply to the Court for such approval.

7.  <u>Representation</u>. The Parties to this Agreement have had the opportunity to review this Agreement and acknowledge that they fully understand and agree to the contents herein. The Parties have had the opportunity to consult with their own attorneys concerning this Agreement and have not entered into this Agreement under any undue influence. Each of the individuals signing this Agreement specifically represents and warrants that they have authority to bind the parties to this Agreement.

8.  <u>Governing Law; Jurisdiction and Venue</u>. This Agreement is entered into in Washington and shall be governed by and construed in accordance with the substantive laws of the State of Washington, without giving effect to conflicts of laws rules. The Parties agree that the Bankruptcy Court for the Western District of Washington shall have

jurisdiction and shall be the sole venue for the determination of any disputes arising out of this Agreement.

9. <u>Successors and Assigns</u>. This Agreement shall inure to the benefit and be binding upon the parties to this Agreement and their successors and assigns.

10. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior agreements, representations, warranties, statements, promises, information, arrangements and understandings, whether oral or written, express or implied, with respect to the subject matter hereof. No variations, modifications, or changes herein shall be binding upon any party unless set forth in a document executed by the Parties.

11. <u>Counterparts; Signature Pages</u>. This Agreement may be executed in one or more counterparts, each of which shall constitute an original document but all of which when taken together shall constitute one and the same agreement. Delivery of an executed copy facsimile or email transmission or other means of electronic communication producing a printed copy will be deemed to be an execution and delivery of this Agreement on the date of such communication by the parties so delivering such a copy. Any party so delivering such a copy via electronic communication shall deliver an executed original of this Agreement to the other parties upon request.

12. <u>Headings</u>. The captions or headings provided in this Agreement are for convenience only and shall not be deemed to be a part of this Agreement.

13. <u>Further Assurances</u>. From time to time and without further consideration, the parties hereto shall execute and deliver such other instruments of conveyance, assignment, transfer, delivery, security and take such other action as may be reasonably necessary in order to consummate the transactions contemplated by this Agreement, providing however that any such instruments shall be without warranty.

14. <u>No Waiver</u>. A party does not waive any right under this Agreement by failing to insist on compliance with any of the terms of this Agreement or by failing to exercise any right hereunder. Any waivers granted hereunder are effective only if recorded in a writing signed by the party granting such waiver.

15. <u>Severability</u>. If any provision of this Agreement is determined by any court or governmental authority to be unenforceable, this entire Agreement shall be null and void.

16. <u>Rules of Construction</u>. Each of the Parties and/or counsel for each party have reviewed this Agreement and accordingly the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

17. <u>Cumulative Rights/Construction</u>. The rights and remedies of the Parties

under this Agreement are cumulative, and any party may enforce any of its rights or remedies under this Agreement or other rights and remedies available to it at law or in equity.

MARK CALVERT, CHAPTER 11 TRUSTEE OF THE
BANKRUPTCY ESTATE OF NORTHWEST TERRITORIAL
MINT, LLC

By _____

Mark Calvert

Date _____3/13/2017_____

RICHARD BRESSLER

Date _____3/9/2017_____

Settlement Agreement -5

| | |
|---|---|
| **From:** | Tom Lerner |
| **To:** | Gearin, Mike |
| **Subject:** | RE: Bressler motion |
| **Date:** | Friday, March 17, 2017 11:14:03 AM |

Understood. Hansen called Dick again about it.

**From:** Gearin, Mike [mailto:Mike.Gearin@klgates.com]
**Sent:** Friday, March 17, 2017 11:13 AM
**To:** Tom Lerner
**Subject:** RE: Bressler motion

I will do that, but not because of anything that Ross Hansen desires.

I saw Bucknell last night at Gayle Bush's retirement party and he was all over me about getting a copy of the agreement. We are almost certainly going to file the motion next week.

**From:** Tom Lerner [mailto:Tom.Lerner@stokeslaw.com]
**Sent:** Friday, March 17, 2017 11:09 AM
**To:** Gearin, Mike
**Subject:** Bressler motion

Mike,

      When you have filed the motion to approve the Bressler settlement, please send me a copy. Ross has been salivating to get his hands on the deal.

Thanks, Tom

**Thomas A. Lerner (v-card | bio)**
Shareholder
Stokes Lawrence, P.S. - *Realizing your vision.*
1420 Fifth Avenue, Suite 3000 | Seattle, WA 98101-2393
Tel.: (206) 892-2147 | Fax: (206) 464-1496 | Cell: (206) 390-0470
Email: tom.lerner@stokeslaw.com | Web: www.stokeslaw.com

This e-mail may contain confidential information which is legally privileged. The information is solely for the use of the addressee(s) named above. If you are not the intended recipient, any disclosure, copying, distribution or other use of the contents of this information is strictly prohibited. If you have received this e-mail in error, please notify us by return e-mail and delete this message. Thank you.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com.

| | |
|---|---|
| **From:** | Gearin, Mike |
| **To:** | Tom Lerner (Tom.Lerner@stokeslaw.com) |
| **Subject:** | Draft Settlement Notice [KLG-USW_Active01.FID237675] |
| **Date:** | Tuesday, April 4, 2017 11:34:33 AM |
| **Attachments:** | 500343664_2.docx |

Tom: I plan on mailing this out today and filing the motion by Friday of this week. Please let me know if you have comments to the notice.

**Michael J. Gearin**

**K&L Gates LLP**

925 Fourth Avenue, Suite 2900

Seattle, WA 98104

(206) 370-6666 Direct

(206) 940-2500 Mobile

Fax (206) 370-6067 Direct

michael.gearin@klgates.com

http://www.klgates.com

Michael J. Gearin, WSBA # 20982
David C. Neu, WSBA # 33143
Brian T. Peterson, WSBA # 42088
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580

Honorable Christopher M. Alston
Chapter 11
Hearing Location: Seattle, Rm. 7206
Hearing Date: Friday, April 28, 2017
Hearing Time: 9:30 a.m.
Response Date: April 21, 2017

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

In re:                                          Case No. 16-11767-CMA

NORTHWEST TERRITORIAL MINT, LLC,                NOTICE OF HEARING ON
                                                TRUSTEE'S MOTION TO APPROVE
                                                SETTLEMENT WITH RICHARD
                        Debtor.                 BRESSLER PURSUANT TO
                                                BANKRUPTCY RULE 9019

TO:         NORTHWEST TERRITORIAL MINT, LLC, Debtor;
AND TO:     MARK D. NORTHRUP and MILLER NASH GRAHAM & DUNN, Attorneys for
            OFFICIAL UNSECURED CREDITORS COMMITTEE,
AND TO:     UNITED STATES TRUSTEE;
AND TO:     SPECIAL NOTICE LIST;

        PLEASE TAKE NOTICE that a hearing has been scheduled for **April 28, 2017, at 9:30 a.m. (PT)**
before the Honorable Christopher M. Alston, United States Bankruptcy Judge, in Courtroom 7206, 700
Stewart Street, Seattle, WA, 98101 on the Trustee's Motion to Approve Settlement with Richard Bressler
Pursuant to Bankruptcy Rule 9019 (the "Motion").

        Richard Bressler ("Bressler") is a member and 50% owner in Medallic Art Company, LLC
("Medallic" or "Medallic LLC"). Bressler invested three million dollars ($3,000,000) to acquire his interest
in Medallic LLC in July of 2009. The remaining fifty percent ownership interest in Medallic LLC is
nominally held by Ross B. Hansen ("Hansen") and a corporate affiliate of Hansen, Medallic Art
Corporation. Under the terms of Medallic LLC's limited liability company agreement, managerial control
over Medallic is presently vested in Medallic Art Corporation, which is solely owned and controlled by
Hansen. Medallic asserts ownership and/or control over certain assets including the real property lease for
the Mint's business in Dayton, Nevada and other personal and intellectual property used in the business of
the Mint.

        In August of 2016, Medallic LLC, under the exclusive control of Hansen, filed a complaint against
Mark Calvert, chapter 11 Trustee (the "Trustee"), commencing Adversary Proceeding No. 16-01196 (the
"Medallic Litigation") in this Court. The Trustee has answered Medallic's complaint and asserted

NOTICE OF HEARING ON MOTION TO APPROVE
SETTLEMENT WITH RICHARD BRESSLER
PURSUANT TO BANKRUPTCY RULE 9019 - 1
500343664 v2

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

A-30

counterclaims. Among the claims at issue in the Medallic Litigation, is the Trustee's claim that Medallic should be substantively consolidated with the bankruptcy estate of the Debtor, Northwest Territorial Mint, LLC (the "Mint"), or, alternatively, that Medallic is the alter ego of the Mint (collectively, the "Substantive Consolidation Claims"). If the Court orders substantive consolidation of Medallic and the Mint, the assets of Medallic and the Mint will be consolidated into a single pool from which the claims of creditors of both entities will be satisfied and intercompany claims between Medallic and the Mint will be extinguished.

The Trustee and Bressler have entered into a settlement related to the Medallic Litigation, which has been memorialized in a written settlement agreement (the "Settlement Agreement"). Under the terms of the Settlement Agreement, Bressler stipulates to the Trustee's proposed substantive consolidation of Medallic with the bankruptcy estate of the Mint. Furthermore, to the extent that Bressler obtains management control over Medallic, he will cause Medallic to stipulate to, and not oppose, the Trustee's proposed substantive consolidation of Medallic and the Mint. If the Court does not order substantive consolidation, Bressler further stipulates to and agrees not to oppose the Court's determination that Medallic is an alter ego of the Mint. To the extent that Bressler obtains managerial control over Medallic, he will cause Medallic to stipulate to and not oppose a determination that Medallic is an alter ego of the Mint. In return, if the Court substantively consolidates the Mint with Medallic, or finds that Medallic is the alter ego of the Mint, Bressler will be granted an allowed general unsecured claim in this case in the amount of $3,000,000. Bressler will not be entitled to any other claim in the case.

Under the terms of the Settlement Agreement, the Trustee and Bressler have also agreed to release claims against one another. Such mutual releases are conditioned upon (i) the parties' fulfillment of their obligations under the Settlement Agreement and (ii) the Court's substantive consolidation of Medallic and the Mint or determination that Medallic is the alter ego of the Mint.

The Trustee has determined that the Settlement Agreement is in the best interests of the estate. Substantive consolidation is critical to the Trustee's proposal of a plan of reorganization that will provide meaningful returns to creditors. Absent substantive consolidation of Medallic with the bankruptcy estate of the Mint, the Trustee is faced with more expensive and protracted litigation with Medallic over fraudulent transfers made by the Mint to or for the benefit and the defense of Medallic's claims for substantial administrative claims. Bressler's consent to substantive consolidation materially advances the Trustee's claims for substantive consolidation.

By the Motion, the Trustee requests that the Court enter an order approving the Settlement Agreement.

PLEASE TAKE FURTHER NOTICE that copies of the Motion and related documents may be (1) reviewed and copied at the Clerk of the United States Bankruptcy Court, 700 Stewart Street, Seattle, WA 98101 or (2) may be obtained by submitting a written request to Ms. Denise Lentz, Paralegal, K&L Gates, LLP, 925 Fourth Avenue, Suite 2900, Seattle, WA 98104-1158, Email: denise.evans@klgates.com.

