**From:** Mark Calvert mark@cascadecapitalgroup.com
**Subject:** FW: Move of Auburn.xlsx
**Date:** November 30, 2016 at 11:06 AM
**To:** Connie Hoff mountainviews@sbcglobal.net

CONFIDENTIAL
But help you understand the plan to profitability

Mark

**From:** Mark Calvert
**Sent:** Wednesday, November 30, 2016 10:03 AM
**To:** mike.gearin@klgates.com; Paul Wagner
**Cc:** Northrup, Mark D.
**Subject:** Move of Auburn.xlsx
**Importance:** High

To All

Here is the current plan for the move of Auburn.
As you can see the potential… (not what I am telling people) is around $250k per year
As you know I have only represented a reduction of about $14k to $15k per month…
So 25% discount on what we think it could be and it might even be a little more….
This will need to be baked into the model….
This represents a $20k reduction in the monthly break even.
This is substantial and a major set in making the company more efficient.

Look forward to making this happen.
Only exposure is going to be the Auburn Land Lord.
We will need to ensure we are out in January….
And we will need to find a way to extend the hearing until January…
That way we can manage the situation….
The land lord is very litigious and we need to find a smooth way out of this situation…

Mark

# FW: NWTM Committee Update April 6, 2017..xlsx

**From:** Mark Calvert <"/o=first organization/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=a443e6d571cb4990baed6b22a025f7a2-tod m">
**To:** Connie Hoff <mountainviews@sbcglobal.net>
**Date:** Fri, 07 Apr 2017 09:59:45 -0700
**Attachments:** NWTM Committee Update April 6, 2017..xlsx (13.05 kB); Bressler Settlement Agreement/Final for Signature [KLG-USW_Active01.FID237675] (80.9 kB); FEB MARCh SNAP SHOT.docx (14.95 kB); MARCH APRIL SNAP SHOT.docx (15.3 kB)

CONFIDENTIAL

**From:** Mark Calvert
**Sent:** Wednesday, April 5, 2017 6:20 PM
**To:** Northrup, Mark D. ; Gearin, Mike
**Cc:** Bill Atalla ; Paul Wagner
**Subject:** NWTM Committee Update April 6, 2017..xlsx

Mark

Here is the agenda for the call tomorrow at 2:00 PM to 3:00 PM

The agenda will give the committee a good understanding of the overall status of the case and the status of operations of the company. I will have Bill and Paul join the call to share information on the operations and the committee member will be able to ask operating questions. In addition Mike will provide information on the status of the litigation with Ross / Medallic and I will provide some information on the status of the fraud analysis.

The goal is to share all information on the status of the operations and litigation and answer any questions the committee might have. My guess is this will call will be over an hour...

Looking forward to updating the committee

Mark

## Participant Instructions:

Host Name:

Participant Access Code:

Northrup

0175360

**Miller Nash Conferencing Phone Numbers**
Portland Local: 503-205-2700
Seattle Local: 206-777-7557
Vancouver Local: 360-619-7054
Bend Local: 541-749-3344
Toll Free: 866-853-8383
Internal Extension: 2700

**Participant Detailed Instructions:**
**Participant:** Dial one of the Miller Nash Conferencing numbers.
**Operator:** Welcome to Shoretel Converged Conferencing.
Enter an access code, then press #. To cancel press *.
**Participant:** Enter Participant Access Code from above.
If the leader has already activated the conference:
**Operator:** One moment while your call is connected.
If the leader has not yet activated the conference:
**Operator:** The leader hasn't activated this call yet.

33

Please stay on the line. To turn off the music press 1.

# DOCUMENT PROVIDED NATIVELY

Name:    NX_CALVERT_00009033.xlsx

Size:    13KB (13,054 bytes)

# NWTM
## Agenda for Committee Meeting
## As of April 6, 2016

<u>Outline of topics to be discussed:</u>

**1 Results of the hearing on discovery, continuance of the Medallic trial and exclusion of Medallic expert witness**
  a   Discovery Provided
  b   Review of discovery by Medallic
  c   Bifurcation, insolvency and reasonable equivalent value
  d   Expert report not adequate but will be included limited to report
  e   Cost of deposition of expert will be covered by Medallic
  f   Trial is scheduled for May 2 to 4 and continued to June 3 to 5th

