RECEIVED
Western District of Washington
at Seattle

MAR 29 2019

MARK L. HATCHER, CLERK
OF THE BANKRUPTCY COURT

March 22, 2019

**The Honorable Judge Christopher Alston**

Bankruptcy Court, Western District of Washington

700 Stewart Street, Room 6301

Seattle, WA 98101

RE: Medallic Art and Northwest Territorial Mint

Your Honor,

I write to you yet again. I know you are close to finalizing the fees for Mr. Calvert and company but request that you please consider some information presented below prior to your conclusions.

I have two objectives for this writing. The first to correct a purposely misleading comment made by Mr. Calvert. He continues to try and paint an inaccurate picture of my character and this last hearing underscored his cleverness in how he does that. In the heat of his statements, saying he was "offended", which was overacted; he decided to throw my name in amongst the discussion about theft by individuals from the mint. He never mentions the person by name who was caught nor Mr. Wagner who is still benefiting from the NWTM assets; the assets I am trying to 'legally' buy. It was an opportunity to mention me in a negative light.

Mr. Calvert mentioned me by name so as to set the stage to discredit my first and now my second offer to buy the "valueless" asset called NWTM. He knows I am pressing this issue and he just wants me to go away. But just in case you should ask about me and the offers, he can say, I am not a reliable purchaser hence his characterization of me as being a thief.

I would think the court would be very upset with him knowing he purposely lied about what transpired that evening. It is documented in great detail by the head of Human Resources who accompanied me that evening at 6:00 PM after work, not in the middle of the night as Mr. Calvert stated, (attached). He knowingly misled you with information that is not true. I have my lawyer working with Mr. Gearin to formally resolve this misinformation for the record. Whether he does the right thing is questionable.

Also attached you will find my lawyers letter asking for a statement be made to the court to correct Mr. Calvert's overt lie. You will also find the proof that he knew better in what he said and represented to you about me.

Second, I have copied you on my latest offer to acquire the remaining NWTM assets with a sizable increase in my offer especially when you take into account these assets have no value as Mr. Calvert has reported. I cannot understand why he is non responsive to my offers. I can guess but that would be speculation.

So, now you have the latest information and confirmation of an aspect of Mr. Calvert's character that is not becoming of an individual let alone a trustee of the court.

Regards,

Bill M. Atalla

To Whom It May Concern:

On Tuesday February 6, 2018 around noon Bill Atalla, Michael White, and myself Matthew Lee agreed to meet at 80 East Airpark Vista boulevard, also known as the Medallic Art building. The three of us agreed to meet at 6:00 p.m. after Michael got off work. The reason we would be meeting is too photograph and document the machines that we were hoping to buy if our investor came through. Due to Michael getting a job at Panasonic the only time we could meet was in the evening.

I was the first to arrive at the building about 5 minutes to early, Bill arrived at 6:00 p.m., and Michael arrived shortly after. Bill at this time informed me that he also needed to clean out his office, and Trustee Mark Calvert had approved it. To enter the building Michael was the only one who had a key, I had the combo for the alarm, and Bill had received permission from Mark Calvert to enter the facility.

The three of us entered the facility around 6:10 p.m. to start getting the information needed. We entered the lobby side door leading us into the breakroom, and then down to the main production floor entrance. The first thing we did when entering was turned on all the lights to make sure we had good visibility of the equipment. Not having the exact time, I would say we were on the production floor for close to an hour and a half. Michael photographed equipment in every area except packaging.

When we were done photographing the production floor, Michael and I turned off the lights. Bill separated from us to go clean up his office, and I went with Michael to double check his former office space. Michael took a few items that were not Northwest Territorial or Medallic Art property. The items were a coffee mug and Protein shaker. Michael and I left the production floor and headed back toward the break room. On our way upstairs to photograph art equipment we stopped into the security office to make sure Jeff Goodfellow did not take the AR-15. I have spoken to Mark Calvert about buying the AR-15 multiple times. When Jeff returned to start closing the building, the first question he had was if we still had the AR-15.

After seeing that the AR-15 was still there, Michael and I went through the breakroom and up the lobby stairs. On the way I attempted to open the HR office, to verify I had taken everything, but the door was locked. Michael photographed the Bell, the small scale, and the large scale from the top of the stairs. We then entered into the main upstairs area, through the door where the current Library is located. Michael and I entered into the library and looked at the medals and where the telescope once sat. The telescope had been given away for free to Jeff Goodfellow from Paul Wagner. This upset all three of us, for the fact that we had all taken a liking to it. It was our belief that it was not Paul's to give away.

As we went to leave the Library we met Bill in the hallway. Bill then entered into the Library with us. Bill expressed his concern about things possibly missing, and not being where they should be. We exited the Library and all three of us went down to Bill's office momentarily before heading over to

the Art area. Michael White noticed that one of the 3D art computers was missing. Knowing that Paul had given away all the art computers up in Kent, and then was working to hire the artists. Per Michael White this computer had approximately 14 thousand dollars' worth in the computer and software. Paul has been trying to start up his own import business, and has done many things to make us all suspicious. Hoping to avoid any further issues, the three of us went into the IT office. I was hoping that Michael would see the computer and put his tensions to rest. We did not find the computer, but Bill did notice a few items that had been removed from his office. These items included:

- A nickel plated Titanic Medal, in a wooden box
- A 1oz Silver bullet
- Some Medallions that Tom Boyle made that were scrapped in their packaging

I know that Bill took the Titanic Medal and also the Silver Bullet, but I am unsure about the scrap medallions.

