**Below is the Order of the Court.**

Christopher M. Alston
**U.S. Bankruptcy Judge**
(Dated as of Entered on Docket date above)

Christopher M. Alston
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Suite 6301
Seattle, WA 98101
206-370-5330

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In re | Chapter 11 |
| Northwest Territorial Mint LLC, | Case No.  16-11767 |
| | ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN |
| Debtor. | |

This matter came before the Court on the Final Application for Payment of Fees and Reimbursement of Expenses of Counsel for the Official Unsecured Creditors' Committee (Dkt. No. 1894), First Application for Compensation of Cascade Capital Group LLC as Accountants for the Chapter 11 Trustee (Dkt. No. 1924),  Trustee's First Application for Compensation (Dkt. No. 1926), and K&L Gates LLP Application for Compensation (Dkt. No. 1928) (collectively the "Applications").  The parties filing the Applications seek compensation for services and

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND
MILLER NASH GRAHAM & DUNN–1

reimbursement of expenses incurred from the initial date of employment through September 30, 2018. The Court conducted hearings on December 7, 2018, February 1, 2019, and March 13, 2019. After the parties provided supplemental declarations on March 25, the Court took the matters under advisement.

## I. FINDINGS OF FACT

This case has been both eventful and contentious, and therefore the Court does not summarize every event that occurred in the facts below. Rather, the Court considered the following events to be significant when evaluating the Applications submitted by the professionals.

### A. Commencement of the Case.

The origins of this bankruptcy case trace back to a bizarre landlord-tenant dispute. Northwest Territorial Mint, LLC (the "Mint") leased property in Auburn, Washington, from an entity affiliated with Bradley Stephen Cohen and Cohen Asset Management Inc. (collectively "Cohen"). After the Mint vacated the premises, Cohen sued for damages the Mint allegedly caused by contaminating the property. Dkt. No. 18 at 16. In August 2012, Cohen filed a lawsuit in federal court in Nevada (the "Cohen Lawsuit") against the Mint and its principal, Ross Hansen, alleging the defendants created two websites that falsely portrayed Mr. Cohen as the "Bernie Madoff of the real estate industry" to gain leverage in the lawsuit over the Auburn property. *Id*. at 14. Three and half years later, the jury returned a verdict finding Ross Hansen and the Mint defamed Cohen and engaged in fraud, oppression, and malice, and awarded compensatory and punitive damages. On March 1, 2016, the Nevada District Court entered judgment in favor of Cohen in the amounts of $12,500,000 against the Mint and $25,500,000 against Ross Hansen. *Id*. at 9–11.

On April 1, 2016, the Mint commenced a case under chapter 11 of the Bankruptcy Code[1] to stop Cohen's collection efforts and give it breathing room to reorganize. Dkt. No. 12 at 3. Just a week later, Ross Hansen stipulated on behalf of the Mint to the appointment of a chapter 11 trustee. The Office of the United States Trustee (the "UST") requested that the Court approve Mark T. Calvert as the trustee. Dkt. No. 48. In his acceptance and declaration, Mr. Calvert declared that he has acted as a chapter 11 trustee in other cases in this jurisdiction. *Id*. The Court entered an order approving Mr. Calvert as the chapter 11 trustee on April 11, 2016. Dkt.

---

[1] All references to the Bankruptcy Code mean United States Code, Title 11.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–2

No. 51.  Four days later, the UST formed an unsecured creditors' committee (the "Committee") and appointed seven creditors to it.  Dkt. No. 73.

## B.    The Mint's Operations and Precarious Financial Position.

The Mint is a Washington limited liability company whose sole member is Ross Hansen. At the time it filed, the Mint's business operations included selling precious metals and coins online and in retail stores, minting and manufacturing commemorative medals, coins, and ribbons, and buying and selling precious metals including gold, silver, platinum, and palladium bullion.  The Mint maintained its corporate headquarters in Kent, Washington, and operated in several locations across the country.  One of those locations was Dayton, Nevada, where the Mint operated in a 100,000-plus square-foot facility (the "Dayton Premises").  Dkt. No. 1185 at 2.  The Mint conducted most of its bullion business at a leased building in Federal Way, Washington.  Dkt. No. 580 at 3.

Until the appointment of the Trustee, Ross Hansen was the President of the Mint.  Diane Erdmann was the manager of the vault in Federal Way.  She and Ross Hansen have been in a committed relationship since 2000.  Dkt. No. 580 at 3.[2]

At the time of bankruptcy filing, the estate had approximately one thousand dollars and other limited current assets with which to satisfy its considerable operating expenses.  The Mint had 241 employees, a monthly payroll of approximately $630,000, and monthly employee benefits of approximately $60,000.  The company had accumulated approximately $25.5 million dollars in unfulfilled customer orders, including approximately $575,000 of orders for which deposits had been taken after the bankruptcy case was filed.  According to the Trustee, the Mint's custom minting business, while creating quality and valued products, was unprofitable, lacked necessary financial oversight tools, and was saddled with extremely poor management practices.  Trustee's Report, Dkt. No. 1229 at 1–2.  The Mint had not prepared financial statements or tax returns for at least five years and had not instituted inventory controls for precious metals.  No physical inventory of precious metals had been conducted to the knowledge of any of the company's employees, there was no cost accounting to determine the profitability of divisions of the company or the profitability of individual orders, and the business and financial records of the Mint were disorganized.  Dkt. No. 1229 at 3–4.

---

[2] This docket entry is a memorandum decision of the Court.  The parties filed appeals and cross-appeals, and ultimately a portion of the Court's ruling was reversed.  See Dkt. 1051.  None of the factual findings from that decision cited here were disturbed on appeal.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–3

The Trustee estimated that at the time of filing more than $13.8 million in precious metal inventory was missing. Dkt. No. 1229 at 4. Of the remaining precious metals in his possession, the Trustee was able to identify approximately $900,000 of specific items belonging to certain customers and, after providing proof of ownership, the Court authorized the return of those items. *Id.* More than three thousand creditors filed proofs of claim exceeding $83 million. *Id.* at 2. Many of these creditors asserted claims based on monies deposited for precious metals or custom minted items that would be entitled to priority up to $2,850 per claim under 11 U.S.C. §507(a)(7). The Trustee estimated the capped priority claims totaled approximately $10 million. Dkt. No. 369 at 5.

Upon his appointment, the Trustee ceased the bullion sales, consolidated the manufacturing operations, and focused on growing sales of minted items. Dkt. No. 1229 at 8–9. The Trustee decided that he would operate the business to profitability to allow an independent reorganization, a reorganization backed by an investor, or a going-concern sale of the company on terms that would provide a return to creditors. *Id.* at 14.

C.     **The Trustee and Committee Employ Professionals.**

The Trustee sought and obtained permission to employ K&L Gates LLP ("Trustee Counsel") as his general counsel. Dkt. Nos. 60 and 255. The Trustee also requested permission and to employ his own firm, Cascade Capital Group, LLC ("Cascade") as accountants for the Trustee. Dkt. No. 61. In support of Cascade's employment, the Trustee declared it was necessary to hire an accountant to provide financial accounting services for the estate and that it may be necessary to conduct forensic accounting services related to his investigation of certain transactions engaged in by the Mint. Dkt. No. 62 at 1–2.

At the initial hearing on the Cascade employment application, the Court expressed concern with the inherent conflict of the Trustee reviewing and approving the fees and expenses of his own firm. Dkt. No. 398 at 42–44. In a supplemental declaration, the Trustee promised Cascade would bill its time only for work as his accountants and he would not bill trustee services through Cascade. Dkt. No. 375 at 4. Based on these representations, the Court entered a final order authorizing the Trustee to employ Cascade as his accountants *nunc pro tunc* to April 11. Dkt. No. 387.

The Committee obtained permission to employ Miller Nash Graham & Dunn LLP ("Committee Counsel") as its general counsel. Dkt. No. 424. A little over a year into the case,

the Committee also sought to engage Lorraine Barrick as a financial advisor to analyze the Trustee's financial reports, evaluate any operating projections presented by the Trustee in support of a plan of reorganization, and review and analyze estate business operations, financial matters, and strategies for reorganization as the Committee may request. Dkt. No. 962. The Court approved her employment on April 25, 2017. Dkt. No. 992.

**D.      The Interim Payment Order Excludes the Trustee.**

The Trustee sought an order establishing procedures for interim payment of fees and reimbursement of expenses incurred by the Trustee and the other professionals. He proposed reimbursement of all expenses and payment of 80 percent of the fees incurred every month rather than apply for compensation every 120 days. The Trustee explained that he and the professionals would devote substantial amounts of time and energy to this case and incur substantial fees and costs, and if required to wait 120 days per 11 U.S.C. § 331 for payment they would suffer undue hardship. Dkt. No. 101 at 2–4. At the hearing conducted on June 2, 2016, the Court authorized the procedures for the professionals but informed the Trustee and Trustee Counsel that it would not approve interim payments to the Trustee because his compensation was limited by 11 U.S.C. § 326. Consequently, the Trustee was not included in the order entered by the Court. Dkt. No. 394.

In late 2016, the Trustee informed the Committee that he intended to make an interim payment to the professionals. Dkt. No. 2035-2 at 17. According to the meeting minutes, Committee members expressed concern about the proposed payment and questioned the Trustee about the potentially adverse effect the payment would have on the cash position and reserves of the Debtor. The Trustee asserted that the payment would not adversely affect the Mint's business operations. Based on this representation, the Committee members present withdrew their objection. *Id.*

The Trustee made an interim distribution under the Court-approved procedures to the professionals in December 2016: $232,671.12 to Trustee Counsel, $56,990.18 to Committee Counsel, and $110,338.70 to Cascade. Dkt. No. 893 at 36. Unfortunately, the Mint soon suffered cash flow issues. According to the monthly operating report, Cascade returned $50,000 to the estate on March 21, 2017 "to help fund working capital needs" of the company. Dkt. No. 985 at 48. Cascade returned an additional $50,000 on August 7, 2017. Dkt. No. 1982-11 at 2.

Other than this one interim payment in December 2016, the professionals have received no compensation or reimbursements during this case.

**E.    The Trustee Sells the Texas Business and Makes Inconsistent Representations.**

A division of the Mint operated in Tomball, Texas.  Due to the Mint's poor cash flow, the Trustee determined very early in the case to sell the assets of this division and use the funds to preserve other aspects of the Mint's business.  He sought approval of a sale to an entity formed by two individuals, one of whom indirectly owned the building that housed the Tomball operations.  Dkt. Nos. 200, 201, and 202.  Another entity, Ira Green, Inc., offered to bid more for the assets, so the Trustee conducted an auction.  Medallic Art Company, LLC ("Medallic"), an entity controlled by Ross Hansen, filed an objection to the sale motion, asserting the Tomball assets may include property owned by Medallic rather than the Mint.  At the initial sale hearing on May 26, 2016, Ross Hansen also sought to participate in auction.  The Trustee insisted that Ross Hansen provide a deposit and proof of available funds before he be allowed to bid, and the Court agreed.  After taking testimony and conducting several hearings, the Court overruled Medallic's objections and approved a sale of the assets to Ira Green, Inc., for approximately $1 million.  Dkt. No. 369 at 3.

In connection with the sale of the Tomball business assets, the Trustee sought approval of a $25,000 break-up fee to the initial bidder.  The Court did not approve the break-up fee at the sale hearing but stated it would consider the request at a later hearing.  Dkt. No. 370. Subsequently, the initial bidder submitted a declaration and a memorandum asserting it was entitled to a break-up fee that exceeded $58,000.  Dkt. Nos. 479 and 480.  The Trustee strenuously objected, asserting the bidder was "disgruntled" and that the request was "especially absurd" because the bidder only incurred out-of-pocket expenses of approximately $6,000 in connection with its stalking-horse bid.  Dkt. No. 488 at 4.  The Trustee conceded that he still supported a $25,000 break-up fee because he promised the bidder he would do so, but he expressed displeasure at the amount of the request and exclaimed, "Hell hath no fury like a bidder scorned."  *Id*. at 3.  In reply, the bidder submitted an email from the Trustee (with a copy to his counsel) showing the Trustee actually invited the bidder to file the larger request for a break-up fee:

> You need to have your attorney file for the 56k with the affidavit from Larry we discussed.
> Then I will follow up with a supporting motion for 30k…

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–6

The hearing is scheduled for July 8th…
So… get it filed and we will push forward.
Thanks
Mark
PS please pass this to your attorney to confirm he is going to file the motion…
Thanks

Dkt. No. 495-2 at 2 (ellipses in the original).

At the hearing, the Court informed the parties that it was troubled by the apparent inconsistency between the Trustee's email and his indignant response. Dkt. No. 594 at 51. The Court set the break-up fee and other related matters for an evidentiary hearing and required the Trustee to provide the Court all of his emails with the bidder. *Id.* at 53–56.

In lieu of the evidentiary hearing, the Trustee sought approval of a compromise with the bidder and the Tomball landlord. Dkt. No. 799. The Court refused to approve the settlement because the Trustee's motion did not fairly or accurately portray the consideration exchanged. Dkt. No. 839 at 19–25. The Court viewed the settlement motion as a thinly-veiled attempt by the Trustee to deliver the break-up fee he had promised. *Id.* The Court expressed displeasure with the Trustee's conduct on this matter.

To address the Court's concern with his conduct, the Trustee stated in a declaration that he "never encouraged Mr. Tucker to file a 'phony' claim that had never been asserted by Tucker/Cook before." Dkt. No. 1921 at 7. He explains his email as follows: "My June 20, 2016 email suggests that the parties could reach a compromise at $30,000 in the event that [the bidder] provided documentation substantiating a demand for $56,000…However, the potential compromise that I alluded to in my June 20 email was ultimately not reached before the July 8, hearing on the break-up fee." Id. at 7-8. The Court rejects this explanation, as the email speaks for itself. In this case, the Trustee negotiated many compromises and sought approval of them through his counsel. The June 20 email plainly is not an offer to compromise but a plan to secure the Court's approval of a break-up fee. The claim from the bidder may not have been phony, but the Trustee's opposition was.

The Trustee also sought permission to pay the accrued vacation compensation of about 36 terminated employees at the Texas facility. Dkt. No. 556. At a hearing on August 19, 2016, the Court asked Trustee Counsel if this case was administratively solvent, and he said yes. The Court pressed Trustee Counsel on this issue, noting there were already over $1 million in

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–7

professional fees. Trustee Counsel assured the Court the estate was still administratively solvent because there were substantial liquid assets. Trustee Counsel also acknowledged the Trustee had terminated approximately 44 employees at other facilities with accrued vacation compensation, but he was not seeking permission to pay any priority wages to these employees at the same time. The Court denied the request because it would result in disparate treatment of similarly-situated creditors. The Court expressed concern that the motion was premature because the former Texas employees might receive payment, but future administrative insolvency would preclude payments to other former employees.

**F. The Trustee Litigates Over a Pre-Petition Fee Deposit.**

Just a few days before the commencement of this case, the security cameras at the Mint recorded Ross Hansen, Diane Erdmann, and two others filling and removing boxes from the Mint. Ross Hansen and Diane Erdmann claimed they were taking personal items and moving valuable assets of the Mint to another facility to thwart collection efforts by Cohen. Dkt. No. 580 at 4.

When the Mint decided to seek protection under the Bankruptcy Code, it hired The Tracy Law Group, PLLC ("Tracy") to prepare a bankruptcy petition. Tracy requested an advance fee deposit of $150,000 and insisted that it be paid by a third party. Diane Erdmann paid the deposit using $50,000 transferred from her checking account and $99,460 received from the sale of gold coins. Tracy drew down $21,885.50 for pre-petition services and paid $1,717.00 for the chapter 11 filing fee, leaving approximately $125,857 in its trust account.

The Trustee asserted the remaining deposit funds constituted property of the Mint estate because the source of the funds was precious metals and cash Diane Erdmann stole from the Mint. The Court conducted an evidentiary hearing and found, among other things, that Diane Erdmann 1) was the "gatekeeper" of the bullion and the cash at the Mint, 2) did not keep adequate inventory records, and 3) removed items from the Mint's vault and then provided nearly $150,000 to Tracy. The Trustee, however, could not prove either the $50,000 or the specific gold coins sold to generate the balance of the deposit funds were stolen from the Mint. Dkt. No. 580 at 6. The Court did agree with the Trustee's alternative argument that the Funds constituted an advance fee deposit in which the Mint possessed at least a beneficial interest that brought the Funds into the estate.

On appeal, the District Court affirmed the conclusion that deposited funds belonged to Diane Erdmann. Dkt. No. 1051 at 3. The District Court reversed the ruling that the funds were part of the estate, concluding the Mint had no interest in the funds before filing for bankruptcy and no interest could spring from the filing. *Id.* at 5–6.

**G.      The Trustee Engages in Extensive Litigation to Acquire the Dayton Lease.**

Very early in the case, the Trustee determined the Dayton facility was critical to the Debtor's business and would be the focus of a chapter 11 plan. Dkt. No. 1185 at 2. But the Trustee had to overcome a significant hurdle to assuming the lease for the Dayton Premises: The Mint was not the tenant under the written agreement with the owners, Connie and Robert Hoff. The following discussion highlights the substantial risk and litigation costs facing the Trustee to acquire the lessee's rights under the lease.

1.      <u>Creation of the Lease</u>. The Hoffs operated a minting business known as "Medallic Arts." In 2009, Ross Hansen entered into an agreement to purchase this business from the Hoffs. As part of the sale, he and the Hoffs entered into a lease for the Dayton Premises (the "Dayton Lease"). The same day the parties executed the Dayton Lease they also signed a written amendment that acknowledged Ross Hansen was assigning his interests to a Nevada entity he controlled, Medallic Art Limited Partnership ("MALP"). At some point after the execution of the assignment of the Dayton Lease, the State of Nevada permanently revoked the corporate status of MALP. Consequently, there was uncertainty as to who held the rights and obligations of the lessee under the Dayton Lease.

The Mint always operated at the Dayton Premises and paid rent due under the Dayton Lease directly to the Hoffs. But at the outset of this case, Ross Hansen asserted that either he or his company, Medallic, was the tenant under the Dayton Lease and the Mint was a mere sub-lessee. Dkt. No. 1185 at 2–4. The Trustee and his counsel acknowledged early in the case that it was going to be expensive, risky, and time consuming to resolve this "gooey mess." *Id.* at 4.

2.      <u>The Medallic Litigation</u>. In early August 2016, Medallic commenced an adversary proceeding against the Trustee seeking, among many other things, a declaratory judgment that it held the rights as the tenant under the Dayton Lease, it owned the personal property used by the Mint, and the Mint owed Medallic a substantial amount of rent for the use of the property. The Trustee answered by denying the allegations and asserting counterclaims that included an action for substantive consolidation of Medallic with the estate of the Mint. The

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–9

parties vigorously litigated various issues, including the Trustee's motion for partial summary judgment on ownership of the Dayton Lease (which the Court denied), and engaged in extensive discovery.

In April 2017, with trial just a few weeks away, Medallic moved to voluntarily dismiss its claims. On April 19, the Court granted the motion and dismissed Medallic's claims and affirmative defenses with prejudice. The Court subsequently entered a judgment that substantively consolidated Medallic, including its assets and liabilities, with the chapter 11 estate of the Mint. Therefore, it no longer mattered whether Medallic or the Mint was the tenant under the Dayton Lease; if Medallic held the tenant's rights, the Trustee controlled those rights. *Id.*

## H. The Bressler Settlement Leads to Issues with Committee Members.

The Trustee attempted to obtain approval of a settlement with a business associate of Ross Hansen. Unfortunately, a member of the Committee prematurely revealed these efforts to Ross Hansen. This improper disclosure led the Trustee, Trustee Counsel, and Committee Counsel to several regrettable acts of their own.

1. <u>The Settlement Agreement</u>. Richard Bressler was a passive investor in Medallic. Ross Hansen controlled the entity and owned (either directly or beneficially) half of the interests in the company, and Mr. Bressler owned the other half of the interests. Dkt. No. 970. Early in the Medallic litigation, Mr. Bressler testified in support of Medallic in opposition to the Trustee's efforts to gain control of the Dayton Lease. Adv. Pro. No.16-01196-CMA, Dkt. No. 28. A few weeks before Medallic capitulated, the Trustee filed a motion for approval of a settlement agreement with Mr. Bressler. Dkt. No. 970. Under the settlement, Mr. Bressler agreed to not oppose the Trustee's efforts in the Medallic litigation. Mr. Bressler also agreed that if he obtained management control over the entity, he would cause Medallic to stipulate to substantive consolidation or an alter ego determination. In return, if the Court ruled in the Trustee's favor on the substantive consolidation or the alter ego issues, then Mr. Bressler would receive a $3 million general unsecured claim.

The Court denied the request for several reasons: 1) there was no dispute between the estate and Mr. Bressler to compromise; 2) since Mr. Bressler was not a party, he had no standing to oppose any relief sought by the Trustee in the lawsuit; 3) the agreement incentivized Mr. Bressler to testify to facts favorable to the Trustee after initially testifying for Medallic; and 4) since Medallic had already conceded, there was no need for any cooperation from Mr. Bressler.

Dkt. No. 1134 at 4–6, 10–12, 18-19, and 21–22.

2. <u>Committee Member's Unauthorized Disclosure</u>. The Bressler settlement became the subject of considerable controversy. On March 13, 2017, Committee Counsel advised the Committee that the Trustee had reached an agreement with Mr. Bressler. Dkt. No. 1979 at 7. The very same afternoon, Committee member William Hanson sent two emails to Committee Counsel. The first email states that he is sending a separate letter expressing the Committee's dissatisfaction with the Trustee that he wants delivered to the Court. Dkt. No 1979 at Ex. F. The second email is the letter for the Court that is highly critical of the Trustee, Trustee Counsel, and Committee Counsel. William Hanson states in that email that Mr. Calvert must be replaced as the Trustee and that "our dissatisfaction needs to be formally registered and put on the record." *Id*. at Ex. H.

Committee Counsel did not file the communication with the Court, but instead forwarded it to Trustee Counsel.[3]  *Id*. In an email sent the next day, Trustee Counsel informed Committee Counsel that someone had told Ross Hansen about the agreement between the Trustee and Mr. Bressler. *Id*. at Ex. I. Later that day, Committee Counsel reported to Trustee Counsel that William Hanson confessed in a phone call that he had accidentally disclosed the existence of the Bressler agreement to Ross Hansen and that he intended to resign. Dkt. No. 2035-5 at 15.

3. <u>Trustee Counsel's Communications with Committee Members</u>. On March 21, Trustee Counsel sent an email to all members of the Committee.[4]  In it, he charged that some members of the committee had collaborated with Ross Hansen "in adversity to the interests of the bankruptcy estate." Dkt. No. 1979 at Ex. L. He demanded each Committee member immediately produce all their communications with Ross Hansen or his representatives. *Id*.