PLEASE TAKE FURTHER NOTICE THAT IF YOU OPPOSE the Motion, you must file your written objection by the following deadline: NO LATER THAN **Friday, April 21, 2017.** Objections must be filed with the Court, 700 Stewart Street, Seattle, WA, 98101, and a copy delivered to:

      Michael J. Gearin
      Brian T. Peterson
      K&L Gates, LLP
      925 Fourth Avenue, Suite 2900

NOTICE OF HEARING ON MOTION TO APPROVE
SETTLEMENT WITH RICHARD BRESSLER
PURSUANT TO BANKRUPTCY RULE 9019 - 2
500343664 v2

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

A-31

1            Seattle, Washington 90104

2          PLEASE TAKE FURTHER NOTICE that in accordance with Local Bankruptcy Rule 9013-1(d)(7), failure to timely file and serve an objection to the Motion may be deemed by the Court an admission that any

3 opposition to the Motion is without merit. Further, pursuant to Local Bankruptcy Rule 9013-1(e), failure to appear at the hearing on the Motion may be deemed by the Court to be an admission that any opposition to

4 the Motion is without merit. Further, pursuant to Local Bankruptcy Rule 9013-1(f), if no opposition to the Motion is timely filed and served, the Court may either (a) grant the Motion by default at the hearing, or (2)

5 grant the Motion prior to the hearing on the Trustee's ex parte presentation of a proposed order accompanied by proof of service and a declaration that no objection to the Motion was timely received.

6

7          DATED this 4th day of April, 2017.

8                            K&L GATES LLP

9                          By /s/ Michael J. Gearin
                             Michael J. Gearin, WSBA #20982

10                              David C. Neu, WSBA #33143
                             Brian T. Peterson, WSBA #42088

11                          Attorneys for Mark Calvert, Chapter 11 Trustee

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

NOTICE OF HEARING ON MOTION TO APPROVE
SETTLEMENT WITH RICHARD BRESSLER
PURSUANT TO BANKRUPTCY RULE 9019 - 3
500343664 v2

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

A-32

| | |
|---|---|
| **From:** | Tom Lerner |
| **To:** | Gearin, Mike |
| **Subject:** | RE: Draft Settlement Notice [KLG-USW_Active01.FID237675] |
| **Date:** | Tuesday, April 4, 2017 12:49:54 PM |

This looks fine to me.

---

**From:** Gearin, Mike [mailto:Mike.Gearin@klgates.com]
**Sent:** Tuesday, April 04, 2017 11:35 AM
**To:** Tom Lerner
**Subject:** Draft Settlement Notice [KLG-USW_Active01.FID237675]

Tom: I plan on mailing this out today and filing the motion by Friday of this week. Please let me know if you have comments to the notice.


**Michael J. Gearin**

**K&L Gates LLP**

925 Fourth Avenue, Suite 2900

Seattle, WA 98104

(206) 370-6666 Direct

(206) 940-2500 Mobile

Fax (206) 370-6067 Direct

michael.gearin@klgates.com

http://www.klgates.com


This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com.

| | |
|---|---|
| **From:** | Gearin, Mike |
| **To:** | Tom Lerner (Tom.Lerner@stokeslaw.com) |
| **Subject:** | Medallic [KLG-USW_Active01.FID237675] |
| **Date:** | Wednesday, April 12, 2017 2:09:14 PM |
| **Attachments:** | Dkt. 72 Motion for Voluntary Dismissal.PDF |

Have you seen this?

| | |
|---|---|
| 1 | **BUCKNELL STEHLIK SATO & ORTH, LLP**<br>2003 Western Avenue, Suite 400<br>Seattle, Washington 98121<br>(206) 587-0144 • fax (206) 587-0277 |

JUDGE: Christopher M. Alston
DATE: [to be determined]
TIME:
CHAPTER: 11
LOCATION: Seattle
RESPONSE DATE:

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON, AT SEATTLE

In re:                                          )    No. 16-11767-CMA
                                                )
NORTHWEST TERRITORIAL MINT, LLC,                )
                                                )
            Debtor.                             )
_____         )
MEDALLIC ART COMPANY, LLC, a Nevada             )    Adv. No. 16-01196-CMA
limited liability company,                      )
                                                )
            Plaintiff,                          )
                                                )
      v.                                        )
                                                )
MARK CALVERT, as trustee and on behalf of       )    **MOTION FOR VOLUNTARY**
the estate of Northwest Territorial Mint, LLC,  )    **DISMISSAL**
                                                )
            Defendant.                          )
_____         )

Plaintiff Medallic Art Company, LLC ["MACLLC"] moves for entry of an order dismissing its claims in this adversary proceeding with prejudice and without award of costs or fees, reserving the rights of all parties with respect to the form of any order for substantive consolidation or an alter ego determination entered herein or in the administrative case of Northwest Territorial Mint, LLC ["Mint"], and providing that upon entry of such an order granting substantive consolidation (or granting equivalent relief, such as treating MACLLC as the "alter ego" of Mint), the counterclaims

Motion for Voluntary Dismissal - 1

**BUCKNELL STEHLIK SATO & ORTH, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144   fax (206) 587-0277

W:\CLIENTS\3607\350\motion for voluntary dismissal.doc

Case 16-01196-CMA   Doc 72   Filed 04/12/17   Ent. 04/12/17 11:28:41   Pg. 1 of 7
Case 16-11767-CMA   Doc 2036   Filed 03/04/19   Ent. 03/04/19 18:22:50   Pg. 40 of 75

1   filed by defendant/trustee Mark Calvert ["Trustee"] herein shall be dismissed with prejudice and

2   without award of fees or costs.  As such, MACLLC further requests that the "Phase I" trial, set for

3   May 2, 3 and 4 and June 6, 7 and 8, 2017, be immediately stricken, and the "Phase II" trial be

4   stricken upon dismissal of the counterclaims herein.  This Motion is based upon the records and files

5
6   of this case, and the following.

7   I.      **BACKGROUND FACTS**

8           On or about August 12, 2016, MACLLC filed its Complaint herein.  The Complaint sought,

9   in the First Cause of Action, declaratory judgment establishing that MACLLC is an entity separate

10  from Mint, it owns specific assets originally obtained from Medallic Art Company, Ltd. to the

11
    exclusion of ownership of such assets by Mint, MACLLC and its assets should not be substantively
12
13  consolidated with Mint's estate, MACLLC's leases and subleases of equipment, personal property,

14  licenses, and the Nevada premises to Mint are valid, and MACLLC has a valid and enforceable right

15  to accrued lease payments and royalties as prayed in the Complaint.  It further sought (Second Cause

16  of Action) an accounting from the Trustee for lease, royalty and similar obligations of Mint to

17
18  MACLLC, together with judgment for amounts established in such accounting; (Third Cause of

19  Action) injunctive relief against the Trustee, and (Fourth Cause of Action) damages for conversion

20  of MACLLC property.  Complaint, docket no. 1.

21          On or about September 14, 2016, the Trustee filed Defendant's Answer, Affirmative

22  Defenses, and Counterclaims herein.  The Trustee broadly denied MACLLC's claims and requests

23  for relief, and asserted in his counterclaims, that (1) the assets and liabilities of Mint and MACLLC

24
25  should be substantively consolidated *nunc pro tunc* to as of the petition date of Mint; (2) MACLLC

26
27
**BUCKNELL STEHLIK SATO & ORTH, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144   fax (206) 587-0277

28  Motion for Voluntary Dismissal - 2

W:\CLIENTS\3607\350\motion for voluntary dismissal.doc

1 should be held the alter ego of Mint and thus liable for Mint's obligations, (3) Mint made various

2 transfers to MACLLC referred to by Trustee in his counterclaims as "Medallic Fraudulent

3 Transfers," which should be avoided as intentionally fraudulent transfers and recovered for the

4 benefit of Mint's estate; (4) the "Medallic Fraudulent Transfers" should alternatively be avoided and

5
6 recovered as constructively fraudulent transfers, and (5) transfers made by Mint to or for the benefit

7 of MACLLC should be recovered under principles of unjust enrichment and restitution.

8 Defendant's Answer, docket no. 6.

9 The Trustee has consistently urged and represented that if the Trustee were to prevail by

10 obtaining substantive consolidation or an alter ego determination (the first two counterclaims), then

11
12 trial on fraudulent transfers or unjust enrichment and restitution (the third, fourth and fifth

13 counterclaims) would be unnecessary. *See, e.g.,* Trustee's Motion to Bifurcate Trial, p.6 at lines 3-5

14 ("The Court should therefore bifurcate the trial and determine the substantive consolidation and alter

15 ego issues prior to addressing the remaining claims and counterclaims asserted by the parties"); *id.*

16 at p.7, lines 2-5 ("If Medallic LLC is substantively consolidated with the Debtor, the Court would

17
18 have no need to determine the contractual rights and claims between the parties, including by

19 analyzing the extensive transfers from the Debtor to or for the benefit of Medallic LLC").

20 The Court agreed with this position, concluding in its Order on Motion to Bifurcate Trial,

21 docket no. 48: "If the Court consolidates the assets and liabilities of the two entities or finds the

22 Mint owns the Disputed Assets, then the parties will not need to address any of these factual issues

23 [pertaining to the Fraudulent Transfer and Unjust Enrichment Counterclaims]. *Id.* at 22, lines 4-5.

24
25 The Court has further ordered that a Phase II trial (scheduled for October 24, 25, 31 and November 1

26
27

28 Motion for Voluntary Dismissal - 3

**BUCKNELL STEHLIK SATO & ORTH, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144    fax (206) 587-0277

1  and 2, 2017) will only occur if all issues are not resolved after the Phase I trial on the following

2  issues: (a) whether MACLLC should be declared an entity separate from Mint, or should be

3  declared to be the alter ego of Mint; (b) whether some of the assets acquired from a third party [the

4  "Disputed Assets"] are property of Mint's estate, and (c) whether MACLLC should be substantively

5  consolidated with Mint. First Amended Notice of Trial and Order Setting Deadlines, docket no. 59,

6
   pp. 1-2, 4.
7

8       As the court is aware, one of the issues in the case has been the position of Richard Bressler.

9  As the recently filed settlement agreement acknowledges[1], Mr. Bressler invested $3 million in cash

10 in Medallic in connection with the purchase of the Medallic assets from the Hoffs. Mr. Bressler, for

11 reasons of his own, chose to enter into an agreement that is dated more than a month ago in which he

12
   appears to trade his agreement for substantive consolidation for a release and an unsecured claim of
13
14 $3 million against a consolidated estate. Also for reasons of their own, Mr. Bressler and the Trustee

15 chose to keep the agreement secret for over a month, although the existence of some sort of

16 agreement leaked out. We leave it to the Trustee to explain why the agreement needed to remain

17
   secret.
18

19      Medallic has determined not to further pursue its Complaint. Without waiving the

20 confidentiality of privileged communications between Medallic and its counsel, the following facts

21 are worth noting:

22       First, trial of this matter will be very expensive.

23       Second, the value of the Medallic assets, regardless of whether they are consolidated with
24

25 ---
   [1] *See* the recently filed Trustee's Motion to Approve Settlement with Richard Bressler Pursuant to
26
27                                      **BUCKNELL STEHLIK SATO & ORTH, LLP**
                                             2003 Western Avenue, Suite 400
                                              Seattle, Washington 98121
28  Motion for Voluntary Dismissal - 4       (206) 587-0144   fax (206) 587-0277

1  those of Mint, have eroded in value over the course of the case. The Trustee has been in possession

2  of the assets from the day he was appointed. The Medallic assets are collateral for the obligations to

3  the landlord on the Dayton facility, the Hoffs.

4      Third, it certainly appears that Mint is administratively and operationally insolvent. Unpaid

5  professional fees are approaching $3 million. The business has lost money on an operating basis

6

7  (before professional fees) almost every month since early in the case (*see* docket nos. 729, 788, 836,

8  851, 893, 910, and 950). In short, the remaining business, whether consolidated or not (especially in

9  light of the claims of the Hoffs), is of doubtful value.