**2 Settlement discussion with Ross / Medallic**
  a   Strong desire to settle due to admin costs of trial
  b   Proposed settlement terms are too expensive currently
  c   Deal breaking terms, taxes and Medallic name

**3 Ross Deposition**
  a   Number of issue with the start of deposition
  b   Completed two days total of 8 hours
  c   Will be completed deposition on April 14th
  d   Interesting comments made by Ross

**4 Medallic Expert deposition shooting for April 14th**
  a   Will determine amount of work actual completed
  b   Lack sufficient time to do any significant procedures

**5 Mark Calvert, Trustee deposition is scheduled for April 19th**
  a   Major findings:
         Insolvent prior to 2007,
         Reasonable equivalent value shortfall over $10 million
  b   Use of float to fund operations has been confirmed
  c   Realized and unrealized losses were as high as $40 million in 2007
  d   Delays in delivers to make money in a decreasing market
  e   Significant work completed on timing of insolvency
  f   Only open item is inventory unable to tie down on year by year basis

37

**6 Status of Bressler and potential other case settlement issues;**
- a   Settlement gives him a claim in the estate of $3 million
- b   His decision was partially tax based, ordinary loss vs capital

**7 Operating Report from Bill**
- a   Status of sales growth and change in sales approach
- b   Status of major contract discussions
- c   Nevada TV Station

**8 Staffing changes past three months**
- a   VP of Marketing Terminated / New VP Marketing Retained
- b   VP of Sales Terminated
- c   Tool Room Manager Terminated
- d   CFO / Controller in process of retaining

**9 Operating Results for March**
- a   March Sale of $1.2 million, profitable
- b   April sales projected at $1.3 million and profitable
- c   May sales, still filling up… but believe $1.3 million and profitable
- d   June expecting sales of over $1.0 million
- e   July, first month where I have a concern about profitability

**10 Plan status**
- a   Just need Medallic Litigation Resolved
- b   Ready to move forward with Plan, could file by June
- c   Will depend on sales growth
- d   Will sell company if sales growth does not materialize

**11 Possible buyer of the company**
- a   Not interested if sales continue to improve
- b   Will have discussions and be prepared to sale do not grow as needed
- c   Purchase price of say $8 million

**12 FBI update**
- a   Pulled to another case for over a month
- b   Next meeting next week to share insolvency analysis
- c   Do not expect anything until the June time frame

**13 Question and Answers**

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into and effective as of this 9th day of March, 2017, upon the terms and conditions set forth below, by and between Mark Calvert as Chapter 11 Trustee for Northwest Territorial Mint, LLC ("Trustee") in bankruptcy case no. 16-11767, United States Bankruptcy Court for the Western District of Washington and Richard Bressler on behalf of himself and his marital community ("Bressler"). The Trustee and Bressler are collectively referred to herein as the "Parties."

## RECITALS

A.      On April 1, 2016, Northwest Territorial Mint, LLC (the "Debtor" or the "Mint") filed a chapter 11 voluntary bankruptcy petition, commencing Case No. 16-11767-CMA (the "Bankruptcy Case") in the United States Bankruptcy Court for the Western District of Washington (the "Bankruptcy Court"). On April 11, 2016, the Bankruptcy Court appointed Mark Calvert as chapter 11 Trustee.

B.      Bressler is a member and fifty percent interest holder in Medallic Art Company LLC, a Nevada limited liability company ("Medallic"). Bressler invested Three Million Dollars ($3,000,000) to acquire his interest in Medallic in July, 2009. Bressler's intent in making his investment in Medallic was to become a financial member only, with no management or operational role, for the purpose of realizing a desired rate of return analogous to a capital lease. The remaining fifty percent interest in Medallic is nominally held by Ross Hansen ("Hansen") and a corporate affiliate of Hansen, Medallic Art Corporation. Under the terms of the Medallic Limited Liability Company Agreement, managerial control over Medallic is presently vested in Medallic Art Corporation which is solely owned and controlled by Hansen.