All three of us left the IT room, and went to Bills office. On the way to Bill's office Bill stopped and showed the camera what he had removed from the IT room. When we arrived at Bill's office he had three boxes packed with items. One box had binders and office supplies, the other two boxes held medals, wooden stands, and packaging. These items Bill had been working on for the past year. Per Mark Calvert, employees were able to remove between 50 and 75 medals that they had worked on or been apart of. I briefly glanced into the boxes since Edgar Chacon and Russ Wilson had already been through Bill's office. Bill carried the boxes to the lobby and then to his truck. Bill then called Mark Calvert to let him know what was taken, and what he believed was missing. Mark Calvert did not answer the phone. At approximately 7:50 p.m. I set the alarm, and Michael locked the front door. We all drove off at the same time, in different vehicles.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Date: February 8, 2018

*Matthew Lee* (signature)

Matthew Lee

**DONALD A. BAILEY**
Attorney at Law
1601 Fifth Avenue, Suite 610
Seattle, Washington 98101

Telephone: (206) 682 4802
Mobile: (206) 910 2384
Donald.Bailey@shaferbailey.com

March 20, 2019

Michael Gearin
K & L Gates
925 4thAve, #2900
Seattle WA 98104

Re: Mint - Atalla

Dear Mike:

Bill Atalla and I listened to the recording of the March 13 hearing in front of Judge Alston. We were shocked to hear the judge attack Mark Calvert for complying with the FBI subpoenas. We can see how Mark would be upset and offended at the judge's remarks. I don't think the judge really understands the work product doctrine, either.

Then the judge trotted out some old emails, questioning Mark about them and virtually accusing him of turning a blind eye to employee theft. I can well imagine Mark losing his composure at that point. I would have too. Apparently, in the heat of the moment, Mark mis-spoke, and mentioned Bill Atalla's name in the same breath as the sheriff and the FBI agent who took stuff upon leaving. At 26:18 of the recording, Mark says "So, no, I had Bill Atalla come in in the middle of the night, in the middle of the night, picking up stuff. I had to go chase him down."

Mark must have forgotten that he gave Bill Atalla permission to go into his office and clear out his things, that Bill went in at 6 pm, right after working hours, not in "the middle of the night", and that Matthew Lee wrote a report for Mark of what transpired (copy attached). Obviously, if there really were credible allegations that Bill had committed theft, your firm would have raised them when Bill moved to compel payment of his severance pay.

Bill would like Mark to correct the record with a brief declaration acknowledging that Bill had permission to go into the facility to photograph some equipment and clean out his office, that he did not go in "in the middle of the night", and that Mark has no

Michael Gearin
March 20, 2019
page - 2

In his prior offer, Bill offered to have his new company pay a dividend to the unsecured creditors of the Mint. That part of the offer is withdrawn as unworkable.

In Mark Calvert's Third Supplemental Declaration (Docket 2039), he mentions negotiations with prospective purchasers of the store inventory and the residual assets of the estate. Both you and Mark have said that Bill is welcome to make a cash bid when a sale is submitted for court approval. This is of course the law and procedure in Bankruptcy Court anyway. Bill would very much like the opportunity to talk to Mark about the offer set forth in this letter before the deal is presented to the court, and how he can best assist the trustee in wrapping up this estate.

Very truly yours,

Donald A Bailey

encl.
cc: M Northrup

**DONALD A. BAILEY**
Attorney at Law
1601 Fifth Avenue, Suite 610
Seattle, Washington 98101

Telephone: (206) 682 4802
Mobile: (206) 910 2384
Donald.Bailey@shaferbailey.com

March 20, 2019

Michael Gearin
K & L Gates
925 4thAve, #2900
Seattle WA 98104

Re: Mint - Offer to Purchase

Dear Mike:

Bill Atalla previously made an offer to purchase the intellectual property assets of the Mint. This letter is a revision of that prior offer. The price offered is now $50,000.

The intellectual property assets which are the subject of this offer (the "IP Assets") are as follows:

1. NWTM customer list (domestic and import),
2. All NWTM trademarks and copyrights,
3. The NWTM name and brand,
4. All NWTM art and design files,
5. The NWTM Amazon website,
6. The nwtmint.com domain and all other NWTM derivative websites (which we understand to number 19),
7. Any Chinese dies that can be used with permission from the customer,
8. All rights to Military Exchanges which sell NWTM products, and
9. Any other intellectual property rights owned by the bankruptcy estate related to the foregoing.

Bill Atalla intends to create a new operating company to own and use the IP Assets. He will pay the estate $50,000 for the IP Assets. The sale would be subject to Bankruptcy Court approval, but would otherwise be "as is, where is", without warranty of title, merchantability or fitness for a particular purpose. Bill recognizes that the trustee can only sell the rights the bankruptcy estate holds. In making this offer, Bill has done his own investigation of the IP Assets, and is not relying on any representation made by any representative of the estate.

Michael Gearin
March 20, 2019
page - 2

credible evidence that Bill removed anything he was not authorized to remove. Fortunately, Mark's statements were not under oath, so there should be no negative ramifications to correcting the record.

I realize that Mark is not currently a fan of Bill, but I hope that will not prevent him from correcting an obvious mis-statement that could have serious negative ramifications for Bill. I am happy to work with you on the wording of a corrective declaration. Just let me know if Mark is inclined to do the right thing. Thanks.

Very truly yours,

Donald A Bailey

encl.
cc: M Northrup