On March 21, William Hanson replied to Trustee Counsel's email, confessing that he had accidentally disclosed the existence of the Bressler settlement to Ross Hansen. He acknowledged it was a serious mistake, stated he would resign from the Committee, and did so

---

[3] A Committee Counsel attorney later explained in a declaration why he decided not to file the letter to the Court: "Through March 2017 the Chapter 11 ride with the Trustee was sometimes certainly rough and subject to fair criticism but throwing the pilot out of the plane in mid-flight was neither warranted nor a prudent option…." Dkt. No. 1979 at 9–10.

[4] The email stated he was contacting them in their individual capacity and not as members of the Committee. While Washington Rules of Professional Conduct prohibit attorneys from communicating with parties who are represented by counsel (*see* WA RPC 4.2), Committee Counsel did not represent the individual Committee members, who have separate interests as creditors in the case. While it would have been prudent for Trustee Counsel to have Committee Counsel conduct the investigation, Trustee Counsel arguably did not need permission from Committee Counsel to communicate with the individual members.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–11

the next day. Dkt. No. 1979 at Ex. M and Ex. N. The Trustee and Trustee Counsel still insisted that other Committee members produce their communications with Ross Hansen. On March 27, 2017, Committee members Paula and Richard Pehl sent Committee Counsel a zip file containing their communications with Ross Hansen. Dkt. 1999-6 at 1–2. Two days later, Committee Counsel forwarded these documents to Trustee Counsel. Dkt. No. 2035 at Ex. C.

      4.    <u>Exclusion of Committee Members</u>. On March 17, Committee Counsel sent an email to the Trustee and Trustee Counsel asking them to consider action to have the Pehls removed from the Committee "based on their collusion with Ross and Bill Hanson…" Dkt. No. 2035 at Ex. D.

      A few weeks later, Committee Counsel reversed his position in an email to Trustee Counsel stating he no longer thought that Ms. Pehl was doing anything to advance Ross Hansen's agenda. Dkt. No. 2035 at Ex. D. He noted that while she still was not "a fan" of the Trustee, she needed to be included in current events, including a call between the Committee and the Trustee scheduled for the next day. *Id*.

      On April 6, 2017, the Committee conducted a telephonic meeting with the Trustee, Trustee Counsel, and two other company officers. According to the minutes of the meeting, the Pehls left the call shortly after it began at the request of the Trustee. The Trustee's position was that the Pehls had not yet submitted disclosures of their contacts with Ross Hansen and so they should not be allowed to participate in the Committee meeting. Dkt. No.2035 at Ex. B, part 2.

      On May 10, 2017, Trustee Counsel sent an email to the Pehls (with a copy to Committee Counsel) alleging that they had not complied with the Trustee's request that they fully disclose their communications with Ross Hansen. Dkt. No. 1999-10 at 1. The Court asked Trustee Counsel to explain why he made those inaccurate assertions to unrepresented individuals. In a subsequent declaration he explained that he had forgotten that Committee Counsel provided him the documents in late March. Dkt. No. 2036 at 3–4.

**I.**    **The Trustee and Trustee Counsel Repeatedly Assure the Court the Estate is Solvent, and the Case is Proceeding to a Successful Conclusion.**

      During and after the Medallic Litigation and the Bressler Settlement, the Trustee filed several motions. In connection with these motions, the Trustee and Trustee Counsel represented to the Court that the case was on a successful track and, notwithstanding the accumulating professional fees, the estate continued to be administratively solvent.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–12

**Below is the Order of the Court.**

At the end of 2016, the Trustee filed a motion for authority to hire Bill Attalla as CEO and pay him an annual salary of $300,000 and other benefits. Dkt. No. 857. At the hearing on February 3, 2017, the Court expressed concern about the sizable administrative expenses in the case and inquired about the financial condition of the estate. Trustee Counsel assured the Court that even if the Trustee lost the litigation with Medallic over the Dayton Lease and even if it had to liquidate all assets, he believed the estate was administratively solvent. Dkt. No. 915 at 5–6. Based in part on these representations, the Court authorized the employment. *Id.* and Dkt. No. 897.

In May 2017, the Trustee filed a motion for approval of post-petition financing by factoring company receivables. In support of the Motion, the Trustee declared that "revenue streams have not been fully developed" and that consequently the Mint "continues to experience a tight cash flow." Dkt. 1035 at 2. The Trustee stated he remained convinced in the long-term viability and profitability of the Mint's business, and an infusion of cash would afford the new CEO and sales team a chance to grow sales. *Id.*

In a response, the Committee supported the motion but also informed the Court that the Mint experienced a significant and expected operating loss in April. Dkt. No. 1049 at 1–2. At the hearing on June 2, 2017, Trustee Counsel confirmed that the company experienced a downturn in April and therefore had initiated a marketing effort to sell the Mint. The Trustee and Trustee Counsel still expressed optimism that in six months the Trustee would either sell the business or put forth a plan with an infusion of equity that would generate a distribution to unsecured creditors in the range of 50 percent to 75 percent. The Court granted the motion, entered an interim order, and then entered a final order several weeks later. Dkt. Nos. 1062 and 1109.

While the Trustee represented at the financing motion hearing that he might propose a reorganization plan, he later revealed to the Court that he had already given up on that option. In a declaration filed in January 2019, the Trustee explained that after the business suffered the large and unanticipated loss in April 2017, he communicated to the Committee that a reorganization plan was not feasible, and he focused on a sale of the company as a going concern. Dkt. No. 1982 at 4–5.

The Trustee declares that he actively marketed the company for sale during the spring, summer, and fall of 2017. *Id.* He claims that he received expressions of interest from "multiple

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–13

parties" for a purchase of the company in the range of $3 to $10 million dollars. *Id*. He does not state, however, how many expressions of interest materialized, nor does he state how many of these expressions developed into offers. The Court later learned the Trustee did receive an offer in late July for substantially all estate assets—for only $2 million. Dkt. No. 2035-3 at 13–19.

**J.    In Litigation with the Dayton Lease Landlord, the Trustee Changes his Position on the Necessity of the Dayton Lease.**

After succeeding in the litigation against Medallic, the Trustee turned his attention to assuming the Dayton Lease. The Trustee filed an assumption motion in October 2016, which was continued to May 2017 to coincide with the expected conclusion of the Medallic litigation. In his 2016 declaration supporting assumption, the Trustee stated he had reached an understanding with the Hoffs on the maintenance, repairs, and improvements that that the estate would undertake to cure all defaults. But when the Court heard the assumption motion in 2017, the Hoffs claimed they had agreed to assumption of the Dayton Lease if the Trustee performed certain repairs, but never agreed those certain repairs constituted all the defaults that existed in late September 2016. In short, the Trustee failed to memorialize the agreement that he believed had been struck.

Consequently, when it came time to assume the Dayton Lease, the Trustee had to litigate with the Hoffs over the defaults requiring cure. Dkt. No. 1185 at 7–11. Based on the Trustee's representation that the estate could promptly cure the defaults determined after a hearing, the Court authorized the Trustee to assume the Dayton Lease and set an evidentiary hearing. *Id*.

After several days of testimony, evidence, and argument, the Court issued a written ruling in September 2017. Dkt. No. 1185. The salient findings include the following:

1.    In his opening statement at hearing, Trustee Counsel declared they would demonstrate that in the summer of 2016 the Trustee sought to establish with the Hoffs a definitive amount for repairs and maintenance because he was deciding whether to stay or move to new space. Trustee Counsel asserted the Dayton Lease was "bad" and the Trustee needed far less space for the Nevada operations. The Trustee, according to his counsel, strongly considered moving out, and stayed only because he believed he had an assurance from the Hoffs that he needed to spend only about $120,000 to cure all defaults. *Id.* at 7–11.

2.    Trustee Counsel presented evidence to support this estoppel argument. An expert testified there was a significant vacancy rate in the local market in the Summer of 2016 and the Trustee could have substantially reduced his leasing costs had he moved. The Trustee then

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–14

testified that he had identified a new location where he could have moved the Dayton operations and reduce the rental expense by $25,000 per month. He then stated if he had moved the estate would have saved $900,000 in rental costs over the remaining term of the Dayton Lease, $120,000 in repair and maintenance costs he negotiated, and $40,000 he spent to clean up solvents. The Trustee estimated that the costs to move plus the loss in revenue from the move would total $750,000. He testified that he sought "a total number" from the Hoffs in August 2016 because he needed the amount for his "move versus stay analysis." Dkt. No. 1185 at 14.

       3.     The Court noted the significant costs to stay the Trustee identified and asked the Trustee how much he had budgeted for legal fees to resolve the dispute with Medallic and Ross Hansen over the Dayton Lease. In response, the Trustee dramatically changed positions and testified he did not estimate those costs because he lacked the funds to move. The Trustee then proceeded to completely change his testimony to state that when he was seeking a total cure amount from the Hoffs in August 2016, he was not conducting a "move versus stay analysis" but instead was deciding whether to assume the Dayton Lease or shut the company down.

       In sum, after testifying that he had identified a better location that would save the estate substantial amounts and that he needed a final cure number from the Hoffs to decide whether to stay or move, the Trustee then revised his testimony by claiming he possessed no ability to move the operations. The Court made additional findings on the Trustee's shifting statements on this crucial issue. Dkt. No. 1185 at 13–15.

       In connection with the pending Application, the Court afforded the Trustee an opportunity to further explain this shift in position. In a supplemental declaration, he swore the Dayton Lease was necessary because the estate lacked the working capital to move. Dkt. No. 1982 at 8. This testimony is directly contrary to his testimony on the stand that he was seeking a cure cost figure from the Hoffs to decide whether to stay or move to a new location he identified. This declaration only compounds the Trustee's problems, as it confirms that he was not telling the truth either when he testified that he identified a better space and engaged in a "move versus stay analysis" or when he testified that he had no ability to move operations.

**K.**    **Concerned with the Costs of Administration, the Court Orders the Professionals to file Fee Applications.**

       As the case went on, the Court grew concerned that no plan had been filed and the administrative expenses continued to mount. According to the July 2017 monthly financial report, the Trustee estimated that the estate had accumulated professional fees exceeding $4.13

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–15

million. Dkt. No. 1163 at 45. Even though the case was nearly eighteen months old, the Trustee and the other professionals had not submitted any applications for the allowance of compensation or reimbursement of expenses that would disclose how they were spending their time. The Court thus ordered the Trustee and the professionals to file fee applications and note them for hearing in early October.

The Trustee, Trustee Counsel, Cascade, and Committee Counsel each filed an interim application for payment of fees and reimbursement of expenses and a supporting declaration. The Committee, through Committee Counsel, raised several general and specific objections to the applications filed by the Trustee, Trustee Counsel, and Cascade, including the following issues:

1. The Trustee and Cascade spent significant time under "Plan of Reorganization & Disclosure Statement" yet never filed a plan or disclosure statement;

2. The Trustee improperly included in the Cascade application time for "traditional trustee duties" that did not involve professional accounting services;

3. A substantial amount of time in the Cascade and Trustee applications for "Investigation – Fraud" appeared to be spent assisting the FBI pursue a criminal investigation and not providing a benefit to the estate; and

4. The Trustee failed to engage in a cost/benefit analysis before engaging in expensive litigation against Ross Hansen and Diane Erdmann that, to date, had not generated a return for the estate.

Dkt. No. 1224.

In their applications, the Trustee and the professionals made clear that they were only complying with the Court's instruction and did not want the Court to rule on these initial applications. The Trustee explained it was premature to determine to what extent the estate would succeed in realizing on the enterprise value of the company, and he anticipated requesting approval of his fees and costs when the value of the business could be determined. Dkt. No. 1201 at 2. Committee Counsel also noted a far more practical reason: the estate lacked the cash assets to pay any fee awards, even if approved, and it was unclear when and whether any funds would ever become available. Dkt. No. 1224 at 2.

On October 6, 2017, the Court conducted a hearing on the initial fee applications. While the Court acceded to their requests to defer ruling on the allowance or disallowance of

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–16

compensation and reimbursement, it informed them that it had many issues with the applications. The Court reiterated the objections raised by the Committee and expressed the following additional concerns:

1. The Trustee had reimbursed his own expenses without obtaining Court permission;

2. Many of the time entries on Cascade's application did not reflect accounting services;

3. The Trustee's reimbursed expenses included payment to a law firm that had not been approved by the Court;

4. Significant fees and costs had been devoted to litigation with questionable value to the estate.

5. The Trustee misled the Court with his vociferous objection to the initial bidder's break-up fee request after telling the bidder to file the request.

The Trustee and the professionals did not submit any other requests for compensation or reimbursement until they filed the pending Applications over a year later.

**L.    The Trustee Files a Status Report that Contradicts Trustee Counsel's Prior Representation on the Estate's Solvency yet Expresses Optimism for a Distribution to Unsecured Creditors.**

Along with his reply in support of the Court-ordered fee application, the Trustee filed a Report of Investigation and Status Report dated October 3, 2017 (the "Status Report") (Dkt. No. 1229). The Trustee appended to this Status Report a separate analysis that he prepared in which he concluded the estate had been administratively insolvent on a liquidation basis from the outset:

> The liquidation value of the assets of the company at the time of the Trustee's appointment was of de minimus value to creditors and there were large administrative claims that would have arisen in liquidation that would have consumed what value there was….if the Trustee had elected to close the business and liquidate the Company's assets in August 2016, there would have been no return to general unsecured creditors. Only administrative creditors, principally administrative winddown expenses of employees, landlords and professionals would have received any distribution from the estate *and those administrative creditors would not have been paid in full.*

Dkt. No. 1229 at 10 [emphasis added].

This liquidation analysis estimated that as of September 1, 2017, the estate was facing $2,866,043 in post-petition payables, which included approximately $1,000,000 in WARN Act claims based on an abrupt closing of operations, and $2,705,606 in professional fees. Dkt. No.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–17

1229 at 32–33. The Trustee asserted that a liquidation of the estate assets would only yield $4,272,193. *Id*. Thus, in contrast to Trustee Counsel's assertion in February 2017, the Trustee's expert opinion was that the estate had been administratively insolvent on a liquidation basis since the beginning of the case.

Despite the poor sales and cash flow issues, the Trustee continued to express confidence that he could generate a return for creditors. In the Status Report, he assigned an enterprise value of $14,000,000 to the estate's business as a going concern. *Id*. at 10–11. The Trustee opined that in the next three years the business was expected to generate positive cash flow of approximately $4 million for a total estate value of approximately $18 million. *Id*. He anticipated a sale of the Mint as a going concern or a reorganization of the Mint that would eventually provide distributions to creditors. *Id*. The Trustee reported eight parties expressed interest and signed confidentiality agreements to obtain more detailed information and tour the operations. Dkt No. 1229 at 13. He represented that as of October 2017 two parties had expressed interest in the company, and discussions centered on a purchase price of $4 million - $5 million for 50 percent of the Mint with the balance held by a liquidating trust for the benefit of creditors. *Id*.

Trustee Counsel discussed the Trustee's Status Report at a hearing on professional fee applications on October 6, 2017. At the hearing, Trustee Counsel continued the refrain that success was near and that the Trustee expected to confirm a plan in the first half of 2018.

**M.    The Trustee Abruptly Shuts the Company Down.**

Two weeks after filing the Status Report, the Trustee filed a monthly operating report that painted a less rosy picture. He warned that if the tight cash flow issues could not be resolved, he would need to close the business and liquidate the assets on terms that will provide very little return to creditors. Dkt. No. 1287 at 47. In the operating report filed the following month, the Trustee declared that in October he received an executed asset purchase and sale agreement to acquire the business. Dkt. No. 1309 at 47. The offer was for $10 million from Gary Anderson/Eureka House of Metals. Dkt. No. 2035-3 at 21–22. The Trustee stated that he anticipated obtaining confirmation of the buyer's source of funds before the end of November, filing a sale motion, and closing the sale before the end of the year. Dkt. No. 1309 at 47.

In his subsequent monthly operating report, the Trustee explained he was still attempting to verify the source of funding for this offer but had not been able to do so as of December 18,

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–18

2017. Apparently, Mr. Anderson established a "Go Fund Me" page on December 17 to raise the $500,000 down payment. Dkt. No. 1616-10. In an email to the Hoffs dated December 27, 2017, the Trustee acknowledged that he had been waiting for seven weeks for the buyer to fund the purchase price. Dkt. No. 1330 at 64. He informed the Hoffs that he was forced to close to shut down the business and terminate virtually all employees. *Id.* The abrupt closure resulted in a class-action WARN Act claim exceeding $700,000. Dkt. No.1389.

After the business shut down, Mr. Atalla surmised in an email to the Trustee that the Dayton Lease actually hampered the reorganization efforts: "I will say that one of the biggest reasons for investors turning away was the weight of the oversized building and its monthly lease/tax costs." Dkt. No. 2083 at 25.

**N.    The Trustee Makes Several Missteps in His Efforts to Liquidate Assets.**

After shutting down the business, the Trustee began the liquidation of estate assets. Unfortunately, the Trustee's attempt to sell some of these assets proved highly problematic. Several problems were of the Trustee's own making.

1.    <u>First Attempt to Sell Customer Dies.</u>  One aspect of the Mint's business was to create dies for customers to strike various items, including commemorative coins, medals, and awards. The Mint's customers ranged from individuals to large organizations like the Boy Scouts of America and the United States Golf Association. *See* Dkt. Nos. 1369 and 1512. The Mint retained possession of the dies so customers could re-order items over time.

In late January, the Trustee sought authority to sell the Mint's equipment, dies, tooling, archives, and inventory via a public auction conducted by a Court-approved auctioneer. Dkt. No. 1350. Several customers objected to the Trustee's request to sell the dies. These customers asserted, among other things, that the Trustee could not sell the dies because either the dies were not property of the estate or the intellectual property rights associated with the dies could not be transferred without the consent of the customer. *See e.g.,* Dkt. Nos. 1369, 1371, and 1406. In support of their position on ownership, some customers noted the Mint's website (maintained by the Trustee during the case) stated that "with hundreds of thousands of dies and a century of safekeeping, there's no one you can trust more than Medallic Art Company to protect your dies" and promised the Mint will never dispose of its customer's die's. Dkt. Nos.1412 at 4 and 1412-10 at Ex. G. In response, the Trustee pointed to a disclaimer (in very small print) on the web site that warned, "NWTM/Medallic Art retains copyright rights to all artwork it creates, and also

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND
MILLER NASH GRAHAM & DUNN–19

retains possession and ownership of all dies it creates for its customers." Dkt. No. 1412-11. Customers also raised the concern that an individual die sold via a public auction could end up in the hands of someone who has no interest in or capability of fulfilling orders for new items, requiring customers to pay for new dies.

2. <u>Second Attempt to Sell Customer Dies</u>. Recognizing the concerns posed by an auction sale, the Trustee filed a new motion seeking approval to sell approximately 2,700 dies, customer lists, certain other intellectual property, specific tools and equipment, and certain other assets to Medalcraft, Mint, Inc. ("Medalcraft"), a company with a minting business, for $700,000. Dkt. Nos. 1457 and 1460. Notably, Medalcraft acknowledged the die ownership issue and pledged to use the customer dies to strike items only for and at the request of the individual customer associated with each die. *Id.*

Prior to the hearing on the proposed sale, the Trustee obtained Court approval of bidding procedures. Dkt. No. 1471. These procedures provided, among other things, that if the Trustee received a qualified alternative bid then he would conduct an auction that would conclude after each bidder had the opportunity to submit another bid with full knowledge of the then-existing highest bid. Dkt. No, 1471 at 4–5.

Yet after obtaining approval from the Court, the Trustee proceeded to violate his own bidding procedures. Before the bid deadline, the Trustee received an offer from an individual, Rodger May, for the assets sought by Medalcraft. The Trustee then conducted an auction for those assets at his Counsel's office on March 7. At the auction, Medalcraft bid $810,000, Mr. May then bid $825,000, and Medalcraft declared it was done. After the parties left, the Trustee later convinced Mr. May to increase his offer to $900,000. The Trustee then notified Medalcraft that he was going forward with Mr. May's $900,000 offer, and Medalcraft increased its offer to $910,000. Without informing Mr. May of this new bid, the Trustee presented Medalcraft's $910,000 offer for Court approval on March 9.

At the hearing, counsel for Mr. May appeared and complained about the bidding process. The Court expressed similar concerns and continued the hearing for a week. At the continued hearing, the Trustee informed the Court that, even though he had allowed Mr. May to participate in the auction, he had decided Mr. May was not qualified to purchase the assets and renewed his request that the Court approve the $910,000 offer from Medalcraft. Dkt. No. 1533. Finding the

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–20

entire process unfair to both Mr. May and Medalcraft, the Court declined to approve the sale and required the Trustee to start over.  Dkt. No. 1539.

        3.   <u>Third Attempt to Sell Customer Dies</u>.  Soon after the Court entered the order denying the sale, the Trustee renewed his motion to sell certain assets to Medalcraft.  The pool of assets did not change, but now the purchase price was $1 million.  Dkt. No. 1558.  The Trustee's proposed order provided that Medalcraft (a) would not use any die without the express consent of the customer on whose behalf the die was created, and (b) was taking the dies subject to any intellectual property rights in the dies that may be owned by the customer or any person involved with the creation of the die.  Dkt. No. 1624 at 12–13.  This language resolved the ownership issues as to these certain dies, and the Court approved the sale.  Dkt. No. 1639.  The Court also approved a sale of certain older dies owned by the estate to a historical society for $420,000.  Dkt. No. 1719.

        4.   <u>Inconsistent Statements About the Number of Customer Dies</u>.  The sale to Medalcraft involved about 2,700 dies.  The Trustee still had possession of thousands more dies— though how many was never revealed to the Court.  At the initial hearing on the sale to Medalcraft, Trustee Counsel stated the Trustee had at least 300,000 dies.  At the same hearing, the Trustee confirmed that he had told at least one customer that he had over 400,000 dies, and he would charge the customer a fee of $250 to $300 to research the customer's die and ship it to him.  Dkt. No. 1494 at 3.  The website maintained by the Trustee stated, in bold, that it maintained 309,405 dies.  Dkt. No. 1412-10 at 2.

        At a hearing on May 20, 2018, Trustee Counsel informed the Court that a Mint employee conducted a count and estimated that Trustee had only 80,000 to 100,000 dies[5] in his possession and control in Dayton, but that the Mint owned thousands more dies that were in China.  Trustee Counsel explained at a hearing on July 27, 2018, that the estate's dies in China had little value and the Trustee was contemplating a motion to abandon them.  In a declaration filed in November 2018, the Trustee confirmed that the Mint had assets in China that included dies.  Dkt. No. 1915 at 4–5.  But in a declaration filed in January 2019, the Trustee confessed that his prior representations about the dies had been inaccurate.  Dkt. No. 1982 at 7–8.  With respect to dies in China used to manufacture product, while he and Trustee Counsel had repeatedly asserted the dies belonged to the Mint, the Trustee declared he has seen no evidence to support a claim that

---

[5] The Trustee explained that each die was three to six inches in diameter, so the total count was an estimate.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–21

the estate owns them. *Id*. He blames the employees and prior management of Mint for the poor information on the number of dies owned and controlled by the Mint. *Id*. He does not offer any explanation for why he accepted and publicly repeated this information for over two years without checking its accuracy.