10      Finally, Mr. Bressler's entry into the recently disclosed settlement agreement creates the

11  potential for conflicting priorities between the two owners of Medallic, Mr. Hansen and

12

13  Mr. Bressler, and appears to resolve Mr. Bressler's interests in a manner satisfactory to Mr. Bressler.

14      In light of the foregoing, Medallic has determined that there is no benefit to pursuing the

15  litigation further. Medallic is willing to let the Trustee and the Mint estate have Medallic's assets

16  and become responsible for its liabilities.

17
18      ## II.    LAW AND ARGUMENT

19      Fed. R. Civ. Proc. 41(a), made applicable to this proceeding by Fed. R. Bankr. Proc. 7041,

20  provides that a plaintiff may voluntarily dismiss an action as a matter of right prior to the service of

21  an answer or a motion for summary judgment by the defendant (Fed. R. Civ. Proc. 41(a)(1)(A)(i)),

22  by stipulation of all parties (*id.,* subsection (a)(1)(A)(ii)), or if an answer or motion for summary

23  judgment has been served, by court order on terms that the court considers proper (*id.,* subsection

24

25  _____

    Bankruptcy Rule 9019, docket no. 970 in the above-captioned administrative case of Mint.

26

27

28  Motion for Voluntary Dismissal - 5

**BUCKNELL STEHLIK SATO & ORTH, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144    fax (206) 587-0277

W:\CLIENTS\3607\350\motion for voluntary dismissal.doc

1    (a)(2)).  In the latter case, if a defendant has pleaded a counterclaim before being served with

2    plaintiff's motion to dismiss, the action may be dismissed only if the counterclaim can remain

3    pending for independent adjudication.  Fed. R. Civ. Proc. 41(a)(2).[2]

4

5          The contention that a defendant has incurred substantial expense in defense of an action is

6    not the type of legal prejudice that may justify denial of a motion under Fed. R. Civ. Proc. 41(a)(2).

7    *E.g., Aqua Lung America, Inc. v. Watermark Scuba, Inc.,* 2013 Wl 951009, at *1 (W.D. Wash.

8    2013)(per Pechman, J.), *citing In re Lowenschuss,* 67 F.3d 1394, 1401 (9th Cir. 1995), *cert. denied,*

9    116 S.Ct. 2497 (1996).

10          An award of costs and fees is "not appropriate when a plaintiff obtains a voluntary dismissal

11    *with prejudice* because in such a case 'the defendant cannot be made to defend again.'"  *Aqua Lung,*

12    *supra,* 2013 WL 951009, at 2; *see also Trustees of Northwest Laborers-Employees Health and*

13    *Security Trust v. Malone,* 2010 WL 4622118, at *1 (W.D. Wash. 2010)(per Leighton, J.)(same);

14

15    *Chang v. Pomeroy,* 2011 WL 618192, at *1 (E.D. Cal. 2011)("[D]istrict courts in the Ninth Circuit

16    have determined that the payment of fees and costs ordinarily should not be imposed as a condition

17    for voluntary dismissal with prejudice").  An exception may apply in an "exceptional case," but an

18    exceptional case must be proven by clear and convincing evidence, such as to show bad faith.  *Aqua*

19    *Lung, supra,* 2013 WL 951009, at *2.[3]

20

21          Here, MACLLC's requests authority to dismiss its complaint **with prejudice**.  This will save

22

23    ──────────

   [2]  Here, counterclaims could remain pending for adjudication (and in fact, some have been bifurcated for

24    potential Phase II trial), but for reasons stated, counterclaims should be dismissed upon the granting of
   substantive consolidation or alter ego relief.

25    [3]  By contrast, where a dismissal is without prejudice, an award of costs and fees may be granted in view of
   the risk that the lawsuit will be refiled and will impose duplicative expenses on the defendant.  *Trustees v.*

26

27

28    Motion for Voluntary Dismissal - 6

**BUCKNELL STEHLIK SATO & ORTH, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144    fax (206) 587-0277

W:\CLIENTS\3607\350\motion for voluntary dismissal.doc

not only MACLLC, but also the Trustee, from the expense of trial. There is no legal prejudice to the Trustee, as MACLLC will not be able to bring this proceeding or its causes of action again, causing duplicative costs of litigation. An award of fees or costs in inappropriate in connection with a dismissal with prejudice, as recognized by courts in the Ninth Circuit and elsewhere.

Because there is no need for Phase I trial in light of MACLLC's willingness to dismiss the complaint with prejudice, Phase I trial should be stricken. The proper, precise form of an order granting the Trustee substantive consolidation or a determination that MACLLC is the alter ego of Mint is unclear. MACLLC submits that the parties should explore whether the form can be agreed, or if not, the form of order should be noticed for presentation so that the Court can determine the details. Upon entry of an order granting the Trustee relief in the nature of substantive consolidation or an alter ego determination, the Phase II trial should be stricken as moot (as the Trustee has represented and acknowledged, it will be if the Trustee prevails on substantive consolidation or alter ego claims), and this adversary proceeding closed by entry of final judgment without award of fees or costs.

Respectfully submitted this 12th day of April, 2017.

BUCKNELL STEHLIK SATO & ORTH, LLP


        /s/Thomas N. Bucknell
Thomas N. Bucknell, WSBA # 1587
Edwin K. Sato, WSBA # 13633
Andrea D. Orth, WSBA # 24355
Attorneys for Medallic Art Company, LLC

---

*Malone, supra,* 2010 WL 4622118, at *1, *citing Colombrito v. Kelly,* 764 F.2d 122, 123 (2d Cir. 1985).

**BUCKNELL STEHLIK SATO & ORTH, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144   fax (206) 587-0277

Motion for Voluntary Dismissal - 7

W:\CLIENTS\3607\350\motion for voluntary dismissal.doc

A-41

Case 16-01196-CMA    Doc 72    Filed 04/12/17    Ent. 04/12/17 11:28:41    Pg. 7 of 7
Case 16-11767-CMA    Doc 2036    Filed 03/04/19    Ent. 03/04/19 18:22:50    Pg. 46 of 75

1

2

3

4

5

6

7

8

9

**BUCKNELL STEHLIK SATO & ORTH, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144 • fax (206) 587-0277

JUDGE:      Christopher M. Alston
DATE:       [to be determined]
TIME:
CHAPTER:    11
LOCATION:   Seattle
RESPONSE DATE:

10

11

12

13

14

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON, AT SEATTLE

15

In re:                                              )      No. 16-11767-CMA
                                                    )
16    NORTHWEST TERRITORIAL MINT, LLC,              )
                                                    )
17                                                  )
              Debtor.                               )
18    _____     )
                                                    )
19    MEDALLIC ART COMPANY, LLC, a Nevada           )      Adv. No. 16-01196-CMA
      limited liability company,                    )
20                                                  )
              Plaintiff,                             )      **[proposed] ORDER GRANTING**
21        v.                                        )      **VOLUNTARY DISMISSAL**
                                                    )
22    MARK CALVERT, as trustee and on behalf of     )
      the estate of Northwest Territorial Mint, LLC,)
23                                                  )
                                                    )
24            Defendant.                            )
                                                    )
25    _____     )

26

27

28    Order Granting Voluntary Dismissal - 1

**BUCKNELL STEHLIK SATO & ORTH, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144   fax (206) 587-0277

W:\CLIENTS\3607\350\[proposed] order granting voluntary dismissal.doc

THIS MATTER arises upon Motion for Voluntary Dismissal ["Motion"] filed by plaintiff Medallic Art Company, LLC ["MACLLC"] and was set for hearing pursuant to an order shortening time. The Court, having considered the Motion, all papers submitted in support of or response to the Motion, the records and files of this proceeding, and the arguments of counsel, and being otherwise duly advised, finds and concludes that the Motion should be granted. It is accordingly

**ORDERED**:

1. The Motion is granted, and without limiting the foregoing,

2. Plaintiff's complaint is dismissed with prejudice and without award of fees or costs to any party;

3. The "Phase I" trial, set for May 2, 3 and 4 and June 6, 7 and 8, 2017, is hereby stricken;

4. The rights of all parties with respect to the form of any order for substantive consolidation or an alter ego determination entered herein or in the administrative case of Northwest Territorial Mint, LLC are hereby reserved, and such an order may be presented in form agreed by the parties hereto, or noted for presentation with opportunity to object;

5. Upon entry of an order granting substantive consolidation or determining that MACLLC is the alter ego of debtor Northwest Territorial Mint LLC, the counterclaims filed by defendant/trustee Mark Calvert ["Trustee"] herein shall be dismissed with prejudice and without award of fees or costs, and the "Phase II" trial herein shall be stricken.

/// End of Order///

**BUCKNELL STEHLIK SATO & ORTH, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144    fax (206) 587-0277

Order Granting Voluntary Dismissal - 2

W:\CLIENTS\3607\350\[proposed] order granting voluntary dismissal.doc

A-43

1    Presented by:

2    BUCKNELL STEHLIK SATO & ORTH, LLP

3

4    _____/s/ Thomas N. Bucknell_____
      Thomas N. Bucknell, WSBA # 1587

5    Edwin K. Sato, WSBA # 13633
      Andrea D. Orth, WSBA #  24355

6    Attorneys for Medallic Art Company, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    Order Granting Voluntary Dismissal  - 3

**BUCKNELL STEHLIK SATO & ORTH, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144   fax (206) 587-0277

W:\CLIENTS\3607\350\[proposed] order granting voluntary dismissal.doc

News to me.

**From:** Gearin, Mike [mailto:Mike.Gearin@klgates.com]
**Sent:** Wednesday, April 12, 2017 2:09 PM
**To:** Tom Lerner
**Subject:** Medallic [KLG-USW_Active01.FID237675]

Have you seen this?

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com.

Interesting that they folded their hand before the Court approved our deal. You think Ross just ran out of money to keep up the fight?

**From:** Gearin, Mike [mailto:Mike.Gearin@klgates.com]
**Sent:** Wednesday, April 12, 2017 2:09 PM
**To:** Tom Lerner
**Subject:** Medallic [KLG-USW_Active01.FID237675]

Have you seen this?

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com.

| | |
|---|---|
| **From:** | Gearin, Mike |
| **To:** | Tom Lerner (Tom.Lerner@stokeslaw.com) |
| **Subject:** | Bressler Settlement |
| **Date:** | Tuesday, April 25, 2017 11:59:39 AM |
| **Attachments:** | Dkt. 993 Submitted by Not Entered Order re Motion to Approve Bressler Settlement.pdf |

Judge Alston is requiring us to appear on Friday to provide information supporting the settlement.
Do you intend to appear?



Submitted But not Entered.

_____
**Christopher M. Alston**
**U.S. Bankruptcy Judge**
(Dated as of Entered on Docket date above)

**ORDER NOT ENTERED:** Counsel for trustee shall appear on date and time stated in notice to provide information to allow Court to determine if compromise is fair and equitable.

1
2
3
4
5
6
7
8
9

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| In re:<br><br>NORTHWEST TERRITORIAL MINT, LLC,<br><br>Debtor. | Case No. 16-11767-CMA<br><br>**ORDER GRANTING MOTION TO APPROVE SETTLEMENT WITH RICHARD BRESSLER PURSUANT TO BANKRUPTCY RULE 9019** |

This matter having come before the Court on the *Motion to Approve Settlement with Richard Bressler Pursuant to FRBP 9019* (the "Motion") [Dkt. No. 970], filed by Mark Calvert, as Chapter 11 Trustee ("Trustee"), and the Court having considered the Motion, and the pleadings and papers herein, and the Court having found that the settlement described in the Motion is fair and equitable and reasonable given the particular circumstances of this case, notice of the Motion was adequate under the circumstances, good causes exists to grant the relief requested in the Motion, and that no further notice is required for entry of this Order; it is therefore **ORDERED** as follows:

    1.    The Motion is **GRANTED**.

ORDER GRANTING MOTION TO APPROVE
SETTLEMENT - 1

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

A-48
Case 16-11767-CMA    Doc 993    Filed 04/25/17    Ent. 04/25/17 11:12:47    Pg. 1 of 2
Case 16-11767-CMA    Doc 2036    Filed 03/04/19    Ent. 03/04/19 18:22:50    Pg. 53 of 75

**Submitted But not Entered.**

2.      The Settlement and Settlement Agreement, as those terms are defined in the Motion, are approved; and

3.      The Trustee is authorized to undertake such actions as are necessary and appropriate to carry out the terms of the Settlement and Settlement Agreement.