C.      Medallic, under the exclusive control of Hansen, filed a complaint against the Trustee under Adversary No. 16-01196, United States Bankruptcy Court for the Western District of Washington (the "Medallic Litigation"). The Trustee has answered and counterclaimed. Among the claims at issue in the Medallic Litigation, is the Trustee's claim that Medallic should be substantively consolidated with the bankruptcy estate of the Mint or alternatively, that Medallic should be deemed an alter ego of the Mint (collectively these claims are the "Substantive Consolidation Claims"). If the Court orders substantive consolidation of Medallic and the Mint, the assets and liabilities of Medallic and the Mint will be consolidated into a single pool to satisfy claims of creditors of both entities and intercompany claims between Medallic and the Mint will be extinguished.

D.      In the Medallic Litigation, the Trustee has also alleged the existence of fraudulent transfers to include the more than $3.3 million in direct transfers from the Mint to Medallic and transfers by the Mint for the benefit of Medallic. Bressler is not a party to the Medallic Litigation. Medallic ceased making distributions to Bressler on account of his investment in 2013.

35

E.     The Trustee asserts that, without Bressler's knowledge, the Mint and Medallic were operated by Hansen prior to the bankruptcy in a manner which exhibited attributes of a Ponzi scheme in that orders of bullion customers of the Mint were fulfilled primarily from later customer deposits while the Mint made false and misleading statements and concealed material facts from bullion customers in order to induce them to extend credit to the Mint.

F.     The Trustee has formulated a plan of reorganization for the consolidated Mint which is premised on the continued operations of the substantively consolidated Mint to drive profits which will be distributed to pay the claims of creditors. The plan has been drafted, but not yet filed with the Court and the Court has not yet considered the approval of a disclosure statement for the plan. Resolution of the Substantive Consolidation Claims is important to the furtherance of the estate's interests in achieving confirmation of a plan of reorganization.

G.     The parties to this Agreement wish to resolve potential claims and issues between them as reflected by the terms contained below.

## AGREEMENT

In consideration of the mutual promises and covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties to this Agreement agree as follows:

1.     Recitals. The Recitals set forth above constitute an integral part of this Agreement and the parties hereby affirm the facts set forth therein and agree to the incorporation of the Recitals by this reference with the same force and effect as if set forth herein as agreements of the Parties.

2.     Stipulation to Substantive Consolidation. Bressler stipulates to and agrees not to oppose the Trustee's proposed substantive consolidation of Medallic with the bankruptcy estate of the Mint. To the extent that Bressler obtains management control over Medallic, he will cause Medallic to stipulate to and not oppose the Trustee's proposed substantive consolidation of Medallic with the bankruptcy estate of the Mint. If the Court does not order substantive consolidation of Medallic with the bankruptcy estate of the Mint, Bressler stipulates to and agrees not to oppose the Court's determination that Medallic is an alter ego of the Mint. To the extent that Bressler obtains management control over Medallic, he will cause Medallic to stipulate to and not oppose a determination that Medallic is an alter ego of the Mint. Nothing in this Agreement presumes or shall be interpreted to compel Bressler to become the Manager of Medallic.

3.     Allowance of Claim. If the Court substantively consolidates the Mint with Medallic, or finds that Medallic is an alter ego of the Mint, Mr. Bressler will be granted an allowed general unsecured claim in the Bankruptcy Case in the amount of Three Million Dollars ($3,000,000). Other than this Three Million Dollar allowed general unsecured claim, Bressler will not be entitled to any claim or interest in the bankruptcy case.

4.     <u>Release of Claims by Trustee against Bressler</u>. Contingent upon the fulfillment by Bressler of his obligations under this Agreement, and the Court's substantive consolidation of Medallic with the bankruptcy estate of the Mint or the Court's finding that Medallic is the alter ego of the Mint, the Trustee, on behalf of the Bankruptcy Estate, its respective agents, affiliates, parents, subsidiaries, officers, directors, shareholders, legal representatives, successors and assigns, shall be deemed to have fully and forever released, compromised and discharged Bressler and his current, former, and future, agents, lawyers, employees, predecessors, successors, assigns, affiliates, and representatives from all actions, claims, demands, damages, debts, losses, liabilities, indebtedness, causes of action (whether at law or in equity) and obligations of whatever kind or nature, whether now known or hereafter discovered, direct or indirect, new or existing, foreseen or unforeseen, by reason of any matter, cause or thing whatsoever occurring on or prior to the date hereof, arising out of or relating to the affairs of Medallic and the Mint.