5.    <u>Resolution of Ownership Issue for Remaining Customer Dies</u>.  After the sales of dies to Medalcraft and the historical society, the Trustee had in his possession another 12,037 dies the Mint had created for custom jobs. Dkt. Nos. 1560 and 1561. The Trustee wanted to sell these dies but needed to address the ownership issue. To resolve all claims of ownership, Trustee proposed a "settlement protocol" whereby the estate would cede any claim of an ownership interest in any die in exchange for $300 plus the costs of shipping. Dkt. No. 1560. Any customer who did not claim ownership to a die or refused to pay $300 would waive any rights to the die. *Id*. The Court rejected this proposal, as the protocol did not involve a compromise; rather, the Trustee wanted permission to force customers to either pay $300 per die or relinquish their ownership claims.

The Trustee submitted a revised proposal that the Court eventually approved. This settlement protocol required the Trustee to provide notice to all customers associated with the dies that the Trustee claimed were part of the estate. Any customer objecting to the Trustee's position had to submit a claim by June 21, 2018. The Trustee was authorized to settle any ownership claims, and for those objecting customers with whom the Trustee did not settle the Court would conduct an omnibus hearing to set future proceedings to determine ownership. Dkt. No. 1671.

Unfortunately, the Trustee failed to accurately convey the process approved by the Court. On June 19, 2018, several customers filed a motion to enforce the settlement protocol and attached some troubling emails. Apparently unaware of the Court-approved process for determining ownership, an employee of the Mint was telling customers that the Court had already determined the Trustee owned the dies and that the Court had approved a payment of $300 per die to transfer ownership to the customer. Dkt. No. 1728. This "protocol" described by the employee was expressly rejected by the Court. The Trustee denied knowledge of these emails before receiving the motion but admitted that the employee had sent emails to approximately 74 customers that contained these false statements and eleven customers paid the Trustee $300 per die. Dkt. No. 1860. The Court conducted a hearing and determined that, at a

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–22

minimum, the Trustee was negligent in his supervision of the settlement communications. Dkt. 1982-2 at 70. The false emails were at the very least confusing and at worst caused dozens of customers to believe this Court had deprived them of their rights to due process.

Most customers did not assert an ownership interest in the dies by the deadline. The Trustee sold these unclaimed dies to Medalcraft for $110,000. Dkt. No. 1828. The Trustee chose not to litigate with customers who asserted ownership interests in dies and instead returned the dies for a $45 shipping charge. Dkt. No. 1774-1.

**O.     The Trustee Engages in Litigation Against the Two Mint Insiders that Yields no Results for Creditors.**

In addition to the fee deposit litigation and the Dayton Lease ownership dispute, the Trustee engaged in two other contested matters against Ross Hansen and Diane Erdmann. Neither of them generated any value for the estate.

1.     The Contempt Motion. In June 2016, the Trustee sought an order holding Ross Hansen in contempt for violations of the automatic stay. Dkt. No. 460. The Trustee accused Ross Hansen of trying to exercise control over assets of the bankruptcy estate, disrupt the business operations of the estate, and otherwise interfere with the Trustee's efforts to rehabilitate the Mint. The Trustee asked the Court to prohibit Ross Hansen from contacting employees, appearing at any of the Mint's facilities, and intentionally interfering with the Trustee's administration of this estate in any way. Dkt. No. 460-1.

After a hearing, the Court denied virtually all the requested relief. In its oral ruling, the Court noted Ross Hansen's conduct either ceased before the motion was filed or did not violate the stay. The Court concluded that the Trustee spent lots of time and money to prevent behavior that, even if it was improper, had stopped well before the hearing. The Court did allow the Trustee the opportunity for an evidentiary hearing on one of his claims for a stay violation. Dkt. No. 595. The Trustee chose not to pursue it and withdrew the balance of his motion. Dkt. No. 635.

2.     The Fraudulent Transfer Lawsuit. In September 2016, the Trustee commenced an adversary proceeding against Diane Erdmann to recover alleged fraudulent transfers. For at least eight years, the Mint paid her personal American Express Platinum Card bill every month. Diane Erdmann and Ross Hansen both used the card for Mint expenses and personal expenses. In the initial complaint, the Trustee sought to recover from her only the personal charges. A.P. No. 16-1217 at Dkt. No. 1. Subsequently he filed an amended complaint seeking to recover from

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–23

Diane Erdmann the entire amount the Mint paid to American Express over the eight years, which exceeded $8.6 million. A.P. No. 16-1217 at Dkt. No. 23.

With the initial complaint the Trustee also filed a motion for a prejudgment writ to attach Diane Erdmann's interest in a) the remaining advanced fee deposit held by Tracy (which was approximately $125,000) and 2) coins and bullion seized by the King County Sheriff (which had a total value of approximately $150,000). In support of the motion, the Trustee stated his belief that the cash and bullion were likely the sole source of recovery for a judgment against Diane Erdmann and that without a writ she would likely put these assets out of the reach of her creditors. A.P. No. 16-1217 at Dkt. No. 5 at 3. The Trustee eventually withdrew that motion but renewed it about eight months later. The Trustee again declared the cash and bullion which he sought to attach may be the only presently identifiable source of recovery for a judgment against Diane Erdmann. A.P. No. 16-1217 at Dkt. No. 65 at 6. After a hearing on September 22, 2017, the Court denied the motion because the Trustee failed to prove Mr. Erdmann was about to convert the property into cash for the purpose of placing it beyond the reach of creditors. Even though he had represented that without a pre-judgment writ he likely could not recover on any judgment against Diane Erdmann, the Trustee continued with the litigation.

After a multi-day trial, the Court entered judgment in favor of the Trustee and against Diane Erdmann for $430,462, plus post-judgment interest at the federal judgement rate. A.P. No. 16-1217 at Dkt. No. 97. The Trustee, however, has not collected anything on this judgment against her, and she filed for protection under the Bankruptcy Code. Dkt. Nos. 2039 at 2–3 and 2092 at 42.[6]

Even though the Trustee asserted the Mint operated in a "Ponzi-like fashion" (Dkt. No. 1229 at 1), the Trustee did not pursue any other fraudulent or preferential transfer claims. Dkt. No. 1982 at 9. Other than the hearing with the Hoffs over the cure obligations and a small breach of contract lawsuit[7], the Trustee aimed all litigation efforts at Ross Hansen and Diane Erdmann. Notably, the Trustee acknowledges his animosity towards Ross Hansen, although he claims his feelings are justified and did not cloud his administration of the case. Dkt. No. 2063.

---

[6] The Trustee recently filed a motion to approve a sale of certain property and a compromise with the Cohen Group and Ms. Erdmann's bankruptcy trustee that would yield approximately $50,000 - $60,000 for this estate.

[7] The Trustee sued a party who entered into a post-petition agreement to purchase some estate assets for approximately $176,000. After a one-day trial, the Court entered judgement against the Trustee, finding and concluding the Trustee failed to prove damages. See A.P. No. 17-01127.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–24

**P.      The Trustee Makes Unauthorized Payments and Files Inaccurate Reports.**

Beyond all the issues in this case, the Trustee failed to meet some of his most basic responsibilities, including the duty of candor to the Court.  First, he made ten payments to himself totaling more than $32,000.  Dkt. Nos. 1982-4 at 4 and 2039 at 6.  Even though the Court had refused the Trustee's request to be included in the Interim Payment procedures, he failed to obtain approval before making any of these payments.  Moreover, he made three of those payments *after* the Court warned him at the initial fee application hearing in October 2017 that he needed permission to pay himself.  Next, he compounded this error by not identifying these payments in the Monthly Operating Reports.  Each report, which he prepared and signed under oath, required him to separately list all payments to attorneys or professionals.[8]  The Trustee, however, filed nine monthly reports that failed to call out the disbursements to himself.  Dkt. No. 893 at 8 and 36, Dkt. No. 985 at 8, Dkt. No. 1033 at 8, Dkt. No. 1163 at 8, Dkt. No. 1212 at 8, Dkt. No. 1417 at 8, Dkt. No. 1480 at 8, and Dkt. No. 1532 at 8.

The Court asked the Trustee to explain his failure to obtain approval of the payments.  He claims that payments to himself were merely ordinary course reimbursements of business expenses of the Mint, and that he believed he did not need court approval to make the payments or identify them as payments to be separately listed in the monthly reports.  Dkt. No. 2039 at 2.  This testimony is not credible.  Not only does the Bankruptcy Code clearly require a trustee to obtain permission to reimburse his or her expenses, the Court removed the Trustee from the interim payments procedure and required him to seek Court approval before receiving any payments.  And the monthly reports require separate identification of all disbursements to professionals without regard to the purpose of the payment.

The Trustee also maintains that he did not conceal these payments because they are listed on the Statement of Cash Disbursements Detail.  Dkt. No. 2037 at 3.  First, this explanation cannot apply to the payment on December 30, 2016, where the both the payee and the description of the payment in the monthly report was "Transfer" and provides no clue that the

---

[8]  The form Monthly Financial Report completed by the Trustee each month contains a section UST-14, Continuation Sheet for Statement of Cash Receipts and Disbursements, which asks the following question: "Did the debtor, or another party on behalf of the debtor, make any payments during this reporting month to a professional such as an attorney, accountant, realtor, appraiser, auctioneer, business consultant, or other professional person?"  The preparer must check either a "yes" box or a "no" box.  If yes, the preparer is supposed to list each payment.  In the December 2016 report, he checked the "yes" box and identified interim payments to Trustee Counsel, Cascade, and Committee Counsel, but did not list a $8,907 payment to himself.  Dkt. No. 893 at 36.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–25

**Below is the Order of the Court.**

Trustee disbursed nearly $9,000 to himself. Dkt. No. 2039 at 6. There is no escaping the conclusion that the Trustee, either intentionally or negligently, concealed this payment. Second, as to the other payments showing Cascade as the payee, that information is in small print and buried in 50-page reports. *See, e.g.*, Dkt. No. 1033 at 37 of 70 (listing payment to Cascade Capital Group on 4/28/2017 for "Trustee Fees"). The Trustee knew of the payments, so he could have—and should have—expressly identified all payments to himself in answer to the question on the reports.

Finally, the Trustee made unauthorized payments to professionals. For example, he paid $3,274.50 to Amicus Law Group in October 2016 and reimbursed himself $1,188 for additional amounts he paid to Amicus Law Group in March 2017. The Trustee states that he reimbursed the estate for these two payments, although he did not return the $1,188 until January 2019—a month *after* the initial hearing on his Application. Dkt. Nos. 1982 at 9 and 1982-4 at 3. He also paid at least $2,425 to Atkins Intellectual Property for legal services. While acknowledging he made payments for legal advice, the Trustee is silent as to whether he has recovered any of these payments from Atkins or has reimbursed the estate. Dkt. Nos. 2027 at 31 and 2037 at 5–6. The Court authorized neither the employment of these lawyers and nor any payments to them.

**Q.    The Trustee and Trustee Counsel Continue to Make Inconsistent Statements About the Solvency of the Estate.**

By the middle of 2018, it was clear the there would be no distribution to unsecured creditors and the administrative claims would not be paid in full. In an apparent attempt to justify these poor results, the Trustee and Trustee Counsel contended that the case was a disaster from the beginning—a position in stark contrast to the multiple representations that plan confirmation and creditor distributions were just around the corner.

In August 2018, the Trustee filed an *ex parte* motion for an order establishing an administrative expense claim deadline in which he acknowledged the estate is administratively insolvent. Dkt. No. 1837 at 1. Only seven parties (not including professionals) filed administrative expense claims, and the Trustee subsequently filed a motion to allow some and disallow others. Dkt. No. 1920. In a declaration supporting that motion, the Trustee estimated the dividend to allowed administrative expense claims to be about 35 percent. Dkt. No. 1921. The Court entered an order on this motion, allowing several claims and authorizing the Trustee to make interim distributions of 40 percent of the allowed amounts. Dkt. No. 1965. The Trustee also obtained approval of settlements with several parties asserting administrative expense

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–26

claims and made payments in accordance with the approved agreements.  The Trustee now boasts that he has paid virtually all administrative claims in full other than the professionals.  Dkt. No. 2014 at 2.

This statement is disingenuous.  When the settling administrative claimants accepted substantial discounts in exchange for immediate payment it was public knowledge the estate could never pay the full amount of their allowed claims.  For example, the $700,000 claim for WARN Act violations was settled for $125,000.  In the motion for approval of the settlement, the Trustee and class claimants expressly acknowledged this bankruptcy case is administratively insolvent, and the Trustee estimated that administrative priority claims will receive a recovery of one third or less of the amount of their allowed claims.  Dkt. No. 1847 at 9.  A former employee, Michael White, asserted an administrative claim in the total amount of $86,874.15 but accepted an immediate payment of $35,000 to settle his claim.  Dkt. No. 1946.  The Hoffs, whose administrative expense claim for post-petition rent alone exceeded $500,000, accepted an immediate payment of $354,421.90.  Dkt. No. 1874.

Far more troubling was the contention by Trustee Counsel that directly contradicted his prior statements on administrative solvency of the estate.  At the first hearing on the fee applications on December 7, 2018, Trustee Counsel declared in his prepared opening remarks that the estate was administratively insolvent from the beginning:

> From the outset of this case, there was only one possible avenue for recovery for creditors.  And that was for the Trustee to salvage, restructure, reorganize, and propose a reorganization plan for the Debtor's business.  On a liquidation basis, at the time the case was filed, this case was administratively insolvent.  Everyone knew that, creditors knew that, Creditors' Committee knew that, and the Trustee knew that.

The Court reminded counsel of his statement at the Atalla employment hearing in February 2017 that he believed estate was administratively solvent, even on a liquidation basis.  He had no explanation for his two diametrically-opposed positions.  The Court afforded him an opportunity to submit a declaration, in which he clarified his February 2017 statement that the estate was administratively solvent was true and his December 2018 assertion that everyone knew the estate was administratively insolvent at the earliest stages of the case was "in error."  Dkt. No. 2036 at 2–3.  Trustee Counsel offers no reason why he made this material unforced error.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–27

In a subsequent declaration that also addressed these inconsistent representations, the Trustee will only admit there has been "some confusion" about discussions of administrative insolvency of the estate at various junctures in the case. Dkt. No. 1982 at 4. The Court agrees—and the confusion has been caused by inconsistent statements. The Trustee declared in his Status Report filed in October 2017 the estate was administratively insolvent from the earliest phases of the case if the estate had been forced into a liquidation at that time. The Trustee reiterated in a recent declaration that if the estate had been liquidated in the first 120 days, there would have been no recovery for creditors. Dkt. 1982 No. at 14. Yet Trustee Counsel has asserted throughout this case the estate was *not* administratively insolvent on a liquidation basis—except at December 7, 2018, hearing, when he said the exact opposite.

Today, there is no question that the estate is insolvent. When the professionals filed the Applications, the Trustee was holding $2,389,183 in unencumbered funds. Dkt. No. 1928 at 4. Accrued professional fees in this case exceed $6 million, and the Trustee holds only about $2.27 million in cash. Dkt. No. 2116 at 21. There is no money for priority claims—including the accrued vacation compensation for the terminated Tomball employees the Trustee sought to pay in August 2016.

**R.      The Trustee and Professionals file the Pending Applications.**

The Trustee, Trustee Counsel, Cascade, and Committee Counsel filed the Applications in November 2018. Many creditors filed objections that expressed frustration with the lack of any distributions and opposed any payments to professionals. While the Court understands the creditors' concerns, the objections offered no legal or factual basis for denying the requests in the Applications.

Committee Counsel filed a response that raised several issues. With respect to both the Trustee and Cascade Applications, Committee Counsel suggested the services under "Investigation-FBI/US Trustee Office" may have provided a substantial benefit to the FBI but provided no economic benefit to the bankruptcy estate or its creditors. Committee Counsel also questioned the benefit of the time devoted by the Trustee and Trustee Counsel to developing a Plan of Reorganization and Disclosure Statement given the absence of a reorganization. Dkt. No. 1943 at 9–15.

As to the Cascade Application, Committee Counsel asserted that, other than the tasks under "Accounting" and perhaps "Bank Database," it is difficult to determine whether any of the

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–28

categories describe work that could not be generally performed by a trustee without the assistance of an attorney or accountant for the estate. Dkt. No. 1943 at 11. The Cascade Application also seek allowance of a total of $205,065.00 in services performed by Mr. Calvert, not as Trustee, but in his personal capacity as an accountant/principal of Cascade. Committee Counsel observed the vast bulk of these work categories do not appear to describe "accounting" tasks or to require an accountant's professional expertise. Committee Counsel also questioned the propriety of a request for compensation of more than $190,000 for two staff employees who are apparently not trained accountants. Dkt. No. 1943 at 9–15.

With respect to the Trustee Counsel Application, Committee Counsel asserted that the substantial time devoted to litigation against Ross Hansen and Diane Erdmann produced no benefit to the estate. Committee Counsel asserted that Committee members opposed much of this litigation, but Counsel did not offer evidence showing the opposition had been expressed to the Trustee or his counsel. Dkt. No. 1943 at 13–15.

The Pehls filed a response that reads primarily as a list of grievances and unsupported attacks but does raise several concerns that warrant examination: 1) Committee Counsel improperly disclosed Committee member communications to the Trustee; 2) the Trustee and Trustee Counsel made improper contacts and engaged in overreaching conduct, like insisting that certain Committee members be excluded from meetings, and Committee Counsel failed to represent Committee members against the conduct; 3) after spending significant time to obtain an accountant, Committee Counsel did not allow the accountant to conduct a forensic audit of the Trustee's work; 4) Committee Counsel did not apprise the Court of the Committee's concerns with the hiring of Mr. Atalla; and 5) the Trustee transferred to preferred employees, allowed preferred employees to take, or simply lost, many estate assets. Dkt. No. 1999.

William Hanson also filed a response. Dkt. No. 2003. He essentially states the same objections raised by the Pehls, but provides little evidence or argument opposing the Applications. His primary issues are 1) Committee Counsel forwarded his letter demanding removal of the Trustee to Trustee Counsel rather than filing it with the Court, and 2) Committee Counsel interfered in efforts to obtain a forensic accounting of the Trustee's work. William Hanson acknowledges he disclosed privileged information to Ross Hansen one time but denies routinely feeding information to him.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–29

Committee Counsel included in his response an excerpt from an email from David James, co-chair of the Committee. In this excerpt, Mr. James expresses a desire to "contest Calvert and his Capital group receiving any payment whatsoever, since he, in all our unsecured creditors' views, failed to do anything he stated he could and would do." Dkt. No. 1943 at 7. The email excerpt continues in that vein and lambastes the Trustee in very personal terms but does not challenge any specific aspect of the Applications. And while Mr. James, the Pehls, and Mr. Hanson all appear to accuse the Trustee of failing to fulfill his duties, none of them filed an adversary proceeding, commenced a contested matter, or pursued any other action against the Trustee.

Mr. Atalla, the former CEO, filed a response, but his complaint is that the Trustee did not respond to his offers to purchase estate assets. Not only does he fail to raise any actual substantive objection to the Applications, but since he received payment on his compromised administrative claim, Mr. Atalla is no longer a creditor and has no standing to assert an objection. Similarly, an individual named Joshua Gibbons filed responses to the Applications, but there is no evidence that he is a creditor or an interested party with standing to object. The Court therefore did not consider the filings of Mr. Attalla and Mr. Gibbons in its review of the Applications.

At the initial hearing on the Applications, the Court raised several issues and asked the professionals to submit additional declarations and information. The Court also required the Trustee, Cascade, and Trustee Counsel to re-submit their time records in a usable format and to address certain issues, and they did. The Court conducted two more hearings and requested additional information and declarations.

## II. LEGAL ANALYSIS

### A. General Principals

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and 11 U.S.C. §§ 327(a) and 330(a).

The Bankruptcy Code authorizes a court to award to a trustee or a professional person employed under section 327 or 1103 (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person, and (B) reimbursement for actual, necessary expenses. 11 U.S.C § 330(a)(1). The court may award compensation that is less than

the amount of compensation that is requested.  11 U.S.C. § 330(a)(2).

In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including (A) the time spent on such services, (B) the rates charged for such services, (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title, (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed, (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field, and (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.  11 U.S.C. § 330(a)(3).  Except for certain circumstances that do not apply in a chapter 11 case, the court shall not allow compensation for (1) unnecessary duplication of services, or (2) services that were not (a) reasonably likely to benefit the debtor's estate or (b) necessary to the administration of the case.  11 U.S.C. § 330(a)(4)(A).

"Services that are reasonably likely to provide an identifiable, tangible and material benefit to the debtor's estate can be compensated, even if they do not actually provide such a benefit (and as long as such services meet the other requirements of section 330(a))." *In re Smith,* 317 F.3d 918, 926 (9th Cir. 2002), *abrogated on other grounds by Lamie v. United States Trustee,* 540 U.S. 526, 531–39 (2004).  A determination of a reasonable fee allowance under section 330 is achieved by answering the following five questions:

1. Were the services authorized?
2. Were the services necessary or beneficial to the administration of the estate at the time they were rendered?
3. Are the services adequately documented?
4. Are the fees requested reasonable, taking into consideration the factors set forth in § 330(a)(3)?
5. Did the professional exercise reasonable billing judgment?

*In re Strand*, 375 F.3d 854, 860 (9th Cir. 2004), *citing In re MEDNET, MPC Corp.,* 251 B.R. 103, 108 (B.A.P. 9th Cir. 2000) (citation omitted).

Reasonable billing judgment requires the professional to consider the following: (a) Is the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery? (b) To what extent will the estate suffer if the services are not rendered? (c) To what extent may the estate benefit if the services are rendered and what is the likelihood of the disputed issues being resolved successfully? *Unsecured Creditors' Comm. v. Puget Sound Plywood, Inc.*, 924 F.2d 955, 958–59 (9th Cir. 1991). A court order authorizing a professional to undertake a task does not relieve the professional from the obligation to exercise billing judgment. *Id*.

When a cost benefit analysis indicates that the only parties who will likely benefit from an investigation of a claim are the trustee and his professionals, investigation is unwarranted, and a court does not abuse its discretion in denying fees for those services. *MEDNET*, 251 B.R. at 108–109, *citing In re Riverside-Linden Inv. Co.*, 925 F.2d 320, 322 (9th Cir. 1991) (citation and internal quotation marks omitted).