///END OF ORDER///

Presented by:

K&L GATES LLP

*/s/ Michael J. Gearin*

Michael J. Gearin, WSBA #20982
David C. Neu, WSBA #33143
Brian T. Peterson, WSBA #42088
Attorneys for Mark Calvert, Chapter 11 Trustee

ORDER GRANTING MOTION TO APPROVE
SETTLEMENT - 2

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Look forward to seeing you there.

---

**From:** Tom Lerner [mailto:Tom.Lerner@stokeslaw.com]
**Sent:** Tuesday, April 25, 2017 1:43 PM
**To:** Gearin, Mike
**Subject:** RE: Bressler Settlement

Well, on further reflection, unless Dick doesn't want me to go, I will plan to attend.

---

**From:** Gearin, Mike [mailto:Mike.Gearin@klgates.com]
**Sent:** Tuesday, April 25, 2017 1:37 PM
**To:** Tom Lerner
**Subject:** Re: Bressler Settlement

Your call.  I don't know what questions he has.

-------- Original Message --------
From: Tom Lerner <Tom.Lerner@stokeslaw.com>
Date: Tue, April 25, 2017 12:40 PM -0700
To: "Gearin, Mike" <Mike.Gearin@klgates.com>
Subject: Re: Bressler Settlement

Not unless you see a need or benefit to my doing so.

Tom Lerner
(Work- 206-892-2147)
(Cell- 206-390-0470)

On Apr 25, 2017, at 11:59 AM, Gearin, Mike <Mike.Gearin@klgates.com> wrote:

> Judge Alston is requiring us to appear on Friday to provide information supporting the
> settlement.  Do you intend to appear?

> This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com.
> <Dkt. 993 Submitted by Not Entered Order re Motion to Approve Bressler
> Settlement.pdf>

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com.

| From: | Thomas Lerner |
| To: | Creditor Debtor Section |
| Subject: | RE: [creditor-debtor-section] CONFIDENTIAL - OPERATIONS ADVICE OF DEBIT |
| Date: | Monday, May 1, 2017 2:09:29 PM |

No one sends files like this to the list. My guess is that Mr. Erlich's account got hacked and there is something evil in the attachment.

**From:** Mr.Patrick Henry Brick [mailto:bricklaw@msn.com]
**Sent:** Monday, May 01, 2017 2:05 PM
**To:** Creditor Debtor Section
**Subject:** Re: [creditor-debtor-section] CONFIDENTIAL - OPERATIONS ADVICE OF DEBIT

what in hell is this?

Patrick H. Brick, Lawyer
Suite 2250
Pike Tower Building
520 Pike Street
Seattle, WA 98101
(206) 282-8644 Fax: (206) 386-5355
bricklaw@msn.com

**Website: patrickbrick.com**

This email transmission and any documents, files or previous email messages attached to it may contain information that is confidential or legally privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, printing, distributing or use of this transmission is strictly prohibited. If you have received this transmission in error, please immediately notify the sender by telephone or return email and delete the original transmission and its attachments without reading or saving in any manner.

---

**From:** Daniel Ehrlich <daniel@ehrlichlawyer.com>
**Sent:** Monday, May 1, 2017 1:42 PM
**To:** Creditor Debtor Section
**Subject:** [creditor-debtor-section] CONFIDENTIAL - OPERATIONS ADVICE OF DEBIT





# Danie Ehrlich Manager sent you 1
## file

Please Download the file to Review

| PDF | OPERATIONS ADVICE OF DEBIT.pdf | | 124.6 KB |

*These files will expire on May 9th 2017, 4:00pm PDT*

VIEW FILES

Terms | Privacy

--
Law Offices Of Daniel Ehrlich, PLLC
1610 Broadway Ave.
Everett, WA 98201
T: (425) 954-5578 Cell (206) 355-8143
F: (425) 296-1103
daniel@ehrlichlawyer.com
http://secure-
web.cisco.com/1npiwb8fSgSTzhGRfC0stmI8g792Qy5T75IUIU1vrANGrzZ9FvykGaKLGO3ialwmesfH8IagIoC4mLcVB5B4Rcnv6suycf7YISpJssdkrpV/9tTyv2598VFQYXfNbK4vxE_1pSe-
8ofdGACXpMI3ar5ZIfEVvjEyEAAQZN1QuohehVuJ01-Qt57oy3imXqIRysHnXsrmsrOIBk95nb0Y17S8f6jtH4BKLDZPRTY8xfwLFCK-xAloYcbswxY9c6oxV7gsaN58qw19EGtfOX-CkW-
5DsQw-fOZDlVnkhNMvr6FQX0/http%3A%2F%2Fwww.ehrlichlawyer.com
--

You are currently subscribed to creditor-debtor-section as: bricklaw@msn.com.
To receive the Daily Digest format, send an email to: digest-creditor-debtor-section@list.wsba.org.
If you wish to unsubscribe, please contact the WSBA List Administrator.
---
---
You are currently subscribed to creditor-debtor-section as: Tom.Lerner@stokeslaw.com.
To receive the Daily Digest format, send an email to: digest-creditor-debtor-section@list.wsba.org.
If you wish to unsubscribe, please contact the WSBA List Administrator.
---
---
You are currently subscribed to creditor-debtor-section as: michael.gearin@klgates.com.
To receive the Daily Digest format, send an email to: digest-creditor-debtor-section@list.wsba.org.
If you wish to unsubscribe, please contact the WSBA List Administrator.
---

| From: | Tom Lerner |
|---|---|
| To: | Gearin, Mike; mark.northrup@millernash.com |
| Subject: | Dick Bressler's $9 million claim |
| Date: | Thursday, May 4, 2017 9:11:05 AM |
| Attachments: | 934029.doc |
| | 934151.docx |

Good morning,

I know your in-boxes are likely full, so I thought I would use a subject line that would get your attention. I had thought of using "Mark Calvert runs a racketeering operation" but was concerned that Mark might not share my sense of humor about that.

Having spent some time reviewing the record developed in the case and considering the 510 issues that Mike mentioned after our hearing, Dick Bressler has a claim based upon the Mint having functioned as a racketeering operation (pre-Mark, of course). There are about 4,000 claims, many of which should easily support a pattern of mail fraud and wire fraud, even apart from the use of the internet to misrepresent the financial condition of MA to Dick. Because the claim arises from RICO rather than as a shareholder in Medallic, the Khan case (attached) resolves the subordination issue in our favor.

Our home run scenario is a $9 million claim, based on Dick's $3 million investment and treble damages. I am proposing that we instead file a claim for $2,237,000—which is the net after the distributions that Dick has received, and that in the spirit of the settlement which dissatisfied Judge Alston, your clients agree not to object to that claim. We will then all have kept our words in fact and in spirit, even if without the imprimatur of the Court—and we are taking what I might call "the Alston discount" in reducing the claim from $3 million. In keeping with the settlement theme, we would also expect that Mark would not bring the claims that he had conditionally released. So, my cards are on the table, face up.

I have attached the factual statement for our claim. While we may disagree about the legal conclusions that flow from the facts (or not), if you find that the attached factual statement incorrectly represents any of the facts as you have developed them, please let me know. At this stage of this case, it seems like we should be able to reach substantial agreement with regard to the underlying facts rather than litigate facts, and if we need to litigate, we can limit that to the legal effect of those facts.

I trust that you will both consider this a settlement communication and look forward to reaching an agreement. I do not think that a prefiling agreement would require court approval, but you may have a different view.

Tom

**Thomas A. Lerner** (v-card | bio)
Shareholder
Stokes Lawrence, P.S. - *Realizing your vision.*
1420 Fifth Avenue, Suite 3000 | Seattle, WA 98101-2393
Tel.: (206) 892-2147 | Fax: (206) 464-1496 | Cell: (206) 390-0470
Email: tom.lerner@stokeslaw.com | Web: www.stokeslaw.com

This e-mail may contain confidential information which is legally privileged. The information is solely for the use of the addressee(s) named above. If you are not the intended recipient, any disclosure, copying, distribution or other use of the

contents of this information is strictly prohibited. If you have received this e-mail in error, please notify us by return e-mail and delete this message. Thank you.

**In re Khan, 846 F.3d 1058 (2017)**

63 Bankr.Ct.Dec. 169, Bankr. L. Rep. P 83,059, 17 Cal. Daily Op. Serv. 632...

846 F.3d 1058
United States Court of Appeals,
Ninth Circuit.

IN RE Zafar David KHAN, Debtor,
Zafar David Khan, Appellant,
v.
Kenneth Barton; Thomas Burke; Nancy K. Curry,
Chapter 13 Trustee, Appellees.
In re Terrance Alexander Tomkow, Debtor,
Terrance Alexander Tomkow, Appellant,
v.
Kenneth Barton, Appellee.
In re Terrance Alexander Tomkow, Debtor,
Terrance Alexander Tomkow, Appellant,
v.
Kenneth Barton, Appellee.
In re Zafar David Khan, Debtor,
Zafar David Khan, Appellant,
v.
Kenneth Barton, Appellee.
In re Terrance Alexander Tomkow, Debtor,
Terrance Alexander Tomkow, Appellant,
v.
Kenneth Barton, Appellee.
In re Zafar David Khan, Debtor,
Zafar David Khan, Appellant,
v.
Kenneth Barton, Appellee.

No. 15-60002, No. 15-60003, No. 15-60004, No.
15-60005, No. 15-60006, No. 15-60007
|
Argued and Submitted November 9, 2016
Pasadena, California
|
Filed January 23, 2017

**Synopsis**
**Background:** Creditor filed proofs of claim in Chapter 13 cases of debtors, relating to state court judgment against debtors and their corporation for conversion, fraud, breach of fiduciary duty, and California statutory violations related to his loss of common stock shares in corporation. Creditor also moved to convert both Chapter 13 cases to Chapter 7. Debtors then brought adversary proceedings seeking to disallow creditor's claims based on allegation that claims were subject to mandatory subordination. Debtors also filed objections to creditor's claims on same theory. The United States Bankruptcy Court for the Central District of California, Julia W. Brand, J., converted cases to Chapter 7, overruled claims

objections, and dismissed adversary proceedings with prejudice. Debtors appealed. The Bankruptcy Appellate Panel, Taylor, J., 523 B.R. 175, affirmed.

**Holdings:** The Court of Appeals, Fernandez, Circuit Judge, held that:

[1] creditor's claims were not subject to mandatory subordination, and

[2] bankruptcy court did not abuse its discretion in converting debtors' Chapter 13 cases to Chapter 7 cases.

Affirmed.

Rawlinson, Circuit Judge, filed opinion concurring in part and dissenting in part.

West Headnotes (10)

[1] **Bankruptcy**
⬥ Review of Appellate Panel

The Court of Appeals reviews decisions of the Bankruptcy Appellate Panel (BAP) de novo. 28 U.S.C.A. § 158(d)(1).