5.     <u>Release of Claims by Bressler</u>. Contingent upon the fulfillment by the Trustee of his obligations under this Agreement on behalf of the Bankruptcy Estate and the Court's substantive consolidation of Medallic with the bankruptcy estate of the Mint or the Court's finding that Medallic is the alter ego of the Mint, Bressler, his respective agents, affiliates, parents, subsidiaries, officers, directors, shareholders, legal representatives, successors and assigns shall be deemed to have fully and forever released, comprised and discharged the Bankruptcy Estate, the Trustee, and the Trustee's current, former, and future, agents, lawyers, employees predecessors, successors, assigns, affiliates, and representatives from all actions, claims, demands, damages, debts, losses, liabilities, indebtedness, causes of action (whether at law or in equity) and obligations of whatever kind or nature, whether now known or hereafter discovered, direct or indirect, new or existing, foreseen or unforeseen, by reason of any matter, cause or thing whatsoever occurring on or prior to the date hereof arising out of or relating to the affairs of Medallic and the Mint, excepting only his allowed $3 million claim as described in paragraph 3 above.

6.     <u>Agreement Subject to Court Approval.</u> This agreement is binding on the parties, subject only to the approval of the Bankruptcy Court. The Trustee agrees to promptly apply to the Court for such approval.

7.     <u>Representation</u>. The Parties to this Agreement have had the opportunity to review this Agreement and acknowledge that they fully understand and agree to the contents herein. The Parties have had the opportunity to consult with their own attorneys concerning this Agreement and have not entered into this Agreement under any undue influence. Each of the individuals signing this Agreement specifically represents and warrants that they have authority to bind the parties to this Agreement.

8.     <u>Governing Law; Jurisdiction and Venue</u>. This Agreement is entered into in Washington and shall be governed by and construed in accordance with the substantive laws of the State of Washington, without giving effect to conflicts of laws rules. The Parties agree that the Bankruptcy Court for the Western District of Washington shall have

jurisdiction and shall be the sole venue for the determination of any disputes arising out of this Agreement.

9.   Successors and Assigns.  This Agreement shall inure to the benefit and be binding upon the parties to this Agreement and their successors and assigns.

10.   Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior agreements, representations, warranties, statements, promises, information, arrangements and understandings, whether oral or written, express or implied, with respect to the subject matter hereof.  No variations, modifications, or changes herein shall be binding upon any party unless set forth in a document executed by the Parties.

11.   Counterparts; Signature Pages.  This Agreement may be executed in one or more counterparts, each of which shall constitute an original document but all of which when taken together shall constitute one and the same agreement.  Delivery of an executed copy facsimile or email transmission or other means of electronic communication producing a printed copy will be deemed to be an execution and delivery of this Agreement on the date of such communication by the parties so delivering such a copy.  Any party so delivering such a copy via electronic communication shall deliver an executed original of this Agreement to the other parties upon request.

12.   Headings.  The captions or headings provided in this Agreement are for convenience only and shall not be deemed to be a part of this Agreement.

13.   Further Assurances.  From time to time and without further consideration, the parties hereto shall execute and deliver such other instruments of conveyance, assignment, transfer, delivery, security and take such other action as may be reasonably necessary in order to consummate the transactions contemplated by this Agreement, providing however that any such instruments shall be without warranty.

14.   No Waiver.  A party does not waive any right under this Agreement by failing to insist on compliance with any of the terms of this Agreement or by failing to exercise any right hereunder.  Any waivers granted hereunder are effective only if recorded in a writing signed by the party granting such waiver.

15.   Severability.  If any provision of this Agreement is determined by any court or governmental authority to be unenforceable, this entire Agreement shall be null and void.

16.   Rules of Construction.  Each of the Parties and/or counsel for each party have reviewed this Agreement and accordingly the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

17.   Cumulative Rights/Construction.  The rights and remedies of the Parties

under this Agreement are cumulative, and any party may enforce any of its rights or remedies under this Agreement or other rights and remedies available to it at law or in equity.