A court has an independent duty to evaluate professionals' fees. *In re Columbia Plastics, Inc.*, 251 B.R. 580, 584 (Bankr. W.D. Wash. 2000). Parties seeking compensation have the burden of establishing entitlement to the fees requested. *Id.* The applicant bears the burden of proof to establish that its hourly rate and hours expended are reasonable. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). There is a strong presumption that the lodestar figure represents a reasonable fee. *In re Powerine Oil Co.*, 71 B.R. 767, 772 (B.A.P. 9th Cir. 1986), *citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986). But if a fee application is inadequate, the court should not be forced to wade through it to calculate the "lodestar" and it may use an alternative fee formula. *Puget Sound Plywood, Inc.*, 924 F.2d at 961. One bankruptcy court noted an application for fees "should be self-contained, including enough information on its face to review the charges." *In re Air Vermont, Inc.*, 114 B.R. 48, 51 (Bankr. D. Vt. 1988). The reviewing court should not "venture guesses nor undertake extensive investigation to justify a fee for an attorney or trustee" because it is "not an overly burdensome task to enlighten the court as to the work undertaken." *In the Matter of Evangeline Refining Company*, 890 F.2d 1312, 1326 (5th Cir. 1989).

The burden is on the applicant to show the reimbursable nature of its expenses. *In re Leonard Jed Co.*, 118 B.R. 339, 342 (Bankr. D. Md. 1990). The Court has the discretion to award trustees reimbursement for actual, necessary expenses. 11 U.S.C. § 330(a)(2) (1988);

*Sousa v. Miguel* (*In re U.S. Trustee*), 32 F.3d 1370, 1374 (9th Cir. 1994). Attorney and non-attorney trustees and other professionals may not be reimbursed for normal overhead expenses, which typically include rent, insurance, taxes, utilities, secretarial and clerical pay, library, computer costs, office supplies, local telephone charges, meals, and local travel. *Id.* at 1375.

Under the Court's local rules, a professional fee application in a chapter 11 case must include the following: (1) a narrative summary of the services provided, results obtained, and benefit to the estate, (2) an itemized time record of services for which an award of compensation is sought, including, (A) the date the service was rendered, (B) the identity of the person who performed the service and the hourly rate of such individual, (C) a detailed description of the service rendered and the time spent performing the service, and (D) the total number of hours spent and the total amount of compensation requested; and (3) a statement of expenses, by category, for which reimbursement is sought, and for extraordinary expenses, state (A) the date the expense was incurred, (B) a description of the expense, (C) the amount of the expense requested, and (D) the necessity of the expense. When an applicant's cumulative applications exceed $15,000, the narrative summary and itemized time entries shall be divided into categories according to the nature of the tasks performed, with the total hours, fees, and expenses broken down for each category. Local Rules Bank. W.D. Wash. 2016-1(a)(5), (6), and (7) and (d).

A professional's employment in a bankruptcy case is limited to the employment approved in the order authorizing the employment. *In re Computer Learning Centers, Inc*., 285 B.R. 191, 205 (Bankr. E.D. Va. 2002). Clerical work is not compensable as it is "not in the nature of professional services and must be absorbed by the applicant's firm as an overhead expense." *In re Stewart*, 2008 WL 8462960, at *7 (B.A.P. 9th Cir. Mar. 14, 2008), *aff'd*, 334 F. App'x 854 (9th Cir. 2009) (citations omitted).

**B.    Issues Common to the Applications**

The Trustee and the professionals devoted a substantial amount of time to certain activities in this case that generated little or no benefit to the estate. While Ninth Circuit authority requires a showing only that the services were reasonably likely to provide an identifiable, tangible, and material benefit at the time of performance, the statements and conduct of the professionals cut against their compensation requests in several instances.

1.    <u>Dayton Lease Litigation</u>. From the outset of the case, the Trustee and Trustee Counsel claimed that acquiring the rights to the Dayton Lease was critical to the success of the

case. The Trustee, Trustee Counsel, and Cascade spent a significant amount of time pursuing the motion to assume the Dayton Lease, litigating over the cure obligations, attempting to perform the obligations, litigating the Hoffs' relief from stay motion, and then negotiating and resolving the Hoffs' substantial administrative expense claim. But they asserted in the litigation against the Hoffs the Dayton Lease was "bad" and that the Trustee had located a better option. To minimize his cure obligations, the Trustee claimed the Hoffs' promises in August 2016 caused him to stay at the Dayton Premises rather than lease space at the smaller and cheaper location. If the Dayton Lease was "bad" then the Trustee and his professionals should not have devoted significant time to assume it and then deal with the consequences after defaulting on the assumed obligations. These inconsistent positions create a question as to whether the actions of the Trustee, Trustee Counsel, and Cascade to preserve the Dayton Lease were reasonably likely to provide a benefit for the estate. Given the Applicants must prove their right to compensation, their own arguments and evidence that the estate did not need the Dayton Lease preclude a finding that they met their burden.

        2.    <u>Avoidance Actions Analysis</u>. The Trustee has a statutory duty to investigate the acts, conduct, assets, liabilities, and financial condition of the debtor. 11 U.S.C. § 1106(a)(3). The Trustee also must determine whether to pursue avoidance actions. Thus, it is expected that the Trustee and his professionals would devote some time to determining whether the Mint was insolvent before it filed and to examining some potential fraudulent transfers. Trustee Counsel spent approximately 50 hours analyzing potential avoidance action claims, which appears to be an appropriate amount of time.

        Cascade, however, devoted hundreds of hours to evaluating the Mint's pre-petition financial condition. The accountants recorded 423 hours under the category "Insolvency." In addition, Cascade spent over 580 hours constructing a "Bank Database" which the Trustee asserts was used to determine the Mint's insolvency back to 2008. Dkt. No.1924 at 6. After committing all this time to examining the issue, the Trustee used the analysis to pursue only one avoidance action: the fraudulent transfer lawsuit against Diane Erdmann to recover monies paid to American Express.

        Apparently recognizing the disproportionate number of hours spent performing an analysis for this one piece of litigation (that has not yet yielded any recovery), the Trustee now claims he needed to determine the Mint's solvency for the lawsuit with Medallic over the estate's

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND
MILLER NASH GRAHAM & DUNN–34

rights to the Dayton Lease and other assets. Dkt. No. 1982 at 12–13. Cascade also seeks compensation for preparing a reasonable equivalent report, claiming the Medallic litigation required a significant amount of time to confirm fraudulent transfers for trial. Dkt. No. 1924 at 9.

These current claims, though, diverge from the Trustee's prior representations to the Court. In the adversary proceeding against Medallic, the Trustee moved to bifurcate the trial into two phases, arguing that if he prevailed in the first phase, the estate could avoid the costs of preparing for the second phase. Adv. Proc. No. 16-01196-CMA, Dkt. No. 25 and 35. The second phase involved fraudulent transfer claims against Medallic. The Trustee declared that insolvency and reasonable equivalent value were two of the "thorny and complicated" issues that the parties would not have to address if the trial was resolved after the first phase.[9] Based on the Trustee's contention that the estate could avoid substantial litigations costs, the Court granted the motion and bifurcated the trial. Medallic conceded before trial of the first phase, so the Trustee should not have incurred time and expense preparing a solvency analysis for the second phase of that litigation. Once again, inconsistent statements counter the professionals' claims that the services were reasonable or necessary.

3. <u>Fraudulent Transfer Litigation Against Diane Erdmann</u>. Trustee Counsel and Cascade incurred significant time and expense pursuing these fraudulent claims. Trustee Counsel denominated the matter as the "American Express Fraudulent Transfer Action" and Cascade's placed its time under the category "Investigation-American Express," presumably because the property transfers at issue were to American Express. Cascade also billed time to this litigation under the categories "Investigation" and "Investigation – Diane/Ross."

Since American Express received the payments and clearly has assets that could satisfy a judgment, the Court asked Trustee Counsel to explain the decision to pursue only Diane Erdmann. Counsel asserted a constructive fraudulent transfer claim would have required the Trustee to prove that American Express had not provided reasonably equivalent value to the

---

[9] "A resolution of the [phase 2] claims…would necessitate that the parties engage in expensive litigation and discovery of facts and issues that are not necessary to a determination of the [phase 1] claims, including …. tabulation of the value of the numerous transfers made from the Debtor to or for the benefit of Medallic LLC between 2009 and the petition date; the Debtor's intent in connection with such transfers; the calculation of the value exchanged, if any, for such transfers, and whether or not such value is "reasonably equivalent" to the value of the transfers…and the Debtor's insolvency." Trustee's Motion to Bifurcate Trial, Adv. Proc. No. 16-01196-CMA, Dkt. No. 25 at 6.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–35

Below is the Order of the Court.

Mint for the transfers. American Express, according to Trustee Counsel, had a significant defense which Diane Erdmann lacked, namely that it provided reasonably equivalent value to the Mint in the form of an indirect benefit by enabling the Mint to acquire goods on credit. Dkt. No. 1981 at 1–2.

Trustee Counsel's analysis relies on a misstatement of the law. The Trustee's constructive fraudulent transfer claim required him to prove the Mint did not *receive* reasonably equivalent value, not that American Express *provided* no value.[10] If the Trustee and Trustee Counsel truly believed the Mint received an indirect benefit, they should not have pursued constructive fraudulent transfer claims against Diane Erdmann.

4. <u>Plan and Disclosure Statement</u>. The Trustee and all the professionals spent significant time developing and reviewing a plan and disclosure statement. In his Application, the Trustee claimed that until April 2017, he was confident that he would be able to file a chapter 11 plan of reorganization. Dkt. No. 1926 at 10. But the Trustee did not prevail in his litigation against Medallic until April 2017. And the Trustee also asserts in his Application that unless he succeeded in that lawsuit he could not have moved forward with any reorganization plan:

> The Medallic Litigation was critical to the Trustee's ability to preserve the enterprise value of the company…If Hansen and Medallic LLC had prevailed on its claims against the Debtor, Medallic LLC would have been awarded title to assets in Dayton, and granted a considerable money judgment against the Debtor for the Debtor's use of such assets. Under those circumstances, the Trustee would have had no chance of reorganizing the Debtor's business, the Trustee would have been forced to immediately liquidate the Debtor's assets, and Medallic would have held substantial administrative claims against the estate.

Dkt. No. 1926 at 9–10.

Medallic capitulated in April 2017, so at that time the Trustee might have had a basis to begin preparing a plan and disclosure statement. Unfortunately, the business suffered a large and unanticipated loss in that same month, and the Trustee communicated to the Committee that a reorganization plan was not feasible. Dkt. No. 1982 at 4–5. As Committee Counsel succinctly stated, "[T]he Trustee was never able to maintain and stabilize the Mint's operation and revenues at a level sufficient to support the formulation and confirmation of a plan of reorganization."

---

[10] RCW 19.40.041(a)(2) and 19.40.051(a) (the Washington statute applicable to the transfers at issue) and 11 U.S.C. § 548(a)(1)(B)(i) provide a transfer made or obligation incurred by a debtor may be avoided if the debtor made the transfer or incurred the obligation "without receiving a reasonably equivalent value in exchange for the transfer or obligation.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–36

Dkt. No. 1895 at 5.  The Trustee and the professionals nonetheless devoted substantial time to drafting, meeting to discuss drafting, and re-drafting a plan and disclosure statement that were never filed.

Courts have disallowed fees incurred to prepare plans and disclosure statements when the draft plan has no realistic hope of confirmation.  *See In re Lederman Enterprises, Inc.,* 997 F.2d 1321, 1324 (10th Cir. 1993) (where inability of debtor to propose plan "should have been apparent to counsel from the commencement of the case," no compensation awarded); *accord, In re Koh),* 95 F.3d 713, 714–15 (8th Cir. 1996).  As discussed more fully below, the Court must deduct a significant amount of time spent on this task.

**C.      The Trustee's Application**

1.      <u>Trustee's Duties and Responsibilities</u>.  The Bankruptcy Code establishes several duties for a chapter 11 trustee, including:

a)      If a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper;

b)      If operating the business of the debtor, file periodic reports and summaries of the business operations;

c)      Unless the court orders otherwise, investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

d)      As soon as practicable, file a statement of any investigation conducted, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate; and

i)      As soon as practicable, file a plan, file a report of why the trustee will not file a plan, or recommend conversion of the case to a case under chapter 7, 12, or 13 of this title or dismissal of the case.

11 U.S.C. §1106(a)(1), (3), (4), and (5), and §704(a)(5) and (8).

A chapter 11 trustee owes fiduciary duties to creditors of the estate.  *In re Perez*, 30 F.3d 1209, 1214, n.5 (9th Cir. 1994).  The trustee has a fiduciary obligation to conserve the assets of the estate and to maximize distribution to creditors.  *In re Rigden*, 795 F.2d 727, 730 (9th Cir.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–37

1986).

A trustee has a substantial degree of prosecutorial discretion to sue or not to sue, but it is an abuse of discretion to bring an action to set aside an avoidable transfer if it would not financially benefit the estate. *In re Bean*, 251 B.R. 196, 204 (E.D.N.Y. 2000), *aff'd*, 252 F.3d 113 (2d Cir. 2001). In deciding whether to bring an avoidance action, "a trustee, cognizant of his fiduciary role, must avoid spurious lawsuits as well as those which, while having theoretical legal merit, would be unduly expensive to the estate, involve undue risk to the estate or likely result in minimal recovery for the estate." *In re Haugen Const. Serv., Inc.*, 104 B.R. 233, 240–41 (Bankr. D.N.D. 1989). The trustee must consider whether the probable cost of legal services or litigation would be disproportionately large in relation to the maximum probable, not possible, recovery. *Puget Sound Plywood*, 924 F.2d at 958–59; *In re Scoggins*, 142 B.R. 940, 945 (Bankr. D. Or. 1992).

2.      <u>Limits on Chapter 11 Trustee Compensation</u>.  The compensation of a chapter 11 trustee is subject to a cap.  11 U.S.C. § 326(a).  Compensation requested at the statutory rate by a chapter 11 trustee is not presumed reasonable, however, and courts must determine whether there exists a rational relationship between the amount of the commission and the type and level of services rendered by considering the § 330(a)(3) factors and a lodestar analysis. *In re Salgado-Nava*, 473 B.R. 911, 921 (B.A.P. 9th Cir. 2012).

3.      <u>The Trustee's Time</u>.  The Trustee maintained detailed time records that show he spent 2,622.6 hours administering the case through September 30, 2018.  He seeks to be paid $400 per hour, which he asserts is discounted from his "normal" hourly rate of $450.  Dkt. No. 1927 at 2.  According to another declaration from Mr. Calvert, $450 is his hourly rate for accounting-related services.  Dkt. No. 1925 at 2.  Multiplying the hours by $400 yields $1,020,365 in fees for his services.  He declared the total capped compensation under § 326(a) based on distributions is $906,310, which is the amount he seeks.

The Trustee recorded his time under 27 categories that are described in his Application. Dkt. No. 1926 at 16–22.  The Court finds all the services under the following categories were authorized, were necessary, were reasonably likely to provide an identifiable, tangible, and material benefit to the debtor's estate, are adequately documented, are reasonable within the meaning of section 330(a)(3), and are the product of reasonable billing judgment: Accounting, Bank Database, Bankruptcy Schedules, Cash Flow Management, Close of Company, Committee,

DIP, Investigation – Discovery, Investigation – Storage Inventory/Vault, Inventory, Investigation-American Express, Job Costing, Liquidation, Litigation Support, and Sale of Company. The fees requested in these categories total $311,920.

The Court finds that some time entries in certain categories do not meet the *Strand* test and the Trustee is not entitled to compensation for these services.

*Bankruptcy Administration*. Most of the time is compensable. The services described by the entries "Various emails" and "Discussion with Mike and Brian" are disallowed for inadequate documentation. The Trustee also fails to demonstrate how the time spent in discussions or meetings with "PSBJ," which is shorthand for the *Puget Sound Business Journal*, was necessary.

Amount requested: $45,210. Total deduction: $2,160.

*Claims*. Reviewing and resolving claims is an appropriate activity for the Trustee, and the Court finds that most of the time in this category is compensable. For the reasons previously stated, the time spent negotiating a settlement of the claims of the Hoffs was not necessary. *See* Section II.B.1. Discussions with and about Ms. Hoff, Mr. Hoff or the Dayton Lease after September 1, 2016 are not compensable.

Amount requested: $94,960. Total deduction: $16,280.

*Court Hearing*. Several time entries are not sufficiently documented, including "Mediation on Kasirajan," "Prep for deposition," and "Deposition" and are disallowed. And because the Trustee asserted the Dayton Lease was "bad," he fails to meet his burden to show the time preparing for and spent in Hoff litigation, including time with expert witness George Humphrey, was necessary. The Court also denies the Trustee compensation for his efforts to sell assets in early March 2018 in violation of the bidding procedures order. The Court will not reward the Trustee for conduct that was unfair and caused harm to the integrity of the bankruptcy process. Similarly, the Court disallows the time spent in June 2018 to explain the false statements made to die customers about the die settlement protocol. The Trustee should not be compensated for fixing a problem caused by his own negligent supervision of one of his few remaining employees.

Amount requested: $94,600. Total deduction: $31,360.

*Investigation*. The entries in this category include services that should be recorded under various other categories. Many of the entries reflect discussions with Trustee Counsel and other

individuals. Several entries in mid-2017 appear to relate to the lease cure litigation against the Hoffs. The entries in January 2018 all appear to be related to the fraudulent transfer litigation against Diane Erdmann. The Court notes that in October 2017, the Trustee filed his Status Report that purportedly summarized his investigations. He does not adequately explain how time entries after that date constitute investigation of possible estate assets. Nonetheless, most of the services are compensable, like the discussions and efforts to preserve documents, even if they do not constitute investigations. The Court disallows the entries relating to litigation with the Hoffs as these services were unnecessary. *See* Section II.B.2. As for the entries in January 2018 relating to the Erdmann/American Express/Insolvency litigation, these are disallowed for the reasons described below under "Investigation – Diane/Ross".

Amount requested: $14,805. Total deduction: $4,120.

*Investigation – Diane/Ross.* The Trustee had a duty to investigate potential fraudulent transfer claims, including those against Diane Erdmann. The Trustee ultimately obtained a $432,000 judgment against her. But it was also clear that, after the Court denied the Trustee's request for a pre-judgment writ, Diane Erdmann likely would have no assets to satisfy a judgment. Any recovery would require pursuit of those persons who allegedly received fraudulent transfers from her—meaning more litigation and more expense. When he was unable to settle with her after the mediation in October 2017, the Trustee should have ceased his efforts. While the *possible* recovery was hundreds of thousands of dollars, the *probable* recovery was zero. The Court concludes that it was not reasonably likely that time devoted to trying the claims against Diane Erdmann would generate a benefit to the estate and continuing to incur fees and expenses was not a reasonable exercise of billing judgment. The time incurred after October 10, 2017 (the date of the mediation) to prepare for trial, the time in trial, and time pursuing the appeal is not compensable.

Amount requested: $9,170. Total deduction: $1,720

*Investigation – FBI/US Trustee.* The Trustee was obligated to comply with valid subpoenas and to cooperate with the FBI, U.S. Attorneys, the UST, or other government agencies, and the Trustee should be compensated for this time. *In re Holder*, 207 B.R. 574, 585–86 (Bankr. M.D. Tenn. 1997) (Bankruptcy Code sections 503(b)(3)(C) and (b)(4) evidence Congressional intent to compensate those interested parties, including the trustee and trustee's counsel, that cooperate in connection with the prosecution of a criminal offense relating to a

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–40

crime associated with the debtor, the debtor's business or the debtor's property.

The Trustee, however, should not be compensated for conducting any investigation *for* the FBI, as the title of the category implies. While he may be compensated for his time spent gathering information responsive to document requests from the FBI or other government agencies, the time he spent preparing for meetings and meeting with FBI agents to provide his analysis of various matters to the FBI was neither necessary nor likely to generate a benefit to the estate.

In one of his sworn declarations, the Trustee proclaimed the United States Government issued at least ten subpoenas from April of 2016 to August of 2018 compelling his production of many documents. He also asserted the FBI made other detailed informational requests of him throughout the case. Dkt. No. 1950 at 10. The Court requested that he submit copies of the subpoenas to the Court, and the Trustee filed them under seal. The Trustee submitted only eight subpoenas dated between February 2017 and December 2017. Dkt. No. 2057. Most the Trustee's time entries reflect services *before* the date of the first subpoena.

The Trustee's time records show many calls, meetings, and communications either with the FBI about the status and progress of the case, or with others about the FBI but the descriptions do not reflect the Trustee was responding to a subpoena or document request. Only three of the time entries mention the word subpoena, and several entries reflect discussions about information requested and meetings with Mint personnel.

The Trustee contends a criminal conviction of Ross Hansen would result in restitution for his alleged victims, which would include creditors. Dkt. No. 2063 at 3–4. On April 12, 2018, a federal grand jury indicted Ross Hansen and Diane Erdmann, and a criminal action was commenced against them. Dkt. No. 1758 at 1. The Court is not convinced that the incarceration of Ross Hansen or Ms. Erdmann could benefit creditors of the Mint; even if required to pay restitution, being in prison will preclude their earning monies anytime soon.

The Ninth Circuit held in *Puget Sound Plywood* that while the lodestar approach is the primary method for calculating fees, a bankruptcy court could employ an alternative formula where it could not realistically quantify to numerical precision the lodestar calculation. 924 F.2d at 960. Here, the lack of adequate descriptions precludes a determination of how many hours the Trustee devoted to compensable services and how many he devoted to volunteering his expertise

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–41

to the FBI. Based on a review of the time entries, the Court concludes the requested compensation should be reduced by 25 percent of the time in this category.

Amount requested: $14,065. Total deduction: $3,516.25.

*Medallic*. As discussed above, the Court has concerns about the time the Trustee devoted to litigating against Medallic to acquire the Dayton Lease. But there were other issues with Medallic beyond the rights to the Dayton Lease, including the ownership of personal property used by the Mint to produce medals, coins, and other items. Medallic initiated the litigation, requiring the Trustee and his professionals to respond. The Trustee seeks compensation for 39.4 hours devoted to Medallic issues. This is a relatively small number of hours, and these services were reasonable and necessary for the administration of the case.

*Monthly Operating Reports*. The Trustee filed at least nine monthly operating reports that failed to state the Trustee had reimbursed Cascade or himself. *See* Section I.R. The Trustee should not be compensated for the time spent reviewing those reports.

Amount requested: $14,900. Total deduction: $2,720.

*Operations*. The Trustee devoted substantial time to the operations of the Mint, and all his hours are compensable except for those spent on the Dayton Lease after September 1, 2016. As of that date, Medallic had filed its lawsuit against the Trustee. Since the Trustee asserted the Dayton Lease was bad, the Trustee cannot meet his burden to show the time spent to preserve the Dayton Lease in litigation against Medallic, assume the Dayton Lease, litigate against the Hoffs to determine the Dayton Lease cure obligations, attempt to make the cures, and resolve all other Dayton Lease issues was necessary.