Cases that cite this headnote

[2] **Bankruptcy**
⬥ Conclusions of law; de novo review
**Bankruptcy**
⬥ Clear error

Because the Court of Appeals is in as good a position as the Bankruptcy Appellate Panel (BAP) to review bankruptcy court rulings, it independently examines the bankruptcy court's decision, reviewing the bankruptcy court's interpretation of the Bankruptcy Code de novo and its factual findings for clear error; the Court of Appeals accepts findings of fact made by the bankruptcy court unless those findings leave the definite and firm conviction that a mistake has been committed by the bankruptcy judge.

Cases that cite this headnote

**In re Khan, 846 F.3d 1058 (2017)**

63 Bankr.Ct.Dec. 169, Bankr. L. Rep. P 83,059, 17 Cal. Daily Op. Serv. 632...

[3]    **Bankruptcy**
       ⟜Discretion

A bankruptcy court's ultimate decisions to convert cases from Chapter 13 to Chapter 7 are reviewed for abuse of discretion.

Cases that cite this headnote

[4]    **Federal Courts**
       ⟜Abuse of discretion in general

A court abuses its discretion when it makes a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.

Cases that cite this headnote

[5]    **Bankruptcy**
       ⟜Particular cases and issues

A bankruptcy court's finding of bad faith is reviewed for clear error.

Cases that cite this headnote

[6]    **Bankruptcy**
       ⟜Security purchase rescission claims

Creditor's claims, relating to state court judgment against individual debtors and their corporation for conversion, fraud, breach of fiduciary duty, and California statutory violations related to his loss of common stock shares in corporation, were not subject to mandatory subordination, since creditor's claims did not arise out of purchase or sale of securities; debtors' separate wrongdoing did not have any connection to purchase or sale of creditor's shares, judgment did not arise from purchase or sale, risk that those who purchase or sell stock assume and expect to take was not that shares themselves later would be stolen outright

by other individuals, and any reliance upon equity contributed by corporation's investors did not touch upon separate torts committed by debtors. 11 U.S.C.A. § 510(b).

Cases that cite this headnote

[7]    **Bankruptcy**
       ⟜Security purchase rescission claims

Mandatory subordination provision of Bankruptcy Code for claims arising from the purchase or sale of securities of debtor or debtor's affiliate is not limited to bankruptcy cases involving corporate debtors, but also applies in cases filed by individual debtors. 11 U.S.C.A. § 510(b).

Cases that cite this headnote

[8]    **Bankruptcy**
       ⟜Security purchase rescission claims

Damage award against debtors for conversion that was based on value of securities at time of conversion did not "arise out of" purchase of securities and risks that purchase might entail, and thus claim against debtors based on damage award was not subject to mandatory subordination, since award arose out of debtors' conversion of securities many years later and value of securities at date of conversion was measuring stick. 11 U.S.C.A. § 510(b).

Cases that cite this headnote

[9]    **Bankruptcy**
       ⟜Grounds or cause

Bankruptcy court did not abuse its discretion in converting debtors' Chapter 13 cases to Chapter 7 cases, where timing of debtors' Chapter 13 petitions was highly suspect, debtors failed and refused to provide financial information critical to determining value of their assets, and they further failed to provide information regarding movement of funds among their various

In re Khan, 846 F.3d 1058 (2017)

63 Bankr.Ct.Dec. 169, Bankr. L. Rep. P 83,059, 17 Cal. Daily Op. Serv. 632...

business entities. 11 U.S.C.A. § 1307(c).

Cases that cite this headnote

[10] **Bankruptcy**
 ⇐Involuntary Conversion; Request by Creditors or Other Parties in Interest

When converting Chapter 13 proceedings to Chapter 7 proceedings, a bankruptcy court is required to consider the totality of the circumstances. 11 U.S.C.A. § 1307(c).

1 Cases that cite this headnote

**\*1061** Appeal from the Ninth Circuit Bankruptcy Appellate Panel, Taylor, Dunn, and Kirscher, Bankruptcy Judges, Presiding, BAP No. 14-1021, BAP No. 14-1060, BAP No. 14-1020, BAP No. 14-1041, BAP No. 14-1061, BAP No. 14-1062

**Attorneys and Law Firms**

Lewis R. Landau (argued), Calabasas, California, for Appellants.

Patrick C. McGarrigle (argued) and Michael J. Kenney, McGarrigle Kenney & Zampiello APC, Chatsworth, California, for Appellees.

Before: Diarmuid F. O'Scannlain, Ferdinand F. Fernandez, and Johnnie B. Rawlinson, Circuit Judges.

**SUMMARY**

**Bankruptcy**

On appeal from the Bankruptcy Appellate Panel, the panel affirmed (1) the bankruptcy court's decision that a creditor's claims were not subordinated and (2) the bankruptcy court's conversion of the debtors' Chapter 13 bankruptcy proceedings to Chapter 7 proceedings.

11 U.S.C. § 510(b) requires that claims for damages arising from the purchase or sale of a security of the debtor or an affiliate of the debtor be subordinated to certain other claims or interests. Disagreeing with the BAP, and following *Liquidating Tr. Comm. of the Del Biaggio Liquidating Tr. v. Freeman (In re Del Biaggio)*, 834 F.3d 1003 (9th Cir. 2016), the panel held that § 510(b) applies when debtors are individuals. Nevertheless, the panel agreed with the bankruptcy court that the creditor's claims did not arise out of a purchase or sale of securities, but rather were based upon a judgment entered against the debtors on account of their actions in fraudulently converting the creditor's stock.

The panel held that the bankruptcy court did not clearly err when it found bad faith and did not abuse its discretion when it converted the debtors' Chapter 13 proceedings to Chapter 7 proceedings.

Concurring in part, Judge Rawlinson agreed with the majority that the bankruptcy court acted within its discretion when it converted the proceedings from Chapter 13 to Chapter 7. She also joined the majority's conclusion that 11 U.S.C. § 510(b) applies to debtors who are individuals. Judge Rawlinson dissented from the conclusion of the majority that § 510(b) was inapplicable because the creditor's claims did not arise from a purchase or sale of securities.

Partial Concurrence and Partial Dissent by Judge Rawlinson

**OPINION**

FERNANDEZ, Circuit Judge:

Zafar David Khan and Terrance Alexander Tomkow (collectively "Debtors") appeal the judgment[1] of the Bankruptcy Appellate Panel of the Ninth Circuit ("BAP"), which affirmed the decision of the bankruptcy court that the claim of Kenneth Barton was not subordinated pursuant to the provisions of 11 U.S.C. § 510(b),[2] and converted[3] the Debtors' Chapter 13 bankruptcy proceedings[4] to Chapter 7 proceedings.[5] We affirm the decision of the bankruptcy court.

**BACKGROUND**

In 2013, Barton obtained a Superior Court of the State of California ("Superior Court") judgment against the Debtors and RPost International, Ltd. ("RIL") for

conversion, fraud, breach of fiduciary duty, and violation of California Business and Professions Code Section 17200, based upon Barton's allegations that the Debtors fraudulently converted his 6,016,500 shares of common stock in RIL.

The Superior Court found that after Barton and the Debtors founded RIL, they each received an initial distribution of RIL stock in 2001. The consideration for the stock "was stated to be unreimbursed expenses and compensation."

After suffering a stroke, Barton took leave from RIL. Thereafter, the Debtors cancelled Barton's shares of stock and returned them to the RIL treasury in June or July of 2009. The Superior Court held that the Debtors fraudulently converted Barton's stock in 2009 and determined that they had forged corporate resolutions in an attempt to support their fraud and either "misplaced or destroyed" the shareholder registry, which was "the best evidence of the issuance of [the] stock." The Superior Court then ruled that Barton should recover damages and that his 6,016,500 shares should be reinstated. After further hearings, the Superior Court determined Barton should, instead, receive the value of the converted stock. Therefore, it fixed damages for the conversion at $3,850,560, based upon the value of the RIL stock as of June 30, 2009, the date of conversion, which was $0.64 per share. After adjustments, a judgment including *1062 $3,840,060 for the converted shares was entered in Barton's favor.

A few days before the Superior Court intended to determine the value of the RIL stock for the award of compensatory and punitive damages, each of the Debtors had separately filed a Chapter 13 petition for bankruptcy. At the § 341 (creditors meeting) hearing, the Debtors did not give meaningful information regarding their companies' business transactions, stock valuation, and settlements. And, in their Chapter 13 Schedules, they each reported their RIL stock as having a $0 value and listed Barton's conversion judgment as having a value of only $100,000 with a "[remainder] unliquidated; pending [the Superior Court] proceedings." Neither Debtor filed amended schedules or an amended Plan that included the full value of the judgment after it was rendered.

Barton filed a proof of claim in each case and the Debtors objected. They argued that the claims should be mandatorily subordinated under § 510(b), which, they said, would render the claim unenforceable and subject to disallowance under § 502(b)(1). The Debtors also filed separate actions for mandatory subordination and disallowance on the same grounds as those alleged in their objections. The bankruptcy court dismissed the

separate actions after the parties litigated the claim objections to resolution because the same result would apply to those actions.

Barton had filed separate motions to convert each case to Chapter 7, arguing that the Debtors acted in bad faith, which was cause to convert under § 1307(c).

After a hearing, the bankruptcy court ruled on the Debtors' claim objections based on subordination and disallowance and on Barton's motions to convert. It held that Barton's claims were not subject to subordination because they were not "for damages arising from the purchase or sale of ... a security." § 510(b). Rather, the bankruptcy court determined that Barton's claims were based upon the Superior Court judgment for fraud and conversion. The bankruptcy court did not specifically address the disallowance issue, but did dismiss the Debtors' separate objections related to that issue. Finally, the court granted Barton's motions to convert. As to each of the Debtors, it found that "the timing of the filing was intended to defeat the state court action ... [because] it was likely that there was going to be an award of damages that would have put these Debtors outside a Chapter 13." It also found that the Debtors manipulated the bankruptcy process and concealed assets. The Debtors then appealed to the BAP.

The BAP affirmed the bankruptcy court's subordination determination, but on different grounds. It determined that § 510(b) did not "apply in an individual debtor case." *Khan I*, 523 B.R. at 183. The BAP also affirmed the bankruptcy court's refusal to disallow Barton's claims because they were not subject to subordination and, even if they were, "there [was] no basis for claims disallowance under § 502(b)(1)." *Id.* at 182. Lastly, the BAP held that the bankruptcy court did not abuse its discretion when it found bad faith and converted the cases from Chapter 13 proceedings to Chapter 7 proceedings. *Id.* at 185–87. These appeals followed.

### JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 158(d)(1).

[1] [2]"We review decisions of the BAP de novo." *Aalfs v. Wirum (In re Straightline Invs., Inc.)*, 525 F.3d 870, 876 (9th Cir. 2008). "This court independently reviews the bankruptcy court's rulings on appeal from the BAP." *1063 *Miller v. Cardinale (In re DeVille)*, 361 F.3d 539, 547 (9th Cir. 2004). " 'Because we are in as good a position as the BAP to review bankruptcy court rulings, we independently examine the bankruptcy court's

decision, reviewing the bankruptcy court's interpretation of the Bankruptcy Code de novo and its factual findings for clear error.' " *Id.* "[We] accept findings of fact made by the bankruptcy court unless [those] findings leave the definite and firm conviction that a mistake has been committed by the bankruptcy judge." *Aalfs*, 525 F.3d at 876 (internal quotation marks omitted).

[3] [4] [5]"We review for abuse of discretion the bankruptcy court's ultimate decisions ... to convert [the cases] from Chapter 13 to Chapter 7." *Rosson v. Fitzgerald (In re Rosson)*, 545 F.3d 764, 771 (9th Cir. 2008). A court abuses its discretion when it makes "a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc). We "review the bankruptcy court's finding of bad faith for clear error." *Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1222–23 (9th Cir. 1999).