MARK CALVERT, CHAPTER 11 TRUSTEE OF THE BANKRUPTCY ESTATE OF NORTHWEST TERRITORIAL MINT, LLC

By_____

   Mark Calvert

Date_____

RICHARD BRESSLER

_____

Date_____

43

44

# Snap Shot
## February Accomplishments and March Priorities

**FEBRUARY:**

Have begun defining the mission and vision (primarily the positioning statement) for the 'new' company—all part of a strategic plan which we will review in March. Most of the previous PT's have been completed and a new set consistent with the company direction will be defined as the working part of this plan. Completed streamlining the art department turn around process (end to end management), working closely with the sales team to explore large accounts as part of determining their individual effectiveness, understand the needs of the sales team in terms of lead generation, addressing higher pricing over competitors, defined a comprehensive set of marketing directions/programs which are still being prioritized, hired a world class Director of Marketing (3/20 start date), revamped the sales management role of Don, working to standardize product offerings, pricing, shipping costs/margins, established policy for 90 day late AR with commission payback program, established what is backlog and deleted bookings on hold reporting, reviewed sales collateral and handout programs refining those with each sales person, recalibrated sales position—an individual with full resources of the company at their disposal, and as industry experts in the recognition field by vertical, realigned Don's role as Director of Sales with participation in the newly formed Product Development Group and as the Sales Force to Art Department conduit. I have put in place an bonus incentive plan for Don to insure his close alignment with the sales team and to help him focus on getting product out within the quality requirements, since his financial motivation is geared on exceeding quotas and getting the product out—it will stabilize the Quality Department, working to hire sales people, building a Stock sales team with Erin and James and will add a dedicated pick, pull and ship department reporting to James, working on appropriate compensation for the Stock team along with Don, reviewing resumes for Dayton Controller, Kent Program to RIF obvious candidates continues with a view to a minimal organization, working on understanding product costs and true cost of sales with Edgars new report, brought in an new D&B sales data base tool and are in two week trial with the Dayton Sales team and administrators (KEY to connecting the sales person with the right individual(s)), understanding/defining the needed management reports for visibility and will further utilize Paul's IT background to connect our disparate systems this year to provide those reports, focus on MACO lack luster sales by obtaining list of 35K mailing and putting in place proactive call back and email program, retraining sales people on techniques to handle 'high price' objections, moved motivating letter/update to employees to quarterly (April 1 first letter), worked on employee communications, management coaching, Hawaii closed and assets shipped to Dayton, handled a few 'unhappy' customers, formed dedicated team to deliver Stock orders, putting bonus program in place similar to Jeff's for James regarding on-time,

45

putting together Product Development team, moving toward new products and virtual production/sales, understanding production process, attending meetings-sales, management, production, Quality program redefined, revised organization chart, changed Certification program, established formal 'customer' visit tour, revamped Archives and established company library and customer visit room, formalized employee recognition programs, trial run of virtual product creation (stamp) for key customer visit of March 2, completed very successful audit for University group.

## MARCH:

Primary focus is hiring sales, training sales, generating leads, proactive programs for MACO follow up, continue to provide my personal leads to sales people, firmly establish real sales management leadership (DON) and standardize practices, pricing etc., Prioritize marketing programs and launch campaigns, begin revamp/consolidation of 15 company websites, complete social media integration, delete obsolete stock products— move to special orders only, finalize the 'stock' program team and process flow, complete sales training manual, advance building improvement program, hire controller and accounting clerk, work on employee watch list, critical hires, pursue personal sales opportunities by Bill and Don, complete strategic plan, bring Irina up to speed, refine Edgar's cost of order report, work on defining controllers primary focus (cost issues, inventory, profitability, etc.), all sales people up to speed on new desk top software for sales leads, monitor 4 tens program, reputation management campaign begins, press release on CEO, Director of Marketing, Sales, Controller—spaced out to illustrate growth, Graco sale, ARM equipment sale, complete Auburn move integration, reduce work force in Kent, key article on 'new' company for use with lost customers, mentor HR supervisor and bring all personnel files up to date, establish Board of Directors, upon legal ability—rebrand/rename the company—integrate in all marketing programs, collateral, websites, define Dayton sales meeting schedules for 2017, roll out critical marketing programs, work with individual sales people to increase effectiveness, focus on stock product sales and inventory turns, define new market verticals and make prospect calls by Bill and Don, define company IP (proprietary finishing techniques, patents?, etc.), move sales people to full spectrum selling (MACO, NWTM, IMPORT), establish company party line (positioning statement and elevator pitch), more major customer invitations/visits, internship from the university begins (we won one of seven places) for website review and suggested revisions (technology centric).