Amount requested: $207,245. Total deduction: $10,000.

*Plan of Reorganization & Disclosure Statement*. The Trustee asserts that among the services provided in this category, the Trustee conducted personnel reviews, performed company-wide lease reviews and negotiations, evaluated the Debtor's operations, formulated a financial model for a reorganization plan, conducted a budget plan, worked on sales order process optimization, and evaluated the possible sale of the company. Dkt. No. 1926 at 21. Most of these services should be in the "Operations" category but are still compensable.

The Court has several concerns about the hours spent drafting and re-drafting a financial model for a plan and disclosure statement that were never filed. First, the Trustee could not move forward with a reorganization unless and until he prevailed in uncertain litigation with

Medallic. Second, by the time he prevailed in April 2017, the Mint's financial condition precluded reorganization. Thus, the conditions for a reorganization plan never existed, and it was unnecessary to devote more than a modest amount of time to outline a plan in the event the right conditions materialized. The Trustee fails to meet his burden to show it was either necessary or beneficial at the time to spend many hours preparing a plan just in case the litigation was successful. It matters not if the Committee requested a plan; the Trustee and his professionals should have declined the request and explained there would be no reason to incur the costs unless and until certain events occurred.

The Court disallows time spent drafting a plan and disclosure statement, drafting financial models, and analyzing issues for a plan ($23,840) and all time incurred after April 2017 ($4,880).

Amount requested: $62,720. Total deduction: $29,270.

*Sale of Assets.* In this category, most of the time was necessary, and the fees requested are reasonable given the unusual nature of these assets. The Court, however, will not allow compensation to the Trustee for the time devoted to his second attempt to sell the dies in early March 2018. He and Trustee Counsel obtained an order approving bid procedures and then ignored the order. His conduct was unfair and improper, and he should have known that the Court would not approve a sale that violated the bid procedures. It follows that services devoted to pursuing a sale that the Court would reject were not reasonably likely to benefit the estate. Finally, the Court disallows the time spent resolving the confusion over the die settlement protocol in June 2018, as the Trustee will not be compensated for fixing a problem caused by an employee he failed to supervise.

Amount requested: $112,880. Total deduction: $7,200

*Travel.* The Trustee describes this category as time he spent traveling to local and out-of-state locations. Travel for its own sake does not benefit the estate. The Trustee has failed to explain why he took each trip, and he bears the burden to show why each trip was reasonably likely to provide a benefit to the estate. The Trustee has not provided the Court with any specific information or evidence related to this travel from which the Court could determine a benefit to the estate. The Court will disallow compensation for all travel time.

Amount requested: $25,640. Total deduction: $25,640.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–43

Below is the Order of the Court.

4.    The Trustee's Expenses.  The Trustee claims expenses of $35,389.66 but acknowledges that he already paid himself $32,389.85.  As noted above, he did not obtain Court authority to reimburse himself, nor did he identify these payments in the Summary of Disbursements in the Monthly Operating Reports.

The Trustee certainly should be reimbursed for the costs of the surety bond.  The expenses labeled "Hoff Testimony/Raymond Crook" and  "Denise Crites Photography - Video at Dayton Plant" appear to be related to the cure obligation litigation with the Hoffs.  While the Court has determined the litigation was not necessary, these were legitimate (and relatively small) expenses incurred to pursue the Trustee's position and the Court will authorize their reimbursement.  The expenses "Kent Move - Garbage Container rental and pick up" and "Utilities and Locks changed Dayton" relate to the closing of the Mint's facilities and should also be reimbursed.

But like the Trustee's request for compensation for his travel time, the expenses under "Travel"  cannot be authorized on this record.  The Trustee seeks reimbursement of $15,048.53 in Airfare, $1,540.66 in Meals, $2,071.01 in Ground, $2,181.67 in Lodging, and $540 in Miscellaneous.  These costs are not tied to any trip or any traveler.  For example, the Trustee's time records reflect one trip to Nevada in July 2016, but airfare expenses for that month total $1,432.90.  One round-trip coach ticket from Seattle to Dayton could not cost over $1,400.  If the Trustee desired approval of these travel expenses, he should have provided the details of these expenditures and explain why these costs were necessary.  The Court denies the request for reimbursement for all expenses under Travel.

Amount requested: $35,389.66.  Total deduction: $21,382.03.

In sum, the Court is reducing the Trustee's request for compensation and reimbursement by a total of $155,368.

**D.    Cascade's Application**

1.    Additional Legal Standards.  If a court has authorized a trustee to serve as an attorney or accountant for the estate under section 327(d), the court may allow compensation for the trustee's services as attorney or accountant and not for performance of any of the trustee's duties that are generally performed by a trustee without the assistance of an attorney or accountant for the estate.  11 U.S.C. § 328(b).  To allow additional compensation to be paid to other professionals who perform trustee duties allows the restriction imposed by § 326 to be

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–44

Case 16-11767-CMA    Doc 2118    Filed 10/11/19    Ent. 10/11/19 15:32:21    Pg. 44 of 85

circumvented and may allow a trustee a windfall, that is, to be compensated for work done by others. *Computer Learning Centers, Inc.*, 285 B.R. at 208.

The trustee has the burden to prove the services for which he or she seeks professional fees under section 327(d) were not duties that generally are performed by a trustee without assistance of a professional. *In re McKenna*, 93 B.R. 238, 240 (Bankr. E.D. Cal. 1988). For example, a trustee's attorney was not entitled to compensation for services performed in computing distributions, reviewing checks, preparing checks, and reviewing and organizing returned checks; even though the case involved many creditors and required more administrative work, it did not pose unique or complex legal issues. *In re J.W. Knapp Co.*, 930 F.2d 386, 388 (4th Cir. 1991).

The Trustee has requested the maximum compensation allowed under section 326. Both to avoid a windfall to the Trustee and to comply with section 328(b), Cascade must limit its request for compensation for only those services involving accounting expertise. Unfortunately, Cascade seeks hundreds of thousands of dollars for performing duties of a trustee that required no professional assistance.

2. <u>Cascade's Time</u>. Cascade requests $926,742.20 in compensation. It maintained detailed time records showing its personnel spent 5,317.83 hours on this case through September 30, 2018. The following is a list of Cascade's individual timekeepers who incurred time reflected in the billing statements, along with their titles and hourly rates:

- Mark Calvert, Principal ($350/hour)
- Charles Green, Senior ($350/hour)
- Christine Unwin, Senior Staff (and licensed private investigator) ($180/hour)
- Tod McDonald, Senior Manager with 15 plus years of experience with Cascade ($300/hour)
- Jody Cannady, a 15-year Accountant with Cascade ($120/hour)
- Marjorie Chappel, Staff ($100/hour)
- Jessica Gilmore, Staff ($100-$150/hour)

Dkt. No. 1924 at 4. Mr. Calvert charged $50 less per hour than his rate for his Trustee services in this case and $100 less per hour than his normal rate for accounting related services. In addition, the hourly rate of Mr. McDonald is discounted from his normal rate of $350. Travel for each employee was billed at half their stated hourly rate. Dkt. No. 1925 at 2.

The Application states Ms. Gilmore's rate was "$100-$150/hour." The time entries reveal that her rate increased during the case from $100 an hour, then $125 an hour, and then to $150. Cascade neither discloses when her rates changed nor provides her blended hourly rate.

Like the Trustee, Cascade timekeepers recorded their time under 27 categories. Mr. Calvert, on behalf of Cascade, describes the services in the Application and in a supplemental declaration. Dkt. No. 1924 at 5–11 and Dkt. No. 1982 at 12. Mr. Calvert declares that he reviewed the Court-ordered Cascade fee application from 2017 and moved considerable amounts of his personal time from the Cascade Application to the Trustee application in response to the Court's prior expression of concern on this issue. Dkt. No. 1982 at 11.

The Court finds all the services provided by Cascade under the following categories required expertise beyond that expected of an ordinary trustee, were authorized, necessary, were reasonably likely to provide an identifiable, tangible, and material benefit to the debtor's estate, are adequately documented, are reasonable within the meaning of section 330(a)(3), and are the product of reasonable billing judgment: Bankruptcy Schedule, Cash Flow, DIP, Job Costing, and Liquidation Analysis. The fees requested in these categories total $77,238.

The Court finds that many of the services in the remaining categories either failed to meet the *Strand* test or did not require accounting expertise, and therefore Cascade is not entitled to compensation for them.

*Accounting*. Most of the time in this category is compensable. But beginning in January 2018 (after the shutdown of the Mint's operations), there are many entries for time spent on mundane tasks, like travel to post office, travel to bank for deposits, mail pickup and sorting, and phone calls to change subscriptions. Dkt. No. 1982 at A-11–A-19. An example of a problematic entry reads as follows:

> JLQ on 1/10/18: "PO Box to pick up mail and go through. Deposit at Key Bank on way." 3.08 hours at $120.00/hour, $369.60 billed.

*Id.* at A-12. These services do not require financial or accounting expertise. The tasks may have been necessary, but they could have been performed by a trustee without assistance of a professional. The Court disallows compensation for time devoted to these tasks.

Amount requested: $90,505.40. Total deduction: $11,425.20.

*Bank Database*. This category relates to the building of a database of all cash-in and cash-out over the eight-year period before the bankruptcy filing. Cascade claims the database

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–46

was required to create storage inventory records, determine amounts owed to customers, document the Medallic transaction and payments to Medallic and Dick Bressler, and determine the level and extent of the Mint's pre-petition insolvency. Dkt 1982 No. at 12.

As noted above, it is questionable whether the professionals should have devoted so much time to determine insolvency when the analysis was used to pursue one avoidance action. The database, however, was used for multiple purposes, and the Court finds most of the time is compensable. Many entries, though, reflect time spent to "clean up" or reorganize the database by JG (Jessica Gilmore) at $100/hour. Cascade fails to show how these tasks required accounting skills and therefore the Court denies compensation for these services.

Amount requested: $103,010. Total deduction: $4,900.

*Bankruptcy Administration*. Cascade explains it assisted the Trustee with the following: (i) duties related to initial takeover of company as trustee; (ii) meetings with Ross Hansen; (iii) evaluation of the Debtor's insurance; (iv) meetings with lawyers; (v) indexing of files; (vi) compilation and review of documentation related Trustee's understanding the bankruptcy case; (vii) restriction of duties and access of employees to precious metals. Dkt. 1924 No. at 6.

First, two of the time entries reflect services before the effective date of employment (April 11, 2016) and are disallowed. Second, Cascade's summary of the services describes trustee statutory duties (taking control of operations) and clerical work (indexing files) that required no accounting expertise. Many time entries describe meetings, emails, and phone calls without any explanation of their purpose. Cascade provides no reason for having its personnel participate in weekly company conference calls or for the multiple entries consisting only of the words "Admin-Emails."

There are many other time entries reflecting services that plainly do not require accounting expertise, including the following examples:

Moving items from desk for move to Kent - 0.50 hours

Trustee insurance compliance, Admin - 0.50 hours

Bond Rider, Admin - 0.50 hours

Annette's office - 0.50 hours

Ensuring Ross's files are properly put away on forklift - 0.50 hours

Indexing Ross's files - 2.00 hours

Type up notes from Dayton - 1.40 hours

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND
MILLER NASH GRAHAM & DUNN–47

Type up notes from Dayton - 1.60 hours

Memo writing - 0.25 hours

Indexing Ross's files at K&L Gates - 4.00 hours

Indexing Ross's files at K&L Gates - 4.00 hours

Dkt. 1982-1 at 28.

It appears that some of the services in this category involved reviewing tax returns, reviewing cash flows and cash activity, and preparing fee applications, which are compensable. These time entries total $11,297. The Court disallows the balance of the time in this category.

Amount requested: $37,455. Total deduction: $26,158.

*Claims.* According to Cascade, this category reflects its time to assist the Trustee in his analysis of missing assets, conducting an analysis of storage customer claims, verifying ownership of stored inventory, and conducting proof of claim reconciliations. Dkt. No. 1924 at 7. The Court, though, does not glean any time devoted to analysis of missing assets or verification of ownership of stored inventory and can find only one entry that refers to storage customer claims. Rather, the entries reflect some time spent resolving an EEOC claim, a few hours calculating WARN Act liability, and lots of time reviewing proofs of claim.

Reviewing and resolving claims falls within the statutory duties of a trustee. With few exceptions, the time entries in this category do not reflect the performance of accounting work. Some of the tasks that clearly do not require expertise include the following:

Call with Mark regarding Bill Atalla vacation and pay check deposit dates. Call with Annette regarding vacation taken for Bill—2.08 hours

Sat with creditors as they examined the NV inventory binders. Did some entries and MOR things while waiting. Let them look through pictures of the vaults on my computer—3.17 hours

Update creditors list—1.00 hours

The Court is particularly troubled by multiple entries that state only "Proof of Claim." Ms. Gilmore spent 14 hours one day on this task. Approximately 134 hours—well over half of the total in this category—are devoted to the services described solely in this manner. Similarly, there are services described as "Proof of claim to creditor schedule reconciliation" that apparently represent time spent comparing the filed claims (there were over 3,000) with the schedules filed in the case—a task that does not requiring any accounting expertise.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–48

As for the time devoted to resolving EEOC claims, Cascade does not explain what accounting expertise was involved. And time spent negotiating a settlement of the claims of the Hoffs was not necessary. *See* Section II.B.1.

The Court will allow time devoted to storage customer claims ($400). The only other time entries that reflect any accounting work are those relating to calculating WARN Act claims. The fees for these entries total $1,624. The rest of the time is not compensable.

Amount requested: $34,127.20. Total deduction: $32,103.20.

*Close of Company.* The time entries in this category again reflect virtually no accounting work. It appears that after the Trustee shut down operations, he used his accounting company personnel to provide administrative services. JLQ (Jody Cannady's initials changed during the case) spent hours in weekly conference calls, but Cascade fails to explain how she provided any financial expertise in these calls. Most of the time entries for Ms. Gilmore clearly did not involve accounting expertise; Cascade should know that it cannot be compensated for her time attending a going away lunch, formatting and working on a list of close down procedures, picking up and sorting mail, photographing items, and labeling photographs. "Calls with Connie" also do not involve accounting and were unnecessary because the Trustee failed to show it was necessary to pursue the Dayton Lease and then settle with Ms. Hoff.

Cascade recorded time for calculating WARN Act claims in this category as well. The fees for these entries total $1,575 and are compensable. The Court denies the request for compensation for the remainder of the time.

Amount requested: $10,863. Total deduction: $9,288.70.

*Committee.* Cascade claims it assisted the Trustee in drafting reports and financial information for the Committee. Dkt. No. 1924 at 7. Time spent preparing financial information is compensable. Mr. Calvert billed 3.6 hours under this category, but none of the time entries reflect work by him to prepare any financial documents or to provide any accounting-related services. His time is disallowed. The Court also disallows the time spent by Ms. Gilmore gathering handouts (3.0 hours), acquiring bank statement (0.5 hours), and attending the meeting with creditors (5.8 hours). The first two entries reflect trustee work, and Cascade demonstrates no need to have her attend the meeting on November 29, 2016 with the Trustee *and* another accounting professional (Tod McDonald, a senior manager).

Amount requested: $20,475. Total deductions: $2,190.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–49

**Below is the Order of the Court.**

*Court Hearing*. Mr. Calvert recorded all the time in this category. In a supplemental declaration, Mr. Calvert simply asserts that he attended depositions and court hearings in his capacity as a financial advisor and attaches a schedule describing the reasons for his attendance. Dkt. No. 1982 at 12 and Exhibit M.

Cascade bears the burden to prove it was necessary for one its accountants to attend to a hearing or deposition. Of the 40.1 hours in this category, Mr. Calvert spent 17.0 hours in the depositions of Ross (presumably Ross Hansen), 4.0 hours in a deposition of Diane (presumably Diane Erdmann), and 9.6 hours preparing for those depositions. It would be necessary for an accountant to prepare questions for and/or attend a deposition if the witness testimony involves accounting issues. Here, neither Ross Hansen nor Diane Erdmann are accountants, and Mr. Calvert does not explain why an accountant needed to witness their testimony firsthand. The three entries reflecting time devoted to hearings suffer from the same deficiency—there is no information that shows his expertise as an accountant was needed or even used. The last time entry, "Numbers for Mike G for Court today," also lacks any description of a task that required any financial or accounting work. Cascade fails to show that Mr. Calvert attended hearings and prepared for and attended depositions in his capacity as an accountant for the estate rather than as the Trustee. The Court disallows all the time requested in this category.

Amount requested: $13,575. Total deduction: $13,575.

*Insolvency*. Cascade devoted hundreds of hours to conducting an analysis of the Mint's pre-petition financial condition to determine if and when the Mint became insolvent. The Trustee ultimately used the pre-petition insolvency analysis only to pursue fraudulent transfer claims against Diane Erdmann. *See* Section II.B.2. While most of the time in this category is compensable, there are many hours devoted to tasks for which Cascade cannot be compensated.

For example, Mr. Calvert spent approximately 10 hours meeting with Ms. Gilmore, who was not a CPA until the fall of 2017. *See* Dkt. No. 1950 at 13. Cascades fails to demonstrate how these meetings were necessary and provided accounting expertise to the estate. This time spent by Mr. Calvert (10 hours at $350/hour) is not compensable. The Court also denies compensation for the following time entries (which total $2,737) that reflect Cascade was providing analysis to the FBI rather than providing accounting services to the estate:

MTC - 1/12/2017 Meeting with Paul, Annette and Erin on data for insolvency analysis

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND
MILLER NASH GRAHAM & DUNN–50

and info requested by the FBI—2.50 hours

JLC - 1/31/2017  Met with Erin - Storage meeting with FBI and fulfillment—0.35 hours

MTC - 2/7/2017  Meeting with Paul on insolvency analysis and FBI meeting next week—1.20 hours

MTC - 4/26/2017  Meeting with the FBI to review findings on insolvency—4.00 hours

For reasons previously discussed, the Court will not allow time devoted to the solvency analysis in April 2018, as there was no use for the analysis after completion of the fraudulent transfer litigation against Diane Erdmann.  The fees for these entries total $390.

Finally, the Court denies Mr. Calvert's request to be compensated for 4.6 hours at $350/hour for time described as "Copied and printed out binders of information on insolvency and reasonable equivalent value."  These tasks obviously did not require any of his financial expertise and should not have been included in Cascade's Application.

Amount requested: $78,176.20.  Total deduction: $8,237

*Inventory*.  Cascade states this category includes time for taking physical inventory of precious metals in all vault locations, weighing metals, documenting location of metals, documenting ownership of metals found, and returning customer-owned inventory.  Dkt. No. 1924 at 8.

Investigating estate property is considered trustee work.  11 U.S.C. § 1106(a)(3); *In re Prairie Central Railway Co.,* 87 B.R. 952, 959 (Bankr. N.D. Ill. 1988) (investigation of assets, conduct, liabilities and financial condition of the debtor is a trustee function).  Cascade's own description and the time entries themselves confirm that Cascade was performing services typically done by trustees.  Cascade does not identify any services requiring accounting or financial expertise.  While the Trustee needed to take stock of the estate's precious metals, which turned out to be a difficult and time-consuming task, Cascade does not explain why this effort necessitated the involvement of accountants.

For example, many of the larger daily time entries reflect substantial time spent photographing, printing, and indexing information (*e.g.*, 14 hours on August 17, 2016 to "Copy original NV document discovery for Trustee's Attorney"), and none of these services require accounting expertise.  The Court estimates that these charges for clerical tasks account for at least 260 hours, amounting to approximately $27,000 in fees.

This category also includes approximately 28 hours of Mr. Calvert's time. His entries reflect communications with creditors, Trustee Counsel, the FBI, and other individuals outside of Cascade. He fails to show how his time provided accounting services to the estate, so all his time ($9,800) is disallowed. CMU (Ms. Unwin) spent 48.5 hours at $180 per hour preparing for meetings, meeting, and communicating with the FBI. Gathering and transmitting information to the FBI does not constitute accounting services, so the Court disallows this amount as well.

While he does not expressly include forensic accounting in his description of services, the Court finds that some of the time was devoted to providing an accounting analysis to be used in legal proceedings to determine the estate's ownership in certain property.[11] The Court will allow compensation for balance of the time devoted to this category.

Amount requested: $126,737.20. Total deduction: $45,530.

*Investigation*. Many of the entries by Cascade reflect services that should be recorded under various other categories, as they relate to specific litigation against Medallic and Diane Erdmann. Even though these services are denominated as "Investigation," which is typically a trustee task, most of the entries reflect analysis of financial information and are compensable.

Some of the services under this category, however, are not compensable. For example, the time spent after completion of the litigation against Diane Erdmann in January 2018 ($2,980) either was unnecessary (like the 3.0 hours by MTC to review solvency analysis on 4/16/18) or did not involve financial or accounting services and will not be allowed.

Several of Mr. Calvert's time entries also raise concerns. While some of the services may be compensable, the entries show Mr. Calvert spent a considerable amount of time in discussions with a variety of individuals but do not reflect any accounting services. He prepared for litigation, attended court hearings, and prepared depositions question, but the time records fail to demonstrate that the performed these tasks as an accountant rather than as the Trustee. The Court also disallows Mr. Calvert's time spent in "Discussion with PSBJ on theft and fraud" on May 24, 2017. Again, PSBJ is short-hand for the *Puget Sound Business Journal*, and even if he could argue an article about the Mint would benefit the estate, there is no indication Mr. Calvert spoke with the publication as an accountant rather than as the Trustee. These non-compensable time entries total $8,680.

---

[11] Forensic accounting is the application of accountancy principals to monetary issues that arise in courts, as in the apportionment of funds and of financial responsibilities upon a divorce or dissolution of a partnership. *Black's Law Dictionary* (10th ed. 2014).

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–52

Amount requested: $36,271.50.  Total deduction:  $11,660.

*Investigation-American Express*.  Most of the time in this category is compensable, including that of Mr. Calvert, who reviewed and analyzed American Express statements.  Most of the time of Ms. Gilmore, though, will not be allowed.  Her time entries, which include "getting numbers" and "cleaning up" statements and data bases, reflect no accounting or financial expertise.  These services amount to 64.5 hours.

Amount requested: $31,962.50.  Total deduction: $6,450

*Investigation – Diane/Ross*.  As noted above, the Trustee had a duty to investigate potential claims against Ross Hansen and Diane Erdmann.  But Mr. Calvert attempts to seek additional compensation for performing his trustee duties by including time in this category when none of his services involve accounting.  His time entries state he "followed up" and met with various people to discuss facts and legal strategies, reviewed memoranda, transcripts, declarations, and draft pleadings, and "dropped off" documents.  These entries describe Mr. Calvert as the Trustee supervising the investigation, not providing financial or accounting expertise.  All his time (26.5 hours, for a total of $9,275) is disallowed.