## DISCUSSION

[6]We will first consider the Debtors' assertion that the bankruptcy court and the BAP erred when they determined that § 510(b) did not apply.[6] Thereafter, we will consider their argument that those courts should not have determined that the conversion of their proceedings from Chapter 13 to Chapter 7 was appropriate.

### I. *Subordination of Barton's Claims*

[7]Section 510(b) requires that claims for damages "arising from the purchase or sale" of a "security of the debtor or of an affiliate of the debtor" shall be subordinated to certain other claims or interests.[7] As already noted, the bankruptcy court determined that the section did not apply because Barton's claims did not arise from the purchase or sale of a security. The BAP affirmed the bankruptcy court on the basis that the section did not apply because the Debtors were individuals. *See Khan I*, 523 B.R. at 183–84. However, after the BAP ruled, we held that § 510(b) does apply when debtors are individuals and in doing so we specifically disagreed with *Khan I*. *See Liquidating Tr. Comm. of the Del Biaggio Liquidating Tr. v. Freeman (In re Del Biaggio)*, 834 F.3d 1003, 1010 (9th Cir. 2016). That effectively overturned the basis of the BAP's decision, and we now make that explicit by rejecting the BAP's contrary decision.

Nevertheless, we affirm the bankruptcy court's decision on the basis stated by that court, that is, we agree that Barton's claims did not arise out of a purchase or sale of securities. No doubt Barton did purchase securities in RIL

in 2001 shortly after RIL was founded. Also, we assume *1064 that RIL is an affiliate of the Debtors.[8] However, Barton's claims against the Debtors do not arise from his purchase of RIL securities. Rather, they are based upon the judgment entered against the Debtors by the Superior Court on account of their actions many years later (2009) when they fraudulently converted Barton's stock.

Of course, we have given a broad interpretation to the "arising from"[9] language of the statute. For example, in *Del Biaggio*, we found a sufficient nexus to a purchase and sale where the claimant (Freeman) had been fraudulently induced by the individual debtor to invest in an affiliate of the debtor. We pointed out that "Freeman's claim is really no claim at all but for his investment in [the affiliate]." *Del Biaggio*, 834 F.3d at 1009. In fact, Freeman's claim was not for misrepresentations as such, but for the investment he made in "detrimental reliance on those misrepresentations." *Id.* And what he sought "correspond[ed] exactly to the amount he invested." *Id.*

The case at hand is quite different from *Del Biaggio* because here what Barton seeks has nothing to do with his investment, other than the fact that he had purchased the now-purloined securities many years earlier. And the damages he sought were not remotely related to the purchase; they were simply a judgment measured by the value of the converted property when the conversion took place.

We recognize that in other cases, where no actual purchase or sale had been consummated, we found that claims, nevertheless, arose from a purchase or sale transaction. *See, e.g., Pensco Tr. Co. v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*, 782 F.3d 492, 496–97 (9th Cir. 2015) (the claim arose out of a failed agreement by the debtor to purchase claimant's stock); *Am. Broad. Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823, 829–31 (9th Cir. 2001) (a merger fell through so no ultimate sale took place, but claim still arose from a sales transaction). While those cases do bespeak a broad interpretation of "arising from," there is a limit to the reach of § 510(b), which stops short of encompassing every transaction that touches on or involves stock in a corporation. That is well explicated in *Racusin v. Am. Wagering, Inc. (In re Am. Wagering, Inc.)*, 493 F.3d 1067 (9th Cir. 2007).

In *Racusin*, the claimant was promised that due to past services he would be paid, in part, with common stock of the company upon completion of a common offering or initial public offering. *Id.* at 1070. When the contract was breached, he sued the company and others for damages. *Id.* The district court determined that Racusin should receive shares of stock, and he appealed. *Id.* He did so on

In re Khan, 846 F.3d 1058 (2017)

63 Bankr.Ct.Dec. 169, Bankr. L. Rep. P 83,059, 17 Cal. Daily Op. Serv. 632...

the basis that he did not want stock; he wanted damages. We agreed with him. *Id.* Thus, we "remanded the case to the district court to calculate the monetary value of the ... shares." *Id.* The amount was determined, the debtors quickly filed for bankruptcy, Racusin filed a claim, and the debtors asserted that § 510(b) required subordination. *Id.* We disagreed. *Id.* at 1071. We pointed out that Racusin did not seek to be, and was not, a shareholder. Rather, the value of the stock was just the measuring stick for determining the "compensation owed for services he performed pursuant to a contract that the debtors breached." *Id.* at 1073. Thus, he was a true creditor rather than an equity investor in a "now- *1065 bankrupt corporation." *Id.*; *see also In re Angeles Corp.*, 177 B.R. 920, 926 (Bankr. C.D. Cal. 1995) (debtor had committed bad acts after claimant's purchase of securities was complete, and claims did not arise from the purchase), *aff'd*, 199 B.R. 220 (B.A.P. 9th Cir. 1996).

[8]Here, Barton sought and obtained damages. Even though his damage award for conversion was based on the value of the securities at the time of conversion, his action did not arise out of the purchase of the securities and the risks that the purchase might entail. It arose out of the Debtors' conversion of the securities many years later. The value of the securities at the date of conversion was the measuring stick.

Moreover, the oft-quoted rationales for the § 510(b) subordination requirement[10] do not apply here. Primarily, the separate wrongdoing of the Debtors had no connection to the purchase or sale of Barton's shares of stock in RIL; nor did the judgments against the Debtors that form the basis for Barton's bankruptcy claims arise from a purchase or sale. In any event, the risk that those who purchase or sell stock (investors in a corporation) assume and expect to take is not that the shares themselves will later be stolen outright by other individuals.[11] Nor, to the extent it applies at all, does the equity cushion rationale affect our decision here.[12] Even if the Debtors' creditors did, somehow, rely upon the equity contributed by RIL's investors, that does not touch upon the separate torts committed by the Debtors in this case.

In short, the bankruptcy court did not err when it refused to subordinate Barton's claims pursuant to § 510(b).

## II. *Conversion of Chapter 13 Proceedings to Chapter 7 Proceedings*

[9] [10]The Debtors also assert that the bankruptcy court clearly erred when it found bad faith,[13] and abused its discretion[14] when it converted their Chapter 13 proceedings to Chapter 7 proceedings.[15] We disagree. The bankruptcy court was required to and did consider "the

totality of the circumstances." *Eisen v. Curry (In re Eisen)*, 14 F.3d 469, 470 (9th Cir. 1994) (per curiam) (internal quotation marks omitted). However, the Debtors point to the factors we outlined in *Leavitt*, 171 F.3d at 1224. Those are:

(1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Bankruptcy Code, or otherwise filed his Chapter 13 petition or plan in an inequitable manner;

(2) the debtor's history of filings and dismissals;

(3) whether the debtor only intended to defeat state court litigation; and

(4) whether egregious behavior is present.

*Id.* (citations, internal quotation marks, and brackets omitted). The bankruptcy court was well aware of those factors, and declared that the second factor did not cut against the Debtors. It did, however, find manipulation of the bankruptcy proceedings *1066 (first factor) and interference with the state proceedings (third factor). Moreover, although it did not specifically mention the egregiousness of the Debtors' behavior, it plainly thought that the behavior was quite troubling at the very least (fourth factor). The BAP agreed with the bankruptcy court's analysis. *See Khan I*, 523 B.R. at 185–87.

The Debtors attack those determinations and concentrate a good deal of their firepower on *Leavitt*'s third factor. *Leavitt*, 171 F.3d at 1224; *see also Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1445 (9th Cir. 1986). They focus on the word "only" and take that to mean that defeating state court litigation had to be the sole motive, but we have not so treated it. For example, in *Leavitt* itself we decided that avoidance was merely the "primary" motive. *Leavitt*, 171 F.3d at 1225; *see also Eisen*, 14 F.3d at 470 (if only intent is to defeat state court litigation, that *is* bad faith); *Chinichian*, 784 F.2d at 1445 (multitude of factors showed bad faith, including the real purpose of the filing). The Debtors do not appear to recognize that the factors are simply factors to consider and that not every one of them must be met. That rather blinds them to the overarching requirement that what matters is "the 'totality of the circumstances.' " *Eisen*, 14 F.3d at 470; *see also Ho v. Dowell (In re Ho)*, 274 B.R. 867, 877 (B.A.P. 9th Cir. 2002) (a court must decide " 'in the light of *all* militating factors' "). The BAP recognized that. *See Khan I*, 523 B.R. at 185. As the BAP put it: "Even if a debtor presents more than one purpose for filing, the third *Leavitt* factor does not fail to support cause if the other purpose also reflects bad faith. And, once again, the third factor is considered in a totality of

In re Khan, 846 F.3d 1058 (2017)

63 Bankr.Ct.Dec. 169, Bankr. L. Rep. P 83,059, 17 Cal. Daily Op. Serv. 632...

the circumstances context." *Id.* at 186.

We have carefully reviewed the record together with decisions of the bankruptcy court and the BAP, and are satisfied that the evidence fully supports the determinations that there was bad faith and that conversion was appropriate. The highly suspect timing of the Debtors' Chapter 13 petitions, their failure and refusal to provide financial information critical to the determination of the value of their assets, and their further failure to provide information regarding the movement of funds among their various business entities all combined to justify the conversion decision.

Thus, the bankruptcy court did not clearly err or abuse its discretion.

### CONCLUSION

This case presents a saga of picaresque behavior. The Debtors converted Barton's stock and were required by the Superior Court to pay substantial damages as a result. In the bankruptcy proceedings, their timing was at least suspicious, and they continued their inappropriate behavior by refusing to be forthcoming about the nature and activities of the business entities they controlled. On this record, the bankruptcy court properly determined that Barton's claims should not be subordinated and that the Chapter 13 proceedings should be converted to Chapter 7 proceedings. We, therefore, affirm the bankruptcy court.[16]

**AFFIRMED.** Barton shall recover his costs on appeal.

**\*1067** RAWLINSON, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the bankruptcy court acted within its discretion when it converted the debtors' bankruptcy proceedings from Chapter 13 to Chapter 7. I also join the majority's conclusion that 11 U.S.C. § 510(b) applies to Debtors who are individuals. However, I dissent from the conclusion of the majority that § 510(b) is inapplicable because the claims of Kenneth Barton did not arise from a purchase or sale of securities. In my view, the opposite conclusion is inescapable–that Barton's claim *did* arise from the purchase or sale of a security under § 510(b).

It is undisputed that Barton purchased securities in RPost International, Ltd. It is also undisputed that Debtors impermissibly converted Barton's stock. However, that conversion did not erase the fact that Barton's subsequent claims against Debtors arose from his previous purchase of securities.

The majority acknowledges that we have consistently interpreted the phrase "arising from" broadly. *Majority Opinion,* p. 1064. We most recently reiterated that interpretation in *Del Biaggio Liquidating Trust v. Freeman (In re Del Biaggio),* 834 F.3d 1003, 1009 (9th Cir. 2016) ("[W]e observe that § 510(b)'s arising from language reaches broadly to subordinate damage claims involving qualifying securities.") (citation and internal quotation marks omitted). We went on to explicate that the "arising from" phraseology is "broader than causation" and is "ordinarily understood to mean 'originating from,' 'having its origin in' 'growing out of,' or 'flowing from' or in short, 'incident to or having connection with.' " *Id.* (citation omitted).

We rejected the creditor's contention that his claims did not arise from the purchase or sale of securities because the claimant was indisputably an investor in the debtor's affiliate. *See id.* at 1008–09. Rather, we continued to adhere to "one of the general principles of corporate and bankruptcy law" embodied within the text of § 510(b): "that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets." *Id.* at 1008 (quoting *Racusin v. American Wagering Inc. (In re American Wagering),* 493 F.3d 1067, 1071 (9th Cir. 2007)).