# Snap Shot of March Accomplishments and April Priorities

## MARCH:

Rebuilding the sales organization-Marty in charge, Don moved on. All sales people, Greg and Erin part of the team. Looking for sales hires from competitors, focusing on strategic partnerships to leverage sales growth-Bradford Exchange as an example. Working with sales team on major accounts and personal leads handed off to them. Brought in larger accounts which resulted in near term business and longer term as partners. New sales desk top software in place. Irina, Director of Marketing is in place. Marketing is beginning lead program by understanding each sales person's specific needs. Entire marketing campaigns and priorities have been defined and now being scheduled. Our web sites and competitors analyzed, web architecture, web design and social media integration are underway. Full analytics and metrics for next generation of web site (consolidate all 20 of our sites). Working with contract company D4 Advanced Media—brought on board an intern to help define the navigational architecture which is his specialty. Looking to bring on additional interns in the computer graphics area and tool room to offset needs from Tom's departure. Separated the stock business as a micro business, a customer now of the Mint. Paul is tasked to manage the stock business and explore secondary offshore manufacturing sources for the business. Developed stock business flow chart and resource requirements. Hired Tim Sullivan to expand our military exchange presence. Working to dispose of the Graco stock or to integrate into the stock business. Interviewed and ready to hire Controller/CFO, began time charge reconciliation with production jobs, all raw material inventory in one place—expect CFO to focus on cost accounting, overall profitability and inventory management both raw materials and stock store. Continuing to push key hires, resolving HR issues, new employee manual in place. Cultural improvement programs working as planned. 4 x 10 work week fine tuning, reputation management program is underway with first effort—a TV Feature called Made in Nevada by Kolo 8 TV—interviews and filming the first week of April. ARM equipment sale pending, Auburn move integration continues, reducing Kent workforce, lost customer program underway with admins, HR department consolidation , realigned QA department/lead quality standards checklist, certification program—weekly updates, symbiotic relationship with QA and Production, standardized customer visit/tour presentation, updated organization chart, PT's updated, reorganized the art department under Mike as well as die shop, standardized shipping costs with target margins, standardized sales to art department check list, began Ira Green relationship rebuilding, met with Chief of Fire Department on new product idea, major account sales

strategies—airplane, stamp, Bradford collections. Management visibility through IT programs/ACT/Epicor by Paul—control board single source content. Compensation adjustments, personnel issues, building maintenance schedule and priorities defined, two college tours for intern programs, completed corporate positioning statement, began overall rebranding strategy plan.


## APRIL:

New product development group being established—will develop Society of Medalist's Issue #130 as first product with Bradford Exchange and co-market along with a dozen other medals from past issues—first real effort to extend our marketing and sales reach. Will campaign for lost accounts and exploit existing customers with product variations. Working with Marty to define 'real' sales management reports/forecasts with focus on run rate, backlog and major account strategies. Working on entire marketing programs; priorities and schedules, web strategies, sales leads, e-blast and phone calls to boost MACO sales. Need to begin Board of Directors formation, hire CFO (May 1 start date), begin company rebrand program, new vertical market/product definition, hire sales talent, develop sales training, consolidate websites, streamline stock store, update immediate collateral needs, develop new marketing collateral program, e-blasts to support stock store and sales people, continue Kent downsize, monitor Wisconsin program, explore additional joint sales partners, sell off excess store inventory, raw material inventory and equipment. Continue QA program refinement through weekly meetings, encourage employee empowerment, accountability mentality and mutual respect through interpersonal communications skills, new quarterly newsletter, reputation management program, TV Program—Made in Nevada, standardize price lists as we did shipping costs, explore Dick Johnson new product ideas, mobile 'design your own coin' app investigation, single points of failure analysis, China alternatives, Tim Sullivan program, CDCcoin.com opportunities, continue building maintenance and clean-up program, press releases on company beginning with new name followed by key employees etc., virtual sales catalogue of collections, new product ideas, AMAZON opportunity for new building based on 3D program, stamp collectors list e-blast, MACO e-blast testimonials, Paul on IT programs, sales program API and EPICOR reports in conjunction with CFO, progress 'move to china' program of stock product to free up Dayton production capacity, obsolete stock products (special order only approach), explore Canada manufacturing over China for wine country opportunity, continue major account customer tours, become 'tour' friendly, looking into additional packaging alternatives to reduce dependency on single source and reduce costs/lead times, EBAY and ETSY programs, turn on Amazon once store runs at 98% on

time, developing a seasonal snapshot of store related events for e-blasts, continue personal actions with customers, work with Marty on pricing and margin decisions. Explore pay per click and other lead generating advertising programs, begin PR campaign to affirm our market position over competitors. Continue to build on employee's strengths and focus on a unified 'can do' culture.