The Court also disallows three billing entries of TRM (Tod McDonald) in May 2016:

> Forensic work. Deal with Ross Hansen showing up at NWT offices unexpectedly. Research IRA creditors and summarize. Work to keep UPS account live - 5.20 hrs.

> Forensic work. Affidavits for Ross Hanson visit. Lease summary for new space. IRA account summary. Operations plan going forward - 5.50 hrs.

> Detailed review of inventory seized from Ross Hanson. Summarized and cleaned up the data, delivered to K&L Gates. Review with Darrin and Erin. Review of materials from John Drummey. Calls with K&L regarding same - 4.50 hrs.

These entries suffer from block billing.  The Court is unable to determine how much time was devoted to each task, and some of these tasks ("Deal with Ross" for example) did not involve accounting services.  Mr. McDonald's disallowed time totals $4,560.  Finally, much of Ms. Gilmore's time involved reviewing and sorting emails and cleaning up data, which do not require accounting expertise.  She also recorded time for reviewing a deposition transcript, "mediation efforts," and attending the Erdmann trial.  The application fails to explain how she provided any accounting services in connection with these tasks or why it was necessary for her to undertake these efforts.  Her disallowed time amounts to $4,940.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–53

Amount requested: $27,254.20.  Total deduction: $18,875.

*Investigation – Discovery*.  Cascade added this category when supplementing its Application to address issues raised by the Court (Dkt. No. 1982) but provided no description of the services included in it.  None of the services described in this category involve accounting.  Rather, it appears Mr. Calvert and other Cascade personnel assisted with gathering documents and responding to discovery requests issued by parties opposing the Trustee.  All time is disallowed.

Amount requested: $9,188.  Total deduction: $9,188.

*Investigation – FBI/US Trustee*.  While the Trustee has an obligation to comply with valid subpoenas and to cooperate with the FBI, U.S. Attorneys, the UST, or other government agencies, neither the Trustee nor Cascade have any duty to prepare reports, memoranda, or analyses for the FBI or the UST.  The significant number of hours spent communicating with the FBI, preparing for meetings (including 12.5 hours by Ms. Gilmore and seven hours by Mr. Calvert in the same day), and meeting with the FBI are not compensable without showing these meetings were to prepare responses to subpoenas or to provide specific assistance with a criminal investigation.

The time in this category is problematic for Cascade for another reason.  While the Trustee may be compensated for his time as Trustee spent sharing responsive information with the FBI and UST, Mr. Calvert offers no reason why he needed to use the services of accountants to gather and provide information responsive to subpoenas issued to the Mint or Trustee.   The time entries do not suggest either accounting expertise was used to identify or produce documents requested by the FBI and the UST or the Trustee could not have responded without Cascade's expertise.  And if Cascade really did provide accounting services in preparing and presenting reports, Cascade cannot expect to be compensated by the estate for spending many hours imparting accounting expertise and analysis to the FBI or the UST.

Once again, Mr. Calvert has a substantial number of hours (nearly 100) in this category.  Most of his time was spent meeting and communicating with FBI personnel and the UST and preparing for those meetings.  If Mr. Calvert spoke with government officials, he was doing so as the Trustee—there is no indication that he was acting as the estate's accountant in these communications.  The Court disallows all his time ($34,580) in this category.

Cascade may be compensated for some time devoted to responding to subpoenas issued to Cascade. As noted above, the Trustee filed copies of eight subpoenas under seal. Dkt. No. 2057-1. It appears the following five subpoenas were directed to Cascade:

1.     One dated December 6, 2017, asking for various Mint documents for the nine year-period prior to the bankruptcy filing. Of course, Cascade only had responsive documents if the Trustee moved them from the Mint to Cascade's office for review or safekeeping.

2.     One dated November 9, 2017, commanding all inventories conducted by Cascade after the petition date.

3.     One dated May 1, 2017, demanding all documents "produced to you in litigation by: Ross Hansen, Diane Erdmann, and Mike Parish/Olympic Trading Co." and copies of the Rule 2004 examinations for Ross Hansen, Diane Erdmann, and Mr. Parish. Cascade was not a party to any litigation with any of these individuals and it did not conduct any 2004 exams. If Cascade had any responsive documents, it was because the Trustee chose to locate the documents at his offices. While the subpoena is issued to Cascade, the attachment identifying the requested documents is addressed to "Northwest Territorial Mint c/o Cascade Capital Group." The attachment confirms that the Mint is the real is target of the subpoena and Cascade is merely a custodian.

4.     A second one dated May 1, 2017, seeking all Medallic Art Company (or related entities) banking records and statements. Again, even though the subpoena is issued to Cascade, the attachment identifying the requested documents is addressed to "Northwest Territorial Mint c/o Cascade Capital Group."

5.     The earliest subpoena to Cascade is dated April 12, 2017, and demands all reports regarding solvency, reasonable equivalent value, and other topics, lists of precious metals, and a variety of other information, including "[a]ll recorded calls between bullion customers and [the Mint's] bullion salespeople." Again, the attachment identifying the requested documents is addressed to "Northwest Territorial Mint c/o Cascade Capital Group." And the FBI could not know about the specific reports prepared for the Trustee unless someone told the FBI that the reports existed.

None of the subpoenas commanded or requested that Cascade create or prepare any reports, analyses, or any other documents. Thus, Cascade will not be compensated for finalizing reports requested by any of the subpoenas. And since the first subpoena was not issued to

Cascade until April 2017, the Court disallows time incurred in this category before this date. Further, Cascade's request for compensation for delivering the responsive documents is denied—the Trustee should have required the FBI to pick them up at the expense of the government, not creditors of this case.

As for time spent producing documents to the UST, Cascade has not offered any evidence that the document requests from the UST were issued to Cascade. And Cascade accountants were not needed to gather the responsive information.

The Court finds that some entries in and after April 2017, like gathering documents, reviewing Dropbox files, downloading sales recordings, producing other responsive information, and communicating with the FBI or U.S. arguably involved responding to the subpoenas issued to Cascade. These entries total $5,056.50 and the Court disallows the remaining fees requested.

Amount requested: $52,484. Total deduction: $47,427.50.

*Investigation Storage Inventory/Vault.* Cascade asserts time in this category related to the forensic rebuilding of the Mint's storage inventory records. This category also included time to reconcile accounting records with the physical inventory. Considerable time was also spent taking physical inventory of the vault. More than 3,000 pictures in Dayton alone were taken of shelves of inventory, boxes of inventory on the shelves, and the contents of each box. Dkt. No.1982 at 12.

While it was necessary to take an inventory of estate assets, Cascade offers no explanation why accountants were required to undertake these tasks. Even more problematic is that almost all the time in this category was recorded by Mr. Calvert. His entries again reflect a trustee performing his statutory duty to investigate the asset of the estate by overseeing the inventory process—lots of discussions, meetings, and following up with individuals about inventory—rather than an accountant performing any financial analysis. The following time entries are illustrative:

4/12/2016 - Issue with six boxes shipped to Nevada

4/14/2016 - Missing inventory from two weeks ago

5/7/2016 - Concerned that Ross attorney deposits are from the estate, missing cash from the vault

5/31/2017 - Discussion with Attorneys and then with Erin on ability to prove if any of the gold and silver sold was NWTM owned property

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–56

4/23/2018 - Follow up on Betty claim and supporting documentation, provided everything to David Neu and discuss possibility of an adversary proceeding

Dkt. No. 1982-1 at 72.

The Court allows compensation for two entries by Mr. Calvert (on August 25, 2016 and January 3, 2017) that appear to involve some analysis of financial information. As for the balance of the time entries by Mr. Calvert (which total 21.3 hours) and those by Ms. Gilmore and Ms. Cannady (sorting information and preparing lists and schedules), Cascade fails to demonstrate how any of these services provide accounting services to the estate and therefore the time entries are disallowed.

Amount requested: $8,864.40. Total deduction: $8,199.40.

*Medallic.* Cascade explains that it performed services related to the verification and identification of assets allegedly owned by Medallic, review and analysis of Medallic financial statements, and preparation of analysis to be presented at trial. Cascade states the Medallic litigation required a significant amount of time to confirm the flow of funds, the Debtor's insolvency, and fraudulent transfers. Dkt. No. 1924 at 9. There are again many troublesome time entries in this category.

First, Cascade devoted a large amount of time to researching and preparing a reasonable equivalent value report and an insolvency analysis in 2017. The Trustee convinced the Court to bifurcate the Medallic adversary to avoid incurring costs preparing for the fraudulent transfer claims, which included analyzing solvency and whether the Mint received reasonably equivalent value for certain transfers. *See* Section II.B.2. After the Court entered the order in December 2016, the Trustee no longer needed to expend resources to analyze these issues. The Trustee's prior representations mean these services (most of which were performed by Mr. Calvert) were not necessary, and therefore the Court disallows compensation for all this time.

Next, Ms. Gilmore has many entries called "trial prep" without identifying any financial or accounting expertise she provided. The Court disallows 18 hours of her time, which amounts to $1,800.

Over half of the entries represent time spent by Mr. Calvert. Once again, most of the time was spent acting as the Trustee overseeing litigation or performing tasks that require no accounting, as illustrated by the following examples:

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–57

6/11/2016 - Follow up with Rob on his declaration and Medallic matters, called other staff and confirmed understanding

7/1/2016 - Follow-up on customer email and info for Medallic Settlement

8/12/2016 - Review of Medallic Art complaint and logic for settlement

1/10/2017 Meeting with Mike and K&L team on preparing for Medallic Litigation

3/28/2017 Printed draft reports and organized for Mike Gearin

Dkt. No. 1982-1 at 76–78.

The Court allows compensation for a few time entries (on 2/9, 3/7, 3/8, 3/27 and 4/13 all in 2017) that reflect accounting and analysis, which total $1,225. The balance of Mr. Calvert's time ($31,290) is disallowed.

As discussed above, the Trustee and Cascade are unable to demonstrate it was necessary to litigate against Medallic to acquire the Dayton Lease. But it was necessary to litigate with Medallic over personal property used by the Mint to produce medals, coins, and other items and defend against the Medallic lawsuit. It is likely the Trustee and his professionals would have incurred substantial time even if the Trustee had abandoned any interests in the Dayton Lease. Therefore, the Court allows the balance of the amounts requested in this category.

Amount requested: $55,184. Total deduction: $35,499.

*Monthly Operating Reports.* Cascade states this time represents collecting data from accounting staff for the required operating reports, analyzing financial statement data for accuracy, and drafting write-ups of significant monthly events. Dkt. 1924 No. at 10. Neither collecting data nor drafting the monthly statement of significant events require accounting skills, and these services are not compensable. And as the Court has previously noted, at least nine monthly operating reports failed to clearly disclose the Trustee had reimbursed Cascade or himself and thus were not correct.

Preparing monthly operating reports is a statutory function of a trustee. 11 U.S.C. §§704(a)(8) and 1106(a)(1). One bankruptcy court held that when an individual served in the dual role of trustee and attorney for the trustee, that person has a higher duty to make a detailed statement of the services provided when seeking compensation for preparing monthly operating reports. *In re NWFX, Inc.*, 267 B.R. 118, 355 (Bankr. W.D. Ark. 2001). Here, most of the time entries simply state "MOR" without any explanation of the specific work done, and the Court

disallows them.  Cascade does provide detail for some of the services that went beyond clerical work, like collecting documents and drafting narratives, and those fees total $5,460.  The balance is disallowed.

Amount requested: $27,469.40.  Total deduction: $22,009.40.

*Operations*.  Cascade states the time in this category represents its efforts to assist the Trustee with understanding all departments, creating and establishing new procedures for all departments, sales training, and researching and implementing new systems and software for HR and Accounting.  Dkt. No. 1924 at 10.  Cascade, however, was not authorized to provide general assistance with operations of the Mint.  The Court authorized the Trustee to hire his own accounting firm to provide financial and forensic accounting services only.

Like "Bankruptcy Administration," this category contains very few time entries that reflect services that could be construed as accounting.  Most of the services consist of meetings, discussions, and preparing memoranda about various standard corporate issues, like human resources, medical benefits, sales, product development, and quality.  And like several other categories, many time entries either are vague or do not reflect any financial expertise, like the following:

JG 6/29/2016 - Leadership Training with Eldon McBride and staff  8.00 hrs.

TRM 7/12/2016 - Continued meetings with Dayton team 7.20 hrs.

JLC 7/22/2016 - HR Issues, morale - Jacquie 1.50 hrs.

JLQ 1/6/2018 - to/from NWTM to drop off numismatic and money for movers to Paul 1.50 hrs.

JLQ 1/8/2018 - Withdrew cash to pay Dave Huffman for driving silver to Hallmark for melting. Met Dave in Federal Way to give him payment. 1.50 hrs.

Dkt. No. 1982-1 at 83–86.

Some of the entries reflect time devoted to profitability analysis, and it is reasonable to expect the accountants to have spent some time addressing accounting issues at the Mint.  Similarly, there are a few entries relating to bank statements, substantive consolidation analysis, billing, capacity, meetings with the accounting department, and profitability, which total $5,662, and are compensable.  But for most of the entries, Cascade fails to demonstrate the Trustee could

not have performed these services without accounting expertise.  The Court disallows the balance of the time in this category.

Amount requested: $36,014.60.  Total deduction: $30,352.60.

*Plan of Reorganization & Disclosure Statement.*  Cascade explains that it assisted the Trustee in his evaluation of the Debtor's operations, formulation of a financial model for a reorganization plan, assessment of tax, and other issues relevant to the plan of reorganization.  Dkt. No. 1924 at 10.  There was no need to expend more than a nominal effort on a plan unless and until the Trustee prevailed in the Medallic litigation.  *See* Section II.B.4.

Yet Cascade devoted significant time to this endeavor.  Not only does Cascade fail to show how these services were necessary or likely to produce a benefit, many of the time entries, like "Valuation model" and "Plan of reorganization model," are inadequately documented.  Mr. Calvert has one entry with the cryptic description, "Review of Float Calculation."  Cascade provides no explanation of what it was reviewing, floating, or calculating for the plan or why the accountants needed to engage in those activities.  Some entries clearly are unrelated to either plan preparation or accounting, like "Move issues, set up" and "Hawaii terminations."

Many of the entries by Ms. Gilmore also do not reflect accounting services.  While she devoted some time to researching tax matters, she primarily created lists and participated in conference calls and planning meetings.  Cascade offers insufficient information to determine what accounting expertise she provided in connection with these services.  The Court disallows 10.5 hours of her time, representing $1,050 of the fees.

It was appropriate for Cascade to provide some assistance to the Trustee in outlining a plan in the event the rights circumstances presented themselves, so entries reflecting those services—namely, restructuring memoranda and meetings between a senior accountant (TRM) and the Trustee about overall plan issues—are compensable.  These fees amount to $5,800.  The Court disallows all other time entries through April 2017 and all time entries after April 2017, since the Trustee informed the Committee in that month that a reorganization was not feasible.  Dkt. No. 1982 at 4–5.

Amount requested: $36,965.  Total deduction: $31,165.

*Sale of Assets.*  Cascade states this category includes its efforts to assist the Trustee in the creation of the Trustee's price model for the sale of the Graco business in Tomball, Texas.  Dkt. No. 1924 at 10.  A cursory review of the time entries proves this representation to be inaccurate.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–60

The Court entered an order approving the sale of the Tomball assets on June 2, 2016. There are only three entries before that date, and only one of these makes mention of a price model. That time will be allowed. All the remaining time entries lack any reference to accounting work and, again, appear to reflect work that does not require any financial expertise: contacting potential buyers, sorting emails, drafting emails to send to customers, and meetings to address die ownership claims (which involve legal, not financial, issues). There are several descriptions of services that constitute trustee or clerical work and should not be included in an accountant's fee application:

JG 1/12/2017 - Find auctioneer expert for Mark for selling equipment in Dayton 1.50 hrs.

JG 3/14/2017 - Update email buyer list and create draft email 2.20 hrs.

JG 3/15/2017 - Call potential buyers and email interested buyer's surplus inventory/sale requirements 2.00 hrs.

JG 4/20/2018 - Sort through die ownership communication emails and create matrix with contact information 2.00 hrs.

Dkt. No. 1982-1 at 89.

Except for the one entry, all these services could have been performed without Cascade. The Court disallows all but $280 in this category.

Amount requested: $6,688.80. Total deduction: $6,408.80

*Sale of Company.* Cascade asserts this category consists of work to assist the Trustee in evaluating the possible sale of the entire company, including creating a buyers list, formulating price models, extensive correspondence with potential buyers, meeting with potential buyers, and creating and sending potential buyers requested information. Dkt. No. 1924 at 10–11. The time entries show Ms. Gilmore asked potential buyers for contact information, created lists of buyers, and sent out information—tasks that do not require accounting expertise. No time entries reflect formulation of pricing models. Like the prior category, the services described here did not require the skills of an accountant. The Court disallows all the fees in this category.

Amount requested: $2,800. Total deduction: $2,800.

*Travel.* For this category, Cascade merely states personnel spent time traveling to local and out-of-state locations. Dkt. No. 1924 at 11. Again, travel *qua* travel provides no value to the estate. Cascade carries the burden to show each trip was necessary *and* that the traveler provided

accounting services in connection with each trip. Cascade offers no explanation for why any of its personnel travelled anywhere and thus fails to meet is burden. The Court disallows compensation for all travel time.

> Amount requested: $3,432.90. Total deduction: $3,432.90.

> In sum, the Court disallows $386,874.70 of the compensation requested. Approximately $119,000 of the disallowed amount represents over 340 hours by Mr. Calvert spent on clerical tasks and performing trustee duties.

> 3. <u>Cascade's Expenses</u>. Cascade seeks reimbursement of $27,147 in expenses in several sub-categories. The first consists of travel costs (airfare, meals, ground, lodging, and miscellaneous) which amount to $5,307.09. Like the Trustee, these costs are not tied to any trip, traveler, or task. Cascade has failed to identify who, what, where, and why these costs were necessary, and therefore the Court denies reimbursement for them.

Cascade seeks reimbursement of $1,046.21 for supplies but offers no description of the items it purchased. Consequently, Cascade fails to show the expenditures were for something more than general office supplies used in this engagement and is not entitled to reimbursement. *Sousa,* 32 F.3d at 1375.

Cascade next seeks reimbursement for "Outside Data Entry" which has four sub-entries. The first is "Columbia Research – Committee Report." On its face, the expense does not appear to involve data entry but rather a report prepared by Columbia Research for the Committee. The Court is familiar with Daniel Seligman, an attorney who provides legal services through his company, Columbia Research Corp, as he has served as special counsel for trustees in several cases in this district. *See, e.g., In re Metropolitan Realty Group Inc.,* Case No. 12-15192-CMA W.D. Wash.; *In re Haddouch*, Case No. 12-15339-CMA W.D. Wash. A review of the Application reveals Mr. Calvert and Mr. McDonald of Cascade each had at least one meeting with a Daniel Seligman about "findings." Dkt. Nos. 1982-1 at 31 and 1982-2 at 24. The Court concludes the expenditure was not for data entry. The fourth sub-entry is simply labeled "PACER." PACER stands for Public Access to Court Electronic Records, an electronic public access service provided by the Federal Judiciary that allows users to obtain case and docket information online from federal appellate, district, and bankruptcy courts. Cascade offers no explanation how PACER provided data entry services. The Court disallows the reimbursement request for these two expenditures.

**Below is the Order of the Court.**

Given that these two sub-entries were not for data entry, the Court is concerned about the expenses titled "India Data Entry" and "Perfect Audit Data Entry." The Court, though, has no information that contradicts Mr. Calvert's declaration that these expenses were for data entry, so the Court will allow them. Cascade also should be reimbursed for the QB/Dropbox software, close-down supplies, and shipping costs.

Total expenses requested: $27,147. Total expenses disallowed: $13,023.95.

In sum, the Court disallows $399,898.65 of the total amount of compensation and reimbursement requested by Cascade.

**E.     Trustee Counsel's Application**

1.     <u>Additional Legal Standards</u>. Most courts addressing the issue have held an attorney for the trustee or a debtor in possession is a fiduciary of the bankruptcy estate. *In re Count Liberty, LLC*, 370 B.R. 259, 280 (Bankr. C.D. Cal. 2007) (collecting cases). Counsel for the trustee or debtor in possession must not blindly follow the instructions of the client. "If the trustee ... insists on pursuing collection efforts in a manner which is not cost-effective, then counsel should seek to withdraw or, at least, recommend that the client secure a second legal opinion." *Strand*, 375 F.3d at 859 (citations omitted). "Once it becomes reasonably obvious that the prospective costs of commencing or continuing litigation will exceed any benefit to the estate, the attorney is duty bound to abandon the claim." *In re McLean Wine Co., Inc.*, 463 B.R. 838, 851 (Bankr. E.D. Mich. 2011) (citations omitted). In *Strand*, the Ninth Circuit affirmed the bankruptcy court's reduction of compensation to trustee's counsel because the benefit to be achieved was modest compared to the fees requested; accordingly, the bankruptcy court properly focused on the lack of a beneficial result regardless of the validity or success of counsel's legal theory. *Strand*, 375 F.3d at 859.

Expenses of travel from the professional's ordinary place of business within the district to court, including reasonable mileage, tolls, and parking fees, should be reimbursed, as they are directly related to the particular matter rather than the general activities of the professional and would not have been incurred except for involvement in the case at hand. *In re Bank of New England Corp.*, 134 B.R. 450, 457 (Bankr. D. Mass. 1991), *aff'd*, 142 B.R. 584 (D. Mass. 1992)

2.     <u>Trustee Counsel Time</u>. Trustee Counsel requests $3,080,791.51 in compensation. Counsel maintained time records that show it spent 7,672.7 hours on this case through September 30, 2018. Trustee Counsel recorded its time under 31 categories. Dkt. No. 1928 at 7–19.

In its April 2016 employment application, Trustee Counsel asserted the following timekeepers would provide most of the services at the following rates:

- Michael Gearin                    $525.00
- David Neu                         $430.00
- Brian Peterson                    $335.00
- Denise Evans, Paralegal           $205.00

Dkt. No. 56 at 2.  The Court is familiar with these individuals as having experience in bankruptcy matters.  Unfortunately, Trustee Counsel neither identifies the rest of the people who recorded time in this case nor provides a list and hourly rates of the remaining timekeepers. Reviewing the Application, the Court estimates that at least another 75 individuals recorded time on the Application.  For example, a Thomas S. Miller recorded about 85 hours between April 11 and April 30, 2016.  Trustee Counsel did not identify Mr. Miller in the employment papers and provides no information on his role or experience.  As for the many other individuals, the Court is left to guess whether they are partners, associates, legal assistants, electronic discovery analysts, legal librarians, or something else.