In *Del Biaggio,* we cited our precedent concluding that a claimant was a shareholder even though the debtor's defalcation "converted the claimant's interest from an equity interest to a debt interest before the bankruptcy filing." *Id.* at 1009 (quoting *Pensco Trust Co. v. Tristar Esperanza Properties, LLC (In re Tristar Esperanza Properties, LLC),* 782 F.3d 492, 497–98 (9th Cir. 2015)).

We also referenced *American Broadcasting Sys. v. Nugent (In re Betacom of Phoenix, Inc.),* 240 F.3d 823, 830 (9th Cir. 2001), as an example of our broad interpretation of § 510(b). *See id.* We explained that we applied § 510(b) to a damages claim predicated on a "purported breach of contract in a merger agreement" because the claim was "one 'surrounding' the sale or purchase of a security of the debtor." *Id.* (quoting *In re Betacom,* 240 F.3d at 829).

In addition, we noted that our broad interpretation of the "arising from" language of § 510(b) is consistent with the interpretations advanced by our sister circuits. *See id.* (referencing *Templeton v. O'Cheskey (In re Am. Hous. Found.),* 785 F.3d 143 (5th Cir. 2015); *SeaQuest Diving, LP v. S&J Diving, Inc. (In re SeaQuest Diving, LP),* 579 F.3d 411, 421–22 (5th Cir. 2009); *Rombro v. Dufrayne*

63 Bankr.Ct.Dec. 169, Bankr. L. Rep. P 83,059, 17 Cal. Daily Op. Serv. 632...

(*In re Med Diversified, Inc.*), 461 F.3d 251, 254–55 (2d Cir. 2006)).

**\*1068** The majority also cites our precedent and does not attempt to distinguish it, other than to try to fit the facts of this case within the confines of our decision in *American Wagering. See Majority Opinion*, pp. 1064–65. However, the fit is cramped and imperfect. Preliminarily, in *Del Biaggio*, we described our decision in *American Wagering* as requiring subordination "where there exists *some nexus or causal relationship* between the claim and the purchase of the securities." *Del Biaggio*, 834 F.3d at 1009 (citation and internal quotation marks omitted) (emphasis added). We explained that the facts in *American Wagering* did not fall within our broad interpretation because, and only because, the claimant's contract with the debtor was explicitly *not* for the purchase or sale of securities. *See id.* Rather, the contract was explicitly for services as a financial advisor. The resulting agreement stated:

> Should [the creditor] bring in a buyer ... said company will be paid a commission based on 5% of the purchase price.

*In re Am. Wagering*, 493 F.3d at 1069.

Seven months later, another agreement was entered into between the same parties, with the following provision:

> [Claimant] has been our financial advisor for the purpose of an initial public offering ... As compensation he would be paid 4 ½% of the final evaluation in the form of ... common stock and $150,000 cash.

*Id.* at 1070.

After two years, the debtor filed an action against the creditor seeking to invalidate the contract in its entirety. *See id.* Following a jury trial, a verdict was rendered in favor of the creditor for "stock ... in an amount equal to 4.5% of $45,000,000 [the final valuation of the common stock] and $150,000 in cash." *Id.* Consistent with this verdict, the court awarded the creditor 337,500 shares of stock worth $2.025 million. *See id.*

The creditor appealed the award, arguing that it was error for the court to award specific performance by way of bestowing stock, when the creditor requested money damages. *See id.* We agreed and remanded for the court to calculate the monetary equivalent of the 337,500 shares.

*See Leroy's Horse and Sports Place v. Racusin*, 21 Fed.Appx. 716, 717–18 (9th Cir. 2001). On remand, the creditor was awarded monetary damages of $2,310,000–$150,000 cash plus $2,160,000 (the value of the stock as of the date when the creditor could have sold his shares). *See American Wagering*, 493 F.3d at 1070.

Shortly after the damages award, the debtor filed for Chapter 11 bankruptcy protection, and sought to subordinate the creditor's claim pursuant to § 510(b). *See id.*

As we observed in *Del Biaggio*, the creditor in *American Wagering* never sought "to recover an investment loss." *Del Biaggio*, 834 F.3d at 1009. Rather, the creditor's "contract with the debtor merely used stock value as a basis for calculating compensation." *Id.* We clarified in *American Wagering* that the creditor "received a money judgment for services rendered." 493 F.3d at 1073. We referenced "[o]ur earlier decision" reversing the award of stock to the creditor as making it clear that the creditor's "underlying claim [was] a debt claim, not an equity claim." *Id.* The creditor "did not sue debtors as an equity investor seeking monetary damages for fraud ... related to their mishandling of shareholders' economic investment." *Id.* Instead, the creditor brought his action as an individual who was not compensated as provided in an employment agreement. *See id.*

In contrast, Barton initially brought his action in state court specifically describing **\*1069** himself as a shareholder who had been wrongfully deprived of his shares by the debtors. In his Third Amended Complaint, Barton asserted that he was issued 6,016,500 shares of RPost International Limited Stock, that Defendants now owned. Barton alleged that he was "a shareholder," that he was owed a fiduciary duty of disclosure, and that Defendants wrongfully converted Barton's shares of stock, causing Barton to suffer damages "[a]s a direct, proximate, and foreseeable result of the taking and conversion of Barton's shares ..." *Third Amended Complaint, Barton v. RPost International Ltd*, Case No. YC061581, Superior Court of the State of California for the County of Los Angeles-Southwest District, February 16, 2011, pp. 5–9.

Consistent with Barton's allegations focusing exclusively on the conversion of his shares, the Superior Court judge continued in the same vein. Indeed, the decision of the state court judge leaves no doubt about the genesis of Barton's claims. The state court "issue[d] a declaration that Plaintiff Barton was at all relevant times an owner of 6,016,500 common shares ... and that he provided appropriate consideration for said shares of stock...." *Statement of Decision, Barton v. RPost International Ltd.,*

Case No. YC061581, Superior Court of the State of California for the County of Los Angeles, August 3, 2012, p. 5. The state court prohibited RPost International "from taking any action to encumber, forfeit, and/or cancel Barton's shares without having obtained prior written approval from either the court, Barton or his duly authorized counsel." *Id.*

The court ordered Defendants to restore the shares of stock to Barton. *See id.*, p. 8. Leaving no doubt that the remedy was intended to restore Barton to the position of shareholder, the state court ordered that Barton "have no role in the management of the company but ... be given reasonable notice of meetings of its shareholders and major transactions." *Id.* The state court "encouraged [the parties] to meet and confer to determine, *on their own,* a purchase price *for Barton's shares of stock* so that a potentially uncomfortable relationship going forward can be avoided." *Id.* (emphases added).

The state court's order unequivocally restored Barton to his status as a shareholder in RPost International. Unlike the creditor in *American Wagering,* the record nowhere reflects that Barton objected to the remedy of specific performance. It was only after the punitive damages phase of the trial that the state court awarded the monetary value of the stock to Barton. *See Ruling on Punitive Damages and Revisions to Statement of Decision, Barton v. RPost International Ltd.,* Case No. YC061581, Superior Court of the State of California for the County of Los Angeles, June 18, 2013, pp. 1–2. Nevertheless, the state court continued to link its damages award to the conversion of Barton's shares. *See id.,* p. 2. The court explained that because "the assets and character of RPost International had changed dramatically ... returning the 6,016,500 shares to Mr. Barton would undoubtedly spark an endless round of post-judgment motions and additional lawsuits." *Id.* However, the court never strayed from its conclusion that Mr. Barton was entitled to this remedy as a shareholder of RPost International. *See id.*

The facts of this case are not even close to those we considered in *American Wagering.* In that case, the creditor was never a shareholder of the debtor and never sought or accepted specific performance by way of the award of shares. *See Am. Wagering,* 493 F.3d at 1069–70. The plaintiff in that case steadfastly based his claim on an employment contract that was simply **\*1070** measured by the price of the stock. *See id.* at 1071 (noting that the original contract "only gave [the creditor] the monetary value of the shares of stock, not the stock itself"). Notably, the plaintiff in *American Wagering* actually appealed the district court's decision awarding stock as a remedy. *See id.* at 1070. In contrast, Barton predicated his entire complaint on his status as a shareholder. No other

basis for recovery was ever articulated, and Barton posed no objection when the state court awarded him shares and shareholder rights as a remedy. At bottom, Barton's claim is closer to the facts of *Del Biaggio,* where we characterized the damages claim in a similar fraudulent scheme resulting in the loss of equity shares as "clearly one arising from the sale or purchase of securities." 834 F.3d at 1009. As in *Del Biaggio,* the damages sought by Barton and awarded by the state court "correspond exactly to the amount [Barton] invested in [RPost International] through his initial purchase of [RPost International] securities ..." *Id.* As in *Del Biaggio,* "[Barton's claim is really no claim at all but for his investment in [RPost International]. *Id.*

Similar to the majority's approach, the creditor in *Del Biaggio* sought to "analogiz[e] his case to the facts of *American Wagering.*" *Id.* We rejected the proposed analogy because the creditor in *Del Biaggio,* like Barton, sought to "recover an investment loss," *id.* rather than "valu[ing] a free-standing injury by reference to a security." *Id.* at 1009–10. As in *Del Biaggio,* without a separate source of injury unrelated to his security holdings, Barton's "asserted injury is inseparable from his [RPost International] investment." *Id.* at 1010.

The majority also relies upon the decision of a bankruptcy court, *In re Angeles Corp.,* 177 B.R. 920, 927 (Bankr. C.D. Cal. 1995) that was summarily affirmed by the Bankruptcy Appellate Panel. *See* 199 B.R. 220 (B.A.P. 9th Cir. 1996).

The discussion section of *Angeles* is light on the underlying facts. The court noted only that "it appears that approximately $250 million of money invested by limited partners was lost from inception of the partnerships to the present." *Angeles,* 177 B.R. at 924. Addressing the subordination question, the court ruled that "claims alleging misconduct, breach of fiduciary duty, or wrongful acts by Debtor ... in managing the partnerships *subsequent* to the purchase of the limited partnership interests are *not* ... subject to subordination ..." *Id.* at 926 (emphases in the original).

This interpretation ignores the broad language of § 510. *See Weissman v. Pre–Press Graphics Co., Inc.* (*In re Pre–Press Graphics Co., Inc.,* 307 B.R. 65, 76 (N.D. Ill. 2014) (describing *Angeles* as "supporting the narrow approach" to interpreting § 510)). It is also directly contrary to more recent precedent. *See SeaQuest Diving,* 579 F.3d at 418 (involving rescission of creditor's equity investment *subsequent* to the purchase); *Tristar Esperanza Prop.,* 782 F.3d at 497 (explicitly rejecting the argument that the subsequent nature of the claim dictates the outcome); *Del Biaggio,* 834 F.3d at 1007 (addressing

a subsequent fraud claim stemming from an equity investment).

In the twenty-plus years that *Angeles* has been in existence, the case has been widely and roundly criticized. In the case of *In re Enron Corp.*, 341 B.R. 141, 154 (Bankr. S.D.N.Y. 2006), the bankruptcy court questioned whether *Angeles* "can still be considered good law" in view of "the recent trend in the case law." The court described *Angeles* as "embrac[ing a] restricted reading of section 510(b)" that had been "uniformly rejected" in more recent cases, and observed that these more **\*1071** recent cases "explicitly disagree [ ] with the legal principles" espoused in *In re Angeles. Id.* The bankruptcy court expressly referenced our decision in *Betacom*, noting that the holding in *Betacom* "eviscerates the logic of *Angeles* even if the *Betacom* court did not address [*Angeles*] directly." *Id.* at 155 (citation omitted); *see also Frankum v. Int'l Wireless Comm. Hldgs, Inc. (In re Int'l Wireless)*, 279 B.R. 463, 469 n.2 (D. Del. 2002) ("[T]he validity of ... *Angeles* in this circuit is suspect ... Accordingly, the Court declines to adopt the rationale[ ] of [*Angeles*]." ); *In re Pre–Press Graphics*, 307 B.R. at 77–78 (declaring *Angeles* "not ... persuasive" and undermined by more recent precedent from the Ninth Circuit); *Id.* at 76 ("The statutory interpretation set forth in [*Angeles*] ... has been called into doubt by recent decisions from the Third, *Ninth* and Tenth Circuits.") (emphasis added); *In re Granite Partners*, 208 B.R. 332, 342–43 (Bankr. S.D.N.Y. 1997) (characterizing *In re Angeles* as "not persuasive").