# Dayton Cure Cost Analysis 08.17.18 -- v4.xlsx --- FRE 408 Settlement discussions.

| | |
|---|---|
| **From:** | Mark Calvert <"/o=first organization/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=a443e6d571cb4990baed6b22a025f7a2-tod m"> |
| **To:** | Connie Hoff <mountainviews@sbcglobal.net> |
| **Date:** | Fri, 17 Aug 2018 17:19:19 -0700 |
| **Attachments:** | Dayton Cure Cost Analysis 08.17.18 -- v4.xlsx (43.91 kB) |

FRE 408 Settlement Discussions.
Connie
I worked most of the day with Mike on this…
In short he has some strong view associated with the cure costs and the lease term.
As for the cure, he thinks the painting is not required…..just cleaning…
But
When you get down to the summary… the major difference is the lease term…
He feels 1 month vs 2 month and give the market… base upon discussion with other brokers, the marketing period is 4 months vs 8 months… So in total you have 5 months to market the building vs 10 months…. That accounts for most of the reduction from the 500k… almost 120k down for this one item…
So…. Know this is less than you expected but this is where we are at…. At this point. He is going to send to Al and discuss the market with Al and the cure period… He thinks I should just continue with the cure items and get it done in the next month…. So… that is where we are at….. currently…
Please review and then lets discuss… still committed to finding a solution and can force the settlement at some point but not at 500k and not at 350k… lets find a solution together…
Thanks
Mark

**FRE 408 Settlement Discussions**
**Dayton Lease**
**Cure and Good Order & Condition Repairs**
**As of August 17, 2018**

| | Court Ordered Cures | Good Order, Condition & Repair: Lease | Months | Rate | Remaining Lease Term | Total | Difference |
|---|---|---|---|---|---|---|---|
| Total Court Ordered Cures | $208,807 | | | | | | |
| Total end of lease schedule 1 | | $47,247 | | | | | |
| Total per detail end lease schedule 2 | | $22,768 | | | | | |
| Estimated Admin Recovery Ratio | 100% | 33% | | | | | |
| Total Estimated Cure and Repair Item | $208,807 | $23,104.80 | | | | $231,912 | |
| Remaining Lease Term | | | 1 | $46,446 | $46,446 | | |
| Real Estate Taxes | | | 1 | $2,695 | $2,695 | | |
| Utilities (estimated) | | | 1 | $6,250 | $6,250 | | |
| Estimated Admin Recovery Ratio | | | | | 100% | $55,391 | $55,391  1 vs 2 months |
| Remaining Lease Term | | | 4 | $46,446 | $185,786 | | |
| Real Estate Taxes | | | 4 | $2,695 | $10,779 | | |
| Estimated Admin Recovery Ratio | | | | | 33% | $64,866 | $64,866  4 vs 8 months |
| Total potential obligation as of this date | | | | | | $352,169 | $120,257  Total Lease Term Difference |

**Proposed Settlement Amount**

| | | |
|---|---|---|
| Original  Offered amount by Hoffs | 142.0% | $500,000 |
| Total potential obligation as of this date | 100.0% | $352,169 |
| **Unreconciled Difference** | -42.0% | ######## $120,257  ($27,573) Total Difference |
| | | -11.89%  Cure and end of leas |

$3

# Re: ARM - Northwest Territorial Equipment Offer

**From:** CONNIE HOFF <mountainviews@sbcglobal.net>
**To:** Ron Parr <ronparr@gmail.com>
**Cc:** Mark Calvert <mark@cascadecapitalgroup.com>, Mike White <michael.white@nwtmint.com>
**Date:** Tue, 01 Nov 2016 11:02:47 -0700

Ron,

Thank you for your offer. I can confirm that on behalf of NWTM that your offer is accepted pending approval from the Bankruptcy Court. In the mean time please mail a copy of your offer to the address below with your deposit check check of $14,500.00 representing 10 percent of the total sales price.