The Application also fails to identify the changes in hourly rates during the case.  Mr. Gearin charged $525/hour at the outset and raised his rate to $540/hour by September 2018.  Dkt. No. 1929-2 at 10 and 939.  There is nothing wrong with a professional increasing his or her rate, but an applicant should clearly identify changes in the request for compensation.  *See Appendix B: Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under United States Code by Attorneys in Larger Chapter 11 Cases*, 78 Fed. Reg. 116, 36251 (June 17, 2013); *Computer Learning Centers, Inc.*, 285 B.R. at 236 ("Changes in rates must be conspicuously disclosed in the notice of the fee application sent to creditors and clearly identified and discussed in the fee application itself.").

Trustee Counsel's decision to not identify the timekeepers and their rates is perplexing, as the firm routinely includes this information in fee applications filed in this district.  *See, e.g., In re Meridian Mortgage Investors Fund V, LLC*, Case No. 10-17952, U.S. Bankruptcy Court, W.D. Washington, Dkt. No. 476 (application includes list of timekeeper initials, name, title, and hourly rate*); In re Coast Crane Company*, Case No. 10-21229, U.S. Bankruptcy Court, W.D. Washington, Dkt. No. 387 (same); *In re Kates*, Case No. 09-10188, U.S. Bankruptcy Court, W.D. Washington, Dkt. No. 291 (same).  The failure to provide this basic information prevents

**Below is the Order of the Court.**

the Court from determining whether Trustee Counsel met its burden to prove the hourly rate and hours charged by the unidentified individuals are reasonable. *Hensley,* 461 U.S. at 437.

The Court finds all the services under the following categories were authorized, necessary, were reasonably likely to provide an identifiable, tangible and material benefit to the debtor's estate, are adequately documented, are reasonable within the meaning of section 330(a)(3), and are the product of reasonable billing judgment: Fee/Employment Objections, Financing and Cash Collateral, Cohen v. Hansen, NW Territorial Mint et al. King County Case, David T. Achord v. NW Territorial Mint, LLC USBC Adv. Case, Trustee v. ARM Industries LLC, and Meeting and Communications with Creditors. The fees requested in these categories total $146,144. The Court also notes that many time entries in various categories reflect travel and parking to attend hearings. These services are compensable and the expenses should be reimbursed. *Bank of New England Corp.*, 134 B.R. at 457. The fees requested in the following categories require further analysis.

*Asset Analysis & Recovery.* Trustee Counsel states fees in this category include work in the identification and preservation of assets of the Mint, assessment of relationships with creditors, resolution of garnishment issues, initial assessment of the relationship between the Mint and Medallic, and assessment of insurance coverage issues. Dkt. No. 1928 at 7–8.

These services are compensable. A substantial amount of time, though, was provided by timekeepers for whom Trustee Counsel has provided no information (Miller, Masters, Coonrod, and Perez-Vargas).[12] The Court disallows their time.

Amount requested: $141,981. Total deduction: $24,038.50.

*Asset Disposition.* Fees in this category were related to sales of assets by the trustee and the filing of motions seeking authority from the Court. Dkt. 1928 at 8. Trustee Counsel seeks $456,257 for assisting with sales that generated $3,370,000.

First, the Court disallows the time devoted to the break-up fee hearing in July 2016. There was a contested hearing because the Trustee instructed the jilted bidder to file an inflated request and then Trustee Counsel spent multiple hours opposing it. This conduct cannot be rewarded. The time devoted to these tasks total $6,082.50.

---

[12] Christopher M. Wyant recorded time under this category and many others. The Court is familiar with Mr. Wyant, and he appeared before the Court a number of times in this case.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–65

Second, the Court disallows most of the time spent on the failed sale to Gary Anderson/Eureka Metals at the end of 2017. The Trustee never obtained any earnest money from this buyer, who obviously lacked the resources to close the sale as evidenced by his "Go Fund Me" page to raise the down payment. Trustee Counsel spent many hours in November and December revising a purchase and sale agreement and drafting and re-drafting a sale motion and bid procedures. Unless and until the Trustee had some assurances that the buyer was "real" it was not necessary to continue to revise agreements and motion papers. The Court disallows a total of $15,326 for these tasks.

Third, the Court disallows all time related to efforts to obtain approval of the first asset sale to Medalcraft in mid-March 2018. The Trustee violated the Court-approved bid procedures, and Trustee Counsel assisted these misguided efforts. *See* Section I.N.2. The time devoted to these tasks total $14,944.50.

Finally, the Court disallows the time spent addressing the false statements made to dozens of customers about the die settlement protocol. *See* Section I.P.5. The estate should not pay for the Trustee or his professionals to fix the problem he caused. These fees amount to $983.

Amount requested: $456,257.50. Total deduction: $37,336.

*Business Operations.* Fees in this category relate to the assessment of payroll and insurance issues, engagement with certain custom mint customers about delivery and contract issues, addressing issues with credit card payment firms, addressing certain landlord issues with performance obligations under real property leases, addressing notifications to insurers, and the employment of a production manager for the Dayton facility. Dkt. No. 1928 at 22.

Generally, this time is compensable. But there are eight timekeepers (two named Miller, Scheuermann, Thibadeau, Spilsbury, Locher, Smith, and Tibbert) for whom Trustee Counsel has provided no information. It appears that four of these people conducted research and provided advice on insurance coverage issues. The Court would expect bankruptcy counsel to consult with other attorneys in the firm with insurance coverage expertise, but the Court has no information to determine whether the rates they charged and time they spent are reasonable.

Amount requested: $80,982. Total deduction: $43,544.

*Case Administration.* Fees in this category include on-going communications with the Trustee about administration of the bankruptcy case, preparation of bankruptcy schedules and statements of financial affairs, preparation for and attendance at the initial meeting of creditors,

assistance with the preparation of initial pleadings, working with the Trustee to coordinate communications with creditors via a hosted website and via other means, and assisting the Trustee in preparations for and attendance at the initial status conference as ordered by the Court. Dkt. No. 1928 at 9. Most of these services are compensable, but there are some exceptions.

First, since Trustee Counsel was employed *nunc pro tunc* to April 11, 2016 (Dkt. No. 60), services provided before that date will not be compensated. The Court disallows $2,798.

Second, for reasons previously stated, the Court disallows the time spent addressing the false statements made to customers about the die settlement protocol in June 2018. The non-compensable time totals $12,912.50.

Finally, the Court disallows the time of the unidentified timekeepers (Miller, Stockert, Whitington, and Tibbert).

Amount requested: $228,067. Total deduction: $18,269.

*Claims, Administration and Objections.* Fees in this category include analysis of claims, work on claims databases and consultations with creditors on the filing of claims, an analysis of priority and secured claims of taxing authorities, addressing administrative claims of the Tomball, Texas landlord, filing a motion for an administrative claims bar date, representing the Trustee on WARN Act claims, and resolving other significant administrative claims. Dkt. 1928 at 9–10.

In general, the time devoted to the tasks in this category was reasonable and necessary. The Court notes a significant number of hours devoted to reviewing and cataloguing proofs of claim. This time is compensable, as it is reasonable to expect the attorneys to understand the nature of the claims asserted against the estate and then advise the Trustee on options for reorganization or liquidation.

Again, there is significant amount of time by unknown individuals (Miller, Masters, Short, Smith, Tausend, Groshong, Watson, and Madden) and the Court disallows their compensation.

Amount requested: $184,548. Total deduction: $14,652.50.

*Employee Benefits/Pensions.* Fees in this category principally involved assessment of employee benefits including vacation and health insurance as well as initial assessment of potential WARN Act issues. Dkt. No. 1928 at 10. These services provided a benefit to the

estate. But the Court must disallow the time of the unidentified individuals (Groshong, Filipini, Miller, and Spillotis) in the absence of information on their status.

Amount requested: $13,747.50. Total deduction: $4,006.50.

*Fee/Employment Applications*. There is one entry for time ($1,207.50) before April 11, 2016, that must be disallowed. The Court also disallows compensation for the services provided by unknown timekeepers (Smith and Mather) which total $1,376. Otherwise, the time in this category is compensable. The appropriate people spent a reasonable number of hours on the fee applications, which were complicated and involved a substantial number of time entries, on motions to approve employment agreements, and on applications to employ professionals.

Amount requested: $74,457. Total deduction: $2,583.50.

*Litigation*. Trustee Counsel addressed 15 pending lawsuits or threatened lawsuits, analyzed potential litigation claims, took Rule 2004 examinations, responded to Rule 2004 exam motions brought by Medallic, and addressed alleged efforts by Ross Hansen to interfere with administration of the estate. Dkt. 1928 No. at 11.

First, the hours of the unknown timekeepers (Pinch, Stockert, Miller, Soskin, Duncan, Drake, Diersen, Slavik, and Connor) are disallowed. This time totals $18,761.50.

Second, the Court estimates that approximately $41,000 in time under this category was devoted to the motion to hold Ross Hansen in contempt for violating the stay. Dkt. No. 1980-1 at A-62–64. Trustee Counsel has also recorded time devoted to the same task under the category "Relief from Stay" that amounts to roughly another $24,000. Dkt. No. 1980-1 at 114. The Court noted in its oral ruling on the motion that the conduct about which the Trustee complained had ceased when he filed the motion. Most of the time was spent on discovery after Trustee Counsel filed the motion. The Court concludes that it was not necessary to pursue the motion to the end and Trustee Counsel did not exercise reasonable billing judgment. The Court disallows compensation for most of the time incurred after Trustee Counsel filed the motion (June 28, 2016), which amounts to $38,998 in this category.

Amount requested: $115,235. Total deduction: $57,759.50.

*Trustee v Medallic Art Co LLC*. The greatest number of hours in this category were devoted to litigating with Medallic over ownership of the rights to the Dayton Lease and to many business assets. In its lawsuit against the estate, Medallic not only asserted ownership of certain assets but claimed the Mint owed it substantial amounts for leasing the personal property.

Trustee Counsel includes over $490,000 in this category.  In addition, Trustee Counsel later explains that approximately $196,000 of the fees and costs recorded under "Electronic Discovery Fees and Costs" relate to the Medallic litigation.  Dkt. No. 1928 at 19.  That amounts to nearly $700,000 in legal fees spent to battle with Medallic.

First, the Court disallows the time entries of unidentified timekeepers (Miller, Greenswag, Bassetti, Hoefer, Jacobson, Nylen, Anderson, Mawhinney, Connor, Slavik, and Gracey) which total $13,227.

Second, the Court disallows all time specifically devoted to the Trustee's summary judgment motion on the tenant's rights under the Dayton Lease.  Trustee Counsel fails to demonstrate it was reasonable or necessary to pursue control of a lease that counsel stated was "bad."  The entries devoted to these efforts amount to $28,192.50.

While the fees and costs associated with the Medallic Litigation were substantial, the Court agrees with Trustee Counsel that the Trustee was compelled to defend the claims asserted by Medallic and prosecute his counterclaims at least with respect to the physical assets at issue.  Medallic sought the allowance of a pre-petition claim of nearly $1.8 million, to recover post-petition lease, royalty payments exceeding $21,000 per month, and damages for conversion.  *See* Proof of Claim No. 2981-1.  The Trustee and Trustee Counsel had little choice but to incur litigation costs to repel these claims and to quiet title to assets the Trustee eventually sold.  The Court allows the balance of the requested amount.

Amount requested: $490,371.  Total deduction: $41,419.50.

*Trustee v. Diane Erdmann*. Fees in this category include those incurred in the investigation of Diane Erdmann's exercise of control over and appropriation of assets of the Mint in the period preceding its chapter 11 filing, the investigation of the inventory management and recordkeeping done by Diane Erdmann to determine if she or Ross Hansen diverted any estate assets, and in the evidentiary hearing to determine ownership of the advanced fee deposit held by Tracy.  Dkt. No. 1928 at 14.

While some creditors have complained that Trustee Counsel spent nearly $200,000 to collect the balance of the fee deposit (which was $125,000), that criticism is unfair.  The Trustee had a duty to determine whether estate assets had disappeared.  The company inventory records were incomplete, requiring substantial time and effort to determine what happened to millions of dollars in precious metals.  Given that Diane Erdmann oversaw the vault and surveillance videos

showed her and Ross Hansen removing items from the company vault on the eve of the bankruptcy filing, it was reasonable to investigate the conduct of Diane Erdmann. The fact that the Trustee was not successful does not warrant denial of compensation to Trustee Counsel for its necessary efforts that could have yielded far more than the $125,000 fee deposit. The Court also notes that virtually all the time after April 2017, which totals approximately $35,340.50, should have been recorded under "American Express Fraudulent Transfer Action", so the fees devoted to litigating over the fee deposit and mission items are closer to $162,000.

The Court disallows the time of unidentified attorneys (Tausend, Steidl, Wolf, and Slavik), which totals $3,214.50. For reasons explained in the discussion of "American Express Fraudulent Transfer Action" category below, the Court also disallows all the fees incurred after October 12, 2017, which total $11,062, as these were unnecessary services devoted to futile litigation.

Amount requested: $197,724. Total deduction: $14,276.

*EEOC v NW Territorial Mint, LLC USDC Case.* Fees incurred in this matter are related to an enforcement action brought against Mint by the United States Equal Employment Opportunity Commission. The services in this category were necessary and the time appears reasonable, but the Court must disallow the entries of the unknown timekeepers (Hurley and Spillotis).

Amount requested: $37,462. Total deduction: $3,422.50.

*State of NV v Hansen, NWTM et al, Nevada State Court Case.* Fees incurred in this matter relate to an action that was pending in the State of Nevada at the commencement of the Mint's bankruptcy proceeding in which the Nevada Department of Environmental Protection sought a substantial judgment against the Mint for violation of environmental regulations. The services in this category were necessary and the time appears reasonable, but the Court disallows the entries of the unknown timekeepers (Whittington and Bjorkman).

Amount requested: $4,421. Total deduction: $275.50.

*American Express Fraudulent Transfer Action.* Services in this category include research on and related analysis of potential fraudulent transfer claims against Diane Erdmann, which included reviewing and analyzing voluminous credit card statements. Trustee Counsel states the fees amount to $254,758, but the actual total exceeds $289,000 when the time from the "Trustee v. Diane Erdmann" category is included. In addition, a significant amount of the time under the

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–70

category "Electronic Discovery Fees and Costs" was devoted to the fraudulent transfer adversary proceeding against Diane Erdmann. Dkt. No. 1928 at 19.

According to the Trustee's own motion for a prejudgment writ of attachment, he identified a maximum of $275,000 in assets that would be available to satisfy a judgment against Diane Erdmann. Once the Court denied the prejudgment writ request, continuing the litigation against Diane Erdmann was of questionable benefit. The Trustee did attempt to obtain something from her via mediation on October 12, 2017. When those efforts failed, Trustee Counsel had a duty to cease pursuit of claims against her—it should have known the costs of proceeding surpassed any probable return. While Trustee Counsel did obtain a sizable judgment, they have collected nothing. The Trustee attempted to realize on some precious metals she may own, but she filed bankruptcy on the eve of the hearing. Dkt. No. 2092 at 42. Trustee Counsel's prediction that without a prejudgment writ the Trustee would likely not recover on any judgment proved to be accurate; by plowing ahead with the lawsuit all the way through trial and then an appeal, Trustee Counsel failed to exercise reasonable billing judgment.

The Court disallows all fees incurred after mediation failed on October 12, 2017, which amount to $106,262.50. The Court also disallows the entries of the unidentified timekeepers (Miller, Wolf, Steidl, Tausend, and Hoefer), which total $31,116.

Amount requested: $254,748, Total deduction: $137,378.50.

*Plan and Disclosure Statement*. First, the time of unidentified timekeepers (Miller and Nylen), which totals $2,147, is disallowed. Second, as noted previously, work on a plan and disclosure statement was premature unless and until the Trustee obtained a favorable ruling in the Medallic litigation. And by that time that ruling occurred, the Trustee had determined that a plan of reorganization was no longer feasible. The Court also notes that the time entries reflect Trustee Counsel was simultaneously drafting both a plan of liquidation and a plan of reorganization. Trustee Counsel thus was billing time for every contingency without regard to whether the outcome was likely. Trustee Counsel cannot meet its burden to demonstrate that devoting over one hundred hours to drafting and revising a plan and disclosure statement was necessary or reasonably likely to produce a benefit to the estate.

Time spent analyzing potential use of net operating losses and other plan issues were necessary to provide guidance to the Trustee, and the time ($3,320.50) is compensable. The

Court disallows the remaining time spent drafting, editing, and meeting to discuss drafting and editing a plan or disclosure statement.

Amount requested: $41,571.50. Total deduction: $38,251.

*Relief from Stay and Adequate Protection*. Fees in this category are principally related to the defense of relief from stay motions brought by the Tomball, Texas landlord and the Hoffs, and for pursuing the estate's motion seeking a finding of contempt against Ross Hansen for violation of the automatic stay.

While most of the time is compensable, the Court denies compensation for services related to the Hoffs' relief from stay motion because they brought the motion after the Trustee assumed the lease. Since Trustee Counsel argued it was a "bad" lease and the Trustee had another option, Counsel is unable to show that it was necessary to litigate and resolve the consequences of defaulting on a lease the Trustee did not need to assume. The Court determines these fees total $7,741.50.

Amount requested: $56,803.50. Total deduction: $7,741.50.

*Tax Issues*. The services in this category are compensable, but the Court must disallow the time of unidentified timekeepers (McClellan, Kelley, Almquist, and Mobley).

Amount requested: $30,949.50. Total deduction: $20,065.

*Assumption and Rejection of Leases and Contracts*. Fees in this category include addressing the disposition of multiple leases including the Federal Way, Auburn, and Tomball leases, bringing a motion to assume the Dayton Lease, and litigating lease cure obligations with the Hoffs. Dkt. No. 1928 at 18. Again, Trustee Counsel fails to meet its burden to show it was necessary to assume the Dayton lease and then to litigate the lease cure issues given its contention that the lease was not necessary because the Trustee had another option. The Court disallows all time related to these endeavors.

Amount requested: $211,870. Total deduction: $156,433.50.

*Avoidance Action Analysis*. The services in this category are compensable, but the Court disallows the time of unidentified timekeepers (Miller and Ray).

Amount requested: $20,234.50. Total deduction: $4,316.

*Real Estate*. Again, the services in this category are compensable, but the Court must disallow the time of an unidentified timekeeper (McClellan).

Amount requested: $3,119.50. Total deduction: $1,963.50.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–72

*Reporting*.  Trustee Counsel devoted 26.2 hours to assisting with and reviewing the Trustee's monthly operating reports, which amounts to less than an hour a month.  While there were errors and incorrect statements in at least nine reports, counsel was not responsible for these misstatements. No time is disallowed.

*Intellectual Property Advice and Trademark Registration*.  Once again, the services in this category are compensable, but the Court disallows the time of unidentified timekeepers (Jacobson, Schermer, Carlson, and Edmondson).

Amount requested: $5,278.  Total deduction: $2,256.50.

*Electronic Discovery Fees and Costs*.  These fees (the costs are actually listed under "Expenses") relate to the collection and preservation of records of the Debtor, and the gathering and production of records in response to discovery requests under BR 2004 orders and in litigation.  Dkt. No. 1928 at 19.

First, none of the timekeepers in this category have been identified by Trustee Counsel. Second and more importantly, Trustee Counsel has not divided legal services into categories as required by the Local Rules.  Given that the Court is disallowing some of the fees related to certain litigation, it must know which electronic discovery services were in pursuit of non-compensable activities.  Trustee Counsel's failure to segregate these time entries prevents this Court from determining if Trustee Counsel has met its burden to show that the services were necessary and reasonable.  The Court disallows all fees in this category.

Amount requested: $269,937.01.  Total deduction: $269,937.01.

In sum, the Court disallows $899,936 of the fees requested by Trustee Counsel.

3.  <u>Trustee Counsel Expenses</u>.  Like the time under Electronic Discovery, Trustee Counsel did not allocate most of its expenses to any categories.  Some of the expenses are identified as related to Electronic Discovery (matter no. 77100), and these amount to $15,599. But Trustee Counsel recorded most of the expenses under a single matter number labeled "Costs" (99999).  Trustee Counsel does not divide the expenses into categories, leaving it to the Court to go through every line item to determine the amounts spent online research, meals, court fees, and other expenses.

The failure of Trustee Counsel to comply with the Local Rules is again perplexing; Trustee Counsel established separate matter numbers for each category, so individuals could have recorded each expense under the appropriate category.  Instead, Trustee Counsel submits

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–73

over $156,000 in expenses under one general category, leaving it to the Court to figure out which costs supported which tasks.

The Court estimates that in addition to the $15,600 in electronic discovery costs, Trustee Counsel spent approximately $67,000 on Westlaw searches, $3,275 on CD roms, $13,193.05 on BAE Systems Information, and $19,990 on court reporter fees. These are extraordinary expenses, and Local Rules require the Trustee Counsel to explain the necessity for each. Unfortunately, Trustee Counsel fails to provide adequate documentation for its request. Consequently, Trustee Counsel is unable to meet its burden to show the extraordinary expenses were necessary, and the Court denies reimbursement of those costs.

Requested amount: $172,745.23. Total deduction: $119,159.

In sum, the Court disallows a total of $1,019,095.11 from the amounts requested by Trustee Counsel for compensation and reimbursement.

**F.      Committee Counsel's Application**

1.      <u>Additional Legal Standards</u>.  An attorney for an unsecured creditors' committee appointed by the bankruptcy court does not owe a duty of care to individual committee members. *Schultze v. Chandler*, 765 F.3d 945, 950 (9th Cir. 2014).  Counsel for a committee does, however, undertake the obligation to represent the interests of the entire class fairly.  *Pension Ben. Guaranty Corp. v. Pincus, Verlin, Hahn, Reich & Goldstein Professional Corp.*, 42 B.R. 960, 963 (E.D. Pa. 1984).

Counsel for a committee, like counsel for a trustee, must engage in a cost benefit analysis when billing its time.  In *Puget Sound Plywood*, *supra*, the Ninth Circuit affirmed a fee award of one third of the requested fees where the attorney for an Unsecured Creditors' Committee incurred more fees than the likely recovery. The Ninth Circuit held that counsel for the Committee had "an obligation to consider the potential for recovery and balance the effort required against the result that might be achieved." 924 F.2d at 961.  *See also In re Auto Parts Club, Inc.*, 211 B.R. 29, 33–34 (B.A.P. 9th Cir. 1997) (affirming bankruptcy court's decision to reduce committee counsel's fees when counsel did not scale back its services once the decision was made to sell the debtor's assets, especially in light of the fact it was unlikely unsecured creditors would receive a distribution even at the highest possible estimated sales price).