Finally, but not incidentally, I disagree with the majority's conclusion that Barton should not be included within the category of investors who assumed the risk of investment loss. As a shareholder, Barton was the quintessential investor whose fortune was tied to the ups and downs of his investment, including those linked to fraud. *See Del Biaggio*, 834 F.3d at 1011 ("As an investor, [the creditor] bargained for increased risk in exchange for an expectation in the profits ..." "Congress enacted § 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud ... to bootstrap their way to parity with general unsecured creditors ...") (citation and footnote reference omitted). Unfortunately, Barton is not exempt.

In sum, considering the broad language of § 510(b) and the correspondingly broad interpretation we have consistently applied in our precedent, Barton, a shareholder in the debtor corporation, asserted conversion claims arising from the purchase of his shares. Without a doubt, his claim stemmed directly from the wrongful appropriation of the very shares he purchased. *See Del Biaggio*, 834 F.3d at 1009. I respectfully dissent from the majority's contrary conclusion which, in my view, contravenes circuit precedent and the policy underlying § 510(b).

**All Citations**

846 F.3d 1058, 63 Bankr.Ct.Dec. 169, Bankr. L. Rep. P 83,059, 17 Cal. Daily Op. Serv. 632, 2017 Daily Journal D.A.R. 651

Footnotes

|   |   |
|---|---|
|   | This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader. |
| 1 | *Khan v. Barton, (In re Khan)* ("*Khan I*"), 523 B.R. 175, 178 (B.A.P. 9th Cir. 2014). |
| 2 | Hereafter all references to section numbers are to sections of Title 11 of the United States Code, unless otherwise indicated. |
| 3 | *See* § 1307(c). |
| 4 | §§ 1301–1330. |
| 5 | §§ 701–784. |
| 6 | In light of our determination that § 510(b) does not apply, we need not consider the Debtors' assertion that Barton's claims should be disallowed because they were subordinated. |
| 7 | More particularly, the section reads as follows: |

In re Khan, 846 F.3d 1058 (2017)

63 Bankr.Ct.Dec. 169, Bankr. L. Rep. P 83,059, 17 Cal. Daily Op. Serv. 632...

For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

8    The Debtors alleged that each owned over 20% of RIL. *See* § 101(2)(B) (defining "affiliate").

9    *See* § 510(b).

10   *See Betacom*, 240 F.3d at 830 (dissimilar risks and equity cushion rationales).

11   *See id.; see also Del Biaggio*, 834 F.3d at 1010–11.

12   *Betacom*, 240 F.3d at 830; *see also Del Biaggio*, 834 F.3d at 1011–12.

13   *See Leavitt*, 171 F.3d at 1222–23; *de la Salle v. U.S. Bank, N.A. (In re de la Salle)*, 461 B.R. 593, 605 (B.A.P. 9th Cir. 2011).

14   *See Rosson*, 545 F.3d at 771; *see also Hinkson*, 585 F.3d at 1263–64.

15   *See* § 1307(c).

16   Of course, in so doing we have rejected the reasoning of the BAP on the subordination issue.

---

**End of Document**                     © 2017 Thomson Reuters. No claim to original U.S. Government Works.

## STATEMENT OF FACTUAL BASIS FOR CLAIM

1.    Mr. Bressler acquired an interest in Medallic Art Corporation, LLC ("Medallic Art") under the circumstances described in my previously filed Declaration dated November 10, 2016. Mr. Bressler's interest in Medallic Art principally arose from his view of the historical significance of some of the dies that Medallic Art owned, as some of those dies were derived from work by notable early 20th century sculptors. Mr. Bressler believed that those dies had unique artistic and historical value, and the business relationship proposed between Medallic Art and the Northwest Territorial Mint, LLC ("NWMT" or "the Mint") provided an opportunity to perpetuate that artwork, while also providing him with a reasonable return on his investment in Medallic Art through a leasing and licensing arrangement with NWMT. Throughout, it was his clear intention to take no role in management of Medallic Art, and to have no liability risk. As with any investment, Mr. Bressler understood that if Medallic Art was unsuccessful as a business, that his investment could be lost.

2.    Mr. Bressler has subsequently learned that in the course of managing both Medallic Art and NWTM, Mr. Hansen failed to maintain the clear distinction between the two entities that Mr. Bressler had always intended to be the case. Mr. Bressler's understanding was that Medallic Art had separate assets and that its business relationship with NWTM was to be one based on leased and licensed assets, with marketing and sales to be conducted by NWTM in order to maximize the profit for both NWTM and Medallic Art of the licensed dies. To his knowledge, any other business that NWTM did, particularly with regard to precious metals, was entirely independent and had nothing to do with Medallic Arts or him.

3.    Mr. Bressler has subsequently been informed, through the course of the NWTM bankruptcy, that the Trustee, Mark Calvert, who is a notable professional fraud examiner, has discerned the existence of fraudulent transfers to include the more than $3.3 million in direct transfers from the Mint to Medallic. Mr. Calvert has also asserted that the Mint and Medallic were operated by Mr. Hansen prior to the bankruptcy in a manner which exhibited attributes of a Ponzi scheme in that orders of bullion customers of the Mint were fulfilled primarily from later

customer deposits while the Mint made false and misleading statements and concealed material facts from bullion customers in order to induce them to extend credit to the Mint. Further, Mr. Calvert has alleged that from the inception of my investment in Medallic Art or before, unbeknownst to me, the assets of the Mint were improperly diverted for the purpose of the assets of Medallic Art being acquired through an entity controlled by Mr. Hansen, such that Medallic Art should be treated as a mere component part or alter ego of the Mint. This was never Mr. Bressler's intention nor expectation.

4.      The Trustee has further described circumstances that indicate that the Mint was insolvent at the time of my investment in Medallic Art. The implication is that Mr. Bressler's investment, and the acquisition of Medallic Art, with its facilities, equipment and assets, became a tool to help prop up the Mint. A more complete expression of the Trustee's investigation can be found in The Trustee's Answer and Counterclaims in *Medallic Art Company, LLC v. Calvert*, Adversary Case No. 16-01196 (In re: Northwest Territorial Mint, LLC Case No. 16-11767-CMA) ("the Adversary Proceeding") filed in the United States Bankruptcy Court for the Western District of Washington. Mr. Bressler has not independently investigated the Trustee's allegations in the Adversary Proceeding, and relies upon the Trustee's statements in the Adversary Proceeding.

5.      It has never been Mr. Bressler's intention to become an investor in the Mint, and Mr. Bressler did not purchase an ownership interest in the Mint. While the Trustee has alleged that "Employees, vendors, and creditors of NWTM dealt with Medallic LLC and the Debtor as a single economic unit" the Trustee has quite correctly not included Mr. Bressler among those who treated the two entities as a single economic unit.

6.      Mr. Bressler's loss in this bankruptcy proceeding arises because, as the Trustee has described, Mr. Hansen operated the Mint and Medallic in a fashion that caused their separate identities to cease to exist.

7.      Except as a long ago customer of the Mint, Mr. Bressler has had no business involvement with the Mint. Mr. Bressler now accepts the Trustee's allegations in the adversary

proceeding that the Mint induced customers to order precious metals such as gold and silver bullion from the Mint at a time and under circumstances when the Mint was financially incapable of fulfilling those orders.

8. The Trustee has alleged that the Mint operated with over 240 employees in 8 offices in six states. Upon information and belief, the Mint solicited orders through the internet, mails and telephone, and that these communications occurred across state lines. Given the location of the Mint's manufacturing and storage facilities, it inevitably involved interstate transactions.

9. Further, Mr. Hansen communicated with Mr. Bressler about the business affairs of Medallic Arts by telephone and email, while never disclosing that the operations of the two businesses were being managed in a way that caused their separate identities to cease to exist, or that Medallic Art had been subsumed into the Mint at a time when the Mint was insolvent. Rather, at least to the end of 2013, Mr. Bressler understood that Medallic Art was an independent and financially successful business. After 2013, Mr. Bressler no longer received dividends on his investment. Mr. Hansen provided Mr. Bressler with what sounded to be commercially reasonable explanations for the decline in the financial success of the business.

10. Upon information and belief, in the course of its solicitations and acceptances of the orders for precious metals and bullion, the Mint made misrepresentations to its customers regarding its ability to deliver the goods ordered, the time within which the goods would be delivered, the security of the payment made to the Mint and that precious metals purchased by Mint customers would or could be safely and securely stored for the customer's benefit within Mint facilities. As the Trustee has stated in the Adversary Proceeding "As early as 2009, the Debtor delayed the delivery date for customer orders, allowing the time for the Debtor to collect more cash from newer orders and to acquire other assets. Cash collected from newer customers was routinely used to pay for purchases of product in fulfillment of outstanding customer orders."

11. Medallic Art constitutes an enterprise within the meaning of 18 U.S.C. §1962.

12.     NWTM, through the commission of two or more acts constituting a pattern of racketeering activity used or invested the proceeds derived from that racketeering activity in Medallic Art, the ultimate result of which was to render Medallic Art insolvent and subsumed within NWTM, and subject to the claims of creditors of the NWTM. This conduct violates 18 USC §1962(a).

13.     NWTM, through the commission of two or more acts constituting a pattern of racketeering activity directly or indirectly acquired or maintained an interest in Medallic Art, the ultimate result of which was to render Medallic Art insolvent and subsumed within NWTM, and subject to the claims of creditors of the NWTM. This conduct violates 18 USC §1962(b).

14.     Because its business was predicated upon a fraudulent scheme, as alleged by the Trustee but unknown to me, NWTM's control, operation and management of Medallic Art was the product of a pattern of racketeering activity, in violation of 18 USC §1862(c).

15.     As a result of foregoing activities by NWTM, Mr. Bressler has lost the entirety of his $3 million investment in Medallic Art. Even accounting for dividend distributions that Mr. Bressler received from Medallic Art over a period of years and treating that as though it had been a return of capital, Mr. Bressler had still suffered a loss of $2,237.000.

| From: | Tom Lerner |
| --- | --- |
| To: | mark.northrup@millernash.com; Gearin, Mike |
| Subject: | Bressler claim |
| Date: | Thursday, June 15, 2017 7:32:13 AM |

Good morning gents,

　　　　We are 15 days away from the claims deadline, so I thought I would check with you to see if you had a response from your clients with regard to my proposal on the Bressler claim.

Thanks, Tom

**Thomas A. Lerner (v-card | bio)**
Shareholder
Stokes Lawrence, P.S. - *Realizing your vision.*
1420 Fifth Avenue, Suite 3000 | Seattle, WA 98101-2393
Tel.: (206) 892-2147 | Fax: (206) 464-1496 | Cell: (206) 390-0470
Email: tom.lerner@stokeslaw.com | Web: www.stokeslaw.com

This e-mail may contain confidential information which is legally privileged. The information is solely for the use of the addressee(s) named above. If you are not the intended recipient, any disclosure, copying, distribution or other use of the contents of this information is strictly prohibited. If you have received this e-mail in error, please notify us by return e-mail and delete this message. Thank you.