Just to review the terms again; The equipment is being offered where is as is and without any warranty. You are responsible for the loading and transportation charges and costs. NWTM personnel will disconnect the equipment from the electrical service and drain out the glycol from the coolant lines. You will have to schedule a time to pickup the equipment with Mike White, the production manager after court approval and after you have transferred the balance of the payment. The balance of the payment must be received within 10 days after court approval and the pickup of the equipment must occur within 30 days after court approval.

Mailing Address:
Northwest Territorial Mint
P.O.Box 2148
Auburn,WA 98071-2148

Physical Address:
Northwest Territorial Mint
80 East Airpark Vista Blvd.
Dayton,NV 89403
775-246-6000

---------------------------------------------
On Tue, 11/1/16, Ron Parr <ronparr@gmail.com> wrote:

Subject: ARM - Northwest Territorial Equipment Offer
To: "Connie Hoff" <mountainviews@sbcglobal.net>
Date: Tuesday, November 1, 2016, 10:22 AM

HI Bob,
The offer we discussed is attached to this
email. Thanks for all of your help! As soon as
you have specifics on the other pieces of equipment, let me
know, and we'll write up an offer on those
also.
Kindly,
Ron ParrARM Industries,
LLC585 West Main St.Santaquin, Utah
84655(801) 360-7068

55

# Second Surplus Equipment Offer Acceptance

From:    CONNIE HOFF <mountainviews@sbcglobal.net>
To:      Ron Parr <ronparr@gmail.com>
Cc:      Mark Calvert <mark@cascadecapitalgroup.com>, Mike White <michael.white@nwtmint.com>
Date:    Sat, 05 Nov 2016 16:04:50 -0700

Dear Mr.Ron Parr,

Thank you for your second offer for additional Surplus NWTN Equipment received today. I can confirm that on behalf of NWTM that your offer is accepted pending approval from the Bankruptcy Court. In the mean time please mail a copy of your offer to the address below with your deposit check check of $5,100.00 representing 10 percent of the total sales price.

Just to review the terms again; The equipment is being offered where is as is and without any warranty. You are responsible for the loading and transportation charges and costs. NWTM personnel will disconnect the equipment from the electrical service and drain out the glycol from the coolant lines. You will have to schedule a time to pickup the equipment with Mike White, the production manager after court approval and after you have transferred the balance of the payment. The balance of the payment must be received within 10 days after court approval and the pickup of the equipment must occur within 30 days after court approval.

Mailing Address:
Northwest Territorial Mint
P.O.Box 2148
Auburn,WA 98071-2148

Physical Address:
Northwest Territorial Mint
80 East Airpark Vista Blvd.
Dayton,NV 89403
775-246-6000

Beat regards,

Bob Hoff

51

# FW: Judge's Ruling

**From:** Mark Calvert <"/o=first organization/ou=exchange administrative group
(fydibohf23spdlt)/cn=recipients/cn=a443e6d571cb4990baed6b22a025f7a2-tod m">

**To:** Connie Hoff <mountainviews@sbcglobal.net>

**Date:** Mon, 05 Dec 2016 12:20:25 -0800

FYI
Mark

-----Original Message-----
From: Gearin, Mike [mailto:Mike.Gearin@klgates.com]
Sent: Monday, December 05, 2016 11:20 AM
To: Mark Calvert
Subject: RE: Judge's Ruling

We ordered them already. Will have it this week.

-----Original Message-----
From: Mark Calvert [mailto:mark@cascadecapitalgroup.com]
Sent: Monday, December 05, 2016 11:13 AM
To: Gearin, Mike
Subject: FW: Judge's Ruling

Can you help me get a copy...
Mark

-----Original Message-----
From: Connie Hoff [mailto:mountainviews@sbcglobal.net]
Sent: Monday, December 05, 2016 11:01 AM
To: Mark Calvert
Subject: Judge's Ruling

Hi Mark,

When we spoke last Thursday you promised to forward me a copy of the Judge's ruling. I would really appreciate a copy. Also, Bob is wondering what you would like him to tell Ron Parr with regard to the equipment for which you are currently holding his deposits.

Thank you,

Connie

Sent from my iPad

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Mike.Gearin@klgates.com<mailto:Mike.Gearin@klgates.com>.-5

54