**Below is the Order of the Court.**

2.    <u>Objections by Committee Members</u>.  Notably, not one member of the Committee has submitted a statement in support of the Application.[13]  The Pehls and William Hanson do not object to any specific time entries in any categories but generally object to Committee Counsel's Application because of alleged failures to represent the interests of the Committee.

First, they charge Committee Counsel improperly disclosed Committee member communications to the Trustee.  Committee Counsel contends his transmission of William Hanson's letter did not constitute an improper disclosure of confidential information, since William Hanson himself had intended—and demanded—that the letter be filed with the Court as a public document.  Dkt. No. 1979 at 6.  The Court agrees that Committee Counsel did not violate the duty to preserve attorney-client communications, since William Hanson did not expect the communication to remain confidential.  But Committee Counsel's decision to not file it but instead share the letter with Trustee Counsel is troubling.  If Committee Counsel believed it was a poor idea to file the letter, he should have told William Hanson or, at most, done nothing with it.

The Pehls also allege Committee Counsel did not apprise the Court of Committee opposition to, or concerns with, actions of the Trustee, like hiring Mr. Atalla.  The Court reviewed the minutes of the meetings and other documents provided by the Pehls.  These documents show there were conflicts among members.  The Court finds insufficient evidence to support the charge the Committee Counsel misrepresented to the Court any decisions of the Committee.

Next, the Pehls assert Committee Counsel failed to represent Committee members against improper contacts and overreaching conduct by Trustee and Trustee Counsel.  The evidence suggests the Committee Counsel neither treated all Committee members fairly nor defended them from the Trustee.  First, as noted above, Committee Counsel ignored William Hanson's request to file his letter and instead sent it to Trustee Counsel—attorneys for the person Mr. Hanson clearly perceived as an adversary—without consulting him.  Next, Committee Counsel allowed the Trustee to exclude the Pehls from participating in at least one Committee meeting based on the charge they had not provided certain documents to Trustee Counsel—a charge that was false.  Finally, Committee Counsel also solicited assistance from the Trustee and Trustee

---

[13] In a responsive brief, Committee Counsel inserted an excerpt of an email from the Chair of the Committee that contains the line, "I have no problem with your fees." *See*, Dkt. No. 1943 at p. 7.  Contrary to the assertion of Committee Counsel, this excerpt does not constitute a statement on the record by the Committee member.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–75

**Below is the Order of the Court.**

Counsel to remove the Pehls from the Committee.

The UST has the authority to appoint as well as remove members of official committees. *In re America West Airlines*, 142 B.R. 901, 902 (Bankr. D. Ariz. 1992). A bankruptcy court can modify committee membership only if it finds the UST abused its discretion when selecting committee members. *In re Pierce*, 237 B.R. 748, 754 (Bankr. E.D. Cal. 1999). It follows that unless and until the UST removes a member of a committee, no one can preclude that member from participating in committee activities. If Committee Counsel truly believed a Committee member was breaching a fiduciary duty to the creditors, Committee Counsel had an obligation to report the conduct to the UST or the Court. It was improper for Committee Counsel to act in concert with the Trustee and Trustee Counsel to remove or marginalize certain Committee members or to prevent certain members from participating in Committee activities.

The Pehls and William Hanson also complain that after spending significant time to obtain an accountant, Committee Counsel did not allow the accountant to conduct a forensic audit of the Trustee's work. The minutes of the Committee meetings, though, do not reflect a decision by the Committee that the accountant should have undertaken that endeavor. While there are written communications from the Pehls and other Committee members to Committee Counsel expressing a desire that someone audit the Trustee's work (*see, e.g.*, email from David Pettys, Dkt. No. 1979-1 at 14), there is no evidence showing Committee Counsel thwarted a request by the Committee to have the accountant undertake that endeavor after she was engaged in late April 2017. This was the Mint's catastrophic month that dashed any hopes of a reorganization, so unleashing an accountant on the Trustee at this time likely would have yielded little benefit to creditors.

Finally, the Pehls and William Hanson allege Committee Counsel's consistent support for the decisions of the Trustee prove that Committee Counsel worked for the Trustee rather than the Committee. The evidence does not support their claim. Given that the interests of the Trustee and the Committee—maximizing the return to creditors—were aligned, it is not surprising that Committee Counsel recommended the Committee follow the Trustee's lead on most matters.

3. <u>Committee Counsel Time</u>. Committee Counsel requests $384,137 in compensation. It is not seeking reimbursement for any expenses. Committee Counsel identified the primary timekeepers who provided the legal services:

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–76

Mark D. Northrup - $475-$500/hour

Geoffrey Groshong - $500/hour

John Knapp - $450/hour

These are the ordinary rates these individuals charge for similar services. Dkt. No. 1895 at 13. The Court is familiar with all three of these experienced bankruptcy lawyers. The Application includes time of two other individuals with whom the Court is familiar: Jesus Palomares, who is a bankruptcy attorney, and Kalen Daniels, who is a bankruptcy paralegal. Committee Counsel includes time of one person, Emily Krisher, but provides no information on this timekeeper, and the Court denies compensation for her time.

Committee Counsel divided its services into seven categories. The Court finds and concludes services described in the following categories meet the *Strand* test: Asset Analysis & Recovery, Asset Disposition, Claims Administration & Objections, and Communications with Non-Committee Creditors. The fees described in these categories (excluding $1,690 for the time of Ms. Krisher) total $22,040 and are compensable. The following categories either contain problematic entries or require further discussion.

*Case Administration*. Most of the services are compensable, as the Committee Counsel was required to gather information to advise the Committee and communicate with creditors, analyze and understand certain contested matters and sale motions, and discuss various options with the Trustee, Trustee Counsel, and others. The Court closely examined the time entries after April 2017, when Committee Counsel was informed that no reorganization was likely, and after December 2017 when the Trustee shut down the Mint operations. The Court finds that, for the most part, Committee Counsel reduced its participation in the case after these events. The exception is the time devoted to the Trustee's asset sales in February and March 2018. There was no prospect of any distribution to unsecured creditors, so it was unnecessary to prepare for and attend auctions and hearings on sale motions. The Court denies compensation for these tasks, which total $5,152.

The Court also disallows compensation for the time entry "Attend hearing on Trustee's motion for contempt" (3.5 hours). Committee Counsel criticizes Trustee Counsel for pursuing contempt charges against Ross Hansen. The Court agrees it was not prudent to pursue those charges to the end, and it was equally imprudent for Committee Counsel to attend the hearing.

The Court also reviewed the entries reflecting one or more Committee Counsel attorney attending a hearing or other event. Given the magnitude of the claims and issues in this case, it was appropriate for at least one and sometimes two attorneys to attend some proceedings, like the first meeting of creditors, as two attorneys might be needed to take separate actions on the information gleaned at the meeting. The Court notes both Mr. Groshong and Mr. Northrup attended hearings on the motion for partial summary judgment in the Medallic litigation (the latter recorded his time under "Communications and Meetings with Creditors Committee"). The Committee was not a party to the adversary proceeding, and there was no need to have two lawyers sit and listen. The Court disallows the time of Mr. Groshong ($2,400) in this category.

The Court disallows the time devoted to communications with the Trustee and Trustee Counsel about Committee personnel issues. As discussed above, the Court finds it was improper for Committee Counsel to work with others to undermine members of the Committee. This time amounts to $882. In addition, four entries totaling $600 containing any variation of the description "Analyze case issues" are vague and do not identify the specific tasks, precluding the Court from finding the services were necessary. Finally, Ms. Krisher's time (totaling $364) is disallowed.

Amount requested: $145,692. Total deduction: $9,398.

*Communications and Meetings with Creditors Committee.* The record reflects that this Committee required a substantial amount of work from Committee Counsel. With limited exceptions, the Court finds that time entries reflect communications that were necessary for the representation of the Committee. The exceptions are the entries reflecting communications with the Trustee or Trustee Counsel on Committee personnel issues in March 2017. Again, Committee Counsel will not be compensated for any time spent to undermine certain Committee members. Those fees amount to $833. Ms. Krisher's time (totaling $1,040) also is disallowed.

Amount requested: $119,550. Total deduction: $1,873.

*Employment of Professionals and Fee Applications.* While significant time was spent on the engagement of Ms. Barrick, Committee Counsel explains the process involved talking to and meeting with several candidates. Dkt. No. 1895 at 9. All of time entries reflect necessary services for which reasonable compensation is sought. The Court finds the services described in this category meet the *Strand* test.

In sum, the Court disallows $11,271 from the compensation requested.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–78

**G.     Additional Reductions from the Applications**

Violations of professional ethics or breaches of fiduciary duties permit a reduction, denial or forfeiture of compensation or other sanctions.  *In re DiLieto*, 468 B.R. 510, 540 (Bankr. D. Conn. 2012).  Courts depend upon the candor of the parties and their counsel.  *In re Original Designer Homes, Inc.,* 2012 WL 3821888, at *5 (Bankr. S.D. Tex. 2012).  When professionals misrepresent the nature of the work for which they seek payment, the estate and the integrity of the bankruptcy system are injured as a result.  *Columbia Plastics, Inc*., 251 B.R. at 590–91.  Merely reducing the requested compensation by the amount of the improper request is not a sufficient deterrent to such overreaching conduct.  *Id*.

The Trustee and the other professionals were put on notice that the Court has significant concerns about their conduct throughout the case.  The specific issues raised by the Court included a) the inconsistent statements about the solvency of the estate, b) the misleading opposition to the breakup fee request of the bidder for the Tomball, Texas assets, c) the unauthorized and undisclosed payments to the Trustee and/or Cascade and to attorneys, d) the inconsistent statements about the necessity of the Dayton Lease, e) the fees requested by Cascade included time for non-accounting services, f) incorrect statements about the dies owned by the estate, g) the communications with and about certain Committee members, and h) the time devoted to certain tasks, such as litigating against Diane Erdmann and the category "Investigation—FBI/UST ."  The Court afforded the Trustee and other professionals multiple opportunities to submit supplemental declarations to address these and other concerns.  *See, e.g.,* Dkt. Nos. 1980, 1981, 1982, 2015, 2016, 2036, 2037, 2039, and 2063.  The Court considered all these declarations and found, for the reasons already stated, multiple instances of misleading and inaccurate statements, improper billings, unauthorized payments, and other troubling conduct.  Accordingly, the Court must consider further reductions to any compensation that it might otherwise award the professionals in this case.

1.     The Trustee.

Initially, the Court notes there is insufficient evidence to support the accusations of the Pehls that the Trustee concealed, lost, or transferred estate assets to others.  The Pehls did not appear in Court to explain their contentions, did not seek an evidentiary hearing, and did not take any other action to advance their allegations.

The evidence does show the Trustee made many poor decisions in this case. The Trustee spent nearly a year and incurred hundreds of thousands of dollars in legal fees to acquire the rights to the Dayton Lease that he later stated was "bad." The CEO employed by the Trustee confirmed the Trustee's later assessment when he lamented that the Dayton Lease was the biggest obstacle to reorganizing the company. By the time the Trustee prevailed in the Medallic Litigation, the Mint experienced a major downturn in sales, precluding any chance of a reorganization. He then incurred another $150,000 in legal fees to litigate the cure obligations because he failed to memorialize his alleged agreement with the Hoffs. In the eight months that he attempted to sell the business as going concern, he accepted one offer—from a buyer who tried to cobble together the down payment with a "Go Fund Me" page. When the Trustee discovered that this buyer could not perform, he shut down the business and immediately terminated all employees, resulting in WARN Act claims and a large administrative expense claim of the Hoffs.

But the Trustee did not merely make a series of bad judgment calls. He violated the Bankruptcy Code, Bankruptcy Rules, and orders of the Court, and he made multiple misrepresentations, large and small, to the Court and other parties. The myriad transgressions include the following:

a) After the Court denied the Trustee's request to be eligible to receive expense reimbursements under the interim payment procedures, the Trustee still reimbursed himself without Court approval.

b) On nine monthly operating reports the Trustee checked the "no" box in response to the question of whether any professionals had received payments even though he had paid himself or Cascade.

c) The Trustee used estate funds to pay two sets of lawyers without obtaining authority to either employ the lawyers or compensate them.

d) After he secured an order approving bid procedures, the Trustee disregarded the order, resulting in an invalid sale process, additional and unnecessary legal and transactional costs for several parties, and erosion of confidence in the system.

e) Directly to the Court and through his counsel, the Trustee made multiple inconsistent and inaccurate statements about the financial condition of the estate and the prospects of a reorganization.

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–80

      f)     Directly to the Court and through his counsel, the Trustee repeatedly declared the necessity of the Dayton Lease, but when it suited his purposes he argued and testified under oath that the Dayton Lease was not necessary because he had identified a suitable and less expensive space to rent.

      g)     Even though he assured the Court he would not seek to compensation as an accountant for performing his trustee duties, Cascade's application includes approximately 340 hours of Mr. Calvert's time for performing trustee or clerical tasks.

      h)     Even though he was aware of the Court's concerns about the conflicts inherent with a trustee hiring his own firm, the Trustee not only failed to monitor and review Cascade's invoices but caused Cascade to seek compensation for clerical tasks and trustee work, like getting the mail, reviewing proofs of claim, making photocopies, taking photos, and compiling notebooks.

      i)     Through his counsel, the Trustee falsely represented to the Court that he objected to the amount of the break-up fee sought by an initial bidder, when in fact he instructed the bidder to submit the requested amount to the Court.

      j)     Directly and through his counsel, the Trustee told the Court and creditors that the estate owned hundreds of thousands of dies when that was not the case. He even told a customer that he had over 400,000 dies and was going to improperly charge a fee to research the customer's inquiry about a die.

Bankruptcy trustees are entitled to broad immunity from suit when acting within the scope of their authority and pursuant to court order. *See Mullis v. United States Bankruptcy Court*, 828 F.2d 1385, 1390–91 (9th Cir.1987), *cert. denied*, 486 U.S. 1040, 108 S.Ct. 2031, 100 L.Ed.2d 616 (1988); *Lonneker Farms, Inc. v. Klobucher*, 804 F.2d 1096, 1097 (9th Cir.1986). However, a trustee may be liable for "intentional or negligent violations of duties imposed upon him by law." *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1357 (9th Cir.1983), *citing Mosser v. Darrow*, 341 U.S. 267, 274, 71 S.Ct. 680, 683, 95 L.Ed. 927 (1951). A trustee has a duty to preserve the assets of an estate and must "exercise that measure of care and diligence that an ordinarily prudent person would exercise under similar circumstances." *Rigden*, 795 F.2d at 730. Out of this apparent conflict, certain standards have evolved which a trustee must satisfy before immunity may attach: the trustee should obtain court approval and give notice to the debtor of a proposed action; the trustee's disclosure to the court must be candid; and the act must

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–81

be within the trustee's official duties. *Bennett v. Williams*, 892 F.2d 822, 823 (9th Cir. 1989) (citations omitted).

In one case, a bankruptcy court found a chapter 11 trustee breached his fiduciary duty to estate when a) he paid a retention bonus to his administrative assistant of $10,000 without first obtaining authorization from the court and without notice to parties in interest, b) he made eight payments (none larger than $5,000) to a party who performed tax accounting services for debtors without filing motions with the court for allowance of professional compensation and in absence of any court order, c) he made four payments to a law firm that represented him without court authority, and d) he knowingly and intentionally paid trustee's fees to himself or his law firm without first obtaining court approval. *NWFX, Inc.*, 267 B.R. at 168–170, 203.

The Trustee's improper conduct, not his poor decisions, warrants further deductions to his fee request. He is not entitled to immunity because his disclosures to the Court were not candid: he misled the Court on multiple occasions, testified inconsistently on the stand, filed monthly reports with false statements, and made unauthorized payments to himself and others. In addition, one of his employees carrying out his settlement protocol made false statements to dozens of customers. The Trustee also disregarded rules and the bidding procedures order. Like the trustee in *NWFX*, the Trustee breached his duties to the estate. These acts damage the integrity of the bankruptcy system. Denial of all compensation to the Trustee is the appropriate result. The Court allows reimbursement of $14,007.63 of the Trustee's expenses. Since he already reimbursed himself $32,389.85, the Trustee must disgorge $18,382.22.

2. <u>Cascade</u>.

In connection with Cascade's employment and at the hearing on the initial fee applications in October 2017, the Court expressly warned Mr. Calvert that a) he should not include trustee work in Cascade's fee application, and b) Cascade is entitled to compensation only for accounting services. Despite these warning, Cascade submitted a fee application asserting it is entitled to hundreds of thousands of dollars for Mr. Calvert's trustee duties and for performing tasks that clearly did not involve accounting expertise.

Nonetheless, the evidence does not support a conclusion that Cascade misrepresented the nature of the work for which it seeks payment. On the contrary, Cascade has submitted detailed and candid descriptions of its services to the estate—and this candor leads to the Court's

determination that hundreds of hours are not compensable. The Court will not further reduce Cascade's compensation.

Since the Court is denying all compensation to the Trustee, Cascade might argue it should be compensated for performing the Trustee's duties since the total fees for trustee work will not exceed the statutory cap of section 326(a). But it would be anomalous to reward Mr. Calvert's accounting firm for performing trustee work because Mr. Calvert's own conduct warrants denying him compensation as trustee. Cascade did not know the Court would disallow the Trustee's compensation request, so it should not have sought compensation for tasks that clearly were not accounting work. More importantly, the statutory cap on the Trustee's compensation does not come into the analysis at all because the Bankruptcy Code plainly allows Cascade compensation only for accounting services and proscribes compensation for performing duties of the Trustee. 11 U.S.C. §328(b). Even if having Ms. Gilmore (who did much of the non-compensable clerical work) perform trustee work saved the estate money because her hourly rate was lower than the Trustee's, the Court may not award Cascade compensation for those tasks when the Bankruptcy Code prohibits it. *See In re Virissimo*, 354 B.R. 284, 288 (Bankr. D. Nev. 2006) (whether the trustee fees are below or above the statutory cap is irrelevant to determination of whether professional is entitled to fees).

3.      <u>Trustee Counsel</u>.  As noted in the discussion of the Trustee's conduct, many misrepresentations to the Court were made through Trustee's Counsel. Indeed, Trustee Counsel actively advanced three of the most consequential and egregious false narratives: a) repeatedly assuring the Court the estate was administratively solvent but stating the exact opposite when it suited the interests of the Trustee and Trustee Counsel; b) filing a strident objection to a break-up fee request knowing that the Trustee had encouraged the request; and c) after repeatedly asserting that acquiring the Dayton Lease was critical to the success of the case, it later argued that the Dayton Lease was "bad" and that the Trustee had a better option.

"An attorney's duty goes beyond not merely putting false evidence before the court; the duty is greater—the lawyer has a duty to not make misrepresentations to the court." *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 840 (Bankr. C.D. Cal. 1991) (*citing In re Disciplinary Action David L. Curl*, 803 F.2d 1004, 1005–06 (9th Cir. 1986)); *see also In re Dinova*, 212 B.R. 437, 447 (B.A.P. 2d Cir. 1997). "Improper conduct on the part of officers or attorneys has frequently been penalized by withholding compensation or reimbursement or both." *Wilde Horse*

ORDER ON FEE APPLICATIONS OF TRUSTEE, CASCADE CAPITAL GROUP, LLC, K&L GATES, AND MILLER NASH GRAHAM & DUNN–83

*Enterprises*, 136 B.R. at 844 (*citing Matter of Ranchero Motor Inn, Inc.*, 527 F.2d 1044, 1047 (9th Cir. 1975)).

Unfortunately, Trustee Counsel failed to meet its duty to not make misrepresentations to the Court. Consequently, the Court could deny all compensation to Trustee Counsel based on this conduct. But the Court also knows the lawyers who represented the Trustee enjoy excellent representations in the community, and the Court is not aware of any prior conduct that remotely resembles what happened in this case. Trustee Counsel vigorously represented its client and implemented the Trustee's strategy, and consequently found itself making unfortunate statements. While the attorneys should have refused to engage in the problematic conduct, in practice it is difficult for an attorney to say no to a client, particularly when representing a bankruptcy trustee; if the trustee is determined to proceed on a course of action, then either counsel will need to withdraw or the trustee will have to engage special counsel to handle the specific matter. Either way, the attorney's refusal to follow the trustee's direction will certainly become public, placing the attorney and the client in an uncomfortable relationship.

For these reasons, the Court will not disallow the entire fee request. Instead, the Court will reduce the otherwise allowable amount (which is $2,180,855.80) in half. The Court allows Trustee Counsel compensation of $1,090,427.90 and reimbursement of $53,586.23 of its expenses.

4. <u>Committee Counsel.</u> The Court is troubled by the accusations that Committee Counsel treated several Committee members (the Pehls and William Hanson) unfairly. There is some evidence to support the charges. None of these Committee members, however, appeared in court to provide evidence or argument sufficient to sustain their charges. The Court will not deduct any additional amounts from the fee request of Committee Counsel.

## III. <u>CONCLUSION AND ORER</u>

For the reasons stated above, the Court ORDERS the following:

1. The Final Application for Payment of Fees and Reimbursement of Expenses of Counsel for the Official Unsecured Creditors' Committee (Dkt. No. 1894) is approved in part, and the Court awards Counsel for the Official Unsecured Creditors' Committee fees of $371,176 as **final** compensation and denies the additional compensation requested in application;

2.     The First Application for Compensation of Cascade Capital Group, LLC as Accountants for the Chapter 11 Trustee (Dkt. No. 1924) ) is approved in part, and the Court awards Cascade Capital Group, LLC fees of $539,867.70 as **<u>interim</u>** compensation and reimbursement of expenses of $14,123.05 and denies the additional compensation and reimbursements requested in its application;

3.     The Trustee's First Application for Compensation (Dkt. No. 1926) is approved in part, and the Court awards the Chapter 11 Trustee reimbursement of expenses of $14,007.03 and denies all compensation and the additional reimbursements requested in his application;

4.     K&L Gates LLP Application for Compensation (Dkt. No. 1928) is approved in part, and the Court awards K&L Gates LLP fees of $1,090,427.90 as **<u>interim</u>** compensation and reimbursement of expenses of $53,586.23 and denies the additional compensation and reimbursements requested in its application;

5.     The Trustee is authorized to immediately disburse the following amounts:

a)     To Counsel for the Official Unsecured Creditors' Committee, the sum of $371,176 less the prior interim payment of $56,990.18, for a total payment of <u>$314,185.82</u>;

b)     To Cascade Capital Group, LLC, the sum of $539,867.70 plus $14,123.05 less the prior interim payment of $10,338.70, for a total payment of <u>$543,652.05</u>; and

c)     To K&L Gates LLP, the sum of $1,090,427.90 plus $53,586.23 less the prior interim payment of $232,671.12, for a total payment of <u>$911,342.03</u> ; and

6.     Within fourteen (14) days of entry of this Order, the Chapter 11 Trustee shall return to the estate $18,382.22.

///END OF ORDER///